**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Action No.:

UNITED STATES OF AMERICA,

Plaintiff,

v.

**MICHAEL AARON TEW**,
**Defendant.**

---

**INFORMATION**

---

The United States Attorney charges that:

**GENERAL ALLEGATIONS**

1. At all times relevant to the charges contained in this Information, MICHAEL AARON TEW resided in the State and District of Colorado.

2. At all times relevant to the charges contained in this Information, N.A.C., Inc. ("NAC") is a company headquartered in Florida and with an office in New York. NAC operates in the United States and is affiliated with the company N.A.C. Group, Inc., d/b/a/ N.A., which is an airline that provides freight forwarding solutions, to include by charter and airlift. N.A.C. Holdings, Inc. ("NAC Holdings") is also an affiliate of N.A.C. NAC, N.A., and NAC Holdings are collectively "the Victim Company."

3. Between a time unknown but no later than 2015 and until in or around September 2018, MICHAEL AARON TEW was a contracted Chief Financial Officer (CFO) for the Victim Company.

4. In or around February 2012, MICHAEL AARON TEW registered the entity Sand Hill, LLC in the State of New York. In or around November 2018, MICHAEL AARON TEW registered Sand Hill, LLC as a foreign limited liability company in the State of Colorado.

5. The Victim Company paid for MICHAEL AARON TEW's contracted professional services on a monthly basis. Payments for those services were made to Sand Hill, LLC.

6. MICHAEL AARON TEW was terminated by the Victim Company in or around September 2018.

7. At all times relevant to the charges contained in this Information, K.T. resided in the State and District of Colorado.

8. Beginning at some point in time unknown but not later than 2016 and until in or around July 2020, J.Y. was an employee of the Victim Company. Among the roles he held at the Victim Company, J.Y. served as the Director of Finance, and at some point in time after 2016, he assumed the role of Controller, but continued his responsibilities as the Director of Finance. J.Y.'s employment was terminated by the Victim Company on or around July 7, 2020.

## COUNT ONE

9. Beginning by at least August 2018, and continuing thereafter until about July 2020, in the State and District of Colorado, and elsewhere,

**MICHAEL AARON TEW**

and others, including J.Y. and K.T., and others unknown, did knowingly combine, conspire, confederate and agree together with other persons to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

**MANNER AND MEANS OF THE CONSPIRACY**

It was part of the conspiracy that:

10. The defendant and others, known and unknown, submitted or caused to be submitted fraudulent invoices for payment to the Victim Company. These invoices contained material false pretenses and representations about the provision of services purportedly provided to the Victim Company.

11. It was part of the conspiracy that these invoices were submitted by or on behalf of multiple corporate entities. H.S. CPAs LLC (HS CPAs); M.C.G., Inc. ("MCG"); 5530 J.D., LLC, ("5530 JD"); and P.M., Inc. ("PM") may have been or purported to be real companies whose existence predated the scheme to defraud. These four entities were operated by or otherwise affiliated with individuals who were contacts of the defendant or K.T. The defendant created and registered another entity, Global Fuel Logistics, Inc. ("GFL") in at least Wyoming and Colorado for the purpose of having different names on the fraudulent invoices submitted to NAC or its affiliates. The defendant, in coordination and consultation with K.T. and J.Y., also submitted fraudulent invoices on behalf Aero Maintenance Resources ("AMR"), a so-called "division" of GFL. On some occasions, the defendant used or caused to be used the name "SHI LLC" as the recipient payee on the fraudulent invoices. SHI LLC does not legally exist in Colorado, Michigan, New York, or Florida, but was shorthand for "Sand Hill, LLC."

12. It was further part of the conspiracy to provide indicia of legitimacy on the

fraudulent invoices, including:

a. Unique, non-consecutive invoice numbers, which implied that invoices were being directed to companies beyond the Victim Company;

b. Listing the entity that was purportedly providing services, a description of services and, sometimes, a project name, as well as a due date;

c. Identifying a sum certain, sometimes round numbers and other times specific numbers, that were associated with the purported provision of certain numbers of hours of service or work and which were sometimes reduced by "adjustments;"

d. Identifying real bank account information for the entities, even if the entity was not in fact associated with that bank account; and

e. Identifying a purported specific person, "Jessica Thompson," as a contact person in the "Accounting Department" for questions about the invoices from GFL and AMR. "Jessica Thompson" did not in fact exist.

