UNITED STATES DISTRICT COURT
for the
District of Colorado

In the Matter of the Search of )
*(Briefly describe the property to be searched or identify the person by name* )  Case No. 20-sw-00896-MEH
*and address)* )
)
In the Matter of the Search of )
**3222 East First Avenue, Apartment 224, Denver,** )
**Colorado 80206** more fully described in Attachment A, )
attached hereto, to include the person of Kimberley Tew at )
the time of the search warrant execution )
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the __State and__ District of __Colorado__ *(identify the person or describe property to be searched and give its location)*:

**SEE "ATTACHMENT A"**, which is attached to and incorporated in this Application and Affidavit
The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

**SEE "ATTACHMENT B"**, which is attached to and incorporated in this Application and Affidavit
The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

  X   evidence of a crime;

  X   contraband, fruits of crime, or other items illegally possessed;

  X   property designed for use, intended for use, or used in committing a crime;

  ☐   a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of __18__ U.S.C. §§ __371, 1343, 1349, 1519, 1956, and 1957__, and the application is based on these facts:

  X   Continued on the attached affidavit, which is incorporated by reference.

  ☐   Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*s/ Sarah Anderson*
*Applicant's signature*

Sarah Anderson, Special Agent, FBI
*Printed name and title*

Sworn to before me and:   ☐ signed in my presence.
           ☒ submitted, attested to, and acknowledged by reliable electronic means.

Date: 07/31/2020
*Judge's signature*

City and state: Denver, CO     Michael E. Hegarty, U.S. Magistrate Judge
*Printed name and title*

EXHIBIT A

SW_00000031

# ATTACHMENT A

## DESCRIPTION OF LOCATION TO BE SEARCHED

The Subject Premises are at **3222 East First Avenue, Apartment 224, Denver, Colorado 80206,** and include the person of Kimberley Tew, an occupant of this residence. The Subject Premises are further described as a multi-family apartment building located at the southeast intersection of East First Avenue and Steele Street. The entrance to the apartment building is on East First Avenue. The Subject Premises are located within the Steele Creek apartment complex.



The apartment building has an elevator in the lobby, and the Subject Premises are on the second floor.



The place to be searched includes all rooms for the apartment unit 224 pictured and described above, including the person of Kimberley Tew, a person who resides at this apartment unit, at the time of the search warrant execution.

2

# ATTACHMENT B

## DESCRIPTION OF ITEMS TO BE SEIZED AND SEARCHED

The following items, located at the Subject Premises that constitute evidence of the commission of, contraband, the fruits of crime, or instrumentalities of violations of 18 United States Code, Sections 371, 1343, 1349, 1519, 1956, and 1957 (hereinafter "**Subject Offense(s)**") occurring between January 2018 to July 31, 2020.

A. Two cloth, or similar material, bags approximately the size of an 8.5 by 11 inches piece of paper, with one bag bearing the insignia, label or logo of Wells Fargo, and the other bearing an insignia, label, or logo of another bank.

B. An Apple iPhone device for phone number 917-446-2046, for which there is probable cause to believe contains the following items, that constitute evidence of the commission of, contraband, the fruits of crime, or instrumentalities of the **"Subject Offenses"**:

   1. Any and all information, notes, software, documents, records, or correspondence, in any format and medium, pertaining to violations of **Subject Offenses**.

   2. Any and all address books, names, and lists of names and addresses of individuals who may have been contacted by use of the Device(s) or by other means for the purpose of committing violations of **Subject Offenses**.

   3. Any and all information, records, documents, invoices and materials, in any format or medium, that concern any accounts with an Internet Service Provider pertaining to violations of **Subject Offenses**.

   4. Any and all information, records, documents, invoices and materials, in any format or medium, that concern e-mail accounts, online storage, or other remote computer storage pertaining to violations of **Subject Offenses**.

   5. Records of Internet activity, including Internet Protocol addresses, firewall logs, transactions with Internet hosting providers, co-located computer systems, cloud computing services, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses pertaining to violations of **Subject Offenses** or that show who used, owned, possessed, or controlled the Device(s).

   6. Any and all information, documents, records, photos, videos, or correspondence, in any format or medium, pertaining to use or ownership of the Device(s), the location of the use of the Device, or that aid in the identification of persons involved in violations of **Subject Offenses**.

   7. Credit card information, bills, and payment records pertaining to violations of **Subject Offenses**.

   8. Documents, correspondence, records, or information, in any format or medium, relating to the transfer, purchase, sale or disposition of virtual currency or cryptocurrency.

1

9. Records, correspondence, and documents, in any format or medium, pertaining to banking, real estate, or other financial transactions, including the sale of goods, that constitute evidence of or proceeds of the Subject Offenses or the concealment or expenditure of proceeds of the Subject Offenses.

