IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Daniel D. Domenico

Civil Action No. 1:20-cr-00305-DDD

UNITED STATES OF AMERICA,

     Plaintiff,

v.

    1. **MICHAEL AARON TEW**;

    2. KIMBERLEY ANN TEW,
       a/k/a Kimberley Vertanen

    Defendants.

---

## ORDER DENYING MOTION TO SUPPRESS USE OF MICHAEL TEW'S STATEMENTS

---

Defendant Michael A. Tew moves to suppress from evidence statements he made to agents of the United States government on July 8, 2020. (Doc. 216.) For the following reasons, the motion to suppress is denied.

## BACKGROUND

Michael A. Tew's charges stem from an alleged scheme to defraud National Air Cargo (NAC), a Florida company at which Mr. Tew served as a contracted chief financial officer between 2015 and September 2018. Between August 2018 and July 2020, Mr. Tew allegedly conspired with Ms. Tew and others to defraud NAC via wire of more than $4 million. Mr. Tew was arrested on July 8, 2020 pursuant to a Criminal Complaint (Doc. 1) and arrest warrant (Doc. 2) issued the same day. On July 13, 2022, Mr. Tew filed the instant motion to suppress. (Doc. 216.) On

October 12, 2022, the court held a hearing on the motion, at which testimony and evidence were received. The following facts are taken from Mr. Tew's motion and reply, and the government's response; and the testimony given at the hearing. Any facts in dispute are noted.

On July 8, 2020, armed IRS agents and an FBI agent went to Mr. Tew's home upon suspicion that he was going to flee the country. Mr. Tew alleges that the agents were under orders to ensure that Mr. Tew did not flee, although the agents deny they had such orders. The arrest warrant had not yet been issued for Mr. Tew's arrest. Two agents were positioned in the lobby and three others went up to the second floor where Mr. and Ms. Tew live. When Mr. Tew walked out of his apartment at approximately 2:50 p.m., IRS Special Agent Anthony Romero informed Mr. Tew that FBI Special Agent Sarah Anderson was on her way and asked if they could speak privately.[1] Mr. Tew agreed and told Agent Romero that he wanted to tell his wife, Kimberley Tew, what was happening. Mr. Tew recommended that the agents meet him in an outdoor common area on the second floor that abuts the Tews's apartment. Mr. Tew returned to his residence before going with Ms. Tew to the common area where the agents were waiting. Special Agent Romero made small talk with Mr. and Ms. Tew for approximately twenty minutes before Special Agent Anderson arrived. Mr. Tew alleges that Special Agent Romero told one of the Tews's children that he was "not there to arrest their daddy." Special Agent Romero denies he said this. At one point

---

[1] The agents testified that at some point during the interview of Mr. Tew, Ms. Tew accused Special Agent Romero of grabbing Mr. Tew when he first encountered him in the hallway. Special Agent Romero asked Mr. Tew if that was true and Mr. Tew responded it was not. Ms. Tew was not present in the hallway. The motion does not make this allegation and Mr. Tew does not appear to rely on it as a basis for suppression. In any event, because both Mr. Tew and Special Agent Romero deny the incident, I find that it did not occur.

during the small talk, when Ms. Tew became agitated, Mr. Tew got up to walk back inside his apartment, and Special Agent Romero asked him to remain within eyesight. During the conversation Mr. and Ms. Tew declined to answer some of Special Agent Romero's questions, and asked him questions as to why he was at the apartment. At approximately 3:12 p.m. Special Agent Anderson arrived. Special Agent Anderson requested permission to record the conversation with Mr. and Ms. Tew, which they declined. She did not record the conversation.

