IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 20-cr-00305-DDD

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1. **MICHAEL AARON TEW**, and
2. **KIMBERLEY ANN TEW**,
    a/ka Kimberley Vertanen,

    Defendants.

### GOVERNMENT'S MOTION FOR DETENTION PENDING SENTENCING

Following an eight-day jury trial, Michael and Kimberley Tew are now convicted felons. The law dictates that they be detained pending sentencing. 18 U.S.C. § 3143(a). The facts also suggest that the presumption of detention cannot be overcome.

As proven at trial, the Tews spent the past six years conniving to get away with a brazen scheme to steal $5 million, much of which was converted offshore into bitcoin. In service of this goal, the Tews lied to their friends and associates for years. During the conspiracy, they collaborated on what they would do if they ever were caught.

When that day finally came and federal agents showed up at their door, Michael Tew made good on their plans and sought to flee the country with his

family. A swift probable cause arrest interrupted that attempt. But they did not give up. Thereafter, Kimberley Tew tried to tamper with several witnesses and impede the government's investigation. In doing so, she candidly admitted the plan she shared with her husband all along — despite the extent of the evidence against them both —the government could "only have one head." When trial finally arrived, they persisted with their plan, by ignoring court orders and deadlines, and by attempting to manipulate the jury by pointing blame at one another.

Each sought to delay trial in this matter for years. Throughout, they showed that neither has come to terms with the substantial harms wrought by their years of deception and criminality. Now, they seek to delay justice even further, demanding presentence release and intimating that they should be accorded staggered sentences, using their status as parents as justification.

As if the long history of this case were not enough to indicate that such a result would be an injustice, recently acquired bank records underscore the point. Those records show that the Tews likely lied to the courts, and that their casual relationship to truth came at a tangible cost to the American taxpayer. Specifically, they made representations to the court — under penalty of perjury — in order to secure the appointment of CJA counsel to which they were not entitled. While availing themselves of free CJA representation, they lived in an $8,649.69-a-month luxury apartment and pocketed gross income of between $22,000 and $124,000 *every month* since January 2022.

The Tews should be treated like every other defendant convicted at trial.

There are not two systems of justice in this country – one for the wealthy and one for the poor. The law should be applied equally, and that law presumes they should be detained. The facts add weight to that presumption, and the Tews have not presented clear and convincing evidence to the contrary. The Court should revoke their bonds and order that they be detained pending sentencing.

> I. **Recently obtained bank records suggest that the Tews lied on their CJA affidavits, which constitutes perjury and a mandatory revocation of bond.**

As detailed below, Michael Tew has received at least $1,212,181.27 in gross deposits into a single bank account since January 2022. The government respectfully requests that the Court order release to the government of the Tews' respective CJA financial affidavits, filed at ECF No. 282, so that the government can evaluate whether they made false statements under penalty of perjury. *See United States v. Kahan*, 415 U.S 239, 243 (1979); *see, e.g., United States v. Jenkins*, 2012 WL 12952829, at *4 (N.D.N.Y. Oct. 9, 2012) ("[T]he government has the authority request disclosure of the above-described financial affidavit on the ground that it is necessary for the government to determine whether to seek a separate indictment against the affiant for perjury); *United States v. Ponzo*, 2012 WL 28065, at 6 (D. Mass. Jan. 3, 2012) (ordering release of defendant's financial affidavit after trial so that government could evaluate whether separate prosecution for perjury was warranted); *United States v. Becker*, 2010 WL 1936038, at *2 (D. Kan. May 12, 2010) (granting disclosure of CJA affidavit to government).

Should the Court conclude that release of the affidavits is appropriate, the

3

government also requests a hearing, pursuant to 18 U.S.C. § 3148, to determine whether the Tews' orders of release should be revoked on the basis that they committed new crimes while on release

Bank records obtained during the trial show that tens of thousands of dollars are deposited into an account held in the name of Michael Tew every month:

| Month and Year | Deposits |
|---|---|
| 01/22 | $50,875.79 |
| 02/22 | $124,989.95 |
| 03/22 | $55,521.54 |
| 04/22 | $57,233.14 |
| 05/22 | $71,069.11 |
| 06/22 | $62,932.81 |
| 07/22 | $53,482.97 |
| 08/22 | $51,086.67 |
| 09/22 | $59,056.31 |
| 10/22 | $27,523.52 |
| 11/22 | $25,332.10 |
| 12/22 | $39,491.31 |
| 01/23 | $36,856.25 |
| 02/23 | $46,199.01 |
| 03/23 | $41,929.82 |
| 04/23 | $22,987.04 |
| 05/23 | $33,174.51 |
| 06/23 | $35,474.86 |
| 07/23 | $36,500.05 |
| 08/23 | $30,875.68 |
| 09/23 | $43,116.57 |
| 10/23 | Not available |
| 11/23 | $51,069.33 |
| 12/23 | $63,477.26 |
| 01/24 | $91,925.67 |
| TOTAL | $1,212,181.27 |

