1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO
2

3   Criminal Action No. 20-cr-305-2-DDD

4   UNITED STATES OF AMERICA,

5        Plaintiff,

6   vs.

7   KIMBERLEY ANN TEW,

8        Defendant.
    _____

9                  **REPORTER'S TRANSCRIPT**
                   SENTENCING HEARING
10  _____

11       Proceedings before the HONORABLE DANIEL D. DOMENICO,

12  Judge, United States District Court for the District of

13  Colorado, occurring at 1:30 p.m., on the 8th day of August,

14  2024, in Courtroom A1002, United States Courthouse, Denver,

15  Colorado.

16                       **APPEARANCES**

17       Bryan Fields, Sarah Weiss and Laura Hurd, Assistant

18  U.S. Attorneys, 1225 17th Street, Suite 700, Denver, Colorado,

19  80202, appearing for the Government.

20       David Kaplan and Jamie Hubbard, Stimson LaBranche

21  Hubbard, LLC, 1652 North Downing Street, Denver, CO 80218,

22  appearing for the Defendant.

23

24       TAMMY HOFFSCHILDT, FCRR, CRR, RMR, Official Reporter
             901 19th Street, Denver, Colorado 80294
25        Proceedings Reported by Mechanical Stenography
             Transcription Produced via Computer

1                    **P R O C E E D I N G S**

2        (In open court at 1:06 p.m.)

3            *THE COURT:*  Good afternoon.  Please take your seats.

4    We're here for a sentencing hearing in case number 20-cr-305-2,

5    United States versus Kimberley Tew.

6            Why don't I begin by having counsel enter their

7    appearances.  For the government?

8            *MR. FIELDS:*  Good afternoon, Your Honor.  Bryan Fields

9    for the United States.  I'm joined by my co-counsel,

10   Sarah Weiss, co-counsel, Laura Hurd, and Special Agent Lisa

11   Palmer.

12           *THE COURT:*  Welcome.

13           *MR. KAPLAN:*  Good afternoon, Your Honor.

14   David Kaplan, appearing on behalf of Kimberley Tew, along with

15   Jamie Hurd (sic) Mrs. Tew is present.

16           *MS. HUBBARD:*  My last name is Hubbard, Your Honor.

17           *THE COURT:*  I thought so.  From probation?

18           *PROBATION:*  Josh Roth, from probation.

19           *THE COURT:*  Thank you for being here, as well.  We're

20   going to begin with a discussion of the Government's Motion For

21   A Preliminary Order Of Forfeiture, which the defendant has

22   objected to.  I, in addition, then will turn to sentencing.  We

23   will take a break somewhere.  I'm not sure if it will be

24   in-between the forfeiture issue and the sentencing itself, but

25   I will plan to take a break at some point.

1          I do want to address forfeiture first, and I think I

2     will just, sort of, tell you, based on my understanding of the

3     law and what has been filed so far, that I understand the

4     defendant's position, but that the law of conspiracy, in

5     particular, which she has been convicted of, makes it somewhat

6     difficult for defendants to argue that they should, sort of, be

7     separated out from the proceeds, even if they didn't have

8     themselves a direct role in a particular transaction.

9          So, while I understand the factual and, sort of,

10    fairness argument that the defendant has before it, the

11    government seems to be on fairly strong legal grounds on this

12    issue, but I would like to hear from both sides.

13         I think it makes sense to start with the government,

14    since it's their burden, and so is Ms. Hurd going to address

15    this?

16         MS. HURD:  Your Honor, may I step to the podium?

17         THE COURT:  Please.

18         MS. HURD:  Thank you.  Your Honor, in our filings we

19    address the conspiracy issue, and you have, sort of, intimated

20    that there is strong legal basis for this.  The government

21    agrees.

22         The evidence at trial established that Michael Tew,

23    Kimberley Tew and John Yioulos engaged in this conspiracy, in

24    netting more than $5 million, and they did it by submitting the

25    false invoices for services that were not rendered to the

1    company here.

2         After Mr. Tew was terminated, they continued to submit

3    invoices through Jonathan Yioulos for payment.  Mr. Tew

4    continued to recruit -- or attempt to recruit other individuals

5    into the conspiracy, and had personal connections with various

6    individuals involved in the company submitting invoices.  The

7    Tews also used multiple business and dummy email accounts to

8    disguise their conduct.  As a result, as was before the jury

9    and found by the jury, the scheme netted $5,023,878.50.

10        Ms. Tew is arguing she should only be responsible for

11   the substantive accounts, but that doesn't align with the

12   jury's findings here nor does it align with the statute.

13   Your Honor, under 18 United States Code 981(a)(1)(C), any

14   property, which constitutes or is derived from proceeds

15   traceable to either wire fraud or a conspiracy shall be

16   forfeited.  Interestingly, Your Honor, 981 specifically states

17   conspiracy, therefore understanding that anything derived from

18   the conspiracy can be forfeited in a case.  That is where the

19   government has strong legal basis supporting what it's asking

20   for today.

21        THE COURT:  All right.  Me interrupt you and I

22   apologize, but let me just ask you a couple of questions, one

23   sort of directly related to that, which is I understand what

24   the statute says and your position, but if the forfeiture

25   applies to funds that have been derived or proceeds of it, do

1    you have to show -- do I have to find, that she has those

2    funds?  What if 4 million of it we all agreed Yioulos kept

3    completely himself and the Tews never got, would she still be

4    subject to forfeiture for that?

5          *MS. HURD:*  The facts make all of the difference.  So

6    you are correct, the government -- technically speaking, the

7    Tenth Circuit hasn't ruled on *Honeycutt*, in whether it applies

8    981, because it doesn't discuss the very important wording, *the*

9    *person obtained*, right?  It just says *derived from the*

10   *conspiracy*.  So the Tenth Circuit has, sort of, skirted this

11   issue to date, but from a policy perspective we generally try

12   to attribute the funds to those that received or enjoyed the

13   benefit of them, and that's, sort of, in line with the

14   *Honeycutt* decision.  It said, you can't just take from a

15   low-level player everything that's going on, right.  We are not

16   applying *Pinkerton* liability to that, but what we do want to

17   recognize is that you should look to what the person is

18   enjoying.  What they are getting from the fraud.

19         I don't think there's any doubt in this case

20   Your Honor, that Ms. Tew and Mr. Tew, in a joint marital

21   relationship, enjoyed the bulk, if not all, every single dollar

22   in this conspiracy.  They don't need to retain it.  They just

23   have to have used it for their benefit.

24         *THE COURT:*  But I do have to find that they obtained

25   it, at some point.  I understand that they don't have to have

6

1    retained it.

2            MS. HURD:  Yes, Your Honor.  I think the evidence is

3    clear, the exhibits, especially Exhibit 108 -- sorry -- 1008

4    sort of sets forth the whole scheme.  Then the jury was tasked

5    with figuring out the scope of the conspiracy, and they were

6    given the jury instructions which says look at the Indictment,

7    and then determine if this is within the conspiracy, right?  So

8    for Count 1, one of the facts set forth in the Indictment said

9    over $5 million, as a result of this particular fraud.  Further

10   the -- all of the -- excuse me, Your Honor, all of the bank

11   accounts that were admitted in trial, there were many, those

12   also show, kind of, the use of these funds, as they went to the

13   benefit of Mr. and Mrs. Tew, this included the cryptocurrency,

14   personal expenses, various other things that are just normal

15   expenses of a marital relationship.

16           THE COURT:  Okay.  And you don't think anything should

17   be subtracted out from that total number?  I agree with you,

18   it's clear that 5-million number is very clearly established

19   from the Indictment and elsewhere, but I'm just curious if you

20   acknowledge anything should be netted out, I guess?

21           MS. HURD:  Your Honor, that would be their burden

22   under 981(a)(2), but nonetheless, the idea is if you are using

23   it for your benefit, whether it's a kickback, whether it's paid

24   to other people, because you are running another scheme, it

25   doesn't really matter.  Those aren't expenses, those aren't

1   deductions that are normally understood, because the defendants

2   realized the gain when they got the funds.

3        THE COURT:  Okay.  Thank you.

4        MS. HURD:  Thank you, Your Honor.

5        Your Honor, I think we've explain the law in regards

6   to retaining or obtaining those funds.  There's little doubt

7   that there was multiple statements in furtherance of the

8   scheme, and those, sort of, tell the tale of the obtaining of

9   the funds.  I won't go through all of those, Your Honor, that

10  relate to each transaction here, but generally speaking, Ms.

11  Tew was, sort of, the driving forcing behind this.  She was

12  consistently asking for money.  The fact she may not have

13  executed the original wire fraud is irrelevant under the law.

14  Accordingly, Your Honor, the government maintains that she

15  should be fully responsible for the full amount of the fraud,

16  in the amount of 5,023,878.50.

17       Your Honor, as noted in the government's motion, we

18  will not seek to get both from the defendants; meaning, we

19  would only get the total amount of 5 million, if the Court were

20  to find that the full amount should be attributable to her.

21       THE COURT:  Okay.  Thank you.  I appreciate that

22  clarification.

23       MS. HURD:  Your Honor, we rest on the remaining

24  pleadings and the law we have set forth in those pleadings, and

25  I think that it's well within the law to make her responsible

1    for the full amount.  Thank you.

2             THE COURT:  Thank you.  Mr. Kaplan?

3             MR. KAPLAN:  Yes, Your Honor.  Your Honor, our

4    position, as the Court acknowledged in its introductory

5    comments have been placed in our pleading.  I would just add a

6    couple of items.  I agree with the Court's acknowledgment of

7    the conspiracy law, as it relates to forfeiture, and what the

8    weight of it says, but I also agree with the Court having some

9    concern about Ms. Tew being held responsible for the entire

10   amount.  We've indicated to the Court that the response would

11   be for $184,300 that we think is the amount attributable to her

12   behavior, and we would ask the Court to consider that as the

13   forfeiture amount.

14            The government comes up and says that because of the

15   conspiracy she should be responsible for the entire amount, and

16   we take objection to that, as the Court said, in the government

17   establishing that she had obtained the $5 million.  The other

18   item that is of concern is the government just spoke of her

19   being the driving force behind the fraud.  I assume that's

20   going to be much of what's contested during the sentencing

21   hearing in front of the Court, and so I want to take exception

22   to that whenever it is stated, even if it's stated in the

23   context of a forfeiture.

24            I'm also concerned with the manner in which the

25   government chose to ask for this as $5 million, simply by

1    Ms. Kimberley Tew.  I assume, although it's difficult to assume

2    things, I don't like to do it much, but that that is the amount

3    that will also be requested of Mr. Tew, and although there is

4    certainly evidence that I don't need to belabor, there should

5    be an amount that is attributable to Mr. Yioulos, whatever that

6    may be, during argument during his sentencing.

7         So the fact that the government hasn't asked for this

8    to be joint and several gave me the impression, at least the

9    statements that just were made, that trailing the comment that

10    she was the driving force behind the fraud and therefore

11    responsible for the $5 million, as if that should be an amount

12    that is attributable to her.

13         Again, I don't want to presume how the government is

14    going to discuss the amount when Mr. Tew in front of the Court,

15    but I take exception to that manner of issuing and order as it

16    relates to restitution.

17         Other than that, rest on the information I provided

18    the Court.

19         THE COURT:  All right.  Thank you, Mr. Kaplan.  And I

20    do think that the government clarified, again, that they won't

21    be seeking forfeiture from both of the Tews in that amount, and

22    obviously then, there's also the interplay with restitution

23    that I do think is requested, or at least recommended to be

24    joint and several among all three of the defendants, and how

25    that plays out is a bit of a complication, and also I take into

1    account your concern with describing her as the driving force.

2    I don't think that's a necessary part of my analysis of the

3    forfeiture issue, and I do think we will have time to discuss

4    that, but I do find that the facts here, as I indicated,

5    support that the government's position on forfeiture, whether

6    or not she was the driving force, Ms. Tew was indicted and

7    convicted of being part of this conspiracy.  The conspiracy

8    obtained that amount, that amount is proceeds derived from the

9    criminal activity, and there's no reason to separate out, under

10   the law, only those transactions that Mrs. Tew was individually

11   involved in directly, because she, at the very least,

12   indirectly received some benefit from all of those

13   transactions, and so I think the government has met its burden

14   on this, particularly under the *US vs. Channon* case, where the

15   defendants are married, the money went into one or both of

16   their accounts.  I think that Mrs. Tew fits the description of

17   someone who benefit -- who derived these benefits, taking into

18   account the government's admission that it won't be seeking

19   double forfeiture, which would be, obviously, problematic.

20           So I'm going to grant -- I'm going to grant the

21   Government's Motion For A Preliminary Order Of Forfeiture In

22   The Amount Of $5,023,878.50.

23           I think we should at least go ahead and just get

24   started on the sentencing itself, and maybe after we deal with

25   objections or something I will take a quick break, but I will

1    just kind of give you, again, try to give you a little bit of

2    an idea of some of my initial consideration.  Mr. Kaplan?

3         MR. KAPLAN:  Your Honor, could I just have one more

4    comment on the forfeiture issue, based on something that you

5    said?

6         THE COURT:  Sure.  Go ahead.

7         MR. KAPLAN:  Will be very brief.  Your Honor, the

8    Court mentioned some issues that involve with forfeiture versus

9    restitution that I recognize also.  I just wanted to point out,

10   in the government's document on forfeiture, it indicated that

11   pursuant to the Attorney General recommendation or a

12   recommendation to the Attorney General, the forfeiture money

13   was going to be provided to the eligible victims, and I would

14   just, in the Court's contemplation of the question of

15   forfeiture and restitution, I think that plays a role in how

16   the government can ask for funds or additional funds from

17   Ms. Tew.

18        THE COURT:  Maybe we should go ahead and have a little

19   discussion of that, because I have gotten myself worked up

20   about restitution and forfeiture before, and it, sort of,

21   bothers me, the idea, at least, under the law that the US can,

22   kind of, decide whether or not to, sort of, double up on and

23   make someone, both, provide full restitution and forfeiture.

24        My understanding, what the government is saying, is

25   that their recommendation will be to not double up; that any

12

         1   restitution be counted against the forfeiture.  But, Ms. Hurd,

         2   would you make me make sure I understand the position.

         3           MS. HURD:  Yes, Your Honor.  28 CFR Subpart 9 sets

         4   forth that any net proceeds from forfeited funds can be applied

         5   to restitution, restoration, depending on a civil or criminal

         6   case.  We just have the authority to recommend that to the

         7   Attorney General, and his delegees, but generally speaking,

         8   Your Honor, there's some factors that have to be met, most

         9   cases meet those factors.  It's rare when people can pay twice.

        10   So really the government is, like, primary goal is to get money

        11   back for restitution, and that's just the mechanism.  So we

        12   were just telling the Court that we intend to, when we find out

        13   proceeds -- or when we find any assets, those net proceeds,

        14   once they are sold or whatever else, we would ask that the

        15   Attorney General use their discretion to apply those to restore

        16   the victim; meaning, provide it to the Clerk of the Court for

        17   restitution.  Does that make sense, Your Honor?

        18           THE COURT:  It does, as a legal matter.  Again, I

        19   have -- it's always seemed to me that if they have to pay

        20   restitution, that they no longer have those proceeds to

        21   forfeit.  So it's, sort of, seems to me it should be less

        22   discretionary on the part of the Attorney General, but I

        23   understand that's the law.

        24           MS. HURD:  Yeah, Your Honor.  If I could do it in

        25   every case, that I have that magic wand, I would.

1    Unfortunately, it's just not the way it's written or the scheme

2    that its set forth.  So we just follow that procedure,

3    Your Honor.  I'm always hopeful that we can get money back to

4    victims that way, as well.

5            THE COURT:  Okay.

6            MS. HURD:  Thank you, Your Honor.

7            THE COURT:  I appreciate the government's

8    representations that they will seek to do that in this case.

9            Mr. Kaplan, was that what you were trying to address?

10           MR. KAPLAN:  Yes, it was.  And it was my understanding

11   from the paper, so I wasn't necessarily suggesting that they

12   were trying to do something differently, but when the Court

13   raised it as a legitimate concern, I recognized, and the

14   government obviously recognizes, I was just pointing out that

15   that is my understanding, notwithstanding the requirement that

16   the Attorney General weigh in, but it was my understanding how

17   the government, in this case, was seeking to proceed.

