1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 20-cr-305-DDD

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

1. MICHAEL TEW,
2. KIMBERLEY TEW,

    Defendants.

_____

**REPORTER'S TRANSCRIPT**
JURY TRIAL, DAY 1

_____

    Proceedings before the HONORABLE DANIEL D. DOMENICO,
Judge, United States District Court for the District of
Colorado, occurring at 8:30 a.m., on the 5th day of February,
2024, in Courtroom A1002, United States Courthouse, Denver,
Colorado.

**APPEARANCES**

    Bryan Fields and Sarah Weiss, Assistant U.S.
Attorneys, 1225 17th Street, Suite 700, Denver, Colorado,
80202, appearing for the Government.

    Jason Dale Schall, Bowlin & Schall Law LLC, 7350 East
Progress Place, Suite 100, Greenwood Village, CO 80111 and
Kristen M. Frost, Ridley McGreevy & Winocur PC, 303 16th
Street, Suite 200, Denver, CO 80202, appearing for the
Defendant, Michael Tew.

1          David Scott Kaplan and Jamie Hughes Hubbard, Stimson

2    LaBranche Hubbard, LLC, 1652 North Downing Street, Denver, CO

3    80218, appearing for Defendant, Kimberley Tew.

4

5          TAMMY HOFFSCHILDT, FCRR, CRR, RMR, Official Reporter
                901 19th Street, Denver, Colorado 80294
6          Proceedings Reported by Mechanical Stenography
                Transcription Produced via Computer

7

8                        **P R O C E E D I N G S**

9

10          *THE COURT:*  All right.  Thank you, all.  You may take

11    a seat.  So, I should explain, next I'm going to read to you

12    our preliminary instructions.  These give you a bit more detail

13    about how the trial will be conducted, and what you will be

14    considering, and how you are supposed behave.  I should note,

15    after I read these instructions, we will take a brief break,

16    Mr. Keech will give you some orientation and explain a few more

17    of the logistics, and we will rearrange the seating so everyone

18    is up in the box, but for now, I will just read the preliminary

19    instructions to you, where you are seated.

20          Instruction 1:  Twelve of you are the regular jurors

21    in this case, and one of you is an alternate juror.  The

22    alternate may -- I'm sorry.

23          *THE COURTROOM DEPUTY:*  We have 14 jurors.  The

24    government, I don't believe, exercised all of their

25    peremptories.

1          THE COURT:  Oh, did we have an extra?

2          MR. FIELDS:  That's right, Your Honor.  Yes.

3          THE COURT:  Well, before I get started, thank you.

4   Mr. Keech gets to excused the next random number.  Go ahead.

5          THE COURTROOM DEPUTY:  Random?

6          THE COURT:  On our random list.

7          THE COURTROOM DEPUTY:  Nicholas Watkins would be

8   excused, Your Honor.

9          THE COURT:  All right.  Mr. Watkins, thank you.

10          THE JUROR:  Thank you.

11          THE COURT:  Sorry about that.  Do we have the right

12   number of jurors now?

13          MS. WEISS:  Thank you, Your Honor.

14          THE COURTROOM DEPUTY:  Yes, Your Honor.

15          THE COURT:  I guess we could have just gone with two

16   alternates, but, Mr. Watkins gets to go home.

17          So again, thank you, though, for being here, and

18   serving in this important role.

19          So, as I mentioned, 12 of you are the regular jurors

20   and one of you will be the alternate juror.  The alternate may

21   become a member of the jury, if, for some reason, it becomes

22   necessary to excuse one of the regular jurors and replace him

23   or her at some point during the trial.  So everyone has to pay

24   attention, throughout.

25          This criminal case has been brought by the United

1    States Government.  I may sometimes refer to the government as

2    the prosecution.

3         The government is represented by Assistant United

4    States attorneys Bryan Fields and Sarah Weiss.  Defendant,

5    Michael Tew, is represented by his lawyers, Jason Schall and

6    Kristen Frost.  Defendant, Kimberley Tew, is represented by her

7    lawyers, David Kaplan and Jamie Hubbard.

8         The Indictment charges both of the defendants with

9    Conspiracy To Commit Wire Fraud, Count 1, Michael Tew is

10    charged with 39 counts of wire frauds, Count 2 through 40,

11    Kimberley Tew is charged with six counts of wire fraud counts

12    21, 22, 25, 26, 31 and 32.

13         The Indictment further charges both of the defendants

14    with Conspiracy To Commit Money Laundering, Count 41.  Michael

15    Tew is charged with 14 counts of engaging in monetary

16    transactions criminally derived property, Counts 42 and 44

17    through 56, which is referred to as Money Laundering Spending.

18    Kimberley Tew is charged with five counts of Money Laundering

19    Spending, Counts 43, 44, 47, 48 and 56.

20         The Indictment further charges Michael Tew with four

21    counts of willful failure to file a tax return, Counts 57

22    through 60.

23         The Indictment is simply the description of the

24    charges made by the government against the defendants.  It is

25    not evidence of guilt or anything else.  The defendants pleaded

1   not guilty and are presumed innocent.  They may not -- they may

2   not be found guilty by you unless all 12 of the regular jurors

3   unanimously find that the government has proved guilt beyond a

4   reasonable doubt.  Because there are two defendants in this

5   trial, you will have to give separate consideration to the case

6   against each defendant.  Each is entitled to individual

7   consideration.

8        The trial will begin with an opening statement from

9   the government's attorneys, after the government's opening

10  statement, the defendants' attorneys may make opening

11  statements.  These opening statements are not evidence.  Think

12  of these statements as a general outline of the evidence, each

13  side expects to present during the trial, offered to help you

14  follow and understand evidence as it comes in.

15       Following the opening statements, the government will

16  begin presenting its evidence.  The government will call one or

17  more witnesses to testify.  The government's attorneys will ask

18  each witness questions first, then the defendants' attorneys

19  may ask the witness questions, then each side may be permitted

20  to ask the witness follow-up questions.  When it is the

21  defendants turn to present evidence, the process is reversed.

22       While questioning the witnesses, each side may show

23  exhibits to the witnesses; exhibits may include documents or

24  physical objects.  If I allow an exhibit to be admitted as

25  evidence, the exhibit may be displayed to you on T.V. monitors

1    or if it is a physical exhibit, it may be displayed to you here

2    in the courtroom.  All the exhibits that are admitted as

3    evidence will also be available to you during your

4    deliberations at the end of the trial.

5        After the government has presented all its evidence,

6    the defendant will have an opportunity to present evidence, but

7    they are not required to do so, because the government bears

8    the burden to prove its case beyond a reasonable doubt.  If the

9    defendants present evidence, the government may introduce

10   rebuttal evidence.

11       After all of the evidence has been presented, I will

12   give you final instructions on the law and the process you must

13   follow during your deliberations.  Then the attorneys for each

14   party will present closing arguments.  Closing arguments are a

15   final opportunity for the parties to summarize the evidence and

16   to argue their positions.  Following closing arguments, you

17   will retire to deliberate on your verdict.

18       Instruction number 2: As I mentioned during the jury

19   selection process, in a jury trial, the jury and the judge work

20   as a team, each performing different jobs.  Jurors have four

21   tasks; one, to listen to and review all of the evidence; two,

22   to decide from the evidence what the facts are; that is, what

23   actually happened.  You and you alone will be the judges of the

24   facts.  Three, to apply the law to the facts.  You must follow

25   the law, as I give it to you, whether you agree with the law or

1   not; and four, to reach a decision as to all charges and

2   defenses.  Your decision is called a verdict.

3          As the judge, I must determine what law applies, and

4   instruct you as to the law during the trial.  I must ensure

5   that the process moves smoothly and properly rule on any

6   objections made by the attorneys, and make decisions about

7   whether you are permitted to consider certain evidence or not.

8   You might think of my rulings like a referee's calls made

9   during a football game as to whether a ball is in or out of

10  bounds.  Nothing that I may say or do during the course of the

11  trial is intended to indicate or should be taken by you as

12  indicating what your verdict should be.

13         At times you may be excused from the courtroom, or I

14  may have a private conference with the attorneys up here at the

15  bench.  We will try to minimize any interruptions and

16  inconvenience to you, but these conferences are a natural and

17  essential part of the trial process.  The attorneys will be

18  addressing issues such as which order witnesses will be

19  presented in, whether the parties can agree on certain facts,

20  the rules of law that should apply and so on.  Please be

21  patient, even if the trial seems to be moving slowly, because

22  these conferences often actually save time in the end.

23         Instruction number 3:  I will now summarize the

24  allegations detailed in the Indictment.  You will be provided

25  with a copy of the Indictment in your jury binders.  As I

1   mention, the defendants in this trial are Michael Tew and

2   Kimberley Tew.  You will notice the Indictment names a third

3   defendant, Jon Yioulos.  The government has entered into a plea

4   agreement with Jon Yioulos.  The fact that Jon Yioulos has

5   pleaded guilty to one or more offenses charged in the

6   Indictment is not evidence of the guilt of Michael Tew or

7   Kimberley Tew.

8          The Indictment alleges that during the relevant time

9   period, Michael Tew and Kimberley Tew were married.  The

10  Indictment alleges that the Tews conspired to defraud National

11  Air Cargo, which may be referred to as NAC or National.  NAC is

12  a Florida company at which Mr. Tew served as a contracted chief

13  financial officer between 2015 and 2018.  The Indictment

14  alleges that the defendant's scheme to defraud involved the

15  submission of false invoices to NAC by companies that either

16  never existed and/or never provided services to NAC, resulting

17  in a loss of over $4 million.

18         The Indictment also alleges the Tews conspired to

19  commit Money Laundering.  The Money Laundering counts involve

20  allegations that the Tews spent funds that they obtained

21  through the scheme to defraud NAC.

22         Finally, the Indictment alleges that Mr. Tew willfully

23  failed to file income tax returns over a series of several

24  years.

25         I will now explain the elements of the offenses, which

1    the defendants are -- with which the defendants are charged.

2    Conspiracy To Commit Wire Fraud.  Both defendants are charged

3    with violation of Title 18 United States Code Section 1349.

4    This law makes it a crime to conspire to commit wire fraud.  I

5    will instruct you, in a moment, about the elements of wire

6    fraud.  To find a defendant guilty of conspiracy to commit wire

7    fraud, you must be convinced that the government has proved

8    each of the following beyond a reasonable doubt:  One, the

9    defendant agreed with at least one other person to commit wire

10   fraud; two, the defendant knew the essential objectivities of

11   the conspiracy; three, the defendant knowingly and voluntarily

12   participated in the conspiracy; and four, there was

13   interdependence among the members of the conspiracy; that is,

14   the members, in some way or manner, intended to act together

15   for their shared mutual benefit within the scope of the

16   conspiracy charged.

17         Wire Fraud, both defendants are charged with multiple

18   violations of Title 18 United States Code Section 1343.  This

19   law makes it a crime to use interstate wire communication

20   facilities in carrying out a scheme to defraud.  To find the

21   defendant guilty of wire fraud, you must be convinced that the

22   government has proved each of the following beyond a reasonable

23   doubt:  1, the defendant devised or intended to devise a

24   scheme to defraud as alleged in the Indictment; two, the

25   defendant acted with specific intent to defraud; three, the

1    defendant used or caused another person to use interstate or

2    foreign wire communications facilities for the purpose of

3    carrying out the scheme; and four, the scheme employed false or

4    fraudulent pretenses, representations or promises that were

5    material.

6        A scheme to defraud is conduct intended to or

7    reasonably calculated to deceive persons of ordinary prudence

8    or comprehension.  A scheme to defraud includes a scheme to

9    deprive another of money, property or the intangible right of

10   honest services.  A scheme to obtain money or property by means

11   of false or fraudulent pretenses, representations or promises

12   is a specific type of a scheme to defraud.

13       An intent to defraud means an intent to deceive or

14   cheat someone.  A representation is false if it is known to be

15   untrue or is made with reckless indifference as to its truth or

16   falsity.

17       A representation also -- would also be false when it

18   constitutes a half-truth or effectively omits or conceals a

19   material fact provided.  It is made with intent to defraud.  A

20   false statement is material, if it has a natural tendency to

21   influence or is capable of influencing the decision of the

22   person or entity to which it is addressed.

23       To cause interstate wire communications facilities to

24   be used, is to do an act with knowledge that the use of the

25   wire facilities will follow in the ordinary course of business

 1   or where such use be reasonably be foreseen.

 2          Conspiracy to commit Money Laundering.  Both

 3   defendants are charged with a violation of Title 18 United

 4   States Code section 1956(h).  This law makes it a crime to

 5   conspire to commit monthly laundering.  I will instruct you in

 6   a moment about the elements of Money Laundering Spending.  To

 7   find a defendant guilty of conspiracy to commit Money

 8   Laundering, you must be convinced that the government has

 9   proved each of the following beyond a reasonable doubt:  One,

10   the defendant agreed with at least one other person to commit

11   Money Laundering Spending; two, the defendant knew the

12   essential objectives of the conspiracy; three, the defendant

13   knowingly and voluntarily participated in the conspiracy; and

14   four, there was interdependence among the members of the

15   conspiracy; that is, the members in some way or manner intended

16   to act together for their shared mutual benefit within the

17   scope of the conspiracy charged.

18          Money Laundering Spending.  Both defendants are

19   charged with multiple violations of Title 18, United States

20   Code Section 1957.  This law makes it a crime to knowingly

21   engage in a monetary transaction criminally deprived

22   property -- derived property.  To find the defendant guilty of

23   Money Laundering Spending, you must be convinced that the

24   government has proved each of the following beyond a reasonable

25   doubt:  One, the defendant engaged in a monetary transaction

1    in criminally derived property; two, the defendant knew that

2    the property was criminally derived; three, the property had a

3    value greater than $10,000; four, the property was, in fact,

4    derived from wire fraud; and five, the monetary transaction

5    took place in the United States.

6        Monetary transaction means the deposit, withdrawal,

7    transfer or exchange in or effecting interstate commerce of

8    funds or a monetary instrument by, through or to a financial

9    institution.

10        A monetary transaction includes a transaction

11    involving the use of a financial institution, that is engaged

12    in or the activities of which effect interstate commerce in any

13    way or degree.

14        Interstate commerce means commerce or travel between

15    the states' territories or possessions of the United States,

16    including the District of Columbia.  Commerce includes travel,

17    trade, transportation and communication.  It is not necessary

18    that the defendant intended or anticipated an effect on

19    interstate commerce, all that is necessary is that the natural

20    and probable consequence of the defendants' acts did, in fact,

21    effect interstate commerce, however minimal that effect is.

