1    IN THE UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF COLORADO
2

3    Criminal Action No. 20-cr-305-DDD

4    UNITED STATES OF AMERICA,

5        Plaintiff,

6    vs.

7    1. MICHAEL TEW,
     2. KIMBERLEY TEW,
8

9        Defendants.
_____

10                  **REPORTER'S TRANSCRIPT**
                     JURY TRIAL, DAY 3
11   _____

12           Proceedings before the HONORABLE DANIEL D. DOMENICO,

13   Judge, United States District Court for the District of

14   Colorado, occurring at 9 a.m., on the 7th day of February,

15   2024, in Courtroom A1002, United States Courthouse, Denver,

16   Colorado.

17                      **APPEARANCES**

18           Bryan Fields and Sarah Weiss, Assistant U.S.

19   Attorneys, 1225 17th Street, Suite 700, Denver, Colorado,

20   80202, appearing for the Government.

21           Jason Dale Schall, Bowlin & Schall Law LLC, 7350 East

22   Progress Place, Suite 100, Greenwood Village, CO 80111 and

23   Kristen M. Frost, Ridley McGreevy & Winocur PC, 303 16th

24   Street, Suite 200, Denver, CO 80202, appearing for the

25   Defendant, Michael Tew.

1          David Scott Kaplan and Jamie Hughes Hubbard, Stimson

2    LaBranche Hubbard, LLC, 1652 North Downing Street, Denver, CO

3    80218, appearing for Defendant, Kimberley Tew.

4

5          TAMMY HOFFSCHILDT, FCRR, CRR, RMR, Official Reporter
                901 19th Street, Denver, Colorado 80294
6          Proceedings Reported by Mechanical Stenography
                Transcription Produced via Computer

7

8                        **P R O C E E D I N G S**

9      (In open court at 8:54 a.m.)

10        *THE COURT:*  Good morning.  Let's take our seats.  So,

11   counsel, I don't know if you have additional issues to bring

12   up.  I wanted to make sure we had -- you had discussed and

13   hopefully worked out a plan for the -- the remainder of the

14   tape; is that right?

15        *MR. FIELDS:*  We have, Your Honor, I consulted with

16   Mr. Schall, and I think we have a plan to play the entire

17   tapes.

18        *THE COURT:*  Okay.  Thank you.  And is that

19   satisfactory to the defendants?

20        *MR. SCHALL:*  That was our plan, Your Honor.  Yes.

21        *THE COURT:*  Mr. Kaplan?

22        *MR. KAPLAN:*  We have a continuing objection to it

23   coming in --

24        *THE COURT:*  The tape, at all?

25        *MR. KAPLAN:*  Right.

1          THE COURT:  But, this part of it, you don't object to?

2          MR. KAPLAN:  That's correct.

3          THE COURT:  Because I do want to make sure that you

4     don't have a specific objection to playing this additional

5     portion?

6          MR. KAPLAN:  Right.  I understand.  No.  As to the

7     process that we're proceeding with, that's fine, without

8     waiving previous --

9          THE COURT:  Understood.  Understood.  The only other

10    thing I wanted to bring up, I don't know if Mr. Keech may have

11    mentioned it, but apparently one of the jurors sent him a note

12    saying he had something to discuss with Mr. Keech.  He hasn't

13    arrived yet, as far as I know.  When he does, I will get

14    Mr. Keech to come figure out if it's hopefully something as

15    simple as needing to take more frequent bathroom breaks I will

16    deal with that, but if it's something more significant,,

17    obviously, we will -- we may have to deal with that.

18          If there's -- so, I guess, is the plan to just play

19    the whole tape, or play that portion of it?  What is the plan?

20          MR. FIELDS:  The plan, this morning, Your Honor, is

21    we're going to start at the beginning.  The only portion of the

22    tape that I didn't play yesterday, was about 15 seconds to a

23    minute and eight.  We are just going to start from the

24    beginning, play it to about one-minute-fifteen, that will

25    orient the jury, then we are going to start off where we left

1    off yesterday, which is 11:45, and play the tape all the way.

2         THE COURT:  Well, that makes sense to me.  I don't

3    have anything else, so I guess I will just recess, wait for

4    Mr. Keech to make sure that all of the jurors are here and then

5    find out what we need to deal with, with that, that note.  So,

6    we will be in recess until that happens.  Thank you.

7         THE COURTROOM DEPUTY:  All rise.  Court is now in

8    recess.

9         (Recess at 8:57 a.m.)

10        (In open court at 9:11 a.m.)

11        THE COURT:  Please take your seats.  Counsel, are we

12   ready to get started?

13        MR. FIELDS:  Government is ready, Your Honor.

14        MR. SCHALL:  Ready, Your Honor.

15        THE COURT:  All right.  So, Mr. Keech did talk to the

16   juror.  It's nothing that I think is a significant problem now,

17   but it just -- if counsel would approach, I will just, sort of,

18   the let you know what's going on.

19        (At the bench:)

20        THE COURT:  This particular juror is from Greeley, I

21   guess, and so he is traveling long distance and staying in a

22   hotel, which the government reimburses, but they don't

23   reimburse until afterwards, and so he is having some financial

24   difficulties, sort of, fronting, what will end up being a

25   thousand dollars in hotels.  So, we're just trying to figure

1    out if we can make that work better for him.  He didn't ask to

2    be excused.  He just wanted to know if there was something that

3    we could do.  So we're looking into it.  You know, he did tell

4    Robb that -- not only did he not ask to not be excused, he said

5    he would probably have to just start driving back home every

6    night, which is not a great solution.

7         MR. KAPLAN:  Where is he?

8         THE COURT:  In Greeley.

9         MS. FROST:  Better than Kremmling.

10        THE COURT:  Right.  Exactly.  So, I'm talking to our

11   jury people about whether we can pay him quicker or use a

12   government card to pay the bills.  That's where we are.  It's

13   nothing we have to deal with now.

14        MR. KAPLAN:  Thank you.

15        (Back in open court.)

16        THE COURT:  Mr. Keech, I think we're ready for the

17   jury.

18        MR. FIELDS:  Your Honor, should we have the witness

19   take the stand?

20        THE COURT:  Yes, please.

21        THE COURTROOM DEPUTY:  All rise.

22      (Jury in at 9:15 a.m.)

23        THE COURT:  All right.  Good morning, ladies and

24   gentlemen.  Welcome back.  Thank you for being here.  Please

25   take your seats.

JONATHAN YIOULOS - Direct

1          So, we're going to, sort of, pick up, essentially,

2     where we left off.

3          Mr. Fields, you may begin.

4          *MR. FIELDS:*  Thank you, Your Honor.

5                    **DIRECT EXAMINATION** (cont'd)

6     *BY MR. FIELDS:*

7     *Q*   Mr. Yioulos, do you remember, we were talking about the

8     recording you made yesterday?

9     *A*   I do.

10    *Q*   All right.  Let's reorient ourselves.  Let's play from the

11    beginning to one minute and 15 seconds in.

12          (The recording was played for the members of the

13    jury.)

14    *Q*   All right.  So, the *Chris*, who is being referred to there?

15    *A*   Chris Alf.

16    *Q*   How often would he come to the Buffalo office?

17    *A*   Couple times a year.

18    *Q*   So, was it a big deal for him to come?

19    *A*   Yes.

20    *Q*   All right.  Now, let's go back to where we left off

21    yesterday.  Let's fast forward to 11:45, and let's play up to

22    14:52.

23          (The recording was played for the members of the

24    jury.)

25    *Q*   So, couple of things there.  With regard to these tax

JONATHAN YIOULOS – Direct

1   issues, what was the tax issue if it was sent directly to

2   Michael versus directly to Global Fuel?

3   A   If it was sent to Global Fuel, they would be on the hook to

4   pay taxes, corporate taxes.  If it was a legitimate -- set up

5   as a legitimate corporation, which it was, they would have to

6   pay corporate tax on that.  If it was sent to the Tews

7   directly, and anybody looked into the deposits that were going

8   into that account, you know that would be a tax issue on their

9   personal end.

10  Q   Then there's reference to, sort of, ACHs going into bank

11  accounts.  Was that ever an issue during the course of conduct

12  that we have been describing?

13  A   Yes.

14  Q   Why?

15  A   There was a few times that there was an issue at the bank,

16  that Michael or Kimberley raised to me, saying either the funds

17  were held up for one reason or another; either the name didn't

18  match or the bank froze the funds.  So, I would have to send

19  more funds to a different bank account or somewhere else, so

20  those were some issues that were going on at the bank.

21        MR. FIELDS:  All right.  Now, let's keep playing to

22  16:30.

23        (Whereupon the recording was played for the members of

24  the jury.)

25  Q   All right.  So, early in your testimony, I think you

JONATHAN YIOULOS – Direct

1  described where National's offices were.  Where were its

2  offices?

3  A   We have offices in Buffalo, and Orlando was where the

4  airline was based out of.

5  Q   What about Michigan?

6  A   The airline was originally based out of Ypsilanti,

7  Michigan.

8  Q   Let's look at Government's Exhibit 841, which is in

9  evidence.  Let's go to page five.  What do you see up there at

10  the top as the address for Global Fuel Logistics?

11  A   Um, 101 West Big Beaver Road, Troy, Michigan, 48084.

12       MR. FIELDS:  All right.  Let's go back to our tape,

13  which is Government's Exhibit 974, and let's play to 18:58.

14       (Whereupon the tape was played for the members of the

15  jury.)

16  Q   So, there are these references to Michael Tew's in-laws.

17  Do you remember hearing that?

18  A   I do.

19  Q   Did you ever meet his in-laws?

20  A   No.

21  Q   Do you know what Kimberley Tew's maiden name was?

22  A   I do, but I can't really pronounce it.  It started with a

23  V, that's all I really know.

24       MR. FIELDS:  All right.  Let's play at 20:57.

25       (Whereupon the recording was played for the members of

JONATHAN YIOULOS – Direct

1   the jury.)

2   *Q*   There are multiple references to a *she* and a *her*.  Who was

3   that?

4   *A*   Kimberley Tew.

5   *Q*   How do you know that's who he is referring to?

6   *A*   Because of the context of the conversation, previous

7   discussions with Michael and Kimberley about Michael Meyers and

8   Meyers Consulting.

9        *MR. FIELDS:*  Okay.  Let's go to 28:32.

10       (Whereupon the recording was played for the jury.)

11  *Q*   Stop here for a second.  So, *Craig*, who is being referred

12  to there?

13  *A*   The Craig who called National, and when Michael -- prior to

14  Michael being terminated.

15       *MR. FIELDS:*  Let's keep going.

16       (Whereupon the recording was played for the members of

17  the jury.)

18  *Q*   Now, you said there that you didn't communicate with

19  Kimberley for obvious reasons.  What was the obvious reason?

20  *A*   I did not like to communicate with her.  Most of my

21  dealings were with Michael.  He understood National a bit more,

22  the operations, and any time I dealt with Kimberley it was just

23  more of a hostile communication.

24  *Q*   Did you actually tell Michael that you didn't want to talk

25  to Kimberley?

360
JONATHAN YIOULOS – Direct

1    A    Yes.

2    Q    Did you tell Kimberley that you didn't want to, actually,

3    talk to her?

4    A    Yes.

5           MR. FIELDS:  All right.  Let's keep going to the end.

6           (Whereupon the recording was played for the members of

7    the jury.)

8    Q    That voice that you heard at the end, who was that?

9    A    The FBI agent who I was with.

10   Q    So, we're talking about July 7th, 2020.  The agents arrest

11   you that day?

12   A    No.

13   Q    What did you do after the phone call?

14   A    I went down to a bench just outside of National, big office

15   park.  So, there's several different buildings, like a big

16   bench, I started talking to them there.

17   Q    After they let you go for the day?

18   A    So, I was actually in my car, with them, during this

19   conversation, and they did let me go for the day.  Yes.

20   Q    What did you do the next morning?

21   A    Went down to the FBI office, in Buffalo, to meet with them

22   again.

23   Q    So, that's July 8th, 2020?

24   A    Correct.

25   Q    What did you do at the FBI office in Buffalo?

JONATHAN YIOULOS - Direct

1    *A*    Sat with the agents, answered any questions they had for me

2    about the conspiracy, gave them my cell phone.  They made a

3    copy of -- they wanted to extract data from my cell phone, so I

4    let them have my cell phone, and they took that, made a copy of

5    the data and eventually gave it back to me.

6    *Q*    Did they ask you to make another call that day?

7    *A*    They did.

8    *Q*    Did you agree to do that?

9    *A*    I did.

10    *Q*    Were you given any instructions for this call?

11    *A*    No specific instructions, necessarily, just to, more or

12    less, highlight any bullet points that they wanted more

13    information about, such things as Political Media, the

14    individual there Larry Ward, just questions that they, maybe,

15    wanted more clarity on.

16          They didn't tell me what to say, specifically.  They

17    just wanted me to bring it up to see if Michael would tell me

18    anything about those questions.

19    *Q*    Was this call recorded?

20    *A*    It was.

21    *Q*    Who recorded it?

22    *A*    The agents.

23    *Q*    Did you listen to that recording before your testimony?

24    *A*    I did.

25    *Q*    Has it been marked as Government's Exhibit 975?

JONATHAN YIOULOS – Direct

1    *A*   Yes.

2    *Q*   Is it a fair and accurate copy of the call that you had

3    with Michael Tew on July 8th, 2020?

4    *A*   Yes, it was.

5              *MR. FIELDS:*  Your Honor, at this time the government

6    would move to admit Government's Exhibit 975.

7              *THE COURT:*  Counsel, any objections, beyond what we've

8    already discussed?

9              *MR. SCHALL:*  Only those previously discussed,

10   Your Honor.

11             *MR. KAPLAN:*  Likewise, Your Honor.

12             *THE COURT:*  Okay.  So, we've already discussed.  Those

13   are overruled for the same reasons, but preserved.  So, go

14   ahead.  It's admitted.

15             *MR. FIELDS:*  All right.  Let's pull up Government's

16   Exhibit 975.  Let's play 30 seconds in please.

17             (Whereupon the recording was played for the members

18   of the jury.)

19   *Q*   All right.  We've heard these voices before.  Just to be

20   sure, whose voices do you hear on the recording?

21   *A*   Michael Tew's and my own.

22   *Q*   And there's this reference to *weird vibes*.  Had there been

23   weird vibes before you left?

24   *A*   Certainly.

25   *Q*   About what?

JONATHAN YIOULOS - Direct

1    *A*    Just what we had talked about previously.  Just questions

2    about the FBI.  You know, Chris did say he was coming to town,

3    prior to me being terminated from National.  One of the reasons

4    I was at the office -- I had been working from home pretty

5    intermittently, during that time, but one of the reasons I

6    wasn't in the office that day was because Chris communicated to

7    me, the week before that he was going to be in the office that

8    day and wanted to meet me in the morning, so that was one of

9    the reasons I actually did go in.  It was just a little strange

10   because Chris usually comes -- when he came to town he

11   typically would come in the afternoon, I would meet him for

12   lunch, we would do lunch and go from there.  This time he

13   wanted to meet in the a.m. so I wanted to make sure I was there

14   to meet him, that's why the vibes were a little strange.

15   *Q*    All right.  Let's play to 4:25.

16         (Whereupon the recording was played for the members of

17   the jury.)

18         *MR. FIELDS:*  Let's stop there, for just one moment.

19   *Q*    Who is this Brian person?

20   *A*    Brian Boyd.  He was the director of security for the

21   airline.

22         *MR. FIELDS:*  Let's keep going.

23         (Whereupon the recording was played for the members of

24   the jury.)

25   *Q*    All right.  Sir, these references to this guy named Ron,

JONATHAN YIOULOS - Direct

1    who is Ron?

2    A    Ron was our IT director at National Air Cargo.

3    Q    And there's also this reference to a ransomware thing.

4    What was that all about?

5    A    In 2020, one of our accounts payable specialists actually

6    clicked on an email link from an outside email, she had never

7    seen it before.  She clicked on the link and by clicking on the

8    link she opened up our network to some hackers to get in, and

9    they were, essentially, holding all of National's data, social

10   security numbers, any type of business data ransom, and so we

11   had insurance for that, but we actually had to pay a ransom of

12   about I believe $800,000 for that ransomware to get -- or to

13   those hackers, to get our data back, and then, you know,

14   security was tightened up a bit at National, but the company,

15   as a whole, only had to pay the detectable, which I believe was

16   like $20,000.

17   Q    Had you told Michael about that?

18   A    I did.

19   Q    Why did you tell Michael about things like that?

20   A    To just let him know what was going on at the company.  We

21   often talked about different things going on.  You know,

22   sometimes it helped create better invoices, more relevant

23   invoices.  You know, we had aircrafts that were going through

24   maintenance checks or we are looking at acquiring new

25   aircrafts.  The invoices he sent over to me related to those

JONATHAN YIOULOS – Direct

1  types of activities.  If anyone went digging or costs went up,

2  there were no questions about why we were sending money.

3        MR. FIELDS:  Let's play to 16:50.

4        (Whereupon the recording was played for the members of

5  the jury.)

6  Q   Stop there for a second.  What's the significance of this

7  name Jessica Thompson?

8  A   She was the made-up person in the emails that I received

9  from Global Fuel and Aero Maintenance Systems.

10       MR. FIELDS:  Let's keep going.

11       (Whereupon the recording was played for the members of

12 the jury.)

13       MR. FIELDS:  Stop there for a second.  Let's pull up

14 Government's Exhibit 742, which is in evidence.  All right.  If

15 we could, let's go to page three.

16 Q   First of all, what is this?

17 A   This is an invoice from Political Media to National Air

18 Cargo.

19 Q   What do you see there under *Activity for Addendum*?

20 A   Prepaid portal subscription, April to August 2019.

21       MR. FIELDS:  Let's play to 20:50.

22       (Whereupon the recording was played for the members of

23 the jury.)

24       MR. FIELDS:  Let's stop there for a second.

25 Q   So, we talked about all of these companies yesterday.  Do

JONATHAN YIOULOS - Direct

1  you remember that?

2  A    I do.

3  Q    Of those companies, did some receive more amounts than

4  others?

5  A    Yes.

6  Q    Of those companies, which ones were, sort of, the smallest

7  amounts?

8  A    Hannah Scaife, CPA, Meyers Consulting, Jessamine

9  Development, those were on the smaller end.  Then went to

10  Political Media, which was kind of the middle, and then the

11  others were the larger ones, Global Fuel and Aero Maintenance

12  Resources.

13         MR. FIELDS:  Let's continue on.

14         (Whereupon the recording was played for the members of

15  the jury.)

16         MR. FIELDS:  Stop there for a second.

17  Q    So, when you said you sent the money out of holdings, what

18  did you mean by that?

19  A    National Air Cargo had many subsidiary companies.  Holdings

20  we would pay -- normally we would pay consultants out of

21  holdings, which was more of like an overhead-type expense.  We

22  pay IT support out of there.  More of those third-party

23  expenses, just smaller ones that related to the overall group.

24  So, if there was an audit of National Air Cargo, they would

25  audit all, you know, I think there was probably about 20

JONATHAN YIOULOS - Direct

1    subsidiary companies as a whole, so they would audit

2    everything, and if you are paying insurance or you are paying

3    audit fees, we would pay those out of holdings, and allocate

4    those expenses based on the size of the company, the percentage

5    of revenue, in each different department.

6           So, holdings, while we didn't pay too many bills out

7    of there, they were not like day-to-day bills.  We would pay a

8    bill out of holdings.

9    Q   Would that create a risk?

10   A   It did.

11   Q   At any point during the course of conduct that we have been

12   talking about, did you start paying things out of different

13   accounts?

14   A   I did.

15   Q   Which accounts?

16   A   Out of National Air Cargo Group's account, which is also

17   National Airlines, same company, just their D/B/A.

18   Q   What was the reason for that?

19   A   National Airlines was our largest subsidiary.  They did the

20   most revenue, most expenses.  There was most work done there.

21   The majority of the bills, that I paid on a regular basis,

22   through operations, were for National Airlines.

23   Q   Whose idea was it to, sort of, diversify the payment

24   source?

25   A   It was a combination between myself and Michael Tew.

JONATHAN YIOULOS – Direct

1            MR. FIELDS:  All right.  Let's keep going.

2            (Whereupon the recording was played for the members of

3     the jury.)

4            MR. FIELDS:  Let's keep going.

5            (Whereupon the recording was played for the members of

6     the jury.)

7  Q    All right.  Even after this, did you get text messages?

8  A    I did.

9  Q    Let's look at what's been marked as Government's Exhibit

10    976.

11 Q    Do you recognize this?

12 A    I do.

13 Q    What is it?

14 A    It's a text message from Michael Tew.

15 Q    What did you do with the text messages that you received

16    from Michael Tew, after your telephone call on July 8th, 2020?

17 A    I showed them to the agents I was with.

18 Q    Did you review this exhibit before your testimony?

19 A    I did.

20 Q    Are these the texts that you forwarded to the agents or

21    allowed them to photograph?

22 A    Yes.

23           MR. FIELDS:  Your Honor, at this time, the government

24    would move to admit Government's Exhibit 976.

25           THE COURT:  Any objections?

JONATHAN YIOULOS - Direct

1          MR. SCHALL:  No objections, Your Honor.

2          MR. KAPLAN:  No, Your Honor.

3          THE COURT:  It's admitted.

4          MR. FIELDS:  Let's go ahead and look.

5   Q   Now, remind us why -- you said this was from Michael Tew?

6   A   Yes.

7   Q   Why does it say JB at the top?

8   A   It's in reference to Joe Batton, who was an actual employee

9   at National Airlines.  While I was employed at National, I

10  didn't want anybody to know I was still texting with Michael

11  Tew.

12  Q   This text here is in gray.  Who sent you this text?

13  A   Michael Tew.

14  Q   Okay.  Read it for us.

15  A   Yes.  *I know with all going on it's weird.  Can you send*

16  *one more today and tomorrow for Friday?  Chris will be back in*

17  *Boca.  I have to get you your BTC.  After our conversation*

18  *today, I realized much of your hard work and help did go to*

19  *waste back then, and you really need to hedge your bets, also.*

20  *We're afraid shit is going to blow up.  The FBI is going to*

21  *come here and kick in our door, soon.  She's afraid you are*

22  *working with the FBI.  Now is the time to get us out of here.*

23  *Don't go dark, please, don't be angry.  She thinks we should*

24  *all turn ourselves in and end it.*

25  Q   All right.  So that reference, *can you send one more*?  One

JONATHAN YIOULOS – Direct

1    more what?

2    A    ACH payment.

3    Q    Had Kimberley ever expressed concerns that you were working

4    with the FBI in the past?

5    A    Yes.

6    Q    How did that come up?

7    A    Through text messages, both with her and with Michael.

8         MR. FIELDS:  Let's go to the next page.

9    Q    All right.  Is this a continuation of the text we were just

10   looking at?

11   A    Yes, it is.

12   Q    Can we pick up where we left off?

13   A    *Kimberley said she is turning herself in today.  She says*

14   *we're ganging on up her.  I'm going to jail.*

15        MR. FIELDS:  Let's look at the next page.

16   Q    This one looks a little bit different.  Is this a

17   photograph of your phone?

18   A    Yes, it is.

19   Q    With the previous ones, did you send screen shots on to the

20   agents?

21   A    I did.

22   Q    All right.  This one has got both gray and blue.  Who is

23   the blue?

24   A    The blue is a text from myself.

25   Q    All right.  Please read the gray.

JONATHAN YIOULOS - Direct

1   *A   Be straight with me so I can at least know what to do, how*

2   *to prep for my kids.*

3   Q   Keep going.

4   *A   I wouldn't do that.  You know this.  I just picked up my*

5   *phone, because I have been in with Chris and Christer.  We have*

6   *been talking about the new 747s.  Honestly, nothing to worry*

7   *about.  It seems tied up for a bit longer, but will get away*

8   *shortly to talk.*

9   Q   That's a new name, Christer.  Who is Christer?

10  A   Chris Alf's son.

11  Q   Next page.  Read these for us, please.

12  *A   Put me on with the FBI.  I'm in a meeting I'm not ignoring*

13  *you.  How much could you possibly need?  I sent you so much*

14  *last week.  How much can you get out?  Okay.  Thank you,*

15  *understood.  Global Fuel Logistics, Inc.*

16  Q   Next page.  Is this a continuation of that text?

17  A   It is.

18  Q   Read it for us.

19  *A   Navy Federal Credit Union, account 7105003094, ABA,*

20  *256074974.  I'm in this meeting with Chris, Christer and*

21  *treasury loan through them.  I don't have an opportunity to get*

22  *out of this right now, and I left my digits at home.  Might be*

23  *able to send tomorrow.  How much are you looking for?*

24  Q   Next page.  Next page.

25  *A   You need to leave that meeting.  Really can't.  I'm*

JONATHAN YIOULOS – Direct

1    *supposed to leave a meeting with Chris and treasury out of the*

2    *blue?  They need me on this call.*

3    Q    Next page.

4    A    *How fast can you buy and how much?  You can open a*

5    *crypto.com account.  It's easy.  Jon, I don't know what the*

6    *fuck is going on over there, but this is all falling apart.*

7    *How fast can you buy me BTC?  The IRS is here.*

8    Q    Next page.

9    A    *What's is going on?  I am going to Chris if you don't*

10   *answer.*

11   Q    Again, Chris, who did you think he was going to call?

12   A    Chris Alf.

13   Q    Next page.

14   A    *Just admit it, you have been working with them all along.*

15   Q    Did you have any other conversations with Michael Tew after

16   you received these text messages?

17   A    No, I did not.

18        MR. FIELDS:  Your Honor, may I consult with my

19   colleagues really quick?

20        THE COURT:  Actually, I would like to take a break

21   now, I think.  So you will have -- let's take a break until 11

22   o'clock.  So, we will be in recess.  Again, all of my previous

23   instructions about keeping an open mind and not discussing the

24   case with one another still remain in effect.  We will be in

25   recess until then.

JONATHAN YIOULOS - Direct

1          THE COURTROOM DEPUTY:  All rise.

2      (Jury out at 10:43 a.m.)

3          THE COURTROOM DEPUTY:  Court is now in recess.

4      (Recess at 10:43 a.m.)

5      (In open court at 11:09 a.m.)

6          THE COURT:  Please take your seats.  Can we go ahead

7  and bring back the jury?  And I should note that we've -- I

8  think we resolved the issue with the juror, that I mentioned

9  earlier.

10         MS. FROST:  Your Honor, actually, really quick, on

11 that issue, I'm glad it's resolved, and I think -- my only

12 thought was, after we chatted at the sidebar, I hope there's no

13 appearance like the United States Attorneys Office or the

14 government funding...

15         THE COURT:  Well, it is the government funding it.

16         MS. FROST:  No, I understand, but not the prosecutors

17 in this room.

18         THE COURT:  They know how the payment is done.

19         MR. SCHALL:  Can the defense chip in, Your Honor?

20         THE COURT:  Yeah.  If you want to kick in, I'm sure.

21         MS. FROST:  I'm completely sympathetic to the problem.

22 I'm coming from Boulder and think that's annoying, so Greeley

23 can be a hardship.

24         THE COURT:  He met with Shelly, our jury person.  He

25 knows that it's the court, basically.

JONATHAN YIOULOS – Cross

1          MS. FROST:  Great.  Thank you for that clarification.

2          THE COURTROOM DEPUTY:  All rise.

3      (Jury in at 11:11 a.m.)

4          THE COURT:  All right.  Welcome back.  Let's all take

5   our seats.  Mr. Fields, did you have anything further?

6          MR. FIELDS:  Your Honor, we have no further questions

7   for this witness.

8          THE COURT:  All right.  Thank you.  We will then turn

9   to Cross-examination.  Mr. Schall.

10         MR. SCHALL:  Thank you Your Honor.

11                    **CROSS-EXAMINATION**

12  BY MR. SCHALL:

13  Q    Good morning.

14  A    Good morning.

15  Q    Please tell me how to pronounce your last name.

16  A    Yioulos.

17  Q    Yioulos.  I apologize if I mess that up.

18  A    You are all right.

19  Q    Mr. Yioulos, you would agree with me, I think, that this is

20  crazy circumstances?