13. It was further part of the conspiracy that at some point after the fraudulent invoices began to be submitted, the defendant, in consultation with J.Y., began providing more specific descriptions of the falsely claimed services listed on the invoices in an attempt to demand payment for services that more closely aligned with the work of the Victim Company and therefore would not arouse suspicion or detection. Initially, the fraudulent invoices contained generic descriptions of service like consulting services or "service fee" but over time, those descriptions grew more specific with later fraudulent invoices bearing descriptions like "Trailing Edge Flap[,]" "Replacement of Moisture Barrier over Kevlar (Labor Hours)[,]" and "A-330-200 (N819CA) Crew / Operations / Staff Training[.]"

14. It was part of the conspiracy that on multiple occasions between no later than August 2018 and July 2020, the defendant, and on some occasions, K.T., contacted J.Y. to request, and at times demand, money. The fraudulent invoices were used by the defendant, K.T., and J.Y. as the cover to receive money from the Victim Company largely into accounts controlled or operated by the defendant and K.T.

15. To accommodate these demands for payment, J.Y., in his role as Controller and also fulfilling the responsibilities as the Director of Finance for the Victim Company often advised the defendant and K.T. about the financial status of NAC and/or its affiliates so that payments of the fraudulent invoices did not result in the Victim Company overdrawing its bank accounts, which would invite scrutiny. The defendant and K.T. sometimes adjusted the amount demanded on the fraudulent invoices based on what J.Y. shared about the financial status of the Victim Company.

16. If J.Y. deferred or delayed payment of the fraudulent invoices based on the financial status of the Victim Company, the defendant and K.T. sometimes pressured or threatened J.Y. to induce him to pay the invoices.

17. The defendant and others known and unknown submitted or caused to be submitted these invoices to J.Y. J.Y. approved and authorized some or all of the payments of these fraudulent invoices. This approval and authorization caused the Victim Company to pay the defendant and others associated with the defendant, including K.T., more than $5,000,000.00 for services the Victim Company never received.

18. Acting largely through J.Y., the Victim Company paid these fraudulent invoices

through automated clearinghouse (ACH) transactions or wire transfers, both of which traveled via interstate wire from the Victim Company's account at Signature Bank in New York to numerous bank accounts maintained by the defendant and K.T. in Colorado as well as to other accounts controlled by their affiliates.

19. J.Y. often paid the fraudulent invoices in installments or "progress payments." That is, he authorized and approved multiple ACH transfers or wire transfers where each transfer was for an amount less than the total amount of an invoice to try to pay the defendant and K.T. with whatever money was available to the Victim Company at that time. The defendant and K.T. accepted partial payments based on what the Victim Company could afford at any given time during the conspiracy. Sometimes partial payments were made by the Victim Company prior to the receipt of an invoice to satisfy the defendant and K.T.'s demands for money.

20. The defendant and K.T. also maintained multiple bank accounts at multiple financial institutions; some they held in their individual names and others were joint accounts. Through these multiple accounts, they each made numerous transfers of funds that originated from the fraud against the Victim Company. On many occasions, those transfers led to several cash withdrawals in a single day from accounts controlled by the defendant and K.T. individually or jointly. After withdrawing cash that originated from payments by the Victim Company, often the defendant and sometimes K.T. deposited the aggregated amount of cash from that day or over a few days into Bitcoin ATMs, where they were able to deposit United States dollars in exchange for Bitcoin.

21. It was part of the conspiracy that when a bank that held accounts receiving payments from the Victim Company during the early part of the conspiracy closed

some or all of the defendant and/or K.T.'s accounts, the defendant and K.T. then created multiple accounts at a credit union, of which K.T. was a member. When that credit union questioned what appeared to be the payment of corporate funds into personal accounts, the defendant, in coordination and consultation with K.T., changed the type of account from individual to business to facilitate the ongoing receipt of payments for the defendant and K.T.'s benefit.

All in violation of Title 18, United States Code, Section 1349.