10. Any and all hidden services accounts used in furtherance of the **Subject Offenses**, including darknet market accounts, associated darknet forum accounts and Tor-based email accounts.[2]

11. Descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to violations of **Subject Offenses**.

12. Evidence of who used, owned, or controlled the Device(s) to commit or facilitate the commission of the crimes described, or at the time the things described in this warrant were created, edited, or deleted, including photographs, videos, logs, call logs, phonebooks, address books, contacts, IP addresses, registry entries, configuration files, saved usernames and passwords, documents, calendars, browsing history, search terms, metadata, user profiles, e-mail, e-mail contacts, messages (text or voice), instant messaging logs, file structure and correspondence.

13. Evidence of software that may allow others to control the Device(s), such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security provisions or software designed to detect malicious software or unauthorized use of the device, and evidence of the lack of such malicious software.

14. Evidence of the attachment to the Device(s) of other storage devices or similar containers for electronic evidence.

15. Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Device(s).

16. Evidence of how and when the Device(s) were used or accessed to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

17. The telephone number, ESN number, serial number, and/or SIM card numbers of or contained in the Device(s).

18. Passwords, encryption keys, and other access devices that may be necessary to access the Device(s).

19. Contextual information necessary to understand the evidence described in this attachment.

---

[2] Hidden services (.onion services) are accessed through the Tor anonymity network. Most are considered dark web services with no legitimate or identified service provider to which legal process may be served.

2

Executing law enforcement personnel are authorized to depress the fingerprints and/or thumbprints of persons reasonably believed to be the user(s) of the Device onto the Touch ID or fingerprint sensor of any Apple iPhone, iPad, or other Apple brand device, or other device that has a fingerprint sensor, in order to gain access to the contents of any such device. Law enforcement personnel may also depress the fingerprints and/or thumbprints of persons reasonably believed to be the user(s) of the Device in order to gain access to applications on the device that may be locked with a fingerprint or thumbprint

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

If the government identifies seized communications to/from an attorney, the investigative team will discontinue review until a filter team of one or more government attorneys and other government personnel, as needed, is established. The filter team will have no previous or future involvement in the investigation of this matter. The filter team will identify and segregate communications to/from attorneys, which may or may not be subject to attorney-client privilege. At no time will the filter team advise the investigative team of the substance of any of the communications to/from attorneys. The filter team then will provide all communications that do not involve an attorney to the investigative team, and the investigative team may resume its review. If the filter team believes that any of the communications to/from attorneys are not actually privileged (e.g., the communication includes a third party), and if the investigation is not covert, the filter team will first seek to obtain agreement from the appropriate defense counsel before providing these attorney communications to the investigative team. If consulting with defense counsel is not possible or does not produce an agreement, the filter team will obtain a court order before providing these attorney communications to the investigative team.

DEFINITIONS:

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

3

# AFFIDAVIT

I, Sarah Anderson, being duly sworn, hereby depose and state that the following is true to the best of my information, knowledge, and belief:

## INTRODUCTION AND AGENT BACKROUND

1. I am a Special Agent employed by the Federal Bureau of Investigation ("FBI"), and have been since 2008 with primary investigative responsibilities involving criminal matters particularly related to economic or white collar crimes. I have participated in several fraud investigations, with many of those investigations involving wire fraud, mail fraud, money laundering and bank fraud. Prior to my employment with the FBI, I served nine years in the United States Army. My primary service in the military was as a finance officer.

2. At all times during the investigation described in this affidavit, I have been acting in my official capacity as a Special Agent with the FBI and have conducted interviews, collected and reviewed documents, and obtained information from the sources outlined in the following paragraphs as they relate to the issue of probable cause. The Internal Revenue Service's Criminal Investigation Division ("IRS-CID") is partnering with the FBI in investigating the theft of funds from National Air Cargo, a Florida company.

3. This affidavit is submitted in support of an application for a search warrant for the place described in Attachment A (hereinafter "Subject Premises,"), and the Apple iPhone for telephone number 917-446-2046 ("the Device") and two cloth bags located therein. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of violations of 18 United States Code §§ 371, 1343, 1349, 1519, 1956 and 1957 are located in the place described in Attachment A.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

4. Based on my training and experience, I use the following technical terms to convey the following meanings:

5. A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet including websites, social media sites, bulletin boards, file sharing, and other Internet sites. Wireless telephones often have a subscriber identity module or subscriber identification module ("SIM"), which is an integrated circuit that securely stores the International Mobile Subscriber Identity ("IMSI") and the related key used to identify and