Special Agent Anderson then spoke with Mr. and Ms. Tew, during which time Mr. Tew made admissions he seeks here to suppress. During the interview Mr. Tew got up and walked around. After Mr. Tew and Special Agent Anderson had spoken for around twenty minutes, Ms. Tew told Mr. Tew to stop answering questions and reschedule the interview for a later time. The interview ended then. Special Agent Anderson then served the Tews with a grand jury subpoena. At approximately 3:42 p.m., Special Agent Anderson arranged with the Tews to meet another time to continue the interview.  At that point, Ms. Tew returned to the apartment with the Tews's children. Special Agent Romero continued to make small talk with Mr. Tew. Mr. Tew requested that Special Agent Romero be present at the next interview. Mr. Tew returned to the apartment, leaving the back door open. After a couple minutes, someone in the apartment closed the door and the blinds. While the Tews remained in their apartment Special Agent Anderson placed a phone call to Assistant U.S. Attorney Hetal Doshi to describe the interview, and Ms. Doshi gave Special Agent Anderson the "green light" to execute a probable cause arrest on Mr. Tew given the statements he made in his interview. Special Agent Romero recalled in his testimony that Special Agent Anderson did not conduct a probable cause arrest, but instead procured an arrest warrant. The type of arrest does not change the custody analysis

because the interview ended before the decision to arrest was made. Approximately twenty minutes after Mr. Tew returned inside his apartment, agents knocked on the Tews's back door and arrested Mr. Tew.[2] At this point the agents read Mr. Tew his *Miranda* rights for the first time.

## ANALYSIS

Mr. Tew seeks to suppress the statements he made to IRS and FBI agents at his residence. He argues that he was in custody when the interview took place and agents should have given him a *Miranda* warning before his interview. This is not the case.

*Miranda v. Arizona* requires law enforcement officers to issue a warning to a suspect in custodial interrogation of his right to remain silent. 384 U.S. 436, 444 (1966). *Miranda* warnings are not required for every law-enforcement interaction; a person must both be in custody and subject to interrogation before a warning is required. A person is "in custody" when he is "deprived of his freedom of action in any significant way," or his "freedom of action is curtailed to a 'degree associated with formal arrest.'" *United States v. Chee*, 514 F.3d 1106, 1112 (10th Cir. 2008). Custody is determined by an objective inquiry: whether a reasonable person in the defendant's situation would have felt free to leave. *United States v. Rogers*, 391 F.3d 1165, 1171 (10th Cir. 2004). A defendant must first present evidence in support of suppression before the government bears a burden to prove that the constitutional right against self-incrimination was waived. *United States v. Crocker*, 510 F.2d 1129,

---

[2] Special Agent Anderson stated she could not remember if the back door had been left open or was closed. Special Agent Romero recalled that the door was closed.

1135 (10th Cir. 1975), *abrogated on other grounds by United States v. Bustillos-Munoz*, 235 F.3d 505 (10th Cir. 2005).

In my view, Mr. Tew's admission that he did not believe he was under arrest should be dispositive. Defendant's motion explicitly states that agents "lulled [Mr. Tew] into a false belief that he was not under arrest." (Doc. 216 ¶5.) Mr. Tew's entire motion and response are built around the argument that agents had the intent of arresting him and would not have allowed him to leave the residence had he tried to do so. In essence Mr. Tew argues that he was in custody because the agents intended for him to be in custody and tricked him and, ostensibly, his young children into believing he was not. This argument fundamentally misunderstands the custody inquiry, which revolves solely around what a reasonable person *in Mr. Tew's position* would have believed. Mr. Tew did not believe he was in custody. Regardless of what Mr. Tew by his own admission believed, I still have an obligation to determine whether his belief matches that of a reasonable person in his situation.

Whether a person is in custody is a fact-intensive inquiry based on the totality of the circumstances. *Chee*, 514 F.3d at 1112. The Tenth Circuit has used several factors to guide this inquiry: (1) whether a suspect is made aware that he is free to refrain from answering questions; (2) whether he is made aware he is free to end the interview at will; (3) the nature of the questioning; and (4) whether the environment was police-dominated. *Id*. at 1113-14. The first three of these factors weigh heavily against regarding Mr. Tew as in custody while agents interviewed him in the common area of his apartment building. The fourth factor weighs slightly toward a finding that Mr. Tew's freedom was curtailed to some extent, but it is insufficient on its own to establish that Mr. Tew was in

custody. Nothing in the record indicates that his freedom was at any point curtailed to a degree associated with a formal arrest.