Every month, much of this money disappears via transfers to Kimberley Tew, wire transfers, cash withdrawals, or purchases on cryptocurrency exchange platforms. At

a hearing, the government can compare the CJA affidavits to these bank records. If the Court concludes that there is probable cause to believe that the Tews committed perjury in violation of 18 U.S.C. § 1621 when they submitted their affidavits, then there is a rebuttable presumption that they should be detained. 18 U.S.C. §3148(b) (mandating revocation where there is probable cause to believe that a person has committed a federal, state, or local crime while on release).

### II. The Tews are now convicted felons, subject to a rebuttable presumption that they be detained.

The Tews are guilty of conspiracy to commit wire fraud, conspiracy to commit money laundering, and substantive counts of the same. They are no longer entitled to a presumption of liberty. 18 U.S.C. § 3143(a)(1). Detention is therefore the mandatory, routine norm for any defendant in their position, namely, one following conviction and before the imposition of a custodial sentence. 18 U.S.C. § 3143(b)(1). As the Senate articulated in the report accompanying the Bail Reform Act:

> Once guilt of a crime has been established in a court of law, there is no reason to favor release pending imposition of sentence or appeal. The conviction, in which the defendant's guilt of a crime has been established beyond a reasonable doubt, is presumably correct in law.

Senate Judiciary Committee Report, S. Rep. NO. 225, 98th Cong., 1st Sess. 19 (1983). *See, e.g., United State v. Johnson*, 652 F. App'x 619, 622 (10th Cir. 2019) (affirming order of detention pending sentencing after applying presumption and concluding that defendant facing only 0-6 months' imprisonment presented flight risk). At this point in the proceedings, the Tews bear the burden to establish that they deserve the extraordinary remedy of presentence release. To do so, they must

show — by clear and convincing evidence — that they are neither flight risks nor dangers to the community. *See, e.g.*, *United States v. Giancola*, 754 F.2d 898, 900-01 (11th Cir. 1985) ("The 1984 Act was intended to change the presumption so that the conviction is presumed correct and the burden is on the convicted defendant to overcome that presumption."); *see also* Fed. R. Crim. P. 46(c) ("The burden of establishing that the defendant will not flee or pose a danger to any other person or to the community rests with the defendant.")/

In considering whether the Tews have met this burden, the Court should be guided by two principles  *First*, the Tews cannot overcome the presumption simply by pointing to their conformity to the terms of their pretrial release.  *See United States v. Martinez*, 2020 WL 1666804, at * 2 (W.D. Okla. April 3, 2020 ("That Defendant was previously compliant with pretrial conditions, at a time when Defendant was hopeful that he would be acquitted of his charges, is insufficient to show by clear and convincing evidence that he would neither flee nor present a danger to the community."); *United States v. Hanhardt*, 173 F. Supp. 2d 801, 806 (N.D. Ill. 2011) (noting that arguments seeking pre-sentencing release based on compliance with pre-trial release orders are "routinely rejected" because "prior to trial there is the possibility of no imprisonment, which evaporates upon a finding of guilt"). Compliance with bond conditions is not a merit badge; it is the bare minimum of what the law and the courts require of everyone on bond.

*Second*, "danger to the community" is not limited to violence. The Court should consider, instead, whether the Tews are likely to continue committing crimes

in the months between now and sentencing. *See, e.g., United States v. Provenzano*, 605 F.2d 85, 95 (3d Cir. 1979) (holding that "a defendant's propensity to commit crime generally, even if the resulting harm would be not solely physical, may constitute a sufficient risk of danger to come within the contemplation of the [Bail Reform] Act"); *United States v. Reynolds*, 956 F.3d 192 (9th Cir. 1992) (concluding that "danger" may encompass pecuniary or economic harm).; *see also* S. REP. NO. 225, 98th Cong., 1st Sess. 12 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3195 ("[T]he language referring to the safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community. The committee intends that the concern about safety be given a broader construction than merely danger of harm involving physical violence."). On this front, there is at least probable cause to believe that the Tews have *not* been compliant with the terms of their release, and indeed have continued to engage in speculative cryptocurrency transactions, all while depleting limited public resources designed to protect the right of counsel for those who actually need it.