18           THE COURT:  Okay.  Well, thank you.  Now we've got our

19   belt and suspenders on, on that issue, so thank you.

20           So, as I was indicating, I will just give you a little

21   bit of a heads up of my thinking on the sentencing.  To some

22   extent I'm in a similar position on some of these objections.

23   I feel like the government has taken a fairly aggressive

24   approach on enhancements in this case, but for the most part I

25   think I'm, at this point, convinced that they are correct on

1    most of them.

2            There are two, and one in particular that I will

3    indicate I question most, one is the aggravating role, the

4    leader or organizer question, and then probably the one I'm

5    most on the fence about is the obstruction of justice

6    enhancement.  The rest, I think the government is on solid

7    legal ground.

8            Why don't -- we can go ahead and begin.  I guess what

9    I would probably want to do on this is begin.  Mr. Kaplan or

10   Ms. Hubbard, are you going to address the objections.  So let

11   me just say what I would like to do first, and say the

12   overarching objection that you have made to sort of the

13   presentence report's quoting from the government's sentencing

14   statement, I understand that general objection and some of the

15   specific objections within it, but I also understand that

16   that's how the process works.  The presentence investigation

17   report is very clear that it's simply reporting what it was

18   given by the government.  I don't take it for anything more,

19   establishing facts beyond that.  I participated in the trial, I

20   understand a lot of the facts.  I take the additional context

21   that's been provided by me -- or by you to me in response into

22   account.  So I don't -- I'm -- I expect I will be overruling,

23   kind of, that general objection, with the understanding that

24   you have provided additional context and I am not simply going

25   to rely on those statements for anything more than just an

15

1    understanding of the government's position.

2         So with that, I think I would like to begin if you

3    feel the need to add to anything on that, you can do so, and

4    then let's just, maybe, address whether there are any other

5    objections that don't affect the guideline range that we still

6    need to address.

7         *MS. HUBBARD:*  Your Honor, just as a general matter, on

8    that policy, to quote from the government's sentencing

9    statement, I think oftentimes that's less problematic than it

10   is in this case.  Largely, because often times the government's

11   sentencing statement is written much more factually, than it is

12   in this case.  The vitriol with which the government has

13   approached the sentencing arguments against my client is

14   something that I have never seen before.  I don't understand

15   the basis for it.  So that really causes more concern in this

16   case than would typically be true, and the reason for that,

17   Your Honor, it's not so much for you, because you presided over

18   the trial, you know, we tried to acknowledge most of our

19   sentencing pleadings, that we don't need to re-litigate the

20   facts with you, who is way more familiar with the facts than

21   you usually are at a sentencing, but this document follows

22   Ms. Tew into custody.  It is a document that goes to the bureau

23   of prisons.  It is a document full of adjectives and adverbs

24   that are defamatory and slanderous and just accusatory, and

25   full of vitriol about my client that the bureau of prisons

1    officials don't need to read all of that.

2            It is easy to prepare a neutral summary of the facts.

3    The Indictment, quite frankly, in this case, is a speaking

4    Indictment that is long and in detail about what happened, and

5    so it's just that whole narrative, that is the government's

6    argument about why Kimberley Tew is the ringleader and the

7    driving force, and this master manipulator, who made her poor

8    powerless husband steal all of this money.  That's the

9    narrative, that's -- it's just unnecessary for that to follow

10   her into the bureau of prisons.

11           So, you know, that's just my -- I'm off my soapbox,

12   apologies, Your Honor.  I don't think it affects the

13   sentencing.  I don't believe it's going to affect Your Honor's

14   rulings here, but it is, from my perspective, a bigger issue,

15   than just how it plays out in this courtroom, because the

16   intent of the PSR is to provide the bureau of prisons with the

17   information that they need to meet her needs and provide for

18   educational opportunities and health concerns, and that's what

19   a PSIR is intended to do, both to educate the Court, and to

20   make sure she gets her needs met in the bureau of prisons.  So

21   this ten-pages of vitriol for my client just doesn't need to be

22   there.

23           THE COURT:  All right.  I will say, in general, I

24   agree that the sentencing statement probably could have been a

25   little bit more matter of fact, and I appreciate that.  I don't

1    think, in this case, there's anything in there, that I'm

2    especially concerned would cause problems with the bureau of

3    prisons, but in general, I understand it.

4        Are there any other sort of nonguideline objections

5    that haven't been addressed, that you think we need to rule on?

6        *MS. HUBBARD:*  No, nothing specific, Your Honor.

7        *THE COURT:*  Okay.  So then I'm going to overrule the

8    objection, to that extent, and then why don't we turn then to

9    the objections that do affect the guideline range, and I

10   indicated to you that I was most troubled by, at this point,

11   but it may make sense instead to just go -- not to address

12   those first.

13       Why don't we go ahead and start with 18-level

14   enhancement for the amount of loss.  I think as we, sort of,

15   just discussed, I think you have got a tough legal position to

16   overcome on that but go ahead if you would like.

17       *MS. HUBBARD:*  Your Honor, I do think there's a

18   distinction between how loss is treated for purpose -- or

19   misuse words.  So, how the amount at issue is treated for

20   purposes of forfeiture and restitution, and how it's treated

21   for purposes of 2B1.1, for sentencing.  And I think, you know,

22   there's a little bit of two sides to the coin, and this is true

23   of many of our sentencing arguments is, you know, sometimes

24   it's actually a misapplication of the guidelines, and other

25   times it's just things we want the Court to consider and in

1    fashioning an overall sentence, right?  But we wanted to

2    articulate the same considerations so that you could have them

3    in mind as you think about, *Do these guidelines apply*?  And if

4    you say, *Well, the guideline applies*, you have it in mind for

5    what's an appropriate sentence.  But when you look at loss, you

6    know, there is -- the law on conspiracy, that I think is

7    particularly apt in this case, is once you are in a conspiracy,

8    there are significant steps you have to take to withdraw from a

9    conspiracy.  We're not contending those were met here, and so,

10   for purposes of whether Kimberley Tew was not guilty of certain

11   aspects of the conspiracy, we didn't present that defense.  But

12   I think that is different than how much is relevant conduct and

13   how much should be attributed to her, for purposes of the loss

14   calculation under 1B -- 2B1.1, in that I don't believe there

15   has to be that same formalistic withdrawal in order to not have

16   the later parts of a conspiracy accounted for.

17          I know in this federal court the conspiracy law often

18   is applied in drug cases, and we're here arguing, you know,

19   there's a conspiracy with 20 kilos, but my guy was only

20   involved with one, and that's how the Court is typically

21   sentencing people.  There has to be some direct involvement,

22   some direct link between the person, who is being sentenced,

23   and the amount of the conspiracy that can be attributed to that

24   person.

25          So the reason I say that this distinction is

 1   particularly apt in this case, is because the evidence of

 2   Ms. Tew's involvement in the conspiracy, the people who she was

 3   connected to, the relationships she had, the evidence was much

 4   more... Your Honor, I'm going to struggle a little bit, as I'm

 5   trying to do the best I can to make sure that my client's

 6   appellate rights are fully preserved, as I make all of these

 7   sentencing arguments.  So forgive me if I stumble over some

 8   words.  But I believe the evidence the government presented was

 9   stronger that she had the relationship with Hannah Scaife, who

10   were the first invoices presented, that she had some

11   relationship with Michael Meyers, who was amongst the first,

12   and then there is very slim evidence of any of her direct

13   involvement when the numbers in this case, got huge, right?

14   Because if you look at the amounts of the invoices, at first,

15   they are -- I mean, they are not tiny, but in the scheme of the

16   5 million, I think it's like 3-and-a-half million were stolen

17   at the very end, through the entities, where there's no link to

18   my client at all.  Michael Tew set up those entities.  All of

19   the conversations are between him and John Yioulos.  At that

20   point, the government's evidence against is that she is a

21   nagging wife asking her husband to get money.

22           So when you are talking about this conspiracy, you

23   have somebody who, the evidence is stronger at the beginning

24   and then it falls off, I think for purposes of relevant conduct

25   and purposes of 2B1.1, that needs to be taken into account.

1    Her direct involvement with the amounts at issue.

2          We've posed two different alternatives for how the

3    Court could consider the evidence, either the counts of

4    conviction, which I think are the 184,300, or the counts of

5    conviction, plus those early entities, where the evidence was

6    stronger that she had the direct connections to people or she

7    was more directly involved with setting up or facilitating any

8    of those invoices.

9          Once you get to Arrow Maintenance Resources, once you

10   get to... I'm forgetting the other acronyms, but later in the

11   conspiracy, there isn't the evidence of her continued

12   involvement.

13        THE COURT:  So let me just ask you, so you talked

14   about relevant conduct, and you talked about, sort of, those

15   specific transactions she was convicted of.  She was also

16   convicted of conspiracy, and the 2B1.1's language just talks

17   about increasing the offense level if the loss from the offense

18   shall she was convicted of, adds up to a certain amount, in

19   this case over three-and-a-half-million dollars.  The

20   conspiracy, as we talked about a little bit, involved over $5

21   million.  She was convicted of conspiracy, why isn't that alone

22   enough?

23        MS. HUBBARD:  I think the Court has to make an

24   individualized determination for each defendant, and so, just

25   like when, in a drug case, somebody pleads guilty to the

1    entirety of the conspiracy, you don't look at it and say, *The*

2    *conspiracy was 20 kilos, so you get hit with sentencing for the*

3    *full 20 kilos,* that's the purse of relevant conduct and the

4    purpose of individualized sentencing under the guidelines, is

5    for the Court to look deeper and look at each individual

6    defendant's involvement, because again we are not talking about

7    guilty or not guilty, for purposes of conspiracy law, right?

8    We're talking about what is this individual defendant's role,

9    in the overall scope of the conspiracy?  Because now that we're

10    at sentencing, what happens with Michael Tew or what happens

11    with Jonathan Yioulos is really not at issue.  The Court is

12    here to sentence Kimberley Tew, and so I think that's the

13    distinction, Your Honor, is that sentencing is a time for

14    individualized consideration, and that applies to the loss as

15    well.

16            *THE COURT:*  Okay.  Thank you.

17            *MS. HUBBARD:*  Do you want me to tackle all of them

18    while I'm here?

19            *THE COURT:*  Why don't we let the government respond on

20    that.

21            *MS. HUBBARD:*  That works.

22            *THE COURT:*  Thank you.  Mr. Fields?  Thank you,

23    Your Honor.  So two issues, one matter of law, one a matter of

24    fact.  I will start with, sort of, the legal issue.  I agree

25    there does need to be an individualized determination here, but

1    the individualized determination the Court is going to make is

2    what was the scope of the conspiracy for this particular

3    person?  What did they agree to?  Were the steps in furtherance

4    of that conspiracy?  And was it reasonably foreseeable?

5           Defense counsel didn't cite any of that law or apply

6    it or even assess it in what we just heard, that's 1B1.3

7    relevant conduct, and that's the individualized determination

8    here.  So as the government points out in its sentencing

9    papers, there's no disagreement about the scope of the

10   agreement here.  The jury found, beyond a reasonable doubt,

11   that she agreed to execute an essential objective of the

12   conspiracy, which was to defraud National Air Cargo.

13          The second thing, Were these in furtherance?  The

14   Court has already made a finding, by a preponderance of the

15   evidence, that all of the communications in -- well, most of

16   the communications in the *James* log were in furtherance.  Many

17   of those featured Kimberley Tew.  They feature Kimberley Tew in

18   every aspect of the conspiracy with each and every vendor, and

19   so that leaves the individualized determination as to whether

20   or not any of this was reasonably foreseeable to her.  And as

21   the government points out in its sentencing papers, right up

22   until the very end, in June of 2020, she is asking Michael

23   about whether the FBI -- like, *What has John said about the*

24   *FBI's investigation in the National Air Cargo*, and, *Oh by the*

25   *way, when is John going to send it again.  Stick with me*.

1          So as a legal matter, I think the Court has everything

2     it needs to make an individualized determination for Kimberley

3     Tew, under 1B1.3, that three-prong test, and then as a factual

4     matter she was involved in every aspect of this.

5          So I would just say two things, so the -- when defense

6     counsel says that there has to be some direct link, that's just

7     not true, as a matter of law, especially when it comes to

8     conspiracy.  If we're talking about she has to be involved in

9     each and every transaction, it's just not true.  The direct

10    link here is, *Did you agree to be part of the conspiracy*?  So

11    let's use the drug example, right?  You are talking about two

12    people, and one defendant agrees, *Yeah, I'm going to help you*

13    *distribute cocaine from Mexico, here into Denver, Colorado*, and

14    they keep on doing that and the objective of the conspiracy is

15    to distribute cocaine.  It's not a separate part of the

16    conspiracy where like, *I only agreed to provide you with sort*

17    *of you know a car, to actually get you know some bricks of*

18    *cocaine on this one day to cross the border on one day*.  The

19    scope of the agreement might be a little different for that

20    particular defendant, but if you just agreed to help distribute

21    cocaine on the streets of Denver, and, you know, you -- and

22    acts are taken in furtherance of that and it's reasonably

23    foreseeable to you that cocaine is going to be distributed on

24    the streets of Denver, you are liable for all of that cocaine.

25          *THE COURT:*  Let me ask you to clarify how you think

1    that example applies.  So I think everyone would agree, if

2    you're my supplier and we have an agreement that I'm going to

3    get a certain amount from you and distribute it, we are both

4    liable for all of that amount, but if you are the higher up in

5    the organization and you also have an agreement with ten other

6    people, isn't the question, am I -- you're liable for all of

7    theirs, but am I also liable for the ten other people's

8    distribution?  Do you think that I would be liable for

9    everybody else too, if I'm just one spoke and you are the hub?

10          MR. FIELDS:  I think the Court would have to make the

11    finding that that, sort of, was part of the agreement, right.

12    There were going to be, sort of, other channels, right, and

13    that is within the scope.  So, you know, if it's a supplier and

14    a, sort of, I don't know, like basically a wholesaler and

15    retailer, right, and so the retailer has to understand that

16    the -- or the wholesaler has to understand the retailer is

17    going to have sub-vendors, things like that, right?  It's

18    within the scope.  If there's a finding, if the facts establish

19    that the wholesaler knew that, agreed to it, and wanted it,

20    that's all that you need to be in furtherance of the

21    conspiracy, and that's what we have here, Your Honor.

22          Kimberley Tew understood what was going on here.

23    There's communications throughout the conspiracy in which she

24    is asking Michael Tew to take money from National Air Cargo.  I

25    don't think there's any doubt as a matter of law and fact that

1    she intended to get the whole amount, and it was reasonably

2    foreseeable.

3              THE COURT:  I agree with you.  I think it's clear that

4    she understood and agreed and was part of the conspiracy to

5    defraud National Air Cargo, and the jury found that, but I

6    don't know that there's evidence, and certainly as the defense

7    points out, the jury didn't find and she was not charged with

8    each particular transaction, and there's not evidence, I think,

9    that would let me say, *I know that she had agreed to each of*

10   *the transactions, that you put evidence on, that add up to the*

11   *$5 million*.  But my understanding is that your position is that

12   it's not necessary to have that, as long as it was reasonably

13   foreseeable and within, kind of, the scope of the basic

14   conspiracy that she did enter into; is that right?

15             MR. FIELDS:  That's right, Your Honor.

16             THE COURT:  Okay.

17             MR. FIELDS:  I have nothing more, Your Honor.

18             THE COURT:  All right.  Thank you.  Yes.  Ms. Hubbard,

19   I will give you a moment, if you want to have, sort of, a bit

20   of rebuttal on this particular issue.

21             MS. HUBBARD:  Your Honor, I think the spoke-and-hub

22   analogy is apt here in that what the government is trying to do

23   is to hold Kimberley Tew responsible for everything that was

24   happening in the middle.  The evidence was very strong at trial

25   of recordings and communications between Michael Tew and

1   Jonathan Yioulos that they were talking about how much money

2   NAC had, talking about how to get that money out of NAC to

3   Michael Tew, and again, as the conspiracy goes on, the evidence

4   becomes that Kimberely's role was to say, *Michael, we need more*

5   *money, get more money, get more money*, and that's not evidence

6   of the same level of direct involvement in the nexus of the

7   conspiracy that exists early.

8       So, Your Honor, I will just stand on our pleadings,

9   unless the Court has further questions on that point?