22        Criminally derived property means any property

23    constituting or derived from proceeds obtained from a criminal

24    offense.  Proceeds means any property derived or obtained or

25    retained directly or indirectly through some form of unlawful

1    activity, including the gross receipts of such activity.  Funds

2    obtained by wire fraud are considered to be criminally derived

3    property.

4         The government is not required to prove that the

5    defendant knew the property at issue was derived from wire

6    fraud or from any specific criminal offense.  The government

7    need only prove that the defendant knew the property was

8    derived or obtained from some kind of criminal offense.

9         Willful failure to file a tax return.  Michael Tew is

10   charged with multiple violations of Title 26, United States

11   Code Section 7203.  This law makes it a crime to willfully fail

12   to file a federal income tax return.  To find a defendant

13   guilty of this crime, you must be convinced that the government

14   has proved each of the following beyond a reasonable doubt:

15   One, the defendant was required, by Title 26 of the United

16   States Code, to file an income tax return for the calendar year

17   specified in the applicable count of the Indictment; two, the

18   defendant failed to file such tax return as required; and

19   three, in failing to do so, the defendant acted willfully.

20        To prove that the defendant acted willfully, the

21   government must prove, beyond a reasonable doubt, that the

22   defendant knew federal tax law imposed a duty on him, and the

23   defendant intentionally and voluntarily violated that duty.

24        These are the issues you are to decide.  After all of

25   the evidence has been presented, I will give you a more

detailed guidance on the law governing the case.  You will

listen to and review the evidence presented during the trial in

order to determine the facts; that is, what happened.  For

example, in a traffic accident, the parties might disagree as

to whether a traffic light was red or green, when a car went

through an intersection.  One witness testifies that the light

was red, another witness testifies that the light was green.

You, as jurors, would evaluate the testimony of these witnesses

and all of the other evidence presented, to decide -- in order

to decide whether the light was red or green.

Evidence will be presented in the form of witness

testimony, documents and other items received as exhibits, as

well as any facts that both sides agree to.  There are two

kinds of evidence, direct and circumstantial.  You may consider

both kinds of evidence, and neither is given more weight than

the other.

Direct evidence is direct proof of a fact.  For

example, by testimony of a person who saw an event, heard a

statement or felt a sensation.  Circumstantial evidence is

evidence that suggests the existence of a fact.  For example,

as an example of circumstantial evidence, imagine that a person

walks into the entryway of a building carrying an umbrella and

wearing a wet raincoat.  You might reason, based on what you

see, that it is raining outside.  There's no direct evidence

that it is raining, you can't see it raining, and the person

1   who walked in has not told you that it is raining, but based on

2   your experience, you draw an inference from the wet raincoat

3   and umbrella.  However, you could reach another conclusion from

4   the wet raincoat and umbrella.  Perhaps you heard someone say

5   that the sprinklers were running outside, as a result, you

6   might conclude that the sprinklers are a more reasonable

7   explanation for the wet items than a rain shower.

8          You make decisions based on direct and circumstantial

9   evidence every day, and you should use your experience in

10  everyday life to help you make your decisions here.  It will be

11  up to you to decide which witnesses to believe, which not to

12  believe, and how much of any witness' testimony to accept or

13  reject.  You should use the same tools, observations and

14  methods you use in your everyday life to help you decide who

15  should be believed and who should not.

16         However, because you will only hear one witness at a

17  time, you should wait until you have heard all of the evidence,

18  before you make up your mind as to whether you believe the

19  testimony of any witness, and before you decide about the

20  existence of any particular fact.

21         Instruction Number 5:  There are certain things that

22  are not evidence and you may not consider these things in

23  reaching your verdict.  One, statements, arguments, questions

24  or objections by the attorneys are not evidence.  In making

25  their opening statements and closing arguments, in posing

1    questions to witnesses and in making and responding to

2    objections, lawyers may assert certain facts, describe certain

3    events in certain ways.  A lawyer's description of facts or

4    events is not evidence that you should consider, because a

5    lawyer is not a witness, and a lawyer's statement is not

6    testimony.

7          If a lawyer's description of a particular fact or

8    event is different from what you heard from a witness,

9    understand that it is the witness' version of the fact or

10   event, not the lawyer's; that is the evidence that you may

11   consider.

12         Two, questions and exhibits to which I sustain an

13   objection are not evidence.  Lawyers have an obligation to

14   their clients to make objections when they believe something

15   being offered as evidence is improper, under the rules of

16   evidence.  Those rules are designed to make sure that both

17   sides receive a fair trial.  You should not be influenced by

18   lawyer's objection or by my ruling on it.  If I sustain an

19   objection to a question or exhibit, ignore that question or

20   exhibit.  If I tell you to disregard a particular statement by

21   a witness, or to disregard some document or item, you must put

22   the statement or item out of your mind and not consider it for

23   any purpose.  If I overrule an objection, treat the witness'

24   answer or exhibit like any other.  If I instruct you that

25   certain testimony or some exhibit is received for a limited

1    purpose only, you must follow my instruction and consider that

2    testimony or exhibit only for the purpose I explained.

3            Three, anything you see or hear out of the courtroom

4    is not evidence.  You must limit yourself to the evidence

5    presented here in the courtroom.

6            Four, during the course of the trial people may enter

7    and leave the courtroom or counsel tables.  It is not unusual

8    for attorneys or parties to have to stand up, move about the

9    room, confer with others or even leave the room to attend to

10   certain matters.  You should not concern yourself with this.

11   It is not evidence.

12           Likewise, unless I am addressing you, the jury, you

13   should not concern yourself with what I may be doing on the

14   bench.  Sometimes I'm doing research or information from my

15   staff, or coordinating with them about our schedule, or

16   something else, so if you see me typing or making notes, or

17   doing anything else, other than directly addressing you, do not

18   take that as commentary on the evidence or on the arguments the

19   parties may be making.

20           Five, during the course of the trial, I may ask a

21   question of a witness.  If I do, that does not indicate I have

22   any opinion about the facts of the case.  I'm only trying to

23   bring out facts that you may consider.  Any such question that

24   I may ask is not evidence, only the witness' answer is

25   evidence.

1          Instruction number 6.  As you know, this is a criminal

2     case.  The law does not require a criminal defendant to prove

3     his or her innocence or to produce any evidence at all.  The

4     government has the burden of proving each defendant is guilty

5     beyond a reasonable doubt, and if the government fails to do

6     so, you must find the defendants not guilty.

7          Proof beyond a reasonable doubt is proof that leaves

8     you firmly convinced of a defendant's guilt.  There are few

9     things in this world that we know with absolute certainty, and

10    in criminal cases the law does not require proof that overcomes

11    every possible doubt.  It is only required that the

12    government's proof exclude any reasonable doubt concerning a

13    defendant's guilt.

14         A reasonable doubt is a doubt based on reason and

15    common sense, after careful and impartial consideration of all

16    of the evidence in the case.  If, based on your consideration

17    of the evidence, when you retire to deliberate, at the end of

18    the trial, you are firmly convinced that each defendant is

19    guilty of the crimes charged, you must find the defendants

20    guilty.  If, on the other hand, you think there's a real

21    possibility that a defendant is not guilty, you must give that

22    defendant the benefit of the doubt and find him or her not

23    guilty.

24         Instruction number 7:  I will now share a few words

25    about your conduct during the trial.  There will be moments

1    when the trial process may seem dull and boring compared to

2    what you see on T.V. or in the movies.  I ask, nonetheless,

3    that you pay careful attention.

4         If you need to take a break, you may signal me or

5    Mr. Keech, by raising your hand, and we will take a break, if

6    anyone needs it.

7         Listen carefully.  Although you can see that the court

8    reporter is making stenographic notes of everything that is

9    said, a typewritten transcript will not be made available for

10   your use during deliberations.  On the other hand, any exhibits

11   that have been admitted into evidence will be available to you

12   during deliberations.

13        You are permitted to take notes during trial, but you

14   are not required to do so.  You will be given a notepad,

15   with -- and paper and a pencil or pen, for that purpose.

16   Unless instructed to the contrary, the notebook and pad should

17   be left on your seat any time you leave the courtroom.

18        It may be difficult to take detailed notes and to pay

19   attention to what the witnesses are saying, at the same time,

20   so if you do take notes, make sure that your note taking does

21   not interfere with your listening to and considering the

22   evidence that is being presented.  Do not discuss the contents

23   of your notes until you begin deliberations.  You may use your

24   notes to help you recall evidence when you deliberate, but do

25   not rely on your notes or those taken by a fellow juror if the

1    notes do not agree with your recollection of the evidence.

2           Everyone takes notes in different formats, levels of

3    detail of different things and the notes are only to be used to

4    aid your memory as to what you saw and heard in the courtroom.

5           You will not be able to ask questions of the witnesses

6    or the attorneys during the trial.

7           During the course of the trial you will receive all of

8    the evidence you are allowed to consider to decide the case.

9    Do not conduct any outside research or investigation about the

10   case, even if you feel that you have not heard the whole story.

11   Do not consult books, visit locations, search on the Internet

12   for information about any party, attorney, witness, event or

13   other information concerning this controversy or trial.

14   Similarly, do not read or listen to anything reported in the

15   media or press that relates to this case, this includes

16   newspaper, radio or any Internet commentary.  Your decision

17   about this case must be made solely based on the evidence

18   presented in the courtroom.

19          Consistent with the solemn oath you just took, there

20   are certain restrictions you must abide by.  During the trial,

21   you are not to communicate about the case with anyone or permit

22   anyone to communicate about the case with you.  Do not talk to

23   any witness or with the parties or with any of the lawyers at

24   all.  You cannot discuss the case with your co-jurors until the

25   trial is over and you begin deliberations.  You are not to

1    communicate about the case with anyone, including your spouse,

2    or family, friends or anyone else, until after the jury has

3    reached its verdict and you have been discharged.  This

4    prohibition applies to electronic communications.  You may not

5    post any information on the Internet or through any other

6    electronic medium about your participation on this jury or

7    about this trial.  This means you may not use social media,

8    email, text or any other form of electronic communication to

9    identify the trial, disclose the identity of any of the persons

10   involved in the trial, including the identities of any other

11   jurors, attorneys, parties or witnesses or to disclose the

12   nature of the case, what occurs in the courtroom or what you or

13   others think about the evidence presented.

14            If you receive any communication about the trial from

15   any person, or through any medium, please tell Mr. Keech, who

16   will tell me.

17            Finally, keep an open mind and do not form an opinion

18   until all of the evidence has been presented, you have heard my

19   instructions on the controlling law and you begin deliberations

20   with your co-jurors.  Once you begin deliberations you may only

21   discuss the case if all jurors are present.

22            So, those are your instructions.  I should say, you

23   can, of course, tell your family or workers that you are

24   serving on a jury, you just can't tell them any of the details

25   about the case while the case is going on.

1            As I mentioned, we now will take a short recess.

2    Mr. Keech, about 15 minutes.  We will take you back to the jury

3    room.  Give you a little bit of an orientation of how this will

4    work, and then we will come back and hear opening statements.

5            So, unless there's anything, we will take a recess

6    until just about 5 minutes till 3 be back.

7            THE COURTROOM DEPUTY:  All rise.  Court is now in

8    recess.

9        (Recess at 2:41 p.m.)

10       (In open court at 2:59 p.m.)

11           THE COURT:  Please take your seats.  Counsel, are we

12   ready for opening statements?

13           MS. WEISS:  Yes, Your Honor.  Thank you.

14           THE COURT:  I don't think we're going to have a time

15   issue, but the government will go first, and then how do the

16   defendants plan to proceed, Mr. Schall?

17           MR. SCHALL:  (Nodding head.)

18           THE COURT:  And Mr. Kaplan, will you be after

19   Mr. Schall?

20           MR. KAPLAN:  Yes.

21           THE COURT:  Okay.  All right.  Then, Mr. Keech why

22   don't we bring the jury back in.

23           (Jury entered the courtroom at 3:02 p.m.)

24           THE COURT:  All right.  Welcome back.  Let's all take

25   a moment to take our seats and get situated.

1           So, members of the jury, thank you, again.  As I

2    mentioned a bit ago, the next stage in this proceeding is for

3    the attorneys to present opening statements.  We will begin

4    with the government, and then Mr. Schall will speak on behalf

5    of Mr. Tew and then Mr. Kaplan on behalf of Ms. Tew.  So,

6    Ms. Weiss, are you presenting?

7           MS. WEISS:  Yes, Your Honor.

8           THE COURT:  Go ahead.  Go ahead.

9                         **OPENING STATEMENT**

10          MS. WEISS:  Good afternoon.  May it please the Court.

11   This is the story of Michael Tew and Kimberley Tew.  Two people

12   who betrayed those who trusted them, to steal $5 million in

13   just two years.  In 2015 National Air Cargo was on the

14   financial brink.  The year before one part of the company had

15   filed for bankruptcy, and the entity and its subsidiaries were

16   having a hard time making ends meet.  So that year the company

17   hired the defendant, Michael Tew, to help right that ship.

18   Kimberley Tew, his wife, also helped the company on special

19   projects.

20          Now, National Air Cargo is one of those companies that

21   helps make the world go around today.  Their industry is called

22   freight forwarding or logistics.  They have an airline that

23   services the other part of the company.  You have probably

24   never heard of National Airline.  You can't go on the website

25   yourself and buy a ticket.  But National is a big player in

1    this industry.  Basically, what National does is they help get

2    things from point A to point B, by whatever means that looks

3    like.  So maybe National, operating in Malaysia, goes and picks

4    up a cargo full of bananas, puts it on one of National's

5    trucks, that truck takes it to one of National's airplanes,

6    where is gets flown to the United States, put on another

7    National's truck, and ends up in a grocery store near you.

8         One of National's biggest customers is actually the

9    Department of Defense.  National helps get everything that the

10   military needs where it needs to be, from plane parts, tank

11   parts, even troops, themselves.

12        Freight forwarding is a capital intensive business.

13   You need a lot of money on hand.  There's a lot of bills to

14   National's clients going out the door, and there's a lot of

15   invoices coming in, to pay for the things like fuel, labor,

16   parts, all of the things that it needs to do what it does on a

17   daily basis.