21  A    Absolutely.

22  Q    Crazy case?

23  A    Yes.

24  Q    And you have been living this crazy case for years?

25  A    Yes.

JONATHAN YIOULOS – Cross

1   Q   It was referred that the 7th of July 2020 was the worst day

2   of your life so far; is that right?

3   A   One of them, yes.

4   Q   And that I believe your testimony was that you actually

5   were relieved that day for your ability to come clean?

6   A   Yes.

7   Q   And you testified, on Direct, that I was at a point that I

8   needed to come clean about everything?

9   A   Yes.

10  Q   And that dealing with, not only stresses of the office and

11  being short of funds, but trying to deal with this conspiracy,

12  and something that was extremely unethical.  You said that

13  about wanting to come clean?

14  A   I did.

15  Q   And you said, under oath, that it was almost like a weight

16  off my shoulders, that this was over?

17  A   Correct.

18  Q   It wasn't over, right?

19  A   It was over for the sake of continuing to wire or transfer

20  from National.  Yes.

21  Q   Fair enough. And you said, on Direct, that, *You intended to*

22  *make it as right as possible, in any way that I could?*

23  A   Correct.

24  Q   And quote, *Get the whole truth out there*?

25  A   Correct.

JONATHAN YIOULOS - Cross

1    Q    That is how you testified, that was your intent, on the 7th

2    of July, 2020?

3    A    Yes.

4    Q    But on the 7th of July, 2020, you did not get the whole

5    truth out there?  Did you?

6    A    With regard to this conspiracy?  Yes, I did.

7    Q    You said you wanted to come clean about everything, and

8    something that was extremely unethical, like a weight off my

9    shoulders.  Was your own fraud against your company a weight on

10   your shoulders?

11   A    Absolutely.

12   Q    Were you coming clean about everything on July 7th, 2020?

13   A    No.

14   Q    No.  So, when you told this jury that you -- yesterday,

15   that, *You were at a point that I needed to come clean about*

16   *everything,* what you meant was come clean about Michael Tew and

17   Kimberley Tew?

18   A    Of course.

19   Q    Not come clean about Jon, the fraudster, pre-Michael and

20   Kimberley Tew?

21   A    Yes.

22   Q    At that point, July 7th, 2020, you were not -- you hadn't

23   pled guilty?

24   A    Correct.

25   Q    You had not signed a Plea Agreement?

JONATHAN YIOULOS - Cross

1   A   Correct.

2   Q   Hadn't agreed to cooperate truthfully and fully, as the

3   government directed?

4   A   I did agree to that with the government.  They said, can we

5   ask you some questions -- you are right, I did not sign a

6   formal Plea Agreement, correct.

7   Q   Okay.  And you said you met with the government agents

8   numerous times since that day July, 2020?

9   A   Yes.

10  Q   And in one of those recent meetings, you admitted to the

11  government that you did not divulge everything right away?

12  A   Correct.

13  Q   And that you did immoral, I believe was the word, things as

14  part of your employment?

15  A   Yes.

16  Q   Okay.  Fair to say that you downplayed your transgressions,

17  involving your own fraud, at least, the first time you spoke

18  with Ms. Palmer?

19  A   I don't know if that's fair to say.  I was focused on the

20  questions that the agents were asking me, regarding the Tews,

21  and this conspiracy, that was a ridiculous amount more than my

22  own conspiracy, that had taken up the majority of my -- my

23  thinking, majority of the questions were about the Tews, about

24  the companies that were involved.  When I was eventually asked

25  about my own conspiracy --

JONATHAN YIOULOS - Cross

1    Q    Let me stop you right there.

2    A    Yep.

3    Q    Try to answer my questions, all right?

4    A    Okay.

5    Q    You didn't tell Ms. Palmer, or her colleague with the FBI,

6    on July 7th, that you had stolen money from NAC before 2018?

7    A    No, I did not.

8    Q    Let's come back to that.  The whole day, July 7th, 2020,

9    you walk out of your now former office at NAC, carrying your

10   personal belongings?

11   A    Correct.

12   Q    You are -- I believe, you testified, immediately confronted

13   by two agent-looking people?

14   A    Yes.

15   Q    Did you understand that you were being recorded?

16   A    At that time?

17   Q    Or that they were recording you?

18   A    I under -- at that time, no.

19   Q    Were you instructed by them, for your protection and

20   theirs, they were recording?

21   A    I don't remember.

22   Q    Okay.  Would it help refresh your recollection to see a

23   transcript of that day?

24   A    Yes.

25          MR. SCHALL:  Your Honor, if I may approach?

JONATHAN YIOULOS - Cross

1          *THE COURT:*  You can give it to Mr. Keech, please.

2          Q    (By Mr. Schall) Mr. Yioulos, on the bottom of the

3   first page there's a number that starts with INV.  I think it's

4   INV00008612; is that right?

5   A    Correct.

6   Q    Take a look at that document, see if it helps refresh your

7   recollection.  There's a lot there.

8   A    Okay.

9   Q    Okay.  Is that familiar to you?

10  A    Yes.

11  Q    Was your interaction with the IRS and FBI starting that

12  morning, outside your former employer, being recorded?

13  A    Yes.

14  Q    And we heard, earlier, minutes ago, that that day you made

15  a consensually monitored phone call with Mr. Michael Tew?

16  A    Correct.

17  Q    And you were aware that was being recorded?

18  A    Correct.

19  Q    Tell me about that recording process?  What happened?  How

20  did you know it was being recorded?

21  A    The agents told me it was going to be recorded.

22  Q    They take out a separate recorder or anything?

23  A    I don't remember the specifics.

24  Q    Okay.  Do you remember any recording devices present?

25  A    Again, I don't remember the specifics.

JONATHAN YIOULOS - Cross

1    Q   Okay.  Do you remember going to your car to make the

2    recorded call with Michael Tew, to utilize the Bluetooth

3    speaker in your car?

4    A   Yes, I do.

5    Q   Okay.  So you -- why would you do that?

6    A   I, at the time I wanted them him to believe that I was

7    driving into work, so being on a Bluetooth would make it seem

8    like I was in the car.

9    Q   Were you instructed, so that both sides of the call could

10   be recorded and heard?

11   A   I don't remember those instructions.

12   Q   You heard, earlier, you probably heard it a thousand times,

13   what I will call the first recorded call with Michael Tew?

14   A   Yes.

15   Q   Do you recall at the end of that recording where Special

16   Agent Luke Humphrey says, *This is the end of the recording*?

17   A   Yes, I do.

18   Q   And do you recall that that was at 1:18 PM?

19   A   Yes.

20   Q   What time in the morning did you leave NAC as a former

21   employee?

22   A   Prior to that, not too -- prior to that, I'm not sure the

23   exact time I walked out of the building.

24   Q   What time do you normally get to work?

25   A   Between 8 and 8:30.

JONATHAN YIOULOS – Cross

1   Q   And how long did it take to collect your belongings and get

2   out?

3   A   The whole process probably took about 15 minutes.  So

4   probably somewhere around 9 AM.

5   Q   So 9 AM to the end that call, 1:18 PM, is, trust my math,

6   four hours, 18 minutes?

7   A   Just about.

8   Q   Were you with the IRS and the FBI this whole time?

9   A   I was with the IRS and FBI the entire time.  Yes.

10          MR. SCHALL:  Your Honor, may I have just a second?

11          THE COURT:  Yes.

12          MR. SCHALL:  Your Honor, may we approach on an issue?

13      (At the bench:)

14          MR. SCHALL:  Your Honor, it's been my understanding

15  that the recording made by the IRS and FBI, on July 7th, 2020,

16  was a continuous recording starting when Mr. Yioulos was first

17  introduced by agents, continuing till all of his interview.

18  His recorded call of Mr. Tew, which we heard, and then some

19  afterwards.  And Mr. Tew would like to admit that five-hour

20  recording, a part of which the government has already admitted.

21          THE COURT:  What do you mean, *You would like to admit*

22  *it*?

23          MR. SCHALL:  Well, I would like it to be an exhibit,

24  introduced into evidence, such that it can be used, played in

25  closing.  I don't intend to play four hours, God forbid, right

JONATHAN YIOULOS - Cross

1    now.  I'm not going to play any of it, but I think it's

2    something that should be in evidence for the jury to consider.

3    If Mr. Yioulos has talked at length about how he was coming

4    clean, and this is his entire interview, he talked at length

5    about how he was not instructed by agents about what to say,

6    and in that interview there is a lot of instruction that

7    occurs, and it's certainly impeachment evidence as to him, but

8    it also completes the recording that the government introduced.

9         THE COURT:  I will let the government respond, I

10   guess.

11        MR. FIELDS:  There's no rule of -- he hasn't cited a

12   rule of evidence that will allow it to be admitted.  It's not

13   in furtherance of the conspiracy.  It's not a codefendant

14   statement.

15        THE COURT:  Well, it's a recording of his interview,

16   that you played part of.

17        MR. SCHALL:  That's the same Federal Rule of Evidence

18   106.

19        MR. FIELDS:  Your Honor, Rule 106, just like all of

20   the other rules of evidence, still would bar the admission of

21   the rest of that.  Yioulos' statements to the agents are not in

22   furtherance of the conspiracy.  They are not a codefendant

23   statement.

24        MR. SCHALL:  They are a confession of a party

25   opponent.

JONATHAN YIOULOS - Cross

1          MR. FIELDS:  They are not a confession of a party

2    opponent.

3          MR. SCHALL:  It is not a confession?

4          MR. FIELDS:  Could you please, I'm sorry.  The

5    statements by Yioulos, to the agents, are not in furtherance.

6    He is not a defendant in this trial, so they are not admissible

7    in 801.

8          THE COURT:  He is a defendant in this case.

9          MR. FIELDS:  Correct.  But the rules, specifically,

10   actually talks about --

11         THE COURT:  The trial.

12         MR. FIELDS:  Exactly.  And I think it's Rule 612, sort

13   of bar extrinsic evidence of these inconsistent statements.

14   The rules themselves are actually really clear on this.  He can

15   certainly use it for impeachment.  He can ask him if there's

16   inconsistency.  He can play it.  That's how the recording

17   should be used.  Reading the entirety of the recording is not

18   allowed under the rules.  He hasn't cited a rule of evidence

19   that would allow it.

20         Rule 106, you know, playing the entire statement, so I

21   would say it's actually, sort of, a statement-by-statement

22   basis, and the portion of the record that's been admitted was

23   admissible under these other rules of evidence, very clearly.

24   The other portions are not.  And so, you know, Rule 106, all of

25   the other rules taken into consideration there's no reason that

JONATHAN YIOULOS - Cross

1    the rest of the recording should be admitted.

2    THE COURT:  For now I think the only basis I hear,

3    probably, is 106, and I don't know enough yet about the rest to

4    know whether fairness requires it.  I think everybody seems to

5    agree, use it for impeachment, those portions, and you are

6    going to have to make more of a showing for the rest of it, but

7    you can continue to pull more out, and what all comes out of it

8    I will consider it again.  But for now, I'm not going to enter

9    the whole thing.

10   MR. SCHALL:  Clarification on two things, just to get

11   this out there.  There's no objection to playing portions of

12   it?

13   MR. FIELDS:  For impeachment, no.  I think that's

14   perfectly appropriate.

15   MR. SCHALL:  And, at which point the Court is going to

16   consider admitting it, the whole thing, I would ask that we

17   have a ruling from the Court about whether or not the admission

18   of the entire interview with Mr. Yioulos opens the door to

19   proffer stuff.

20   THE COURT:  Yeah.  So, I mean, I think that's a good

21   point.  I want to think that through, and if I have to ... I

22   have to think through and listen to the whole thing, I will,

23   but that will be for the Court to do today.  Okay.  So proceed,

24   on the more limited basis for now.

25   MR. SCHALL:  Thank you, Your Honor.

JONATHAN YIOULOS – Cross

1          (In open court).

2          *MR. SCHALL:* May I proceed, Your Honor?

3          *THE COURT:* Yes.

4   *Q*   Back to the beginning of your interview with the IRS and

5   the FBI.

6   *A*   Okay.

7   *Q*   Do you remember a conversation with them where you were

8   considering having an attorney present?

9   *A*   Yes.

10  *Q*   And did you eventually decide not to have an attorney

11  present?

12  *A*   Correct.

13  *Q*   And do you remember Ms. Palmer telling you that she was

14  from the Denver office?

15  *A*   I do.

16  *Q*   And do you remember that she told you that she was going to

17  have to go back to the Denver office?

18  *A*   Yes.

19  *Q*   And do you remember her saying that, *The window for you to*

20  *help yourself here is somewhat short?*

21  *A*   Yes.

22  *Q*   Do you recall when she said that, *The first one to talk to*

23  *us is going to get the best deal?*

24  *A*   I don't remember that, no.

25  *Q*   If you could look at that document, in front of you, on

JONATHAN YIOULOS - Cross

1    what's marked as page 8618.  See if that refreshes your

2    recollection?

3    A    All right.  Okay.  Yes.

4    Q    Just so we're clear, you do now recall that Ms. Palmer told

5    you that, *The first one to talk to us is going to get the best*

6    *deal*?

7    A    Yes, I do.

8    Q    Okay.  Did you feel under pressure, at that time?

9    A    No.

10   Q    No.  Was this a negotiation of sorts?

11   A    I don't believe so, no.

12   Q    Okay.  You are a smart guy, degree -- do you have an

13   advanced degree, as well?

14   A    Yeah, I do?

15   Q    In accounting?

16   A    Yeah.

17   Q    A Masters?

18   A    Yes.

19   Q    So, negotiations aren't something foreign to you?

20   A    Correct.

21   Q    Okay.  And you wanted to get something out of this

22   interview with the IRS and FBI, other than just clearing your

23   conscience, right?

24   A    Yes.

25   Q    What was that?

JONATHAN YIOULOS - Cross

1    *A*   If -- I felt if I cooperated, and cleared my conscience,

2    also, you know, it would look more favorable when it came to my

3    actual sentencing, or a plea, or what -- whatever else it was.

4    *Q*   Taking it back, July 8th, 2020, circa 9-something in the

5    morning?

6    *A*   Yep.

7    *Q*   Did you want to do anything else, at that time, other than

8    clear your conscience?

9    *A*   I think I just told you I wanted to make sure that I

10   could -- if I could clear my conscience, as well as try to help

11   myself in the future, with regard to a plea or a sentencing or

12   whatever I could, however I could help the government, I would.

13   *Q*   Okay.  Well, you were still concerned about your own

14   circumstances?

15   *A*   Of course.

16   *Q*   Yeah.  And do you recall telling the agents, quote, *If you*

17   *can give me your word, that I'm not going to be arrested today,*

18   *I won't call an attorney*?

19   *A*   I don't remember saying that.

20   *Q*   Okay.  Would it refresh your recollection to look at page

21   8624?

22   *A*   Yes.

23   *Q*   Thank you.

24   *A*   Okay.

25   *Q*   Do you now recall telling Agent Palmer, *If you can give me*

1    *your word that I'm not going to be arrested today, I won't call*

2    *an attorney?*

3    A    Yes.

4    Q    Would you call that a negotiation?

5    A    Well, I mean, I wouldn't call it a negotiation because --

6    Q    Okay.

7    A    I -- afterwards they said they also didn't have an arrest

8    warrant for me.

9    Q    But -- but there's a lot afterwards?

10   A    Okay.

11   Q    When you said that statement?

12   A    Yeah.

13   Q    What were you hoping to achieve?

14   A    That I get to go home at the end of the day.

15   Q    So, you did have something, in terms of a goal, other than

16   clearing your conscience?

17   A    Yes.

18   Q    You were not turning yourself in that day?

19   A    Correct.

20   Q    In fact, you were starting to broker a deal in your own

21   self-interest?

22   A    Yes.

23   Q    Not just for what occurred between 2018 and 2020, allegedly

24   with Michael and Kimberley Tew, but also any other

25   transactions, any other thefts that occurred on your duty with

JONATHAN YIOULOS - Cross

1  National; is that right?

2  A    Again, I was focused on the Tews.  I wasn't even thinking

3  about the other transactions.

4  Q    We're going to think about them today, all right?

5  A    Okay.

6  Q    All right.  You were the comptroller when you were

7  targeted; is that right?

8  A    Correct.

9  Q    Would you agree with me -- I'm not an accountant, I'm a

10 lawyer.  But would you agree with me, if I offered to you that

11 the definition of a comptroller is a management-level position

12 responsible for supervising the quality of accounting and

13 financial reporting of an organization?

14 A    Yes.

15 Q    That was your job?

16 A    Yes.

17 Q    We will get back to that.  You talked to agents, between,

18 roughly, 9:15 and 1 o'clock or whatever, as we discussed

19 earlier, right?

20 A    Yes.

21 Q    And how would you summarize those three hours?  What

22 happened?  Tell the ladies and gentlemen of the jury what you

23 did for those three hours?

24 A    Sat on a bench for a little while.  I started to talk more

25 about the conspiracy, the companies that were involved.  Tried

JONATHAN YIOULOS - Cross

1   to give them some details about, essentially, it was both --

2   that I thought it was both Michael and Kimberley, involved in

3   it with me.

4   Q   Let me stop you there.

5   A   Yes.

6   Q   Did you talk about receiving threats or concerns about

7   extortion from Kimberley?

8   A   Yes.

9   Q   And did you say to agents, whenever it was a threat, it was

10  from Kimberley?

11  A   Yes.

12  Q   And whenever it was from Michael, it was excuse my French,

13  something more along the lines of, *We're fucked*?

14  A   Correct.

15  Q   Did you say to agents, *We're going to get screwed, if this*

16  *doesn't happen, and I think it was more along the lines of he,*

17  *Michael, was in a bad spot with Kimberley?*

18  A   Yes.

19  Q   Tell me what you understood *bad spot with Kimberley* to

20  mean?

21  A   So, throughout this conspiracy, I believe that behind the

22  scenes, when I say behind the scenes, more the Tew household, I

23  felt that Kimberley was the one --

24       *MR. KAPLAN:*  Your Honor, I'm going to object to

25  speculation.

JONATHAN YIOULOS - Cross

1      THE COURT:  No.  Overruled.  We're discussing his

2  statements.  Overruled.  Go ahead.

3      THE WITNESS:  I felt that Kimberley was the one who

4  was driving the need for funds in the Tew household.  You know,

5  just my -- my prior work with Michael, when he was the CFO at

6  National, I felt like Michael was a hardworking guy.  He would

7  stay up on countless hours.  He would be on the phone with

8  Dubai, be on the phone with Frankfurt, then be on the phone

9  with me, on US time.  He would stay up late with Chris.  I

10  mean, he did everything to really try to keep the company

11  afloat, as I did, at that time.  And when he initially said he

12  was in a jam, because somebody was holding them up, there was

13  an issue with this Craig individual.  My first response was,

14  how can I help, in a way, and as the conspiracy --

15  Q   Can I ask you a question about that?

16  A   Yes.

17  Q   Was it your response, your intent, how can you help

18  Michael?

19  A   It was how can I help -- yes.  How can I help Michael.

20  Q   Okay.  Because you, even early on, 2018, 2019, you

21  understood that the -- that he was in a bad spot with

22  Kimberley?

23  A   Yes.

24  Q   Let's just call it what it is, was that a -- was Michael

25  ... do you believe he was being told what to do?

 1          MR. KAPLAN:  Objection, speculation.

 2          THE COURT:  Sustained.

 3      Q    (By Mr. Schall) What do you know, based on your

 4   personal knowledge, about the relationship between Michael and

 5   Kimberley Tew

 6   A    In regards to what, exactly?

 7   Q    Let's break that down, all right?

 8   A    Okay.

 9   Q    The -- the *being in a bad spot*, the trouble?

10   A    Okay.

11   Q    Was -- did you understand the trouble to mean people trying

12   to take money?  Get money out of them?

13   A    Yes.

14   Q    Did you understand that to mean people trying to get money

15   out of Michael, specifically?

16   A    I understood it as they were people that Kimberley had

17   dealt with.  I wasn't sure of Michael's relationship to them.

18   Wasn't hundred percent sure.  But for the majority of the time,

19   Michael was the one who would be asking for funds, and I wasn't

20   sure if that was just to cover up Kimberley and her issues, or

21   if the funds were really going to their household.

22   Q    Tell me -- look, tell me about Kimberley's issues.  What do

23   you know?

24   A    All I knew is that she was apparently involved with some

25   bad people online, that she was involved with cryptocurrency.

JONATHAN YIOULOS - Cross

1    She would trade -- buy and sell cryptocurrency, that she had

2    gambling issues, and these are all things that I found out from

3    Michael initially.  Kimberley then confirmed that she did

4    gamble money, and she did have issues with these people, and

5    that Michael wasn't -- this wasn't Michael's fault.  She would

6    always say it's her fault, that these things were happening to

7    us.

8    Q   Is it fair to say, Mr. Yioulos, that Kimberley had an

9    outsized influence on things that happened?

10   A   Yes.

11   Q   Do you recall telling agents, on July 7th, 2020, that,

12   quote, *It's almost like this one woman had us both by the*

13   *balls, and we were kind of -- we were both kind of helpless*?

14   A   Yes.

15   Q   What did you mean?

16   A   Once -- once the conspiracy started and Michael was

17   eventually terminated, and as soon as he was terminated I, you

18   know, continued to send funds, now that he is not the CFO of

19   National anymore, now I'm even more involved in this conspiracy

20   where he is not -- he is not even a supervisor who is telling

21   me to send money out.  He is just a former employee.  And I

22   felt like if I tried to do anything, like go to the authorities

23   or anything of that nature, I felt like I was in so deep that I

24   was still going to get myself in trouble, and that behind the

25   scenes the only person who really wanted money to go out still,

JONATHAN YIOULOS - Cross

1    was Kimberley.

2    Q    You said on Direct, I believe ... that you tried to get

3    this to stop for you and Michael?

4    A    Yes.

5    Q    When did that -- when did you try to get it to stop?

6    A    Countless times.

7    Q    And what was the impediment to that?

8    A    I would always be asked for more.

9    Q    Was Kimberley the impediment to that?

10   A    That I can't confirm.

11   Q    You said, based on your personal knowledge, that you

12   believed Michael wanted it to stop?

13   A    I believe he wanted it to stop, eventually, but as

14   things -- as he was unemployed, and looking for more work, as

15   well, there were several times where he said, *Hey, bud, I also*

16   *need money*.

17   Q    Do you recall telling agents that -- and you talking to

18   Michael here, *I would tell him, like, this is so fucked up like*

19   *what -- what you are doing and he knew it and on the other end*

20   *of the line you could always hear him*.  What do you mean by

21   that?

22   A    Hear him?

23   Q    You said -- do you recall saying that statement, first of

24   all?

25   A    If you could refresh my memory?

JONATHAN YIOULOS - Cross

1    Q    Sure, page 8632.

2    A    Okay.

3    Q    So, did that refresh your recollection?

4    A    Yes.

5    Q    Okay.  And you would tell him, *This is all so fucked up*?

6    A    Yes.

7    Q    And what you meant by that is -- what did you mean by that?

8    A    The whole conspiracy was fucked up.

9    Q    Okay.  Let me pause you right there.  In 2020, July 7th,

10   2020, in your normal life, did you use the word conspiracy?

11   A    In regards to what?

12   Q    Did the word conspiracy come out of your mouth, often, in

13   the year 2020?

14   A    No.

15   Q    Do you think you used the word conspiracy one time over the

16   course of your five-hour day with the IRS on July 7th, 2020?

17   A    I could not tell you whether I did or not.

18   Q    If you reviewed that whole transcript, which could you

19   estimate -- or hold it up for the jury, to show them how thick

20   it is.  I feel confident no one wants you to sit here and read

21   that, but if you did, would you be able to confirm how many

22   times you used the word conspiracy that day?

23   A    I would.

24   Q    Do you think it would be zero times?

25   A    I couldn't tell you that.

JONATHAN YIOULOS - Cross

1   Q   Okay.  Right after -- well, you said you would talk to

2   Michael about how it was fucked up?

3   A   Yep.

4   Q   And you said to the IRS, he knew it?

5   A   Yes.

6   Q   He knew that it was fucked up?

7   A   Yes.  He knew that the whole -- the whole situation with

8   taking money, funds from National, sending money to his bank

9   accounts, to other people, the entire thing, as a whole, that

10  is the totally messed up part about this.

11  Q   Immediately, after you say to the agents, *That he knew it.*

12  *On the other end of the line you could hear him*.  Do you recall

13  telling agents that, quote, *Some of the time it's not always,*

14  *but 50 percent of the time, you could hear his wife Kimberley*

15  *in the background screaming at him at the top of her lungs*?

16  A   Yes.

17  Q   Fifty percent of the time you were on the phone with

18  Michael, Ms. Tew was present?

19  A   Not -- I wouldn't say 50 percent of the time.  I would say

20  I think that was a bit of an exaggeration.  It was probably

21  closer to -- because we would talk often, but when -- we would

22  text often, but when we did have phone calls and there was a

23  request for money, especially when I would not send it, I would

24  say that 50 percent of that time, when there was a request for

25  money and I refused or gave some sort of problem, yes, she was

JONATHAN YIOULOS - Cross

1    in the background.

2    Q    And it was those times, when you refused or kicked the can

3    down the road, if you will, that Kimberley made herself

4    present?

5    A    That is correct.

6    Q    And she would do this sometimes in the background of your

7    call with Michael?

8    A    Correct.

9    Q    And she would also do this through direct texts to you?

10   A    Correct.

11   Q    And we saw some of those texts earlier?

12   A    Yes.

13   Q    Vulgar?

14   A    Yes.

15   Q    All capital letters?

16   A    Yes.

17   Q    Well, let me ... what does -- when someone texts -- when

18   you text or receive a text in all capital letters, what does

19   that mean to you?

20   A    It means the tone is more of a shout.

21   Q    Screaming, right?

22   A    Yes.

23   Q    Somebody is agitated?

24   A    Correct.

25   Q    Was -- when you denied a payment or wouldn't send money on

JONATHAN YIOULOS - Cross

1    the requested timeframe, did that -- was ... was Kimberley

2    agitated?

3    A    Yes.

4    Q    To the point of, at times, you had to block her phone

5    number?

6    A    Yes.

7    Q    Did that solve the problem?

8    A    No.

9    Q    What happened?

10   A    Depended on the situation.

11   Q    Okay.  Did she -- do you believe she got other phone

12   numbers to contact you from?

13   A    That was one of the methods, that was one of the avenues

14   that she would use.

15   Q    So you couldn't get Kimberley out of your life?

16   A    Correct.

17   Q    Even though you told Michael, *Dude, stop*?

18   A    Yes.

19   Q    Did Michael -- in your experience and knowledge of Michael,

20   did he have the ability to make Kimberley stop?

21   A    No.

22   Q    When you were speaking with agents that day, on the 7th of

23   July, did you tell them, quote, *Truthfully, I think it's*

24   *Kimberley's drive to do all of this*?

25   A    Possibly.

JONATHAN YIOULOS - Cross

1   Q    Would it refresh your recollection to look at page 8634?

2   A    Sure.  Yes.

3   Q    Okay.  Did you tell them, *Truthfully I think Kimberley --*

4   *it's Kimberley's drive to do all of this*?

5   A    Yes.

6   Q    And that, quote, *I think Kimberley has issues with her*

7   *thinking that she can make more money by buying high, selling*

8   *low, buying Bitcoin on margin*?

9   A    Yes.

10  Q    Did you tell them, *Doing whatever she needs to do*?

11  A    Yes.

12  Q    And, *I think she gambles*?

13  A    Yes.

14  Q    *I think she gambles the fuck out of his money*?

15  A    Yes.

16  Q    And did you say, *I truly think she loses it all too*?

17  A    Yes.

18  Q    You have testified that, approximately, $5 million went out

19  the door from National, as part of this agreement?

20  A    Yes.

21  Q    Do you know or have reason to believe that Ms. Tew had a

22  gambling problem?