**COUNT TWO**

22. On or about the date identified below, within the District of Colorado and elsewhere, **MICHAEL AARON TEW** did knowingly engage in and attempt to engage in monetary transactions, specifically the withdrawal described below, in and affecting interstate commerce, by, through and to one or more financial institutions, in criminally derived property that was of a value greater than $10,000 and that was derived from specified unlawful activity, specifically, conspiracy to commit wire fraud and wire fraud, in violation of Title 18 United States Code, Sections 1343 and 1349, knowing that the property involved in such monetary transactions represented the proceeds of some form of unlawful activity, as follows:

| Count | Approx. Date | Approx. Amount | Transaction |
|---|---|---|---|
| Two | September 18, 2019 | $15,000.00 | Withdrawal from Wells Fargo account ending in 6934, held in the name of Sand Hill, LLC, an account for which MICHAEL AARON TEW had signature authority. |

All in violation of Title 18, United States Code, Section 1957.

**COUNT THREE**

23. The allegations contained in paragraphs 1 through 22 are realleged and incorporated as if fully set forth in this paragraph.

24. From 2018 to at least July 2020, in the State and District of Colorado, and elsewhere, MICHAEL AARON TEW, a resident of Colorado, did willfully attempt to evade and defeat income tax due and owing to him to the United States of America, by failing to file a 2019 tax return, on or before July 15, 2020, as required by law, to any proper officer of the Internal Revenue Service, failing to pay the Internal Revenue Service the income tax due and owing, and committing the following affirmative acts of evasion, among others, knowing the likely effect of each of which would be to mislead or conceal his true and correct income and taxes due thereon from the proper officers of the United States of America, by:

a. Invoicing the Victim Company in nominee company names, to include fraudulently invoicing the Victim Company on behalf of HS CPAs, M.C.G., 5530 JD, and P.M.;

b. Incorporating GFL in Wyoming after discussion with J.Y. about how it would arouse suspicion to have invoices paid directly to the defendant and/or K.T, setting up a new bank account listed on the GFL invoices to receive fraudulent payments, and listing indicia of identity for the GFL registration in the States of Wyoming and Colorado to be steps removed from the defendant's name and address; and

c. Sending invoices on behalf of a new entity, AMR, to evade detection of significant amounts of payments being sent to GFL.

All in violation of Title 26, United States Code, Section 7201.

**FORFEITURE ALLEGATION**

25. The allegations contained in Counts One and Two of this Information are hereby re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to the provisions of Title 18 United States Code, Section 982(a)(1), 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

26. Upon conviction of the violation alleged in Count One of this Information involving the commission of violations of Title 18, United States Code, Sections 1343, 1349, defendant MICHAEL AARON TEW shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any and all of the defendant's right, title and interest in all property constituting and derived from any proceeds the defendant obtained directly and indirectly as a result of such offense, including, but not limited to: any proceeds from the sale of a 2016 Audi, VIN # WAUFFAFL3GN002447A and a money judgment in the amount of other proceeds obtained by the defendant.

27. Upon conviction of the violation alleged in Count Two of this Information involving violation of Title 18, United States Code, Section 1957, defendant MICHAEL AARON TEW shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1) any and all of the defendant's right, title and interest in all property, real or personal, involved in such offense, or all property traceable to such property, including, but not limited to: a money judgment in the amount of proceeds obtained by the by the defendant.

28. If any of the property described above, as a result of any act or omission of the defendant:

a) cannot be located upon the exercise of due diligence;
b) has been transferred or sold to, or deposited with, a third party;
c) has been placed beyond the jurisdiction of the Court;
d) has been substantially diminished in value; or
e) has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of said defendant up to the value of the forfeitable property.

Respectfully submitted this 29th day of September, 2020.

JASON R. DUNN
United States Attorney

*s/ Hetal J. Doshi*
Hetal J. Doshi
Matthew T. Kirsch
Assistant United States Attorneys
United States Attorney's Office
1801 California Street, Suite 1600
Denver, Colorado 80202
Telephone: (303) 454-0100
Email: Hetal.Doshi@usdoj.gov
Matthew.Kirsch@usdoj.gov

*Attorneys for the United States*