1

authenticate subscribers on mobile telephone devices. A SIM is embedded into a removable "SIM card," which can be transferred between different mobile devices. A SIM card contains a unique serial number ("ICCID"), IMSI, security authentication and ciphering information, temporary information related to the local network, a list of the services to which the user has access, and certain passwords. Most SIM cards will also store certain usage data, such as call history, text ("SMS") messages, and phone book contacts. Such telephones may also contain removable storage media, such as a flash card—such devices can store any digital data, and can have the capacity to store many gigabytes of data. Wireless telephones may also be "smartphones," such that they operate as personal computers capable of accessing the Internet. They operate as GPS navigation devices, *see below*, and can store information about where they have been. They also contain digital cameras. The camera can mark a photo with location data so that upon examination it can be determined where and when a photo was taken. These images can sometimes be recovered even if the user has deleted the image. The smartphone can also connect to the internet using wireless connections, which allow for images, files and other information to be uploaded directly to the Internet or to other digital storage devices or computers. Smartphones also have software, giving them the same capabilities as personal computers including accessing and editing word processing documents, spreadsheets, and presentations. They can also operate as a "tablet," or mobile computer, and can contain software programs called applications. Those programs can perform different functions and save data associated with those functions, including use associated with the Internet. They also operate as personal digital assistants and have contacts and calendar functions. They also can contain media such as music and other files in large quantity.

6. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

7. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

8. A GPS navigation device uses the Global Positioning System to display its current location. It often contains records of the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

2

9. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

10. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

11. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

12. Based on my training and experience, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

13. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features, and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

14. The Device is an Apple product that may be currently locked. It may be equipped with "Touch ID." A Touch ID sensor, a round button on the iPhone or iPad, can recognize fingerprints. The fingerprints authorized to access the particular device are a part of the security settings of the device and will allow access to the device in lieu of entering a numerical passcode or longer alpha-numerical password, whichever the device is configured by the user to require. The Touch ID feature only permits up to five attempts with a fingerprint before the device will require the user to enter a passcode. Furthermore, if the device is equipped with an operating system that is earlier than version 9.3, the Touch ID feature will not substitute for the use of a passcode or password if more than 48 hours have passed since the device has been unlocked; in other words, if more than 48 hours have passed since the device was accessed, the device will require the

3

passcode or password programmed by the user and will not allow access to the device based on a fingerprint alone. If the operating system is version 9.3 or later, that time frame shrinks to 8 hours. Similarly, Touch ID will not allow access if the device has been turned on or restarted, if the device has received a remote lock command, or if five attempts to match a fingerprint have been unsuccessful. For these reasons, it is necessary to use the fingerprints and thumbprints of any device's users to attempt to gain access to any Apple devices found at the Subject Premises while executing the search warrant. The government may not be able to obtain the contents of the Apple devices if those fingerprints are not used to access the Apple devices by depressing them against the Touch ID button. Although I do not know which of the ten finger or fingers are authorized to access on any given Apple device and only five attempts are permitted, I know based on my training and experience that it is common for people to use one of their thumbs or index fingers for Touch ID, and in any event all that would result from successive failed attempts is the requirement to use the authorized passcode or password.

15. Similarly, in my training and experience I know that some applications loaded onto mobile devices or other electronic devices may be secured by the user with a thumbprint or fingerprint. Common among these types of applications are applications such as mobile banking apps or other financial applications, password storage applications, and secure communications apps, among others.

16. Further, if a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers (such as Apple's "Face ID") have different names but operate similarly to Trusted Face.

17. On July 28, 2020, Michael Tew provided me and other law enforcement officers what he believes to be the passcode for the Device. Kimberley Tew is, however, aware of the investigation because she was present when her husband was arrested on or around July 8, 2020 on a criminal complaint for violation of 18 United States Code, Section 1956. Kimberley Tew also knows that her husband Michael Tew has spoken with law enforcement officers on at least three occasions since his arrest. Her knowledge of the investigation and related actions are more fully described in the "Probable Cause" section of the affidavit below. There is reason to believe that Kimberley Tew may have changed her passcode.

18. Due to the foregoing, I am informing the Court that if law enforcement personnel encounter any Device(s) that are subject to seizure pursuant to the requested warrant and may be unlocked using one of the aforementioned biometric features, law enforcement personnel intends to obtain from Kimberley Tew the display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock any Device(s), including to (1) press or swipe the fingers (including thumbs) of Kimberley Tew to the fingerprint scanner of the Device(s) found at the Subject Premises; and/or (2) hold the Device(s) found at the Subject Premises in front of the face of Kimberley Tew to activate the facial recognition feature for the purpose of unlocking the Device(s) in order to search the contents as authorized by this warrant.

19. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

20. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information on the Device(s) that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device(s) were used, the purpose of the use, who used the Device(s), and when. There is probable cause to believe that this forensic electronic evidence might be on the Device(s) because:

   A. Data on the storage medium can provide evidence of a file that was once on the storage media but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   B. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   C. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

   D. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

   E. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

21. Nature of examination. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

22. I know from training and experience that digital storage devices can be very large in capacity, yet very small in physical size. Additionally, from training and experience, I know that those who are in possession of such devices also tend to keep them on their persons, especially when they may contain contraband or other evidence of a crime. The storage capacity of such devices can be as large as tens of gigabytes in size, which allows for the storage of thousands of images and videos as well as other digital information such as calendars, contact lists, programs and text documents. Such storage devices can be smaller than a postage stamp in size, which allows them to be easily hidden in a person's pocket.

5

## CRYPTOCURRENCY

23. Digital currency, such as Bitcoin, is a cryptocurrency and worldwide payment system. Cryptocurrency is decentralized as the system works without a central bank or single administrator. The system also uses strong cryptography to secure financial transactions, control the creation of additional units, and verify the transfer of assets. The network is peer-to-peer, and transactions take place between users directly, without an intermediary. These transactions are verified by network nodes through the use of cryptography and recorded in a public distributed ledger called a blockchain. Every Bitcoin transaction that occurs in the entire payment network, for example, is recorded on the blockchain.

24. There are various types of cryptocurrency. Individuals store information about their cryptocurrency, for example Bitcoin, in a Bitcoin virtual "wallet," which acts as a Bitcoin equivalent of a bank account. Bitcoin wallets have a private key and a public key, which is commonly known as the wallet address. Bitcoin wallets are largely electronic in nature and may be stored on mobile devices, external or removable media, or computers. Passwords for access to electronic wallets are typically complex and are often written down or saved in a readily accessible manner on paper, in a notebook, or on some electronic device. The public key is an auto-generated alphanumeric characters that when used together with a private key or password will open a wallet and allow funds to be sent or received. The public key can be provided to individuals who wish to consummate transactions with Bitcoin. The public wallet addresses for both ends of a transaction, or public key, are recorded on the blockchain when a transaction is processed.

25. Individuals conducting cryptocurrency transactions must use a computer or other electronic device, such as a smartphone, computer or electronic tablet, and/or computer to conduct transactions involving Bitcoin. Such devices are also necessary to access and conduct transactions on a Darknet marketplace, which in my training and experience provides the anonymity that facilitates illicit activity like money laundering

26. Much like traditional banking automated teller machines (ATMs), Bitcoin ATMs allow the deposit of fiat currency like United States dollars which can then immediately be converted into Bitcoin for specific wallets. In order to deposit fiat currency into a Bitcoin ATM and receive Bitcoin in return for the fiat currency, the ATM user must have a destination wallet address.

## PROBABLE CAUSE

27. During some portion of time between 2015 and September 2018, MICHAEL AARON TEW (M. TEW) served as a contracted chief financial officer (CFO) for a Florida company, which also has operations in New York, named National Air Cargo (NAC). He was a contractor for NAC rather than an employee. Between at least 2015 and present, he has resided in Colorado with his wife Kimberley Tew (nee Ventanen) (K. TEW). M. TEW and K. TEW share an apartment with their two minor children at 3222 East First Avenue, Apartment 224, Denver, Colorado 80206. On July 8, 2020, M. TEW was arrested on a criminal complaint for violation of Title 18 of the United States Code, Section 1956(h). K. TEW was present at the apartment for this encounter with law enforcement officers.

28. During the time M. TEW served as the contracted CFO for NAC, M. TEW was not paid directly by NAC for his services. Rather, he billed NAC and was paid by NAC through a single-member LLC, of which he was the only member. The name of that entity was Sand Hill LLC ("Sand Hill") and it was established by M. TEW in or around July 2012.

6

29. In or around September 15, 2018, NAC fired M. TEW for, *inter alia*, unauthorized use of a corporate credit card. The unauthorized use began in or around June 2018. According to NAC, the corporate credit card issued to M. TEW was being used to purchase approximately $45,000 of gift cards in round dollar amounts. In an interview with law enforcement officers in July 2020, M. TEW stated that he purchased those gift cards so that they could be easily, and largely anonymously, sold for cryptocurrency such as Bitcoin.

30. On July 1, 2020, the co-owner of NAC, Christopher Alf, and the Director of Accounting, Abby Schwartz, both advised that TEW's contractor agreement was terminated by NAC for several reasons. One reason was that Schwartz, with the input and assistance of others, determined that charges made by TEW on a corporate American Express card were fraudulent. The gift card charges were unauthorized and served no legitimate business purpose for NAC. Alf and Schwartz further advised that, since TEW's September 15, 2018 termination, NAC has had no further legitimate business dealings or contracts with M. TEW or K. TEW.