Agents were in contact with Mr. Tew for approximately an hour, but only about twenty minutes of that contact included substantive questioning. Special Agent Romero's initial conversation with Mr. Tew and Ms. Tew was informal small talk, and his contact with Mr. Tew after the interview with Special Agent Anderson was casual as well. Mr. Tew refused to answer some of Special Agent Romero's questions, and asked questions of him. Special Agent Romero did not push Mr. Tew on questions he refused to answer.

During Special Agent Anderson's interview of Mr. Tew, she issued him a "1001 warning." A "1001 warning" refers to 18 U.S.C § 1001, which makes it a felony to knowingly and willfully make materially false and misleading statements to a government official. 18 U.S.C.A. § 1001 (West). Special Agent Anderson gave Mr. Tew a 1001 warning when she perceived that his answers were not forthright. Defendant argued at the motions hearing that Special Agent Anderson's warning indicated to Mr. Tew that he could not refuse to answer questions. This is not the case. First, Special Agent Anderson's warning came at the end of the interview. Second, informing a suspect that making a false statement to a government official is a felony is perhaps more likely to encourage a suspect to remain silent, rather than coerce him into answering. I do not find that the 1001 warning weighs in favor of Mr. Tew being in custody at the time of the interview. Mr. Tew presents no evidence that either Special Agent Romero or Special Agent Anderson made him feel as if he

could not refrain from answering questions. His refusal to answer some of Special Agent Romero's questions indicates the opposite.

Mr. Tew ended the interview after Ms. Tew told him to not answer further questions. Special Agent Anderson asked no further questions and arranged to continue the interview at a later date. Mr. Tew presents no evidence that, despite ending the interview, he did not believe he had the ability to do so.

Other factors about the totality of the circumstances and the nature of the interview weigh heavily in favor of the determination that Mr. Tew was not in custody. First, the interview took place in Mr. Tew's apartment building, in a common space adjacent to his apartment at his request, and his wife was present for the majority. A suspect is much less likely to be in custody if interrogation occurs in familiar surroundings such as the suspect's home. *See United States v. Ritchie*, 35 F.3d 1477, 1485 (10th Cir. 1994). Mr. Tew was not separated from moral support and was interviewed in a familiar, public place of his choosing. *See United States v. Griffin*, 7 F.3d 1512, 1519 (10th Cir. 1993)("Circumstances [where custody is more easily found] might include: separation of the suspect from family or colleagues who could offer moral support; isolation in nonpublic questioning rooms; threatening presence of several officers; display of a weapon by an officer; physical contact with the subject; and an officer's use of language or tone of voice in a manner implying that compliance with the request might be compelled."). Special Agent Anderson asked permission to record the interview and did not do so when Ms. Tew declined. Mr. Tew got up and walked around during the interview. He went back into his home after ending the interview of his own volition and was only arrested twenty minutes after

the interview ended—not at the close of the interview. At no point during the interview was Mr. Tew restrained.

Mr. Tew points to evidence that indicates the officers may have dominated the encounter. Six armed officers went to the Tews's apartment building. This is not enough to indicate that a reasonable person in Mr. Tew's position would have believed he was in custody. If the agents were under orders to prevent Mr. Tew from leaving, which is disputed, Mr. Tew was not aware. The agents' weapons were concealed and it is not clear from the record whether Mr. Tew knew they were armed. Four officers were present on the second floor but the contact was limited and largely congenial. Special Agent Romero asked Mr. Tew to remain in his line of sight, but this was only when, according to Special Agent Romero's testimony, Ms. Tew was behaving erratically and he became concerned for the safety of the Tews and the agents present. No agent prevented Mr. or Ms. Tew from returning to the apartment soon after.

Mr. Tew has not met his initial burden of presenting evidence challenging the legality of his statements to IRS and FBI agents. From the evidence presented in the motions and at the suppression hearing, I find that a reasonable person in Mr. Tew's position would have felt free to leave, and thus was not in custody. Because Mr. Tew was not in custody, no *Miranda* warning was required, and his statements are not suppressible based on the absence of such a warning.

## CONCLUSION

It is ORDERED that Mr. Tew's Motion to Suppress the Use of Statements (Doc. 216) is DENIED.

DATED: October 27, 2022          BY THE COURT:

Daniel D. Domenico
United States District Judge