### III. Even if the presumption were not present, the factors set forth in the Bail Reform Act weigh in favor of detention.

The law's presumption that the Tews should be detained is reinforced by all of the factors the statute asks the court to consider. 18 U.S.C. § 3143 (cross-referencing 18 U.S.C. §§ 3142(b) and (c)); 18 U.S.C. § 3142(g) (setting forth factors to consider in applying § 3142(b) and (c)).

7

> **A.  The nature of the crimes is serious and the circumstances suggest that the Tews are not susceptible to customary forms of deterrence.**

The Court is well-acquainted with the nature of the offenses from its oversight of the eight-day jury trial. The crimes of conviction are serious.

The United States Sentencing Guidelines will likely recommend up to 188 months' imprisonment:

| Enhancement | Guideline Provision | Offense Level |
|---|---|---|
| Total Fraud Offense level | | 29 |
| *Base Offense level* | *2B1.1(a)(1)* | 7 |
| *Loss > $3.5 million* | *2B1.1(b)(1)(J)* | +18 |
| *Substantial Financial Hardship* | *2B1.1(b)(2)(A)* | +2 |
| *Sophisticated Means* | *2B1.1(b)(1)* | +2 |
| **Additional Enhancements** | | |
| § 1957 laundering | 2S1.1(b)(a) | +1 |
| Leader/Organizer | 3B1.1(c) | +2 |
| Obstruction | 3C1.1 | +2 |
| **Total Offense Level** | | **34** |
| **Recommended Range** | | **151-188 months** |

The Tews face the near-certainty of a lengthy term of imprisonment. That possibility increases both the risk of flight and the risk of danger. *See United States v. Bruno*, 89 F. supp. 3d 425, 431 (E.D.N.Y. 2015) ("When evidence of a defendant's guilt is strong, and when the sentence of imprisonment upon conviction is likely to be long . . . a defendant has stronger motives to flee.") (cleaned up).

In its assessment of the nature of the Tews' crimes, the Court should consider their criminogenic behavior. To further their two-year fraud, the Tews used various artifices and manipulations to encourage others to commit crimes. The Court heard

8

testimony about how the Tews kept Yioulos involved in the scheme for years and how they encouraged criminal behavior from the principals of several of the sham vendor companies, including H.S. (HS CPAs), M.M. (MCG, Inc), and L.W. (PM). The Tews' willingness to use and manipulate others for their own selfish ends is precisely the type of conduct that increases the likelihood that the public will be exposed to their dangers. Put simply, more than just money is at stake — other people's potential culpability and freedom is at risk, too.

The circumstances of the crime are related to issues of flight and danger. The Tews committed their crime knowing that, someday, they might be caught. The fact that this risk did *not* deter them from committing a serious financial crime weighs in favor of the conclusion that they will continue to commit these kinds of crimes while they remain free. In reality, there is good reason to believe such criminal acts *are* continuing. Just this past October, a Denver District Court judge found that Kimberley Tew committed civil theft and conversion when she kept cryptocurrency that had been promised to an "investor." Attachment A.

Further, the recent bank records described show that the pattern of financial activity the Court saw at the trial has continued. Each month, tens of thousands of dollars deposited into Michael Tew's bank accounts; each month, tens of thousands of dollars are transferred out of those accounts, including to Kimberley Tew, using fintech applications, wire transfers, ATM and cash withdrawals, or transfers into cryptocurrency exchanges. This pattern of banking activity is entirely consistent with that during the crimes of conviction.

Here, the Tews delayed justice in this matter for years and showed every indication that they did not believe the day of reckoning would ever rise. If anything, the excuse that their crimes were ones solely borne of providence and opportunity is dispelled by the fact that they have continued, utterly unabated, even while under pretrial supervision.

> **B. The weight of the evidence is heavy and the likelihood of success on appeal is slight.**

The court is similarly well-positioned to judge the weight of the evidence and the corresponding likelihood that any trial deficiencies amount to more than harmless error. This factor, too, adds to the presumption in favor of detention.