10      *THE COURT:*  I don't.  I'm going to overrule that

11  objection.  I understand it.  Again, as I discussed in

12  forfeiture, the forfeiture discussion I have some, sort of, at

13  least emotional understanding of how unfair it may seem, but I

14  think on the law the government is correct that Mrs. Tew

15  entered into a conspiracy, took steps in furtherance of that

16  conspiracy, was convicted of doing so by the jury, and while

17  she may not have known the specifics of particular transactions

18  or particular arrangements between her husband and Mr. Yioulos,

19  they were all essentially the same sort of transactions that

20  she did know about and were certainly reasonably foreseeable.

21      So I think under the law that enhancement -- or that

22  section, the 18-point increase, under 2B1.1 has to be a

23  applied.  So that objection is overruled.

24      Why don't you go ahead to the next one.

25      *MS. HUBBARD:*  Is the next one on your list the

1   sophisticated means?

2           *THE COURT:* Sure.  Sure.

3           *MS. HUBBARD:* Just trying to follow your organization,

4   Your Honor.  If you want me to go in a different order, just

5   say so.  I think I'm just following the list.

6           You know, our primary argument as to sophisticated

7   means, again, touches on the fact that the Court, at the time

8   of sentencing, has to make an individualized determination.  I

9   am not here arguing that the scheme, overall, doesn't have

10  sophisticated means, given the number of companies, Michael Tew

11  setting up an LLC in another state, all of the things that the

12  PSR points out, about invoices not being consecutively

13  numbered.

14          The Court heard testimony and saw communications

15  between John Yioulos and Michael Tew where they are talking

16  about, *What should I use as the description on this invoice*,

17  *so, that we're not raising suspicion inside NAC*?  I'm not here

18  arguing that none of that happened.  What I'm here to point

19  out, Your Honor, is that none of it involved Kimberley Tew, and

20  the sophisticated means enhancement, Application Note 10(C) to

21  2B1.1 is very specific on this issue.  It says, *If the offense*

22  *otherwise involved sophisticated means and this defendant,*

23  Kimberley Tew, *intentionally engaged in those sophisticated*

24  *means, or caused those sophisticated means to be used*, that's

25  where the evidence falls short.  There's not evidence that

1    Kimberley Tew engaged in the sophisticated means.  There's not

2    evidence that she made the invoices.  There's not evidence that

3    she was involved in those conversations about what should be on

4    the invoices.  There's not evidence that she was responsible

5    for sending them, receiving them, any of that.  That's all

6    John Yioulos and Michael Tew.

7         So again, because we are at sentencing, the issue is

8    not whether it was sophisticated means, the issue is whether

9    this specific enhancement should apply to Kimberley Tew, and

10   whether Kimberley Tew's guideline range should go up by two

11   points?  And I think under the facts of the case and the law as

12   applied to this enhancement, there just isn't the evidence

13   necessary here for that enhancement to apply.

14        THE COURT:  I think there's certainly evidence

15   sufficient to find, by a preponderance of the evidence, that

16   Mrs. Tew, at least at some point, knew of the basics, that fake

17   companies and fake invoices were being used to carry out the

18   scheme.  Is that not enough?  And that she encouraged it, and

19   if only by saying *We need more money*, caused some of those

20   false invoices to be submitted?

21        MS. HUBBARD:  I think if the issue was, *Did she cause*

22   *the fraud itself to occur*, that would be a different issue.

23   But the issue here is *Did she cause the specific sophisticated*

24   *means to occur here*?  And so, I'm not aware of any evidence

25   that she said, *Michael, go set up an LLC in Wyoming.  Make sure*

1    *it's something in the aerospace industry.  Talk to John about*

2    *what we should put on the invoices, to make sure we're not*

3    *raising anybody's suspicion at NAC*.  She is not doing that.

4    Like, I think what you are talking about, as far as was she

5    potentially causing -- is *Michael get money*, is that causing

6    Michael to then potentially go to John and say, *We need money*?

7    Maybe.  But it's not causing Michael to say, *Okay, now, I have*

8    *got to do the LLC*.  That's all Michael's doing; that's

9    Michael's doing, in conversation with John Yioulos; that's John

10   Yioulos saying, *Hey, Michael, I don't think I can send more*

11   *money to Political Media because that is not a legitimate*

12   *expense for NAC*.  *There's only so much I can send to a*

13   *marketing company without raising suspicions*, and then Michael

14   saying, *Let's start using another company*.  That's all

15   happening between the two of them.  So that's not Kimberley Tew

16   causing the sophisticated means to occur, if that makes sense.

17          *THE COURT:*  I understand the argument, yes.

18   Mr. Fields.

19          *MR. FIELDS:*  Thank you, Your Honor.  I'm going to

20   bracket the invoice issue for a second.  So I'm going to focus

21   on all of the other sophisticated means that are in paragraph

22   80 of the PSR.  So this would include using other's

23   identifiers, creating fake email accounts, recruiting others to

24   be use, sort of, sham account holders, using cryptocurrencies,

25   and all of the cases that the government cites, in its

1    sentencing statement, on pages 35 through 38, none of those are

2    addressed by the defendant in any of their responses.  None of

3    them were addressed now.  The defendant concedes, in the

4    response, that the cases cited therein, say those sorts of

5    things are sophisticated means.  So the government's first

6    argument here would be that they have waived any argument that

7    all of those means, in paragraph 80, are sophisticated.

8    There's no doubt that they are and there's no doubt that the

9    defendant individually did that.

10          So you recall the testimony at trial from Hannah

11    Scaife, that Kimberley Tew reached out to her, to specifically

12    used her bank account, so that they could launder money that

13    was being taken from National Air Cargo.  You will also recall

14    the testimony of Michael Meyers at trial, who testified really

15    extensively about his online relationship with Kimberley Tew

16    and how she convinced him to let her use his bank account to

17    again launder money that was being taken from National Air

18    Cargo.  The Court will also recall all of the photographs of

19    Kimberley Tew standing in front of Bitcoin ATMs.  Also recall

20    the substantial bank records, where money would come from

21    National Air Cargo into the accounts, and then be immediately

22    transferred to Kimberley Tew, frequently, and then from there,

23    into various cryptocurrency exchanges, Gemini, Kraken, et

24    cetera.  All of those are sophisticated means.

25          If we are going to look at the use of the shell

companies themselves, the issue isn't, *Did she set it up*?  The

issue is, *Did she engage in the sophisticated means?  Did she*

*use it and did she cause it to be used*?  And the defendant's

statements that there's no evidence is a wild overstatement,

Your Honor.

          If you look at Government's Exhibit 295, this was a

text message -- sorry this is *James* log entry 295.  So

Government's Exhibit 895.  *Hahn, there's only 919 left in*

*Global Fuel, because all of the Wynn stuff hit*.  And Kimberley

Tew responds, *Okay, so hold off on depositing at Sand Hill*.  Or

Government's Exhibit 902, *What's the email for PayPal linked to*

*Sand Hill*.  Again, one of the sham companies used.  Michael Tew

responds, *M2@globalfuel.co*.  Another exhibit, Government's

Exhibit 932, Kimberley Tew asking, *How much did you withdraw*

*from Global*?  Government's Exhibit 914, *If it works for Global*

*Fuel deposit cash into Sand Hill*.  And then Government's

Exhibit 962, *How much money are you showing*, Kimberley asked

Michael.  The response, *55.5 plus the 93 John sent in Global*

*Fuel*.

          She is asking about these shell companies.  She knows

that they are being used.  She is encouraging Michael Tew to

use them.  It's just factually incorrect to say that she did

not -- wasn't aware of the sophisticated means.

          When it comes to the invoices, Your Honor, there was

testimony at trial that Kimberley Tew had submitted her own

1    invoices to National Air Cargo.  Government submitted those

2    invoices at trial.  If you look at Government's Exhibit 986,

3    it's one of those invoices that Kimberley Tew submitted.  If

4    you look at Government's Exhibit 543, Michael Meyers' invoice,

5    they look remarkably similar.  There's evidence that Kimberley

6    Tew used the Michael Meyers' email account.  She admitted as

7    such in her replies, the government notes, in that Motion To

8    Suppress, but there's also independent evidence, including all

9    of the Google records, the shipments of clothing to her house.

10   So she is using someone else's email account and there's

11   independent evidence, and it's a fair inference, that she is

12   the one who submitted those invoices.  And you add, on top of

13   that, Your Honor, all of the evidence recounted in the

14   government's sentencing statement and its objections as to her

15   conversations with Michael Tew, specifically about invoicing.

16   Or her conversations with Jonathan Yioulos, where Yioulos would

17   ask her for an invoice.  *I need an invoice from Scaife*, right?

18   These are those, sort of, one-sided conversations, we don't

19   know what she says, but we certainly know that an invoice was

20   submitted for Hannah Scaife, because Yioulos testified about

21   it, and Abby Schwarts talked about the invoices that were in

22   National Air Cargo's books.  So again, it's a fair inference

23   that she caused -- she engaged in the sophisticated means and

24   caused it to be used.

25            The jury's findings here really leave no doubt that

1    sophisticated means were used, and the Court has already found,

2    by a preponderance of the evidence, that many of these entries

3    in the *James* log were in furtherance of the conspiracy, and if

4    you look at those cases, they are sophisticated means.

5            So for all of those reasons, the government would say

6    that the enhancement applies.

7            *THE COURT:*  All right.  Thank you.  Ms. Hubbard, would

8    you like a brief rebuttal?

9            *MS. HUBBARD:*  Since I have to stand up here anyway for

10   the next issue, I might as well.

11           Your Honor, just briefly, to point out that my

12   understanding of the sophisticated means is that it was

13   applying to the wire fraud counts, and so I think this

14   reference to the use of cryptocurrency and structuring

15   transactions, that appears in paragraph 80 of the PSIR, isn't

16   applicable.

17           I would also urge the Court, given that it's 2024, I

18   think it would be an overstatement to say that just because

19   somebody uses cryptocurrency that makes it sophisticated.  It

20   is becoming an evermore present part of our society.

21           So, just wanted to make those couple of points and

22   stand on the preexisting record.

23           *THE COURT:*  Okay.  I understand that argument and I do

24   think that, at least for some of these transactions, it's not

25   clear that Mrs. Tew participated, but I think that the

1    enhancement still applies, even if it was only a limited amount

2    that she was involved in the use of sophisticated means.  I do

3    think that she, at least, caused and participated in their use,

4    as Mr. Fields explained, both -- I guess on both ends of the

5    transactions, encouraging the use of, she clearly understood

6    the use of shell corporations and the different corporations

7    and invoices.  I think the use of Mr. Meyers' and Ms. Scaife's

8    information.  There's at least evidence I think with -- I think

9    it's probably stronger, my recollection, as to Michael Meyers,

10   that Mrs. Tew was a driving force in that aspect of it, using

11   other's bank accounts, and that that is sufficient.

12          The cryptocurrency, I think you are right, it's

13   becoming more commonplace, but I don't think that means it's

14   not a sophisticated means.  I don't -- I think that taking

15   money out of a -- that may have been criminally derived and

16   immediately or very quickly turning it into cryptocurrency is

17   an effort to hide the money through the use of very

18   sophisticated technology, even if it's relatively commonplace.

19   So I'm going to overrule that objection.

20          Go ahead, Ms. Hubbard.

21          MS. HUBBARD:  I believe the next one in the PSIR is

22   leader organizer enhancement.  Your Honor, I would note, I

23   think one of the important distinctions here is that the wire

24   fraud counts have three defendants, the money laundering counts

25   have two.  And the reason I think that matters is when you are

35

1   talking about the leader/organizer enhancement the key -- the

2   key aspect that the Court is supposed to look at is relative

3   culpability.  There's all of these terms, leader, organizer,

4   control, all of that appears in the case law.  But the key,

5   kind of, policy reason for this enhancement is if one member of

6   the conspiracy is more relatively culpable than the other one,

7   they should be assigned this enhancement, and this is not an

8   enhancement -- I understand the case law that the government

9   cited, where more than one person can be a leader/organizer,

10  and sure that's absolutely true, there often is conspiracies of

11  10, 20, people, and there's multiple people who are heads of

12  that conspiracy, but that's not what we have here.

13          What we have here is a two-person conspiracy, between

14  a husband and a wife, and, Your Honor, I would call the Court's

15  attention to the government's own motion, their Preliminary

16  Order For Forfeiture, **ECF Number 513**, on page seven, the

17  government says, *Michael and Kimberley Tew were equally*

18  *culpable in the conspiracy that obtained 5 million plus from*

19  *the victim company for their benefit.  Based on their joint*

20  *conduct, joint use of proceeds, and joint responsibility,*

21  *government seeks forfeiture*.

22          That's the issue here.  If there's two people in a

23  conspiracy, and the evidence is that they are equally culpable,

24  then the leader/organizer enhancement simply doesn't apply.

25  This is not one that just gets applied in every case.  It's

1    intended to apply when there's truly somebody who has increased

2    culpability, right?  We could, and as the Court has seen in

3    other conspiracy cases, I'm going to default to drug cases

4    because I feel like that's just what we have so many of in this

5    district, but the guidelines are driven by amount of drugs.

6    Guidelines here are driven by amount of loss.  Guidelines are

7    driven by sophisticated means.

8          The Court has said there's sophisticated means in this

9    case that apply to all of the defendants.  So when you look at

10   the Chapter 2 enhancements, in the Sentencing Guidelines, those

11   are, kind of, what is in the whole conspiracy.  What's the

12   action at issue in the whole conspiracy?  This enhancement is

13   Chapter 3.  Chapter 3 is really intended to distinguish between

14   people who have different roles in a conspiracy case, and in

15   this case, this enhancement applies to money laundering.  The

16   proof at trial was on the money laundering that Kimberley Tew

17   and Michael Tew were equally as involved.

18         There were countless pictures of Michael Tew at the

19   Bitcoin ATMs.  There was a handful of Kimberley Tew.  The bank

20   witnesses that came in and testified, had a number of

21   interaction with his Michael Tew.  They remember him asking all

22   kinds of questions about, *What are your withdrawal limits*?  He

23   wanted to know about the bank's policies for how he can access

24   money.  They presented pictures of him going into the lobby,

25   and then driving through the drive through to get more money,

1    right?  Those are all evidence of what Michael Tew was doing

2    with respect to the laundering.  There was one time that the

3    bank teller remembered Kimberley Tew coming and making a

4    withdrawal.  One time.

5         Now, I'm not here to argue that Kimberley Tew was less

6    involved than Michael Tew.  I'm aware of all of the

7    communications between the two of them, about what money is in

8    what account.  How money should be transferred from here to

9    there and moved around.  All -- honestly, Your Honor, none of

10    that is shocking, given that this is a married couple.  A

11    married couple where there are not two separate sources of

12    income.  It's a married couple where one of the two of them has

13    always made the money, since the kids were born at least, and

14    the other one has taken care of the kids and not brought in

15    their own on independent income.

16         These communications about where the bank balances are

17    and where the money lives and how it should be transferred

18    between accounts are not surprising.  They don't make Kimberely

19    the organizer/leader of a money laundering conspiracy anymore

20    than I would be for my husband when I tell him where to pay the

21    pills -- honestly, I just pay the bills, but one of the two

22    people in a relationship takes on that role, and that doesn't

23    make Kimberley Tew the organizer/leader over Michael Tew for

24    the money laundering.

25         *THE COURT:*  I agree with you, sort of, as a factual,

1   your factual description of how relationships work and just

2   reading, for example, Application Note 2, to this, I would

3   think you are on very strong ground, but the government points

4   to binding Tenth Circuit precedent, the *Valdez-Arieta* case,

5   that says exactly, that a defendant can organize illegal

6   activity without exercising control over the other

7   participants, and that there can be an organizer enhancement

8   under Subsection C, which is specifically for small

9   conspiracies, small criminal enterprises, and even if they are,

10   sort of, co-organizer, without one of them being the other

11   one's supervisor, why doesn't that defeat your argument?

12         *MS. HUBBARD:*  Because, again, Your Honor, I would go

13   back to the whole purpose of this 2S1.1, is relative

14   culpability, and so when there are only two people, if they are

15   equally culpable, the application doesn't apply to either of

16   them, and I understand that case law, as far as defining the

17   term *control*, and that you do not need to have control in order

18   for the enhancement to apply, that's how I read the case, is

19   you don't need to have proof of control.