18        It can be a delicate balance, and just like National's

19   planes and trucks, things are moving all the time.  So, at the

20   end of 2015 National needed someone to come in and set its

21   financial house in order.  Someone smart, someone savvy,

22   someone who could impress outside investors, who could hit the

23   ground running, make quick decisions, see the big picture, and

24   when National CEO and founder Chris Alf was introduced to

25   Michael, Mr. Alf thought he found the perfect person for that

1   job.  Michael Tew came highly recommended.  He had sterling

2   credentials, a degree, an undergrad and business school from

3   New York University and a background in the finance industry in

4   New York City.

5        Those credentials and that background, they impressed

6   Chris Alf.  So, towards the end of 2015, National hired Michael

7   Tew, and Michael did good work, and eventually National

8   promoted him to acting chief financial officer, CFO.  Now,

9   Michael Tew lived in Denver, Colorado, and National's offices

10  were Buffalo, New York and Orlando, Florida.  So Michael worked

11  for National remotely, as a contractor.  This arrangement

12  worked out for everyone.  Michael could continue to take on

13  other clients and he could remain in Denver with his family and

14  his wife Kimberley Tew.

15       Michael worked from home at his luxury apartment in a

16  building right by the Cherry Creek Mall.  National supported

17  this, because it valued Michael's work, and the company trusted

18  him.  Kimberley Tew also did some occasional contract work for

19  National.  She was smart and savvy in her own way, boasting a

20  business degree from Fordham, and a background programming for

21  Google.  Again, National appreciated that value add that

22  Kimberley brought to the table.

23       But over time National's relationship with the Tews

24  did not come without its hiccups.  See, despite the fact that

25  Michael had risen to become one of the highest compensated

26

1    people in the company, he sometimes seemed short on money

2    himself.  He would ask Chris Alf for advances to his pay.

3    Advances that Mr. Alf authorized, again, because he liked

4    Michael and he liked his work.

5         Kimberley, for her part, had called National's

6    accounting department a couple of times, screaming at staff,

7    demanding that Michael's bills get paid faster.  Somewhat odd

8    for a chief financial officer, making well over six figures a

9    year, but at the end of the day, those were the Tew's personal

10   issues.  They didn't affect the business.  But that changed

11   around July of 2018.

12        You will hear at that time, National started getting

13   calls from Amex, American Express, a corporate credit card

14   issued by National to Michael, had been used all over the

15   Denver metro area, at various retail and grocery stores.  Now,

16   it turned out that Michael's company Amex had been used to buy

17   gift cards $500 at a time, 600, a thousand, up to $3,000 worth

18   of gift cards at one time over and over and over again, to the

19   tune of almost $45,000 in under six weeks.

20        When confronted about this, Michael admitted he still

21   had the card, hadn't been stolen, at least not by a stranger.

22   He said his wife had taken it.  She was the one making all of

23   those gift card purchases.  See, Kimberley liked to gamble, a

24   lot.  She was also into cryptocurrency at the time.  And

25   Michael told Chris Alf that Kimberley was in debt to a number

1    of people that she traded crypto with on the Internet.  Now,

2    both of the Tews, they apologized profusely, at the time.  Said

3    they made a stupid mistake.  They would pay that money back.

4              But those calls from Amex weren't the only calls about

5    the Tews.  Around the same time, person identifying himself as

6    Craig also began calling National's offices, talking to anybody

7    he could get ahold of on the phone, insisting to speak to

8    Michael Tew.  Craig was saying that Michael owed him money.

9    This caller was not pleasant about it.  He reduced one of

10   National's employees to tears, in fact.  That wasn't all.  This

11   Craig also reached out to Chris Alf's wife, claiming that

12   National is responsible because they hired Michael, for Michael

13   and Kimberly's crypto debts.  This caller made threats against

14   Chris Alf's family, his wife and his daughter.  You are going

15   to hear what Craig said he would do if National did not pay up.

16   By this point, it was clear that whatever was going on with the

17   Tews' personal finances, it was having an impact on National's

18   business.  It was not okay.

19             So, in September 2018, National fired Michael Tew.  No

20   severance, no two-week notice.  Eventually, National got stuck

21   with that $45,000 Amex bill.  The company paid that.  And

22   National and Chris Alf, they moved on, because that's what you

23   do, what you have to do, in a business that moves as quickly as

24   National's.

25             Now, fast forward with me two years in time, to a

sunny Tuesday morning, in July 2020.  The Tuesday right after
the 4th of July holiday, in fact, in a suburb outside Buffalo,
New York.  Pretty warm by Buffalo standards, very nice day, but
it was the worst day of Jon Yioulos' life.  Jon worked for
National.  He worked there since 2015, as the company's
director of finance and its controller, and in that role, he
had worked very closely with Michael Tew.  He considered
Michael to be a friend and a kind of mentor, and he was upset
when Michael was fired two years prior to that, but on July
7th, 2020, when Jon arrived to work at National he was fired,
effective immediately.  Security walked him out of the
building.  But it got worse for Jon from there, because waiting
outside of National's offices that day were agents from the IRS
and the FBI, and they wanted to talk to Jon.  And Jonathan
Yioulos, he knew exactly why.  You see, for a period of over
two years, both while Michael worked at National and after, Jon
had been helping Michael and Kimberley embezzle money from
National, a lot of money, over and over again, sometimes
hundreds of thousands of dollars a time.  In total, over $5
million.

     Let's talk about what led to that sunny day when Jon
Yioulos was fired.  Days before Chris Alf had gotten yet
another call about the Tews.  This time that call was from
federal agents with the IRS and FBI, and they told Chris Alf
that they were interested in the Tews, because they had been

1  reviewing the Tews' bank records and here's what they saw.  The

2  agents saw wires of thousands of dollars coming in.  The money

3  is coming straight back out again.  Lots of cash withdrawal, in

4  particular.  And the agents hadn't put it altogether at this

5  point, but they have figured out enough to know that a lot of

6  this money is coming from National's bank accounts.

7          Chris Alf, you will hear, he was astounded.  *What do*

8  *you mean we're paying Michael Tew?  We fired that guy almost*

9  *two years ago*.  So he put the agents in touch with National's

10  director of accounting, a woman named Abby Schwartz.  You are

11  going to meet Abby during this trial.  She is going to tell you

12  about how she met with the agents, in person, at National's

13  offices over the 4th of July holiday weekend.  She will explain

14  that she met with those agents very deliberately over that

15  weekend and very quietly, so that this was all kept on a

16  need-to-know basis, because at that point, no one really knew

17  how all of this money from National was going to the Tews.

18          Abby is going to tell you about how she started

19  pulling invoices and payment records at the agents' requests.

20  The agents were asking about certain invoices, certain vendors

21  that had been paid by National.  Now, Abby didn't know anything

22  about why these particular vendors, why these vehicle invoices,

23  she just knew that the agents thought all of this was somehow

24  related to Michael Tew.  But Abby is going to tell you in this

25  trial about the moment that she put it together.  She will tell

you about how, when she was looking through National's records

she found an invoice, supposedly from a completely different

company, with a completely different name, but the invoice

listed as payment information the bank account of Michael and

Kimberley Tew. Abby noticed something else, as she is pulling

these records, almost every single payment on every single

invoice had been approved by one person and one person only, a

person that Abby had worked hand in glove with every single

day, for years, National's director of finance and its

controller, Jon Yioulos.

This was someone that Abby knew well. Someone she had

trusted. Someone she shared an office wall with. Her heart

sank. So she told the agents what she found and she told her

boss, Chris Alf. And once again, Chris Alf was astounded. But

he knew he had to fire Jon Yioulos straightaway.

So Yioulos was fired, and on that sunny day in July

2020 he walked out of National for the last time, and that's

where he found the IRS and FBI agents waiting for him.

At this trial, you will hear from Jon Yioulos,

directly. He is going to testify. He will explain that both

shortly before Michael was fired for almost two years after,

the Tews, through a combination of shell companies that they

had created and other companies that were run by their friends

and associates, they submitted false invoice, after false

invoice, after false invoice to National.

1          Ten thousand dollars here, $30,000 there, even six

2     figures' worth of invoices, one after the other, after the

3     other.  And for two years, Jon authorized the payments on those

4     invoices all the while knowing they were bogus.

5          That's how the Tews got $5 million out of National, $5

6     million.  In fact, they still had invoices that they had

7     submitted, that were pending for payment, on the day the agents

8     came knocking.

9          Now, I said that at this trial you will hear from Jon

10    Yioulos, during his testimony.  He is testifying for the

11    government under the terms of a Plea Agreement.  He will

12    explain why he did what he did.  Why, in some ways, by that

13    point, he was relieved to be caught.  But you will not have to

14    rely solely on Johnathan's testimony, because you will hear

15    other evidence in this case.  Vivid evidence from several

16    witnesses.

17         First, you will hear that, pretty much right after the

18    agents approached Jon, he agreed to make some phone calls to

19    Michael Tew.  And the agents recorded those phone calls.  So,

20    you will hear, at this trial, a recording of Michael Tew, in

21    his own words, in his own voice, explain precisely how this

22    conspiracy worked.  You will hear a recording of Michael trying

23    to reassure Jon that they won't get caught.  You will hear a

24    recording of Michael explaining what he did to cover his

25    tracks.  And in those recorded calls, you will hear Michael

1    explain how he set up shell companies to bill National.  How,

2    for one, they picked the name of a friend who they knew had a

3    drug addiction.  For another, how he set it up in his in-laws'

4    address.  All in an effort to put some distance between those

5    invoices and the names Michael and Kimberley Tew.

6        Through the recording Michael will tell you how he

7    used the names of his friends and their companies all in a way

8    to hide the funds coming back to them.

9        Second in this trial, you are going to see a lot of

10   text messages.  Text messages that were backed up on phones,

11   between Michael and Jon, where Michael is begging his friend

12   Jon to send him money.  And then trying to bribe Jon to send

13   him money.  Even threatening Jon, to get him to send more

14   money.

15       You are going to see messages from an iCloud account,

16   messages that will show Kimberley Tew was just as much a part

17   of this conspiracy as her husband was.  You are going to hear

18   and see coarse language, in this trial.  You are also going to

19   hear the names of a lot of different companies.  All of those

20   vendors that the Tews were billing National through.  I'm not

21   going to list them all out right now, because you will become

22   familiar with those names and the companies associated with

23   them over the course of this trial, and much like National

24   helps gets things from point A to point B, that is what the

25   government is going to do through the evidence in this case.

1              Over the next few days, you are going to see a lot of

2      documents that lead from point A to point B.  You are going to

3      see information from Secretaries of State, and companies that

4      helped Michael set up some of these shell entities.  You will

5      see the emails and the invoices that were submitted to

6      National.  The ones that Jon paid from his employer's bank

7      accounts, on the behalf of Michael and Kimberley Tew.  You are

8      going to see information about who created those email

9      accounts, the ones that submitted those invoices, and you are

10     going to see that those email accounts lead straight back to

11     the Tews.

12             You are also going to see some of what the Tews were

13     doing with that money.  That $5 million.  In this trial, you

14     will see surveillance photos of them at banks and ATMs,

15     smiling, as they withdraw tens of thousands of dollars at a

16     time.

17             You will see that those withdrawals line up with funds

18     that were coming into their accounts from National.  You are

19     going to see some of how they spent it.  Paying cash for an

20     Audi®, going to Vegas together, and gambling away thousands of

21     dollars at a time, at a whim, and going to cryptocurrency ATMs

22     all over the Denver metro area, over and over and over again,

23     to buy more and more Bitcoin, because, yes, even after

24     everything that had happened back in 2018, when Michael was

25     fired, Kimberley was still heavily involved in trading

1    cryptocurrency.

2         You are also going to hear, during this trial, what

3    Michael Tew was not doing.  You see over this timeframe,

4    Michael Tew, person with a business degree from NYU, owned his

5    own company and worked in finance for a living, wasn't filing

6    income tax returns.

7         The other thing that you are going to see is a lot of

8    iCloud messages between Michael and Kimberley Tew.  Like most

9    married couples, they communicated a lot, but these weren't the

10   typical kind of messages that we think of between married

11   couples.  Who is picking up the kids?  Can you pick up the milk

12   on the way home?  These messages between a husband and a wife

13   were about how to commit these crimes.  *We need Jon to send*

14   *more money.  Get him to send more money.  How do we convince*

15   *him to send more money.  Should we offer him Buffalo Bills*

16   *season tickets?  Should we say we will pay off his student*

17   *loans?  Figure out if you want to be in this family*.

18        The iCloud messages contain discussion after

19   discussion, instruction after instruction about which bank

20   account to withdraw cash from, how much money is coming in and

21   where it should go, how much cash to take out, how much Bitcoin

22   to buy, on and on and on.  ICloud messages discussing what they

23   will do if they get caught.

24        And before I wrap up, I want to mention one thing

25   upfront.  I expect that when I sit down, defense counsel will

1    stand up and make some arguments about those iCloud messages,

2    how the government got those messages, who sent which message

3    and when.  At this trial, you will also hear from some tech

4    folks at the FBI, who will explain that to you, they are going

5    to testify about this issue exactly.  The iCloud messages are

6    going to require you to use a little common sense to figure

7    out, and here's why, you will hear that when agents with a

8    search warrant in hand, went to seize Kimberley Tew's phone,

9    she wasn't there.  They never got it.  But like many people,

10   those messages should have been backed up to the cloud, to an

11   Apple™ iCloud, in fact.  But when agents seized the iCloud,

12   records, Kimberley's messages with Jon Yioulos weren't there

13   either.  Half of them were Jon Yioulos' side, but not Kimberley

14   Tew's.  And you will find out why.  Because Kimberley Tew

15   admitted, in a recorded meeting, in front of federal agents, at

16   the Yeti store, at the Cherry Creek Mall, of all places, that

17   she wiped that account.

18        You are going to hear from one of the IRS agents who

19   was there that day.  The agent who helped put this whole thing

20   together.  This is going to be a case about detail, about

21   logistics, about movement.  The complications and complexity of

22   getting things, including money, from one place to another.  It

23   is a case with a lot of documents, and a lot of communications.

24        In this trial, you will see a lot of thought, you will

25   see a lot of planning.  It takes a lot to run a multinational

1    freight forwarding business.  Turns out it also takes a lot to

2    run a two-year wire fraud and Money Laundering conspiracy.

3            This is the trial of Michael Tew and Kimberley Tew.

4    Each are charged with one count of Conspiracy To Commit Wire

5    Fraud, each are charged with one count of Conspiracy To Commit

6    Money Laundering.  Michael is charged with 39 counts of wire

7    fraud and Kimberley is charged with six counts of wire fraud.

8    Michael is also charged with 14 counts of Money Laundering

9    Spending, and Kimberley is charged with five counts of the same

10   thing.  And finally, Michael is charged with four counts

11   related to willful failure to file tax returns.  Fifty-nine

12   counts against Michael, 13 counts against Kimberley, in all.

13           At the end of this trial, after you have heard and

14   seen all of the evidence, the government will get up, during

15   closing argument, ask you to use your common sense and the

16   evidence and testimony presented before you, and to find

17   Michael Tew and Kimberley Tew guilty on each and every one of

18   the counts charged against them, because the government will

19   prove, beyond a reasonable doubt, that they are guilty.  Thank

20   you.