23  A    I do.

24  Q    What was -- what was your basis?  How do you know that?

25  A    One, through conversations with Michael; and then two,

JONATHAN YIOULOS - Cross

1    Kimberley also telling me, herself.

2    Q    Okay.  Did -- were you, at all, social friends with

3    Michael?

4    A    We would talk.  I think it was more of a -- we were

5    definitely social friends, prior to him being terminated, and

6    afterwards it was a really messed up type of friendly

7    relationship, where we just tried to keep things cordial.

8    Q    But even though you worked for the same company, you

9    weren't in the same cities?

10   A    No.

11   Q    You were not in the same office?

12   A    No.

13   Q    No watercooler talk, *What did you do this weekend*?

14   A    We would still talk about that, but not at the watercooler.

15   Q    Okay.  Do you know or have reason to believe Michael and

16   Kimberley would go to casinos or Las Vegas?

17   A    Yes.

18   Q    How did you know that?

19   A    I had heard that from a colleague at the bank.

20   Q    Do you know if Michael gambles?

21   A    No.

22   Q    Did he tell you that he didn't gamble?

23   A    I don't remember.

24   Q    Okay.  Did you tell Ms. Palmer, on that day that, quote, *I*

25   *truly believe that he wanted to make this -- he wanted this to*

JONATHAN YIOULOS - Cross

1   *go away as much as I did*?

2   A    Yes.

3   Q    *He wanted this to end.  He didn't want this to continue*?

4   A    Yes.

5   Q    And were you being truthful with agents that day?

6   A    I was.

7   Q    And the *he* there, is talking about Michael Tew?

8   A    That's correct.

9   Q    Okay.  I'm going to ask you a little bit more.  It's going

10  to be on page 8637, but tell me if you remember it before you

11  look.

12  A    Okay.

13  Q    Did you tell agents, *So, that's the truth of the matter.*

14  *Like, I truly believe that.  I think that the real driver of*

15  *all of this was Kimberley, and that's just my opinion, whether*

16  *or not it's a fact or not, I'm just -- that's how -- that's the*

17  *vibe I got throughout all of this*.  Do you recall saying that?

18  A    Yes.

19  Q    And did you believe it to be true, at that time?

20  A    Yes.

21  Q    Okay.  And after you said that to agents, do you recall

22  saying that, *Michael was not doing this for his benefit at all*?

23  A    I don't remember saying that.

24  Q    Would it refresh your recollection to look at page 8637?

25  A    Sure.

JONATHAN YIOULOS - Cross

1   A    Yes, I see it.

2   Q    Okay.  And just for the record, do you now recall telling

3   agents that, *Michael was not doing this for his benefit at all*?

4   A    Yes.

5   Q    And you remember being truthful with agents that day?

6   A    Yes.

7   Q    Did you know, at that time, that it's a federal offense to

8   lie to a federal agent?

9   A    Yes.

10  Q    It's in the news, everybody kind of thinks that, right?

11  A    Yeah.

12  Q    Okay.  All of this discussion occurred well before you

13  made -- agreed and made a consensual, recorded call to Michael

14  Tew?

15  A    Okay.  Yes.

16  Q    Prior to your call to Michael Tew, did you discuss, with

17  agents, how the sausage would be made?

18  A    Yes.

19  Q    What did you -- what did you discuss?

20  A    Michael would typically see if I can get anything out

21  today, and I would say things like, *How much* or *Again*, and I

22  would question it, and then he would give me a dollar amount.

23  I would see if that was a feasible thing to do that, or if he

24  said he needed it in a couple days, I would tend to look at the

25  forecast of the funds coming in, and he would either send me an

JONATHAN YIOULOS - Cross

1    invoice that day, related to one of the various companies that

2    we used, or I would get an invoice later down the line, that

3    was either the sum of a few separate ACHs or just one ACH.

4    Q   So you -- you gave the agents kind of the play-by-play, and

5    worked with them on how to make it a successful consensual

6    recorded call?

7    A   That's correct.

8    Q   And fast forward to the next day, when you did it again.

9    Prior to that second call, do you recall agents telling you

10   that they were very pleased with your first call?

11   A   Yes.

12   Q   And do you recall them telling you that the -- that their

13   prosecutor told them they were happy about the call?

14   A   Yes.

15   Q   Okay.

16        MR. SCHALL:   Your Honor, may I approach the witness?

17        THE COURT:   Just give it to Mr. Keech, if you would.

18        THE WITNESS:   Thank you.

19   Q   I have just -- or, Mr. Keech has just handed you what's

20   been admitted as Government's Exhibit 527.   Do you know what

21   that document is?

22   A   Yeah this is my Plea Agreement.

23   Q   Okay.   Same Plea Agreement, there's only one for you, in

24   this case?

25   A   Correct.

JONATHAN YIOULOS - Cross

1    Q    One you talked with Mr. Fields about two days ago?

2    A    Correct.

3    Q    Does it look to be a complete copy of the actual exhibit,

4    everything is there?

5    A    Yeah.

6    Q    Got your signature page on the end?

7    A    Yes.

8    Q    We're going to talk more about this in a little bit ...

9    probably after lunch, but for now, will you please turn to the

10   page in your Plea Agreement that said *Michael didn't want this*

11   *to continue*?

12   A    Where would that be in my Plea Agreement?

13   Q    You tell me.  Is it not in your Plea Agreement?

14   A    No.

15   Q    Okay.  Please turn to page -- in your Plea Agreement where

16   it says that*, Kimberley had us both by the balls*?

17   A    Again, not in the Plea Agreement.

18   Q    Why not?

19   A    That ... wouldn't be in a standard Plea Agreement, I

20   believe.

21   Q    You didn't draft that Plea Agreement?

22   A    I did not.

23   Q    Let's not belabor the point, but would you please turn, in

24   the Plea Agreement, to where it says, *Kimberley Tew gambles the*

25   *fuck out of his money and loses it all too*?

JONATHAN YIOULOS – Cross

1    *A*   It's not in the Plea Agreement.

2          *MR. SCHALL:*  We'll get back to that in a moment.

3    Your Honor, this is probably a good break point.  I don't mean

4    to impose upon the Court.

5          *THE COURT:*  Well, I would let you go a little bit

6    longer, but if this is a good break point, it's fine with me,

7    and we can just take a recess until 1 PM, if that's all right.

8          *MR. SCHALL:*  I don't mind going longer.

9          *THE COURT:*  It's fine.  Let's just break from now

10   until 1.  Again, all of my previous instructions to the jury

11   remain in place.  So we will be in recess until 1 PM.

12         *THE COURTROOM DEPUTY:*  All rise.

13      (Jury out at 12:00 p.m.)

14         *THE COURTROOM DEPUTY:*  Court is now in recess.

15      (Recess at 12:00 p.m.)

16      (In open court at 1:05 p.m.)

17         *THE COURT:*  Good afternoon.  Please take your seats.

18   Can we go ahead and bring the jury in, I believe?

19         *THE COURTROOM DEPUTY:*  All rise.

20      (Jury in at 1:06 p.m.)

21         *THE COURT:*  All right.  Let's all take our seats.

22   Welcome back.  Mr. Schall was in the midst of

23   Cross-examination.  You may begin again.

24         *MR. SCHALL:*  Thank you, Your Honor.

25

JONATHAN YIOULOS - Cross

1    *BY MR. SCHALL:*

2    Q   Mr. Yioulos, would you be surprised to learn that that

3    transcript in front of you also exists in an electronic PDF

4    form?

5    A   I would not be surprised.

6    Q   And would you believe me if I told you that over the break

7    I did a control-F search for the word conspiracy in that

8    150-plus page document.  There were no responses for that word?

9    A   I would believe you.

10   Q   I want to go through some of the government's exhibits that

11   you have been through before.  If something doesn't look

12   familiar or whatnot, tell me, okay?

13   A   Okay.

14          MR. SCHALL:  Ms. Rodriquez, if you could pull up

15   Government's Exhibit 605.  For all of these that have all green

16   and white text format, can you zoom in on the message body and

17   date and time?  Thank you very much.  Even less than that.

18   Like the left half of that.

19   Q   Okay.  While she does that, would you agree with me that

20   Kimberley Tew was omnipresent in Michael's life, in your

21   interactions with him?

22   A   Yes.

23   Q   And you didn't know Michael to have a gambling problem, did

24   he?

25   A   I did not.

JONATHAN YIOULOS - Cross

1    Q    Is it fair to say that Michael had a Kimberley problem?

2              MR. KAPLAN:  Objection, Your Honor.

3              THE COURT:  Overruled.

4              THE WITNESS:  Yes.

5    Q    All right.  Let's look at this text for me, if you would.

6    Government's Exhibit 605.  Do you remember that one?

7    A    Yes.

8    Q    Is it up there before you?

9    A    Yes, it is.

10   Q    Michael, in green.  You had just asked him about returning

11   the Bitcoin?

12   A    Correct.

13   Q    And Michael says, *Checking, BRB*.  Is that right?

14   A    Correct.

15   Q    You know what BRB stands for?

16   A    Be right back.

17   Q    Be right back.  Okay.  Why would he have to check, if you

18   know?

19   A    Because I had originally sent the Bitcoin to an address

20   that he had instructed me to, but it was a Bitcoin -- Kimberley

21   dealt mostly with the cryptocurrency side of things.

22   Q    Okay.  We're now going to pull up Government's Exhibit 975.

23   That was the second recorded call from July the 8th.  Do you

24   remember hearing that earlier?

25   A    Yes, I do.

JONATHAN YIOULOS – Cross

1  Q   Do you recall asking Michael how $5 million just

2  disappeared?

3  A   Yes.

4  Q   And you, yourself, were, my word, a little apoplectic about

5  how $5 million disappeared?

6  A   Of course.

7  Q   And Michael says, *I wish I had it.  I would have a fucking*

8  *mansion*?

9  A   Yes.

10  Q   Do you remember that?

11  A   Of course.

12  Q   Do you believe Michael got anything to the tune of $5

13  million out of the this?

14  A   Not to the tune of $5 million, no.

15  Q   Did he sound to you, when that call was made, or when you

16  heard it in court, genuinely surprised the amount was near $5

17  million?

18  A   He definitely seemed surprised.  Yes.

19  Q   Is Michael one of these guys that works really hard?

20  A   Yes.

21  Q   And puts his head down and gets a task accomplished?

22  A   Yes.

23  Q   And in almost the stereotypical New York/Wall Street kind

24  of way?

25  A   Haven't dealt with too many New York/Wall Street type of

JONATHAN YIOULOS - Cross

1    individuals.

2    Q   Fair, fair.  But he is somebody that puts his head down and

3    does the work?

4    A   Correct.

5    Q   And would it be fair to say, in your experience with him,

6    he can be fairly oblivious to things going on around him?

7    A   No.

8    Q   Would he be -- you agreed that he seemed surprised by the

9    $5 million amount?

10   A   Yes.

11   Q   Would it -- you're a numbers guy?

12   A   Yes.

13   Q   CPA?

14   A   Yes.

15   Q   And throughout the text you have seen you repeatedly

16   saying, *It's up to 150.  It's up to 650.*  The numbers kept

17   growing?

18   A   Yep.

19   Q   Did Michael ever engage in those conversations in a way

20   that showed you he understood the amounts were skyrocketing?

21   A   Yes.

22   Q   Did he disappear into his work?

23   A   Occasionally.

24   Q   Okay.  So, that recorded call, there's a moment where the

25   phone appears to be muted?

JONATHAN YIOULOS - Cross

1   *A*    Yes.

2   *Q*    Do you remember that?

3   *A*    Yes.

4   *Q*    What happens after that?

5   *A*    He came back to the phone, with a question that Kimberley

6   had asked him.

7   *Q*    Did that surprise you?

8   *A*    No.

9   *Q*    Was that common?

10  *A*    Yes.

11  *Q*    Now, he said on the call, *Sorry.  Just a question from*

12  *Kimberley*?

13  *A*    Yes.

14  *Q*    And, at that point, July 7th, 2020, you and Kimberley

15  weren't -- you didn't want to talk to Kimberley, right?

16  *A*    Correct.

17  *Q*    Okay.  Later in that call, Michael says to you that, *It*

18  *turned into my problem, because I'm married to her*; is that

19  right?

20  *A*    Yes.

21       MR. SCHALL:  If we could pull up Government's Exhibit

22  707.  And then I want to address -- maybe it's on the second

23  page.  Yes.  Zoom in on the writing, please, if you would.  If

24  you could go to the prior page?  I want to make sure I have the

25  right one.

411

JONATHAN YIOULOS - Cross

1   Q   Do you recall telling Michael that you're the one taking

2   all of the risk?

3   A   Yes.

4   Q   Did you feel that way?

5   A   Partially, yes.

6   Q   Tell me why?

7   A   Because I was the one who was actually sending the money,

8   pressing the button, per se.  When I say pressing the button, I

9   mean on the signature website.  I felt like I was the one who

10  was most responsible, in a way, for sending the money.

11  Q   And you were the comptroller?

12  A   The comptroller.

13  Q   You were at the controls, literally.

14  A   Yes.

15          MR. SCHALL:  If you pull up 865, which I will submit

16  to you is a text message conversation.  And then start at the

17  top, please, Ms. Rodriguez.

18  Q   All right.  You are going to remember this one.  Take a

19  look at it.

20  A   Yep.

21  Q   You have testified that Mrs. Tew was often in the

22  background of calls that you had with Michael?

23  A   Correct.

24  Q   Even on occasion, you testified on Direct, that she would

25  take over his phone and communicate with you directly?

JONATHAN YIOULOS - Cross

1    *A*    Yes.

2    *Q*    And you knew that based on?

3    *A*    Context.

4    *Q*    And maybe even she said it was her?

5    *A*    Correct.

6    *Q*    Is that what happened here?

7    *A*    Yes, that's what happened here.

8    *Q*    And, she's angry?

9    *A*    Yes.

10   *Q*    All caps?

11   *A*    Yes.

12   *Q*    And she's -- did you perceive this as a threat?

13   *A*    Yes.

14   *Q*    When she says*, I'm calling the fucking husband*.  What does

15   that mean to you?

16   *A*    So, this girl I was seeing, at the time, she didn't

17   actually have a husband.  This was in reference to this

18   individual though, one of her daughter's father's; this was who

19   she is in reference to calling.  In previous exhibits, there

20   was a reference the Erie County Sheriff's Department, that's

21   where he worked.  So this is who she is referring to.

22   *Q*    Was he in law enforcement?

23   *A*    Yes.

24   *Q*    Okay.  So, did you understand this threat to be, *I'm going*

25   *to call the cops?*

1    *A*    Yes.

2    *Q*    And it just happened to be the -- was ex-boyfriend or

3    ex-spouse.

4    *A*    Yes, ex-boyfriend.

5    *Q*    Of the woman you were dating?

6    *A*    Correct.

7    *Q*    And then she continues to yell at you?

8    *A*    Yes.

9    *Q*    Okay.  And is it fair to say, defending Michael, in a way?

10   *A*    Yes.

11   *Q*    Yeah.  This is September 2019.

12         *MR. SCHALL:*  Ms. Rodriguez, if you would give me the

13   dates on the left side, that would be ideal, along with the

14   body of the text message.

15   *Q*    What I think it says, and you can verify when you see it,

16   but as of September 2019, you say in response, I think, *LOL, I*

17   *have sent you 1.3 million already*?

18   *A*    Correct.

19   *Q*    So you -- you're an accountant and you knew, kind of, as

20   this went along, how the amounts were compounding?

21   *A*    Yes.

22   *Q*    Okay.  And it's ... right there, in the middle, in white;

23   is that right?

24   *A*    Correct.

25   *Q*    You said, *I think I'm entitled to get frustrated*?

JONATHAN YIOULOS – Cross

1    *A*    Yes.

2    *Q*    Is it fair to say this woman made you frustrated?

3    *A*    Yes.

4    *Q*    At the bottom it talks about the BTC.  Is she dangling that

5    BTC Bitcoin over your head?

6    *A*    Yes.

7          MR. SCHALL:  Okay.  There -- if you could zoom in to

8    the last batch of green messages, Ms. Rodriguez, on that page.

9    *Q*    And is it still Mrs. Tew talking in the text message that

10   says, *How do you think it feels to be in our shoes and have no*

11   *control*?

12   *A*    Yes.

13   *Q*    And *no control* is all caps?

14   *A*    Yes.

15   *Q*    Again, that's screaming language?

16   *A*    Yes.

17   *Q*    Do you have reason to believe that Mrs. Tew had control

18   issues?

19   *A*    Yes.

20   *Q*    Was she trying to be in control?

21   *A*    Yes.

22   *Q*    Did you ever hear Mrs. Tew go off on Michael, in a personal

23   way?

24   *A*    Yes.

25   *Q*    Do you recall anything, specifically, that she said?

JONATHAN YIOULOS - Cross

1    *A*    No.

2    *Q*    You know she yelled at him a lot?

3    *A*    Correct.

4    *Q*    Did she ever threaten to kick him out of the family?

5    *A*    I don't recall that.

6            *MR. SCHALL:*  Pull up 832, please.

7    *Q*    And as that populates, your relationship with Michael, you

8    have described at times as -- before these events -- as

9    friendly?

10   *A*    Correct.

11   *Q*    And then, my words, not yours, still friendly but weird,

12   because of what was going on?

13   *A*    Yes.

14           *MR. SCHALL:*  And the -- if you could pull up in large,

15   for me, the large text message, kind of in the middle for me,

16   please, Ms. Rodriguez.

17   *Q*    And you recognize this as part of your conversation with

18   Michael?

19   *A*    Yes.

20   *Q*    And does he say, all that's going on in his life, if you

21   will?

22   *A*    A bit, yes.

23   *Q*    Yeah.  Did Michael normally send paragraphs out in text

24   messages like this?

25   *A*    No.

JONATHAN YIOULOS - Cross

1  Q   No.  And he says in there, *I have undershot the mark a bit,*

2  *primarily because I just want to keep things between us*

3  *copasetic.*  Do you remember that?

4  A   I do.

5  Q   Did you interpret that as Michael wanting to keep things

6  between he and Jon copasetic or between Michael and Kimberley

7  copesetic?

8  A   Myself and Michael.

9  Q   Did it ever come up, their arguments with you?

10  A   Not often, no.

11  Q   No watercooler talk, if you will?

12  A   Not with that specific subject.

13  Q   You did talk with him about your relationships, though?

14  A   Yeah.

15  Q   Right.  And you, at this time, had either had recently or

16  finished or formalized a divorce; is that right?

17  A   Yeah.  In the beginning stages of a divorce, correct.

18  Q   So you were still married, at this time?

19  A   Yes.

20  Q   Okay.  And so, clarify for me, and the jury, you are still

21  married, at this time, but you are dating the woman who is

22  married to the Erie law enforcement officer?

23  A   So still married, agreed to go to mediation for the --

24  before getting a divorce to try to not have to get attorneys

25  involved really.  The cost of that.  Had not started,

JONATHAN YIOULOS - Cross

1   necessarily, dating this girl yet, but at least more or less

2   talking to her.

3   Q   No physical relationships, at that point?

4   A   Um ... at that point, yes, things had become physical.

5   Yes.

6          MR. SCHALL:  Okay.  Exhibit 715, please,

7   Ms. Rodriguez.

8          THE COURTROOM DEPUTY:  Your Honor, is this okay to

9   publish?  This is one of those demonstrative exhibits?

10          THE COURT:  Yes.  We can continue publishing it.

11          MR. SCHALL:  Okay.  Thank you, Your Honor.

12          MR. SCHALL:  In this one, let me find it for you, the

13   big gray one at the top, please, Ms. Rodriguez.  If you could

14   zoom in for us.

15   Q   This is you talking; is that right?

16   A   Yes.

17   Q   And this is you, my word, offering Michael a solution?

18   A   This was myself talking to Kimberley.

19   Q   Is this Kimberley?

20   A   Yes.

21   Q   Okay.  And this is -- this is you saying what you perceive

22   to be a solution on the accounting issues caused by the ACHs

23   and wires that went out?

24   A   Not necessarily.  This had a lot to do with the

25   individuals, themselves, who, like the Michael Meyers, the

JONATHAN YIOULOS – Cross

1   Chris Rincons of the world, from an accounting standpoint, I

2   wanted an agreement, so yes with regard to that.  Those were

3   common issue, but this was more to make sure they didn't cause

4   anymore problems.

5   Q    So, this is more practical.  This is not part of the

6   cover-up idea?

7   A    Oh there's part of the cover-up idea in there, as well.

8   It's a combination of both.

9   Q    At one point, in a text, did Michael say to you, If you

10  recall, *I'm not stupid, and I am not greedy, this is not about*

11  *any of that*?

12  A    Yes.

13  Q    Is Michael stupid?

14  A    Depends.  I mean ... to expect myself, and as a part of

15  this ACH and sending money out of National, over $5 million

16  worth, Michael, Kimberley, myself, think we are all stupid for

17  that.

18  Q    When you paused there, were you about to say *as part of*

19  *this conspiracy*?

20  A    Yes.

21  Q    Why didn't you?

22  A    I just said *this*, instead.

23  Q    Is Michael greedy?

24  A    Yes.

25           MR. SCHALL:  Okay.  I want to talk to you about the

419
JONATHAN YIOULOS - Cross

1  text 717, please, Ms. Rodriguez.  We don't really need to see

2  it.

3  Q   But this is where you tell Michael, *Your wife is now*

4  *sending me emojis, calling me a rat, fucking brilliant*.  Do you

5  remember that?

6  A   I do.

7  Q   How did that make you feel?

8  A   Not great.

9  Q   Why?

10  A   Just another one of those interactions with Kimberley that

11  I had mentioned that were hostile, and it made me feel like she

12  thought I was, at that time, going behind her and Michael's

13  back, trying to do -- at least rat them in or I was going to

14  the authorities about them knowing, which I wasn't, so I didn't

15  like how that made me feel.

16  Q   It was -- was it as if Mrs. Tew was testing your loyalty?

17  A   Absolutely.

18  Q   And this is long before any Plea Agreement, arrest, any of

19  that?

20  A   Correct.

21        *MR. SCHALL:*  Um, 697, please, Ms. Rodriguez.

22  Q   Mr. Yioulos, are you a religious man?

23  A   Semi.

24  Q   Do you have a particular faith?

25  A   Both of my daughters go to a Catholic school.

420
JONATHAN YIOULOS - Cross

1  Q   But I'm just assuming, I don't know, is Yioulos a Greek

2  name?

3  A   It is.

4  Q   So, not Greek Orthodox, right or anything?

5  A   Well, I was baptized in a Greek Orthodox church, but I was

6  confirmed, actually, in the Roman Catholic church.

7          MR. SCHALL:  If you could zoom in on the time and

8  message body, please, Ms. Rodriguez.

9  Q   Let me find it for us.  In the middle, white text, you say,

10  *You wake up night constantly worried*?

11  A   Yes.

12  Q   Were you having a hard time sleeping?

13  A   Oh, absolutely.

14  Q   Was this -- this is fairly early December 2018?

15  A   Yes.

16  Q   So, at this point, had the amounts that you sent out

17  related to the Tews exceeded the amounts that you had taken

18  from the company, yourself?

19  A   Yes.

20          MR. SCHALL:  Okay.  That next message, underneath it,

21  nope sorry.  The big white message, at 8:41, on December 19th.

22  Q   Do you see that?

23  A   Yep.

24  Q   Do you see in there, where you say -- you are talking about

25  Abby Schwartz the other remind --

JONATHAN YIOULOS - Cross

1    A    She was the director of accounting.

2    Q    Was she your boss?

3    A    No.

4    Q    Kind of a peer?

5    A    Yes.

6    Q    Who also had a wire authorization with you?

7    A    Correct.

8    Q    Okay.  And in this message, in talking about Abby, and

9    tiptoeing around this shit, you say, *I'm praying to God she*

10   *doesn't ask too many questions*?

11   A    Hm-hm.  Yes.

12   Q    Was that meant literally, that you were praying about this

13   or is it you were being cute?

14   A    Just a figure of speech.  In that case, it was a figure of

15   speech.

16       MR. SCHALL:  Okay.  Thank you.  Six-fifty, please,

17   Ms. Rodriguez.  And if you could zoom in to the first large

18   green message at the top of the page.

19   Q    Back to the conversation you and Michael?

20   A    Yes.

21   Q    You recognize this up here?

22   A    I do.

23   Q    Fairly early October 2018?

24   A    Correct.

25   Q    Michael says to you, *My life is not a joke*.  Did he -- did

JONATHAN YIOULOS - Cross

1   you interpret this as him freaking out?

2   A   Not freaking out, no.

3   Q   How would you interpret this, at that time?  Not today,

4   sitting here?

5   A   Yeah.  No, at that time, this is him in response to my very

6   sarcastic, *This is a joke, right?*

7   Q   About the money?

8   A   About more money being asked for.

9   Q   Right.

10  A   So I say, *This is a joke, right?*  Like, as a question, but

11  more of, are you kidding me?

12  Q   And he responds very seriously?

13  A   Correct.

14  Q   Would it be fair to say, as you read it, here today, that

15  something is going on on his side of that conversation?

16  A   What do you mean by that?

17  Q   Is he animated?

18  A   This isn't -- in my opinion, this isn't animated, this is

19  him being more matter of fact, like, *My life is not a joke, but*

20  *I have become a joke.*  When I read that, that's more matter of

21  fact to me.

22  Q   And he says, *I have become a joke and things are out of my*

23  *control, because other people make choices that fuck me.*

24       MR. SCHALL:  Ms. Rodriguez, can you show us

25  Mr. Yioulos' response after that?

JONATHAN YIOULOS - Cross

1    Q    If you recall without seeing it?

2    A    I don't.

3    Q    Okay.  Give us a few more chunks.  Try to get a couple more

4    white messages in there, if you don't mind.

5    Q    This is where you respond, you can't do it?

6    A    Correct.

7    Q    And not necessarily this specific time, but in times like

8    it, when you would say this, you had come to expect an end

9    around, a message from Kimberley; is that right?

10   A    Yes.

11   Q    When you said no, Kimberley showed up to make you say yes?

12   A    Yes.

13   Q    Okay.  I want to go now --

14        MR. SCHALL:  Thank you.  You can take that down,

15   Ms. Rodriguez.  Thank you.

16   Q    -- and talk with you about your own transgressions at NAC?

17   A    Okay.

18   Q    Before -- before Michael was fired?

19   A    Okay.

20   Q    When he is the CFO still?

21   A    Yep.

22   Q    Did Michael know, when he was the CFO, that you were taking

23   money from NAC?

24   A    No, he did not.

25   Q    Okay.  On Direct Examination, you said you couldn't

JONATHAN YIOULOS - Cross

1  remember when you first stole money from National?

2  A    Correct.

3  Q    Did you not review or go over that stuff, in preparation

4  for your testimony?

5  A    I reviewed documents, but I couldn't remember the exact

6  date.  No.

7  Q    Okay.  But in all the times you have spent preparing for

8  this?

9  A    Hm-hm.

10  Q    You didn't look back at your own theft from National

11  before?

12  A    I looked at it when I was doing my Plea Agreement, because

13  it was part of my plea, but in preparing for this, no.

14  Q    Okay.  And you met with the government in preparation for

15  trial, estimate, unless you know, about how many times?

16  A    Probably, I mean, this year for -- about four times, and

17  then we were supposed -- we were going to go to trial, I think

18  sometime last year, and it was about three times before that.

19  So, probably total of seven times.

20  Q    Let me distinguish that.  Are those in-person meetings?

21  A    No.  They were over Zoom.

22  Q    Or phone equivalent?

23  A    It was Zoom equivalent, correct.

24  Q    Is this the first time you have been to Denver?

25  A    Yes.

1   Q   Okay.  Ever?

2   A   For this.  I have been to Denver before.

3   Q   Okay.  But you are not a Broncos fan?

4   A   No.

5   Q   But I imagine you like Von Miller?

6   A   Sometimes.

7   Q   Sometimes.  All right.  I will accept that.  I'm going to

8   show you -- do you remember, as we sit here today, when you

9   first took money from NAC?