31. Between no later than August 2018 and present, M. TEW conspired with K. TEW and others known and unknown to engage in a scheme to commit wire fraud, to engage or attempt to engage in monetary transactions in criminally derived property of a value greater than $10,000 that derived from a scheme to defraud NAC via wire, and to knowingly conduct or attempt to conduct a financial transaction designed to conceal or disguise the nature, location, source, ownership or control of proceeds of the wire fraud.

32. Based on the investigation to date, this fraud began while M. TEW was still employed at NAC. In the summer of 2018, M. TEW directly or indirectly caused invoices to be submitted that falsely claimed the provision of services to NAC, or at the very least, overstated the amount of services. Based on the investigation to date, those invoices were submitted directly or indirectly to the then-Director of Finance for NAC, Jonathon Yioulos, who approved and then directly or indirectly executed the payment. Mr. Yioulos was initially interviewed on or around July 7 and 8, 2020. Based on the investigation to date, in the beginning of the conspiracy and scheme to defraud, payments were tendered directly to companies named Hannah Scaife CPAs LLC ("Scaife"), Meyers Consulting Group, Inc. (Meyers) and 5530 Jessamine Development LLC ("Jessamine"). Mr. Yioulos stated that he processed a payment during this time to Jessamine and said he later learned from M. TEW that the payment was fraudulent as Jessamine had not provided services to NAC, or at least not in the amount claimed.

33. After Tew's termination and beginning in or around December 2018 through June 2020, invoices were tendered to NAC on behalf of three companies named Global Fuel Logistics (GFL), Aero Maintenance Resources (AMR), and Political Media (PM). These three entities received payments from NAC in the amount of more than $4.5 million in the aggregate. Invoices from these companies referenced purported services such as "[b]usiness [c]onsulting," "fuel modification inspection & research," and "[m]aintenance." The payments to these three entities were executed through wires or Automated Clearinghouse (ACH) transactions. Many of the wires and ACH payments from NAC were made into accounts owned and controlled by M. TEW and, sometimes also by his wife K. TEW. Some of the accounts were business accounts belonging to Global Fuel Logistics or GFL, but other accounts were personal accounts belonging to M. TEW or K. TEW.

34. The invoices from GFL, AMR and PM were also fraudulent because they were for goods and services NAC never received. Moreover, according to NAC, GFL, AMR and PM were not properly approved vendors for NAC. On July 1, 2020, NAC's co-owner, Mr. Alf, advised that he was unaware of the fact of payments being directed to accounts either directly owned by M. TEW and K. TEW, or indirectly controlled by them. That same day, Mr. Alf stated that he was

7

also unaware at the time the payments were being made about the total amount of payments to these entities. The first payment to one of these three entities was made in or around December 2018 and the most recent payment was made by NAC on or around July 3, 2020. These are the payments to GFL, AMR, and PM known as of this time. There may be additional fraudulent payments to other entities for the benefit of M. TEW and/or K. TEW beyond the three entities identified above as well as additional payments to the three entities listed.

35. According to Mr. Yioulos, M. TEW, and at times K. TEW as well, continued to ask and demand that he process fraudulent invoices, even after M. TEW's employment at NAC was terminated. Mr. Yioulos described that between June 2018 and early July 2020, K. TEW contacted him via phone and/or text on multiple occasions. Mr. Yioulos described telling M. TEW that he had attempted to block K. TEW on his phone, but that she still was able to get through by using other phone numbers. Mr. Yioulos stated that M. TEW and K. TEW threatened to alert NAC about Mr. Yioulos's prior payment of fraudulent invoices and that such disclosure could threaten Mr. Yioulos's continued employment. Mr. Yioulos relayed that on one occasion, K. TEW directly contacted his now ex-wife via LinkedIn which Mr. Yioulos interpreted as a way for K. TEW to show Mr. Yioulos that she had access to his family. K. TEW, using the phone number 469-319-0152, also contacted Mr. Yioulos by text message on July 1, 2020, to request additional money from NAC. Through this investigation, I have learned that this 469-319-0152 phone number is issued by Google Voice. Google Play provides the following description of Google Voice: "Google Voice gives you a phone number for calling, text messaging, and voicemail. It works on smartphones and computers, and syncs across your devices so you can use the app in the office, at home, or on the go." https://www.businessinsider.com/what-is-google-voice-how-to-set-up-use (last accessed on July 30, 2020). According to M. TEW, K. TEW used Google Voice.