> **C. The Tews' respective history and characteristics suggest a profound lack of respect for the law that militates against any finding they will not flee or refrain from committing additional financial crimes (18 U.S.C. § 3142(g)(3)).**

*Character and Past Conduct.* As noted above, the circumstances of the Tews' crimes, by themselves, show a profound lack of concern for legal consequences. Yioulos' frequent references to how they would all spend time in jail for what they were doing did not stop Michael or Kimberley Tew from stealing tens of thousands of dollars every week to fuel a luxury lifestyle, gamble, and speculate in cryptocurrency. When the authorities arrived, the Tews planned to flee. The Tews committed these offenses while parenting young children, heedless of the consequences their needless criminal conduct could have on their children's lives. Neither has the kind of character that suggests they can overcome the presumption

in favor of detention.

Michael Tew's first response to the possibility of federal charges was to ask Yioulos for money so that he could flee. He also contacted MM, wanting to know if MM had spoken to the FBI. Kimberley Tew's response was to tamper with witnesses. Her first effort was her most successful. When Michael Tew eventually agreed to submit to a proffer free from any conditions that would prevent him from cooperating against his wife, Kimberley stalked him down at the Yeti Store, disrupted his meeting with government agents, and corruptly endeavored to prevent him from testifying against her. Before that, she attempted to obstruct the investigation and prosecution by wiping her text messages. And then, when the Speedy Trial clock was ticking towards a deadline for indictment in the beginning of 2021, she sent threats to HS in an effort to prevent HS from providing information to the authorities. The responses of both suggest that each is willing to take extreme risks to avoid consequences or accountability. Their actions further weigh against the notion that they have or will meekly submit to authorities.

*Physical and Mental Condition.* The Tews have no known health issues that would prevent or hinder flight. They have no known diagnosed mental health conditions, but the Court has been able to see and evaluate for itself the extent to which their mental conditions, including Kimberley Tew's severe gambling addiction, have encouraged risk-taking and a propensity to indulge selfish impulses. These factors do not support release.

*Family Ties.* Michael Tew's family is here in Colorado and the Tews live in

Denver with their children. The fact that they have two school-age children is perhaps the strongest factor they can point to in favor of overcoming the presumption of detention. But the mere fact that the Tews have children does not mean they won't flee and it has no bearing on whether or not they will continue to commit crimes or encourage others to do so. Most obviously: the Tews committed the crimes of conviction despite knowing that if they were caught, they'd likely face years in jail that would mean being separated from their kids. That didn't matter. They did it anyways. This suggests that the mere fact that the Tews are parents is insufficient to deter them from making impulsive and harmful decisions. Indeed, a perverse consequence of the pending sentencing might be to *increase* the likelihood that they will flee with their children (in the hope that they can remain outside long enough to see the children to adulthood) or to use their facility with both financial crime and cryptocurrency to hide enough ill-gotten gains to provide for them while they are imprisoned. Finally, it is difficult to believe that the Tews have not made alternative arrangements for their children at this point in the proceedings. They bear the burden of showing how this and other factors can overcome both the legal presumption of detention and the facts supporting it. But they have not presented any evidence at all.

*Financial Resources*. The Tews stole $5 million and put at least $2.4 million of that into cryptocurrency. The government is not capable of finding where all of those funds went, and even if everyone assumes that the two of them gambled or frittered away a substantial portion of it, there is still a high likelihood that they

have thousands hidden somewhere. And that's *before* the Court considers evidence in the form of the bank records described above, which show that in just *one* account the Tews have received over a million dollars in the past two years. The Tews clearly have the means to flee, which makes them flight risks. *See Matter of Extradition of Ricardo Alberto Martinelli Berrocal*, 263 F. Supp. 3d 1280, 1304 (S.D. Fl. 2017) (citing numerous cases in multiple jurisdictions across the United States holding that defendants with financial means to flee are flight risks). Separate and apart from how much money the Tews might currently have, the Court should also consider the Tews' ability to generate money, both licit and illicit: each is very familiar with cryptocurrency, adept at using social engineering to get what they want or need from people, and willing to use others' identities to further their own interests. This factor, too, supports the presumption in favor of detention.

*Length of Residence and Community Ties*.   Michael Tew has family in Colorado, but he spent most of his adult life outside the state. Kimberley Tew has no ties to Colorado outside of her connection with Michael. Despite the fact that both have lived here now for several years, there is no evidence of the kind of robust community ties that would have moral suasion over their decision-making. Michael Tew can work remotely from anywhere in the world and it would be tempting for them to build a new life somewhere else, free from the possibility of a prison sentence or the efforts of civil plaintiffs to collect on any judgment. Like every other factor, this one does not help them overcome the presumption in favor of detention.