20         But here we're talking about two people, equally

21   culpable, and... I lost my train of thought.  Sorry,

22   Your Honor.  Equally culpable for the money laundering, the

23   enhancement shouldn't apply to either of them.

24         The other issue, I think, is when you are applying

25   this enhancement to maybe a different kind of conspiracy, where

1    there was a different aspects of it, that different people

2    could be in charge of, perhaps you could have two people who

3    are both leader/organizer of different aspects of it, but

4    that's not the proof in this case with respect to money

5    laundering.

6            My understanding of the money laundering is it's

7    moving the money to a different account, once it has been

8    transferred to the Tews, spending of proceeds.  And so the

9    money laundering, itself, is taking the money from what had

10   been transferred from NAC into the Tews account and moving it

11   to a different account, and this isn't where, for purposes of

12   the money laundering, Michael Tew could be responsible for part

13   of it and Kimberley Tew be responsible for some other aspect.

14   Like, I keep going back to drugs, and I apologize for that, but

15   perhaps, if there was a conspiracy where one person had the

16   connection in Mexico, they are the leader/organizer for how it

17   gets into the United States, right?  Maybe they are a

18   leader/organizer of the importation into the United States.

19   There's another person who is leader/organizer of the

20   distribution ring here in Denver.  I could see, kind of,

21   scenarios and different factual situations, where you are

22   talking about both people could be leader/organizer even in an

23   only two-person conspiracy, but this isn't -- this is a much

24   simpler case when you look at what is actually charged as money

25   laundering.  It's just the moving of the funds.

40

1          *THE COURT:*  But it's a three-person conspiracy, right?

2     Not as to the money laundering, but as to the overall

3     conspiracy, right?  The enhancement is -- I guess my question,

4     couldn't both of the Tews have been leaders and organizers for

5     this enhancement?

6          *MS. HUBBARD:*  So my understanding is that in the

7     guidelines, and I can find the cite when I sit down, but that

8     there's a specific provision that says, *If the defendant is*

9     *charged with money laundering, that leader/organizer should be*

10    *determined based on money laundering.*  So that's why I think

11    the Court's focus here should be on the money laundering

12    conspiracy, that conspiracy has two defendants, that

13    conspiracy, we're talking about money laundering, it's the

14    moving of the funds, once it touches the Tews' account into

15    another account.  That's where I think there's no evidence that

16    one of the Tews was a leader/organizer over the other.  There

17    was conversations.  They talked to each other about how to move

18    the money, where to move the money, when to move the money.

19    There's Michael Tew going to move the money.  Kimberley Tew

20    doing so, less so.  But there's not somebody who is markedly

21    more culpable than the other one as to the money laundering

22    conspiracy.

23         *THE COURT:*  Okay.  Why don't I let the government

24    respond.  Thank you.

25         *MR. FIELDS:*  Thank you, Your Honor.  It's always nice

1    when there are at least some points of agreement.  I agree with

2    Ms. Hubbard the focus needs to be on the money laundering.

3    Where we disagree is the notion that this needs to be focused

4    on a conspiracy.  The enhancement actually talks about

5    participants.  They don't need to be co-conspirators.  In fact,

6    the part of the enhancement that we're talking about, 3B1.1(c),

7    specifically refers to criminal activity.

8            As the government pointed out in its response, and has

9    gone unrebutted now, just like it went unrebutted before, the

10   defendants are completely ignoring the testimony of

11   Michael Meyers.  Kimberley Tew actively recruited him to be

12   part of the money laundering, to use his accounts to transfer

13   money from National Air Cargo, and he testified that he knew

14   something shady was going on, but he agreed to do it anyway.

15   He is a participant in the criminal activity, one -- Kimberley

16   Tew organized that entire part of the fraud.  So when we're

17   talking about, sort of, *Are they both, sort of, culpable?*

18   *Equally culpable*?  Yes.  *Did they organize different parts of*

19   *the money laundering conspiracy?*  Absolutely.  Kimberley Tew

20   was responsible for organizing things like that.  She organized

21   it regarding Michael Meyers.  She also organized with regard to

22   Christain Rincon.

23           If you look at Government's Exhibit 659, that's

24   another example of Kimberley Tew talking -- this is Michael Tew

25   actually saying, *Kimberley knows more about why you are sending*

1  *all of this money to Christain Rincon*, who was one of Kimberley

2  Tew's, again, online buddies, very similar situated to

3  Michael Meyers.  Ignoring all of that, it's a waiver, and that

4  by itself is enough to constitute leader/organizer, but there's

5  more, Your Honor.  It also ignores evidence that the defendant

6  organized the money laundering conspiracy by using her mother's

7  identifiers, her bank accounts, organizing that entire aspect

8  of the scheme.

9       There's also plenty of evidence, as the government

10  points out, and has again gone unrebutted, that the defendant

11  was the one organizing and directing Michael Tew to make

12  particular transactions.  So, *It needs to go into this*

13  *particular account.  It needs to be this particular amount.  I*

14  *want you to put it into this particular cryptocurrency*

15  *exchange*.

16       The government cites numerous entries from the *James*

17  log, which again the Court has already found, by a

18  preponderance of the evidence, were in furtherance of the

19  conspiracy.  All of those are part of her organizing the

20  conspiracy.

21       Also want to say that the defendant -- defense counsel

22  didn't distinguish, in any meaningful legal way, *United States*

23  *vs. Valdez-Arieta*.  The response that I heard was to go back

24  and look at the, you know, policy issues and the guidelines,

25  but presumably the Tenth Circuit already did that, and the

1    Tenth Circuit has decided, as a matter of law, that there could

2    be two organizers, even in a simple scheme like this, and that

3    3B1.1(c) can apply in these circumstances.

4        So I think the law is very clear regarding who can be

5    an organizer, and the facts are also clear that Kimberley Tew

6    was organizing this.

7        Another example that the Court can look at, it's one

8    of the summary charts, chart 1025, one of the money laundering

9    counts, and if you look there it cites to Government's Exhibit

10   931, with Kimberley Tew giving very specific instructions, *Go

11   to Wells Fargo*, *in this particular amount*.  All of that is part

12   of the organization of the money laundering, which was about

13   taking these proceeds from National Air Cargo and then using

14   the banking system to disburse them as quickly as possible, as

15   efficiently as possible, to the defendant's benefit, that makes

16   her an organizer and this enhancement should apply.

17       *THE COURT:*  Thank you, Mr. Fields.

18       *MS. HUBBARD:*  Your Honor, I was looking more closely

19   at the *Valdez-Arieta* case.  It looks like that is a drug case

20   where there was two people indicted, who are, essentially, the

21   hubs, and the government, for a change, chose not to indict all

22   of the spokes or all of the people on the outside.  And so

23   while there was only two defendants, in that case, it's very

24   clear to me, based on the facts set forth in the case, that the

25   conspiracy, overall, was significantly bigger than two people.

1    And again, when you are talking here, I understand the

2    government wants to talk about Kimberley's mother, who I'm not

3    aware there's any evidence that money went into her account,

4    now trickled down, ten, fifteen transactions later, I

5    understand there's some evidence Kimberley had access to

6    accounts in her name, but the money laundering, itself, is

7    moving the money from the account it goes to into another one,

8    and I am not aware of any evidence that Kimberley's mom's

9    account was involved with that or that Kimberley's mom was

10   involved in anyway.

11       THE COURT:  Money laundering can involve multiple

12   transactions, right?  It's not just the initial transfer from

13   their account to something else, right?  You can money launder

14   things through multiple transactions, I think.

15       MS. HUBBARD:  I think that's true under different

16   theories of money laundering, but this one in particular I

17   think it spending.  So I believe the money laundering has

18   occurred when the money moves.  That's my understanding.  Not

19   my specialty area of law.

20       But as to Michael Meyers there was evidence of both

21   Michael and Kimberley being involved with Michael Meyers.  Now

22   certainly there was evidence that Kimberley had a relationship

23   with Michael Meyers, but Michael Meyers testified to driving

24   and meeting Michael Tew, to actually do the financial

25   transaction itself.  So when you are talking about, again,

1    money laundering, the moving of the money, taking the money out

2    of one person's account, depositing it somewhere else, there

3    was evidence that Michael Tew was equally as involved with

4    Michael Meyers as Kimberley Tew was.  So again, that doesn't

5    put Kimberley higher or an organizer over Michael Tew with

6    respect to Michael Meyers.  It puts her involved with money

7    laundering perhaps in Michael Meyers, but not more so than

8    Michael Tew, and when you look at the Section 3 enhancement

9    here, it is again the relative culpability.

10          *Valdez-Arieta* says, *Sure, you don't have to have*

11   *control over another person, for the enhancement to apply*, but

12   there's it does not say that you don't need to have *more*

13   *culpability than other people who are involved*.  The

14   enhancement only applies if you are *more culpable* than other

15   people in the conspiracy and that's where I think the proof

16   falls short.

17          *THE COURT:*  All right.  Thank you.  So I'm -- as I

18   indicated this one is, I think, a fairly close call, for me.  I

19   actually think, though, that probably the evidence of

20   Mrs. Tew's role as an organizer, at least, or leader is

21   probably stronger on the money laundering side than on the wire

22   fraud side.

23          As we talked about, I think her relationship with

24   Mr. Meyers, in particular, suggests this, sort of, leadership

25   of another less culpable individual, that I think we all agree

1    is at least suggested in *Valdez-Arieta*.  I think the other --

2    use of the other bank accounts is troubling, and the use -- and

3    it was clear to me, that, I think, from the evidence that

4    Mrs. Tew was the one driving the withdrawals, purchases of

5    cryptocurrency, that were, sort of, the key to the money

6    laundering, and so I do think on the -- I'm going to overrule

7    this objection.  Like I said, I think it's kind of a close

8    case, and I will take into account that fact at sentencing, as

9    part of my consideration of the Motion For A Variant Sentence,

10   but I am going to overrule it as an objection.  I do think as a

11   legal matter that that enhancement is properly applied, at

12   least under *Valdez-Arieta*.

13         Ms. Hubbard, I think that also, I think, sort of,

14   obviates the possibility of the two-level reduction for

15   zero-point offenders.  I will tell you, I definitely will still

16   consider the criminal history and lack of any criminal history

17   as part of my sentencing decision, but I don't think I can

18   apply that reduction, and so I think, if I'm not mistaken,

19   there's one more objection.

20         *MS. HUBBARD:*  Just the obstruction?

21         *THE COURT:*  Yeah.

22         *MS. HUBBARD:*  Yeah.  I agree with, Your Honor, as a

23   matter of law, as I read the zero-point offender, it cannot be

24   applied to Ms. Tew if the Court finds leader/organizer.

25         On the obstruction, Your Honor, I feel like we've

1    briefed it.  I'm not -- the government keeps faulting us for

2    not addressing every aspect of every point raised, and I have,

3    quite frankly, never filed objections even close to as long as

4    I did in this case.  So with the obstruction, there is one area

5    in particular that I feel like has been quite a moving target

6    for us to try to address what the alleged obstruction is, in

7    this case.

8          If the Court wants to point me to where your thinking,

9    I'm happy to direct my comments in that way.

10        *THE COURT:*  Yeah.  Thank you.  Let me just tell you.

11   So, I'm not impressed by the government's position that

12   convincing someone not to stop cooperating with the government

13   is obstruction of justice, and I'm, frankly, surprised that

14   they pressed that position without more.  So I will say, I

15   don't see any evidence that what happened with Mr. Tew amounts

16   to obstruction of justice.

17         I have a bit of concern about what happened with

18   Ms. Scaife, who did testify that there was some sort of threat

19   to reveal embarrassing information, so that concerns me a bit.

20   I did look back at the transcript of her testimony, and at

21   the -- those look like text messages to me, but maybe they are

22   the Instagram message that was referenced in her testimony.  To

23   me it's a bit of a stretch to call that a threat, and maybe in

24   some context it could be.  So that's where I am on that.

25         The deletion of text messages is probably more

1    problematic.  I'm not sure what to make of taking contradictory

2    positions.  I think those are all of the justifications, but

3    you know, if you want to address particularly though three,

4    Ms. Scaife, the deletion of text messages, maybe with knowledge

5    that there was an investigation going on, and then the

6    contradictory positions.  Those are, I think, worth your time.

7         MS. HUBBARD:  Okay.  Thank you, Your Honor.  With

8    respect to Ms. Scaife, quite frankly, I don't think that

9    happened.  If it happened, I don't think there's any proof that

10   Hannah Scaife's memory is reliable as to when.  We submitted

11   the messages between Ms. Scaife and my client.  I honestly

12   don't know whether they are text messages or Instagram or

13   something else, but -- and Ms. Scaife was wrong on the timing

14   of the other messages that she testified about.  She testified

15   that Kimberley Tew had sent, you know, pictures from their

16   prior friendship, which she felt like was manipulative.  The

17   timing with which she testified to, that those messages had

18   been sent was wrong, when you look at the messages themselves.

19   And the timing on this matters, Your Honor, because I think

20   that's what the government is saying is allegedly

21   obstructionist, is the timing of this message that was

22   supposedly sent with which there is no proof the message

23   actually was sent, other than Ms. Scaife's own words.

24        My sense was that, you know, obviously, the Court

25   heard the testimony, this was a tumultuous relationship,

1      perhaps not a healthy friendship.  I don't see anything that's

2      obstruction.  I certainly don't see anything that the

3      government has met its burden that the timing of any messages

4      that may or may not have been sent was intended to somehow

5      affect this investigation.  I just don't think that the proof

6      is there.

7              THE COURT:  Okay.

8              MS. HUBBARD:  On the deletion of data, right, we have

9      the recording, where Kimberley, with two 6-year olds in tow,

10     runs down and sees her husband and freaks out, right?  And

11     makes comments, I can't remember exactly what it was but*, I

12     have already wiped most of it anyway.*

13             There is no proof, and it is the government's burden

14     here, to establish the facts necessary to apply any

15     enhancement.  There's no proof as to when that wiping would

16     have occurred.  They say she made the statement, and then later

17     we got data that shows some messages were supposedly missing,

18     that, you know, the government couldn't find, supposedly, the

19     one-sided messages.

20             It's curious to me that Ms. Tew would have wiped data

21     and left 7,000 pages of messages with her husband, where they

22     talk about all of the transactions, in this case, needing

23     money, getting money, all of that.  I just don't think there's

24     any evidence for the obstruction enhancement to apply.  The

25     deletion of data has to be intended to interfere with the

1    investigation.  I don't think that there's proof of that in

2    this case.  Even if there was some deletion of data, there's no

3    proof as to when that deletion of data may have occurred or

4    that it was after Kimberley Tew knew about the investigation in

5    this case.

6        As the Court remembers, the government kind of

7    happened upon all of this and then went and talked to John

8    Yioulos, in New York, and did the call with Michael Tew that

9    was recorded, and then the Tews had no idea that this

10   investigation was happening until Michael was arrested, and

11   this meeting happened within days of that.

12       So we're not talking about a long timeframe here.

13   We're talking about a very short window.  So I just don't think

14   there's the proof necessary for the Court to find that

15   Kimberley Tew, if there was any data deleted, which I'm not

16   sure there's really any proof of that, given all of the data

17   that the Court has seen, all of which came from Ms. Tew's

18   iPhone account, all of those text messages that were presented

19   at trial, all of it came from Mrs. Tew's iCloud account.  I

20   don't know how you wipe one string of text messages and oh, and

21   when you do so, there's only one -- you only wipe one-half of

22   the text messages?  I just think the proof is very lacking

23   here.

24       And then what was the last one the Court wanted me to

25   address?

1          THE COURT:  Oh, taking contradictory sort of factual

2    positions about her use of a particular account.

3          MS. HUBBARD:  Your Honor, I think that that should be

4    attributed to Ms. Tew's counsel, not Ms. Tew herself.  There's

5    a number of things that I think are in the government's

6    sentencing pleadings, including the supposed treatment of

7    witnesses at trial.  My Cross-examination of Hannah Scaife is

8    one of them that is being thrown at Kimberley Tew as a reason

9    the Court should hammer her with a sentence.  That was my

10   strategic decision.  Ms. Tew actually did not approve and did

11   not encourage that Cross-examination.