21           *THE COURT:*  Thank you, Ms. Weiss.  Mr. Schall.

22                         **OPENING STATEMENT**

23           *MR. SCHALL:*  Thank you, Your Honor.  Ladies and

24   gentlemen, this case is crazy.  You are going to hear some

25   things that surprise you.  You are going to hear some things

1    that shock you, and it's going to be evidence for you to

2    consider.

3            The government's Indictment is not evidence for you to

4    consider.  It is a document that lays out their narrative, but

5    it is not the whole story.  What I ask you to demand and to

6    figure out is the whole story, because, I submit to you, this

7    case is about so much more than what's written on that paper.

8    That paper, which is probably in the folders before you right

9    now.  Don't look at it right now, but I'm going to reference

10   it.  You will see in there that my client, Mr. Michael Tew, is

11   charged with 59 counts, 59 violations of federal law.  You will

12   see that his wife, Ms. Kimberley Tew is charged with 13

13   violations of federal law.  You will see, if you read the whole

14   thing, that the cooperating defendant, Mr. Jonathan Yioulos, is

15   charged with, check my math, 40 counts of violating federal

16   law; 59, 13 and 40.  You hear those numbers and if you are like

17   anyone else, you are already drawing assumptions about what

18   that means.  Don't be so sure.

19           Mr. Tew is charged with 59 counts that fall into three

20   buckets, if you will.  Wire fraud, 39 counts; conspiracy to

21   commit wire fraud, one count; Money Laundering Spending, 15

22   counts -- excuse me -- 14 counts, Money Laundering Spending

23   conspiracy one count, and four counts, by himself, of failure

24   to file income taxes.

25           These are the three main players that you are going to

1  hear about, Michael Tew, Kimberley Tew, Jon Yioulos, 59 counts,

2  13 counts, 40 counts, but don't read too much into that.

3          Now, you heard from Ms. Weiss, Mr. Yioulos will be

4  here to testify before you, and when he does, it will be

5  discussed, at length, the Plea Agreement he reached with the

6  government, in which he agreed to testify and come here.  You

7  will see, if you read that Plea Agreement, that he pled guilty

8  to two counts, and 38 the government agreed to dismiss.  Those

9  counts involve wire fraud, you will hear it from his mouth.  I

10  don't need to put words in it.  He will be talking a lot, maybe

11  as early as this afternoon.

12          He is here, cooperating with the government, as part

13  of a deal.  A deal where he pled guilty to 5 percent of the

14  charges he was charged with.  Where he agreed that he would

15  testify truthfully against the Tews.  Where he agreed that he

16  was jointly and severally liable, that's a mouthful, for $5

17  million in restitution.  You will hear from him.  Government

18  will ask him questions, I will ask him some questions,

19  Ms. Tew's lawyers will ask him some questions.  We will see

20  what he has to say.

21          He has, already, something, it's in that Plea

22  Agreement, and you are also going to hear from him, in many

23  other ways, many messages, throughout the course of the last --

24  well, not the last, but between 2018 and 2020.  And I want to

25  present to you that while there's a distinction between direct

1    and circumstantial evidence, there's also a very potent

2    distinction between evidence that happens in the shadows, and

3    evidence that happens in the light, and what I mean by that is

4    you are going to be reading text messages between husband and

5    wife, between former co-workers, that, at that time, no one

6    thought -- or it's up to you to decide what they thought, but

7    it didn't seem like those text messages, those communications

8    would ever reach the light of day.  They are going to come into

9    this courtroom, and you are going to have to consider them.

10           Other evidence, like Mr. Yioulos' Plea Agreement, was

11   designed for the light of day.  It was designed for this

12   purpose.  Consider the strength of evidence that was never

13   supposed to be seen, and evidence that was designed to be seen.

14   In doing so, you will be asked -- it will be your job, so

15   sorry, you are not being asked, to determine whether or not my

16   client, Michael Tew, committed 59 violations of federal law,

17   and each one of those violations had different elements that

18   make it up.  Different structural parts that must be met in

19   order for a crime to have been committed.  You must find each

20   one of those elements in order to convict him of any of those

21   offenses.  If you do not find sufficient proof beyond, a

22   reasonable doubt, for one element of one offense, then you must

23   return a verdict as to that offense of not guilty.  The

24   government has the burden here of proving the case; not

25   Mr. Tew; not his counsel.

1          You have heard, proof beyond a reasonable doubt.

2     We've all watched the T.V. shows.  I submit to you, you

3     probably don't know where it started.  It came originally from

4     a night -- excuse 19 -- an 1880 Supreme Court of the United

5     States case, from the, then, territory of Utah; not the state.

6     It was not a state yet.  And it involved a criminal conviction

7     of a man who was charged with bigamy.  He took a second wife,

8     and his case gave us what is now proof beyond a reasonable

9     doubt.  The standard of proof that the government must show.

10          This case does not involve bigamy, but it does involve

11     marriage, very much so, and you are going to wonder what's

12     going on.  Read those messages, consider the evidence.

13     Remember that Michael Tew doesn't have to take the witness

14     stand.  The Constitution of the United States gives him that

15     right.  Older, even, than proof beyond a reasonable doubt.  As

16     old as our country, a criminal defendant does not have to

17     testify.  The judge will instruct you on that, and not to read

18     too much or anything into the absence of that testimony.

19          You are, however, going to hear a lot of other

20     evidence.  Ms. Weiss indicated as much.  Bank records, galore.

21     Two consensually recorded phone calls.  You will hear those

22     recordings.  You may hear what happened before those recording?

23     We will ask Mr. Yioulos about that.  Written communications.

24     We have discussed, everyone has an iPhone or Android, but

25     everyone, these days, knows how they use their phone and what

1    that means.

2            Some of these communications occurred in the dark,

3    when no one was looking.  Some of them occurred with some

4    light.  Ask yourself, *What's happening*?  Ask yourself, *What is*

5    *going on here*.  Pay special attention to these communications?

6    They will help you understand the story not in the Indictment.

7            Finally, as I close, for now, being that we are

8    residents of Colorado, I would like to ask you to consider the

9    evidence that you hear, as if it were the three component

10   parts, that the three elements of a forest fire, first element

11   is heat, the spark, the flame itself.  You cannot have fire

12   without the spark.  The heat.  The element that eventually

13   grows, and left uncontrolled, becomes a conflagration that runs

14   out of control, destroying the things in its wake.  The second

15   element of a fire is oxygen.  The breath of the fire, without

16   which the fire would be choked off.  There would be no fire.

17   The element that has the ability to deny the fire its life.

18   And finally, ladies and gentlemen, every fire must have fuel.

19   The very object, the very material that the fire consumes, that

20   the fire consumes, only to prolong its own life, only to

21   prolong the flames, to keep them coming, and in the end, the

22   fuel is left ravaged.  It's left destroyed.  It's left as

23   nothing more than dust, and there's nothing left to show of it,

24   and as you consider the evidence presented to you, as the trial

25   develops, I ask that you see behind the Indictment.  I ask that

1    you see the full story and make an effort to understand what is

2    really going on here.  Thank you.

3            *THE COURT:*  Thank you, Mr. Schall.  Mr. Kaplan.

4            *MR. KAPLAN:*  Thank you, judge.

5                            **OPENING STATEMENT**

6            *MR. KAPLAN:*  May it please the Court.

7            *THE COURT:*  Go ahead.

8            *MR. KAPLAN:*  This case is about a scheme concocted and

9    executed by Michael Tew and Jon Yioulos that resulted in

10   millions of dollars of loss to National Air Cargo.  That's what

11   you are going to hear, that's what the evidence is going to

12   demonstrate, when the government attempts to prove their case.

13           Jon Yioulos was briefly mentioned, was an employee of

14   National Cargo, an employee that started as an accounts

15   executive, became a manager, became a controller, and he was

16   intimately familiar with all of the financial workings, all of

17   the financial circumstances, all of the financial procedures,

18   all the way -- the way National Air Cargo got its money,

19   distributed its money, he was intimately familiar with.

20           Michael Tew, as you heard from the government, was

21   hired by National Air Cargo.  He was a pretty impressive guy

22   with an MBA from NYU, very well-spoken, knew about finances,

23   was liked by the head of NAC, that's how you will hear about

24   that company, and came in do just some work for them, and

25   worked his way into a position of great responsibility.  Worked

1     his way into a position, under contract, as the chief financial

2     officer, and similarly to Jon Yioulos, he also became

3     intimately familiar with the financial workings, the processes,

4     the procedures, how NAC did business from a financial

5     standpoint.  What were the strengths of their financial

6     circumstances?  What are the strengths of processes?  How did

7     they do it?  How did they take care of all that?

8          The government just talked about vendors and money

9     coming in and money coming out, and, yes, both of them ended up

10    experts at that, and they worked together.  They were both in,

11    sort of, a related part of the business.  The financial part of

12    the business.  And why is that important?  It's important

13    because the combination of these two people, working with each

14    other, ultimately on behalf of National Air Cargo, and then on

15    behalf of each other, was what made -- what was otherwise a

16    scheme very difficult to do, very difficult to understand, very

17    difficult to work out, very difficult not to get caught,

18    because this is not something that can be done by somebody that

19    didn't know, not only about finances, but didn't know about the

20    finances of this company.  And what they both knew is they knew

21    how vendors were identified.  They knew how vendors would bill

22    for their services.  They knew how invoices were to come into

23    the company.  They knew how invoices were to be approved, and

24    invoices would be forwarded to accounts payable.  How invoices

25    would then be paid out.  They even knew more important things

than that, which is, *How could you fly under the radar?  How

could you do it so you don't get caught*?  These are -- this is

not a scheme or a plan or a design, as I said, that can be a

run-of-the-mill, put-together program.  This is a scheme and a

plan that only could be executed because both of these

individuals knew the weakness that existed.

They knew how to avoid the audits.  They knew how to

to define the companies, to determine what companies would be

accepted and what companies would be accepted and charging a

certain amount of money that for a company this big, wouldn't

be seen by the other financial people involved in the company.

And the two of them were able to create this, create this that

resulted in the loss to NAC.

The government sometimes in their opening talked about

Michael Tew, occasionally about Ms. Tew, and a lot just by

saying*, The Tews*.  *The Tews*.  Well, it's important for you to

evaluate who was responsible for this?  Who committed this

crime, and not lump these two people together, that's not their

responsibility.  Their responsibility is to prove their case

beyond a reasonable doubt, as it relates to two different and

defined individuals, facing the charges, that bring us all into

this room today and for the next week.

Now, you are going to hear from Mr. Yioulos.  I assume

that part of what you are going to hear -- I know what you are

going to hear is that he was a reluctant participant over the

1    years that he did this.  He was a reluctant participant.  But

2    this wasn't his first rodeo at NAC.  This wasn't something that

3    was the first time that he decided to steal from NAC.  He had

4    done it before he even met Michael Tew, and he did it in a way

5    that was very similar, it was an invoice scheme, because he was

6    sitting there with another one of the employees at NAC talking

7    about*, Hey, you know, we can identify how sloppy this*

8    *financial -- this organization is, with their finances*.  *I bet*

9    *you that we could provide invoices, that they would pay, that*

10   *we could then receive, without ever being noticed*.  And that's

11   what they did.  They did it when they just said, *You know what,*

12   *I need some money.  My wife spends a lot of money.  I'm working*

13   *on the house*.  *You want to get into your account or you want to*

14   *get it into my account, doesn't matter, because whenever we get*

15   *it, we'll split it 50/50.*  That was before he met Michael Tew,

16   or knew who Kimberley Tew was.

17       So the idea that when you hear about the bolt of

18   lightning, the consciousness, he was so relieved that this

19   nightmare was over, he is a character that you will evaluate

20   for yourself, and the two of them together were able to

21   function in this way, as I said, because they knew how to do

22   the invoices and set up the vendors, and they knew how to get

23   it by, because Jon Yioulos was the person who could approve the

24   invoices, send them to accounts payable, have his signature on

25   hundreds of these, saying, *I approve this payment*.  Jon Yioulos

1    and Michael Tew.

2            Then there's a whole other part of this plan of

3    theirs, which is, where does the money go?  You have the

4    vendors.  Where does the money go?  And you are going to see a

5    lot of documents, a lot of bank records, a lot of

6    communication, and it's not just volume that's important, it's

7    taking a look closer to see whether all of those documents

8    establish the guilt of Ms. Kimberley Tew, beyond a reasonable

9    doubt.  And what you will find is that the money that was

10   wrongfully received from NAC and put into bank accounts, went

11   into nine or ten different bank accounts.

12           By the time this case is over, you are probably going

13   to have to have a sense yourself of some of these numbers.

14   They are not important right now.  You will see it with the

15   presentation of the government's case, but what you will see is

16   that money gets deposited into an ANB account.  Kimberley Tew

17   isn't a signatory, into an Access National Bank account, '5965.

18   Kimberley Tew is not a signatory.  PBVA account '0987,

19   Kimberley Tew isn't a signatory.  Guaranty Bank & Trust

20   Company, '7867, an account who the signatory is Michael Tew.

21   Region Bank '4514, Kimberley Tew is not a signatory.  Wells

22   Fargo, '6934, Michael Tew account.  Wells Fargo '2064, a

23   Michael Tew account.  Navy Federal Credit Union, account '5336,

24   a Michael Tew account.  Navy Federal Credit Union, '3094, a

25   Michael Tew account.

1          There is one account that you will see this money

2     being deposited into, that Kimberley Tew has any signatory

3     authority.  You know what, it's Navy Federal Credit Union,

4     '8486, and you will see it.  Guess what?  She is not the only

5     signatory on that account, because the other individual who has

6     authority to work in that account, to put money into that

7     account and to take out money of that account is Michael Tew.

8     The only one account that this money was distributed to, from

9     NAC, into bank accounts that has Kimberley Tew's name on it, is

10    also one that's jointly held with Michael.

11         So the volume, the -- looking at the money, and where

12    it goes, it's important to look at it with a critical eye,

13    because there are two defendants here.  You have already been

14    told just it's not -- I can't say it's a corollary to this,

15    because counts can mean many different things.  You have now

16    heard from the government and from Michael Tew's attorney, the

17    difference in the number of counts.  Just show you from jump

18    street there's a distinction.  And yes, Kimberley Tew is

19    married to Michael Tew, and they have two children.  Michael

20    Tew was consultant and chief financial officer for NAC.  He

21    also was allowed, as a contractor and as the government said,

22    to participate in other types of businesses to bring money in,

23    to maintain the pretty comfortable, if not better than

24    comfortable, lifestyle that the family was used to, because

25    Michael Tew is a player, who makes money, and can make money

1    for NAC.  He can make money in other places.  He can make money

2    when he has worked for people in the marijuana industry.  And

3    Kimberley did some work.  She did some work for NAC, that's

4    kind of the melding of things, *Oh, yeah, she worked* -- take a

5    look at how little that really was.  She is a smart lady, but a

6    business person, with the ability to bring money in and have

7    the income to make the lifestyle of their family, what it was.