10  A   It was prior to this scheme.  I do not recall the exact

11  date.

12  Q   So, yesterday you couldn't recall that it was prior to this

13  scheme, but today you can?

14  A   I -- if I answered it yesterday that I couldn't remember,

15  um, then as of yesterday I couldn't.  Today I do remember that

16  it was prior to the scheme, correct.

17  Q   You testified, on Direct, either on day one or day two, I

18  believe the word you used was that you have a photographic

19  memory about this stuff?

20  A   Some of it, yes.

21  Q   Okay.

22      MR. SCHALL:  Your Honor, may I provide the witness a

23  document?

24      THE COURT:  Yes.  Mr. Keech.

25      MR. SCHALL:  Let me make sure I have got the right

JONATHAN YIOULOS – Cross

1    one, Mr. Keech.  I don't.

2            *MR. SCHALL:*  And, Your Honor, I provided Mr. Fields a

3    copy of this, and Ms. Hubbard and Mr. Kaplan too, previously.

4            *THE COURT:*  Okay.  Thank you.

5    *Q*    Could you take a look at that document, Mr. Yioulos?

6    *A*    Yes.

7    *Q*    Do you recognize it?

8    *A*    Yes.

9    *Q*    What is it?

10   *A*    This is my KeyBank statement, in 2017, and KeyBank was my

11   bank of choice, at that time.

12   *Q*    Okay.  And how do you know and recognize that this was your

13   bank statement from KeyBank?

14   *A*    My name on the front, my prior address, and then just

15   seeing a few of the transactions.

16   *Q*    So you recognize this?

17   *A*    I do.

18   *Q*    And do you believe it's a true and correct copy of your

19   KeyBank account invoice from approximately October of 2017?

20   *A*    Correct.

21   *Q*    Okay.

22           *MR. SCHALL:*  Your Honor, we would offer Defense

23   Mr. Tew Exhibit 1.

24           *MR. FIELDS:*  No objection.

25           *THE COURT:*  Can I get a copy of it, please?

JONATHAN YIOULOS – Cross

1          MR. SCHALL:  Sure, that seems important.

2          THE COURT:  Thank you.  Okay.  It's admitted.

3          MR. SCHALL:  Can I have just a minute, Your Honor?

4          THE COURT:  Yeah.

5          MR. SCHALL:  Ms. Rodriguez to the rescue.

6    Q    Let's talk about this, Mr. Yioulos.

7    A    Okay.

8    Q    Yesterday, it was your testimony that you took money from

9    NAC in conjunction with another individual?

10   A    Correct.

11   Q    And you told us, yesterday, that that was a he?

12   A    Correct.

13   Q    You did not tell us who that was?

14   A    Okay.

15   Q    Do you agree?

16   A    I did not.

17   Q    Is there a reason you didn't?

18   A    It was never asked.

19   Q    Okay.  We can cure that today?  Who was the individual that

20   you took money with from NAC, at first?

21   A    Tom Seifert.

22   Q    Was he a NAC employee.

23   A    He was.

24   Q    What was his role?

25   A    He was a senior accountant.

JONATHAN YIOULOS - Cross

1   Q   Do you know if he was terminated over this?

2   A   Yes.

3   Q   Was he terminated over this?

4   A   He was.

5   Q   Okay.  And you testified, I believe, that some of payments

6   would go to you, and some would go to him, and then there would

7   be, I believe you said, Venmo transactions, where you split it?

8   A   Correct.

9   Q   Could you look at Exhibit 1, there for me, please, on the

10  third page.  Do you see one such fraudulent payment hitting

11  your account from NACH, Inc. on October 30th, 2017?

12  A   I do.

13  Q   And how much is that payment for?

14  A   For $3,334.62.

15  Q   And then you see immediately underneath that what appears

16  to be a Venmo deposit for 2500?

17  A   Correct.

18  Q   Do you recall looking at this, if that Venmo deposit $2500

19  would have been half of a payment Mr. Seifert received?

20  A   Most likely, yes.

21  Q   And those, the -- the first payment hit your account

22  October 30th, 2017?

23  A   Okay.

24  Q   Is that what it says?

25  A   Yes.

JONATHAN YIOULOS - Cross

1   Q   Okay.  And then I want to direct your attention to the

2   withdrawals.

3   A   Okay.

4   Q   NAC -- you, if I may, committed wire fraud to deprive NAC

5   of $3,334.62?

6   A   Okay.

7   Q   Yes?

8   A   Yes, that's -- yes.

9   Q   And this was in October of 2017?

10  A   Correct.

11  Q   When Mr. Tew was the CFO of your company?

12  A   Correct.

13  Q   And yesterday you said that you would have split that money

14  with Mr. Seifert?

15  A   Correct.

16  Q   Look at the withdrawals down below for me, please?

17  A   Yes.

18  Q   What is a mobile payment to Capital One that we see three

19  times there?

20  A   A credit card payment.

21  Q   Not Mr. Seifert?

22  A   Correct.

23  Q   So you are paying your own credit card with money taken

24  from NAC?

25  A   Yes.

JONATHAN YIOULOS - Cross

1    Q    Okay.  That's not how you described it yesterday?

2    A    I -- as I remembered it yesterday, and I know that for 95

3    percent of the -- we didn't do this often, but I know the

4    majority of the situations we split it evenly, so, you know, I

5    don't remember this one, specifically.  No.

6    Q    Okay.  So you will note that the first -- well, let's take

7    a big picture here.  Was this your only bank account?

8    A    At this time ... I think I had a checking account, as well.

9    Q    I don't see any direct deposit of a paycheck in here?

10   A    Okay.  Then, yes, I had a checking account.  Yes.

11   Q    Okay.  So this account was somewhat limited?

12   A    Correct.

13   Q    Would you agree with me, that every transaction that you

14   see on this statement, from November 17th, 2017, relates to the

15   commission of fraud against NAC, or the use of those proceeds

16   to pay either a co-conspirator or your credit card bill?

17   A    Yes.

18   Q    One second.  Okay.  Let's keep talking about that.  Do you

19   remember how you effectuated that fraud upon NAC?

20   A    Yes.

21   Q    How did you do it?

22   A    So, I would take a current vendor of National, National Air

23   Cargo, for example, Chris Alf, the owner of the company, often

24   flew private, so I would use an invoice, an actual invoice that

25   was sent from -- that was already in the system, that was sent

JONATHAN YIOULOS – Cross

1    from that private jet company.

2    Q    Can I ask if you recall, was it Duncan Aviation?

3    A    I don't believe it was Duncan Aviation.  There were a few

4    different aviation ones.  I don't remember Duncan.

5    Q    Okay.  Anyway, go ahead.

6    A    So, Chris had his own private jet, but occasionally, when

7    his was broken down, or someone else in the family was using

8    it, he would use a third party.  So, these invoices were

9    relatively simple.  They were anywhere between 7- and $25,000,

10   typically.

11   Q    The legitimate ones?

12   A    Legitimate invoices from those companies.

13   Q    Mr. Alf's private charters?

14   A    Correct.  They would just say flight, this aircraft flew

15   from here to -- call it Denver to Orlando, during this date,

16   and so I would make a -- basically make a copy of that invoice,

17   just download it to a PDF, jump in the PDF, and when I say *jump

18   in*, go into my computer, edit the PDF to a dollar amount and a

19   date and an invoice number that I could just save on my desk,

20   and forward that invoice or put it in myself, either forward to

21   accounts payable or put it in the system myself.

22   Q    And then?

23   A    And then subsequently pay that invoice.

24   Q    To your bank account?

25   A    To my bank account or Mr. Seifert's.

JONATHAN YIOULOS - Cross

1   Q   And what did you do with the proceeds?

2   A   I would typically pay either my credit card, occasionally I

would gambled those proceeds, as well.

4   Q   Well, I --

5   A   Or send them to Mr. Seifert.

6   Q   I have never been to Buffalo.  Is there a casino across the

7   lake?

8   A   There's a casino right in downtown Buffalo.

9   Q   Is that the gambling you would do?

10   A   Yes.

11   Q   Cards?  Slots?

12   A   Cards, roulette, sports.

13   Q   Did you ever tweet about your sports gambling?

14   A   Most likely.

15   Q   You remember?

16   A   I didn't -- I try not to tweet too often about sports

17   gambling.

18   Q   This was for fun?

19   A   Yes.

20   Q   These -- this invoice before you shows $3300 and change,

21   that you took from NAC?

22   A   Correct.

23   Q   In 2017?

24   A   Correct.

25   Q   Do you recall what your salary from NAC in 2017 was,

JONATHAN YIOULOS - Cross

1    legitimately?

2    A    I don't know if it was -- anywhere between 70 and a hundred

3    thousand dollars.  I'm not sure, exactly, where I was at that

4    point.

5    Q    Did you file income taxes for the year 2017?

6    A    I would have, yes.

7    Q    Did you disclose this as income on those taxes?

8    A    I did not.

9    Q    Why not?

10   A    I did not want to disclose income that was not truly

11   legitimate income.

12        MR. SCHALL:  Your Honor, I have a second exhibit, what

13   I will mark as Defendant's Exhibit 2, which was previously been

14   provided to the government, and other defense counsel.

15        THE COURT:  So, Mr. Schall, I'm going to -- I think

16   it's probably fine, but if we're just going to letter them, I

17   think because -- so, Mr. Keech will tell us how.  It's actually

18   going to be marked, if you don't mind.

19        THE COURTROOM DEPUTY:  The last exhibit, the list I

20   have shows P as the last exhibit.  So the first exhibit you

21   offered would be exhibit Q.

22        MR. SCHALL:  That's correct, but the list you have was

23   for, I believe, Mrs. Tew's exhibits.  I don't know if we are

24   going to draw a distinction.

25        THE COURTROOM DEPUTY:  We are going to have

JONATHAN YIOULOS - Cross

1   duplicates, either way.

2          MR. SCHALL:  Whatever Mr. Keech says.

3          THE COURT:  Right.  What I think he said was that

4   the -- the one you already offered is Q, right?

5          THE COURTROOM DEPUTY:  Correct.  This one will be R.

6          MR. SCHALL:  Should I, at least, put a sticker on it,

7   Your Honor?

8          THE COURT:  He has got one.

9          MR. SCHALL:  Okay.

10          THE COURT:  Thank you.

11          THE COURTROOM DEPUTY:  Are there two?

12          MR. SCHALL:  One packet.

13          THE COURTROOM DEPUTY:  One for the Court.

14          THE COURT:  Thank you.

15          THE COURT:  No objection to this.

16          MR. FIELDS:  No objection.

17          THE COURT:  R is also admitted.  Go ahead.

18   Q   Mr. Yioulos, take a look at what's been admitted as

19   Defendant's Exhibit R.  It's a mouthful.  And let me know after

20   you have reviewed it.

21   A   I have.

22   Q   Do you recognize that?

23   A   I do.

24   Q   Is that another KeyBank statement from that same bank

25   account we were talking about earlier?

JONATHAN YIOULOS - Cross

1   *A*   It is.

2   *Q*   This one, is ... if you look on page two, does it say a

3   statement dated March 19th, 2018?

4   *A*   It does.

5   *Q*   So we're before the alleged conspiracy has begun, in the

6   case why we are all here?

7   *A*   Correct.

8   *Q*   Take a look at page two.  Do you see a deposit into your

9   personal account, from National Air Cargo Holdings, Inc.?

10  *A*   I do.

11  *Q*   That's ACH payment?

12  *A*   It is.

13  *Q*   And is there a reason that wasn't a wire payment?

14  *A*   For the same reasons that it wasn't a two case.  I didn't

15  want it wired -- two wires required, dual authentication.

16  *Q*   Didn't want to get caught by Abby Schwartz?

17  *A*   Correct.

18  *Q*   March 2018, you are figuring all of this stuff out?

19  *A*   Wouldn't say figuring all of this stuff out.  What do you

20  mean?

21  *Q*   Easier to do an ACH than a wire?

22  *A*   I believe the first one was an ACH, as well.

23  *Q*   So, by March, though, you have now done it twice, at least?

24  *A*   Yes.

25  *Q*   Figuring it out?

436
JONATHAN YIOULOS - Cross

 1    *A*    I -- yes, it was already figured out, correct.

 2    *Q*    How much was this theft for?

 3    *A*    For $7,970.99.

 4    *Q*    And your testimony yesterday was that you would have paid

 5    half of that to Mr. Seifert?

 6    *A*    Yes, but --

 7    *Q*    Hold on.  I will ask the questions.

 8    *A*    Go ahead.  I'm sorry.

 9    *Q*    And half of $7,970.99, is just under $4,000; is that right?

10    *A*    Correct.

11    *Q*    And I think you will agree with me that on the withdrawals

12    listed blow, the Venmo withdrawals don't total $4,000?

13    *A*    That is correct.

14    *Q*    So, Mr. Seifert did not get half of this one?

15    *A*    Yes, he did.

16    *Q*    Tell me how?

17    *A*    Mr. Seifert and I would gamble together.

18    *Q*    In person?

19    *A*    In person, or if I went to the casinos with Mr. Seifert to

20    place a bet, or any -- any other type of gambling, he would

21    say, *Can you throw this money on this as well*, and if he was

22    down any amount of money that I had loaned him, I would keep

23    more money.

24    *Q*    And you would agree that gambling is a financial

25    transaction?

JONATHAN YIOULOS - Cross

1   *A*   Correct.

2   *Q*   And you would agree that this money entering your account

3   was the proceeds of specified unlawful activity?

4   *A*   Yes.

5   *Q*   Wire fraud?

6   *A*   Correct.

7   *Q*   And that you committed transactions with that money?

8   *A*   Correct.

9   *Q*   And this one is approximately 8,000, right?

10  *A*   Correct.

11  *Q*   Prior one is approximately 3300?

12  *A*   Correct.

13  *Q*   In total, what -- there's a number in your Plea Agreement,

14  we will get there, but for this kind of fraud, that ended up

15  gambling or paying credit cards, just estimate for me the total

16  amount?

17  *A*   Myself or split between myself and Mr. Seifert?

18  *Q*   Total.

19  *A*   Total.

20  *Q*   You, plus Mr. Seifert?

21  *A*   Okay.  I'm guessing somewhere around 80,000, $90,000.

22  *Q*   And then your half -- you would have got half?

23  *A*   I would have gotten, yes, around half.

24  *Q*   Okay.  Any of those fraudulent transfers, did you ever get

25  charged with?

1    A    Say that again?

2    Q    You would agree with me, I believe, that you committed wire

3    fraud here?

4    A    Correct.

5    Q    Did you get charged with the federal offense of wire fraud

6    as to these transactions?

7    A    Yes.

8    Q    You did?

9    A    Yes.  I pled to these transaction, as well.

10   Q    Well, we're going to talk about that.  You pled to the

11   Indictment in this case?

12   A    Correct.

13   Q    And I would submit to you that the Indictment, in this

14   case, says a Count 1 Conspiracy To Commit Wire Fraud Starting

15   in 2018?

16   A    Okay.

17   Q    Do you have any reason to disagree with that?

18   A    I don't.

19   Q    Okay.  Says nothing in that Indictment about theft from

20   National in 2017, do you agree?

21   A    With regard to the year 2017; that is correct.

22   Q    Okay.  So you weren't charged with wire fraud as a result

23   of these deposits hitting your bank?

24   A    That is correct.

25   Q    Okay.  And you weren't charged with money laundering for

JONATHAN YIOULOS - Cross

1    committing financial transactions with the proceeds of that

2    money?

3    A    That's correct.

4    Q    And you were not charged with tax evasion for failing to

5    declare on your income taxes?

6    A    That's correct.

7    Q    Okay.  Did you ever make money gambling?

8    A    Sometimes.

9    Q    Lots or?

10   A    No.  Give it all back pretty much immediately.

11   Q    Gambling is much more common in 2024, than it was in 2020;

12   is that fair to say?

13   A    Yes.

14   Q    Sports gambling?

15   A    Absolutely.

16   Q    Apps?

17   A    There's a ton of them.

18   Q    I don't know, in New York State, is sports gambling

19   gambling --

20   A    Yes.

21   Q    Are you aware that it's also legal in Colorado now?

22   A    Correct.

23   Q    Have you done any sports gambling, since you have been in

24   Colorado?

25   A    Yes.

JONATHAN YIOULOS - Cross

1    Q    Okay.  Give me just a minute.  All right.  Yesterday you

2    said you couldn't remember when your thefts from NAC started,

3    right?

4    A    Yes.

5    Q    You remembered today?

6    A    Yes.

7    Q    And it was no later than at least October 2017?

8    A    That's correct.

9    Q    But you believe it was earlier than that?

10   A    I don't remember the exact date.

11   Q    Do you remember gambling in 2017?

12   A    I'm trying to think back to... most likely, yes.

13   Q    When did you meet Tom -- is it Tom or Thomas Seifert?

14   A    Thomas.

15   Q    When did you meet him?

16   A    I met him in college, at Canisius College.  I met him in

17   the year 2007.

18   Q    And were you at National first or was he at National first?

19   A    I was at National first.

20   Q    And is that how he came on to National?

21   A    Yes.

22   Q    Did you put in a reference, basically?

23   A    Yes.

24   Q    Did you -- were you in charge of his hiring?

25   A    I was.

JONATHAN YIOULOS - Cross

1    Q    So you gave him a job?

2    A    I did.

3    Q    As -- when was that?

4    A    That most likely at the end of 2016, because the only

5    reason I remember, if you would like to know, I can continue?

6    Q    Yeah, please.

7    A    When I was at National, I was the only senior accountant

8    when I first started, and then through people either being

9    terminated, moving or finding better positions, our original

10   CFO was terminated, our director of accounting, who then

11   became -- then was Abby Schwarts, she left to go to Texas for a

12   job.  Our director of finance, he left for another job within

13   Buffalo.  Mr. Alf did not replace any of those positions,

14   except to make Michael Tew our CFO.  He promoted me to manager

15   of accounting, but I didn't have -- there was another senior

16   accountant who had left National, as well.  So, it was

17   essentially just me in the office, in this finance department,

18   so I was looking to fill a few positions there and bring in

19   more help.

20   Q    And you needed help?

21   A    And I needed help, and I had seen via Snapchat actually,

22   that Thomas was back in Buffalo, working at a company doing

23   accounting, again, because we both were accounting majors when

24   we first started at Canisius, so I asked him if he was happy

25   with where he was and if he wanted to come over for a job.

JONATHAN YIOULOS - Cross

1    Q    That's how people get jobs?

2    A    Correct.

3    Q    Yeah.  And so he comes on end of 2016, I think you said?

4    A    Yes.

5    Q    And then, no later than -- towards the end of 2017, you and

6    he are defrauding NAC?

7    A    Correct.

8    Q    How long, if you can recall, when he started at the end of

9    2016, did this become an idea?

10   A    I don't recall.

11   Q    Was it your idea?

12   A    To be honest, it was not my idea.

13   Q    Was it Thomas' idea?

14   A    Yes.

15   Q    And you went along with it?

16   A    Yes.  And I was in charge of the -- I was the controller of

17   National, so even if it was his idea, I was the one in charge

18   of the funds.

19   Q    Okay.  Yep.  Okay.  Let's talk about using NAC funds to pay

20   credit card bills?

21   A    Okay.

22   Q    Michael, I believe your testimony was, was fired in

23   September 18 -- 2018, in part because of fraudulent charges to

24   his corporate American Express card?

25   A    That's correct.

JONATHAN YIOULOS - Cross

1    Q    Correct me if I'm wrong, but there were charges on there,

2    buying gift cards?

3    A    Correct.

4    Q    How do you know this?

5    A    Through conversations with Michael and Kimberley.

6    Q    Okay.  And one of those conversations, did Kimberley tell

7    you that was all her doing?

8    A    Yes.

9    Q    Okay.  So, by this time, September 2018, Michael is fired?

10   A    Correct.

11   Q    And by this time, 2018, you have approximately a year's

12   experience taking NAC's money to pay personal credit card

13   bills?

14   A    Yes, I had.

15   Q    And you offered to help?

16   A    Yes.

17   Q    All right.  You testified, moments ago, that you weren't

18   charged with money laundering?

19   A    Correct.

20   Q    You weren't charged with wire fraud related to the your own

21   personal crimes with Mr. Seifert?

22   A    Correct.

23   Q    Do you know if Mr. Seifert was ever charged?

24   A    I don't believe so.

25   Q    Let me just peruse the answer.  You don't believe that he

1   was ever charged?

2   A    I -- I don't know if he was charged or not.

3   Q    Are you still friends with him?

4   A    I am not.

5   Q    When was the last time you spoke with him?

6   A    I saw him at a bar about a year-and-a-half ago.

7   Q    Was he fired before you were fired from NAC?

8   A    No.

9   Q    He was fired after?

10  A    He was fired after.

11  Q    I want to talk, generally, about ways that you undertook to

12  cover up your actions?

13  A    Okay.

14  Q    Whose idea was it to change Michael's name in your cell

15  phone to JB?

16  A    My own.

17  Q    Why?

18  A    Because I didn't -- while Michael was not employed at

19  National, after he was terminated, if Michael Tew -- people

20  often would come into my office, whether it was Abby, whether

21  it was anybody at the company, we had about 50 people in the

22  Buffalo office.  My phone was out in the open, most time, just

23  on my desk.  I never knew when Michael would text, Michael

24  would call the cell, so I didn't want the name Michael Tew to

25  pop up in my phone.

JONATHAN YIOULOS - Cross

1    Q    You would agree with me that you were trying to hide

2    Michael?

3    A    Correct.

4    Q    Trying to cover it up?

5    A    Yes.

6    Q    Didn't want to get caught?

7    A    Correct.

8    Q    Had you done this with other people?

9    A    No.

10   Q    Um, at this time, in 2018, were you going through the

11   divorce yet?

12   A    In 2018, no.

13   Q    Okay.  When did that all start?

14   A    In 2019.

15   Q    When did your relationship with the new woman start?

16   A    In 2019.

17   Q    Did you conceal her name in your phone in any way?

18   A    No.  We mostly just talked through Snapchat.

19   Q    Okay.  Another mechanism of coverup that occurred here, was

20   the use of lots of companies; is that fair?

21   A    That's fair.

22   Q    And you, as the comptroller of NAC, you had a grasp of the

23   approved vendors that the company used?

24   A    I did.

25   Q    Can you estimate for us the -- dozens, hundreds, thousands;

1  how many vendors were approved?

2  A    Hundreds.

3  Q    Hundreds.  You tell me, all related to cargo transport,

4  airline, maintenance, those kinds of things?

5  A    Correct.

6  Q    And you had experience with how books would be audited; is

7  that right?

8  A    Yes.

9  Q    And so you have a Masters in accounting?

10  A    I do.

11  Q    Masters of Science?

12  A    Yes.

13  Q    And is that from -- tell me what the --

14  A    Canisius College.

15  Q    Is that a Jesuit school?

16  A    It is.  It's now Canisius University.

17  Q    And you knew that if certain vendors moved up the list,

18  auditors might pay attention to that?

19  A    Yes.

20  Q    And a company like NAC, there's so many things to audit; is

21  it fair to say?  That auditors will knock out the biggest

22  buckets they can?

23  A    Yes.

24  Q    And sometimes it can be an approved audit, even if every

25  minor transaction isn't gone through completely?

JONATHAN YIOULOS - Cross

1   A    That's correct.

2   Q    So, in your training and experience, in life, you knew how

3   to avoid audit risk?

4   A    That's correct.

5   Q    And that was something you were able to contribute to this

6   scheme?

7   A    Absolutely.

8   Q    Willingly?

9   A    Yes.

10  Q    What about deleting text messages?

11  A    What about deleting text messages?

12  Q    Did you do that?

13  A    Yes.

14  Q    Why?

15  A    Because I was married, at the time, and I didn't -- and

16  occasionally my wife would, for not any particular reason, not

17  that she was snooping through my phone for any reason, but

18  would ask to borrow my phone.  I would hand her my phone.  I

19  didn't want messages from Michael Tew on my phone, in case she

20  started to look through them.  I didn't want her to be -- to

21  see this conspiracy that I had going on with Michael and

22  Kimberley.

23  Q    Anyone else that you didn't want to see it?

24  A    Um, at that time, it was mostly my wife, at that time.

25  Q    You knew it was evidence of illegal transactions?

1   A    Understandable.

2   Q    Yes, you did know it was evidence of illegal --

3   A    Yes, it is.

4   Q    And yet you destroyed them?

5   A    Yes, I did.

6   Q    And you were never charged with let's say destruction of

7   evidence?

8   A    No, I was not.

9   Q    Or obstruction of justice?

10  A    No, I was not.

11  Q    But you did those things?

12  A    I did.

13  Q    And it's your testimony that it was predominantly about

14  keeping it from your wife?

15  A    Predominately about keeping it from my wife.  Correct.

16        MR. SCHALL:  Ms. Rodriguez, if you could pull up

17  Government's Exhibit 795, please.  The last five messages on

18  the page please, four in white, one in green.

19  Q    Do you recognize this exhibit?

20  A    I do.

21  Q    Conversation via text between you and Michael?

22  A    Correct.

23  Q    And in this you say, *Doesn't really matter, unless Abby got*

24  *curious and she never does*?

25  A    Correct.

JONATHAN YIOULOS - Cross

1    Q    So, you are talking about the perpetuation of fraud on the

2    company?

3    A    I am.

4    Q    And you say, *It's safer to use a company name in case she*

5    *does go snooping*?

6    A    Yes.

7    Q    That's based on your training and experience as an

8    accountant and as comptroller of the company?

9    A    Yes.  And I did not want, you know -- if Michael Tew was

10    terminated from the company, using his ex company name, and --

11    or his real name, you wouldn't have to go snooping too much to

12    see the name that went out.

13    Q    The obvious?

14    A    The obvious.

15    Q    Don't want to get caught?

16    A    Correct.

17    Q    And in this, the last text message, June 26th, 2019, is it

18    fair to say you instruct Mr. Tew that he should set up a

19    legitimate corporation for the fuel consulting?

20    A    Based on previous conversations with him.  Yes.

21    Q    And the genesis of that afterwards was Global Fuel?

22    A    Correct.

23    Q    And Aero Maintenance Systems?

24    A    Aero Maintenance Systems.

25    Q    Thank you.

JONATHAN YIOULOS - Cross

1          MR. SCHALL:  Thank you, Ms. Rodriguez.  If you could

2   pull up 875, for us, please?

3   Q   And while she does that, Michael is not an accountant?

4   A   No.

5   Q   Do you know his educational background?

6   A   Finance, Wall Street, that's all I know.

7   Q   Okay.  I'm going to get sensitive here for a minute?

8   A   That's fine.

9   Q   Accountants have a reputation.

10  A   Okay.

11  Q   As would you agree with me, that they -- accountants tend

12  to think a certain way?  See the world in a certain way?

13  A   Depends, some do.

14  Q   Okay.  You would disagree with me, lumping all accountants

15  into a meme about being numbers people?

16  A   Oh, absolutely.

17  Q   Okay.  But would you say you are that kind of accountant?

18  A   God no.

19  Q   Photographic memory?

20  A   Yeah, but I don't even like accounting.

21  Q   But numbers are important to you?

22  A   They are.

23  Q   You bet on sports, that's all about numbers?

24  A   That has nothing to do with the numbers, in my opinion.

25  Q   Well, tell me, I'm curious?

JONATHAN YIOULOS - Cross

1   A   It makes the games way more interesting.

2   Q   To have something on the line?

3   A   You know, it's a -- gambling is an addiction.

4   Q   You like the risk?

5   A   Of course.

6   Q   Do you believe you have an addictive personality?

7   A   Absolutely.

8   Q   Does anyone else in this case that you know have an

9   addictive personality?

10  A   Yes.

11  Q   Who?

12  A   Michael and Kimberley.

13  Q   Looking at 7 ... 875.  You recognize this exhibit?

14  A   I do.

15  Q   And you talked about, on Direct, how auditors will look at

16  top vendors, right?

17  A   Yes.

18  Q   And I believe you used a term with Mr. Fields quote

19  concentration and risk?