36. Mr. Yioulos also stated that while he exchanged various cryptocurrency with M. TEW and/or K. TEW at various points during this scheme, he only retained a few Bitcoin for his own personal benefit. Similarly, Mr. Yioulos stated that M. TEW and/or his wife K. TEW offered him season tickets to the Buffalo Bills for his assistance with the execution of this fraud, but he declined as he already had season tickets. M. TEW also stated that he may have offered to pay down some portion of Mr. Yioulos's student loans but that no such payments were made.

37. At some point after 2016, Mr. Yioulos assumed the role of Controller at NAC but maintained his responsibilities as the Director of Finance. He was TEW's point of contact at NAC between late 2018 and present. He was terminated by NAC on July 7, 2020.

38. Mr. Yioulos stated that M. TEW used the phone numbers 917-685-1312 and 917-669-7473 to communicate with him from at least June 2018 to present. According to Mr. Yioulos, M. TEW used the two phone numbers interchangeably, and their primary means of communication to discuss, execute, and cover up the fraud was via text message and telephone calls on these two phone numbers. M. TEW stated that he used the phone numbers 917-685-1312 and 917-669-7473 interchangeably to communicate with his wife K. TEW at 917-446-2046 about the particulars of the fraud and conspiracy.

39. Based on our investigation to date, TEW and his wife K. TEW maintained a complex and ever-revolving network of bank accounts into which the NAC funds were deposited. Once the NAC funds were deposited, those funds, in large part or in their entirety, were either withdrawn in cash or otherwise wired or transferred to other accounts and often, ultimately, into various cryptocurrency exchanges. Many of the cash amounts withdrawn, often with multiple cash withdrawals a day by M. TEW and sometimes by K. TEW, were then deposited into Bitcoin ATMs like those operated by Digital Vending Solutions d/b/a XBTeller and Digital Mint. M. TEW and K. TEW also used other Bitcoin ATM vendors. M. TEW often made or caused to be

8

made multiple withdrawals and deposits into Bitcoin ATMs in one day in lower dollar amounts. According to M. TEW, K. TEW did not initially have an account at XBTeller and Digital Mint because she did not possess a valid driver's license and they believed that the companies required a driver's license. That changed in the last several months as Digital Mint advised M. TEW that he could add K. TEW to his account and she has since deposited cash sourced from an account that received proceeds from NAC, directly or indirectly, into a Bitcoin ATM. M. TEW stated that on many occasions when he deposited the cash proceeds from traditional bank accounts into a Bitcoin ATM like XBTeller and Digital Mint, K. TEW texted him at one of his two phone numbers from 917-446-2046 to provide him the various wallet addresses for the cryptocurrency side of the transaction or a picture of the QR code[1] and/or wallet address. K. TEW also used the phone number 917-446-2046 to communicate with M. TEW, often by text, about the amount and destination of proceeds from NAC into other traditional bank accounts controlled or operated by, directly or indirectly, M. TEW and K. TEW.

40. M. TEW stated he used two bags interchangeably to carry cash withdrawn from traditional bank accounts that received proceeds from NAC. M. TEW stated he had two bags, one from Wells Fargo and one that he believed was from Guarantee Bank and Trust. M. TEW stated the banks sometimes provided these bags when customers withdraw large amounts of cash. Video footage from XBTeller on March 27, 2020 shows M. TEW holding a black cloth bag, approximately the size of an 8.5 by 11 inches piece of paper, while he feeds cash into one of XBTeller's Bitcoin ATMs. M. TEW zips the bag closed and carries the bag away from the Bitcoin ATM at the end of the transaction.

41. On July 4, 2020, M. TEW is pictured in photos taken at approximately 4 p.m. at an ATM at a Navy Federal Credit Union. He is pictured carrying a black cloth bag, approximately the size of an 8.5 by 11 inches piece of paper, with "Wells Fargo" written on the front. Based on Navy Federal Credit Union's records, M. TEW withdrew cash funds from several accounts including, but not limited to, 7088874917, 7095660572, 7095660556 and 7095660481 between 4 and 4:30 p.m. that day. On July 28, 2020, M. TEW stated that the Wells Fargo branded cloth bag along with the Guarantee Bank and Trust cloth bag are stored at his shared apartment with K. TEW.

42. M. TEW stated that he believed K. TEW also conducted cryptocurrency and gambling transactions on the Device. M. TEW stated that the need for money between 2018 and present was related, in part, to K. TEW's gambling. He stated that sometimes she was winning and sometimes she was losing with respect to her gambling. M. TEW stated that K. TEW took loans out from other individuals she encountered on the Internet to finance, in part, her gambling. Based on the investigation to date, K. TEW has accounts, whether active or inactive/closed, at the following non-exhaustive list of entities: Coinbase, Gemini Trust Company, Simple, Google Payments, PayPal, Navy Federal Credit Union, TD Bank, JP Morgan Chase, and M. TEW has accounts at Payward Ventures d/b/a Kraken, Coinbase, Circle, Gemini Trust Company, Navy Federal Credit Union, Simple, Colorado State Bank and Trust, and JP Morgan Chase. M. TEW stated that while he has a Kraken (cryptocurrency exchange) account, K. TEW operated that account. M. TEW also stated that K. TEW operated on LocalBitcoins.com, but he was not sure whether she operated an account under her name, his name, or both. According to M. TEW, K. TEW also operated an account in his name with Paxful, another cryptocurrency exchanger.