*Drug use*.   The defendants each have a history of illicit drug use. This is yet

13

another factor that weighs against, rather than in favor, of release: the coming weeks are bound to impose additional stresses on the Tews, which increases the likelihood of drug use and its attendant propensity to encourage rash and ill-considered decisions.

> **D. Alternatives to detention are unlikely to be adequate, especially where, as here, the defendants have been convicted by a jury of crimes and circumstances that are less amenable to supervision.**

Michael and Kimberley Tew are flight risks who are likely to be a continuing danger to the community who will continue to commit crimes while on release. In fact, as noted above, there is at least probable cause to believe that they *have* committed additional crimes while on release. The Court should consider whether alternatives to detention will substantially assure their appearance and prevent future criminal conduct. Among those alternatives, either in combination or in isolation, would be home detention with electronic monitoring, coupled with stringent financial monitoring conditions, internet restrictions or monitoring, a prohibition on gambling, and drug testing.

The government submits that even imposing all of these conditions would be inadequate. Ankle monitors can — and are — easily cut off. *United States v. Maxwell*, 510 F. Supp. 3d 165, 177 (S.D.N.Y. 2020) ("[H]ome detention with electronic monitoring does not prevent flight; at best, it limits a fleeing defendant's head start.") (quoting *United States v. Zarger*, 200 WL 1134364, at *1 (E.D.N.Y. Aug. 4, 2000)). By the time anyone responds, it would not be difficult for the Tews to

have already put miles between themselves and Colorado. *United States v. Wasendorf*, 2012 WL 4793366, at *3 (N.D. Iowa Oct. 9, 2012) ("Although 'fleeing' is typically associated with fleeing abroad, fugitives flee with[in] the United States' boarders [sic] successfully as well. Moreover, it is possible—although difficult—to flee abroad without a passport.") On the road, they would have access to digital wallets bursting with cryptocurrency and experience converting that cryptocurrency into ready cash. Assuming they did not flee and submitted to home detention, financial and internet monitoring would be difficult to enforce. The Tews could — and likely would, if past performance is any indication — lie on any form asking them to report their accounts. Even if they reported their bank accounts, they could retain profiles on any of the many widely-accessible cryptocurrency exchanges or use peer-to-peer platforms. Likewise, pretrial services cannot be over the defendants' shoulders 24-7 ensuring that they do not misuse the internet to perpetrate further offenses. Pretrial services is unlikely to be able to stop or prevent the Tews from committing further financial crimes in real time.

### IV.   Conclusion.

The Tews have been found guilty of serious crimes and the law presumes that they should begin serving their sentences. Now that Kimberley's ultimate gamble has proven to be a loss there is no reason to give them the opportunity to commit additional crimes or to use their considerable resources to flee. Instead, the law dictates their detention, and all available facts support it as well. For all of the reasons set forth above, the Court should revoke the defendants' bonds and order

that they be detained pending sentencing.

Dated this 21st day of Feburary, 2024.

Respectfully submitted,

COLE FINEGAN
United States Attorney

By: */s/ Bryan Fields*   By: */s/ Sarah H. Weiss*
Bryan Fields   Sarah H. Weiss
Assistant United States Attorney   Assistant United States Attorney
U.S. Attorney's Office   U.S. Attorney's Office
1801 California St. Suite 1600   1801 California St. Suite 1600
Denver, CO 80202   Denver, CO 80202
(303) 454-0100   (303) 454-0100
Bryan.Fields3@usdoj.gov   Sarah.Weiss@usdoj.gov
Attorney for the Government   Attorney for the Government

**Certification of Type-Volume Limitation**

I hereby certify that the foregoing pleading complies with the type-volume limitation set forth in Judge Domenico's Practice Standard III(A)(1).

*/s Bryan Fields*
Bryan David Fields

**Statement of Speedy Trial Impact**

Pursuant to Judge Domenico's Practice Standard III(C), the government notes that this motion will not affect the speedy trial clock in this case because trial has already occurred within the Speedy Trial Act deadline.

**CERTIFICATE OF SERVICE**

       I hereby certify that on February 21st, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to any and all counsel of record.

                               *s/ Sarah H. Weiss*
                               United States Attorney's Office