12         The government was offered -- I won't go into all of

13   the details.  That was unfortunate that Ms. Scaife had to go

14   through that, because the government felt like they needed to

15   subpoena her, put her on the stand, and ask her to defame my

16   client's character.  That decision, that I made, shouldn't be

17   held against my client, and I would say the same is true for

18   any contradictory statements that may have been at different

19   points in the case, when she had different counsel.  If we

20   didn't realize a different position had been taken earlier in

21   the case, I don't think that should be attributed to Mrs. Tew.

22         THE COURT:  Okay.  Thank you.  Mr. Fields.

23         MR. FIELDS:  Thank you, Your Honor.  With the Court's

24   indulgence, I'm going to start with Michael Tew, and I

25   recognize how the Court has foreshadowed its ruling and its

52

1    current thoughts and I appreciate that, but just for purposes

2    of the record I want to note the cases that are cited on page

3    42 and 43 of the government's sentencing filing, at **ECF 459**

4    United States vs. Hesser, which is an 11th Circuit case, kind

5    of specifically on point, where a husband tries to convince

6    another family member not to cooperate --

7            THE COURT:  Yeah, but in that case the husband said he

8    will know *whose head to lop off* if they cooperate, that doesn't

9    seem like -- is there evidence -- I mean, the enhancement

10   applies to what seems to me to be unlawful witness tampering,

11   threatening, intimidating, otherwise unlawfully influencing a

12   codefendant.  Where is that?  Where is the unlawfulness?

13           MR. FIELDS:  So it doesn't need to be unlawful,

14   Your Honor.  The statute is *corruptly persuades*, and I would

15   say going to the Yeti store and haranguing your husband not to

16   cooperate, and pleading with him and sort of emotionally

17   manipulating him is enough.

18           Tampering with a witness is definitely obstruction.  I

19   don't take the Court to be taking a position that it, sort of,

20   categorically can never be obstruction.  In mob cases, in New

21   York and Brooklyn, it was applied all the time.  You can see

22   why.  You can imagine, members of the mob, close family, sort

23   of, persuading one another, maybe not using real threats, just

24   sort of corruptly persuading, *Hey, you might not want to*

25   *testify against someone*.

1          You also have the *Pofahl* case, which is a Fifth

2   Circuit case, that one did not involve a threat, as far as I

3   can tell, that was just a letter, a husband writing a letter --

4   or a wife writing a letter, just imploring him not to provide

5   information to the authorities, that was considered enough for

6   the enhancement.

7          *THE COURT:*  Well, I don't think that's accurate

8   either.  I think the Fifth Circuit said that there was

9   additional evidence that supported the enhancement beyond just

10  that.  And I agree with you, I wouldn't certainly say it never

11  can apply, but I do think the government to apply -- to hold

12  someone liable for obstruction of justice for encouraging them

13  or convincing them to do something that they have the right to

14  do, whether it was good advice in this case or not.  I mean it

15  seems, to me, to have been a bad decision, ultimately, for

16  everybody involved.  But attorneys convince people not to

17  cooperate with the government all the time.  People tell their

18  friends, don't consent to searches, that's not obstruction of

19  justice.

20         *MR. FIELDS:*  No, Your Honor.  It would need to be

21  *corruptly persuading*.  In this particular case what would

22  distinguish it from those other scenarios, I leave aside the

23  attorney scenario, which I think is sui generis.  You have a

24  case where charges have already been brought.  It was very

25  clear, and he was cooperating, that was also very clear.  So we

1    have this direct link to an investigation, and Kimberley Tew,

2    very specifically, trying to corruptly persuade her husband not

3    to give the phone, that's going to have evidence of all of the

4    incriminating messages, to the authorities.  She corruptly

5    persuaded him.  We have evidence of that in Government's

6    Exhibit 551, and I think that would be enough for a charge of

7    witness tampering that could have been found by a jury.  It

8    certainly more likely than not, as we sit here today.  But I

9    understand the Court's position, so I'm going to move on to the

10   three other aspects of the obstructive conduct.

11        THE COURT:  Yeah.  I think we just disagree about the

12   adverb.  I think it may have been *unwisely or foolishly*

13   *persuaded him*, but I don't think it was *corruptly* as it's used

14   in the statute.  So go on to the others.

15        MR. FIELDS:  Your Honor, I will start with the data

16   deletion.  So with regard to the data deletion, it shouldn't be

17   a surprise, at all, that only certain messages were missing,

18   but there were thousands of other messages, and the reason it

19   shouldn't be surprising, at all, is if the Court will recall

20   that the testimony at trial was that Kimberley Tew -- that the

21   Michael Tew and Kimberley Tew iCloud accounts had both been

22   merged into one.  So the fact that Kimberley Tew would have

23   deleted messages in her account wouldn't have affected the

24   merger to Michael Tew's account.

25             We have further corroboration of that in the

1    defendant's own submissions.  You have messages from her

2    personal phone, not from the iCloud, where you have both sides

3    of the communication with Hannah Scaife and with

4    Michael Meyers.

5          THE COURT:  Yeah.  Let me interrupt you, because I --

6    I agree with you on that.  It seems pretty clear to me that

7    some effort was made to delete from her phone relevant text

8    messages.  The real question for me has to do with the timing,

9    because as I read -- as I read the enhancement, it tries to be

10   somewhat careful about limiting the timeframe, and there's a

11   possibility -- I mean it seems clear that it was done before

12   she was arrested or anything like that, but that doesn't

13   necessarily mean it doesn't apply.  But if it was done weeks or

14   months ahead of time and she just said, *Man, I don't want to*

15   *have those on here, that looks really bad*, I don't know that

16   that's enough if you haven't met your burden of showing that it

17   was done specifically in response not just to the kind of

18   understanding that maybe there was evidence of wrongdoing but

19   of actual criminal investigation that was pending or about to

20   be pending.  Am I wrong about that?

21         MR. FIELDS:  Well, two responses, one legal, one

22   factual.  So first is the factual matter as to the timing here.

23   The Court will recall there are messages shortly before Michael

24   Tew gets arrested in July.  The arrest is a complete surprise,

25   I think, both to the agents and to Michael Tew himself, right?

1    So there wasn't sort of a long lead up for them when she is

2    likely going to delete messages.  You have this interim period

3    between July 2020, where Michael Tew is charged, but she is

4    not, but Michael Tew is cooperating and providing information

5    on his cell phone, and the Indictment in February.  She shows

6    up at the Yeti store, during the interim period, where Michael

7    Tew has already been charged, and she basically says something

8    to the effect of, you know, *What you are doing here is going to*

9    *be ineffectual because I already wiped it*.

10         So is it more likely than not, the standard that the

11   Court needs to make, that she deleted the messages within that

12   timeframe?  I would argue that it is, Your Honor.  I think the

13   timing of her comments is strong evidence of that, and I also

14   think just the factual circumstances, that that's the time

15   period where she is most in jeopardy, Michael Tew has already

16   been arrested, but she has not been indicted yet, that's the

17   most likely period that she would have deleted it.

18         But even if the Court doesn't agree with that as a

19   factual matter, as a legal matter the enhancement could still

20   apply if it had a material hindrance on the litigation.

21         Now I will refer to the arguments that the government

22   makes in its sentencing filings about how this did have a

23   material hindrance.  It ended up being a key component of the

24   defendant's defense at trial, and during the *James* hearing,

25   trying to cast doubt on the authenticity of a lot of these

1    messages because there was only one side of it, and trying to

2    tell the jury, *Hey, all of these text messages looked a little*

3    *weird*.  *Like, why are some of these only one sided*?  In a way,

4    to sort, of discount those in front of the jury.  And so to

5    rebut that, the government had to task an FBI data analyst to

6    go into the raw data tables associated with the Apple account,

7    design -- sort of, write scripts to, sort of, sift through all

8    of that, sort of sort through it and find the tables, because

9    they are not organized in an intuitive way.

10        THE COURT:  Yeah, I agree with you.  But let me ask

11    you, sort of, about your legal position, because I'm not sure I

12    agree with it.  Your position is even if I think she deleted

13    these well in advance, before she had any necessary

14    understanding that the Feds were looking into it, that as long

15    as it had a material impact on the investigation, that the

16    enhancement applies?

17        MR. FIELDS:  I'm sorry, Your Honor, I misunderstood

18    you.  No.  I think, you know, this is the example of someone

19    flushing drugs down the toilet, right?  So of contemporaneous.

20    I think there's evidence, for a long period of time, like

21    actually throughout the conspiracy, that she thought Yioulos

22    would go to the FBI.  You have those very early on.  Including,

23    you know, she is calling Yioulos a rat, she is very concerned

24    about it.  So, as a factual matter, I think there's evidence,

25    sort of, throughout from the *James* log, again found by

preponderance of evidence, that she was concerned about this.
So if the Court doesn't think that she deleted the messages
during what I would say is the most likely time period, even
then, as long as it had a material hindrance on the
prosecution, the obstruction enhancement would apply.

THE COURT: All right. I mean, I guess I have a
little bit of a problem with that position, because what if
they just automatically -- they know -- a defendant knows they
are involved in illegal activity, they don't want to get
caught, or if they do get caught they want to hide as much
evidence as possible so they just, sort of, routinely delete
everything or use a burner phone. Does that automatically
subject under this enhancement, just because, you know, they
knew that it would help them if there happened to be an
investigation?

MR. FIELDS: Your Honor, I would -- if I could grab my
guideline book?

THE COURT: Sure.

MR. FIELDS: So in that regard, Your Honor, I would
say, you know, you can parse the facts, you know, pretty
finely, I would say. I do think there would be, sort of, a
legal distinction between, sort of, designing your criminal
enterprise, so that no evidence is created at all, right?
Like, so not -- using a burner phone, right? Or using
Snapchat. Using only, sort of, direct, face-to-face

```
 1    communications.  I don't think that's obstruction.  On the

 2    other hand, let's say you have a burner phone, and it's got all

 3    of these text messages on it, you needed that burner phone to

 4    coordinate all of your transactions.  It's got your contacts.

 5    It knows where your drug buddies are, talking a lot about drug

 6    cases today because they come up a lot.  And then you find out

 7    that there's an investigation or you suspect that one of your

 8    co-conspirators might go to the FBI, so you throw the phone in

 9    the river, that's obstruction, and that's what the guidelines

10    say, if that has a material hindrance.

11         So I do think the burner-phone example is one.  Not

12    creating the evidence in the first place isn't necessarily

13    obstruction, if that makes sense.

14         So our position here, like this is very different, she

15    knows that she has got all of these incriminating messages, and

16    there's substantial evidence here that she deleted it.  She

17    admitted it, and the evidence at trial sort of bore out the

18    messages were deleted.  The question is, did it have a material

19    hindrance, and the government's position is it did.

20         THE COURT:  All right.  Thank you, Mr. Fields.

21    Ms. Hubbard, I don't think you have another one to address, but

22    you can come up for quick rebuttal, if you like.

23         MS. HUBBARD:  Just so used to coming back up here, at

24    this point.  Your Honor, from a factual perspective, I would

25    note that the last message that was the one-sided texts, that
```

60

1    was -- that I know to exist is from February 19th, 2019.  There

2    was significant testimony from Mr. Yioulos, himself, about

3    Kimberley Tew and Jonathan Yioulos having a tumultuous

4    relationship.  One that went up and down and back and forth

5    and.  So it's not -- it is entirely conceivable that given the

6    only evidence that looks like it was potentially deleted is

7    this one text string, that Kimberley Tew could have deleted

8    that at any point in time after February 19th, 2019, when she

9    was like, *You know what I'm done with that guy*.  Right?  *I'm*

10   *done with that guy.  I don't want to hear him.  I don't want*

11   *his messages on my phone anymore*.  Because we have both sides

12   of text messages with Hannah Scaife.  We have both sides of

13   text messages with Michael Meyers.  We have both sides of text

14   messages with other people who are also involved, in some way,

15   with the supposed scheme, and so the only evidence that there

16   is -- the only supposed deletion is this one text string

17   between Kimberley Tew and John Yioulos, there isn't any

18   evidence that it happened at a time -- a point in time where it

19   would have been an attempt to interfere with this

20   investigation.

21         I also disagree with how Mr. Fields interprets the

22   provision.  I was just looking at 3C1.1 in the notes.  It seems

23   to me that it needs to be around the time of the investigation,

24   and the way I read that, if it causes a material hindrance,

25   that's the example given if you swallow evidence at the time of

1    arrest, that obstruction doesn't apply if you swallow evidence

2    at the time of the arrest or you do something when you are

3    arrested, unless it also has a material hindrance.

4         The last thing I would note, Your Honor, the

5    government had to call their analysts because they needed to

6    authenticate evidence, that was the purpose of those people's

7    testimony.  I handled both of those Cross-examinations.  The

8    Court had previously ruled that they needed to present the

9    evidence, to lay the foundation for the downloads, and to do

10   the chain of custody, to make sure that it was all admissible

11   evidence.  Those people testified for that purpose.

12        THE COURT:  All right.  Thank you.  I'm going to

13   sustain this objection.  I appreciate the arguments.  As I

14   indicated, I think the evidence as to Mrs. Tew's discussions

15   with Mr. Tew, while I indicated they may have been a mistake,

16   for both of them, in hindsight at least, don't rise to

17   threatening, intimidating or otherwise unlawfully influencing

18   him.

19        The Ms. Scaife testimony about feeling threatened, is

20   a closer call to me, but the evidence just isn't there to

21   support that that was a threat to try to get her to somehow

22   influence the investigation, particularly given the confusion

23   about the timing and the odd context of that exchange, as far

24   as I'm aware.

25        The deletion, I think, if I were more confident about

1    exactly when it had happened, would be the most problematic of

2    these factors, but I just can't quite get to a determination

3    that it's more likely than not that that was done purposefully

4    to interfere with this investigation.  I don't think it's a

5    crazy position to take.  I just can't find that it meets the

6    government's burden.  So I'm going to sustain that objection.

7         That, I believe, is all of the objections, and if I'm

8    not mistaken, I have granted -- or sustained one objection,

9    which would reduce the offense level by two, to 30.  The

10   guideline range -- the defendant's Criminal History Category is

11   Category I, and I think my understanding is that yields a

12   guideline range of 97 to 120 month -- 121 months of

13   imprisonment.  I think the supervised release and the fine

14   remains the same, if I'm not mistaken.

15        Officer Roth, am I right about that?

16        *PROBATION:*  Yes, sir.  Well, the fine is reduced to

17   30,000 --

18        *THE COURT:*  I'm sorry, 30,000.  Thank you for that

19   clarification.

20        So understanding everyone preserves their objections

21   to my rulings on those objections, unless there's anyone who --

22   who thinks we got the calculation wrong, what I would like to

23   do is take our break now, and come back and discuss the

24   ultimate sentence.

25        So, hearing no objection, we will take a break until 3

1   o'clock.

2          THE COURTROOM DEPUTY:  All rise.  Court is now in

3   recess.

4      (Recess at 2:45 p.m.)

5      (In open court at 3:03 p.m.)

6          THE COURT:  Please take your seats.  So we have dealt

7   with the guideline calculations, as I indicated, and now we

8   have the -- ultimate sentencing decision, which is tied up with

9   the Defendant's Motion For A Variant Sentence.  The defendant

10  has asked for a 21-month term of imprisonment, the government's

11  request was at the top of the guidelines for 151 months.

12         I will just tell you, based on my initial review and

13  understanding of the case so far, I think probably 21 months is

14  not quite sufficient to meet the purposes of sentencing, but I

15  do think that 151 months would be much more than is necessary.

16  So I'm likely to arrive at a sentence somewhere in-between, but

17  I want to allow everyone to present their positions on that

18  before I make a final decision.

19         I will ask the government to go first, then Mrs. Tew's

20  counsel and then, of course, if she wishes to make any

21  statement, she will be permitted to do so.  But would the

22  government like to explain their sentencing position?

23         MS. WEISS:  Yes, Your Honor.  Thank you.

24         THE COURT:  Thank you.

25         MS. WEISS:  Thank you, Your Honor.

1          THE COURT:  Go ahead.

2          MS. WEISS:  Today we're here to talk about the 3553(a)

3    sentencing factors as they apply to Kimberley Tew following

4    eight days of a jury trial, in which she was convicted on

5    nearly all counts.  Thousands of -- near thousands of exhibits,

6    dozens of witnesses that came from all over the country to

7    testify, in support of this case.