8    No.  That's Michael.

9         And Kimberley did do some gambling and did do some

10   Bitcoin trading.  She is not here for violating cryptocurrency

11   laws or for her gambling, which she probably did do a little

12   too much of.  And you will hear conversations between a husband

13   and a wife, and they are talking about finances, and they are

14   talking about what could be perceived as funds justifiably

15   received by Michael Tew.

16        So distinguishing the participants, it's going to come

17   down to a company for sure, and then the behavior and the

18   design and intent and the scheme of Jon Yioulos and Michael

19   Tew, and rather than just say*, The Tews*, that seems to roll off

20   the government's tongues, without making that kind of

21   distinction that's so important.

22        So I ask you, as I'm sure you will, to pay close

23   attention to who was needed for the scheme, who had the

24   knowledge and the intelligence for the scheme, who got it

25   through NAC, where it went from NAC, to whose accounts, and

1    after you are done looking at the government's case, you will

2    realize that, well, Kimberley Tew was around for these years,

3    they have not proven, beyond a reasonable doubt, her criminal

4    participation.  Thank you.

5          THE COURT:  Thank you, Mr. Kaplan.  I just said thank

6    you.

7          MR. KAPLAN:  Thank you.  I need to pay attention.

8          THE COURT:  That's all right.  Counsel, so we're

9    finished with the opening statements.  I would like, if we're

10   prepared, go ahead and at least get started with our first

11   witness.  The government can begin presenting their case.

12         MR. FIELDS:  Thank you, Your Honor.  We're ready.  The

13   government calls Jon Yioulos.

14         MS. FROST:  Your Honor, may we approach?

15     (At the bench:)

16         MS. FROST:  Your Honor, at this point, I want to make

17   a motion to sever pursuant to Rule 14 of the Rules of Criminal

18   Procedure.  In the past, prior counsel had filed a motion to

19   sever based on *Bruton* issues.  I believe it was Mr. Bornstein.

20   I believe, in fact, I think it's **ECF 218.**

21         THE COURT:  I will take your word for.

22         MS. FROST:  That was on behalf of Ms. Tew.  I believe

23   he represented both Mr. Tew and Ms. Tew, at the time.  He did

24   not make one on behalf of Mr. Tew, and he did not raise

25   antagonistic defenses, based on my understanding of the prior

1   pleadings and litigation; which, to me, is, I will just say,

2   very odd to have joint representation and move to sever for one

3   defendant based on *Bruton*, but not antagonistic defenses,

4   however, here we are.

5           Ms. Tew's counsel just opened implicating Michael Tew,

6   our client, pointing the finger at him, saying his name is all

7   over the bank accounts, all of the money went back to him,

8   Mr. Tew, Michael Tew's lifestyle, that he was providing for the

9   family was the motivation.  You just heard the entire opening

10  from Ms. Tew, which points the fingers at Mr. Tew and Jon

11  Yioulos.  This is so antagonistic, at this point, that I don't

12  believe that Mr. Tew is going to get a fair trial, based on his

13  wife's counsel pointing the finger at him, and so that's the

14  basis of my motion.

15          THE COURT:  Okay.  I guess I will first let Ms. Tew

16  have a -- state their position.

17          MS. HUBBARD:  It is our intention to defend the case

18  exactly as we opened, which is to suggest that the conspiracy

19  was between Michael Tew and Jon Yioulos.  We intend -- we

20  designated exhibits that suggest that we're going to show that

21  Michael Tew had money coming in, that he was central to this

22  scheme, that is going to be our defense throughout the trial.

23          MS. WEISS:  Why don't you do the *Bruton* thing first.

24  Or you don't want to?

25          MR. FIELDS:  No, I -- so, I guess the government's

51

1    first point would be that this is, obviously, very late.

2    Motions deadline was a little over a year ago.  So, the Court

3    should just ignore this as a late-filed motion.  They have had

4    plenty of opportunity to, sort of, recognize potential defenses

5    and raise them, and haven't.  They are waived.

6         To the extent that waiver was not something that the

7    Court is inclined to do, I would say this argument was actually

8    raised by Bornstein's motion.  He talked about *Bruton*, but if

9    you look carefully at the motion, you will see one of his main

10   arguments was actually that there were just more counts against

11   Michael Tew, which is a way of, sort of, saying that there's

12   more emphasis on this, sort of, conspiracy with Michael Tew.

13   So, I would say that this argument was, sort of, raised, at

14   least, implicitly by Mr. Bornstein and addressed in the Court's

15   order denying severance.

16        Third, if the Court is inclined to actually entertain

17   severance on the merits, it's very high.  Look at the Supreme

18   Court's opinion, joint trials are strongly favored under the

19   Tenth Circuit law, and simply raising antagonistic defenses is

20   not enough.  If it were, then defendants in conspiracy cases,

21   all the time, would be able to get severance, simply by, sort

22   of, deciding, in advance, as a tactical decision, to raise

23   antagonistic defenses.  Tenth Circuit has rejected these

24   theories over and over again.  In cases that are -- some of

25   which are cited in the government's brief.  So, for all of

1    those reasons, we think that the motion for severance should be

2    denied.

3            THE COURT:  I will let you reply.

4            MS. FROST:  Reply to the government.  Your Honor, we

5    have not waived anything.  First, by the prior litigation,

6    there's clear precedent, and right now I'm going to quote the

7    US Supreme Court from *Schaffer v United States*, 362 US 511.

8    The quote is that*, There's a continuing duty in all stages to*

9    *grant a severance if and when prejudice appears*.  So, by not

10   filing the motion, we have not waived anything.  The government

11   is confusing two issues.

12           Second of all, this impacts Mr. Tew's constitutional

13   rights as well, fair trial, due process, effective assistance

14   of counsel, and that issue can pop up at any time.  So, a

15   motions deadline doesn't preclude us from raising that.

16           In terms of our awareness of any kind of potential

17   antagonism with -- how much discovery do we have?  Terabytes?

18           MR. SCHALL:  Defense has been on a short leash to

19   begin with.

20           MS. FROST:  And so with the ongoing proper litigation,

21   with the amount of discovery, until we hear the government's

22   opening, and until we, on behalf of Mr. Tew, clearly hear how

23   antagonistic their plans are to defend their client, Mrs. Tew,

24   no, we're not on notice to raise and litigate this before.  I

25   mean, we don't have a crystal ball, Your Honor.  We are,

1    obviously, now going to be in a position where we've got to

2    point at her, maybe.  I'm not -- maybe.

3            THE COURT:  Well, so let me ask you, I guess this is

4    related to that in two ways.  First of all, does -- this

5    doesn't seem like some surprise bombshell that you couldn't

6    have thought out before, that Mrs. Tew's defense would be

7    based, at least in part, on the idea that she is less culpable

8    or that Mr. Tew was the one who was engaging in all of the

9    transactions with NAC, which I think is consistent with the

10   evidence, as far as I know.  So, I'm not sure why that would be

11   something you couldn't have anticipated coming up.

12           Secondly, just, sort of, kind of, does anybody

13   think -- say I decided, *Yeah, you are right*, does anybody think

14   we could actually continue with half of this trial, right now?

15   No.

16           So, why don't I take this under advisement, and we

17   will get started a little bit, and I will think about it a

18   little bit more.

19           MS. FROST:  As you take it under advisement, to answer

20   your question about bombshell or not bombshell, the difference

21   is when you are a defense attorney in a criminal case, can you

22   anticipate every possible defense?  Sure.  Can you be

23   completely positive?  No.  And we, on behalf of Mr. Tew, for

24   example, we are not under an obligation to front what our

25   defense would be to the government or the Court, because of our

1    client's constitutional rights and work product, et cetera, et

2    cetera.  And so, is it our job to, kind of, predetermine where

3    Ms. Hubbard and Mr. Kaplan are going to go?  Can we generally

4    anticipate a bombshell?  Sure.  But not with enough specificity

5    to be meaningful and effective.

6         THE COURT:  Here is what I want to do for now, let's

7    go ahead and take an hour of testimony, and then I -- if I give

8    you until, say, let's say Wednesday, to file, sort of,

9    simultaneous briefs, like midnight, Wednesday, to explain your

10   positions, end up having wasted three days, but I would rather

11   do that than decide it without having thought it through.  Does

12   that make sense?

13        MS. WEISS:  May I put one thing on the record?  We're

14   not in a position that we were suggesting that we're going to

15   do it now, especially when we're about to just put on one of

16   our witnesses for Direct Examination, for easily the rest of

17   the day.  However, the defense that was outlined in openings,

18   is getting very close to that proffer agreement, and in the

19   interests of full transparency, I think we should just make

20   that known on the record, that we're getting very close to that

21   point.  If this is the general tenor of where we are taking

22   this, we do believe that it's going to be very hard to do that

23   without directly contravening the proffer agreement.

24             THE COURT:  Can I ask for some detail as to that?

25             MS. WEISS:  I mean, I can remember specific

1    statements, and I am happy to pull all of them in preparation

2    for this, if we go down that path, but I believe it's actually

3    fairly vivid.  Kimberley Tew describes a phone call where she

4    discusses starting this scheme with Jonathan Yioulos, in the

5    bathroom, while plucking her eyebrows.  So I -- that's just the

6    one that stands out to me, standing here today.  And I just --

7    like -- I'm not making a motion on this right now.  I'm just

8    making a record.

9         MR. KAPLAN:  That's fine.  I don't want to take too

10   much more time.  I was certainly conscious of the Court's

11   ruling.  It's not a bright line, just by virtue of the way that

12   rulings go.  It's not an insult to the Court.  But I

13   specifically avoided, without getting into it now, if I need

14   to, I will do it, if we need to make a better record, I

15   specifically avoided places that I thought might do that, and I

16   will just say that it -- if that opened the door, then we are

17   just back to how I defend, you know, somebody in a criminal

18   case.

19        THE COURT:  Yeah.  I tend to agree with you.  I didn't

20   see anything saying the evidence pointed that direction.  I

21   think it's okay, as far as I'm concerned, so far, but you can

22   certainly explain why I'm wrong, if we get there.  All right.

23   So, for now, let's just go ahead and you can think this through

24   a little bit more.  Thank you.

25        (In open court.)

JONATHAN YIOULOS – Direct

1          MR. FIELDS:  Your Honor, may we call the witness?

2          THE COURT:  Yes.  Go ahead.

3          MR. FIELDS:  United States calls Jonathan Yioulos.

4          THE COURTROOM DEPUTY:  Please raise your right hand.

5      (**JONATHAN YIOULOS** was sworn.)

6          THE WITNESS:  I do.

7          THE COURTROOM DEPUTY:  Please be seated.  Please state

8   your name and spell your first and last names for the record.

9          THE WITNESS:  Jonathan Yioulos, J O N A T H A N, last

10  name is Yioulos Y I O U L O S.

11         THE COURT:  Go ahead.

12                        **DIRECT EXAMINATION**

13  BY MR. FIELDS:

14  Q   Mr. Yioulos, where did you work between 2018 and 2020?

15  A   National Air Cargo.

16  Q   What was your job?

17  A   At the time I was the controller.

18  Q   Did your title vary over time?

19  A   It did.

20  Q   What were your titles?

21  A   I started as senior accountant, and then manager of

22  accounting, financing and accounting and then controller.

23  Q   While you worked at National, between 2018 and 2020, did

24  you agree with others to take National's money under false

25  pretenses?

JONATHAN YIOULOS – Direct

1    A    I did.

2    Q    What was the agreement?

3    A    No formal agreement.  It was that I would wire money when

4    asked, or ACH money when asked, as well.

5    Q    Sorry.  I interrupted you.

6    A    No.  Or ACH money as well.

7    Q    ACH, what's that?

8    A    It's another form of electronic funds transfers.

9    Q    What was the false pretense?

10   A    That the money was being sent for certain services that

11   were not actually performed.

12   Q    Who asked you to send this money under false pretenses?

13   A    Michael Tew and Kimberley Tew.

14   Q    When they asked you to do that, what choice did you make?

15   A    I made the choice to send it.

16   Q    As a result of that choice, what has happened to you?

17   A    I pled guilty to a felony for wire fraud and conspiracy to

18   commit wire fraud, I lost my job at National, I have had

19   trouble finding a job since then, countless, you know,

20   struggles with family, relationships, all of that.

21   Q    Do you have an agreement with the government?

22   A    I do.

23   Q    Let's pull up -- this is first time we are going to look at

24   an exhibit.  You will see it up on the screen, just you.  It's

25   not yet in evidence.

 1          Let's look at Government's Exhibit 527, please.  You

 2   see that up there in front of you?

 3   A    I do.

 4   Q    What is that?

 5   A    That is the Plea Agreement I signed with the government.

 6          MR. FIELDS:  At this time, the government would move

 7   into evidence Government's Exhibit 527.

 8          MR. SCHALL:  No objection for Mr. Tew.

 9          MR. KAPLAN:  No objection.

10          THE COURT:  All right.  It's admitted.

11   BY MR. FIELDS:

12   Q    All right.  What are your obligations under this agreement?

13   A    To cooperate fully with the government's requests, and that

14   is just to be open and honest and tell the whole truth in what

15   happened during the conspiracy.

16   Q    Okay.  Let's go ahead and take that down.  And what do you

17   hope to gain by testifying here today?

18   A    You know it's -- for me, it's to come, you know, fully

19   clean with everything.  Wipe this off of my -- at least help --

20   continue to help clear my conscience.  Also just to help the

21   government, fully, with their duty to, you know, prosecute,

22   fully.

23   Q    Do you expect to get any benefit in terms of your sentence?

24   A    I do.

25   Q    What?

JONATHAN YIOULOS – Direct

1   A   Hopefully a reduced sentence, as I cooperate.

2   Q   Who decides whether you will get that benefit?

3   A   The judge.

4   Q   What crime did you plead guilty to?

5   A   Wire Fraud and Conspiracy To Commit Wire Fraud.

6   Q   Who was the victim of your crime?

7   A   National Air Cargo.

8   Q   What was National Air Cargo?

9   A   It is a freight forwarding company, bunch of offices all

10  over the world, but I was based out of Buffalo, New York.