20  A   Correct.

21  Q   What's that?

22  A   Essentially if you're from either vendor or customer

23  standpoint, if there was -- it necessarily wasn't top-ten

24  customers.  It was like over 10 percent often of your...

25  Q   Gross?

JONATHAN YIOULOS - Cross

1    A    Gross expenses, for example, it went to one vendor, or if

2    it went to one customer.  Your risk would be that your company

3    is very reliant on that vendor or that customer.  So that was

4    what I was talking about when I said credit risk.

5    Q    If you are too reliant, that would draw attention?

6    A    Yes.  It would just be something that the auditors may

7    comment on or make a note on, in the management report.

8    Management report was something that was issued to management,

9    with recommendations on how to, essentially, improve your

10   business or take away some of the risk, because auditing is all

11   about managing risk.

12   Q    Best practices?

13   A    Correct.

14   Q    That's how auditors justify their compensation?

15   A    Absolutely.

16   Q    And you talked about concentration risk being the reason

17   for dividing into multiple companies?

18   A    Yes.

19   Q    And that's something that you know from your accounting

20   background?

21   A    That's correct.

22   Q    Okay.  And that's why there was Global Fuel and Aero

23   Maintenance Systems, or whatever it is?

24   A    Yeah, one of the reasons, yes.

25            MR. SCHALL:  Government's 747, please, Ms. Rodriguez.

JONATHAN YIOULOS - Cross

1   Let's start at the top.  The first five messages zoomed in, and

2   we will work our way through it to put context to the

3   conversation.  Perfect.

4   Q   April of 2019.  You and Michael are talking via text?

5   A   Correct.

6   Q   What are you talking about?

7   A   He asks if we can send to an existing vendor in the system,

8   to the bank account, and I say, we're not going to bring

9   another vendor into this.

10  Q   You don't say we're not going to pay you.  You are saying

11  how it's going to work?

12  A   Correct.

13  Q   And so, you were cognizant and careful about what was being

14  entered into the NAC system?

15  A   Yes.  I did not want to get caught either.

16  Q   That was the popcorn trail that kept you up at night?

17  A   Absolutely.

18  Q   And you say in here, *Raises too many red flags if it's an*

19  *existing vendor*.  That's what you mean?

20  A   Yes.

21  Q   1099s issues, this all, the accounting meme I was joking

22  about?

23  A   I get it.  No, you are fine.

24  Q   You agree.  It's all accounting stuff?

25  A   Yeah.  This is accounting stuff, correct.

JONATHAN YIOULOS - Cross

1    Q   And then Michael in green, tells you he is fucked?

2    A   Yes.

3            MR. SCHALL:  Okay.  The next five or eight messages,

4    please, Ms. Rodriguez.  You can just go ahead and give us the

5    whole rest of the page, that would be great.  Thank you.

6    Q   Talking about sending money out the door?

7    A   Correct.

8    Q   Michael, you recognize --

9    A   Yeah, I recognize this exhibit.

10   Q   Talking about how this is done or will happen?

11   A   Yes.

12   Q   What's the last thing you say to him there at the end?

13   A   *I have a better plan*.

14   Q   What did you mean by that?

15   A   Um, because I didn't -- I mean he was talking about using

16   these funds, doing something with fuel, one of our fuel

17   vendors.  The fuel was run through a different system at

18   National.  It was tracked in a different way than other

19   expenses.  Fuel was tracked much more carefully, so I had a

20   different plan.  I couldn't tell you exactly what that was,

21   through this text message, but I knew that running it through

22   fuel did not make sense.

23   Q   And typically speaking, when you told Michael how it was

24   going to be, with regards to the accounting stuff, that was how

25   it was going to be?

JONATHAN YIOULOS - Cross

1    *A*    To an extent, yes.

2    *Q*    And the money still went out the door?

3    *A*    Yes, it did.

4    *Q*    And Michael, finance guy, didn't try to correct you on the

5  accounting stuff?

6    *A*    No.

7         *MR. SCHALL:*  Okay.  In Government's 715, please

8  Ms. Rodriguez.  This one is not admitted, but it's published.

9  And the big text message, the gray area at the top.

10    *Q*    Could you review this for me, please, Mr. Yioulos?

11    *A*    You want me to read it for you?

12    *Q*    No.  Just review it for a second.

13    *A*    Okay.  We reviewed this one earlier, I believe.

14    *Q*    So, you don't say here, but, you testified in reference to

15  it somewhere else that you were the one who pushed the button?

16    *A*    Correct.

17    *Q*    Meaning, you were the one that unleashed the funds?

18    *A*    Yes.

19    *Q*    That added oxygen to the fire?

20    *A*    Yes.  I sent the funds on the bank website.  Correct.

21    *Q*    And on Direct, he said you gave Mr. Fields a reason why you

22  didn't quit your job, to escape this?

23    *A*    Correct.

24    *Q*    Do you remember what you said?

25    *A*    If it came back -- I believe it was something along the

JONATHAN YIOULOS – Cross

1  lines of, if it came back an audit, there were always open ends

2  to these things.  I was always waiting on invoices to come

3  through from Michael, preparing them or a consulting agreement.

4  Just seemed like I was always waiting on something, and if I

5  wanted to leave, I couldn't, because whoever came in next would

6  uncover it.

7  Q   But you knew how to upload fake invoices to the system?

8  A   I did.

9  Q   So, why didn't you cover all of the tracks, put in your two

10 weeks and leave?

11 A   Because I felt like it was never an option.  I wanted it to

12 come from the people whose idea it was to send money, in the

13 first place, with regard to this conspiracy, which was the

14 Tews.  I wanted them to have some sort of responsibility to

15 this, and even if I did wrap it all up and told them I was

16 quitting, I felt like I was still going to have to send more or

17 it would become a problem later on.

18 Q   Do you realize how unsatisfying of an answer that is to

19 people that don't steal from their company?

20 A   Oh, I understand.  I have no idea ... why I agreed to do

21 this in the first place.

22 Q   Why did you do it in the first place, without agreeing with

23 Mr. Seifert?

24 A   Because I was ... I was 28 years old -- 27, 28 years old,

25 and just an idiot with money, gambled more than I had and

JONATHAN YIOULOS - Cross

1    wanted to keep stuff from my current wife, my ex-wife, at the

2    time, and you know having credit card debt, everything on

3    there, if she would have found that out.  He was in a financial

4    bind, I was in a financial bind, and it just seemed like...

5    Q    Pressure?

6    A    I was under pressure, so I decided to do it, and then, in

7    this case, it felt like pressure again.

8    Q    Let's talk a little bit about National Air Cargo.  Is that

9    the umbrella entity, National Air Cargo?

10   A    Yeah.  National Air Cargo Holdings.

11   Q    That's the overarching --

12   A    That's the overarching.

13   Q    And then underneath it, separate subsidiaries?

14   A    A bunch of separate subsidiaries.  Yes.

15   Q    When we're talking about this case, are there subsidiaries

16   that are most involved?

17   A    Yes.

18   Q    What's that?

19   A    National Air Cargo Group, Inc., d/b/a National Airlines, so

20   it's the same, and National Air Cargo Holdings, it's the

21   smaller version of the -- the holding company's own piece.

22   Q    And that's the universe we find ourselves in?

23   A    That is correct.

24   Q    When you, on Direct, say, *I submit to you, our or we*, in

25   talking about NAC?

JONATHAN YIOULOS - Cross

1   A   Yes.

2   Q   That's what you are talking about?

3   A   That is correct.

4   Q   Okay.  Some references by Mr. Fields that the company was,

5   my term, unhealthy?

6   A   Yes.

7   Q   Tell me what you know about that?

8   A   So, ever since about -- well, the company filed for

9   bankruptcy in 2014.  They were had a bankruptcy recovery plan.

10  I started in 2015 at National --

11  Q   When did Michael start?

12  A   I believe 20 -- I don't know the exact date.

13  Q   After you or before?

14  A   Um ... that I'm not sure either, because I was not involved

15  in a lot of those discussions, at that time.  I was only a

16  senior accountant.

17  Q   Okay.  The company had a rough patch?

18  A   Yes.

19  Q   Or 2014ish?

20  A   In 2014 a rough patch, rebounded from the rough patch, 2016

21  was one of the worst years the company had ever had, lost like

22  $80 million -- or 60 or $80 million, if I remember correctly.

23  Q   Do you -- were you in a position, at that time, to know why

24  the company was hemorrhaging money in that way?

25  A   Yes.

JONATHAN YIOULOS - Cross

1    Q   Why was it?

2    A   It was a combination; one, poor planning, very reliant on

3    contracts with the Department of Defense, and then after, you

4    know, everything from -- I know it seems like a long time

5    before then, but there was -- war is great for the company.

6    So, 2001, September 11th, sending troops, machinery and

7    everything else under the sun to help the Department of Defense

8    throughout the 2000s was very helpful for the company.  And

9    even afterwards, there was a whole movement to bring troops

10   back, bring machinery back, not leave a single thing overseas.

11   So, the company was reliant on those types of transactions and

12   that type of activity would continue.  It did not.  And I also

13   know that Mr. Alf -- Chris Alf --

14   Q   Owner of the company?

15   A   Owner of the company, you know, he had his own financial

16   transgressions, where he basically had to pay a fine for $28

17   million to the federal government.

18   Q   To the Department of Justice?

19   A   Department of Justice, correct.

20   Q   Do you remember what year that was?

21   A   I'm not a hundred percent sure of that.  No.

22   Q   Okay.  So a lot to digest there.  NAC had issues prior to

23   your arrival?

24   A   Correct.

25   Q   Went through a bankruptcy?

460

JONATHAN YIOULOS - Cross

1    A    Correct.

2    Q    The owner of NAC is Chris Alf?

3    A    Correct.

4    Q    Now, I want to parse that.  Some people think Elon Musk

5    owns Tesla, right?

6    A    Yes.

7    Q    Elon Musk owns a lot of Tesla, but he didn't own a hundred

8    percent of Tesla?

9    A    Chris Alf owned a hundred percent of National.

10   Q    That was my question.  Thank you.  And he started the

11   company?

12   A    He did.

13   Q    At some point along the way, you said he had some

14   transgressions, and paid a $28 million fine to the Department

15   of Justice?

16   A    Correct.

17   Q    This all happened in antiquity, before any of this case?

18   A    Yes, absolutely, 2016 was, like I said, one of the worst

19   years.  There's some other reasons for that, as well, but ...

20   Q    And then we get into the -- when we do some math, the Trump

21   administration?

22   A    Correct.

23   Q    And there's not a lot of wars; is that correct?

24   A    Correct.

25   Q    War's winding down?

JONATHAN YIOULOS - Cross

1   A   Yes.

2   Q   The company's business is -- has a single client in many

3   respects?

4   A   Very much so, very -- there was a very large, you know,

5   vendor, customer risk.

6   Q   That's the United States Government?

7   A   Correct.

8   Q   Okay.  Fast forward to 2017, when you and Mr. Seifert start

9   taking some money?

10  A   Yes.

11  Q   How is the health of the company, at that point?

12  A   Not great.

13  Q   Was it such that your -- I believe you said $80,000 would

14  endanger the company?

15  A   No.

16  Q   When we're talking about this company, we're talking about

17  tens of millions of dollars, aren't we?

18  A   Correct.  I think the worst year the company had was about

19  $154 million in the revenue.  That was the worst year in the

20  last 25 years.

21  Q   And the company owns a bunch of planes?

22  A   Yes.

23  Q   Not like Cessnas?

24  A   Yes.  But the planes were not worth as much as you would

25  think.

JONATHAN YIOULOS - Cross

1   Q    They are kind of like --

2   A    So, imagine if you owned a car without tires.  Owning a

3   plane without engines wasn't very valuable.  We didn't -- at

4   the end of my employment at National, National didn't own a

5   single engine anymore.

6   Q    Okay.  Throughout the course of your involvement with

7   Mr. Seifert, later Mr. and Mrs. Tew, were you always cognizant

8   of the money in the company?

9   A    Yes.

10  Q    And am I right to say you protected things so that payroll

11  could be met?

12  A    Absolutely.

13  Q    The last thing you wanted was payroll not to be met, and

14  then somebody puts their nose under the hood to see what's

15  going on?

16  A    Yeah.  But -- any -- any management position at a company

17  would always want to make sure that their employees are paid,

18  as well.

19  Q    Right.  But there was some implication that the -- your

20  actions --

21  A    Yeah.

22  Q    -- endangered the health of the company?

23  A    Absolutely.

24  Q    Tell me about it?

25  A    Um ... so payroll for our airline was close to $600,000

JONATHAN YIOULOS - Cross

1   every two weeks.

2   Q    Pilots aren't cheap?

3   A    Pilots are not cheap.

4   Q    Okay.

5   A    And so that was our airline.  I believe the Buffalo payroll

6   was around a hundred/$120,000 every two weeks, and then there

7   was -- I think there was a little bit of payroll that was sent

8   out of holdings, as well, that was mostly for Lori Alf, but the

9   payroll would range between 600 and 800,000.

10  Q    When you say Lori Alf, was she on the payroll?

11  A    I believe she was at National Air Cargo -- no, it was

12  called Tracking Innovations, that was another subsidiary of

13  National.  Sorry.

14  Q    Just tell me, because we -- I suspect we all know, was that

15  a bogus job, or was she adding value to National?

16  A    She added value.  I would meet with Lori maybe once a year.

17  She would basically -- she used to work at National before

18  myself, and, you know, she would be in higher-level meetings,

19  but for a weekly salary or annual salary, it didn't seem to

20  justify.

21  Q    Do you know what that salary was?

22  A    I want to say about 25,000 every two weeks, maybe 12,000

23  every two weeks, somewhere around there.

24  Q    Half a million dollars here?

25  A    Just about, I believe.

JONATHAN YIOULOS - Cross

1    Q    So, NAC, National group umbrella, had some big expenses?

2    A    Some even larger expenses, as well.

3    Q    Mr. Alf's private plane trips?

4    A    It wasn't just his private plane trips.  It was his private

5    plane, as well.  He had his own private plane, and Lori also

6    had a plane when I first started a National.  So they had two

7    private jets.

8    Q    Lifestyle choices?

9    A    Lifestyle choices.

10   Q    It's good to own the company?

11   A    Absolutely.

12   Q    So, there was a lot that could be said to be endangering

13   the company?

14   A    Hundred percent.

15   Q    I want to know about this fraud scheme?

16   A    Yes.

17   Q    Did the company become insolvent due to this fraud scheme?

18   A    No.

19   Q    Did it file for bankruptcy due to this fraud scheme?

20   A    No.

21   Q    Did it suffer substantial harm to its ability to obtain

22   credit?

23   A    No.

24   Q    Did it lose its number-one client, Team U.S.A.?

25   A    No, it did not.

JONATHAN YIOULOS - Cross

1    Q    Okay.  In fact, in the recorded call, 976 on July 8th --

2         MR. SCHALL:  Ms. Rodriguez, you can take that down,

3    please.

4    Q    When you're talking with Michael -- and you have been

5    fired, at this point?

6    A    Correct.

7    Q    So you are making stuff up?

8    A    Some of it, yes, some of it, no.

9    Q    You say you meet -- you were meeting with Chris, Christer,

10   and treasury?

11   A    Correct.

12   Q    And in 2020, did NAC participate in the payroll protection

13   program?

14   A    They did.

15   Q    And do you remember what that was?

16   A    Oh, yeah.

17   Q    Imagine, as an accountant, you did a lot of work on that?

18   A    A ton of work.

19   Q    Do you know how much money NAC got from the federal

20   government, as part of the PPP?

21   A    Well, there was -- the PPP portion, and then there was also

22   a separate payroll loan related to Airlines, as well.

23   Q    Uh-huh.  Because COVID was particularly bad for Airlines?

24   A    Absolutely.  Commercial Airlines more than passenger, but.

25   Q    There was a lot of n95 masks?

                              466
                    JONATHAN YIOULOS - Cross

1    *A*   Correct.  But I don't know the specific amount off the top

2    of my head, but it was in the millions.

3    *Q*   Tens of millions?

4    *A*   Most likely.

5    *Q*   Okay.  And you said, at some point, on Direct, that COVID

6    and 2020 started to be very good for the company?

7    *A*   Yes.

8    *Q*   And so, at the time this alleged conspiracy ended, the

9    company was sailing?

10   *A*   Rebounding.

11   *Q*   Okay.  Do you know how it's doing now?

12   *A*   Pretty well.  My only knowledge of the company was from

13   last year.  I ran a 5K at my stepdaughter's school, and ran

14   into an employee who still works at National, and, you know, he

15   just said, *Hey, how are things going*, just started talking to

16   me.  I talked to him for a little bit, and he just said, you

17   know, things are going great over here.  We're super busy.

18   *Q*   Would you agree with me that wars are good for the company?

19   *A*   Wars are great for the company.

20   *Q*   Earlier I handed you Government's 527, your Plea Agreement?

21   *A*   Yes.

22   *Q*   Do you remember that?

23   *A*   I do.

24   *Q*   We're going to put it up on the screen, if you will please,

25   Ms. Rodriguez.

JONATHAN YIOULOS - Cross                                    467

1    Q    This the same document we talked about earlier?

2    A    It is.

3    Q    This is where you admit to committing two felony offenses;

4    is that right?

5    A    That is correct.

6    Q    I'm going to walk you through this?

7    A    Okay.

8    Q    The first thing we see in this Plea Agreement are two

9    Assistant United States Attorneys, who, ladies and gentlemen of

10   the jury, probably will not recognize.  Were those the first

11   prosecutors in the case?

12   A    Yes.

13   Q    And they signed this, along with you?

14   A    Correct.

15   Q    No longer involved with the case?

16   A    That is correct.

17   Q    Paragraph 1 A is where you say you are going to plead

18   guilty to Counts 1 and 39?

19   A    Yes.

20   Q    That's the Conspiracy To Commit Wire Fraud and one

21   substantive count of Wire Fraud; is that right?

22   A    Correct.

23   Q    And that you agree to be liable for restitution?

24   A    That is correct.

25   Q    What do you understand restitution to be?

JONATHAN YIOULOS - Cross

1    A    Paying back the money that I had taken from National.

2    Q    The money that you got?

3    A    No.  Joined in -- so no.  Just any money that I had sent

4    out of National, as part of the conspiracies.

5    Q    And that's what this 5-million-plus figure is?

6    A    That is correct.

7    Q    And you didn't get much of that, if any, did you?

8    A    I got some, as we've discussed, but out of that amount, a

9    very small portion.

10   Q    But you're agreeing here that you are going to be

11   responsible, jointly and severally, with other co-conspirators

12   who are convicted of any offenses?

13   A    That is correct.

14   Q    So, you are signing this document, knowing that you owe

15   five-million bucks?

16   A    Yes.

17   Q    I can imagine that makes you upset?

18   A    Upset is not the right word.  I think it's just

19   disappointed.

20   Q    Aren't you upset that money that you are going to have to

21   pay, is going to be paying off someone else's gambling problem?

22   A    I'm upset at myself, for getting involved in the first

23   place.

24   Q    Difficult question, you are married now, right?

25   A    Not technically, no.

JONATHAN YIOULOS - Cross

1    Q    Well, then it's not a difficult question?

2    A    Hm-hm.

3    Q    Does she -- are you still with --

4    A    Yes.

5    Q    Does she know you are going to owe up to $5 million?

6    A    Yes, she does.

7    Q    That's a problem, right?

8    A    Yes.  It's been an issue that's come up, many times.

9    Q    Okay.  Second page.  There in the second line, it says, *The*

10   *government will recommend a sentence of imprisonment no greater*

11   *than 63 months*.

12   A    Correct.

13   Q    The -- are you aware of the statutory penalty for a

14   violation of a wire fraud act?

15   A    I am.

16   Q    What's the maximum possible penalty?

17   A    The maximum possible, not according to this statutory --

18   Q    Right?

19   A    I believe it's 20 years.

20   Q    Twenty years, that's right, and you are -- two counts; is

21   that right?

22   A    Correct.

23   Q    So, the maximum possible punishment that you could receive

24   is 20 years plus 20 years?

25   A    That is correct.

JONATHAN YIOULOS - Cross

1   Q   And here it says the government will recommend a sentence

2   no greater than 63 months?

3   A   That is correct.

4   Q   Which, if my math is correct, five years, three months?

5   A   Correct.

6   Q   And that they will dismiss Counts 2 through 38 and 40

7   against you, only?

8   A   That is correct.

9   Q   So you pled guilty to two counts, yes?

10  A   That's correct.

11  Q   And 38 counts were dismissed?

12  A   Correct.

13  Q   And there's also an agreement in here, somewhere, that says

14  any other offenses that the government knows about, you are not

15  going to be charged with?

16  A   Correct.

17  Q   So, like the deals with Mr. Seifert?

18  A   Correct.

19  Q   Or the destruction of evidence?

20  A   That is correct.

21  Q   Okay.  Or the money laundering at casinos?

22  A   Correct.

23      MR. SCHALL:  Okay.  Page three, please, Ms. Rodriguez.

24  A part of this Agreement was that -- subsection D.  If we could

25  zoom in on the first paragraph.

JONATHAN YIOULOS - Cross

1  Q   You agreed to provide truthful, complete and accurate

2  information relating to any matter about which you, the

3  defendant, may possess knowledge, information or materials

4  being investigated by the government, and agrees to cooperate

5  fully with the government?

6  A   That is correct.

7  Q   You are signing up to be on their team?

8  A   Essentially, yes.

9  Q   Okay.  And they say, explicitly, you can't lie?

10 A   That is correct.

11 Q   Or it's all out the window?

12 A   That is correct.

13 Q   And you agree in there to attend all meetings where your

14 presence is requested?

15 A   Correct.

16 Q   And you have done that?

17 A   Correct.

18 Q   You have sat -- you said there were three or four, and

19 another four meetings to prepare your testimony?

20 A   Correct.

21 Q   And you agree to testify in this document, here, in the

22 District of Colorado?

23 A   That is correct.

24 Q   You are doing that, right?

25 A   Yes.

1    Q    And you -- well, you tell me, you paid to get here?

2    A    I did not.

3    Q    You did not?

4    A    I did not.

5    Q    Did the government buy your plane ticket?

6    A    Correct.

7    Q    Are they paying for your hotel?

8    A    Correct.

9    Q    Are they -- you got a lawyer, though?

10   A    I do.

11   Q    Are you paying for him?

12   A    I am paying for him.

13            MR. SCHALL:  Next page, please, Ms. Rodriguez, page

14   four.  Last paragraph.

15   Q    This is the paragraph where the government says, we're not

16   going to use this stuff against you?

17   A    Okay.

18   Q    Is it?

19   A    Yes.

20   Q    You recognize this?

21   A    Yes.

22   Q    Did you draft that language?

23   A    I did not.

24   Q    You didn't draft any of this language?

25   A    I did not.

JONATHAN YIOULOS - Cross

1    Q    The whole Plea Agreement?

2    A    Correct, I did not.

3    Q    You reviewed -- you had counsel?

4    A    I had counsel.

5    Q    And your counsel, listed on the back, was who you worked

6    with at the time?

7    A    Correct.

8    Q    That's different than your counsel now?

9    A    That is correct.

10   Q    This counsel was in Buffalo?

11   A    Rochester, which is very close to Buffalo.

12   Q    Right.  Your counsel now is here in Denver?

13   A    That is correct.

14   Q    Do you have knowledge of where -- you got this Plea

15   Agreement from your counsel?

16   A    Yes.

17   Q    Do you have knowledge of where -- who drafted it?

18   A    The government.

19   Q    Government.  Those attorneys listed with their names on it?

20   A    Yes.

21   Q    At that time, Mr. Fields and Ms. Weiss weren't a part of

22   this case?

23   A    That's correct.

24   Q    And your first meetings with the government, when you first

25   started cooperating, they were not part of this case?

JONATHAN YIOULOS - Cross

1   A    That is correct.

2   Q    That was long ago?

3   A    That was a long time ago.  Yes.

4          MR. SCHALL:  All right.  I want to direct your

5   attention to page five, please, Ms. Rodriguez.  Second full

6   paragraph -- third actual paragraph.

7   Q    When you say the government drafted it, you didn't have any

8   say, did you?

9   A    Correct.

10  Q    So, when I asked you, earlier, where it says, *Kimberley had*

11  *us by the balls*, why isn't that in here?  That really wasn't

12  your place?

13  A    It was not my place, but I also had an understanding of --

14  I did read the Plea Agreement prior to.  I understood how plea

15  agreements worked, more or less, and that type of language

16  would not be in a typical plea agreement.

17  Q    Are you familiar with plea agreements?

18  A    Yes.

19  Q    How?

20  A    I always had an interest in the legal field.

21  Q    Okay.  I want to talk to you about that.  When you first

22  met with the IRS on July 7th, 2020, you told them that you had

23  applied to the FBI?

24  A    I did.

25  Q    When was that?

JONATHAN YIOULOS - Cross

1   *A*   I believe in 2016.

2   *Q*   And --

3   *A*   Two-thousand-fifteen.  I'm not sure of the exact year.

4   *Q*   And what happened?

5   *A*   I ... went through the phase, until I got to the polygraph

6   section.  They asked some drug-related questions about

7   something that I had done nine-and-a-half years prior to it,

8   and so the use of any type of drug, other than marijuana, you

9   couldn't have used for ten years.  I had used when I was a

10  freshman in college, so I was 18, at the time, fell within that

11  window of ten years.  I didn't lie about it on the polygraph.

12  They said I could come back a year later, just a transgression

13  of youngness, conspiracy; too, I tore my ACL, so I wouldn't be

14  able to do physical fitness.  Bunch of different things.

15  *Q*   Did you fail the polygraph?

16  *A*   No.

17  *Q*   But you stopped it because you were about -- you would have

18  failed?

19  *A*   I would have failed, correct.

20  *Q*   How did you tear your ACL?

21  *A*   Playing pick-up soccer.

22  *Q*   One or both?

23  *A*   One.

24  *Q*   I only ask, because I just tore mine?

25  *A*   No.  It's not a fun recovery.

JONATHAN YIOULOS – Cross

1  Q   No, it's not; skiing is dangerous?

2  A   Yeah.

3  Q   Okay.  This paragraph blown up here talks about what's

4  called a 5K1.1 motion.  What's your understanding of what a

5  5K1.1 motion is?

6  A   It's the government's ability to recommend a reduction of a

7  sentence to the judge.

8  Q   Based upon?

9  A   My cooperation, substantial assistance.

10  Q   Substantial assistance to the government; is that right?

11  A   That is correct.

12  Q   And that's in the sole discretion of who?

13  A   The judge.

14  Q   Let me back up.  The filing of the 5K1.1 motion is in the

15  sole discretion of who?

16  A   The government.

17  Q   Meaning, the prosecution here?

18  A   The prosecution, correct.

19  Q   And so, they decide how valuable your cooperation is?

20  A   That is correct.

21  Q   And they recommend something to the judge?

22  A   That is correct.

23  Q   And so you're here for a couple of reasons; is that fair?

24  A   Absolutely.

25  Q   Are you still coming clean?

JONATHAN YIOULOS - Cross

1    *A*    I'm doing my part.

2    *Q*    Okay.  Whatever the government tells you to do?

3    *A*    Absolutely.

4    *Q*    Okay.  They say jump, you say how high?

5    *A*    Correct.

6    *Q*    Within the confines of the plea agreement?

7    *A*    Yes.

8    *Q*    Okay.  And if they say, *Jon, I didn't like your testimony.*

9    *I'm not giving you cooperation credit,* that's their

10   prerogative?

11   *A*    Absolutely.

12   *Q*    And if they say*, Jon, way to go*, like on the morning of

13   July 8th, 2020, when Ms. Palmer said the prosecutor said you

14   did a great job, on the first recorded call, then you expect to

15   get a much lower sentence?

16   *A*    I hope to, yes.

17   *Q*    Yeah.

18   *A*    To be clear, I don't expect to.  I just hope to.

19   *Q*    Sure.  And that sentencing hasn't happened?

20   *A*    No, it has not.