---

[1] According to online website "Cryptocurrency Facts,""[a] QR code is a simple, fast, and secure way to share an address when transferring cryptocurrency between two devices. This is especially useful in face-to-face point-of-sale transactions, because copy and paste isn't an option and it avoids having to type in very long codes by hand (if you get even one character wrong, it won't work)." *Available at* https://cryptocurrencyfacts.com/using-qr-codes-to-send-crypto/ (last accessed on July 30, 2020).

9

43. On July 28, 2020, I, along with other law enforcement officers, spoke with M. TEW. He advised that both he and K. TEW accessed the fraudulent proceeds from NAC in a variety of bank accounts. According to M. TEW, the proceeds were used to repay debts owed by the family, in particular K. TEW gambling or trading related debts, and/or he and K. TEW would convert the fiat currency proceeds into cryptocurrency like Bitcoin. M. TEW said that K. TEW often used text messaging from the telephone number 917-446-2046 to provide him instructions on one or both of his phone numbers related to the transfer or other disposition of NAC funds.

44. On July 28, 2020, M. TEW provided visual access to his text messages for approximately 1.5 hours to me and other law enforcement officers. We were able to capture some screenshots of those text messages and observed communications between M. TEW and 917-446-2046, a phone number associated with K. TEW related to the transfer of funds, both fiat currency and cryptocurrency.

45. For example, on August 27, 2019, M. TEW and K. TEW communicated as follows:

    F. M. TEW: "Btc hit let me know what you want"
    G. K. TEW "Sell 2km"
    H. K. TEW "And transfer to NFCU"
    I. M. TEW "dsone"
    J. K. TEW "Can you send rest to below 1JdPtwSPRt2AykDaJWY7GQMhibTr65yJR"
    K. M. TEW "Done"
    L. K. TEW "Can you send me another cb btc wallet address for you please"

46. In my training experience and based on the investigation to date, "btc" refers to Bitcoin, "NFCU" refers to Navy Federal Credit Union, the bank that held accounts into which NAC's money was directly transferred, the long alphanumeric string refers to a potential wallet address, and "cb" refers to Coinbase, another cryptocurrency exchange platform.

47. I also reviewed the following January 13, 2020 text exchange between one of M. TEW's two phone numbers and 917-446-2046, a phone number associated with K. TEW:

    A. K. TEW: "Pls tell me you have good news since today is the day I need to pay my Amex"
    B. M. TEW: "The accounts overdrawn they're talking about bankruptcy their not paying anyone there is no payment schedule yet this week we think something will come in next day or two and he'll send as much as he can – let's just get everything we can out of The bank and double down to focus on paying your AMEX"
    C. K. TEW: "Ok"
    D. M. TEW: "No other choice"
    E. K. TEW: "Wouldn't bk be bad because everything comes out"
    F. M. TEW: "Yes"
    G. M. TEW: "Well maybe"
    H. M. TEW: "Not necessarily"
    I. M. TEW: "Just a restructuring of the outstanding debt"
    J. K. TEW: "Yes the trustee would contact"
    K. M. TEW: "Only if there was a payable"
    L. M. TEW: "Bills already paid are on a diff list"
    M. M. TEW: "But the balance sheet is frozen in time at that point and nothing goes in nothing goes out"

10

48. In my training and experience and my knowledge of this investigation, "bk" refers to bankruptcy.

49. In another text exchange between M. TEW and 917-446-2046, a phone number associated with K. TEW, I observed that on January 17, 2020, M. TEW sent K. TEW several screenshots of text messages between M. TEW and a contact listed as "Jonathan." M. TEW stated on July 28, 2020 while we reviewed these text messages that "Jonathan" referred to Jonathan Yioulos. Mr. Yioulos is NAC's former Director of Finance. The screenshots shared by M. TEW with K. TEW contain the following messages from Mr. Yioulos to M. TEW:

    A. Yioulos: "I don't really know what to tell you"
    B. Yioulos: "It's not like I'm lying"
    C. Yioulos: "I can't make money appear out of nowhere"
    D. Yioulos: "You're being super unreasonable"
    E. Yioulos: "Over $2MM out by this point. And she's flipping out right now?"
    F. Yioulos: "Let's get realistic. I told you Tuesday. I can guarantee that. That's the best I can do"
    G. Yioulos: [photo of a calculated negative balance]
    H. Yioulos: "Yes, I'm really lying"
    I. Yioulos: "I can't send money without having the knowledge more is coming in. I can send Monday for Tuesday, as I've communicated. If I knew money was <u>coming Monday</u>, I might be able to float it, but I don't have that knowledge" (emphasis in original)

50. In my review of text messages between M. TEW and K. TEW as provided to us by M. TEW on July 28, 2020, I also observed screenshots of QR codes between K. TEW and M. TEW that indicate additional cryptocurrency transactions.

51. The following text exchange on September 13, 2019 preceded M. TEW sending K. TEW multiple screenshot confirmations of deposits of cash into a Bitcoin ATM:

    M. M. TEW: "In car now"
    N. K. TEW: "I want to get 15K of btc"
    O. M. TEW: "Ok"
    P. M. TEW: You need me to go to bank?"
    Q. K. TEW: "Yes
    R. K. TEW: How else would I get it"
    S. M. TEW: "Right I forgot its at wells no prob"

52. In another of the text exchanges that we were able to screenshot on July 28, 2020, I observed that M. TEW sent K. TEW an iMessage on September 15, 2019 of what appeared to be a ledger identifying multiple financial transactions with a third party. This ledger was titled MMora KT 9_15_2019 and is an Excel file. It appeared to include both fiat currency transactions as well as cryptocurrency transactions.

53. On July 29, 2020, I attended a meeting with M. TEW in a public space near his shared home with K. TEW to effectuate a consensual extraction of images from M. TEW's two iPhones. M. TEW advised that when he was getting dressed to walk over to meet with me and the other law

11

54. enforcement officers, K. TEW took both of his phones. He stated that he believes she may have deleted some text messages from or to her, but he is not sure what she deleted. In the middle of the extraction of the forensic images of M. TEW's phones, K. TEW located M. TEW speaking with me and other law enforcement officers. She repeatedly stated that M. TEW should take his phone and leave with her. K. TEW indicated that reviewing the cell phones would not yield results because she said something akin to she had "already wiped most of it." K. TEW also made statements indicating that the intent of her actions was to take responsibility for the fraudulent payments originating at NAC in order to allow M. TEW to remain out of custody in order for him to parent their children. M. TEW chose to leave with K. TEW and one phone that had already been extracted, but M. TEW authorized agents to continue with the extraction of the second phone and to deliver that second phone to his apartment building, a few blocks away.

54. Prior to departing the meeting, K. TEW was heard stating that she has something on tape. As K. TEW left the meeting location I witnessed her speaking into a handheld device and appear to make a recorded observation.

55. K. TEW's phone number 917-446-2046 was listed as a telephone record for the following Navy Federal Credit Union bank accounts numbers, all or most of whom received fraudulent payments from NAC, either directly or indirectly, and associated with either M. TEW or K. TEW: 7085338486, 7085403009, 7088874602, 7088874917, 7095660481, 7095660556, 7095660572, 7104374405, 7104374496, 3106359148, 3106229457.

56. According to M. TEW and also based on what we have learned in the investigation to date, K. TEW is a savvy user of cryptocurrency. According to M. TEW, she also uses encrypted messaging applications like WhatsApp and Telegram to communicate about, *inter alia*, various cryptocurrency transactions. She also uses payment methods like Google Payments, Zelle, and PayPal.

57. In my training and experience, I have learned that telephone communication by cell phone is often used to conduct financial transactions, whether through traditional banking institutions or for cryptocurrency accounts.

## REQUEST FOR SEALING

58. It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the warrant is relevant to an ongoing investigation into criminal activity and not all of the potential co-conspirators in this scheme will be searched at this time. Based upon my training and experience, I have learned that, online criminals actively search for criminal affidavits and search warrants via the internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through the carding forums. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

## CONCLUSION

59. I submit that this affidavit supports probable cause for a warrant to search the Subject Premises described in Attachment A, and seize the items described in Attachment B.

SW_00000048

60. I, therefore, respectfully request that the attached warrant be issued authorizing the search and seizure of the items described in Attachment A for the items listed in Attachment B.

I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

s/ Sarah Anderson
Sarah Anderson
Special Agent, Federal Bureau of Investigation

SUBSCRIBED and SWORN before me this __31st__ day of ____July____ 2020.

_____
UNITED STATES MAGISTRATE JUDGE MICHAEL HEGARTY

Application for search warrant was reviewed and is submitted by Assistant United States Attorney Hetal J. Doshi.

13

SW_00000049