8          Today, is about the consequences of Kimberley Tew's

9    choices, and that is what the 3553(a) factors are meant to

10   enable, is the consequences of her behavior.  During this

11   criminal activity, after this criminal activity, through the

12   trial, up through today.

13         Kimberley Tew is a person that understands the concept

14   of consequences, and we know that she understands the concept

15   of consequences, because she leveraged threats of consequences

16   in order to achieve her criminal conspiracies in this case.

17   The Court has heard all of the evidence that the jury heard in

18   reaching their guilty verdicts, and you have considered our

19   written sentencing filing, as well as the defendant's

20   sentencings filings, and what I want to do today is really

21   focus on Kimberley Tew's words, and how they show that she

22   understands what consequences are and how she used that against

23   others in this case.

24         Government's Exhibit 659, this was a text message

25   where Kimberley Tew took over Michael Tew's phone and texted to

1    Jonathan Yioulos.  *You should take this seriously, because you*

2    *could lose your license if he reports you*.

3          Government's Exhibit 205, and I apologize, I'm going

4    to be using the *James* log exhibit numbers, for the most part.

5    *Michael Meyers is dumb, dumb so dumb, dumb enough to do it*.

6          In response, in the same conversation, as Michael Tew

7    is talking about filing an FBI complaint against Chris Rincon.

8    *Don't file an FBI complaint.  You are not think it go through*.

9    Same conversation.  *The only thing that concerns me about Chris*

10   *Rincon and Michael Meyers*, once again two individuals that she

11   recruited into this scheme, in order to money mule those

12   invoices from National, through her husband's accounts, into

13   her own uses, *The only thing that concerns me about those*

14   *individuals is National*.  She knew there was a potential for

15   consequences.

16         To her husband, *You operate on fear, that's why we're*

17   *married*.  In trying to convince him how to behave in this case.

18         Government's Exhibit 242, *I don't know why you never*

19   *talk to John in front of me.  You let him treat you like shit*.

20   *Okay.  I don't respect you.  If he doesn't call you within the*

21   *next 20 minutes, I will personally turn him in.  Fuck it.  He*

22   *can't even help us at this point.  No plan.  No clarity*.

23         During this trial we heard a lot, during the defense

24   case, about how there was only one bank account that was

25   jointly in Kimberley Tew and Michael Tew's names, and that the

1    rest of the accounts were in Michael Tew's name.  No accident.

2    Kimberley Tew was foreseeing consequences, she was foreseeing

3    the arguments that she was going to make in this courtroom in

4    front of that jury.  How do we know that?  Government's Exhibit

5    254.  A text message to Michael, *I want to get 15,000 of*

6    *Bitcoin.*  Michael:  *You need me to go to the bank*?  Kimberley:

7    *Yes, how else would I get it*?

8            Another exhibit, Government's Exhibit 265, to Jonathan

9    Yioulos, message:  *Fuck you.  This is Kimberley.  I'm calling*

10   *the fucking husband.  We're all in this together.  You have*

11   *sent money once in awhile.*

12           Government's Exhibit 306, Michael Tew:  *How much*

13   *should I go for with John today and tomorrow?  What's*

14   *realistic*?  Kimberley Tew:  *As much as you can.*

15           Government's Exhibit 317 text message from Kimberley

16   Tew to Michael Tew:  *Tell Jonathan I'm personally calling the*

17   *local jail to have the guy she is having an affair with pick*

18   *him up.  I don't care if we all go down.*

19           Consequences, Your Honor.  It's very confusing, this

20   case, why someone, with all of the advantages that Kimberley

21   Tew has had in her life, from being adopted into a loving and

22   supportive family, to marrying a high-earning husband, living

23   in an opulent apartment, having two children with that person,

24   why one would risk that all?  And the only explanation that

25   could possibly be mitigating in this case is that Kimberley Tew

67

1    is an addict.  She has a severe gambling addiction.  She talked

2    about that addiction to agents, even though she denies it to

3    this Court today.  She has admitted it at various moments in

4    time, but how we know whether or not she has really admitted it

5    to herself, which is the first step to addressing that

6    addiction, is her behavior, and we know that she would sit in

7    this courtroom, during those days of trial, hearing the

8    evidence come in to this courtroom against her, and she would

9    leave this courtroom, and she would get on a laptop, and she

10   would go to a cryptocurrency betting site, and she would bet

11   thousands of dollars at a time on betting websites, during this

12   case, with absolutely everything on the line.

13        I really hoped that we would come in here and we would

14   see some evidence that she was taking steps to address that

15   addiction, and that's not what's in her objections or her

16   sentencing statement.  We would see some ownership of the way

17   in which, potentially, drugs are play into this.  We have not

18   seen any ownership of that.  We've seen denials of that.

19        And that, Your Honor, when it comes to 3553(a)

20   factors, presents an ongoing serious risk to the community, to

21   herself, to her family, to all of the people that she claims

22   this Court should consider, in fashioning a sentence against

23   her.  They are all at risk.

24        People like Michael Meyers, someone who had

25   significantly less education, street smarts, savviness, who met

1   Kimberley Tew on the internet, had his life almost destroyed by

2   her.

3            Hannah Scaife, someone who knew Kimberley in college,

4   ran back into her in New York, had an addiction herself, and

5   Kimberley Tew saw vulnerability in that addiction.  A

6   vulnerability that, in recorded calls, her husband laughed

7   about.  That she explained was part of what made her a good

8   foil for this.  And I want to take counsel at their word that

9   the decision about how that witness was treated on the stand

10  was that counsel's decision and not Kimberley Tew's decision,

11  but, Your Honor, you observed Kimberley Tew's demeanor in this

12  courtroom during that testimony, and that is on her, that's a

13  consequences that is on her.  She was triumphant about how that

14  woman was treated on that stand.  Triumphant about how

15  Michael Meyers was treated on that stand.

16           Up to her latest sentencing filings where she is

17  accusing her husband of infidelity, in trying to distance

18  herself from the purchase of luxury goods to her home, using an

19  email address that she previously told this Court was hers.

20  Consequences.

21           And so when we talk about what the government is

22  asking for today, especially, and I will -- I don't know if you

23  want to handle the Motion For A Variance separately, but

24  especially when we trial talk about this argument about a trial

25  tax.  What we have in this case, Your Honor, is a long period

1    of time, prior to this courtroom starting, this trial starting,

2    where the government new Kimberley Tew from a distance, from an

3    impressionist perspective, and the government got to know

4    Kimberley Tew, through introduction of that evidence, through

5    her demeanor at trial, through her demeanor during the

6    proceedings pretrial, and outside of the visibility of the jury

7    and within the visibility of the jury, so you come from an

8    impressionist painting to a realistic painting.  That was one

9    of the risks that she took here, and there are consequences to

10   that risk.

11         Talking about the nature and circumstances of

12   Kimberley Tew, herself.  I understand Your Honor's position

13   about the obstruction of justice enhancement, and I don't want

14   to belabor that too much, other than to say that we attached, I

15   believe, as an exhibit to Docket Entry 394, a transcript of the

16   portion of that incident at the Yeti store when Kimberley Tew

17   arrived on scene.  It's 30-pages long.  It's a quick read, and

18   I would ask Your Honor, to indulge the government by rereading

19   that transcript prior to sentencing, briefly, and I want to

20   talk about what she said during that meeting.

21         I apologize, I should have kept a finger on this mouse

22   pad so it didn't give up on me.  She talked about a lot of the

23   factors that she wants this Court to consider mitigating.

24   Things like her kids needing her as a parent at home.  Here is

25   what she said during that meeting about being a parent to those

1    children.  She said, *The girls need one parent Michael, I'm a*

2    *better person to give up*.  She said, *Michael is the better*

3    *parent*.  She begged him to leave that meeting, to remove his

4    phone from where it was being imaged with agents.  She tried to

5    appeal to his parenting and how much the girls needed him, and

6    when that didn't work, here is what she said instead, *I*

7    *actually will not turn myself in, because obviously Michael,*

8    *you are not a good parent.  So I'm going to go home to our*

9    *children that are crazy worried about you.  Michael you deserve*

10   *it if this is your choice.  You have the right person in*

11   *custody -- or not in custody, but with the agents, because you*

12   *don't give a shit about our children.*

13          That's consistent behavior with how we saw Kimberley

14   Tew act with Jonathan Yioulos, with Abby Schwartz, with

15   Michael Meyers, with Chris Rincon, with Hannah Scaife.  Start

16   out nice, and if it doesn't work out the way you want it to,

17   then you go for the gut.

18          Now she is starting out saying that she wants

19   Your Honor to consider things like her family and her children,

20   and her background and her upbringing and her education as

21   mitigating factors.  Your Honor, those are aggravating factors.

22   Those are things that she used and leveraged against people to

23   convince them to either participate in these crimes, to

24   continue to participate in these crimes, to ignore their better

25   nature and their own sense of morality, to follow her down this

1    path.

2              I want to talk about the 3553(a) factors, about

3    seriousness of the crimes, promoting deterrence, protecting the

4    public.  Your Honor, there's a general deterrence factor and a

5    specific deterrence factor and both of these matter here.  When

6    it comes to general deterrence in our filing, I cited several

7    cases about how the concept of collateral consequences are not

8    ones that fall within the 3553(a) factors, and it creates a

9    real risk when we say things like becoming a felon, having your

10   reputation tarnished, et cetera, are somehow justifiable for

11   mitigating a sentence outside of the guidelines range or below

12   the guidelines range --

13             THE COURT:  Let me ask you about that, I guess.  I

14   mean, on their own, no, but don't they suggest, particularly

15   for someone with no criminal history, don't they play into, at

16   the very least, the question of deterrence, and the risk of

17   recidivism, and the need for -- the general need for -- I mean

18   you are asking for an additional 12 years in prison, in this

19   case.  Isn't that appropriate to take into account whether

20   those collateral consequences would play into some of those

21   other factors that are listed?

22             MS. WEISS:  Yes, Your Honor, and I think this is one

23   of these cases where if we were just dealing, as we were

24   pretrial, during plea negotiations, with the impressionism

25   version of the facts, perhaps I would give that more credit in

1    this case.  But what we have, instead, are we've now seen, in

2    this courtroom, text messages, we've heard the testimony of

3    witnesses, who have all shown us that Ms. Tew was very

4    cognizant of those collateral consequences.  She just didn't

5    think she would ever get caught and if she did get caught, she

6    would get out of it, right?

7              One of the things that they talked about, her and

8    Michael was, *I messaged John.  Truthfully we owe him our lives*

9    *I don't think he never knew how bad it was.  If really hates us*

10   *we should figure something out and get immunity.  I told him I*

11   *would turn myself in and negotiate immunity for you, Michael,*

12   *so the kids could have a chance.*

13             This wasn't a crime or situation where desperation in

14   a moment drove an incredibly poor decision.  This was a

15   two-year span of time, that was thought about extremely

16   strategically, the entire way through, in which, Ms. Tew in

17   some ways had some advantages, in knowing that her day of

18   reckoning before the Court and charges in front of this Court

19   might be coming, by virtue of the fact that her husband was

20   arrested on that complaint, months before she was ever

21   indicted, a period of time in which she came in and gave a

22   proffer interview, hoping to achieve a sentence that she would

23   be happier with, and then did not take, and then had a period,

24   years, in the making, in which there were a series of hiring

25   and firing counsel and filing various motions, including

1    motions to delay this case in the days leading up to the trial.

2    She strategically prolonged these proceedings as long as she

3    could.  Every moment in time there represents an opportunity to

4    make a different choice and that wasn't taken.

5            On top of that, Your Honor, we have indications with

6    the relevant conduct that, whether or not we take the generic

7    statistics filed by the defense, about the chances of

8    recidivism in white collar cases, as Ms. Hubbard so eloquently

9    said, we are here to sentence this defendant today.  What do we

10   know about this defendant?  Well, we know she was running a

11   cryptocurrency algorithm, soliciting investors, including

12   Michael Meyers, and the plaintiffs in Denver District Court,

13   and then fleecing them out of money.  We know that she was

14   gambling prior to being indicted, after being indicted, all the

15   way up through the days of trial in this case, following the

16   days of trial in this case, after she was convicted.

17           This is a serious risk.  I mean gambling is an

18   addiction, like any other.  We can look at that behavior, and

19   we can see that that risk is ongoing, that potential for

20   recidivism, when she needs that money so badly so she can

21   gamble it.  It's a huge risk.

22           So again, Your Honor, I would just encourage us not to

23   think about distractions.  Let's look at Kimberley Tew's words,

24   let's look at her actions, let's look at her behavior, and

25   let's tailor the 3553(a) factors at analysis appropriately

1    according to that.

2         THE COURT:  Okay.  So I did want you to address

3    whatever you need to as to the motion, in addition to anything

4    just specifically under the factors.  If you have something

5    that you want to add specifically on that, you should do it

6    now.

7         MS. WEISS:  No, Your Honor.  I will just touch briefly

8    on the kinds of sentences and sentence disparities.  I believe

9    most of this is addressed in our written filings, but we would

10   indicate that the vast majority of sentences in this district

11   are -- for white collar offenders do fall within the guideline

12   range, and that's part of achieving the objectives of the

13   guidelines more generally, that all types of crime are being

14   sentenced concordant with how that matrix has developed and the

15   congressional intent behind it.

16        Here, Your Honor has ruled on the objections, and

17   we're now at an Offense Level of 30, with Criminal History

18   Category I, for 97 to 121 months.  Given that change,

19   Your Honor, the government is still going to request the top of

20   that now applicable guidelines range, and ask for 121 months.

21   I know Your Honor expressed, and I want to be to be cognizant

22   of some of the things that were said during our previous part

23   of this hearing, when we're talking about a leader/organizer

24   role, which Your Honor, I believe understands is close, I would

25   encourage you to think about the words that I read out to you

1    today, which are Kimberley Tew's own words.  The hundreds of

2    text messages, in which she was saying to her husband things

3    like, *I don't need this sulking.  I told you to get in touch*

4    *with John and get money.  Figure out if you want to be in this*

5    *family.  You are extremely rude to me in front of John and have*

6    *said horrible things these past days*.

7        And to John, not knowing that John was under

8    investigation at the time, *Oh my God thank you, oh my God you*

9    *have saved me and my family.  I mean that.  Don't send anything*

10   *this fall*.  And then moments later, *No chance at sending*

11   *anything today and tomorrow?  Like splitting it*?  *Or best just*

12   *all at once.  I don't know how it all works, that's Michael's*

13   *area.*

14       Those are the things that she was saying when she was

15   leading her husband, Mike Meyers, Chris Rincon, Hannah Scaife,

16   all these others down her path.

17       I also want to address how that plays into the

18   Zero-Point Offender Rule.  Again, I think this touches upon

19   what we were talking about previously, in terms of risk of

20   recidivism.  The Zero-Point Offender Rule was designed

21   appropriately to take into account someone who has no criminal

22   history, whatsoever.  Is at the lowest chance of recidivism,

23   presumably.  But what it doesn't account for are all of the

24   instances where someone has committed crimes that don't show up

25   on a criminal history category score.  And what do we have

1    here?

2           We have a person that we know has a gambling

3    addiction, through their own admissions, during the exhibits.

4    We know somebody that has used drugs, numerous times.  In fact,

5    and I know that the filings say there wasn't any drug problem,

6    but the messages belie that.  For instance, *We need to get*

7    *another wire for Friday, I played gambling, last night on*

8    *drugs, and lost.  I need my pills and I need you to get on John*

9    *to cash that check tomorrow.  We need something this week.*

10   *Anything.  John is going to screw us over.  I really, really*

11   *don't want to stress you out, but we're going to need more*

12   *money.  It's just not enough.  It leaves nothing for Vegas.*

13   *We're going to Vegas Down*.  That's not a criminal history

14   category score, but that's behavior that creates a risk of

15   recidivism, Your Honor.

16          As is things like the details that came out in the

17   Denver District Court case, about that algorithm, the amount of

18   money she was able to swindle out of other people in order to

19   feed that gambling addiction, as is the evidence Your Honor

20   heard in this courtroom, about taking the National Air Cargo

21   credit card and driving all over Denver and spending $35,000 on

22   gift cards.  Things that someone with a low chance of

23   recidivism doesn't do.  They don't do things like that.

24          So that might not equate to a criminal history

25   category point, but when we're talking about 3553(a) factors,

1    we're talking about how to sentence this defendant, not a

2    generic defendant, this defendant, based on everything that we

3    know about her.  I would encourage Your Honor to take into

4    account the facts of this defendant, which speak for

5    themselves.