11  Q   Where else did it have offices?

12  A   Orlando, was the one of them, more larger offices, Dubai,

13  Frankfurt, and then some smaller offices in Malaysia, and a few

14  other places, but none that I can really remember, at the time.

15  Q   Pull up your mic a little bit closer, just to make sure we

16  can hear you.

17  A   Of course.

18  Q   When did this conspiracy begin?

19  A   2018.

20  Q   Do you remember which part of 2018?

21  A   I believe it was August.

22  Q   How long were you a member of this conspiracy?

23  A   Since the beginning.

24  Q   Who were the other members of the conspiracy?

25  A   Michael Tew and Kimberley Tew.

JONATHAN YIOULOS – Direct

1          *MR. SCHALL:*  Objection, Your Honor.  Calls for a lot

2    of legal speculation.

3          *THE COURT:*  Sustained.

4      Q    (By Mr. Fields) All right.  You mentioned an

5    agreement?

6    *A*    Yes.

7    *Q*    To submit invoices under false pretenses?

8    *A*    Correct.

9    *Q*    Who else was part of that agreement?

10   *A*    Michael Tew and Kimberley Tew.

11   *Q*    What was Michael's role in the agreement?

12   *A*    He would send invoices over to me at National, and I would

13   pay them.

14   *Q*    Did he provide any advice on how to make sure those

15   invoices would get paid?

16   *A*    Yes.

17   *Q*    How did he do that?

18   *A*    He would send the routing number and account numbers, and

19   the account name that the funds should be transferred to.

20   *Q*    How would he communicate with you about those invoices?

21   *A*    Via telephone or text message.

22   *Q*    What was Kimberley's role in this agreement?

23   *A*    She would ... also ask me to send money.  She would either

24   text me or call me to discuss.

25   *Q*    What was your role?

JONATHAN YIOULOS - Direct

1   *A*   I was the one who would actually input the information in

2   the banks' system, that would be the routing number, the

3   account number, and I would actually submit the funds for

4   transfer.

5   *Q*   This agreement to pay invoices under false pretenses, what

6   was the goal of it?

7   *A*   That ... it started as myself looking to who I thought was

8   a friend, at the time, and a colleague, needed help, and I

9   thought it would start small, and more of a one-off time, as it

10  continued to grow, I couldn't get out of it, and I found myself

11  in too deep, where I felt like I could not get out.  So the

12  goal was to send money when asked, hoping that it would

13  eventually end.

14  *Q*   How much money did you Michael and Kimberley take from

15  National Air Cargo, as part of this agreement?

16  *A*   Over $5 million.

17  *Q*   Did Michael tell you why he needed the money?

18  *A*   There were various reasons.  Yes.

19  *Q*   What did he say?

20  *A*   There were people who he worked with or Kimberley worked

21  with that were either; one, blackmailing them; or two, they

22  just needed money to purchase cryptocurrency, to help get out

23  of some obligations, and it just seemed like every time it just

24  was a different -- different reason, every different person to

25  pay.

JONATHAN YIOULOS - Direct

1   Q   Did Kimberley tell you why she needed the money?

2   A   Yes.

3   Q   What did she say?

4   A   One, was gambling, gambling losses, to cover those; two,

5   was to pay back people who she had borrowed cryptocurrency

6   from.

7   Q   Where did Michael Tew live, while he was working at

8   National?

9   A   Denver, Colorado.

10  Q   Was he a regular employee or a contractor?

11  A   He was a contractor.

12  Q   What is the name of his contracting company?

13  A   Sand Hill.

14  Q   What did you know about this Sand Hill?

15  A   Not much, other than that was the company that he used to

16  write his invoices to National.

17  Q   When you say, *His invoices to National*, what did you mean

18  by that?

19  A   So, when he was a contractor, we would pay him biweekly,

20  and his -- he would write invoices from his company to

21  National, for payment.

22  Q   For work that he was actually doing?

23  A   For work that he was actually performing.  Yes.

24  Q   Did you ever work in Colorado, while you were in the

25  Buffalo office?

JONATHAN YIOULOS - Direct

1    A    I did not.

2    Q    So, if you were in Buffalo, and Michael Tew was in

3    Colorado, how did you communicate with him, when you needed to

4    talk about work?

5    A    Text message, email, phone.

6    Q    How many telephone numbers did he have?

7    A    He had two cell phone numbers.

8    Q    Do you have them memorized?

9    A    Almost.  If I saw them I would know them.  Yes.

10   Q    Did you have them saved in your cell phone?

11   A    I did.

12        MR. FIELDS:  If we could, let's look at Government's

13   Exhibit 531, which is not yet in evidence.

14   Q    Do you see that up there in front of you?

15   A    I do.

16   Q    What is that?

17   A    That is the contact I had for Michael Tew, on my cell

18   phone.

19   Q    Does it fairly and accurately depict your cell phone?

20   A    Yes, it does.

21        MR. FIELDS:  Your Honor, at this time the government

22   would move into evidence Government's Exhibit 531.

23        MR. SCHALL:  No objection.

24        MR. KAPLAN:  No objection.

25        THE COURT:  Okay.  531 is admitted.  Go ahead.

JONATHAN YIOULOS - Direct

1  *BY MR. FIELDS:*

2  Q   All right.  Mr. Yioulos, what is this?

3  A   This is my cell phone, and this is the contact I had for

4  Michael Tew.

5  Q   Michael Tew, why does it say J.B. at the top?

6  A   That is how I had his contact stored, J.B., were initials

7  for Joe Batton, and Joe Batton was an employee at National

8  Airlines, at the time, when Michael Tew was terminated from

9  National.  I changed the contact to J.B., for Joe Batton, for

10 short, in case he called during a workday or texted during the

11 workday.  If my phone was on my desk, I didn't want other

12 employees seeing I was still in contact with Michael Tew.

13 Q   What are the two numbers that you see listed there?

14 A   First one is 917-685-1312.  The second one is 917-669-7473.

15 Q   Did you use both numbers to contact him?

16 A   I did.

17 Q   Did you use one more than the other?

18 A   No.

19 Q   Would you communicate with him via text message?

20 A   Yes.

21 Q   What would you send text messages to him about?

22 A   While he was employed at National, and before the

23 conspiracy, work-related matters, whether it was work that he

24 needed performed as he was the CFO at the time, money that

25 needed to go out for legitimate business, who to pay, just

JONATHAN YIOULOS - Direct

```
 1  different types of communication that would be in the general
 2  course of business, and then once he was terminated, it was
 3  mostly about the conspiracy.
 4  Q   How often do you think you communicated with him about the
 5  conspiracy?
 6  A   Nearly daily.
 7  Q   What was your telephone number during this time period?
 8  A   Area code 585-737-1709.
 9  Q   We can take that exhibit down.  Was Michael Tew married?
10  A   Yes.
11  Q   And who is his wife?
12  A   Kimberley Tew.
13  Q   Did you ever meet her?
14  A   Not in person, no.
15  Q   Say, *Not in person*, did you meet her virtually?
16  A   Nope, just over the phone.
17  Q   What did you know about her background?
18  A   Not a whole lot.
19  Q   Did she do any work for National, while you were there?
20  A   Yes.
21  Q   What did she do?
22  A   When I was at National, she was a consultant of some sort.
23  When she did perform her work, I believe I was still a senior
24  accountant at National, and so I didn't know to the extent what
25  she did, her work, but I know that she was being paid by
```

JONATHAN YIOULOS – Direct

1   National.

2   Q   Would she submit invoices for that work?

3   A   She did.

4   Q   Did you ever review those invoices?

5   A   I did not.

6   Q   Was it National's regular practice, at the time, to

7   maintain its invoices in its file?

8   A   Yes.

9   Q   Let's look at Government's Exhibit 986.  Do you recognize

10  this?

11  A   I do.

12  Q   What is it?

13  A   This is an invoice from Kimberley Tew to National, for

14  consulting services.

15  Q   To whose attention?

16  A   Mine.

17  Q   Would you have handled this invoice?

18  A   I would have.

19       MR. FIELDS:  At this time, the government would move

20  into evidence Government's Exhibit 986.

21       MR. SCHALL:  No objection.

22       MR. KAPLAN:  Your Honor, I think, objection, lack of

23  foundation, based on conflicting testimony.

24       THE COURT:  I haven't heard conflicting testimony, but

25  if you want to lay more of a foundation to explain --

JONATHAN YIOULOS – Direct

1    Q   Mr. Yioulos, early on, do you remember talking about

2    whether or not you handled invoices for Kimberley Tew?

3    A   Yes.

4    Q   Did you say that you didn't handle invoices or you did

5    handle invoices?

6    A   No.  So, I believe the question was, *Did you review the*

7    *invoices*?  So, this work was performed before I was employed as

8    the controller, so I would not have reviewed the work that was

9    performed.  This invoice I did review before paying it.  I

10   would have had to pay this invoice per Chris Alf, at the time.

11   Q   And then after you paid an invoice like this, what would

12   you have done with it?

13   A   This invoice would have went into the accounting system.  I

14   would have forwarded this invoice to our accounts payable clerk

15   to enter into the system, and then I would pay the invoice

16   after.

17        MR. FIELDS:  Your Honor, at this time, the government

18   moves into evidence Government's Exhibit 986.

19        MR. KAPLAN:  No objection.

20        THE COURT:  Go ahead; 986 is admitted.

21   Q   All right.  Do you see a date on this invoice?

22   A   I do.

23   Q   Was this invoice submitted before or after your agreement

24   to submit false invoices?

25   A   This was before.

JONATHAN YIOULOS – Direct

```
 1           MR. FIELDS:  And if we could blow up just the top
 2   left-hand corner.
 3   Q   What is listed as an email contact for Ms. Tew?
 4   A   KLEY@me.com.
 5   Q   What's listed as her telephone number?
 6   A   917-446-2046.
 7   Q   Did you of email her at that kley@me.com address?
 8   A   I don't remember.
 9   Q   What about that phone number, did you ever communicate with
10   her by phone?
11   A   Yes.
12   Q   How would you communicate with her by phone?
13   A   Through text message.
14   Q   What did you communicate with her by phone about?
15   A   The conspiracy.
16   Q   I'm not sure that I did this.  If you could just read that
17   telephone number into the record for us?
18   A   Yes, it is 917-446-2046.
19   Q   Okay.  We can zoom back out.  And at the bottom there, do
20   you see an address?
21   A   I do.
22   Q   What's that address?
23   A   It is 3222 East First Street, Denver, Colorado, 80206.
24   Q   To the best of your knowledge, where did Kimberley Tew live
25   between 2018 and 2020.
```

JONATHAN YIOULOS – Direct

 1  A    Denver, Colorado.

 2  Q    Now, we mentioned this '2046 number.  Did she ever

 3  communicate with you using different telephone numbers?

 4  A    Yeah, she did.

 5  Q    How?

 6  A    I'm not sure how.  Occasionally I would get text messages

 7  from those different phone numbers, when I will not pay

 8  invoices or if there was a reason why I didn't want to pay the

 9  invoices, is when I would start to receive text messages from

10  these other phone numbers, that I didn't have saved as

11  contacts.  I became frustrated with Kimberley many times during

12  this conspiracy, and as such I would block her number.

13           MR. KAPLAN:  Your Honor, I need to object to the

14  witness's use of the term conspiracy.

15           THE COURT:  Yeah, I understand.  I mean, the witness

16  can describe it how he wants, but I will -- I guess I will

17  remind the jury it will be up to you to decide whether there

18  was a criminal conspiracy, and so you can take his description

19  for what it is, but it's his -- it's his use of the language,

20  but you will decide whether it amounts to a conspiracy, as it's

21  been charged.

22           MR. KAPLAN:  Your Honor, could we just note a

23  continuing objection?

24           THE COURT:  Yeah, that would be -- that would be fair.

25  I appreciate that.  And that instruction will apply.

JONATHAN YIOULOS - Direct

1   Mr. Schall?

2           *MR. SCHALL:* Just joining that continuing objection,

3   Your Honor, based on our earlier objection, as well.

4           *THE COURT:* All right.  Thank you.  Go ahead.

5   *Q*   So, if these numbers came to you with these strange

6   telephone numbers, how did you know it was Kimberley?

7   *A*   The context.  It always related to National, either sending

8   funds, cryptocurrency, there were mentions of Michael, so I

9   knew they were from Kimberley, based on the tone, especially,

10  and the context.

11  *Q*   While you had this agreement to submit false invoices, did

12  you ever talk to Kimberley Tew directly on the phone, like, via

13  voice call?

14  *A*   Yes.

15  *Q*   What were your interactions with her like?

16  *A*   Not pleasant.

17  *Q*   Describe that to us what made them unpleasant?

18  *A*   There was always a bit of pressure that I felt I was under

19  while talking to Kimberley.  I dealt primarily with Michael,

20  with most -- most things, whether it was, whether he was

21  employed as an employee at National, or through the time when

22  he was not employed, and I was wiring money to him and

23  Kimberley, and whenever I refused or said I couldn't do it,

24  that's when Kimberley mostly got involved.  She would call with

25  either a threatening tone, saying that she was going to

JONATHAN YIOULOS – Direct

1    contact, at the time, my wife, or she was going to call Chris

2    and Lori, and Chris was the owner of National Air Cargo, Lori,

3    his wife.  So, she would -- they were mostly threatening phone

4    calls or threatening text messages that I would receive.

5    Q   And I think you mentioned Chris and Lori for the first

6    time.  What were their last names?

7    A   Alf, A L F.

8    Q   What were their roles?

9    A   Chris was the chairman of National, the owner, and Lori was

10   his wife.

11   Q   Now, going back to Kimberley Tew.  Did you like Kimberley

12   Tew?

13   A   No.

14   Q   What was your opinion of her?

15          MR. KAPLAN:  Objection, relevance.

16          MR. FIELDS:  Goes to bias, Your Honor.

17          THE COURT:  Overruled.  Go ahead.

18          THE WITNESS:  Um ... you know I ... really enjoyed --

19   I like Michael, as a person.  I didn't think he was a bad

20   person.  I think he got caught up in a bad situation, and I

21   tried to help him out of that at first, and my opinion was that

22   a lot of what Michael was going through was because of some

23   pressure --

24          MR. KAPLAN:  Objection, Your Honor.

25          THE COURT:  Overruled.  Go ahead.

1          *THE WITNESS:*  -- from Kimberley, and I didn't like the

2    fact that my only conversations with her were when things

3    weren't going her way, or -- when I say *her way*, that money

4    wasn't being sent out, when asked.  I felt that I was -- all I

5    was trying to do was try to get myself and Michael out of the

6    situation, as I continued to send more funds out, and I felt

7    like that, strange as it sounds, I felt like that wasn't

8    appreciated, when I'm -- all I was trying to do, I'm putting my

9    own neck on the line and I felt like even when I said I

10   couldn't do something, she kept pressuring me until I actually

11   sent the money.  So I did not like her.