21   *Q*    In fact, it had to happen after this, so that your

22   cooperation could be evaluated?

23   *A*    That is correct.

24   *Q*    And how much you conformed with their ideas of the

25   narrative they wanted to hear?

1   A   I disagree with that.

2   Q   Okay.  Well, you tell me?

3   A   Their -- it wasn't more of a narrative that they had.  This

4   was me telling my side of what happened.  My testimony.

5   Q   Can I stop you right there?

6   A   Yeah.

7        MR. SCHALL:  Ms. Rodriguez, if you could turn to page

8   nine of the Plea Agreement.

9   Q   Remember when you said this Plea Agreement was not your

10  words?

11  A   That is correct.

12  Q   Could you look at pages nine, ten, eleven, twelve,

13  thirteen, fourteen, fifteen, sixteen, seventeen and half of

14  eighteen for me, please.

15  A   Okay.

16  Q   I would submit to you that this document is 21 pages?

17  A   Okay.

18  Q   And that the stipulation of facts covers pages nine through

19  eighteen, which is about 45 percent of the document; is that

20  right?

21  A   Yes.

22  Q   And those are not your words?

23  A   Not my specific words.  No.

24  Q   And that is a narration of facts, in this case?

25  A   Correct.

JONATHAN YIOULOS - Cross

1    Q    It doesn't say everything?

2    A    No.

3    Q    Doesn't say what you told Ms. Palmer and the FBI on that

4    morning about all of the things that we talked about?

5    A    Correct.

6    Q    This is the government's narration?

7    A    It's a list of the -- it's more of a list of the facts of

8    the case.  It's very -- there's a dollar amount that can be

9    tied to the scheme.

10   Q    Sure.

11   A    As a whole, so, yes, the government did draft this.

12   Correct.

13   Q    You did not?

14   A    I did not.

15   Q    You signed it?

16   A    I did.

17   Q    Okay.  Bottom of page 14, please.  Last full two sentences,

18   starting with *Yioulos*.  Do you remember this part?

19   A    I do.

20   Q    Referenced it early?

21   A    I do.

22   Q    *Yioulos also separately caused the victim company to make*

23   *payments for services not actually rendered to the victim*

24   *company to him or a third party for his and the third-party's*

25   *benefit*.  That's Mr. Seifert.

1          *The amount of those additional payments is at least*

2    *approximately $60,000*, right?

3    A    That is correct.

4    Q    Where in there does it say that began before the conspiracy

5    charged here?

6    A    It doesn't.

7    Q    It doesn't.  And yesterday, you testified that your theft

8    from that didn't begin before the conspiracy charged here?

9    A    I said I did not remember.

10   Q    All right.  Okay.

11         MR. SCHALL:  Above this, if you could expand that

12   window by three lines, please, Ms. Rodriguez.

13   Q    It says, you sold Bitcoin that netted approximately

14   $100,000?

15   A    I did.

16   Q    So you did get something?

17   A    I did.

18   Q    You still have that Bitcoin?

19   A    No.

20         MR. SCHALL:  May I have just a minute, Your Honor?

21         THE COURT:  Yes, but I -- it would be a good time to

22   take a break too.

23         MR. SCHALL:  I'm fine with that.

24         THE COURT:  Why don't we take a break for 15 minutes.

25   So, be back at five after.

JONATHAN YIOULOS – Cross

1          THE COURTROOM DEPUTY:  All rise.

2       (Jury out at 2:52 p.m.)

3          THE COURTROOM DEPUTY:  Court is now in recess.

4       (Recess at 2:52 p.m.)

5       (In open court at 3:12 p.m.)

6          THE COURT:  Please take your seats.  Can we go ahead

7    and bring the jury back in?

8          MR. KAPLAN:  Yes, Your Honor.

9          MR. SCHALL:  Do you want me up there?

10         THE COURT:  Sure, that's fine.

11         THE COURTROOM DEPUTY:  All rise.

12      (Jury in at 3:14 p.m.)

13         THE COURT:  All right.  Welcome back.  Let's take our

14   seats.

15         Mr. Schall, did you have anymore questions?

16         MR. SCHALL:  Try to make it brief, Your Honor.

17         THE COURT:  Okay.

18         MR. SCHALL:  May I proceed?

19         THE COURT:  Yes.

20   Q   Mr. Yioulos, I want to talk with you about your preparation

21   for your testimony this week?

22   A   Okay.

23   Q   How many hours do you estimate that you spent preparing for

24   your testimony?

25   A   Twelve to fifteen.

JONATHAN YIOULOS - Cross

1    Q    Is this with your lawyer?

2    A    My lawyer was present.

3    Q    Okay.  Is that estimate based on your lawyer's estimates,

4    how much time he has charged you or your recollection?

5    A    My recollection.

6    Q    Twelve, fifteen hours with the government, as well with

7    their attorneys and agents?

8    A    Yes, about 12 hours with the government.

9    Q    Okay.  And present during those meetings, typically

10   speaking was Mr. Fields?

11   A    Yes.

12   Q    Ms. Weiss?

13   A    Yes.

14   Q    Internal revenue, Special Agent Criminal Divisions Unit

15   Lisa Palmer?

16   A    Correct.

17   Q    FBI Special Agent Sarah Anderson?

18   A    Yes.

19   Q    Anyone else?

20   A    I believe that was it majority of the time, and then my

21   attorney.

22   Q    Your attorney, right?

23   A    And myself.

24   Q    And you testified your -- well, let me take that back.  Are

25   you still a certified public accountant?

JONATHAN YIOULOS - Cross

1    *A*    Yes.

2    *Q*    Still have your license?

3    *A*    I do.

4    *Q*    Is that in the State of New York?

5    *A*    It is.

6    *Q*    Are you concerned that your conviction in this case will

7    deprive you of that license, at some point in the future?

8    *A*    Yes.

9    *Q*    Is that process started?

10   *A*    No.

11   *Q*    Have you had to report this case?

12   *A*    Yes.

13   *Q*    Who -- what's the body in the State of New York that you

14   have to report to?

15   *A*    The Office of the Professions.

16   *Q*    Is that Albany?

17   *A*    Yes.

18   *Q*    The capital of New York?

19   *A*    Correct.

20   *Q*    You are not a lawyer?

21   *A*    I'm not.

22   *Q*    And I take you don't want to be?

23   *A*    Maybe.

24   *Q*    That's for sure.  You, on your Direct, on Monday, and on

25   Tuesday, and somewhat on Cross and Direct today, I offered to

JONATHAN YIOULOS - Cross

1   you that you made frequent use of the word conspiracy?

2   A   Correct.

3   Q   That's a legal term in this case and others, is it not?

4   A   Yes.

5   Q   Not a term you normally use in your day-to-day life?

6   A   No.

7   Q   That term was something you learned to use during your

8   preparation for this case?

9   A   Yes.

10  Q   Were you encouraged to use that term?

11  A   No, I was not.

12  Q   Tell me how you -- what your understanding of what that

13  term was to be in your testimony?

14  A   So, in the preparation, the use of the word conspiracy came

15  up, and they asked if I had to define the word conspiracy what

16  I would define it as, to which I said, essentially, a plan to

17  do something illegal, and so the word conspiracy became more an

18  active term, especially when used by the government, and I

19  agreed with them, that that was an accurate depiction of what

20  was going on here.

21  Q   Fair to say, you echoed their use of the term conspiracy?

22  A   Correct.

23  Q   And you talked about your lawyer?

24  A   Yes.

25  Q   Is he present here with you today?

JONATHAN YIOULOS - Cross

1    A    He is.

2    Q    He is here in the courtroom?

3    A    He is.

4    Q    Been here all three days?

5    A    Correct.

6    Q    And he is helping advise you on how to maximize your

7    interests?

8    A    No.

9    Q    No.

10   A    He is telling me to answer the questions.  No real true

11   advice, other than to answer the questions truthfully, honestly

12   to the best of my ability.

13   Q    Without talking about your conversations with him, that's

14   yours?

15   A    Yes.

16   Q    You understand how cooperation works?

17   A    I do.

18   Q    And that's something not -- I'm not asking the contents of

19   the conversation, but that's something that you talked about

20   with your lawyer?

21   A    Yes.

22   Q    And your lawyer, in fact, was a federal prosecutor at one

23   point too, right?

24   A    To be honest with you, I dealt a lot more with my prior

25   attorney, who recommended this attorney, and I love this -- I

486
JONATHAN YIOULOS - Cross

1   love my current attorney, but I don't know a hundred percent

2   about his background.

3   Q   I would submit to you that I also love your attorney, and

4   he was also a former federal prosecutor.

5           Do you feel like you have earned a lot of cooperation

6   credit?

7   A   I do.

8   Q   Are you hoping to avoid jail time, in this case?

9   A   Of course.

10  Q   Do you have a family to support?

11  A   I do.

12  Q   Tell me about them?

13  A   So, in 2020 I had a wedding, but I didn't sign the official

14  paperwork with my current significant other.  We didn't want to

15  sign anything with regards to tying each other, long term,

16  until this case was resolved.  She has two children, ages 6 and

17  11 now.  When I met, they were 2 and 7.  I have become

18  extremely close with them.  You know, she doesn't have a ton of

19  family in Buffalo.  Very close with her grandmother, who is now

20  sick, and so there's a lot of lot dynamics there that I want to

21  support her with, and just be there for her and the children.

22  Q   That was a lot.

23  A   Hm-hm.

24  Q   You had a wedding?

25  A   I did.

JONATHAN YIOULOS - Cross

1 Q But you're not legally married?

2 A That's correct.

3 Q Is this some kind of an accountant meme hedge bet that you

4 have made or?  That's weird, would you agree?

5 A I mean weird to you, not to me.

6 Q Okay.  Fair enough.  That's true.  And she is standing by

7 you?

8 A Somewhat.

9 Q And your -- does she work?

10 A She does.

11   MR. FIELDS:  Your Honor, I object to this line of

12 questioning.  I'm not sure that his current girlfriend is all

13 that relevant.

14   THE COURT:  Yeah.  I think we've --

15   MR. SCHALL:  Understood, Your Honor.  I will move on.

16   THE COURT:  Sustained.

17 Q Let's shift to your employment?

18 A Yes.

19 Q Are you employed?

20 A I am.

21 Q As a CPA?

22 A No.

23 Q Tell me about your job?

24 A I am a delivery driver for UPS.

25 Q Okay.  The UPS we all know?

488
JONATHAN YIOULOS - Cross

1  A    The UPS we all know, brown trucks.

2  Q    Are the benefits as good as they say?

3  A    I'm not a full-time employee yet.  That's the goal.

4  Q    After you left NAC, did you work in an accounting --

5  A    I did.

6  Q    What company was that?

7  A    So, after I left NAC, I worked for a company called Forbes

8  Capretto.  They were a homebuilder.  I worked there as the CFO

9  and director of HR, but that was only for about three months.

10 Q    And then what?

11 A    And then we split ways, just because it wasn't a great fit.

12 The company.  They weren't really looking for -- they already

13 had head of director of finance, director of accounting,

14 basically, there was no room to grow there.

15 Q    Go ahead.  Were they aware of this case?

16 A    No.

17 Q    Had you been charged yet?

18 A    No.

19 Q    But you had been, obviously, confronted by federal

20 authorities?

21 A    Correct.

22 Q    And gotten a lawyer?

23 A    Correct.

24 Q    But you did not tell your employer about this case?

25 A    No.

JONATHAN YIOULOS - Cross

1    Q    Or any of the allegations or past conduct with National?

2    A    I did not.

3    Q    Was that part of the reason you split ways?

4    A    That was never discussed.

5    Q    Okay.  You didn't bring it up?

6    A    I did not bring it up.

7    Q    How often have you -- from that homebuilder, you went to?

8    A    A different company.

9    Q    Tell me about that?

10   A    So, homebuilder I worked from about September of 2020,

11   until January of 2020 (sic) and then March of 2021, I started a

12   job at ProNexus, LLC., as a consultant.

13   Q    Is that a networking company?

14   A    So, they do outsource accounting function.  So, if you are

15   a company that needs accounting help, you engage ProNexus and

16   they send out one of their experts to go help them with the

17   accounting.

18   Q    What were the dates that you worked there?

19   A    I worked there from March 2021, until -- a little strange,

20   until August 2021, and then one of -- the company that I was

21   doing outsourcing accounting for, hired me full-time, until

22   somebody at that company, the CFO, who knew about the

23   transgressions at that company, had left.  New CFO comes in,

24   finds out about it, terminates my employment immediately.

25   Q    Let me pause you there.

JONATHAN YIOULOS - Cross

1    A    Hm-hm.

2    Q    They found out about it with -- because you told them?

3    A    So, the CFO was -- so ProNexus, who hired me, I had told

4    them about everything going on, with regards to the case.  Once

5    I was officially charged, they were not only informed by me,

6    but they also received a letter from my probation officer,

7    pretrial probation officer, letting them know I was being

8    charged.

9            ProNexus, after discussing with me and talking with

10   me, still went ahead and hired me, and then when the individual

11   engaged me from ProNexus, hired me, because he was working at

12   this company, that was based out of California, called Swift,

13   and he quit, eventually, about two weeks after I had started my

14   full-time employment, at Swift, and after he quit, there was a

15   new CFO, and the CFO must have done -- must have done some

16   digging on me; just a simple Google search, my name will show

17   the trial -- or the charges.

18           So he terminated my employment, and then I reached

19   back out to ProNexus.  I was reemployed by ProNexus, and I

20   worked there from about September of 2021 until February of

21   last year, of 2023.

22   Q    And then what was the precipitating reason for leaving

23   there?

24   A    So I was working with -- when I was at ProNexus, I was

25   doing auditing, auditing banks, that was just for a firm called

JONATHAN YIOULOS - Cross

1    Bonadio.  Bonadio liked the work that I was doing.  They wanted

2    to hire me from ProNexus.  I was a little skeptical, because,

3    obviously, ProNexus already knew about my situation, my legal

4    situation, and I was not sure if -- I was pretty sure that

5    ProNexus did not let Bonadio know about my legal situation.

6    Q    Risky move?

7    A    Risky move for ProNexus, for sure, but I didn't -- they had

8    worked with me for years now, for a couple years, and thought I

9    was not going to do anything again.  And so -- illegal again, I

10   should say.  And Bonadio did some more research on me, before

11   they wanted to make a formal job offer, and I tried to log into

12   my computer one day, I can't log on.  I'm locked out of

13   everything.  I get a text message from one of the partners

14   saying, *We found out about your legal issues.  We no longer --*

15   *we had to terminate you from this job, reach out to your*

16   *employer*.

17          I reached out to ProNexus.  ProNexus is -- has a

18   strong relationship with this client, and it's either keep the

19   client, pretty much, or keep me.

20   Q    Keep Jon?

21   A    They, obviously, went with the client route, and so, you

22   know, since then it's -- it's really been no accounting work.

23   I have looked for other accounting jobs, whenever I do have an

24   accounting job that I'm applying for, I tell them that I'm

25   convicted of a felony, for wire fraud, conspiracy to commit

JONATHAN YIOULOS - Cross

1    wire fraud.  Often times I'm met with, *Hey, we like you.  We*

2    *understand that people do make mistakes, but until we know what*

3    *your sentencing is going to be, we don't want to hire you and*

4    *not have you around, but we would be willing to give you*

5    *another shot, if, you know, we knew what was going on.*

6          So, I applied to UPS, got this job with UPS, just to

7    delivering packages.  In the application you have to disclose

8    that you are willing to do a background check.  I can't

9    remember if there's a column you select if you were convicted

10   of a felony ever.  I'm sure there is.  I'm sure there was when

11   I applied.  But I have been at UPS since October of 2023, and

12   then, as of recently, I started to do a little bit more

13   accounting work, but that's just for my dad and my step mom,

14   who own a company based out of Rochester.

15          *MR. SCHALL:*  Your Honor, may I have just a moment to

16   consult with my client?

17          *THE COURT:*  Yes.

18          *MR. SCHALL:*  Your Honor, I only have a few more

19   questions, but did want to revisit the issue about the

20   recording admission.  Not sure if you want to do that at the

21   bench or?

22          *THE COURT:*  Yeah.  If you need to discuss it now, just

23   come on up to the bench, and if you have something new, just

24   come on up.

25          (At the bench:)

JONATHAN YIOULOS - Cross

1          THE COURT:  So, are you asking because you want to get

2    into it now or just because --

3          MR. SCHALL:  Your Honor, I -- I really don't want to

4    get into it.  It's long.  And no one wants to do that, me more

5    than anyone, but I would like it to be in evidence for the jury

6    for argument, and to be able to evaluate Mr. Yioulos'

7    credibility.

8          THE COURT:  Okay.  I understand, but there's nothing

9    right now that's changed.

10         MR. SCHALL:  He just told me that he talked with

11   agents about what to say and how it colored the calls, and how,

12   on the recording there's coaching, obviously.  We would offer

13   that as its impact on him, not as to the truth of what was

14   said, obviously.

15         THE COURT:  I will keep this issue open.  We'll

16   discuss it at the end of the day, but for now, it's just open.

17   I don't think we need to do anything immediately.

18              (In open court).

19   Q   Mr. Yioulos, as part of this case, as part of your

20   agreement to cooperate with the government, did you provide

21   agents access to your iCloud?

22   A   I did.

23   Q   And to your knowledge, did they mirror image it?  Copy it?

24   A   Yes.

25         MR. SCHALL:  Your Honor, may I provide a --

JONATHAN YIOULOS - Cross

1              THE COURT:  Yes, please.

2              MR. SCHALL:  I marked this as Defendant's T?  S?

3    Might actually be marked as Defendant's Q already; is that --

4    it's on their list as Q.  So, we can go with Q.

5              THE COURTROOM DEPUTY:  I don't have the ...

6              THE COURT:  Q was your first one.

7              MR. SCHALL:  I thought Q was the first one, and then

8    R.

9              MR. KAPLAN:  Can we make it T?

10             MR. SCHALL:  T.  Must be late in the day.

11             THE COURT:  Thank you.

12        Q    (By Mr. Schall) Did I see you smiling over there,

13   Mr. Yioulos?

14   A    Yeah.

15   Q    Do you recognize that document?

16   A    I do.

17   Q    What is it?

18   A    It's my resume'.

19   Q    And did you prepare this document?

20   A    Yes, parts of it.

21   Q    Do you remember when about you prepared it?

22   A    Most likely when submitting it to ProNexus, so end of 2020

23   or 2021, early 2021.

24   Q    You said you made parts of it?

25   A    Yes.  So, I didn't create this all, originally.  My ex-wife

 1   was a recruiter and put together a decent portion of the

 2   resume'.  The back part about Freed Maxick, and that was the

 3   main part that she put together.

 4   Q   Okay.

 5   A   And also some of the responsibilities at NAC, she helped

 6   tweak with me, when we were together.

 7   Q   Did this come off your iCloud?

 8   A   If -- I'm assuming, yes.

 9   Q   You recognize it --

10   A   Yes, I recognize this resume'.

11   Q   As a true and correct copy of your resume'?

12   A   Correct.

13   Q   At a point in time, you estimated 2021, at some point in

14   time.

15   A   Yes.

16        MR. SCHALL:  Your Honor, we offer this as Defendant's

17   Exhibit T.

18            THE COURT:  Any objection?

19            MR. FIELDS:  No, Your Honor.

20            THE COURT:  Okay.  It's admitted.

21            THE COURTROOM DEPUTY:  You will have to zoom out at

22   the top of the counter.

23        Q   (By Mr. Schall) All right.  I want to direct your

24   attention, Mr. Yioulos, this resume' is, obviously, created

25   after you were terminated from National Air Cargo?

1    A    That's correct.

2    Q    Is this something that you said you believe you presented

3    to companies to hire you?

4    A    Correct.

5    Q    And this was at a time where you had or had not been

6    indicted?

7    A    I had been indicted.

8    Q    Were you telling companies about your legal, issues at that

9    point.

10   A    Yes.

11   Q    You had not pled guilty yet?

12   A    I had not pled guilty -- yeah.  I had not pled guilty yet,

13   just been charged.

14   Q    If I told you that the filing date on the Plea Agreement is

15   November 18, 2021, would you agree?

16   A    Yes.

17   Q    This is a document that you sent out, describing you?

18   A    Correct.

19   Q    I want to direct your attention to the National Air Cargo

20   section right here.  It says, *Manager of accounting and*

21   *financial reporting*.

22   A    Yes.

23   Q    And then?

24   A    Oh, yeah.

25   Q    It doesn't say on there, best I can tell, comptroller?

497
JONATHAN YIOULOS - Cross

1  A   It says corporate controller above manager of accounting

2  and financial reporting.

3  Q   I just want to direct your attention to one thing.  After

4  you had been terminated from NAC, you provided this resume',

5  and one of the bullet points says that, *Part of your role at*

6  *NAC was to investigate any unusual nonrecurring transactions to*

7  *ensure proper recording and proper presentation*?

8  A   Yes.

9  Q   And you submitted this to potential employers?

10  A   Correct.

11       MR. SCHALL:  No further questions, Your Honor.

12       THE COURT:  Okay.  Thank you, Mr. Schall.  Mr. Kaplan,

13  I believe --

14       MR. KAPLAN:  Yes.

15       THE COURT:  -- for Mrs. Tew.

16                   **CROSS-EXAMINATION**

17  BY MR. KAPLAN:

18  Q   Good afternoon, Mr. Yioulos.

19  A   Good afternoon.

20  Q   You were just talking about how part of the difficulty you

21  had with getting jobs is because of your uncertain future?

22  A   That's correct.

23  Q   But you also mentioned that if you are Googled, that would

24  cause problems in you obtaining employment, also?

25  A   If an employer Googled me, yes, correct.

JONATHAN YIOULOS - Cross

1    *Q*   And it would do that, because you are charged with fraud?

2    *A*   That's correct.

3    *Q*   And it would be reasonable for an employer to look

4    suspiciously on employing you in a position of responsibility?

5    *A*   That is correct.

6    *Q*   It would be reasonable for them to look up at somebody who

7    had engaged in fraudulent activity that you had engaged in, and

8    decide I'm -- this person is not trustworthy enough to work for

9    our company?

10   *A*   That's correct.

11   *Q*   And in terms of the trust that we're talking about,

12   yesterday, I think it was yesterday, you talked a little bit

13   about how you wanted this weight to be off your shoulder?

14   *A*   Yes.

15   *Q*   And part of what you were thinking about, towards the --

16   before the police contacted you, is trying to finalized the

17   payments, because perhaps that would put an end to this?

18   *A*   Yes.

19   *Q*   And you were hoping, if you had final invoices, that that

20   would put an end to it?

21   *A*   I did.

22   *Q*   But the truth of it is, is that you didn't stop doing this

23   until you were caught?

24   *A*   That's absolutely true.

25   *Q*   And when you first heard, back in 2018, that Michael Tew

JONATHAN YIOULOS - Cross

1    had done some things that were fraudulent, you didn't stop

2    participating with him in the fraud?

3    A    Can you clarify that a bit more?

4    Q    Sure.  Originally, when you were paying invoices and

5    Michael Tew had already created some fraudulent companies that

6    you didn't know about?

7    A    Michael Tew did not create the companies.

8    Q    He was submitting invoices for companies?

9    A    For the companies?

10   Q    Yes.

11   A    Yes.  He submitted invoices in 2018 for the companies.

12   Q    Right.  And then you found out, in talking to him, that

13   some of the invoices that he had submitted were fraudulent?

14   A    I knew that the invoices he submitted were fraudulent.

15   Q    And, at that point, you didn't put a stop to it?

16   A    No, I didn't, um ...

17   Q    Go ahead.

18   A    No.  At that point, while Michael was stilled employed at

19   National, I looked at Michael as a colleague and a friend, and

20   he had asked for payment that was -- like, he asked if there

21   was any way I could pay one of his actual consulting invoices

22   early, which we had done in the past, at National, and I said

23   *There's no way that Chris is going to allow this again.  No way*

24   *Abby is going to say, Yeah, let's pay Michael and leave all of*

25   *these other bills.*  So, I said, *No, there's nothing that we can*

JONATHAN YIOULOS - Cross

1    *do*.  He came to me with an idea, I agreed to pay it, thinking

2    it was a one-off, and that's how this started.

3    Q    Okay.  So, as I understand it then, the first inkling of

4    something that was happening that wasn't appropriate, was him

5    asking for something that was legitimate, but that the head of

6    the company decided that they didn't want to do that?

7    A    It was for services that he had yet to perform.  So, it

8    would have been a prepayment for something that would have been

9    done.  So, yes, it would have been legitimized, eventually.

10   Correct.

11   Q    Right, that's not a theft?

12   A    If it was for that, then no.

13   Q    Right.  But you thought it would be best to ask the head of

14   the company whether it would be appropriate, you did, they said

15   no, and you went ahead and did it anyway?

16   A    Correct.

17   Q    And so, that's what started you on the path of dishonesty,

18   really?

19   A    Absolutely.

20   Q    And so, I mean that may be considered somewhat benign, but

21   shortly thereafter, you came to realize that there were

22   invoices that were being submitted for companies that, for

23   instance, for consulting, that never did any consulting?

24   A    Yes.

25   Q    And that became the beginning of what ended up being a

JONATHAN YIOULOS – Cross

 1  two-year, much more serious, dishonest course of conduct?

 2  A    That's true.

 3  Q    Now, you have talked a little bit about how you liked

 4  Michael Tew, and that was part of, maybe, what brought you into

 5  this scheme; is that fair?

 6  A    Yes.

 7  Q    And you thought he was a hard worker?

 8  A    Yes.

 9  Q    And that you, therefore, I don't know, got seduced into

10  doing it, because of your friendship with Mr. Tew?

11  A    Yes.

12  Q    But during that time, you were working for a company that

13  you started as a senior accountant for; is that right?

14  A    Correct.

15  Q    And had treated you very well?

16  A    Yes.

17  Q    Promoted you to manager of accounting?

18  A    Correct.

19  Q    And then gave you a position of really ultimate financial

20  responsibility by being a comptroller, at least certainly an

21  important person in their finance?

22  A    Absolutely.

23  Q    And during that time you were working with people that I

24  assume that you got along with?

25  A    For the most part, yes.

JONATHAN YIOULOS - Cross

1    Q    People that you respected the work that they did?

2    A    Yes.

3    Q    People that you had at least a business friendship with?

4    A    Yeah.

5    Q    And people who you were working together to promote the

6    responsibilities for the business?

7    A    Yes.

8    Q    Make the business succeed?

9    A    Yes.

10   Q    And it was a tough business, right?

11   A    Very.

12   Q    And it took a lot of work and a lot of commitment?

13   A    Absolutely.

14   Q    And the people that were shoulder-to-shoulder with you,

15   were working hard, through, as you say, tough times?

16   A    Correct.

17   Q    And that you were next to them, at least appearing as if

18   you were working the same way, with the same commitment?

19   A    Yes.

20   Q    But that wasn't true?

21   A    I don't agree with that.

22   Q    Well, you may be considering yourself working hard, but

23   this was in 2018; is that right?

24   A    Correct.

25   Q    And you didn't ... you didn't get caught until July of

JONATHAN YIOULOS - Cross

1    2020?

2    A    Correct.

3    Q    So, really, for pretty much two years, you were doing

4    things to the detriment of that company?

5    A    That is true.

6    Q    To the detriment of the people who were trying to make that

7    company succeed?

8    A    True.

9    Q    And you were doing it in a way with people that really you

10   were being untruthful with, almost every day?

11   A    Is that a question?

12   Q    Yes.

13   A    Yes.

14   Q    And yet, during all that time, there wasn't a moment where

15   you looked up and said, *I'm just going to stop*?

16   A    Thought about it many times.  Never actually did it.

17   Q    And a matter of fact, we've heard a lot about how this

18   scheme happened, and your participation in it, we will talk a

19   little bit more about that, but if you had stopped, certainly

20   after Michael Tew no longer worked for the business, he

21   couldn't have accomplished what he accomplished?

22   A    That's true.

23   Q    He needed an inside man?

24   A    Absolutely.

25   Q    You were the inside man?

JONATHAN YIOULOS - Cross

1    *A*    I was.