6              Anymore questions for me?

7         *THE COURT:*  Not at this time.

8         *MS. WEISS:*  Thank you.

9         *THE COURT:*  Mr. Kaplan?

10        *MR. KAPLAN:*  So, Your Honor, it is correct, this is

11   the time where there's disagreements and arguments about 3553

12   considerations, and what we all know, and the phrase that we

13   use in determining the appropriate sentence, pursuant to 3553

14   is, *A sentence that's sufficient but not greater than*

15   *necessary*.  Everything else kind of is the umbrella, 3553, and

16   it's not unusual, for this time, that there's a dispute about

17   that, and the government and defense counsel will argue their

18   side.

19             I do want to point out, as we did in our paper, and I

20   do here, that in this case, we have a little bit of an insight

21   into what the government felt was an appropriate sentence,

22   sufficient but not greater than necessary, and that is the plea

23   offer that was made very shortly before we went to trial.  I

24   understand that now we have guidelines.  There's repercussions

25   of not taking it.  That's not what I'm suggesting to the Court.

1    But when the government comes up here and talks about the

2    necessity for what they they wanted, which was 151-month

3    sentence, then it is incumbent on me to point out and put a

4    mirror to some of this position of the government, under these

5    circumstances, the protocol that was mentioned in the footnote

6    by the government in terms of you know, it's not legally

7    prohibited, but there's, sort of, like some sort of protocol

8    not to bring that up.  I understand where that's coming from.

9    We want free flow of conversation.  We don't want that to come

10   back later on, when there's those kind of conversations, but it

11   is hard for me not, and I will refuse to come before the Court

12   and know that prior to trial there was an agreed to amount --

13   when I say *agreed to*, the government presented something that,

14   in their calculations, was a sentence between 51 and 64 months.

15   And what does that mean, at the time, I would suggest to the

16   Court that what it means, at the time, is that the government

17   come before the Court and justify a plea agreement, with all of

18   the considerations that the government needs to have, as to

19   what is appropriate under the guidelines and appropriate under

20   3553, that what is sufficient, but not greater than necessary,

21   is 51 to 64 months, and I just can't sit here and out of some

22   sort of protocol for future negotiations, not raise that as

23   pretty good evidence of what they thought right before trial.

24           Now I understand, also, I'm well aware, I have been a

25   criminal defense attorney a very long time, that there are

1    risks to going to trial and having things revealed to the

2    Court, sometimes, and sometimes even the prosecutor that is --

3    that they are unaware of, that would change the whole set of

4    circumstances, in terms of what they think was appropriate.

5         But I would suggest to the Court that that didn't

6    happen here.  They knew, as the Court knows, we had an

7    extensive *James* log hearing.  It was an incredibly extensive

8    log of communications, involving all of the defendants.  They

9    had a cooperating defendant from the beginning of the case, in

10   John Yioulos, who they could speak to about, you know, all of

11   the things that he ended up testifying to, and I am sure many

12   more.

13        They were intimately familiar, in speaking with the

14   members of National Air Cargo and John about the circumstances

15   of National Air Cargo and what the scheme -- what impact it had

16   and finally there were downloads of information that the Court

17   is well aware of, that the government has demonstrated, very

18   successfully, from banks, computers, incredible amount of

19   telephonic communication, recorded conversations that they have

20   used very effectively in the terabytes of information.

21        So to suggest that there was something was disclosed,

22   including the witnesses, those that they called and those that

23   they didn't call, who they had interviewed and spoke with, in

24   the preparation of this case, again, as the government has

25   pointed out and the Court know was prepared numerous times by

1    numerous lawyers representing both the Tews.

2         And so the idea that what Ms. Weiss said was what we

3    learned about Ms. Tew was not, I would suggest to the Court,

4    significant, something that was significantly revealed during

5    trial, that they didn't have when we were engaged in

6    discussions about disposition.

7         What then did they say, in their own submissions to

8    the Court that they learned during trial, because that's

9    another thing that we don't have to wonder about.  They put it

10    in the submission to the Court when they talked about it.  The

11    demeanor of the defendant.  The impact on others.  And they

12    specifically discussed the humiliation of Ms. Scaife.  That she

13    never admitted -- that Ms. Tew has never admitted wrongdoing.

14    No effort to address mental health or gambling addiction.  And

15    then I think they suggested in lots of materials that somehow

16    she was a driving force in the operation.

17         None of those things, as contained in the information

18    that the government gave the Court as revelations during trial,

19    would be the kind of significant differences that would make a

20    difference in what was a, as we've said, sufficient but not

21    greater sentence than necessary.  And they conclude in that

22    that Ms. Tew lacks respect for the law and holds her victims in

23    contempt.  That was what they learned.  It doesn't

24    significantly impact the difference of what these factors are,

25    with what they initially thought was sufficient and now coming

1    before the Court now, and asking for 151, I understand, because

2    of the Court's rulings, that it will be less than that.

3            Their discussion, in the materials they gave the

4    Court, had to do with what they now say is her role in this

5    offense, which I will get to momentarily.

6            The other thing that I want the Court to take into

7    consideration, in terms of how the government views the scheme

8    and how they view it when it was indicted, is how they indicted

9    the case. If they were talking about Ms. Tew as they did with

10   the materials as being some sort of leader that it would not --

11   I think the language they used was, *It would not have happened*

12   *but for Ms. Tew*.

13           Well, how they indict something is certainly not the

14   be all and end all of what they believe the particular

15   culpability is. Matter of fact, in their materials, they talk

16   about how they wouldn't file every count for every violation

17   because they couldn't do that in cases they brought to trial,

18   in every case it would be cumbersome and not valuable. I don't

19   disagree with that at all. But when they indicted the case, it

20   is instructive, in terms of what they felt the scheme was, and

21   I would offer to the Court it has not changed, that Mr. Yioulos

22   was indicted on 40 counts, Mr. Tew was indicted on 59 counts,

23   including four counts of tax fraud, where he was found guilty

24   of all of those, and Ms. Tew merely 14 counts of which she

25   ended up convicted of 12.

1          I don't want to put too sharp of an edge on that, but

2   it is an indication of what they believed the relative

3   culpability, I will suggest to the Court, of the defendants

4   that were involved in this particular scheme.  Another area

5   that would support the 50-plus months that they initially were

6   discussing in plea negotiations.

7          I was going to take some more time, but I don't think

8   it's necessary, based on the Court having not only gone through

9   the trial, which I knew, obviously, but also some of the

10  Court's comments to try to counter the paper that was submitted

11  to the Court that tried to paint Ms. Tew as, you know, some

12  sort of leader of men here, and without which this wouldn't

13  happen, because there couldn't be anything more absurd than

14  that.  You know, notwithstanding, you know, Michael Tew's

15  attorney putting the campfire images up on the screen, these

16  were sophisticated people that Ms. Tew was dealing with, much

17  more sophisticated than she was.

18         Now, the government comes up and talks about an

19  isolated piece of information here.  The way she conducted

20  herself on some occasions with individuals.  Some of the text

21  messages and the emails they come up, to try to paint a picture

22  of Ms. Tew that is not accurate in terms of what the Court

23  heard, as to how the scheme was actually conducted.

24         The scheme was conducted by two sharp, sophisticated,

25  accomplished individuals, who, far and away, without much room

1    for debate, knew exactly how this scheme would be the most

2    effective, and that was not the position that Ms. Tew was in,

3    nor was how she -- what her participation was.  I'm not here

4    defending -- the jury has spoken, and it's conspiracy, all

5    right, and she is responsible for those things.  I'm not here

6    trying to minimize that at all.  What I'm here, having to spend

7    a little bit of time, notwithstanding them not having said it

8    today, is this idea that her involvement somehow overcame the

9    will and the ability to stay away from being participants in

10   this scheme by Mr. Yioulos and Mr. Tew, and I don't think

11   anything in the presentation of the facts would justify that

12   conclusion.  Far to the contrary.

13        And they talk, in their papers, about the effect on

14   the company, and the loss of trust by the people that were

15   involved in it.  That was Mr. Tew and Mr. Yioulos who was

16   involved with that.

17        The government talks about conversations that she had,

18   random conversations that Ms. Tew had with Mr. Yioulos.  The

19   testimony was that, at trial, was that -- by Mr. Yioulos, was

20   that -- I think he said it a few different ways, but at one

21   point I believe he said 98 percent of the conversations he had

22   having to do with anything having to do with the scheme was

23   with Mr. Tew, and it was over two years that he had these

24   conversations.  And at one point he said, *Yeah, he did not want*

25   *to speak with Kimberley Tew anymore*.  So that was the end of

1    that.  I believe that was probably at the end of 2019 beginning

2    of 2020.

3            So if you are talking about the people who made this

4    train run on time, in terms of being able to take the money

5    from NAC, not minimizing the jury has spoken, but suggest in

6    the paper that somehow we've now shifted into blaming Ms. Tew

7    as the impetus, without which this wouldn't happen, is just

8    preposterous.

9            What she did is she was nagging for money.  I think

10   that was demonstrated.  She nagged Michael for money.  Michael

11   was the individual who provided, at least since the children

12   were born, the financial health of the family.  He is -- he is

13   competent and capable of it.  He obtained the funds during the

14   scheme, and best I can tell from documents provided to the

15   Court and in the probation reports, his pretrial reports, he is

16   capable of making millions of dollars still.  And so, to

17   suggest that there's a *nagging wife aggravator*, that should

18   result in the government now coming before the Court saying

19   that Kimberley Tew should get more time because of her

20   involvement in this case than even Michael Tew, shows what I --

21   what we've suggested throughout the paperwork, a certain

22   animus, a certain vitriol, and I think also demonstrated here,

23   a certain personal dislike for Ms. Tew, that is not appropriate

24   for, I think, a sentencing decision, and certainly not

25   reflective of her involvement in this particular offense.

1              The government talks about, that the other parts of

2     the 3553 issue should be having to do with her -- the way she

3     conducted herself during the pendency of this case.  I don't

4     know what the government is observing or what they want -- or

5     what they want the Court to conclude.  Ms. Tew has been

6     compliant during the entire prosecution of the case.  She has

7     been respectful to the Court.  She has not caused any delay or

8     problems with the Court.  Her demeanor during trial, I am at a

9     loss.  I sat at the same table as Ms. Tew throughout the whole

10    trial.  I do not know.  Her demeanor.  There was suggestions

11    that she was going to leave the jurisdiction.  She did not.

12    And much of what the government talks about, in terms of things

13    that they want held against her is really things that were done

14    by lawyers and in the defense of Ms. Tew.

15             It is dangerous to suggest to the Court that things

16    that are done by counsel, defending a defendant, who had the

17    audacity to go to trial, would now come back to be an

18    aggravating factor.  The response to our request for variant

19    sentences is just -- some of the lines that were in it.  They

20    said, quote, *Her stubborn refusal to take any responsibility*

21    *for her actions should weigh heavily in favor of a significant*

22    *custodial sentence.*  Is that stubborn refusal bringing her case

23    to trial?  Is that what we're punishing?  The disregard, the

24    very real threat of incarceration?  I want to be clear to the

25    Court, I understand that we look and see people that make bad

86

1    decisions.  The Court mentioned a few things saying well, *She*
2    *did it, I don't know that it was the best decision for her, but*
3    *what does it stand for?  What significance does it have when*
4    *you are deciding what the appropriate sentence is?*  And
5    anything that suggests that she should be punished, the
6    sentence needs to be longer and larger and harder and more
7    punitive, because she took something to trial, regardless of
8    how ill-advised any of us would think that might be, is not a
9    basis.
10        We've talked about telling the government one thing in
11    a proffer and then repeating -- repeatedly telling the jury
12    something different.  That was legal litigation that
13    Ms. Hubbard and I pursued on her behalf, as we must do, as we
14    are proud to do, because we are aggressive in the defense of
15    somebody who chooses to exercise their right to a trial, but
16    somehow, that gets turned as some sort of aggravating factor.
17        The financial and nonfinancial resources of subjecting
18    numerous lay out of state witnesses to a nearly two-week jury
19    trial was reason enough to justify the government's generosity
20    in a plea agreement.  Again, are we now placed in a situation
21    where the plea -- and I get -- I get that we can save
22    resources.  It's not illegitimate about that.  But when the
23    government talks about that's the reason why we need a lengthy
24    sentence and to aggravate it is because we need to go through
25    the requirements of a jury trial, which, by the way, by any

1   statistic that you look at, somewhere around 3 percent of

2   all -- of all prosecutions end up indictments/charges end up in

3   trial.  All right.  So talk about the trial tax, you know, it's

4   more complicated than that buzzword, that's why I haven't used

5   it till now.  But it is a real thing, in terms of people not

6   going to trial, because the repercussions of the way the system

7   operates now, is so hard that they can't exercise that right.

8   And you know, the government was actually more clear and honest

9   about what they were upset with, having to do with Ms. Tew,

10  than I would have anticipated.

11          You know, Your Honor, I sit and listen to first

12  advisements and a judge tells the defendant, facing charges,

13  that you have an absolute right to go to trial.  A

14  constitutional right to go to trial.  And in the business that

15  I'm in, that we, as defense attorneys in, that, it actually

16  feels -- I mean, it's such an important right.  When I hear

17  that, I take pride in the fact that in this country, not only

18  do we have the right, but the sincerity in which the Court

19  advises anybody in custody of their right to go to trial,

20  really ends up being, you know, it's almost spine tingling.

21  And you know when it happens again?  At a providency hearing.

22  It happens again at a providency hearing, when at the end of a

23  lengthy discussion, the soliloquy, the questions, the answers,

24  I tell people, federal court, at the end of what is a very

25  complete advisement, the very last thing that a judge says is,

1    *We have gone through all of this, but I want to tell you, that*

2    *if you don't want to do this, you have a right to go to trial,*

3    and that's at the beginning and at the end.  That's when we get

4    something that really is, in some ways, unique to our justice.

5           Yet, what I'm hearing from the government in their --

6    in what their most -- well I don't know about most.  Let me not

7    say that.  What I'm hearing from the government is that Ms. Tew

8    had the audacity to do that.  It comes with repercussions.  I

9    have said that before and I am going to say it again, I'm not

10   naive about that.  Lord knows that I'm not naive about that.

11   But it shouldn't come as a punishment for doing it.

12          You can't evaluate who Ms. Tew is by taking out

13   different emails and texts, over the course of a couple years,

14   and thousands, upon thousands, upon thousands of text messages

15   and phone calls, and have the Court conclude that she is some

16   sort of horrible person.  It is rightful that -- there was an

17   introduction of the tens of thousands of communications, that

18   have to do with demonstrating that she is a loving wife, and a

19   loving -- and effective and loving mother, and involved in the

20   schools and going to deal with the family situation.  It is a

21   skewed, terribly skewed view to demonize her by taking clearly

22   what they have and clearly what they used to gather the

23   convictions, and to suggest that the Court, and I would say

24   without much of which having to do with her behavior in this

25   case, without justification, that she is somehow an evil person

1    needing to be incarcerated.  That's not what the Court is

2    determining, but it is the sense of the documents that have

3    been provided the Court, in a real kind of sense of what the

4    government's statements are.

5            So I would suggest to the Court that the Court has

6    already indicated 21 months, and was a number that we arrived

7    upon if we won all of the objections to the guidelines.  So it

8    didn't come out of thin air.  It was indeed something that was

9    rooted in our arguments having to do with the guidelines, but

10   when you come to what the Court did on the guidelines, and how

11   it reached its agreement or disagreement, in most every portion

12   of our objections, to every -- whether it was the loss amount

13   or the organizer/leader, what the Court said is that it was

14   arguments to be entertained, and I took from the Court that

15   they were not all easily defeated or easily agreed to the other

16   way.  And so what does that mean to the request for a variance,

17   including the lack of criminal history?  Which the government

18   seems to suggest is a lack of criminal history because she,

19   perhaps, has a drug problem where there's no evidence of a drug

20   problem, by the way.