12        Q    (By Mr. Fields) I asked you about calls with Michael,

13   calls with Kimberley.  Were there ever group calls, involving

14   the three of you?

15   A    No specific like three-way calls, but there were times

16   where I would be on the phone with Michael, Kimberley would be

17   yelling in the background about something, or Michael would

18   mute the phone, go talk to Kimberley about something, and then

19   come back to the phone and say, *Hey, Kimberley just said this*

20   or, *She just said this*.  *What do you think about this idea*?

21   So, there were, specifically, no three-way conversations.

22   Those were the extent of us being on the phone together.

23   Q    Now, you have told the jury that you helped Michael and

24   Kimberely take a little of $5 dollars from National.

25   A    Yes.

JONATHAN YIOULOS - Direct

1    Q    What was in it for you?

2    A    At the beginning of the conspiracy, nothing.  I had --

3    before the conspiracy began, I had loaned Michael and Kimberley

4    a portion of a Bitcoin that he had asked for, and he said if I

5    loaned him some Bitcoin, Kimberley was great with

6    cryptocurrency, she needed it for a transaction, and she would

7    eventually be able to send it back as a full Bitcoin, because

8    it was quarter or -- quarter or half of a Bitcoin that I sent

9    them, and so that was it.  Really just wanted my Bitcoin back,

10   in the beginning of the conspiracy.

11   Q    And as the conspiracy evolved, what became in it for you?

12   A    At the end of the conspiracy, they had sent me somewhere

13   between three and like nine Bitcoin, somewhere around there, I

14   don't remember the specifics, you know, in the past they had

15   sent me Bitcoin, they would always ask for it back, and I would

16   always send the money right back, but then as the conspiracy

17   continued, I just started cashing in the money when I had it,

18   so that they wouldn't ask for it back.  You know, I never was

19   in the conspiracy to financially gain for myself, initially,

20   and then, near the end of it, I just started -- when I got the

21   Bitcoin I just cashed it out and said I'm in this so far, I

22   took some money.

23   Q    So, we have been talking about Bitcoin™s?

24   A    Yeah.

25   Q    How much was a Bitcoin™ worth around this time?

JONATHAN YIOULOS - Direct

1    *A*   It fluctuated, you know, I believe around that time they

2    would fluctuate between 3 and $15,000.  I believe, when I

3    began, you know, cashing out the Bitcoin™s that I did have,

4    they were only anywhere between 4 and 5,000.

5    *Q*   All right.  Just backing up a little bit.  We have been

6    talking about Bitcoin™.  What is a Bitcoin™?

7    *A*   It is a form of cryptocurrency.

8    *Q*   All right.  Cryptocurrency, when you use the word

9    cryptocurrency, what do you mean?

10   *A*   It's a currency that is essentially all electronic based.

11   People mine cryptocurrency, and it's a form of, essentially,

12   electronic currency.

13   *Q*   Did you trade in Bitcoin™ before you met Michael Tew and

14   Kimberley Tew?

15   *A*   I did.

16   *Q*   How do you trade this cryptocurrency or Bitcoin™?

17   *A*   There's different platforms for it; such as coin base, is

18   one of them, Binance was another one that I used.  You know, I

19   was dabbling in it, so I wasn't an expert by any means, but

20   those were the two that I used, mostly.  I know there's a lot

21   more.

22   *Q*   So if you want to trade cryptocurrency with someone else,

23   how would you do it?

24   *A*   You get their -- basically, their wallet address.  So if

25   you want Bitcoin™, you will have a Bitcoin™ wallet, and it's in

JONATHAN YIOULOS - Direct

1   alphanumeric code, and I would go into my wallet, which was

2   also alphanumeric code, select exactly how much I want to send

3   you, and type in your alphanumeric code, press submit.

4   Typically there's a two-factor authentication, which basically

5   just means you logged in on your password, and then they would

6   either send like a text message to your phone, with like a

7   specific six-digit number or you have an app that refreshes a

8   new number every 30 seconds, and you type in that number just

9   to say, yeah, this is really me, click submit, and sends the

10  money over to that wallet, and they would receive the

11  cryptocurrency.

12  Q   And you mentioned cashing out Bitcoin™.  If you wanted to

13  cash out a Bitcoin™, how do you do that?

14  A   On that same platform.  You know, I would cash mine out on

15  coin base.  I had my bank account linked to that, so when I

16  would cash out the Bitcoin™, what that meant was I would take

17  it from my wallet and convert the Bitcoin™ to USD, whatever

18  that rate was at the time.  So Bitcoin™ was worth, you know,

19  $3,700, I would get $3,700 in USD, and then I would take that

20  out of the my Bitcoin™ wallet and transfer to my bank account.

21  Q   Did you ever talk to Michael Tew about cryptocurrency?

22  A   I did.

23  Q   Was it one conversation or many conversations?

24  A   Many.

25  Q   What would you talk about?

JONATHAN YIOULOS - Direct

1    *A*   Prior to the conspiracy beginning, we basically just talked

2    about different types of platforms.  He mentioned that he and

3    Kimberley had some cryptocurrency.  He told me, you know, be

4    careful trading this, they can be very volatile markets.  Just,

5    he wanted to know what kind of platforms I used.  What type of

6    cryptocurrency I had.  So those were the things that I

7    communicated with him.

8    *Q*   Did you ever discuss cryptocurrency or Bitcoin™ with

9    Kimberley?

10   *A*   I did.

11   *Q*   Did she use those -- did she use Bitcoin™?

12   *A*   She did.

13   *Q*   Describe those conversations with us?

14   *A*   Those only began, essentially, when I loaned them some

15   Bitcoin™, prior to the funds transfers to fraudulent invoices,

16   I -- she said she could help me get one Bitcoin™ back, for the

17   funds that I had sent over, and then throughout the process --

18   or throughout the conspiracy I would -- she would ask for

19   wallet, so she could send cryptocurrency back to me.  She would

20   say, I have got your Bitcoin™, I will send it back to you.  She

21   would send it to me, either the same day or a couple days

22   later, she would ask for it back or Michael would ask for it

23   back and send the wallet address along with it and where to

24   send the money back to.

25   *Q*   All right.  I want to show you another exhibit.  It's also

JONATHAN YIOULOS - Direct

1    not yet in evidence.  It's Government's Exhibit 605.  What is

2    this?

3    A    This is a text message conversation between myself and

4    Michael Tew on Thursday, August 9th, 2018.

5    Q    How do you know that?

6    A    I can tell by the context of the conversation and also the

7    last four digits of the cell phone number for Michael Tew and

8    the cell phone number that I'm looking at.

9    Q    Before your testimony, did you review exhibits purporting

10   to text messages between you and Michael Tew?

11   A    I did.

12   Q    How did you make sure that the messages you were shown and

13   the numbers that are in, you know, whatever that document is,

14   were actually yours?

15   A    I reviewed the -- every exhibit that was given to me, and

16   just made sure that the context made sense, that the messages

17   that appeared to be coming from Michael, whether or not they

18   were his cell phone number or not, were actually coming from

19   Michael, and the messages that I sent back were actually coming

20   from me, and I could tell that from, you know, the context

21   clues and my memory back to the situation.

22   Q    Did you also compare them against contemporaneous events in

23   your life?

24   A    Absolutely.

25   Q    And when you did that, what did you notice?

JONATHAN YIOULOS - Direct

1    *A*   I noticed that, you know, the time that this conspiracy

2    began, I could tell that -- and throughout the conspiracy, that

3    these were conversations that I did have with Michael.

4    *Q*   Now, in that document in front of you, are Michael's

5    messages shown in a particular color?

6    *A*   Yes, they are.

7    *Q*   What color?

8    *A*   His are -- hold on one second.  His are shown in green.

9    *Q*   What color are yours?

10   *A*   White.

11   *Q*   How did you verify that Michael Tew was actually the

12   messages in green and you were the messages in white?

13   *A*   I could tell by the contents of the messages.  You know,

14   especially in this first one, I can tell what I said and what

15   he says back.

16   *Q*   Now, this process that we have been describing, did you

17   follow it for all of the text message communications that we

18   will be discussing during your testimony?

19   *A*   I did.

20        *MR. FIELDS:*  Your Honor, at this time I move into

21   evidence Government's Exhibit 605.

22        *MR. SCHALL:*  Your Honor, Mr. Tew objects, being that I

23   don't believe Mr. Yioulos would testify that he prepared this

24   document or that he reviewed everything on this document, some

25   of which is, I would proffer to the Court, a very technical

JONATHAN YIOULOS - Direct

 1  nature, which a user of a cell phone using to communicate via

 2  text message would have no knowledge of.

 3        *THE COURT:*  So, I will sustain it, and explain it a

 4  little bit more about what -- what he knows about this and what

 5  he doesn't.

 6        *MR. FIELDS:*  Hm-hm.

 7        *THE COURT:*  Go ahead.

 8  Q    What do you know about this particular document?

 9  A    This particular one?

10  Q    Yep.

11  A    I'm asking for the Bitcoin™ that I had sent him.

12        *MR. SCHALL:*  Objection, Your Honor.

13  Q    Let me back you up a little bit. So, before your testimony

14  today, did you review the message body of these documents?

15  A    Yes, I reviewed the bodies.

16  Q    How did you verify that that was actually what you had sent

17  A    Through my memory of the events.

18        *MR. FIELDS:*  Your Honor, at this time, I would move

19  the admission of the exhibit into evidence under Rule 901.  A

20  witness with personal knowledge of the content can authenticate

21  the message.  We're going to be showing just the columns that

22  are time and body, and he is more than competent to talk about

23  that.  In the alternative, I would say that the rest of the

24  exhibit should be admitted, subject to connections with the

25  witnesses later on, will talk about the other columns, at least

JONATHAN YIOULOS - Direct

1    to the extent that they are relevant.

2        THE COURT:  Okay.  Counsel, would you just approach

3    briefly?

4        (At the bench:)

5        THE COURT:  So, as I understand the objection, this

6    is, obviously, not text message.  It's a printout of the some

7    sort of Apple™ report, right?  But all you want to talk to him

8    about is messages.  So, for now, subject to your showing what

9    the rest of it is, if you want to highlight portions of it, and

10   have him talk about those portions, do that.  But I'm not going

11   to admit the document as an exhibit, at this point, subject to,

12   potentially, someone else explaining what the rest of it means.

13   Does that make sense?  Does that address your objection?

14       MR. SCHALL:  My last objection was going to be, was

15   that he started to read off exhibit -- the message.  It's not

16   an exhibit yet.  He can, obviously, refresh his recollection

17   with anything, but it's not an exhibit yet, and from reasons of

18   hash values and crazy technical stuff, may never be an exhibit.

19   So, to ask -- he has no personal knowledge of that, behind the

20   text messages.  He surely does when it comes to the body of the

21   message.  It's not in evidence.  So asking him to read it would

22   be objectionable.

23       THE COURT:  What is the response to that?

24       MR. FIELDS:  Your Honor, everything else in the text

25   message is not hearsay, not for the truth of the matter

JONATHAN YIOULOS - Direct

1    asserted.  The message content and the date was already said,

2    he has personal knowledge, he can authenticate that; number

3    one, as the Court just proposed, admit just those portions.

4    When we have the other witnesses, the entire documents can be

5    produced, or at that point, if, for whatever reason, the

6    objection is sustained, just redact the other portions on each

7    sheet.

8              THE COURT:  Yeah.  So, I think the objection is now he

9    is reading from some other document that's not in evidence,

10   testifying as to his personal recollection.

11             MR. FIELDS:  May I address something?

12             THE COURT:  Yeah.

13             MR. FIELDS:  The actual exhibit itself he has said

14   this is a text message.  He can authenticate it.

15             THE COURT:  It's not a text message.  It's a

16   spreadsheet with a bunch of text messages and some other stuff.

17             MR. FIELDS:  Well, the stuff actually displayed is

18   what we are going to admit, at this point, that is a text

19   message.  Your Honor, you can put text messages in

20   spreadsheets.  He said, *These are my messages*.  He can testify

21   as to that, and then all of the other Court's rulings about

22   authentication will come into play, and so the content, which

23   he has said he can authenticate, should be able to come in, at

24   this point.

25             THE COURT:  Okay.  I will let you admit.

JONATHAN YIOULOS - Direct

1      MR. KAPLAN:  Let me add one thing to the objection.

2  The other thing is, I think counsel is suggesting that he is

3  authenticated it.  It seems to me that the foundation needs

4  laid, he has some contextual understanding that this would be

5  the kind of thing that, you know, he would have written at the

6  time.  I don't think that he laid the foundation that this is

7  the text that was sent or received on that particular day.

8  Just saying it's the kind of things, because it is about the

9  time that it was sent, about the subject that was being talked

10 about.

11     MR. SCHALL:  It's a lot different than a picture of

12 his phone that shows messages on it, that he has visual

13 recollection of.

14     THE COURT:  You can certainly make those points on

15 Cross-examination.  So, we will go with that, for now.

16     MS. WEISS:  Can we just make a clarification for the

17 record?  We're talking about admission, but what I'm actually

18 hearing is, is the difference between displaying versus

19 admitting into evidence.  So, I think what Mr. Fields is

20 proposing is to, at least, be able to display the messages, at

21 this point, for purposes of having defendant testify to them,

22 and then the additional portions concerning authentication

23 issues, the defense wants to go over, would need to be cleared

24 up before we would move that into evidence.  Am I --

25     MS. FROST:  But it can't be displayed until it's in

JONATHAN YIOULOS – Direct

1   evidence.

2          MR. FIELDS:  I'm actually moving the content and the

3   date into evidence.

4          MS. WEISS:  I want to make the record clear.

5          THE COURT:  And I understand the objection is that --

6   well, there's multiple objections, but that portion of it, I

7   will allow you to admit.  Okay.  Thanks.

8          (In open court.)

9   BY MR. FIELDS:

10          MR. FIELDS:  All right.  If we could, let's zoom in on

11   the, sort of, message time.  The message body part of this

12   document.

13          Your Honor, I would move into evidence these portions

14   of the document.

15          THE COURT:  Okay.  Those are admitted for now.

16     Q    (By Mr. Fields) All right.  So, we talked about your

17   review of these documents before your testimony.  Did you meet

18   with the government before your testimony today?

19   A    I did.

20   Q    What happened at those meetings?

21   A    I reviewed these documents with the government and

22   prepared.