2    *Q*    You talk a little bit about Kimberley Tew.  Asked about

3    having you and Michael by the balls.  She wasn't stopping you

4    from putting an end to this?

5    *A*    Not directly but she -- if I -- if I threatened to leave,

6    or said I was done or was not sending anymore money, that's

7    when I would get threats, and I didn't know what was stopping

8    her from -- if I decided to leave, from going to Chris or Lori

9    and/or anybody else at the company, and turning myself in along

10   with them.  Even though it might incriminate them.  I wasn't

11   sure if that was going to happen, that's my looking out for

12   myself.

13   *Q*    That's true, Mr. Yioulos, because one of the things that

14   you said in some of your testimony was that, and even today,

15   you were covering things up so you wouldn't get caught?

16   *A*    That's correct.

17   *Q*    You did a lot of that, we will talk about some -- more

18   specifics.  But you did a lot of that for the two years that

19   you were engaged in this?

20   *A*    Yes.

21   *Q*    Concerted efforts so that the people that we were talking

22   about, that you were working with and your boss wouldn't find

23   out what damage you were doing?

24   *A*    That is correct.

25   *Q*    And that kept your job for you, at least for those two

JONATHAN YIOULOS - Cross

1    years?

2    A    Yes, it did.

3    Q    All right.  But that was a job you shouldn't have had?

4    A    Elaborate.

5    Q    You shouldn't have had a job working in the finances of a

6    company, when you are stealing with -- stealing from them?

7    A    Oh, absolutely agree with that.  If you are stealing from a

8    company, you should not be working for that company.

9    Q    So, you were protecting your own interests, even though, I

10   guess, now you look back and say, *I shouldn't have had that*

11   *responsibility, I shouldn't have been working for that job.  If*

12   *I lost my job, I would have been deserving of it*?

13   A    Absolutely.

14   Q    And you said also that part of the tough times, when you

15   were working for this company, and you recounted it on some of

16   the Cross-examination, that it was partially the responsibility

17   to try to keep the company afloat?

18   A    Yes.

19   Q    At the exact time you were undermining it?

20   A    Absolutely.

21   Q    That's not somebody who is trustworthy, is it?

22   A    I did untrustworthy things.

23   Q    Well, doesn't that make you an untrustworthy person?

24   A    Don't agree with that.

25   Q    So, if I characterized your behavior over the two years

JONATHAN YIOULOS - Cross

1   that we've spoken about in these three days, and I said to you

2   that it would be reasonable to look at you as an individual and

3   say, a liar, somebody who is not trustworthy, that would be a

4   false statement?  That would be a ridiculous characterization?

5   A   I lied, I have been untrustworthy, at times, but I don't

6   believe I'm an untrustworthy person and a compulsive liar.

7   Q   All right.  We will move on, Mr. Yioulos.  But it was lying

8   and being untrustworthy every day for almost two years?

9   A   Yeah.  And being lying and untrustworthy and, you know,

10  being in the position that I was in, as controller of National,

11  being part of this conspiracy, it, you know, in a messed up

12  way, felt like it was part of my job.

13  Q   Part of your job to participate in a fairly complex series

14  of transactions?

15  A   Yes.

16  Q   So, that $5 million was taken fraudulently from the company

17  you worked for, that's in the job description?

18  A   It's not in the job description, but it became part of my

19  day-to-day duties, was to try to manage this conspiracy.

20  Q   Mr. Yioulos, I don't want -- I'm not -- I don't want to

21  beat this to death, but you are telling this jury that you are

22  managing a conspiracy by -- by continuing to steal from your

23  company, that's how you are characterizing this, that what's

24  positive about this, or the spin you are giving to it, is that

25  it was your job to manage the theft?

507
JONATHAN YIOULOS - Cross

1   A    I'm not trying to spin this in any way, shape or form.

2   There's nothing positive about this.  I'm saying the way I

3   felt, at that time, was my best course of action, for my

4   personal self, and the way I felt like I was not going to --

5   going to get caught, fired, for selfish reasons, yes, was to

6   continue this conspiracy, and trying to keep the company afloat

7   and meet their obligations, also trying to meet the obligations

8   and the requests from the Tews, was very difficult, and the

9   only way, sanity-wise, I could keep everything straight, was to

10  act like these vendors, who needed payment, would get payment.

11  These made-up invoices that were coming over, were going to get

12  paid, and if those got paid, I knew that I would still keep my

13  job, and so that's what I meant by it becoming part of the job?

14  It's not part of the description, but for me it was part of

15  keeping my job.

16  Q    Mr. Yioulos, you could wake up one day and decide not to be

17  a criminal, right?

18  A    Absolutely, I wish I would have.

19  Q    As a matter of fact, you are sitting in here, talking about

20  being -- taking an oath and talking about being honest, and

21  being truthful, as you have testified, when there's something

22  to be had in your interest by telling a story that appears to

23  be more favorable to the government.  It would be in your

24  interests, because you're looking, at the end of this, to end

25  up with a lighter sentence, by managing that in a way that was

JONATHAN YIOULOS - Cross

 1   in your interests, perhaps, and in their interests; that's how

 2   you roll?

 3   A    No.

 4   Q    It's not Mrs. Tew who was keeping you from calling law

 5   enforcement?

 6   A    No.  I could call law enforcement any time.

 7   Q    It was not Ms. Tew that was keeping you, except for the

 8   calculus that you seem to have come to rely on, from walking

 9   and telling Mr. Alf?

10   A    No.

11   Q    Or perhaps talking to Abby Schwartz, who was really very

12   much regularly the recipient of your fraud?

13   A    Correct.

14   Q    She wasn't stopping you from doing that?  This isn't a

15   wicked woman's defense, is it?

16   A    She did not stop me from going to the authorities, correct.

17   Q    Matter of fact, when you -- now, you have spoken to law

18   enforcement numerous times?

19   A    Correct.

20   Q    And sometimes they would do phone conferences, with you

21   being in New York and they being elsewhere?

22   A    Yes.

23   Q    Talk about, perhaps, Zooms?

24   A    Yes.

25   Q    And do you recall telling them that 99.9 percent of your

1  interactions were with Michael Tew?

2  A   Yes.

3  Q   And part of your testimony also was that you spoke to

4  Michael Tew almost every day?

5  A   Yes.

6  Q   And so, whatever was happening, you were speaking with him,

7  to help this fraudulent conspiracy continue?

8  A   Correct.

9  Q   You weren't speaking to Ms. Tew every day?

10  A   No, I was not.

11  Q   Matter of fact, you didn't really like her?

12  A   No.

13  Q   And you didn't really want to talk to her?

14  A   I did not.

15  Q   Do you remember telling the law enforcement that you

16  probably only had three, four conversations with her?

17  A   With just her, yes.

18  Q   Okay.  And you have been asked a lot of -- there's been a

19  lot of -- you have been shown a lot of documents, a lot of text

20  messages and the like.  It was a lot of volume, but it wasn't

21  all of the time that you spoke?

22  A   Oh, no.

23  Q   Wasn't even close?

24  A   Nope.

25  Q   So, when you look the interactions you had with Kimberley

510
JONATHAN YIOULOS - Cross

1    Tew, even in this courtroom, when you were asked about it, it's

2    not even close to all of the conversations you had with Michael

3    Tew that the jury has never heard about?

4    A    Correct.

5    Q    When you did talk to Kimberley, Michael was always present?

6    A    Not true.

7    Q    How many times did you talk to Kimberley Tew without him

8    being there?

9    A    Probably two to three times.

10   Q    Well, let me ... you have a transcript up there that's

11   still there?

12   A    Yes, I do.

13   Q    Okay.  Could you go to page -- depends which one you want

14   to use.

15   A    Eight, six, two, four?

16   Q    No.  It's 8635.  I have both page numbers and those Bates

17   numbers?

18   A    Okay.

19   Q    You see 8635?

20   A    I do.

21   Q    Can you take a look at the middle of page 24?

22   A    Okay.

23   Q    They are asking you about your contact with Kimberley, as

24   they put it here?

25   A    Yes.

JONATHAN YIOULOS - Cross

1    Q    And you are talking about whether -- they are asking you

2    questions, and you are answering about whether you had phone

3    conversations with her?

4    A    Correct.

5    Q    And you do describe how she would jump on the phone at

6    times?

7    A    Yes.

8    Q    You also say that she didn't like to talk a lot?

9    A    Correct.

10   Q    And you are asked, *Sounds like, when she talked to you,*

11   *Michael is there also?*  *He is present for the conversation*?

12   Your response is, *Yes*?

13   A    Yes.

14   Q    And then you went, *For sure*, right?

15   A    Yes.

16   Q    And, the -- Agent Humphrey says, *All of the time*?  Your

17   answer is, *Yes.*

18   A    Okay.

19   Q    He says, *Okay.*  And then you mention by saying, *Michael was*

20   *always present*?

21   A    Correct.

22   Q    That's the answers that you gave to law enforcement, when

23   you were talking to them on July 7th?

24   A    Yes.

25   Q    Let me talk a little bit -- very briefly about

JONATHAN YIOULOS - Cross

1    cryptocurrency.  You testified that you traded in it?

2    A    I did.

3    Q    And you traded in it before you met Michael and Kimberley

4    Tew?

5    A    Yes.

6    Q    You know about it, you know about the wallets and how you

7    purchase it, and how you could, hopefully, make some money with

8    it?

9    A    Correct.

10   Q    And you talked to Michael a lot about cryptocurrency?

11   A    A decent amount.

12   Q    And Michael is the one who actually asked, I guess,

13   initially for some Bitcoin, from you?

14   A    Yes.

15   Q    And this was even before this fraudulent scheme that you

16   and him were involved in starting?

17   A    Correct.

18   Q    You knew that Ms. Tew was into cryptocurrency also?

19   A    I did.

20   Q    And when you gave Michael Tew the cryptocurrency, you were

21   expecting to get it back?

22   A    Yes.

23   Q    And you didn't get it back for awhile?

24   A    Correct.

25   Q    And that was making you a little bit nervous and a little

JONATHAN YIOULOS - Cross

 1  bit concerned?

 2  A    Yeah, especially with the divorce.

 3  Q    Right.  And you figured, well, he is a CFO, he makes some

 4  money, so I don't have to really worry about it disappearing?

 5  A    Correct.

 6  Q    At least that's what you thought?

 7  A    Correct.  Especially with his consultant salary that he was

 8  making, just seemed like peanuts to what he got on an annual

 9  basis.

10  Q    Because he is making a lot of money?

11  A    Correct.

12  Q    Let me ask you, as long as you bring that up, he was a

13  consultant, right?

14  A    Yes.

15  Q    So he was making a lot of money for NAC as a consultant?

16  A    Yes.

17  Q    But it wasn't his only job?  Didn't have to be his only

18  job?

19  A    Correct.

20  Q    So, in addition, to -- because of this arrangement, in

21  addition to the money that he made at NAC, he was supplementing

22  his income with other money?

23  A    Correct.

24  Q    So, you figured, guy is making some good coin?

25  A    Yes.

JONATHAN YIOULOS - Cross

1    Q    At the end of the day, let me just jump ahead, you did get

2    a bunch of Bitcoin back when it was all said and done?

3    A    Yes.

4    Q    The beginning of finding out exactly what was happening

5    with the fake invoices, you were actually asking for the

6    Bitcoin back, and it was during those conversations, this is

7    before he got fired, that he revealed to you that he was filing

8    invoices for companies that weren't doing service?

9    A    Yeah.  I would expect the Bitcoin back around that same

10   time.

11   Q    Right.  And he actually -- what he told you is, the company

12   that he had submitted invoices for wasn't a real company?

13   A    Yes, I knew that.

14   Q    And -- well, how did you first find out about it?

15   A    He told me that -- well, he would say, *I'm sending this*

16   *invoice over.  Pay it*.  And it would either be for an

17   individual that he knew or for a fake company.

18   Q    And he told you the fake company was so that he could get

19   the money for himself?

20   A    The money needed for him or to pay people that he and

21   Kimberley were dealing with.

22   Q    If I can have you take a look at the transcript, at page

23   8631.  About the middle of the page?

24   A    Yes.

25   Q    If you could just review that for yourself, for a bit.  So,

JONATHAN YIOULOS - Cross

1    they are asking you about how this thing got started?

2    A    Correct.

3    Q    And what he says it was about the time that you were asking

4    for the Bitcoin back?

5    A    Yes.

6    Q    Because that's what you told them, when they interviewed

7    you, again this is back in 2020, July 7th?

8    A    Yes.

9    Q    And he tells you, *I can't pay it back, I owe X, Y and Z* and

10   then he basically tells you that it was -- it wasn't for

11   consulting.  It was for me?

12   A    Yes.  That's what I said here.

13   Q    All right.  What was your first concern about when you

14   heard that?

15   A    Heard what?

16   Q    That this was happening, that now he is telling you, look,

17   I have been filing bad invoices, fraudulent invoices?

18   A    Well, so let me back up here for a second to this -- to

19   what I told the agents, at that time.  So, I obviously had just

20   gotten walked out of the office, and had told the agents my

21   rendition, my memory of how this thing got started, and from

22   review of text messages, review of their documents, review of

23   the timeline of how things got started, I clearly knew about

24   the conspiracy, the entire time.  So, here I'm telling them,

25   government, you know, I found out about it when he is asking

516

JONATHAN YIOULOS - Cross

1   me, *Hey, I can't pay you back, this, this, and this*, after he

2   gets terminated.  But I knew about the conspiracy, prior to him

3   being terminated.

4   Q   Right.  And so, what you are saying now is you actually

5   knew about the conspiracy from actually the first time it

6   started?

7   A   Yes.

8   Q   That's not what you told them then?

9   A   No.  It's not what I told them then.

10  Q   Now, what your concern was, at least when you were speaking

11  to the agents, in July of 2018, was, my wife is going to be

12  upset with me, because I didn't get the Bitcoin back?

13  A   Yes.  Basically, she would be upset with me if I didn't get

14  the Bitcoin.  She would always make references to having about

15  a half a Bitcoin, and then, obviously, as I transgressed to --

16  the divorce, knowing they look at financial assets, I was a

17  little worried about, *Hey, if she wants half of that Bitcoin, I*

18  *have got to send it to her.*

19  Q   Right.  What I'm getting at, Mr. Yioulos, is that at the

20  very beginning of this interview, when they're asking you about

21  finding the beginning of the scheme, your explanation to them

22  is to -- how it impacted you.  Granted it was two years later.

23  Is that your wife was going to kill you, I mean figuratively,

24  all right, because I lost the Bitcoin, that is what came to

25  mind when you are telling them about being involved in a

JONATHAN YIOULOS - Cross

1  two-year fraud conspiracy?

2  A    That is not the only thing that came to mind.

3  Q    What was the next thing that came to mind, when you talked

4  to them?

5  A    In the line of conversation, about the story, about the

6  Bitcoin?  Yes.

7  Q    So, let's talk a little bit about the scheme, and I

8  understand that we've spent a lot of time on it, so we're not

9  going through it in detail.  You have been -- don't plan on

10 being up here nearly that long, but I do want to, you know,

11 kind of, go through a little bit of it; and that is, when you

12 are talking about the invoices, the invoices were kind of basic

13 starting block of this?

14 A    Yes.

15 Q    And you didn't create them?

16 A    No.

17 Q    Michael Tew created them?

18 A    I would receive them from Michael Tew.  Yes.

19 Q    And let's talk a quick minute about, you have already

20 discussed, so I won't belabor the point also, this is what

21 happens when you come up third or fourth in this.  That part of

22 the reason this thing worked as well as it did, for as long as

23 it did, was because of your expertise in the area?

24 A    One hundred percent.

25 Q    Right.  Also -- it also worked this long -- successfully

JONATHAN YIOULOS - Cross

1   for this long because of Michael Tew's expertise in the area?

2   A    Yes.

3   Q    The two of you, together, as things came up, and coverups

4   needed to occur, knew enough about NAC, and enough about the

5   financial world to have this scheme get more and more

6   sophisticated, as you learned how to better cover it up?

7   A    That's correct.

8   Q    It's been mentioned that some of the things that was

9   brought to the table is what kind of companies would it make

10  sense that we submit an invoice for?

11  A    Yes.

12  Q    You had information about that, from your experience?

13  A    I did.

14  Q    Michael Tew had information about that, from his

15  experience?

16  A    Correct.

17  Q    How to code it with something, that the two of you needed

18  to decide about?

19  A    Yes.

20  Q    Whether it was for maintenance or consulting?

21  A    Absolutely.

22  Q    Well, mainly for maintenance more than consulting?

23  A    Definitely near the end, some sort of outside services.

24  Q    And part of that reason I think that you have expressed is

25  because, you know, the company had a lot of reasons to have

JONATHAN YIOULOS - Cross

1    vendors that were involved in maintenance, not as much to have

2    involved with consulting?

3    A    Yeah.  We had very old aircrafts, needed a lot of

4    maintenance, FAA regulations, so a lot of fixing.

5    Q    Perfect coming together of you and Mr. Tew's knowledge?

6    A    Yes.

7    Q    Michael told you when the funds came in, that it would go

8    into his bank accounts?

9    A    Told me what funds came in.

10   Q    Excuse me?

11   A    Can you repeat that?

12   Q    When the funds were paid?

13   A    Yes.

14   Q    They were paid to accounts that he controlled?

15   A    The majority of the time, yes.

16   Q    Because another thing that the two of you had to work out

17   and was relatively easy to do is with these invoices Michael

18   Tew would tell you, all right, here's the account name, to use,

19   the vendor name?

20   A    We discuss the vendor, yes.

21   Q    The bank?

22   A    Yes.

23   Q    The account number of the bank.  He would be the one that

24   would tell you what it was?

25   A    That's correct.

JONATHAN YIOULOS - Cross

1    *Q*    Routing information?

2    *A*    Correct.

3    *Q*    That information wasn't provided to you by Ms. Kimberley

4    Tew?

5    *A*    No, it was not.

6    *Q*    Matter of fact, you had mentioned that Ms. Tew had worked

7    for NAC for a short period?

8    *A*    Some sort of consultant.

9    *Q*    Cup of coffee, web design, something like that?

10    *A*    Something along those lines.

11    *Q*    So, the fact that she had worked for NAC, she wasn't in the

12    financial part of the company?

13    *A*    No.

14    *Q*    She didn't bring her own individual sophisticated knowledge

15    of how to operate this scheme?

16    *A*    Correct.

17    *Q*    What are progress payment invoices?  I think you mentioned

18    it briefly.  What is that?

19    *A*    Progress payment invoices I believe would be referring to

20    an invoice that was a larger invoice.  So, if the invoice was a

21    hundred thousand dollars, making progress payments to that

22    invoice would be paying a partial payment towards that invoice.

23    So, 25 percent would be 25,000, maybe 50 percent, would be

24    50,000.

25    *Q*    All right.  And I believe, if memory serves me, one of the

JONATHAN YIOULOS - Cross

1    reasons it was good to do it that way, was because you wouldn't

2    have multiple vendors?

3    A    Multiple vendors, but also just multiple invoices,

4    maintenance on aircrafts is expensive, having a larger invoice,

5    not too large, but it would it was easier to keep track of.

6    Q    Another thing that you and Michael Tew knew to be true?

7    A    Correct.

8    Q    And I think, also, covered, so, not in a whole lot of

9    detail.  You keep the amounts in a way that it wouldn't flag

10    the auditors.  Wouldn't be a red flag, at least?

11    A    For the most part, yes.

12    Q    Part of what you and Michael Tew knew about how this thing

13    operated?

14    A    Yes.

15    Q    And sometimes, if you came up with the amount of money that

16    you could give, Mr. Tew would then create an invoice to match

17    it?

18    A    That's correct.

19    Q    Matter of fact, you thought, at some point, it was

20    ridiculous, because he would ask you to remind him of how much

21    money it was, when you were thinking, *Why wouldn't he know?  He*

22    *knows when he gets his money*?

23    A    Correct.

24    Q    So, that's one part of it, the processing of it, which was

25    covered.  So, we can go a little bit quickly.  But tell me how

JONATHAN YIOULOS - Cross

1    you would process it?  You don't have to go into huge detail?

2    A    Process the payment or process, like, the invoice?

3    Q    The invoice.

4    A    Okay.  So, if -- the majority of the time, I would say 95

5    percent of the time, when Michael would send me an invoice from

6    any of the vendors, I would forward the email with the attached

7    invoice to accounts payable, and accounts payable would upload

8    that invoice in the system, and then I would make payment, go

9    on the Signature website, ACH on that invoice or partial

10   payment, as we've talked about, and then when our accounts

11   payable specialist would go online the next day, check the

12   bank, she would see, okay, this payment was for Global Fuel

13   Logistics, she could see, okay, this was for $25,700.  There's

14   a $25,700 invoice out there.  She would apply that payment to

15   that invoice, so it shows that we owe Global Fuel Logistics

16   zero dollars.

17   Q    So was Talica one of these people?

18   A    Talica was.

19   Q    Talica would get an invoice, and when she got an invoice --

20   you were her superior?

21   A    Correct.

22   Q    When she got one from you, to put into the system, she

23   would not question that?

24   A    No.

25   Q    So, you could trade a little bit on your position, so that

JONATHAN YIOULOS - Cross

1   people wouldn't question it?

2   A   Absolutely.

3   Q   These are again your co-workers?

4   A   Yes.

5   Q   And every time you did this, you are, basically, lying to

6   them about what's going on?

7   A   That is correct.

8   Q   Because they always looked like a legitimate invoice?

9   A   They looked very legitimate.

10  Q   There was a time also that you could do the process

11  yourself right?

12  A   Yes.  You know, I knew how to upload invoices into the

13  system.  I could do that myself.  I tried not to, just because,

14  from an audit standpoint, again, segregation of duties.  You

15  don't want to have the same person who is uploading invoices

16  paying invoices just fraud-risk stuff.

17  Q   Again, fly-under-the-radar stuff?

18  A   Correct.

19  Q   And you worked with Mr. Tew, also, about providing more

20  details in the invoice, right?

21  A   Yes.

22  Q   Because some of them were a little thin?

23  A   Yes.

24  Q   And you certainly didn't want an invoice to come in looking

25  a little thin; again, that could reveal what's going on?

1    *A*    Yep.

2    *Q*    You didn't communicate with Kimberley Tew about improving

3    the detail of the invoices?

4    *A*    Not improving the detail of the invoices.  No.

5    *Q*    And then, of course, we probably heard, a couple times, ACH

6    transactions was also a good way to do it, maybe for more than

7    a few reasons, but one was because it didn't require a second

8    approval?

9    *A*    That was the main reason.  Yes.

10   *Q*    And that maybe -- maybe, kind of, a shortcoming in NAC

11   financial --

12   *A*    Again, that was one of the -- when we switched to HSBC

13   Bank, for a minute, I was thrilled.  When I say *thrilled*, it's

14   because it was a metro way, in the course of business, that I

15   would have needed to ask for secondary approval for everything,

16   and asking for secondary approval of invoices that were

17   fraudulent, after maybe I could have gotten away with it once

18   or twice, but I feel like that would have come to an end

19   eventually, and maybe that would have been a deterrent to stop

20   the requests for money.

21   *Q*    It's not the requests for money, Mr. Yioulos.  You seem

22   to -- to place the responsibility on other people, than

23   yourself.  I mean, you could -- there's another simple way,

24   that we talked about, that you could have stopped it; and that

25   is, just stop participating?

JONATHAN YIOULOS - Cross

1    *A*    Absolutely.  But I felt like I was in so deep, at that

2    point, and I had -- you know, of course, of course, I'm looking

3    out for myself, of course there's a selfish interest in this,

4    and I fully admit to having selfish interests in this.  I was

5    protecting myself, and, you know, me stopping it altogether, I

6    didn't want to risk anybody going to the authorities, whether

7    or not it would incriminate them or not.

8    *Q*    Right.  So, what you are saying, you were just hoping that

9    the system would take it over, if they went and -- went to a

10   bank that required it, then it would be somebody else stopping

11   you from doing it?

12   *A*    Yes.  I mean --

13   *Q*    Sounds like a character flaw?

14   *A*    Absolutely, a character flaw.  I -- as my wife so

15   eloquently put, she wish I grew a pair, at that time.

16   *Q*    There was -- you went through a lot text-type of

17   communication for the jury?

18   *A*    Yes.

19   *Q*    Over the last couple days; is that right?

20   *A*    Yes.

21           *MR. KAPLAN:*  If we could put up 718.  This is

22   demonstrative; not admitted yet.

23           *THE COURT:*  Okay.  So we can continue publishing it.

24           *THE COURTROOM DEPUTY:*  Are you using government's

25   laptop?  Defendant's laptop?

JONATHAN YIOULOS - Cross

1          MR. KAPLAN:  Just got to get in the rhythm here.

2          THE COURTROOM DEPUTY:  That's fine.  That's fine.

3          MR. KAPLAN:  I would like Mr. Yioulos to be able to

4    look at it all, to go in the offered -- the last page.

5          If I could just have a moment?  Okay.  Can we go to

6    the next page?

7    Q   Mr. Yioulos, you did this once before, so -- I don't want

8    to go through the whole thing, but if you could read through

9    this, and if you could show him the pages.

10          MS. HUBBARD:  Starting where?

11          MR. SCHALL:  Starting at -- there, yeah.

12   A   Okay.  *If you keep texting me, yes I'm done helping.*

13   Q   Okay.

14   A   *Because you're extremely rude and confrontational and think*

15   *I'm some sort of rat trying to fuck you guys over.  Just let me*

16   *deal with Michael.  Scream at him?  Right.  Criminal?  Never*

17   *said that.*

18          MR. KAPLAN:  That's enough.

19          THE WITNESS:  Okay.

20   Q   If we can go back to the start of this.  These are the ones

21   that -- one of the ones that the government had you review?

22   A   Correct.

23   Q   And that you told the Court and the jury that you had a

24   recollection of it?

25   A   Yes.

JONATHAN YIOULOS - Cross

1    *Q*   And that you also understood that it was with Kimberley

2    because -- Ms. Tew -- because it referenced Michael in the

3    third person?

4    *A*   Correct.

5    *Q*   Do you -- you see the -- the redacted portion right there.

6    Do you recall, you have the photographic memory, what that

7    message was?

8    *A*   No, I do not.

9            *MR. KAPLAN:*  If we could ...

10           *THE COURT:*  Mr. Keech.

11   *Q*   I have handed you what's been marked as Defendant's Exhibit

12   S.

13   *A*   Okay.

14   *Q*   And I would like you to take a look where it says, *If you*

15   *keep texting me*?

16   *A*   Yes.

17   *Q*   And review it from there, and as to what we just said.  Are

18   these the same text messages that you just read?

19   *A*   Correct.

20   *Q*   All right.  Underneath the text message that says, *If you*

21   *keep texting me*, look at below that?

22   *A*   Yes.

23   *Q*   Now, this is the same series and the same text message --

24   text messages that you testified to, yeah?

25   *A*   Yes.

 1    Q    And it is the same string that you remember?

 2    A    Yes.

 3    Q    And you remember it now?

 4    A    Yes.

 5    Q    Okay.

 6         MR. KAPLAN:  Your Honor, if we could publish this?

 7         THE COURT:  Can I see a copy, first, please?

 8         MR. KAPLAN:  Sorry, Your Honor.

 9         THE COURTROOM DEPUTY:  Is it on the screen right now?

10         MS. HUBBARD:  I can.

11         THE COURT:  If you can get it --

12         MR. KAPLAN:  Do we --

13         THE COURT:  Yeah.  Because I can see the screen

14    without publishing it to the jury, so that's fine.

15         Is this part I'm looking at, the only difference from

16    the other portion, or is this all we're going to look at, right

17    now?

18         MR. KAPLAN:  Whatever -- the full three pages there,

19    is all.

20         THE COURT:  Okay.  The only difference is this part?

21    I'm just trying to figure out what's different from what I have

22    already seen, and --

23         MR. KAPLAN:  That's the unredacted portion.

24         THE COURT:  Okay.  I just would like to see new stuff

25    we're adding in.