21           I mean, what they cited and what was a very narrow

22   look at it and what was contained in the presentence

23   investigation report is Ms. Tew does take prescribed

24   medication.  The presentence investigation report talked about

25   what she took.  She tried cocaine sometime in her youth and she

90

1    smokes marijuana occasionally.  Not a drug problem.  They are

2    concluding an addiction to gambling, which, I mean, I guess

3    people could draw their own conclusions, but I don't know that

4    there was any testimony as to that, and then they borrow from

5    things that the Court will decide whether it's appropriate to

6    consider those things.  The civil case, which we, in our

7    responses, question whether that is appropriate.  I understand

8    the Court can draw conclusions about the algorithm as it

9    relates to some of the people who testified, but

10   cryptocurrency, in and of itself, is not aggravating.  I mean

11   they are really pulling at some straws outside of what is

12   appropriate, and that is that she has been convicted.  She was

13   convicted of the offense that she was convicted of, and that

14   results in repercussions.

15        We ask the Court to consider 21 months.  Like I said,

16   if we had been successful it would have been something around

17   that time.

18        We talk about deterrence and punitive and those kind

19   of things, and I will add this, as it relates to the more

20   specific factors under 3553, and that is, 150 months really

21   rolls off the tongue pretty easy for the government, and what's

22   not sufficient amount of time, when you are talking about years

23   incarcerated, rolls off maybe all of our tongues too easily.  I

24   know doesn't roll off any judge's tongue too easily, because

25   you are required to impose it and have a real understanding of

1    what impact that might have, but I do think we have a tendency,

2    when we get lost in the numbers, you know, the guidelines, and

3    what's an appropriate sentence, to get a little calloused, a

4    little immune to what that means, and I don't think anyone of

5    us want to do that.  I wouldn't suggest the Court does.  But I

6    think that when you are in this environment and dealing with

7    numbers, the real reality of what is an appropriate sentence,

8    in terms of being incarcerate and what deters and what prevents

9    it from happening in the future, it does not need the kind of

10   numbers that the government is coming here and asking, and so

11   we would ask the Court to provide a sentence that's close to

12   what we've recommended, as the Court, in good conscience, can

13   provide.

14        I don't know if now is the time to talk about

15   surrendering and things like that?

16        THE COURT:  We can talk about that in a little bit.

17   After I have determined the sentence.

18        MS. WEISS:  Your Honor, may I respond very briefly?

19        THE COURT:  No, I have heard enough.  Thank you.  I

20   did -- let's see, I think I had one question about whether

21   Ms. Tew wishes to make a statement, though.

22        Ms. Tew, you have the right to make a statement before

23   I make a decision, but you are not required to.

24        MS. HUBBARD:  Just going to talk to her.

25        (Discussion off the record between counsel and her

1    client.)

2          THE DEFENDANT:  Thank you.  I ... I'm sure I'm not

3    going to say the things you want me to say, but I do want to

4    tell you I am very grateful for you and for your courtroom, and

5    I love our country and I love that I had a trial, and I think

6    about the jurors and I am very grateful for them.

7          This has not been hard -- this has not been easy.  My

8    husband was arrested on July 8th of 2020, and since then we

9    have tried to keep our heads up and raise our children the best

10   that we can.

11         And for the record, Michael is a great parent, so.  He

12   is funny, he makes them laugh, and I'm just more serious.  I do

13   want to say that I really care, very much, for Hannah, and I

14   also care for Michael Meyers.  I liked who he was, as a person,

15   and who he was trying to become.  And I still want only the

16   best for them.  Especially Hannah.

17         Thank you for letting me speak.

18         THE COURT:  Thank you, Mrs. Tew.  All right.  Thank

19   you everyone for your efforts in this case and your time today.

20   I have considered, as I indicated, the record in this case,

21   both what we've discussed today, as well as a number of other

22   things, going back through the record, the docket, the filings

23   in this case, and based on my review of the record, the

24   sentencing factors set forth in Title 18 Section 3553(a), my

25   judgment is that the defendant, Kimberley Ann Tew, be committed

1    to the custody of the bureau of prisons for a term of 48 months

2    on each conviction -- each count to run consecutive --

3    concurrent, sorry, to each other.

4          Upon release from imprisonment, she will be placed on

5    supervised release for a term of three years, again, on each

6    count, to run concurrently.  I will impose a fine at the bottom

7    of the guidelines, which is $30,000.  She is also required to

8    pay a special assessment of a hundred dollars on each count of

9    conviction, which I believe totals $1200.  She will be required

10   to pay restitution in the amounts, and as indicated in the

11   presentence investigation report, jointly and severally with

12   her codefendants in this case, as we previously discussed.  She

13   will also be ordered to forfeit her interest in the money

14   judgment as discussed at the beginning of this hearing.

15         Mrs. Tew, while on supervision, you will be required

16   to comply with all of the terms of supervision that are

17   recommended and discussed in the presentence investigation

18   report.  So that will include all of the mandatory statutory

19   conditions.  The standard conditions that this Court has

20   adopted in General Order 2020-20.  Will also include all of the

21   special conditions recommended by the probation officer, which

22   I do find are reasonably related to the factors laid out in the

23   statute, given the facts of this case and the history and

24   characteristics of this defendant.  Those will include

25   participation in programs of mental-health treatment and

1      cognitive behavioral treatment, as supervised and approved by

2      the probation officer.  It includes restrictionns on gambling

3      and use of cryptocurrency, both of those, given what happened

4      in this case, and the conviction and the issues that seem to

5      have led to, at least, some of this conduct, are necessary to

6      ensure that it doesn't reoccur.

7              There are a number of financial conditions that are

8      required to ensure payment of the various financial penalties,

9      and you will be subject to the search condition, which will

10     ensure that there are not ongoing issues of this type and only

11     kicks in, of course, if there's reasonable suspicion of a

12     violation of those conditions.  It does appear that the

13     defendants can pay interest, so I will require interest on the

14     restitution.

15             My justification for this sentence, is, as I

16     indicated, I think some of the -- first of all, some of the

17     guideline calculations while legally appropriate are somewhat

18     borderline cases that ran up the guideline numbers a bit higher

19     than seemed appropriate in this case.  I don't rely super

20     heavily on the plea agreement draft that was offered, but it

21     does, at least, make me feel a bit more confident that the

22     number I have arrived at is not completely out of line with

23     where the government, at one point, thought would be an

24     appropriate punishment for this case.

25             In particular, as I indicated, while the two point --

95

1    two-level reduction for first time offender doesn't technically

2    apply in this case, that reduction, to me, is often

3    insufficient to meet the importance that I put on the fact that

4    someone who has never been in front of a court before, never

5    been sentenced to anything significant, in this case to

6    anything at all, to me is just in a very, very different

7    position than someone even who may have a couple of minimal

8    criminal history points or even some criminal history that's

9    not accounted for.

10        In this case, 48 months, for someone who has never

11   served any time before, never had any interaction with the

12   criminal justice system, to me, is a sufficient sentence to

13   meet all of the purposes of sentencing.  It is a significant

14   sentence for a first-time offender.

15        This is a significant crime though.  The government

16   has pointed out the damage that this caused to a number of

17   people, the company, for one, just in general, this sort of

18   conduct requires companies that could, instead of wasting time

19   on a bunch of redundant accounting procedures, could be doing

20   something productive and useful to society.  So I take that

21   into account.  And it's a serious crime.  There's a lot of

22   money involved here.  I think the parties, obviously, have sort

23   of a different conception of Mrs. Tew's role in the crime.  I

24   guess I fall somewhere in the middle, as my sentence does.  It

25   seems clear to me Mrs. Tew understood what was going on, was,

1   in many ways, a driving force in the sense that her need or

2   desire for money pushed her husband to do this and in turn

3   Mr. Yioulos to do this.  On the other hand, it doesn't seem at

4   all as clear to me that she set out to set her husband and

5   Mr. Yioulos into doing something criminal, more that she took

6   advantage of it, and certainly participated in it, that's

7   worthy of a crime, but I don't think it's quite fair to

8   consider her the *but for cause*, or at least not the only *but*

9   *for cause*, and so I think she deserves a significant sentence

10  to reflect the seriousness of the offense, and to deter others

11  from engaging in sort of thing in the future, as well as to

12  ensure that both she understands that this was not just wrong

13  but deserving of punishment and that it can't happen again.

14          I think, as -- I guess I indicated in questioning, my

15  question with Ms. Weiss, I do take into account, at least to

16  some degree, the collateral consequences, not so much

17  reputational or anything like that, but there are children

18  involved here that will suffer because a sentence like this,

19  and would suffer even more with an additional six years or so.

20  I just don't think that should be discounted completely.  I do

21  think that the deterrence of a sentence like this, in a case

22  like this, is impacted and the likelihood, both general and

23  specific deterrence is impacted, that I just can't justify a

24  sentence -- an incarceration sentence that's that much longer.

25  Particularly, this was driven by greed.  This was a crime

97

1   seeking money.  The financial penalties here are significant,

2   and will be difficult to overcome, and so for all of those

3   reasons I think a variant sentence, not to the degree requested

4   by the plaintiff, which I think would be insufficient to

5   recognize her role, but I do think it's sufficient.

6          I don't know that Mrs. Tew's demeanor during the trial

7   is really relevant for my consideration either.  I also, sort

8   of, not sure how it would play out.  I do -- I do think that

9   what happened with Ms. Scaife and with Mr. Meyers is very

10  concerning.

11         I think the government's position that the gambling

12  addiction or habit or whatever we want to call it, which I

13  think is not too far separate from the attraction to Bitcoin,

14  as a form of gambling for a lot of people, I share the concern

15  that that could get someone in a financial hold that could lead

16  them into a temptation to do this sort of thing again, and so

17  21 months, I think, would be insufficient.  Forty-eight months

18  is my best effort to balance all of those factors and to make

19  sure that Mrs. Tew's able to overcome those compulsions or

20  desires and recognize that she can't encourage someone or get

21  involved in something like this again, no matter how much there

22  might be a desire for money.

23         Obviously, this is a significant downward variance,

24  but only about half a variance from the guidelines, as I

25  calculated it, for a first-time offender under these

1    circumstances, with no threat of violence.  I do take into

2    account, as Mr. Kaplan pointed out, that she has been

3    compliant.  She may have tried to put off going to trial, as

4    long as possible, but none of the parade of horribles that have

5    been suggested about what would happen before trial, none of

6    those came to pass.  I do take that into account, with the

7    suggestion that Mrs. Tew has recognized the need to be more

8    respectful of the law and her obligations, and I expect that

9    that she will be and this sentence is my effort to balance all

10   of those factors, and I think it's sufficient but not greater

11   than necessary to do so.

12           As I may have hinted, to that extent I'm not inclined

13   to remand the defendant, at this time, unless something

14   significant has changed between when we last discussed this?

15   Does the government believe there's something significantly new

16   that would warrant immediate remand?

17           *MR. FIELDS:*  Your Honor, I am prepared to talk about

18   that, but there's also a request I would like to make regarding

19   restitution.

20           *THE COURT:*  Okay.  Go ahead.

21           *MR. FIELDS:*  So we just ask that it be due and payable

22   immediately, and that she be required to pay restitution at 10

23   percent of her income.

24           *THE COURT:*  Yeah.  So those I think I would -- I would

25   impose the restitution requirement.  Those are recommendations

 1   in the presentence report.  I will adopt all of those.  Thank

 2   you.

 3          MR. FIELDS:  Thank you very much, Your Honor.  With

 4   regard to remand, we would ask for it, Your Honor, but we're

 5   mindful of the Court's conclusions.  The only thing is that now

 6   she is certainly facing four years of jail, which has made

 7   people leave before, so that's the only thing that's changed.

 8          THE COURT:  All right.  Thank you.  I appreciate that,

 9   Mr. Fields.

10          Mr. Kaplan, Ms. Hubbard, do you have anything to add

11   on any of this?

12          MR. KAPLAN:  Just a couple things, Your Honor.  I

13   know -- I appreciate not having Mrs. Tew remanded.  I know that

14   the Court -- well, everybody is aware that Mr. Tew is going to

15   be sentenced in about a month, and I understand that usually,

16   that -- the procedure is if she is not remanded that she

17   reports after it's designated, but in this situation, we would

18   request a stay for 60 days, because in 30 days Michael and

19   Kimberley will know what is required of them and for how long

20   and the circumstances of that.  I mean, it's a little bit

21   different.  It's not that they were not prepared, because I

22   know it's been coming a long time, but the final preparations

23   will be made after they can tell somebody, if they need to, of

24   you know how they are going to deal with the child care,

25   depending on his sentence now and for how long and what

1    location, and those are kind of considerations that, quite

2    frankly, are better finalized when the family knows what the

3    circumstances of both parents are.

4         Aside from that, given the conversation about

5    prescribed medication, government suggesting that there may be

6    an addiction, we would request an RDAP.

7         THE COURT:  Okay.  Let me address the first issue you

8    raised, first.  I assume the government would oppose that,

9    since they believe immediate remand is appropriate.  I

10   understand that.  But I think these are unusual circumstances,

11   as I indicated.  I think -- I'm not concerned about Mrs. Tew at

12   this point absconding.

13        Mr. Roth, is there a way that we can phrase, I think

14   it requests that we not designate for 60 days to make that

15   work?  I know you have done it before, but I forget the exact

16   mechanism.

17        PROBATION:  Yes.  To avoid any issues with the BOP

18   potentially designating her a time that you are not

19   anticipating, I would recommend a specific date.  So I would

20   recommend October 8th or later that she be designated.

21        THE COURT:  Okay.  So would that make sense that

22   she -- that we include that kind of language in the judgment?

23        MR. KAPLAN:  Yes, that would be appreciated.

24        THE COURT:  Okay.  I will do that.  As to the RDAP, I

25   don't see the necessity, based on what I know, but if it's a

1    request that she at least be made -- that that be possibly be

2    made available.  Anybody who wants to participate in that I'm

3    happy to recommend it, as long as Mrs. Tew understands those

4    sorts of things I can't order.  They are only recommendations,

5    and BOP will make a decision based on a number of factors.

6          *MR. KAPLAN:*  Along those same lines ... well, if I may

7    have a moment?

8              (Discussion off the record between counsel.)

9          *MR. KAPLAN:*  Your Honor, also, it's not unusual, and I

10   know the -- the Court always minimizes the importance of it.

11   We may request a placement for her, but I don't want to do --

12   request the Court put a recommendation for a placement, but I

13   think it would make more sense if I spoke with Ms. Tew and

14   found out where the kids might be.  So right now I don't want

15   to recommend a Colorado placement if that's the -- the kids

16   aren't there.

17         *THE COURT:*  Well, it's difficult for women too.  There

18   are only so many federal facilities for women.  So, I think

19   yeah, if we're going to do that, we may have to do a little

20   research.

21         *MR. KAPLAN:*  We will do that.

22         *THE COURT:*  Okay.  The only other thing I wish to say

23   is I know you have indicated that you plan to appeal your

24   conviction.  I just want to advise you that if you do wish to

25   appeal, you must do so within 14 days after judgment is entered

1    or your right to appeal will be lost.  If you can't afford an

2    attorney for an appeal, the Court will appoint one to represent

3    you, and if you are request, the Clerk of the Court of this

4    court must immediately prepare and file a Notice of Appeal on

5    your behalf.

6            Is there anything else from the government?

7            MR. FIELDS:  Your Honor, I just want to put on the

8    record that we respectfully oppose the Court recommending RDAP.

9    We see that as another manipulation, that's an opportunity for

10   her to get an even lower sentence.  She has not admitted to

11   having a drug problem or a gambling problem.  There's no basis

12   in the record for the Court to recommend that.  It's, in fact,

13   contrary to everything that they have been filing, and so for

14   the Court to put its thumb on the scales to BOP with that

15   recommendation, we think would be improper.

16           THE COURT:  Okay.  Noted, but overruled, to the extent

17   it was a motion.  Anything on behalf of the defendant?

18           MR. KAPLAN:  No, Your Honor.

19           THE COURT:  Anything else, Mr. Roth?

20           PROBATION:  No, Your Honor.

21           THE COURT:  All right.  The Court will be in recess.

22           THE COURTROOM DEPUTY:  All rise.  Court is now in

23   recess.

24       (Recess at 4:20 p.m.)

25

1                          REPORTER'S CERTIFICATE

2

3          I certify that the foregoing is a correct transcript from
   the record of proceedings in the above-entitled matter.

4

5          Dated at Denver, Colorado, this 26th day of August, 2024.

6                          s/Tammy Hoffschildt

7                          _____
                           Tammy Hoffschildt, FCRR,RMR,CRR
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25