23   Q    All right.  When did this exchange occur?

24   A    Thursday, August 9th, 2018.

25   Q    All right.  And again, who is in white and who is in green?

JONATHAN YIOULOS - Direct

1  A    I'm in white, Michael is in green.

2  Q    What did you say?

3  A    I said, *Hey, no rush, but when do you think you will send*

4  *the BTC back, just so I have a timeframe*?  He said, *Checking*

5  *BRB.  Been phone glued to ear since like 6:30*.  I said, *All*

6  *good.  No worries*.  He said, *You'll get it.  I promise.*

7  *Haven't gotten off phone.*

8  Q    Now, August 9th, 2018, was that towards the beginning of

9  the conspiracy, the middle or the end?

10  A    The end.

11  Q    Now, let's look at -- this is not in evidence yet --

12  Government's Exhibit 863.  What is this?

13  A    This is a text message conversation between myself and

14  Michael Tew.

15  Q    And again, do you know that because you followed that same

16  process that you described to the jury just a little bit ago?

17  A    Yes.

18       MR. FIELDS:  Same thing, let's zoom in on message

19  saying time and message body.

20       Your Honor, I would move into evidence, this portion

21  of the exhibit.

22       THE COURT:  Understanding the same objections apply.

23       MR. SCHALL:  Your Honor, same issues, same objections,

24  understanding all of that, no objection to what is being

25  offered right now, if that makes sense.

1          THE COURT:  Mr. Kaplan, is there something in

2     addition?

3          MR. SCHALL:  Yes, Your Honor.  I think we're going to

4     have to approach again.

5          THE COURT:  Okay.

6        (At the bench:)

7          MR. KAPLAN:  This won't take long.  So, this is, I

8     think, Kimberley's iCloud, and it was never on his phone --

9     excuse me -- it was on his phone, but he deleted it off his

10    phone, and then he is reading dates and, you know, this whole

11    document he has never seen it, and he is introducing, you know,

12    evidence that is based on what he is just reading without ever

13    having -- it's on his phone.  It's on his iCloud.  How can you

14    lay the foundation for that, for that document?

15         THE COURT:  So, here is what I think the problem with

16    this is, which may be worse, but similar to the last problem,

17    is you are asking to admit a document that has very specific

18    information on it, but what I'm hearing is he -- this is not

19    something he saw, other than preparing for this case, and

20    normally why -- why is it admissible in this way, as opposed to

21    potentially, at most, if you ask him what -- did you have the

22    text conversation with, I guess this is Kimberley, and he says

23    yes, and then, if he doesn't remember exactly, well, you would

24    normally have to ask him what was the content of that, and if

25    he doesn't remember, maybe you could use it to refresh his

JONATHAN YIOULOS – Direct

1    recollection, but then it still doesn't come in as evidence.

2    Isn't that what we're doing here?  But you just, sort of, using

3    this as a replacement for his memory?

4         MR. FIELDS:  No, Your Honor.  This goes back two cases

5    that were cited in the government's motion, in order to

6    authenticate those documents.  The witness does not have to be

7    the one who actually created the document.  It could be --

8    actually this arises all of the time in cases involving drug

9    conspiracy, things like that, send text message to someone

10   else, they deleted the messages on their phone, but they are

11   still around, and that witness, who was a part of the

12   conversation, can testify to their own personal knowledge of

13   what happened under 901(b).  There's a bunch of other cases I

14   have in my notebook that I can come up here and talk to the

15   Court about.  But that's all that 901 requires; it's an

16   authentication requirement.  So, to the extent they want to say

17   these are not real, that's the subject of Cross-examination,

18   they can Cross-examine on that, but his testimony under oath

19   today, Your Honor, was that, *I went through, I reviewed these,*

20   *and I am telling you, under oath, that these are my text*

21   *messages, because I remembered them, because I looked at*

22   *contextual events, and I know they are*, and that's all that is

23   required.

24        As far as, you know, what format they are in, that's

25   the *Kirkpatrick* decision, which was cited in the motion in

JONATHAN YIOULOS - Direct

1    limine.  You could take messages from a cell phone, and put

2    them in, basically, any form you want.  The content is what

3    matters, not the format.  Text messages, phones, or journals

4    come in all sorts of different formats all the time.  The

5    content is what matters, and he has testified content is

6    authentic.

7        MR. SCHALL:  This isn't a list of text messages with

8    dates, like everybody can recognize, authenticate, including,

9    like, children.  This is a list produced by Apple™ with their

10   name on the top in the corner, which means something to most

11   people, that lists all of this other stuff that makes it look

12   much more serious and much more profound and official in ways

13   that he doesn't know about.

14       THE COURT:  Mr. Kaplan?

15       MR. KAPLAN:  The other thing, I did go over this to

16   refresh his recollection, or that they just say you are going

17   to be testifying, let me show you this, that we knows come from

18   Apple™, on this date, with this information.

19       THE COURT:  Sure.  You can ask, *Do you think that's

20   what happened*?  You can certainly ask about it.  So, I think I

21   agree.  I mean, you can establish, and I will ask you to, sort

22   of, clarify, these were provided to him and he can -- he can

23   review it, but he didn't provide it, if you want to handle it

24   that way, but stuff we're talking about, at this moment, is

25   just the highlighted portion.  So, if we need to redact Apple™

JONATHAN YIOULOS - Direct

```
1   or something else, do that.  But right now, we're just talking

2   about this, I'm convinced Mr. Fields is right, that if he is

3   testifying this is an accurate depiction of his text exchanges,

4   then it's admissible.

5            MR. KAPLAN:  But the date that's on there, you know,

6   isn't that part of what he is testifying to, or it just simply

7   because it was on that --

8            THE COURT:  I think it is, but you can certainly

9   question him, if he has an accurate memory of down to the

10  second, you can certainly try to undermine the credibility of

11  it.  That's his testimony.  So I will allow it.  Ask a few more

12  questions and then we will break for the day.

13           (In open court.)

14      Q    (By Mr. Fields) All right.  This message, which is

15  not yet in evidence.  Did you review a lot of text messages

16  before your testimony today?

17  A   I did.

18  Q   Fair to say they are pretty detailed?

19  A   They are.

20  Q   And you know the document in front of has got specific

21  dates, as well?

22  A   Correct.

23  Q   How do you know, sitting here in a courtroom, several years

24  later, that this is actually your message and not something

25  that was hallucinated by an AI or created by someone else?
```

JONATHAN YIOULOS - Direct

1   *A*   Because I can tell by -- I remember the conversations I

2   had.  I remember -- I remember -- it's almost like a

3   photographic memory, to a certain extent.  I remember these

4   conversations.  I remember going back and forth about how much

5   money I was going to send out.  I remember sending my Bitcoin™

6   address.  I remember sending different types of information,

7   and then, also just reviewing the other documents in connection

8   with these text messages.  You know, I remember sending certain

9   dollar amounts, and then tying them back to certain invoices

10  that were -- that I would pay, the fraudulent invoices, and

11  just remembering how I would structure these things with

12  Michael, to make sure that the payments matched the invoices.

13      *MR. FIELDS:*  Your Honor, at this time I would move

14  into evidence the portion of the exhibit highlighted, which is

15  message subject and message body.

16      *THE COURT:*  All right.  Understanding that the

17  previous objections are preserved, I -- unless --

18      *MR. SCHALL:*  Nothing further, Your Honor.

19      *THE COURT:*  All right.  Then I will admit them with

20  that understanding, go ahead.

21      Q   (By Mr. Fields) All right.  What does it say?

22  *A*   I said, *60K our -- out*.  He said -- when I say he, Michael

23  said.  *OMG, Jon, none of us want to get caught*. *You good*?  He

24  said, *Send me your BTC address*.  I said, *We're good*.  *This just

25  has to be it for awhile.*  And I sent my BTC address, which is

JONATHAN YIOULOS - Direct

1    in alphanumeric code.  Would you like me to read that?

2  Q    No.

3  A    Then he sent a Bitcoin™ transaction, also in alphanumeric

4    code, with a link and another text message to *Blockchain*

5    website, which is the receipt for sending cryptocurrency.

6  Q    Just so we have on the record what you have identified as

7    the log, could you read off the last for digits?

8  A    Of my wallet?

9  Q    Yep.

10  A    It is 'HB8K.

11  Q    All right.  You know, that long alphanumeric string there,

12    how do you make sense of that?  What is that?

13  A    So, within anybody's individual wallet, you do -- you get

14    your specific alphanumeric code, and these platforms made it

15    fairly easy to copy and paste into a text message, pretty

16    easily, my wallet address.  So that's what I would send to

17    Michael, when I was talking about cryptocurrency.

18  Q    So, then those things at the bottom that just say,

19    *Blockchain* what, is the *Blockchain*?

20  A    That's, essentially, how cryptocurrency is traded, over the

21    *Blockchain*.  It's a bunch of stuff that I -- is, I don't

22    understand a ton of, but, essentially, the receipt of him

23    sending the Bitcoin™ from his wallet to my wallet.

24  Q    This September 2019, is that in the beginning, towards the

25    middle or at the end of your agreement to submit false

JONATHAN YIOULOS – Direct

1   invoices?

2   A    Towards the middle.

3   Q    Were you worried about getting caught around then?

4   A    Yes.

5   Q    Why?

6   A    Because by that time there had been a significant amount of

7   money that had already been sent out.

8        MR. FIELDS:  Your Honor, I'm ready to move on to

9   another exhibit.

10       THE COURT:  Why don't we take a break.  It's 5

11  o'clock, so, thank you.

12       Members of the jury, we're about to recess for the

13  day.  Remember, until the trial is over, you may not discuss

14  the case with anyone, including your fellow jurors or family

15  members, anyone involved in the trial.  If you happen to see

16  any of us, around, in the courthouse or outside or anything,

17  don't try to talk to them, and if they ignore you, it's not

18  because they are being rude.  It's because they don't want to

19  get in trouble with me.  And don't research or text or email

20  anybody else about this case.  Again, the only information you

21  are using, deciding the issues in this case, is what you learn

22  here in this court.  Remember to keep an open mind, until you

23  have heard all of the evidence and the instructions and the

24  views of your fellow jurors.  With that, we will excuse the

25  jury for the evening.

1          Mr. Yioulos, you may step down.

2          THE COURTROOM DEPUTY:  All rise.

3          THE COURT:  All right.  Let's briefly take our seats.

4    Mr. Yioulos, you may leave now.  Thank you, for now.

5          So, counsel, my hope would be that perhaps you can

6    confer a little bit about what we're going to do with these

7    types of objections.  I understand they may continue to come

8    up, but unless there's something we really need to deal with

9    right now, I think I have given you a couple of assignments,

10   and I would rather try to deal with them in the morning at -- I

11   will be back at 8:30, if we need to, again.  We do have that

12   obligation to confer anyway about tomorrow's evidence.  So, is

13   there anything, given that, that you think we need to address,

14   or do you want to give me a heads up about, right now?

15         MS. FROST:  Could, I -- do you want me to stay here or

16   approach?

17         THE COURT:  You can stay there.  Just use the

18   microphone.

19         MS. FROST:  I have two things by way of reminder.

20         THE COURT:  Do you want me to say anything to the jury

21   about your absence?

22         MR. SCHALL:  Your Honor, my law partner, who is not --

23   he is a member of the District Court, he is not a member of the

24   CJA panel, he is a member of the Tenth Circuit CJA panel, has

25   been assisting with appellate issues, is able and willing, and

JONATHAN YIOULOS - Direct

```
1    I would encourage him to be here in Ms. Frost's absence

2    tomorrow.  I don't think we need to say anything, but if it's

3    okay with you.  He is not attorney of record.  He is not, you

4    know, in the case, but if he could sit at counsel table.

5              THE COURT:  I think I'm okay with that.  I will let

6    the government respond, as long as he -- I don't think he can

7    bill CJA for that.  As long as you are okay with that, I think

8    I am.

9              MR. FIELDS:  No objection, Your Honor.

10             THE COURT:  All right.

11             MS. FROST:  He can't bill CJA for being me.

12             THE COURT:  No.

13             MS. FROST:  Just so you are aware, I should be here in

14   the morning, running out, and it's actually a mock jury

15   exercise in a different case.  So I'm going from a real trial

16   to a mock trial and coming back.

17             Oh, second thing, really quick, Your Honor, I just

18   want to supplement the record on the witness' use of the word

19   conspiracy, and the government continuing to use that word in

20   their questioning.  I think the government's improperly

21   testifying, by using the word conspiracy, asking the witness to

22   draw a legal conclusion by using the word conspiracy, and

23   invading the province of the jury, who is the fact finder, who

24   will ultimately determine whether -- once they get your

25   instructions -- whether there's been a conspiracy proven.  I
```

JONATHAN YIOULOS - Direct

1    understand that the Court gave, kind of, a corrective

2    instruction 20 minutes ago, or whenever it was, but at this

3    point I think I heard the word conspiracy come out of the

4    prosecutor and witness' mouth maybe ten more times, and at this

5    point it's inappropriate.

6         THE COURT:  All right.  I don't agree with --

7    completely with that.  I don't think it's necessarily testimony

8    or invading the province of the jury, but I do think that we

9    would all be better off if we try to avoid using the word

10   conspiracy.  I know that the witness uses it, and I don't want

11   the prosecutors trying to instruct the witness tonight, so I'm

12   not sure that we can do much more than I will give another

13   corrective instruction, when we can.  I give multiple

14   instructions about statements or positions of counsel not being

15   evidence, so I don't think it's necessary to do so, again,

16   right now, but I will ask counsel, in particular, to try to

17   avoid using that, and I will give another instruction, when it

18   seems necessary, because I -- I -- the basic point of the

19   objection is well taken, even if I don't necessarily agree with

20   exactly all of the conclusions.

21        Anything else?  All right.  I will take a recess until

22   tomorrow morning.  Thank you.

23        THE COURTROOM DEPUTY:  All rise court is now in

24   recess.

25        (Recess at 5:05 p.m.)

JONATHAN YIOULOS – Direct

**INDEX**

| Item | Page |
|------|------|
| ITEM | PAGE |

OPENING STATEMENTS

| | |
|---|---|
| By Ms. Weiss | 23 |
| By Mr. Schall | 36 |
| By Mr. Kaplan | 42 |

WITNESSES

JONATHAN YIOULOS

| | |
|---|---|
| Direct Examination By Mr. Fields | 56 |
| 527 | 58 |
| 531 | 64 |
| 986 | 67 |
| 605 (certain portions) | 83 |
| 605 (certain portions) | 88 |

**REPORTER'S CERTIFICATE**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.  Dated at Denver, Colorado, this 20th day of October, 2024.


*S/Tamara Hoffschildt*
Tamara Hoffschildt