JONATHAN YIOULOS - Cross

1             MR. KAPLAN:  You are looking at it now.

2             THE COURT:  Okay.  Well, we already saw that.

3             MR. KAPLAN:  Well, not this part.  This is redacted

4    on...

5             THE COURT:  Okay.

6             MR. KAPLAN:  That's the difference.

7             MS. HUBBARD:  And this page is different.

8             THE COURT:  Okay.  Any objection to publishing this

9    portion?

10            MR. FIELDS:  No, Your Honor.

11            THE COURT:  Okay.  Go ahead.

12   Q    The redacted -- the unredacted version is a text that says,

13   *Done helping you.  Your wife is now sending me emojis.*

14   A    Correct.

15   Q    And that is in the same chain that also references,

16   speaking about Michael in the third person?

17   A    Yes.

18            MR. KAPLAN:  We can take that down.

19   Q    Briefly go through the companies, the sham companies that

20   the jury has heard a lot, so I will not begin to belabor the

21   point too much, but Michael Tew was the one who set up the

22   companies?

23   A    Yes.

24   Q    And set it up at NAC vendors?

25   A    Yes.

JONATHAN YIOULOS - Cross

1    Q   With your help?

2    A   With my help, correct.

3    Q   And so, one of the companies was Sand Hill?

4    A   No.

5    Q   Well, let me put it this way.  That was -- appreciate the

6    answer to that.  Sand Hill -- let me back up.  Sand Hill was a

7    company that actually was Michael Tew's company?

8    A   Correct.

9    Q   And so when he got paid, he got paid by NAC giving him

10   money to his company, Sand Hill?

11   A   Correct.

12   Q   Okay.  And there was some conversation/discussion, Sand

13   Hill would be a vendor that would get money?

14   A   Correct.

15   Q   And so, what I was getting at, is that that changed, so

16   that you wouldn't be paying Sand Hill money when Michael Tew no

17   longer worked there?

18   A   Correct.

19   Q   Because, again, we're doing things to make sure that nobody

20   gets caught?

21   A   Absolutely.

22   Q   And so, the workaround on that, was to call it something

23   else?

24   A   Correct.

25   Q   And you called it was?

JONATHAN YIOULOS - Cross

1    A    SHI.

2    Q    Jessamine?

3    A    Yes.

4    Q    That's one of the sham companies?

5    A    Yes.

6         MR. KAPLAN:    Could we put up 614?    These are admitted

7    into evidence, Your Honor.

8         THE COURT:    Yes.    Thank you.

9    Q    And this is a text between you and Michael?

10   A    Correct.

11   Q    And we've seen it.    And this was the series, perhaps, if I

12   can remind you of it, we can work it through even quicker,

13   where there needed to be a corrected invoice?

14   A    A corrected account number.

15   Q    Right.    Exactly.    So, they've -- so, what this basically

16   shows is what they saw  -- this is a text between you and

17   Michael, him saying, *The guy gave us the wrong number*?

18   A    Correct.

19   Q    But you don't know if that guy actually exists?

20   A    Correct.

21   Q    All right.    Matter of fact, it would be Michael Tew just

22   doing something for his own accounting purposes?

23   A    Again, I didn't know if it was Michael or Kimberley

24   involved in this, at this point.

25   Q    Right.    But when we're talking about these text messages,

JONATHAN YIOULOS - Cross

1   you are having this conversation with Michael?

2   A   Yes, you are correct.

3        MR. KAPLAN:   Okay.   If we can go to 615.

4   Q   In 615, this is from Christopher Rincon to you, correct?

5   A   Correct.

6   Q   And this is actually creating the Signature Bank wire

7   detail?

8   A   Yes.   The wire detail is attached in this email.

9   Q   Just so we use this as an example, and we've had plenty of

10  them, this is something that you are going to make a request of

11  Abby Schwartz, right?

12  A   This one, if it was a wire confirmation, which this one

13  was, yes, that would be the approval from Abby Schwartz.

14  Q   Just remind me, her title was?

15  A   She was the director of accounting.

16  Q   And that's what you did, so this, you know, furthers the

17  scheme, is lying to your co-worker, right?

18  A   Correct.

19        MR. KAPLAN:   And if we can see 639.

20  Q   And this is a text messages between you and Michael, again,

21  right?

22  A   Correct.

23  Q   And -- at this point, Michael is no longer at NAC, because

24  the date of this one?

25  A   Correct.

 1  Q   And what he tells you is that he has a personal

 2  relationship with somebody at Jessamine?

 3  A   This is where -- he doesn't tell me, specifically, in this,

 4  that he has relationship, I --

 5  Q   Assuming it?

 6  A   I'm assuming that he has a personal relationship.

 7  Q   Okay.  Fair enough.  And this is your telling him, look, we

 8  need -- because you have or you assume that he has a personal

 9  relationship.  Please, get me an agreement?

10  A   Correct.

11  Q   And that's -- and that's kind of a theme, right?  You

12  asking Michael, Mr. Tew, to make sure that the agreements are

13  in, make sure you have the agreements?

14  A   Correct.

15  Q   And that was a problem for you, because Mr. Tew wasn't

16  always as efficient with that, as you would have liked?

17  A   Correct.

18  Q   Again, between you and him, if you guys were going to pull

19  it off, you needed to have your ducks in a row?

20  A   Absolutely.

21  Q   Hannah Scaife.  I have heard it pronounced both ways?

22  A   I don't know which way it was supposed to be pronounced,

23  either.

24  Q   Another sham company?

25  A   Yes.

JONATHAN YIOULOS - Cross

1           MR. KAPLAN:  If we can go to Exhibit 601, top of the

2     email, please.

3     Q   This is also messages between you and Mr. Tew; is that

4     right?

5     A   Yes.

6     Q   And -- and this is an expense invoice for what is described

7     as financial consultants?

8     A   Yes.

9     Q   In this particular communication, he is saying, *It's easier*

10    *just to send me the money*?

11    A   Yes.

12    Q   All right.  So, you are not even -- you are not even -- I

13    mean having -- well, you are not even sending it to the

14    consultant?

15    A   Correct.

16    Q   You agree to send it to him?

17    A   Correct.

18    Q   And you did that?

19    A   Correct.

20    Q   And he gave you the wire information, and in this one it

21    was into Guaranty Bank & Trust Company, use the last four

22    numbers, '7867?

23    A   Correct.

24    Q   Six-oh-three.  This is another email between, again,

25    Michael and you.  It's August 8th of 2018.  And this is invoice

JONATHAN YIOULOS - Cross

1    two of two.  And this is pretending that there's some

2    engagement letter that's going to be sent?

3    A    Correct.  Or an engagement with Hong Kong investors.  Yes.

4    Q    Again, send it by ACH and Michael Tew?

5    A    Yes.

6    Q    During this time, actually, he is sending it off of the --

7    he is still working for National Air Cargo?

8    A    That's correct.

9    Q    So, he is using his own email address?

10   A    Correct.

11   Q    So now, during this time, you are both still working for

12   the company?

13   A    Correct.

14   Q    Is there more to this?

15        MR. KAPLAN:  Can we scroll?  Yeah.

16   Q    Again, you are asking him, you are telling him, *I will get*

17   *out the payment today, I know the due diligence is really*

18   *picking up*.  What is that in reference to?

19   A    Just the -- like the due diligence, meaning, investor

20   relations between us and HNA.

21   Q    It's a fabrication?

22   A    It was picking up, for sure.

23   Q    But --

24   A    In reference to this, it was a fabrication, correct.

25   Q    And again, you are back -- get me an agreement?

JONATHAN YIOULOS - Cross

1    *A*    Yes.

2    *Q*    And you are asking that of Michael Tew?

3    *A*    That's correct.

4    *Q*    Finally, on this one, go to 607, please.  And this is also

5    an invoice that is between Michael and you?

6    *A*    That's correct.

7    *Q*    Same thing, asking for money to finish out this particular

8    invoice?

9    *A*    Yes.

10    *Q*    Now, when Political Media became one of the -- one of the

11    vendors --

12          MR. KAPLAN:  Well, why don't we pull up 732.  This is

13    an email from Political Media to NAC?

14    *A*    Correct.

15    *Q*    Now, maybe you can recall this also, so we can move through

16    it a little bit quicker?

17    *A*    Okay.

18    *Q*    This is a one where there's --

19    *A*    A second version that gets sent?

20    *Q*    Yes.  There's -- they think it's a mistake in an invoice?

21    *A*    Yes.  There was additional payment that was requested, so

22    it was, essentially, added to this invoice.

23    *Q*    All right.  So, if you move to 741.  You're asking for a

24    change in the invoice?

25    *A*    Correct.

JONATHAN YIOULOS - Cross

1  Q  And explain, again, why you thought there was a problem

2  with it?

3  A  So, I wanted him to change the invoice, for the -- I

4  believe, at this time, it was for the dollar amount that went

5  out.  There was an additional $9900, or something around that

6  dollar amount that went out.  So, I needed him to change it.

7  Q  And that's also -- so all of this paperwork would pass

8  muster if it was looked at?

9  A  Yes.

10  Q  You wanted this consistent, so it was all buttoned up,

11  tight?

12  A  Yes.

13  Q  That's you catching it and saying, *I need to clean this up*

14  *a little bit because this could be a problem?*

15  A  Yes.

16  Q  When it came to Political Media, you also had other

17  concerns about it that you expressed to Mr. Tew, right?

18  A  Correct.

19  Q  Because Political Media, the business they were in, was a

20  media-type business, and you didn't feel like the money going

21  out would be justified, based on the type of work that NAC

22  does?

23  A  That's correct.

24  Q  So, you just started to think that PM doesn't make sense?

25  A  Correct.

JONATHAN YIOULOS - Cross

1    Q    Who did you communicate that to?

2    A    Michael Tew.

3    Q    And so, instead of slowing down, you were making it more

4    efficient?

5    A    Yeah, you could say that.

6    Q    Because you didn't like what was going on, you thought it

7    wouldn't be hidden enough so, *Hey, why don't we change this*

8    *around*, and talk to Mr. Tew about it?

9    A    Correct.

10    Q    And then, that's what gave birth to Global Fuel Logistics?

11    A    Correct.

12    Q    And you have talked a little bit about how, with, you know,

13    having the planes was a good way to put a fraudulent invoice

14    together.  You figure, if we're going to come up with a

15    company, let's do something that seems like it would justify

16    the amount of invoices that were coming in and being paid?

17    A    Yes.

18    Q    And you figure, well, another place that could be flying

19    under the radar was fuel?

20    A    Hm, not necessarily fuel.

21    Q    All right.  Well, why don't you then explain what was the

22    beauty of Global Fuel Logistics, as a way to do this?

23    A    It sounded like an airline expense.

24    Q    So, even if it wasn't fuel, it sounded like it had to do

25    with planes, jets?

1   *A*   Correct.

2   *Q*   Look at 912, please.  So, this is an example of now it's

3   turning into the Global Fuel Logistics, as part of the Michael

4   Tew and Jonathan Yioulos fraud, right?

5   *A*   Yes.  This was Aero Maintenance Systems, but again, Aero

6   Maintenance Systems was basically a sister company, unit of

7   Global Fuel Logistics.

8   *Q*   You beat me to the question.  Because if you look at

9   this -- at this, you can see at the bottom, Aero Maintenance

10  Systems Resources, a unit of Global Fuel Logistics?

11  *A*   Correct.

12  *Q*   Was there some benefit of having two sister companies?

13  *A*   I want to -- we wanted to keep them separate, for the most

14  part, but for -- just so Michael wouldn't have to set up a

15  second company, with another W-9, I believe this is why this

16  was set up like that.

17  *Q*   So that's further, kind of, conspiratorial conversation

18  between you and Michael, how to do this so that it would work

19  and not put Michael Tew took far out?

20  *A*   Correct.

21  *Q*   And I know you spent enough time answering these questions

22  about that previous fraud, so I'm not going to rework that

23  soil, but enough to say that the the previous fraud, that you

24  did with your -- was it a college buddy that ended up there?

25  *A*   Yes.

JONATHAN YIOULOS - Cross

1    Q    It was an invoice-related way to steal money?

2    A    Absolutely.

3    Q    And that happened before Michael Tew and this conspiracy

4    was a gleam in your eye?

5    A    Correct.

6    Q    Finally, there was -- well, maybe not finally, but close to

7    finally.  Trying to get this done.  There was the banking side

8    of this, which had to do with where the money went.  Where it

9    was deposited.  That was not much in your bailiwick, right?

10   A    Correct.

11   Q    But let me just run through, very quickly, a few of the

12   documents that really was a bit affiliated with your part of

13   the scheme.

14        MR. KAPLAN:  If we can go to Exhibit 8.

15   Q    So we've -- the jury has seen plenty of these, so I don't

16   think it needs a lot of explanation, but just putting context

17   here, these are the transaction details, the ACHs transaction

18   details?

19   A    That's correct.

20   Q    And that's a NAC-related document?

21   A    Correct.

22   Q    And this is the kind of information that has to be put in

23   for the money to be paid?

24   A    Correct.

25   Q    And this is -- is this the kind of thing that somebody who

 1   is in accounts payable would see?

 2   A   They could see this.

 3   Q   Okay.

 4   A   Um ... again, part of this -- this part, yes, they could

 5   see.  They could go in, the day after it was made, see which

 6   ACHs cleared the bank, and if they wanted more detail, because

 7   oftentimes the only part that would be showing on the website,

 8   on the face of it, was the dollar amount, so they would see

 9   $15,250 taken out of of National Air Cargo's bank account, they

10   wouldn't know who it was for, unless they pulled up this

11   confirmation and looked at it, or unless it was already

12   updated, on the cash sheet, which is our daily cash

13   transaction, by somebody else.

14   Q   Does your name appear on anything, short of this, from

15   looking at what you just said?

16   A   The cash sheet?

17   Q   Yes.

18   A   No.

19   Q   If you look at this completed ACH transaction, it gives you

20   the information, in terms of -- the processing information, the

21   destination accounts, it shows here that this is a Political

22   Media vendor?

23   A   Correct.

24   Q   And the amount of money it's for.  Like, could be hundreds

25   of these, right?

JONATHAN YIOULOS - Cross

1   *A*   Yes.

2   *Q*   I mean, I'm talking about as it relates to this conspiracy?

3   *A*   Oh, yes, definitely, countless.

4   *Q*   Countless.  And here it shows that it's going into an

5   account and it gives last four number of '8486?

6   *A*   That's correct.

7   *Q*   And this is something entered by you, that's your name?

8   *A*   Correct.

9   *Q*   And you also provide the approval?

10  *A*   Correct.

11  *Q*   So, if we can just do a few more of these.

12         *MR. KAPLAN:*  If we can go to Exhibit 12.

13  *Q*   Requested by you, approved by you?

14  *A*   Correct.

15  *Q*   And this is a different account, this is account '5336,

16  right?

17  *A*   Yes.

18  *Q*   So, that's a different bank, where it's -- the money is

19  going to end up?

20  *A*   Correct.

21  *Q*   And that information is given to you by Michael Tew?

22  *A*   Correct.

23  *Q*   So, he is the one who is telling, *Yeah, why don't you send*

24  *it to this account at '5336*?

25  *A*   Yes.

JONATHAN YIOULOS – Cross

1          MR. KAPLAN:  Let's go to Exhibit 13.

2     Q    Entered by you, approved by you, correct?

3     A    Correct.

4     Q    And this is going -- the name is the SHI, LLC?

5     A    Correct.

6     Q    Kind of a Sand Hill?

7     A    Correct.

8     Q    This account is even a different number; this goes to count

9     '7934?

10    A    Correct.

11    Q    Provided by Mr. Tew?

12    A    Yes.

13         MR. KAPLAN:  Okay.  I lost my place.  Was this 2064?

14         MS. HUBBARD:  It's 13.

15         MR. KAPLAN:  Okay.

16    Q    20.  Same sort of thing, requested, approved, has to do

17    with Global Fuel Logistics payment?

18    A    Yes.

19    Q    And this is still, yet, another account, which ends in

20    '2064?

21    A    Yes.

22    Q    Provided to you by Michael Tew, correct?

23    A    Yes.

24         MR. KAPLAN:  We can go to Exhibit 40.

25    Q    Seeing the same thing, I think?  Take a minute to look at

JONATHAN YIOULOS - Cross

1    it.  This is still another account that Mr. Tew wants this

2    money to go to; this is '3094?

3    A    That's correct.

4         MR. KAPLAN:  Go to Exhibit 356.

5    Q    Same form, your name on it, this is Political Media, this

6    is still, yet, the fifth account that Michael Tew wanted going

7    into, and that's '5965?

8    A    That's correct.

9    Q    Exhibit 357.  This looks a little bit different.  What's

10   this?  What's the difference here?

11   A    Just the format of the account information.

12   Q    Pretty much the same?

13   A    Yes.

14   Q    Function?

15   A    Essentially, the same function, correct.

16   Q    And the account that this would go into, that was provided,

17   says Jessamine as the company, 5530 Jessamine Development, and

18   the account that Mr. Tew would have that go into ends in '2171?

19   A    I think the account ended in -- wait.  Yep, you are right.

20   Sorry.

21   Q    Two, one, seven, one.  All right.  And finally, the 362.

22   This is the eighth account that Mr. Tew is asking for you to

23   work, for the money to be deposited in, that number is '4514?

24   A    That's correct.

25   Q    And that, kind of, takes us, in a more abbreviated fashion

JONATHAN YIOULOS - Redirect

1   than the government perhaps, into how this scheme between you

2   and Michael Tew really functioned?

3   A    Yes.

4          MR. KAPLAN:  If I may have a moment?

5          THE COURT:  Okay.

6          MR. KAPLAN:  No more questions.

7          THE COURT:  All right.  Thank you.  So, Mr. Fields, I

8   assume you won't be able to complete Redirect in five minutes?

9          MR. FIELDS:  I can do it in five minutes, Your Honor.

10         THE COURT:  Well, then I will take you at your word.

11  Go ahead.

12                    **REDIRECT EXAMINATION**

13         THE COURT:  You have six, actually.

14         MR. FIELDS:  Thank you.  I will take them.  Thank you

15  very much, Your Honor.

16  BY MR. FIELDS:

17  Q    Mr. Yioulos, you remember being asked about this $7,000 in

18  your KeyBank account?

19  A    I do.

20         MR. FIELDS:  Let's pull up Government's Exhibit 40.

21  I'm still going to have enough time, even with the tech issue.

22         THE COURT:  All right.

23    Q    (By Mr. Kaplan) All right.  How much money was sent

24  to this account?

25  A    Ninety-five thousand dollars.

JONATHAN YIOULOS - Redirect

1    Q    Was this sent to your KeyBank account?

2    A    It was not.

3    Q    Who benefited from this?

4    A    Michael Tew.

5    Q    And $95,000, is that a little over ten times more than

6    $7,000?

7    A    Yes.

8    Q    All right.  Let's look at Government's Exhibit 38.  What is

9    this?

10   A    Another ACH confirmation with Global Fuel Logistics for

11   $82,422.

12   Q    Who got that money?

13   A    Michael Tew.

14   Q    All right.  You were asked about being untruthful every day

15   to your colleagues at National.  Do you remember those

16   questions?

17   A    I do.

18   Q    Is that something you wanted to do?

19   A    No.  Who was asking you to do that, every day.

20   A    Michael Tew.

21   Q    Who profited from it, the most?

22   A    Michael Tew.

23   Q    Who threatened if you wouldn't stop lying to your

24   colleagues every day?

25   A    Michael and Kimberley Tew.

JONATHAN YIOULOS - Redirect

1    Q    Did you want to stop?

2    A    Yes.

3    Q    Who encouraged you to keep doing it anyways?

4    A    Michael and Kimberley Tew.

5    Q    You were asked about your Plea Agreement.  Do you remember

6    that?

7    A    I do.

8    Q    Is it in your interests to tell a story about the Tews

9    that's not truthful?

10   A    No, it is not.

11   Q    Why is not in your interests?

12   A    Because if I am untruthful about anything, regarding the

13   Tews, the conspiracy, my plea can be basically ripped up and

14   void.

15   Q    And if there was a dispute over your Plea Agreement, who

16   would decide whether or not you had breached it?

17   A    Um, I believe the government.

18   Q    And if there was a dispute over whether or not you told the

19   truth, who would decide that dispute?

20   A    The government and the judge.

21   Q    You were asked about covering things up, right?

22   A    Correct.

23   Q    Did you cover things up throughout these two years?

24   A    I did.

25   Q    Who did the coverup benefit?

548
JONATHAN YIOULOS - Redirect

1   A    Myself, Michael Tew and Kimberley Tew.

2   Q    How did you benefit them?

3   A    They made -- they received over $5 million in funds from

4   National, and the authorities were not contacted, and they were

5   not found out during that time.

6   Q    You were asked about all of this money going to Michael

7   Tew.  Do you remember those questions?

8   A    I do.

9   Q    If you didn't pay this money into the accounts that Michael

10  Tew directed, who would complain about it?

11  A    Kimberley Tew.

12  Q    What would she do when she complained about it?

13  A    Text me, one-off call, or try to get in touch with somebody

14  that she thought would get a rise out of me.

15  Q    Do you remember being asked about all of these agreements?

16  A    I do.

17  Q    You had those decisions with Michael?

18  A    I did.

19         MR. FIELDS:  Pull up Government's Exhibit 659.  Let's

20  go to page two.  If we could blow up this part right there.

21  Q    Remember this message?

22  A    Yes, I do.

23  Q    Who sent it?

24  A    Kimberley did.

25  Q    Who said Michael couldn't send anymore agreements.

JONATHAN YIOULOS - Redirect

1    *A*   Kimberley did.

2    *Q*   If you had been able to get all of these agreements, and

3    all of the invoices, do you think it would have been easier to

4    stop sending them money?

5    *A*   Most likely, yes.

6    *Q*   So, whose actions kept you involved in this scheme for two

7    years, where you had to lie to your colleagues every day?

8    *A*   Michael and Kimberley.

9            *MR. FIELDS:*  No further questions, Your Honor.

10           *THE COURT:*  Thank you, Mr. Fields.  Thank you,

11   Mr. Yioulos.  Your testimony is complete.  You may step down.

12   And unless there's any reason to do otherwise, I will let the

13   jury go and ask counsel to just stay for a few minutes.

14           So, members of the jury, again, all my same -- same

15   instructions to you, about keeping an open mind, not making up

16   your mind until you have heard all of the evidence and my

17   instructions, not discussing the case with anyone else, not

18   doing research about the case on your own, those still stand.

19   Again, I appreciate your time, and we will see you back here at

20   9 o'clock tomorrow.

21           *THE COURTROOM DEPUTY:*  All rise.

22       (Jury out at 5:01 p.m.)

23           *THE COURT:*  All right.  Take your seats, please.  So,

24   I would just briefly like to discuss the question of admission

25   of the entirety of the tape.  From what I have heard so far,

JONATHAN YIOULOS - Redirect

1    I'm not going to do that.  My read of Rule 106 is I'm not even

2    sure this constitutes part of the same statement as the

3    discussion on the phone with Mr. Tew.  Even if it does, I

4    haven't heard anything that suggests that in fairness, the rest

5    of it should be considered.  I will consider and probably would

6    admit, if the defense has certain portions, the portions they

7    discussed with witnesses or may discuss, I guess it's probably

8    over.  If you come up with snippets that you want to turn into

9    exhibits, I will probably let you send those back, and if

10   there's more that you really think specific parts that should

11   be admitted, in fairness, I will consider that, but I'm not

12   going to send the whole thing back.

13           So, that's where I am on that.  Is there anything else

14   we need to discuss tonight?

15           MR. SCHALL:  On that, Your Honor, hopefully we don't

16   have to do that tonight?  Hopefully we can offer that to the

17   Court by the close of evidence.

18           THE COURT:  Yeah.  I don't see any need that we have

19   to do it tonight.

20           MR. SCHALL:  Thank you.

21           THE COURT:  Mr. Fields, anything?

22           MR. FIELDS:  Your Honor, just one minor logical issue.

23   The Court has entered an order allowing us to take testimony by

24   contemporaneous video recording.  So I have talked to defense

25   counsel, what we would like to do, with the Court's permission,

JONATHAN YIOULOS - Redirect

1    under Rule 611, which allows you to direct, sort of, the mode

2    of testimony, is to take that testimony after the lunch break

3    tomorrow at around 1 o'clock, so we have a time certain.  Even

4    if that means we are taking that witness a little bit out of

5    order.  It's a very short witness.  We don't think it will

6    disrupt the presentation of the evidence too much, and we think

7    it will help make things go smoothly.

8              THE COURT:  I assume there's nothing?

9              MR. SCHALL:  No objection.

10             MR. KAPLAN:  No objection.

11             THE COURT:  Okay.  That's fine with me.

12             MR. FIELDS:  Thank you, Your Honor.

13             THE COURT:  Anything else?

14             MS. FROST:  Your Honor, on behalf of Mr. Tew, I had

15   one thing.  Can I walk up to the podium?  It's hard to lean.

16             THE COURT:  That's fine.

17             MS. FROST:  I just wanted to check in on the severance

18   issue.  You had said, a day or two ago, that, maybe, file

19   something on Wednesday.  Can we file tomorrow morning, because

20   one of the things we're trying to do is try and get

21   transcripts?

22             THE COURT:  Yeah.  I don't see any problem if you want

23   take -- probably not going to read it after midnight anyway.

24   So -- but -- so, it's up to, if you want to spend some of your

25   time in the morning, and you know if you -- well, let's, for

JONATHAN YIOULOS - Redirect

1    now, say in the morning.  By the time we start tomorrow at 9, I

2    would like to see it, and if there's an issue with that, we can

3    discuss it.  I will probably spend time over the weekend

4    considering that, so it's not a big rush for me.  Tomorrow

5    morning it fine.

6         MS. FROST:  I appreciate that.  As you know, with the

7    press of business, when you're in trial, you are prepping for

8    the next day, and that getting -- getting onto Westlaw until 2

9    in the morning, which sometimes puts you to sleep, instead of

10   keeps you awake.

11        THE COURT:  I get you, and I would rather have you be

12   on the ball in court than spending too much time on that.  So,

13   you if you need until tomorrow morning, that's fine.  Anything

14   else?

15        MS. FROST:  And I just want to quickly supplement

16   Mr. Tew's record, on the severance, based on Mr. Kaplan, by my

17   count, pointing at Mr. Tew seven times -- I'm sorry, I'm just

18   giving Mr. Kaplan a taste of his own medicine -- at Mr. Tew,

19   seven times, during his examination with Mr. Yioulos.  I just

20   wanted to put that on the record.  Didn't want to object while

21   it was happening, with the witness on the stand.

22        THE COURT:  Okay.  Yeah.  That seems probably not

23   inaccurate, and you can include that in your briefing, if you

24   would like to.

25        If there's nothing else I don't think I need to see

JONATHAN YIOULOS - Redirect

1    you -- be here a few minutes early, but, you know, ten till

2    seems fine, tomorrow.

3            MS. FROST:  Great.  Thank you, Your Honor.

4            THE COURTROOM DEPUTY:  Court will be in recess.

5        (Recess at 5:05 p.m.)

6                              **INDEX**

7    **Item**                                                   **Page**

8    ITEM                                                       PAGE

9            WITNESSES

10       JONATHAN YIOULOS

11           Direct Examination By Mr. Fields           356

12           Cross-examination By Mr. Schall             374

13           Cross-examination By Mr. Kaplan             497

14           Redirect Examination By Mr. Fields          545

15                             EXHIBITS

16   Exhibit                  Received

17   1                          427

18   R                          434

19   T                          495

20   975                        362

21   976                        369

22

23

24

25

JONATHAN YIOULOS – Redirect

1                        **REPORTER'S CERTIFICATE**

2        I certify that the foregoing is a correct transcript from

3    the record of proceedings in the above-entitled matter.  Dated

4    at Denver, Colorado, this 20th day of October, 2024.

5

6                                      *S/Tamara Hoffschildt*
                                       Tamara Hoffschildt
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25