IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 20-cr-305-DDD

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

1. MICHAEL TEW,
2. KIMBERLEY TEW,

    Defendants.

_____

**REPORTER'S TRANSCRIPT**
JURY TRIAL, DAY 6

_____

    Proceedings before the HONORABLE DANIEL D. DOMENICO, Judge, United States District Court for the District of Colorado, occurring at 9 a.m., on the 12th day of February, 2024, in Courtroom A1002, United States Courthouse, Denver, Colorado.

**APPEARANCES**

    Bryan Fields and Sarah Weiss, Assistant U.S. Attorneys, 1225 17th Street, Suite 700, Denver, Colorado, 80202, appearing for the Government.

    Jason Dale Schall, Bowlin & Schall Law LLC, 7350 East Progress Place, Suite 100, Greenwood Village, CO 80111 and Kristen M. Frost, Ridley McGreevy & Winocur PC, 303 16th Street, Suite 200, Denver, CO 80202, appearing for the Defendant, Michael Tew.

 1          David Scott Kaplan and Jamie Hughes Hubbard, Stimson

 2    LaBranche Hubbard, LLC, 1652 North Downing Street, Denver, CO

 3    80218, appearing for Defendant, Kimberley Tew.

 4

 5          TAMMY HOFFSCHILDT, FCRR, CRR, RMR, Official Reporter
              901 19th Street, Denver, Colorado 80294
 6          Proceedings Reported by Mechanical Stenography
              Transcription Produced via Computer

 7

 8                    **P R O C E E D I N G S**

 9        (In open court at 8:57 a.m.)

10        *THE COURT:*  Good morning.  Please take your seats.

11    Mr. Schall, I understand you had something you wanted to

12    mention?  You can go ahead and come up, but I had two things I

13    just wanted to mention, myself.  Number one, thank you for the

14    jury instruction work.  And I think, at this point, we'll

15    probably make some tweaks, but probably wait till the close of

16    the evidence, or close to it, to get anything back to you.  I

17    don't know that there's much more that we can do on that, right

18    now.

19          Secondly, as to the Motion To Sever, I'm going to deny

20    that.  I'm not -- I will either put out a written order or

21    explain it later.  I don't want to delay us this morning.  But

22    I don't think that, procedurally, or on the substance, that

23    severance is appropriate or warranted.  So, I will explain,

24    either in writing, or from the bench, later.

25          So, with that, Mr. Schall, you had something?

1          MR. SCHALL:  Very briefly, Your Honor.  To my error,

2     Judge Prose, Judge -- Magistrate Judge Prose set a hearing for

3     a bond revocation for a client of mine, that was arrested in

4     the past week, at noon, and I mistakenly thought that would be

5     in this building.  It's next door.  And I don't anticipate any

6     issues there, inform the Court that I might be a little late.

7     But if we break at noon, and there's matters before the Court,

8     I will let Ms. Frost handle those, while I skedaddle.

9          Second issue, more relevant, Mr. Tew's counsel has

10    gotten snippets of the recording that we would like to offer

11    under Rule 106.  I believe there's six of them, several-minutes

12    long, each.  We just received those back from the IT person.  I

13    have not given them to the government yet.  I will establish a

14    link to do that today, but in terms of mechanics, those would

15    probably be defense exhibits, end of the alphabet somewhere,

16    and we will work on that in the next day or two.

17         THE COURT:  Okay.  Yeah.  Thank you.  Just share them,

18    and we will discuss how to --

19         MR. SCHALL:  That's all I had.

20         THE COURT:  Thank you, very much.  If there's nothing

21    else, I would like to go ahead and bring the jury back.  Do you

22    have your next witness ready?

23         MR. FIELDS:  We do, Your Honor.

24         THE COURT:  Mr. Keech.

25         THE COURTROOM DEPUTY:  All rise.

SPECIAL AGENT SARAH ANDERSON - Direct

1    (Jury in at 9:01 a.m.)

2         THE COURT:  All right.  Welcome back, ladies and

3    gentlemen.  I hope everyone had a good weekend.  I appreciate

4    your being back here, today.  We're going to pick up, again.

5    The government has called -- is prepared to call its next

6    witness.  Go ahead.

7         MR. FIELDS:  Thank you, Your Honor.  The United States

8    calls Sarah Anderson.

9         THE COURTROOM DEPUTY:  Please raise your right hand.

10     (**SPECIAL AGENT SARAH ANDERSON** was sworn.)

11         THE WITNESS:  I do.

12         THE COURTROOM DEPUTY:  Please be seated.  Please state

13    your name and spell your first and last names for the record.

14         THE WITNESS:  My name is Sarah Anderson, S A R A H,

15    A N D E R S O N.

16                    **DIRECT EXAMINATION**

17    BY MR. FIELDS:

18    Q    Good morning, Ms. Anderson.

19    A    Good morning.

20    Q    Where do you work?

21    A    I work at the Federal Bureau of Investigation or FBI.

22    Q    What are your current responsibilities at the FBI?

23    A    I investigate white-collar crime matters.  We call them

24    economic crime.

25    Q    What's your title?

SPECIAL AGENT SARAH ANDERSON - Direct

1    A    Special agent.

2    Q    Where were you assigned in 2020?

3    A    I was assigned to the Denver division of the FBI.  The same

4    squad to which I'm currently assigned, the white-collar crime

5    squad.

6    Q    How long have you been a special agent with the FBI?

7    A    Over 15 years.

8    Q    Have you received training in interviewing witnesses?

9    A    Yes.

10   Q    Describe that for us?

11   A    I received initial training going through Quantico,

12   Virginia, as a new agent training, and then throughout the

13   course of my time I have had refresher training and then just

14   on-the-job training, doing my normal day-to-day functions.

15   Q    What about training executing search warrants?

16   A    Yes.  I have had training in that, as well.  Similar,

17   on-the-job training, initial training, as I went through

18   Quantico.

19   Q    During your years in the FBI, approximately how many

20   interviews do you think you have conducted?

21   A    Hundreds of interviews.

22   Q    What about search warrants?

23   A    Fewer search warrants, but quite a few.  Um, numerous

24   search warrants.

25   Q    Are you familiar with an investigation of Michael Tew and

SPECIAL AGENT SARAH ANDERSON – Direct

1    Kimberley Tew?

2    *A*    Yes.

3    *Q*    How are you familiar with it?

4    *A*    I was assigned as the case agent for that investigation,

5    for my office, in the fall of 2019.

6    *Q*    Were you working on it with anyone else?

7    *A*    I worked on it, jointly, with IRS Criminal Investigation

8    Special Agent Lisa Palmer, and then a forensic accountant from

9    my office, Matt Morgan.

10   *Q*    As part of your investigation, did you apply for search

11   warrants?

12   *A*    Yes.

13   *Q*    Was one of those search warrants for an account at Apple™?

14   *A*    Yes.

15   *Q*    What was the account?

16   *A*    It was an account *kley@me.com*.

17   *Q*    Do you have experience executing these digital warrants?

18   *A*    Yes.

19   *Q*    What do you do to execute one of these warrants on a place

20   like Apple™?

21   *A*    Different -- different digital warrants are executed

22   differently, but in the case of Apple™, that one I submitted to

23   a law enforcement email address, at the time, for electronic

24   submission of warrants.

25   *Q*    After you do that, what happens?

1025

SPECIAL AGENT SARAH ANDERSON - Direct

1  *A*   After I submitted the warrant, I got notification from

2  Apple™ that they were in receipt of it, that it would require

3  approximately two to four weeks for them to actually process

4  the warrant and make the return.

5  *Q*   All right.  Fast forward two to four weeks later.  What

6  happened?

7  *A*   I received another email communication that the information

8  was prepared, and they wanted to turn it over to the FBI,

9  except that the volume of it was very voluminous.  There was a

10  lot of data.  So, they had a special way to transfer it to our

11  headquarters unit, and they would be in receipt of the

12  information they returned.

13  *Q*   What's the name of the headquarters unit?

14  *A*   It was the Data Intercept Technology Unit.

15  *Q*   At that time, did you ask for assistance processing that

16  warrant?

17  *A*   Yes.

18  *Q*   Who did you turn to for help?

19  *A*   Our digital operation specialist, Nick Hanggi.  He is an

20  individual that works primarily cyber-crime matters in-house at

21  the FBI, to assist in this type of investigation.

22  *Q*   *Digital operation specialist,* what do they do?

23  *A*   I think of them as a computer scientist.  He processes and

24  handles a lot of electronic data.  He knows how to download it,

25  and knows the programs used, involved with it.

SPECIAL AGENT SARAH ANDERSON - Direct

1   *Q*   Was he able to return that Apple™?

2   *A*   Yes.

3   *Q*   What did he do with it?

4   *A*   He put the return on an external hard drive, and then

5   submitted it to our evidence -- evidence vault.

6   *Q*   Did he use a tool to make that data easier for review?

7   *A*   He used a program called Cellebrite.

8   *Q*   What is Cellebrite?

9   *A*   Cellebrite is a program that takes raw data and then

10   manages it, sorts it in a way that's usable for someone like

11   the case agent to review.  Where we can look at it.  Where it's

12   not just just the raw data.  We can sort through various

13   messages or texts or photos or images.

14   *Q*   After -- does Cellebrite generate reports?

15   *A*   Yes.

16   *Q*   What did he do with those reports?

17   *A*   He put those reports on the external hard drive, as well.

18   *Q*   The same hard drive as the other data?

19   *A*   Yes.

20   *Q*   All right.  Now, over there, on the cart, there should be a

21   Redweld®.  If I could ask Mr. Keech to grab that.  On the far

22   right, second shelf on the cart.  There.  Yep.

23         *THE COURTROOM DEPUTY:*  Envelope or just the Redweld®?

24         *MR. FIELDS:*  Just the Redweld®, please.

25   *Q*   What is that?

SPECIAL AGENT SARAH ANDERSON - Direct

1  *A*   This -- this is the folder that was submitted to our

2  evidence room by Nick Hanggi, when he received the Apple™

3  return.

4  *Q*   What's inside the envelope?

5  *A*   Inside the envelope is the external hard drive, that he put

6  the material on.

7  *Q*   How do you know that's the same hard drive that DOS Hanggi

8  put those reports in the Apple™ return on?

9  *A*   When materials are submitted to the evidence room, there's

10  a chain of custody sheet, and it will show the day it was in

11  receipt of the individual, and the day it was placed in the

12  evidence room, and then anytime it's removed from the evidence

13  room, there's, like, a chain of custody that indicates the

14  reason why, and then who was removing it.  And so the evidence

15  room, there's some technicians who operate it, and they

16  maintain custody of the evidence.

17  *Q*   Do you know how hard drives, like that, are stored in FBI

18  evidence?

19  *A*   So, electronic media, hard drives, computers, similar-type

20  devices, they are stored in what we call our digital evidence

21  section.  So it's separate from general evidence or valuables

22  or drug evidence.

23  *Q*   Now, after DOS Hanggi created those Cellebrite reports, did

24  he create something called a derivative report for you to

25  review?

SPECIAL AGENT SARAH ANDERSON – Direct

1  *A*    Yes.

2  *Q*    What is a derivative report?

3  *A*    A derivative report is a report that the analyst, like Nick

4  Hanggi, might put together, so he can sort through some of the

5  information; look for specific phone numbers or names or

6  contacts within the return.

7  *Q*    What did you do with those Cellebrite reports, once you had

8  received them?

9  *A*    We provided them to our co-case agent, Special Agent Lisa

10  Palmer, and to the U.S. Attorney's Office, for discovery.

11  *Q*    As part of the investigation, did you also serve Court

12  orders for information associated with certain Google accounts?

13  *A*    Yes.

14  *Q*    Which counts?

15  *A*    There was an account in the name

16  *political.media.wdc@gmail.com.*

17  *Q*    How did you serve that order?

18  *A*    I served that order in the same way I did Apple™.  I sent

19  it to an email address, that was set up for law enforcement

20  submission from Google.  I received notification back from

21  Google that they had received my order, but they wanted it to

22  be processed through a Google platform they set up for law

23  enforcement, and they responded to my request through an online

24  platform where I had a log-in number and username.

25  *Q*    Did you, ultimately, get information back from Google?

SPECIAL AGENT SARAH ANDERSON - Direct

1    *A*   Yes.

2    *Q*   What did you do with that information, when you received

3    it?

4    *A*   Once I received that information, I documented it and it

5    was submitted to our FBI case file.

6    *Q*   Now, let's move on to a different topic.  At some point in

7    your investigation, did you decide to make contact with

8    executives at National Air Cargo?

9    *A*   Yes.

10   *Q*   When did you make that decision?

11   *A*   In the summer of 2020.  We reached out to National Air

12   Cargo representatives.

13   *Q*   Who did you make contact with?

14   *A*   I first contacted Lori Alf.

15   *Q*   What happened after you made contact with Lori Alf?

16   *A*   After my contact with Lori Alf, we had additional contact,

17   seven days later, with Lori Alf and her husband, Chris Alf, the

18   National Air Cargo director of security, Brian Boyd, and Abby

19   Schwartz, from accounting.

20   *Q*   Did you schedule interviews to take place at National Air

21   Cargo?

22   *A*   Yes.

23   *Q*   Approximately when were those interviews scheduled to take

24   place?

25   *A*   The -- so, after my initial contact, there was some

SPECIAL AGENT SARAH ANDERSON - Direct

1    followup interviews with National Cargo on July 1st.  There was

2    additional interviews that took place on July 7th.

3    Q    Without getting into what was said, during those

4    interviews, can you just tell us who was interviewed?

5    A    During the interview, Jonathan Yioulos was interviewed that

6    day.  Abby Schwartz was interviewed, as well, that day, and a

7    followup interview.

8    Q    All right.  This is just one lose end.  Was there an FBI

9    colleague out there in New York?

10   A    Yes.  I requested the assistance of FBI Agent Luke

11   Humphrey, to assist with interviews.

12   Q    All right.  After those interviews, did National Air Cargo

13   decide to take personnel action?

14   A    Yes.

15   Q    Did they tell you the day they were doing that?

16   A    Yes.  They actually -- so, they terminated Jonathan Yioulos

17   prior to the FBI interview of him, FBI and IRS interview of

18   him.

19   Q    What day was that?

20   A    That was on July 7th.

21   Q    On July 8th, 2020, did you receive a request to interview

22   Michael Tew?

23   A    Yes.

24   Q    Who made that request of you?

25   A    Assistant United States Attorney Hetal Doshi.

SPECIAL AGENT SARAH ANDERSON - Direct

1    *Q*    After you got that request, did you make arraignments to

2    travel to his last known address?

3    *A*    Yes.

4    *Q*    What was that address?

5    *A*    It was 3222, East 1st Avenue, in the Cherry Creek avenue --

6    Cherry Creek area of Denver, Colorado.

7    *Q*    Again, one other loose end.  Are you familiar with that

8    area, in Cherry Creek?

9    *A*    Yes.

10   *Q*    Is there a Target store located around that area?

11   *A*    Yes.

12   *Q*    Where is it?

13   *A*    Um, it's fairly adjacent to it.  In fact, later on, when we

14   had to do an operational event there, we staged at that Target

15   location, the parking lot.  So, it's not too far afield from --

16   it's a couple blocks away.

17   *Q*    Even though it's pretty close to the Cherry Creek

18   neighborhood, is it actually in a different city?

19   *A*    I think it's in Glendale, Colorado, probably.

20   *Q*    What was the objective of interviewing Michael Tew?

21   *A*    I was there to interview him about the activity that was

22   going on the National Cargo.  So I began the interview by

23   talking about the specifics related to there was concerns about

24   American Express, charges that had been made, at -- on a credit

25   card that was National Air Cargo business credit card.

SPECIAL AGENT SARAH ANDERSON – Direct

 1   *Q*   Approximately, what time did you get to the residence?

 2   *A*   It was a little after 3 PM, on the 8th.

 3   *Q*   Were other agents already there?

 4   *A*   Yes.

 5   *Q*   Who?

 6   *A*   There were agents from the IRS Criminal Investigation Unit,

 7   already at the apartment complex.

 8   *Q*   All right.  Now I want to show you an exhibit that's not

 9   yet in evidence.  It will show up there on the monitor.

10         Actually, before we are done with that, if you want to

11   put the hard drives back, we can put that back on the cart.

12         All right.  Let's look at Government's Exhibit 555, if

13   we can.  What is that?

14   *A*   That's a photograph of the exterior of the apartment

15   complex; like a portion of the apartment complex.

16         *MR. FIELDS:*  At this time the government would move

17   for Government's Exhibit 555.

18         *THE COURT:*  Any objections?

19         *MR. SCHALL:*  No.

20         *MR. KAPLAN:*  No, Your Honor.

21         *THE COURT:*  It's admitted.

22   *Q*   All right.  So, you say that's the exterior of the

23   building?

24   *A*   Yes.

25   *Q*   If you could, on the screen there in front of, you can

SPECIAL AGENT SARAH ANDERSON - Direct

1   actually draw, with your hand.  Can you tell us where that

2   front entrance is to the building?

3   A   So, this is the parking garage, to the left, and there's an

4   entrance here, to, like, a lobby entrance.

5   Q   So, let's go ahead and take this down.  I want to show you

6   another exhibit that's not yet in evidence.  It's Government's

7   Exhibit 556.  What is this?

8   A   That's the entrance to the lobby area of the apartment

9   complex.

10          MR. FIELDS:  At this time the government moves for

11  admission of Government's Exhibit 556.

12          THE COURT:  Any objections?

13          MR. SCHALL:  None.

14          MR. KAPLAN:  No, Your Honor.

15          THE COURT:  It's admitted.

16  Q   So, on the left there, is that the entrance to the garage

17  you were just talking about?

18  A   Yes.

19  Q   So, after you walked -- well, first of all, is this a large

20  apartment complex?

21  A   I think it's fairly large.  Yes.

22  Q   So, what do you do, after you walk into the lobby?

23  A   So, when I arrived at the lobby, there was an IRS agent

24  already at the building, and he met me there in the lobby.

25  Then I went with him up to the second floor.

SPECIAL AGENT SARAH ANDERSON - Direct

1    *Q*   Why did you go to the second floor?

2    *A*   That was the apartment that was being occupied by the Tews.

3    *Q*   Do you remember the unit number?

4    *A*   It was Unit Number 224.

5    *Q*   What did you see, when you arrived on the second floor?

6    *A*   I was taken out to an exterior courtyard area, and then

7    there were a few IRS agents there, and Michael and Kimberley

8    Tew.

9          *MR. FIELDS:*  Let's go ahead and take down Government's

10   Exhibit 556, please.

11   *Q*   All right.  How were you dressed for this encounter?

12   *A*   I was dressed similarly as I am today.  I was in a suit.

13   *Q*   Were you armed?

14   *A*   Yes.

15   *Q*   Was your firearm visible?

16   *A*   No.  It was under my suit jacket.

17   *Q*   All right.  Now let's look at another exhibit, not yet in

18   evidence, 557.  What is this?

19   *A*   This is a photograph of the exterior of Apartment 224.

20   There is an inner courtyard area, sort of, blocked off with the

21   half wall of of cinderblocks, that's outside of the Apartment

22   224.  Past the half wall there's a common area, like a fire pit

23   that more than one unit -- more than one unit enter out on to.

24   *Q*   Is this where your encounter with Michael and Kimberley Tew

25   took place?

SPECIAL AGENT SARAH ANDERSON – Direct

1    A    Yes.

2             MR. FIELDS:  At this time, the government would move

3    for admission of Government's Exhibit 557.

4             THE COURT:  Any objections?

5             MR. SCHALL:  None.

6             MR. KAPLAN:  No, Your Honor.

7             THE COURT:  It's admitted.

8    Q    All right.  So, if you could, describe to us, when you

9    first got there, where were Michael and Kimberley Tew?

10   A    So, they were in the inner courtyard area that's particular

11   to their apartment unit.

12   Q    Can you circle that area for us, in the photograph?

13            MR. FIELDS:  Let the record reflect that the agent has

14   circled the, sort of, bottom, middle portion of the photograph?

15            THE COURT:  Okay.

16   Q    All right.  What did you do when you got there?

17   A    I told Mr. Tew that I was hoping to ask him some questions

18   related to his employment with National Air Cargo, his previous

19   employment there.

20   Q    Did you tell him who you were?

21   A    Yes.  I identified myself as a special agent with the FBI.

22   Q    Did he agree to speak with you?

23   A    Yes.

24   Q    Where did Kimberley Tew go, at that point?

25   A    Kimberley Tew stayed within that courtyard area, during the

SPECIAL AGENT SARAH ANDERSON - Direct

1  interview.

2  Q   At some point, did you ask to record the interview?

3  A   Yes.

4  Q   What happened when you made that request?

5  A   Kimberley objected to me recording it, so I did not

6  continue to fire up my recorder, to start it.

7  Q   Were you there to interview both Michael and Kimberley Tew?

8  A   No.  I was there just to interview Mr. Tew.

9  Q   Even though you were only there to interview one of them,

10  was Ms. Kimberley Tew present during this entire encounter?

11  A   Yes.

12  Q   Why was that?

13  A   It was a voluntary interview.  It wasn't an interview in

14  which I would have a spouse not be present for.  I have done

15  many interviews, over the course of my career, and frequently,

16  when a spouse is interviewed, they might be more comfortable

17  with a spouse there or want a spouse to be there, present with

18  them.

19  Q   Was Kimberley Tew present throughout your interview?

20  A   Yes.

21  Q   Did she move around, at all, during the interview?

22  A   Um, there was some movement, maybe in and out of the

23  unit -- the apartment unit, during the course of the interview.

24  Q   What about Michael Tew, did he move around during the

25  interview?

SPECIAL AGENT SARAH ANDERSON – Direct

1    *A*    Yes.   Initially, when we began the interview, we sat at the

2    fireplace area, behind the cinderblock wall, that common area.

3    We sat there for a little while.  That's where I actually tried

4    to get the recording going.  And then during the course of the

5    interview, he moved back into that inner courtyard area.

6    *Q*    And just so it's clear, were other agents also present,

7    during this interview?

8    *A*    Yes.

9    *Q*    How many of you where there?

10   *A*    Approximately, I think, five agents.  Five or six agents

11   were there.

12   *Q*    So, there were five or six agents to interview two people?

13   *A*    Yes.

14   *Q*    Why?

15   *A*    Well, the other agents that were there, weren't

16   knowledgeable about the case.  It is my understanding they were

17   there to assist me in interviewing the Tews, but they really

18   didn't have any background or knowledge of the area.

19   *Q*    How would you describe Michael Tew's demeanor, during the

20   interview?

21   *A*    I would say that they were as interested in why I was

22   really there, as I was to gather information from them.

23          *MR. SCHALL:*  Objection, Your Honor.  She asked about

24   Michael Tew's demeanor.

25          *THE COURT:*  Sustained.

SPECIAL AGENT SARAH ANDERSON - Direct

1    *Q*   If you could, just, sort of -- let's focus just on Michael

2    Tew, and I will talk about Kimberley Tew in a moment.

3                So, just with regard to Michael Tew, how would you

4    describe his demeanor, during the interview

5    *A*   I would say he was curious as to what the nature of my

6    questions were getting at.  Where I was going with my questions

7    towards him.

8    *Q*   What about Kimberley Tew's demeanor?  How would you

9    describe her demeanor during that interview?

10   *A*   Similarly, inquisitive as to, really, why I was there.

11   *Q*   So, describe to us what happened during the interview?

12   *A*   So, I began to talk with Mr. Tew about his previous

13   employment at National Air Cargo.  How long he had worked

14   there.  We talked about his assistance providing them, during

15   their bankruptcy filings, that he had been terminated from that

16   location, and then if he had been in contact with anyone

17   currently at National Air Cargo.

18   *Q*   When you asked if he had been in contact, currently, at

19   National Air Cargo, what was his response?

20   *A*   He advised that he had been with Jacob, who was not further

21   identified, kept in touch with him via LinkedIn, to see what

22   was going on with National Air Cargo.

23   *Q*   The only person he mentioned was Jacob?

24   *A*   Yes.

25   *Q*   How long would you say the interview lasted?

SPECIAL AGENT SARAH ANDERSON - Direct

1   *A*   Approximately 30 minutes, or so.

2   *Q*   How did your interview end?

3   *A*   At the conclusion of the interview, I had a subpoena for

4   records related to Sand Hill, an entity Sand Hill, and I served

5   that to Mr. Tew.

6   *Q*   What did he do with it?

7   *A*   He handed the subpoena to Kimberley Tew.

8   *Q*   Did he say anything when he handed it to her?

9   *A*   He said that Kimberley organizes their files.

10  *Q*   Did anyone propose another meeting?

11  *A*   Yes.  We -- at the conclusion of the interview, and the

12  service of the subpoena, I attempted to set up another date

13  that would work to conduct an additional interview or longer

14  interview, but it wasn't successful, and we didn't end up

15  scheduling a different time.

16  *Q*   Why was it unsuccessful?

17  *A*   Dates that were suggested, there was complications or

18  conflict with those various dates.  So, nothing was set before

19  the end of the interview.

20  *Q*   Did you ask Kimberley Tew for contact information to set up

21  that interview?

22  *A*   Yes.

23  *Q*   What was her response?

24  *A*   Um, initially, I was just trying to get a phone number, so

25  I could follow up and give a call to see when a good time would

1040
SPECIAL AGENT SARAH ANDERSON - Direct

1  be to schedule an interview.  I didn't get a phone number, but

2  she sent me an email related to it.

3  Q  Did you return to the residence on July 31st 2020?

4  A  Yes.

5  Q  What was the purpose of this second visit to the residence?

6  A  To execute a search warrant.

7  Q  What were you looking for?

8  A  I was specifically looking for Kimberley Tew's iPhone and a

9  couple of banker bags.

10  Q  Approximately how many agents were there with you, as part

11  of this team?

12  A  There were 10 to 12 agents on that team.

13  Q  Why do you need 10 to 12 agents to execute a warrant like

14  this?

15  A  When a warrant is executed, it's part of an operational

16  plan.  So, during search warrants, there's a lot of different

17  moving pieces.  We document via photographs, a photography log.

18  Someone else that keeps an evidence log.  So, there's quite a

19  few number of agents to participate in all of the different

20  functions involved in a search warrant, and then also, because

21  it is a search warrant, you have a lot of agents, for the

22  safety of the agents there, as well.

23  Q  What do agents do when they first arrive to execute a

24  search?

25  A  Upon first arriving executing a search, we will approach

SPECIAL AGENT SARAH ANDERSON - Direct

1   the residence and knock, inform them who is outside and that we

2   have a warrant that we would like to execute.

3   Q   At that point, is there, sort of, a preliminary, first

4   step, before they actually start searching?

5   A   Upon making entrance into a residence, or, you know,

6   property or going to execute a search warrant on, you will

7   clear the area to make sure it's safe.  There's -- you have

8   accounted for everybody.  All of the occupants of the area.

9   And then following that, you will begin the formal search

10  portion of it.  It typically begins with documenting the

11  residence, through photographs.

12  Q   Why do they take those photographs?

13  A   The photographs are taken for a number of reasons.  First,

14  to document the condition of the area in which you are

15  searching, so that, you know, can alleviate claims of

16  destruction or damage that are done there.  Also document

17  evidence in the space where you are searching, and really just

18  as, you know, a picture is worth a thousand words.  It

19  documents the scene and you can refer to it later.

20  Q   Was anyone present when the team arrived to execute the

21  search?

22  A   Yes.  Mr. Tew was present and two minor children were

23  present.

24  Q   Was Kimberley Tew present?

25  A   No.

SPECIAL AGENT SARAH ANDERSON - Direct

1    *Q*   So, did agents do those steps, take photographs?

2    *A*   Yes.

3    *Q*   After they started executing the search, what did they

4    find?

5    *A*   During the execution of the search, we located banker's

6    bags.  We documented those.

7    *Q*   Were they able to find that cell phone?

8    *A*   No.

9    *Q*   Let's look at Government's Exhibit 558, which is not yet in

10   evidence.  What is this this?

11   *A*   Is a photograph of the interior of the apartment that we

12   were searching.

13          *MR. FIELDS:*  At this time, the government would move

14   for admission of Government's Exhibit 558.

15          *THE COURT:*  Any objections?

16          *MR. SCHALL:*  Only relevance, Your Honor.

17          *THE COURT:*  Well, overruled.  I will let him explain

18   the relevance.  Go ahead.  It's admitted.

19          *MR. FIELDS:*  Thank you.

20   *Q*   Ms. Anderson, do you see, sort of, a sign on the wall

21   there?

22   *A*   Yes.

23   *Q*   Was that sign originally present, when -- before the

24   search?

25   *A*   No.

SPECIAL AGENT SARAH ANDERSON - Direct

1    Q    Who puts that sign there?

2    A    So, the search team will put that sign there, in part, to

3    just document the various areas of the apartment that we're

4    searching.

5    Q    Do you also see -- this as almost like a, *Where is Waldo*?

6    You see a little yellow placard?

7    A    Yes.

8    Q    Where is that?

9    A    It's sitting on the half-wall, that's kind of just visible

10   to the right of the photograph.

11   Q    Could you circle that on the screen for us?  All right.

12   That's sort of in the middle, far right?

13   A    Yes.

14   Q    Was that placard originally present before agents executed

15   their search?

16   A    No.  That's a placard that the search team brings with

17   them.

18   Q    What is the purpose of that placard?

19   A    To mark evidence items when they are located and to be

20   photographed.

21        MR. FIELDS:  Let's take this down.  Now let's look at

22   another exhibit not in evidence, Government's Exhibit 559.

23   Q    What is this?

24   A    This is a just a closeup shot of same placard, and then on

25   top of the white box, behind the placard, there's a black

SPECIAL AGENT SARAH ANDERSON - Direct

1    banker's bag.

2          *MR. FIELDS:*  At this time the government would move

3    for Government's Exhibit 559.

4          *THE COURT:*  Any objections?

5          *MR. SCHALL:*  None.

6          *MR. KAPLAN:*  No, Your Honor.

7          *THE COURT:*  All right.  It's admitted.

8          *MR. FIELDS:*  And now, let's look at another exhibit,

9    that's not in evidence, that's Government's Exhibit 560.

10   *Q*   What is this?

11   *A*   That's a closer shot of the black banker's bag.

12         *MR. FIELDS:*  Your Honor, at this time the government

13   would for admission of 560.

14         *THE COURT:*  Hearing no objection, I will admit 560.

15   *Q*   All right.  And finally, as you might be able to

16   anticipate, let's look at Government's Exhibit 561.  What is

17   this?

18   *A*   That's an even more -- better closeup of the same black

19   banker's bag.

20         *MR. FIELDS:*  At this time, the government would move

21   for admission of Government's Exhibit 561.

22         *THE COURT:*  Hearing no objection to 561, it will be

23   admitted.

24   *Q*   What did the agents do after they found this banker's bag?

25   *A*   It was taken and put into evidence?

SPECIAL AGENT SARAH ANDERSON - Direct

1  *Q*   Who put it into evidence?

2  *A*   I did.

3  *Q*   So, again, over there on the, sort of, cart there,

4  Mr. Keech could help us, there should be -- it's yellow

5  envelope.  It's just underneath the Redweld®.

6  *Q*   All right.  That's been marked as Government's Exhibit 562.

7  What is that?

8  *A*   This is the envelope -- the evidence envelope in which the

9  black banker's bag was submitted to our evidence room.

10 *Q*   How do you know that?

11 *A*   I submitted it to evidence, I checked it out of evidence,

12 here for this trial; I'm just familiar with it.

13 *Q*   Is that envelope sealed?

14 *A*   Yes.

15 *Q*   Why is it sealed?

16 *A*   It's sealed because when it was packaged at the search

17 warrant, we put evidence tape on it, and it wasn't -- it has

18 not needed to be opened since that time period.

19 *Q*   All right.  Could you go ahead and open that bag for us?

20 What do you see inside there?

21 *A*   Just the black Wells Fargo banker's bag.

22 *Q*   Did that appear to be in the same or substantially the same

23 condition as when you found it?

24 *A*   Yes.

25         *MR. FIELDS:*  Your Honor, at this time, the government

SPECIAL AGENT SARAH ANDERSON – Direct

1    would move for admission of Government's Exhibit 562.

2             THE COURT:  Any objection to 562?

3         MR. SCHALL:  No, Your Honor.

4             THE COURT:  All right.  It's admitted.

5    Q   All right.  Finally, let's look at Government's Exhibit

6    409, which is already in evidence.  Do you see that photograph

7    there?

8    A   Yes.

9    Q   What do you notice?

10   A   Well, I can see Mr. Tew in the photograph, and then I can,

11   you know, visually see the black banker's bag in that

12   photograph, as well.

13   Q   If you compare it to 562 in front of you?

14   A   Yes.

15   Q   What do you notice?

16   A   I notice that it's the same color, approximate same size

17   and shape, appears to be similar banker's bag.

18           MR. FIELDS:  Your Honor, may I have just a moment?

19           THE COURT:  Yes.

20           MR. FIELDS:  All right.  One last followup.  We can

21   take that down.

22   Q   Earlier, you had mentioned the Apple™ email account that

23   you executed the warrant on?

24   A   Yes.

25   Q   Just for purposes of the record, could you spell that out

SPECIAL AGENT SARAH ANDERSON - Cross

1    for us?

2    A    The kley?  *Kley@me.com.*

3           *MR. FIELDS:*  Thank you very much.  No further

4    questions, Your Honor.

5           *THE COURT:*  All right.  Thank you, Mr. Fields.

6    Cross-examination?

7           *MR. SCHALL:*  May I have just a moment, Your Honor?

8           *THE COURT:*  Yes.

9           *MR. SCHALL:*  May I proceed, Your Honor?

10          *THE COURT:*  Yes.

11

12                       **CROSS-EXAMINATION**

13   *BY MR. SCHALL:*

14   *Q*    Special Agent, are you familiar with the Cellebrite

15   software?

16   *A*    I'm not overly familiar, no.  Just as an end user, yes.

17   *Q*    Is it -- is its capabilities limited -- if you know -- to

18   what you testified earlier, producing documents of sorts?

19   *A*    I don't think I could speak to that about the documents --

20   I know it produces a report that can be analyzed.

21   *Q*    Is it -- is -- let me back up.  Do you know if that

22   software, or versions of that software, are utilized for

23   different things within the Federal Bureau of Investigation?

24   *A*    Yes.

25   *Q*    And if I were to say to you, are you familiar with what's

SPECIAL AGENT SARAH ANDERSON - Cross

1    sometimes referred to as the *dark side of the FBI*, would that

2    mean anything to you?

3    *A*    No.

4    *Q*    Is there, within the FBI, domestic investigations and

5    investigations that involve foreign countries, foreign

6    nationals, more like intelligence?

7    *A*    Yes.  We do have different branches within the FBI.

8    *Q*    And is one of those the counterintelligence branch?

9    *A*    Yes.

10   *Q*    And that -- have you ever referred to that or ever heard it

11   referred to as *the dark side*?

12   *A*    Not in-house.  My spouse is a criminal special agent.  He

13   works C.I.  He works outside of the house.  We don't refer to

14   it as *the dark side*.

15   *Q*    That is a different side of the house?

16   *A*    Yes.

17   *Q*    And they don't mix, very often?

18   *A*    No.  They are definitely segregated violations.  They have

19   their own squads and their own supervisors.

20   *Q*    And if you know, that's because the laws that permit

21   investigations, external to the United States, are different

22   than the laws that permit investigations internal to the United

23   States?

24   *A*    Yes.

25   *Q*    Okay.  But your testimony that you are not an expert or

SPECIAL AGENT SARAH ANDERSON - Cross

1   know much about the Cellebrite software?

2   A   No.  I'm not an expert on the Cellebrite software.

3   Q   You know what, I'm not going to belabor the point, but you

4   know the company that produces it?

5   A   I believe they are based in Israel, but I couldn't tell you

6   the name of the company.

7   Q   When you -- taking you back to the interview you did with

8   Mr. Tew, in the courtyard that day.  Why weren't you there to

9   interview Kimberley Tew, as well?

10  A   Well, at the time our investigation was still fairly new.

11  It was sort of in its infancy.  We had just discovered the

12  individual at National Air Cargo, who was assisting at

13  funneling money out of the company.  You knew -- he had been in

14  primary communication with Mr. Tew.  So, that was the focus of

15  my interview.

16  Q   And when you handed Mr. Tew the subpoena, did he ask for a

17  lawyer?

18  A   He did not.

19  Q   Was he arrested shortly, thereafter?

20  A   Yes.

21  Q   And you said there -- I think you said, five or six federal

22  agents present, at that time?

23  A   Yes.

24  Q   And Michael Tew was present?

25  A   Yes.

SPECIAL AGENT SARAH ANDERSON - Cross

1   Q   Kimberley Tew was present?

2   A   Yes.

3   Q   Do you know where their children were?

4   A   Their children were in and out of the apartment units.

5   Sometimes on the exterior -- and I am sorry, is this about the

6   arrest or is this the interview?  Which?

7   Q   Well, let's talk about the interview, first?

8   A   Okay.  So, during the course of the interview, the children

9   were sometimes in the exterior courtyard area, and sometimes

10  back and forth into their apartment.

11  Q   And both parents, if you will, were attending the

12  interview?

13  A   Yes.

14  Q   Were the children free to roam?  Were they cared for?  What

15  was that about?

16  A   They were cared for.  They were, sort of, playing in that

17  exterior courtyard area.  They were --

18  Q   With the agents?

19  A   Not particularly with the agents.  No, just back and forth.

20  Q   Okay.  But they were in a safe space?

21  A   Yes.

22         MR. SCHALL:  May I have just a moment, Your Honor?

23         THE COURT:  Yes.

24         MR. SCHALL:  Pass the witness, Your Honor.

25         THE COURT:  Okay.  For Mrs. Tew?

SPECIAL AGENT SARAH ANDERSON - Cross

1        *MR. KAPLAN:*  Thank you.  Briefly.

2                          **CROSS-EXAMINATION**

3    *BY MR. KAPLAN:*

4    *Q*    Good morning.

5    *A*    Good morning.

6    *Q*    It sounds like, in terms of your role, having to do with

7    subpoenas and issuing the requests for information, you really

8    are just a conduit for asking for it, receiving it and passing

9    it along?

10   *A*    And then also the review of the information, the returns.

11   *Q*    Okay.  So, let me ask you about that, for a quick second.

12   When you say, *Review the information upon the returns*, there

13   was a portion of the information that you have talked a little

14   bit having to do with the Cellebrite information?

15   *A*    Yes.

16   *Q*    And that is what you suggested was in a more readable form?

17   *A*    Yes.

18   *Q*    And did you review all of the Cellebrite information?

19   *A*    I have not reviewed the Cellebrite in its entirety.  No.

20   *Q*    Did you have an opportunity to look it over, to make some

21   evaluations about it?

22   *A*    Yes.

23   *Q*    So, was -- kind of a general review, without diving too

24   deeply into each of the Cellebrite documents?

25   *A*    It was also a sorted review, just after doing specific

ROMAN HERNANDEZ – Direct

1    search terms of phone numbers or account identifiers.

2    *Q*   So, you had enough opportunity to gauge the character of

3    the Cellebrite information?

4    *A*   Yes.

5          *MR. KAPLAN:*  Nothing further.

6          *THE COURT:*  Thank you, Mr. Kaplan.  Any redirect?

7          *THE GOVERNMENT:*  No Redirect, Your Honor.

8          *THE COURT:*  All right.  Thank you.  You may step down.

9    You are excused.  Is the government ready to call their next

10   witness?

11         *MR. FIELDS:*  We are, Your Honor.  The United States

12   calls Roman Hernandez.

13         *THE COURTROOM DEPUTY:*  Please raise your right hand.

14       (**ROMAN HERNANDEZ** was sworn.)

15         *THE WITNESS:*  I do.

16         *THE COURTROOM DEPUTY:*  Please be seated.  Please state

17   your full name and spell your first and last names for the

18   record.

19         *THE WITNESS:*  Roman Hernandez, R O M A N,

20   H E R N E N D E Z.

21                         **DIRECT EXAMINATION**

22   *BY MR. FIELDS:*

23   *Q*   Good morning, Mr. Hernandez.

24   *A*   Good morning.

25   *Q*   Where do you work?

ROMAN HERNANDEZ – Direct

1    A    I work for the Internal Revenue Service.

2    Q    People sometimes abbreviate that just IRS?

3    A    Yes.

4    Q    What is your position?

5    A    I'm a Court Witness Coordinator.

6    Q    What are your responsibility as a Court Witness

7    Coordinator?

8    A    I certify -- excuse me -- IRS records to be used as

9    exhibits at trial, and when I'm at trial, I represent the

10   Commissioner of IRS, in his role as custodian of records.

11   Q    How long have you had this position?

12   A    For 12 years.

13   Q    What did you do before that?

14   A    Before this job, I was a Case Advocate with the Taxpayer

15   Advocate Service.  They are a part of the IRS that helps people

16   that are going through financial hardship situations.

17   Q    What did do you before that?

18   A    Before that I was an auditor.  I audited individual returns

19   by correspondence and by phone.

20   Q    And before that, what did you do?

21   A    Way back in 2001 I started as a contact representative.

22   They are the people you talk to if you call the IRS.  If you

23   want to make a change to your return, you would send a claim or

24   an amended return to that kind of person, too.

25   Q    How mean years, total, have you worked at the IRS?

ROMAN HERNANDEZ - Direct

1    A   Twenty-two years.

2    Q   All right.  What is the IRS?

3    A   The IRS is a part of the Treasury, United States Treasury.

4    They are an agency of the U.S. Government.  They collect taxes

5    for the U.S. Government.

6    Q   Does it have a legal duty to do that?

7    A   Yes.

8    Q   In your role as a taxpayer advocate, did you become

9    familiar with a process by which people pay their taxes?

10   A   Yes, I did.

11   Q   Who is required to file a tax return?

12   A   It's anyone that has a gross income that meets the

13   requirement.  It's different by year.  Changes by year.

14   Q   Are you familiar with those requirements between 2016 and

15   2019?

16   A   I am, yes.

17   Q   What were the requirements during that period of time?

18   A   In 2016, if you made -- if you had gross income of $10,350

19   then you are required to file a return.  In 2017 it was

20   $10,400, and in 2018 it was $12,000, and 2019, it was $12,200.

21   Q   Can it change depending on whether, you know, it's

22   individual or you're filing a joint tax return with your

23   spouse?

24   A   Yes.  If it's a joint return, then you double that amount.

25   So, in 2016 it would have been $20,700.

ROMAN HERNANDEZ - Direct

1   Q   When are tax returns due?

2   A   Typically, April 15th is the date.  It's usually four

3   months and 15 days after the close of the year -- the prior

4   year.

5   Q   So, we're currently here in 2024, right?

6   A   Yes.

7   Q   So, April 15th, 2024, that's the deadline for what year's

8   tax return?

9   A   For the 2023 return, the prior year.

10  Q   The prior year?

11  A   Yes.

12  Q   Can you get an extension on that deadline?

13  A   Yes.  You can get an extension now to October 15th.

14  Q   What date?

15  A   I'm sorry, 15th.

16  Q   How many extensions are you allowed to get?

17  A   It's one now.

18  Q   Are there certain forms that individuals use to report

19  their taxes?

20  A   Yes.  For individuals, it's something in the 1040 family.

21  Q   How do people find these forms?

22  A   Probably online is the quickest way to get it.

23  Q   Are you familiar with the process by which returns are

24  processed, once they are received by the IRS?

25  A   I am, yes.

ROMAN HERNANDEZ - Direct

1    Q   Describe that process for us?

2    A   Well, a lot of people file electronically now, so we

3    receive it over the Internet.  There's certain information that

4    has to pass validation on the form, so we have to have the

5    right -- you have to provide the right social security number,

6    the name has to match the social security number that was

7    issued by the Social Security Administration.  You file

8    electronically, you have to provide your correct date of birth,

9    and you have to verify, out of the pin that you used the

10   previous year, or your adjusted gross income from the previous

11   year.

12   Q   We live in the 21st Century and a lot of people submit

13   electronically.  But do some people still submit by paper?

14   A   Yes.  You can file by paper.  Yes.  You can mail it to the

15   IRS.

16   Q   What does that process look like?

17   A   It's the same process.  Basically, we validate the

18   information on the return.  If there's enough information on

19   the return to process it, then it goes through processing.  It

20   has to go through some human hands, of course.  There's a

21   person that will key in the information from the return, and

22   then goes to the IRS' main database, the master file, and it

23   posts and that's when we assess tax, apply any payments, and if

24   there's a refund due, then the refund will go out.

25   Q   So, during the course of your 22 years at the IRS, these

ROMAN HERNANDEZ – Direct

1   various roles that you have had, have you become familiar with

2   the systems that the IRS uses to maintain its records?

3   A    Yes, I have.

4   Q    And I think you already mentioned one of those for us.  Was

5   that the Master File?

6   A    Yes.

7   Q    What is the Master File?

8   A    It's the main repository of tax information for people and

9   businesses.

10  Q    What kinds of records are kept in the Master File?

11  A    Generally, information from the Form 1040, but we also get

12  information from third parties.

13  Q    Information from third -- well, first of all, what is a

14  third party, in this context?

15  A    At this time of year a lot of people are receiving, if they

16  had an employer, you might get a W-2 in the mail from your

17  employer.  If you had interest -- if you earned interest at a

18  bank, then the bank would send you a statement of interest

19  earned for the year.  Those are what we call reports from third

20  parties, and there's a database within Master File that

21  collects that information.

22  Q    Does the Master File also provide information about a lack

23  of records?

24  A    Yes, it does.

25  Q    How is that information kept and maintained?

ROMAN HERNANDEZ - Direct

1   A   Well, if I'm looking for a return, I need to know some of

2   the basic information that I mentioned before, like, the

3   person's name, social security number, the forms I'm looking

4   for, and the tax year that I'm searching for.

5   Q   Yeah.  So are these Master Files associated with certain

6   taxpayers?

7   A   They are.

8   Q   How is that association maintained?

9   A   Mainly by social security number.

10  Q   All right.  So we have been talking about individuals.

11  What about corporate entities, do they have to file tax

12  returns?

13  A   They do.

14  Q   How does that work?

15  A   In the same way it does for individuals.  If you have

16  requirement to file, then IRS expects you to file.  It's

17  required by the law.

18  Q   Have you ever heard of something called an EIN?

19  A   Yes.

20  Q   I just used an acronym, what does it stand for?

21  A   It stands for Employer Identification Number.

22  Q   What is that?

23  A   It's a tax ID number that's issued by the IRS.

24  Q   How is it issued by the IRS?

25  A   You basically apply for it.  You can ask for an employer

ROMAN HERNANDEZ - Direct

1    identification number.  If you have a social security number,

2    that's pretty much all you need to get an EIN.

3    Q   Before your testimony today, did you try to find the Master

4    File for a taxpayer named Michael Aaron Tew?

5    A   Yes, I did.

6    Q   What was the process for finding such a file?

7    A   Well, I went to the Master File, I used his social security

8    number, and there were four years I searched for 2016, 2017,

9    2018 and 2019, and I found no record of returns filed for those

10   years.

11   Q   So, you found a Master File associated with Michael Tew?

12   A   Yes.

13   Q   Does the IRS have a process of certifying its records?

14   A   Yes, they do.

15   Q   What is that process?

16   A   Typically we attach a blue sheet to it.  It's a Blue Ribbon

17   Certification, is what it is called.  In this case, I performed

18   the search, and then the search is validated.  It's certified

19   by a signing official.  They will file the blue sheet, and we

20   put the gold seal of the IRS on it.

21   Q   Were you able to obtain certified records for Michael Tew's

22   Master File for your testimony today?

23   A   Yes, I was.

24   Q   I want to show you some exhibits that are not yet in

25   evidence.  The first one is Government's Exhibit 101; and now

ROMAN HERNANDEZ - Direct

1    let's look at Government's Exhibit 102; Government's Exhibit

2    103; and Government's Exhibit 104.  Do you recognize those

3    documents?

4    A    Yes, I do.

5    Q    What are they?

6    A    They are reports of income.

7              MR. FIELDS:  Do you need a glass of water?

8              THE WITNESS:  I do, yes.

9              THE WITNESS:  Thank you.

10   Q    I'm sorry, I interrupted your answer.  Let me ask the

11   question again.

12             Those exhibits that we just looked at, 101 through

13   104, what are they?

14   A    They are reports of income for 2016, 2017, 2018 and 2019

15   for Mr. Tew.

16   Q    Were they certified in using that process that you just

17   described to us?

18   A    Yes, they were.

19             MR. FIELDS:  Your Honor, at this time, the government

20   would move for admission of Government's Exhibits 101 through

21   104.

22             THE COURT:  Any objections?

23             MS. FROST:  No objection, Your Honor.

24             THE COURT:  All right.  It's -- they are admitted.

25   Q    All right.  So, we're currently on Government's Exhibit

ROMAN HERNANDEZ - Direct

1    104.  Can you see that in front of you?  Do you see it in front

2    of you?

3    A    Yes, I can.

4    Q    Sorry.  It says, *Information Return Program Payee*

5    *Transcript*.  What is an Information Return Program Payee

6    Transcript?

7    A    It's a transcript from the their party database that I

8    talked about.  It's a database that collects reports of income.

9    Q    Okay.  Now, let's take that down.  I want to show you a

10   couple of other exhibits.  So, let's look at Government's

11   Exhibit 105.  Not yet in evidence.  And now let's look at

12   Government's Exhibit 110.  Government's Exhibit 111.

13   Government's Exhibit 112.  Do you recognize those documents?

14   A    I do, yes.

15   Q    What are they?

16   A    They are Certified Account Transcripts for Mr. Tew, for tax

17   years 2016 through 2019.

18   Q    Those other records kept in that Master File?

19   A    Yes.

20   Q    What is an Account Transcript?

21   A    It's a record of return processing.  If a return is

22   received, it will show on the Account Transcript.  If a return

23   is not received, it will also show that there's no return

24   there.

25        MR. FIELDS:  Your Honor, at this time the government

ROMAN HERNANDEZ - Direct

1  would move for admission of Government's Exhibits 105, 110, 111

2  and 112.

3          THE COURT:  Any objections?

4          MS. FROST:  No, Your Honor.

5          THE COURT:  All right.  Those are admitted, as well.

6          MR. FIELDS:  All right.  One last bundle.  Take that

7  down for now.

8  Q   Were you able to obtain certified records for an entity

9  called Sand Hill?

10 A   Yes.

11 Q   Let's look at Government's Exhibit 106, 107, 108, and 109.

12 What are those?

13 A   They are reports of income for Sand Hill for tax years 2016

14 through 2019.

15         MR. FIELDS:  At this time, the government would move

16 for admission of those exhibits, which I can read off again, if

17 it's helpful.

18         THE COURT:  Hearing no objection, they will be

19 admitted, but why don't you go ahead and read them again, just

20 to make sure we're on the same page.

21         MR. FIELDS:  Government's Exhibit 106, 107, 108, and

22 109.

23 Q   All right.  Let's look at one of these.  Let's look at

24 Government's Exhibit 107.  So, this is one of those Information

25 Return Program Payee Transcripts?

ROMAN HERNANDEZ - Direct

1  *A*   Yes, it is.

2  *Q*   And that first page, there that's -- just the sort of blue

3  ribbon IRS certification, right?

4  *A*   Yes.

5  *Q*   Let's look at page two.  Let's zoom in on that.  What are

6  we looking at?  Take us through the information that's

7  displayed in these records?

8  *A*   Well, this is what an IRS employee sees on their screen

9  when they look -- when they look in the Master File for reports

10 of income for Sand Hill Research.  This one is for 2017, and

11 the information is, kind of, bundled up at the top.

12 *Q*   So, let's stop there for a second.  You say this one is for

13 2017.  How can you tell?

14 *A*   Can I circle it on the screen?

15 *Q*   Yes, please.

16 *A*   It's up at the top here.  That's the 2017 tax year.

17 *Q*   Okay.  And then do you see L1.

18 *A*   Yes.

19 *Q*   What is that?

20 *A*   That's the business that the income was reported as being

21 paid to.

22 *Q*   And then over here, what information goes there?

23 *A*   It's information from 1099 Miscellaneous, identifying the

24 payee, the recipient of the income as Sand Hill and also

25 Michael Tew.

ROMAN HERNANDEZ – Direct

1    Q    And then, if we, kind of, look within the body of this

2    right here, *Total doc seven, number summarized*, and there's

3    some columns there.  What information goes in there?

4    A    It's a summary of everything that's contained in the

5    report.  So, there's a total of seven different -- or seven

6    different documents reporting all of the income that's listed

7    below on the second column.

8    Q    So, do you see something called *NonEmp Com*?

9    A    Yes.

10    Q    What is*, NonEmp Com*?

11    A    It's short for Nonemployee Compensation.

12    Q    Is there a number next to it?

13    A    Yes.  It's reporting, $338,138.

14    Q    What does that mean?

15    A    For -- it means for 2017, there was nonemployee

16    compensation reported as paid to Sand Hill in that amount.

17    Q    And then do you see*, Cashout, CT*?

18    A    Yes.

19    Q    What is *Cashout CT*?

20    A    It's stands for cash -- Cash Out Count.  It's reporting

21    cash transaction of $73,000.

22    Q    What kind of cash transactions are reported?

23    A    Pulling money out of the bank, typically.

24    Q    Who reports that to the IRS?

25    A    The financial institutions do.

ROMAN HERNANDEZ - Direct

1  *Q*   All right.  So, this was the *Information return payee*

2  *transcript for Sand Hill partners for 2017*, right?

3  *A*   Yes.

4  *Q*   Let's look at the corresponding one for Michael Tew, in

5  2017.  So, that should be Government's Exhibit 102.  Okay.

6  Let's go to page two.  All right.

7         So, can you use this record to tell us how much other

8  people paid Michael Tew in 2017?

9  *A*   Yes.

10  *Q*   How do you do that?

11  *A*   By looking at the *Summary*.

12  *Q*   So, what do you see in the *Summary* there?

13  *A*   On the second column it's reporting nonemployee

14  compensation paid of $1,801.

15  *Q*   Is there also a *Cashout CT* on this one?

16  *A*   Yes.  There's a *Cashout* account amount of $87,200.

17  *Q*   Is that more than the threshold that you described earlier?

18  *A*   Yes, it is.

19  *Q*   All right.  Now, let's look at the account transcripts just

20  to orient ourselves.  Can we go to Government's Exhibit 110.

21  Let's go to page two.  All right.  If you could tell us what

22  information is described in one of these transcripts?

23  *A*   Sure.  In the upper right-hand -- upper left-hand corner,

24  it shows that this is information for a Form 1040.  It's for

25  tax period 2016.  That will help.  Shows the social security

ROMAN HERNANDEZ - Direct

1   number that was used to search the Master File.  In this case,

2   it's for Michael Tew.  And down below that it will show -- it

3   would show information from a processed return if we had

4   received a return, but in this case it's all zeros, indicating

5   that there was no return filed for this year.

6   Q   Circle for us, exactly, where you see that information?

7   A   Sure.  Well, these are the zeros that I talked about.

8   Q   Okay.  And so, those zeros mean that no return was filed?

9   A   Um ... I guess I need to correct what I said.  In case

10  there's no information, currently, on the account.  I guess a

11  better place to look would be down at the bottom.  The very

12  last line which states, *Return not present for this account*.

13          MR. FIELDS:  Can we zoom in on that?  These are not

14  the best printouts.

15  Q   Could you circle for us where you see that?

16  A   Yes.

17  Q   All right.  So what does that mean, in 2016?

18  A   Means that the IRS received no return for these taxpayers,

19  for this year.

20  Q   Now let's look at Government's Exhibit 111.  Is this the

21  transcript for 2017?

22  A   Yes, it is.

23  Q   All right.  Let's go to page two here.  Can you tell us,

24  based on the information this *Account Transcript*, whether or

25  not a return was filed for Michael Aaron Tew in 2017?

ROMAN HERNANDEZ - Direct

1   *A*   I can.  And there was no return filed for this year.

2   *Q*   How do you know that?

3   *A*   The very last line of the transcript.

4   *Q*   Now, let's go to Government's Exhibit 112.  Is this the

5   Account Transcript for 2018?

6   *A*   Yes, it is.

7   *Q*   Let's go page two.  Same question, can you tell us whether

8   or not Michael Tew filed a tax return in 2018?

9   *A*   Well, the bottom line says, *Return not present for this*

10  *account*.  So, that means there was no return filed.

11  *Q*   Okay.  One last question, let's look at Government's

12  Exhibit 105.  And let's go, again, to page two.  Again, can you

13  tell us was a tax return filed in 2019?

14  *A*   No, there was not.

15  *Q*   How do know that?

16  *A*   It says, *Requested data not found*; meaning, there's nothing

17  on this account for this year.

18  *Q*   All right.  So, I know I said *one last question*, but I

19  really actually have one last series of questions.

20          So, before this case, were you asked to look for any

21  tax returns from Michael Tew for tax years, 2016, 2017, 2018,

22  and 2019?

23  *A*   Yes, I was.

24  *Q*   Did you perform a diligence search?

25  *A*   I did.

ROMAN HERNANDEZ – Cross

1   Q   Were you able to find any tax returns for Michael Tew for

2   those years?

3   A   No, I was not.

4           MR. FIELDS:  May I have a moment Your Honor?

5           THE COURT:  Yes.

6           MR. FIELDS:  No further questions, for the witness.

7           THE COURT:  Okay.  Thank you.  Cross-examination,

8   Ms. Frost?

9           MS. FROST:  May I have one moment, Your Honor?

10          THE COURT:  Yes.

11                          **CROSS-EXAMINATION**

12  BY MS. FROST:

13  Q   Good morning, Mr. Hernandez.

14  A   Good morning.

15  Q   You are here to testify for the government, from the IRS,

16  right?

17  A   Right.

18  Q   And we can agree that you have never met Michael Tew,

19  correct?

20  A   Correct.

21  Q   And you have never met Kimberley Tew?

22  A   I have not, no.

23  Q   You don't know anything about Michael Tew?

24  A   No.

25  Q   And you don't know anything about Kimberley Tew?

ROMAN HERNANDEZ - Cross                                    1069

1   A   I do not.

2   Q   You are here, basically, to explain to us how those

3   records -- how the IRS keeps those records that you just

4   testified about, right?

5   A   Right.

6   Q   Kind of like a custodian of records?

7   A   Yes.

8   Q   And you talked about the Master File, right?

9   A   Right.

10  Q   You just talked about some transcripts that show reports of

11  income?

12  A   Yes.

13  Q   And the Account Transaction Records?

14  A   Yes.

15  Q   Now, in terms of the Master File, you said that you

16  reviewed a Master File related to Michael Tew, who you don't

17  know, right?

18  A   Correct.

19  Q   Did you review a Master File related to Kimberley Tew?

20  A   I did -- yes, I did.

21  Q   When did you review Kimberley Tew's Master File?

22  A   Um ... I performed the search twice.  I think the first

23  time was in January 2023, I want to say, and second time was

24  January of this year, 2024.

25  Q   And who asked you to review Kimberley Tew's Master File?

ROMAN HERNANDEZ - Cross

1   A   It was an IRS Case Agent Lisa Palmer.

2   Q   And did your investigation, review of Kimberley Tew's file,

3   review anything of significance?

4   A   No.

5   Q   What about the Certified Account Transaction Records, did

6   you search any records related to Kimberley Tew?

7   A   Yes.  It was the same search that I performed.

8   Q   What about reports of income related to Kimberley Tew?

9   A   No, I did not.

10  Q   And why didn't you look at those particular records?

11  A   I wasn't asked to search for those.

12  Q   Are you aware of any audit was ongoing with relation to

13  Michael Tew?

14  A   No, I'm not.

15  Q   You are not aware or there wasn't an audit?

16  A   Not that I'm aware of.

17  Q   Okay.  Are you aware if any audit had been conducted in

18  relation to Kimberley Tew?

19  A   I'm not, but my serach was only for the years that we

20  talked about.  So, if there's one beyond that, I don't know

21  about that.

22  Q   Thank you.  And I appreciate that clarification.  I am

23  asking about 2016 to 2019?

24  A   Okay.  Thank you.

25  Q   In terms of any collection efforts on behalf of the IRS,

ROMAN HERNANDEZ - Cross

1    are you aware if those occurred for the years of 2016 to 2019?

2    A    I'm not, no.

3    Q    And you don't -- you don't even work in the collections

4    department, if you will?

5    A    No, I do not.

6            MS. FROST:  And, Your Honor, I'm going to ask to pull

7    up GX-111, which was just admitted into evidence and publish.

8            THE COURT:  Okay.

9            MS. FROST:  And can we move to the second page,

10   please?

11   Q    And, Mr. Hernandez, you just testified about this document,

12   on Direct Examination?

13   A    I did, yes.

14   Q    And you explained that it indicated, *Returns not present*

15   *for this account*, down at the bottom left-hand corner, which I

16   just circled?

17   A    Correct.

18   Q    We can also agree that this account transcript indicates

19   *married, filing joint*?

20   A    Yes.

21           MS. FROST:  We can take that down, please.  Can we now

22   see Exhibit 112 and publish that, please?  The second page,

23   please.

24   Q    And again, you just talked about this transcript, and that

25   indicated, *Returns not present to this account*?

ROMAN HERNANDEZ - Cross

1  A    Yes.

2  Q    As I have circled in the bottom left-hand corner?

3  A    Correct.

4  Q    And this transcript also indicates, *Married, filing joint*,

5  right?

6  A    Yes.

7         MS. FROST:  Thank you.  We can take that down.  And

8  can I now see 111, please?  Second page.

9  Q    Again, this transcript, you testified, indicates, *Return*

10 *not present for this account*?

11 A    Yes, it does.

12 Q    As I have circled in the bottom left-hand corner?

13 A    Yes.

14 Q    And again, this transcript also indicates, *Married, filing*

15 *joint*, correct?

16 A    It does, yes.

17        MS. FROST:  Thank you.  We can take that down.

18 Your Honor, may I have a moment?

19        THE COURT:  Yes.

20        MS. FROST:  Thank you, Mr. Hernandez.  I have no

21 further questions.

22        THE WITNESS:  Thank you.

23        THE COURT:  Thank you, Ms. Frost.  Anyone on behalf of

24 Mrs. Tew?

25        MR. KAPLAN:  No questions.

1    THE COURT:  Okay.  Thank you.  Any Redirect?

2    MR. FIELDS:  No Redirect, Your Honor.

3    THE COURT:  All right.  Thank you.  You may step down.

4  Thank you, Mr. Hernandez.  Mr. Fields, can we go ahead and get

5  started with your next witness?

6    MR. FIELDS:  We can, Your Honor.  The United States

7  calls Nicholas Hanggi.  Mr. Hanggi.

8    THE COURTROOM DEPUTY:  Please raise your right hand.

9    (**SPECIAL AGENT NICHOLAS HANGGI** was sworn.)

10    THE WITNESS:  I do.

11    THE COURTROOM DEPUTY:  Please be seated.  Please state

12  your name and spell your first and last names for the record.

13    THE WITNESS:  Nicholas Hanggi N I C H O L A S, H A N G

14  G I.

**DIRECT EXAMINATION**

16  BY MR. FIELDS:

17  Q   Good morning, Mr. Hanggi.

18  A   Good morning.

19  Q   Where do you work?

20  A   I work at the FBI.  I'm a special agent.

21  Q   FBI, that's the Federal Bureau of Investigation?

22  A   That's correct.

23  Q   What did you do before you were a special agent?

24  A   Prior to being a special agent, I was a digital operations

25  specialist in the Denver division, sometimes referred to as a

SPECIAL AGENT NICHOLAS HANGGI - Direct

1    DOS.  Prior to that I was a CART examiner, in Silicon Valley

2    RCFL in San Francisco Division.

3    Q   There were more government acronyms in there.  Silicon

4    Valley, RCFL.  What is the RCFL?

5    A   That's the Regional Computer Forensic Laboratory.

6    Q   And CART, talking about, like, one of those carts?  What's

7    a CART?

8    A   No, sir.  CART stands for Computer Analysis Response Team.

9    They are the digital forensic experts in the FBI.

10   Q   What did -- okay.  And you also mentioned DOS or Digital

11   Operations Specialist, right?

12   A   That's correct.

13   Q   What is the role of a Digital Operations Specialist?

14   A   So, a Digital Operations Specialist is a newer role in the

15   FBI, but primarily they support investigative teams and handle

16   technical requests to help identify evidence, and then once

17   that evidence is identified, they help collect it, preserve it,

18   process it and provide reports to the investigative team for

19   their review.

20            It's very similar to a CART examiner, but it was --

21   the job was created to help, sort of, offset the workload that

22   the CART teams were handling within the FBI.

23   Q   During your time with the FBI, have you heard of the

24   concept of information stored in the Cloud?

25   A   Yes.  Yes, I have.

SPECIAL AGENT NICHOLAS HANGGI – Direct

1   *Q*   What are some common cloud storage services?

2   *A*   So, one of the most common cloud storage services is Drop

3   Box, there's Google Drive, and then Apple™ iCloud is another

4   type of cloud storage.

5   *Q*   Do you have personal experience using Apple™ iCloud?

6   *A*   Yes, I do.  I have it, personally, in my life.

7   *Q*   How does it work?

8   *A*   So, iCloud is just a service that you sign up for, with

9   Apple™.  Most people who have Apple™ devices, like an iPhone or

10   tablets or MacBooks, create an iCloud account when they

11   purchase those devices.  What it allows you to do is backup

12   your devices to the Cloud.  Particularly, on an iPhone, allows

13   you to backup certain apps and their data.

14   *Q*   In what scenario does Apple™ store data in the iCloud for a

15   particular user?

16   *A*   So, within the settings on a device like an iPhone or a

17   tablet, you can check a box to backup information to your

18   iCloud account, and if you have that box enabled, Apple™ backs

19   up the data that you select to the iCloud servers.

20   *Q*   What kind of data can you select?

21   *A*   You can select messages, photos, documents, app-specific

22   data that is retained within applications, downloaded to the

23   device.  Primarily, though, most users backup whatever the

24   default is, after you turn on the device.

25   *Q*   Is this iCloud data, does it get associated with a

SPECIAL AGENT NICHOLAS HANGGI – Direct

1   particular account identifier?

2   A   Yes, it does.  It's associated with the email accounts or

3   Apple™ identifier that is associated when you sign up for the

4   iCloud service.

5   Q   You have experience, at the FBI, handling data from Apple™

6   iCloud accounts?

7   A   Yes.  In previous roles, as well as my current role as a

8   special agent, I routinely work with data provided by Apple™,

9   pursuant to legal response.

10  Q   And in what format does Apple™ provide data to the FBI in

11  response to legal process?

12  A   So, when it's initially provided to the FBI, it's in ZIP

13  folders, or Zip files, which are just a compressed folder that

14  contains several other types of data, and then that data can be

15  unzipped and worked with, inside of our forensic tools.

16  Q   In your various roles with the FBI, did you develop

17  familiarity with the systems the FBI uses to process and review

18  digital evidence?

19  A   Yes.  I became very familiar with those systems.

20  Q   Have you heard of something called OpWAN?

21  A   Yes, I have.

22  Q   What is OpWAN?

23  A   OpWAN is internal network utilized by the FBI, specifically

24  for handling computer and digital evidence.  It is not

25  accessible from outside FBI facilities, and it allows us to

SPECIAL AGENT NICHOLAS HANGGI - Direct

1   facilitate sharing of data between FBI field offices.  It also

2   allows us for processing that data, because of the large file

3   shares available to that network.

4   Q   During your time as a digital operation specialist, did you

5   ever use something called Cellebrite?

6   A   Yes, I did.

7   Q   Does Cellebrite come in different formats?

8   A   So, Cellebrite is a developer -- software developer of

9   multiple software applications, one of them being called

10  Physical Analyzer, which is just a piece of software, much like

11  Microsoft Word or Google Chrome or any type of application you

12  might have on the computer, and that software, in this case, is

13  used to process digital evidence.

14  Q   During the course of your career with the FBI, how many

15  times do you think you have used it?

16  A   Many times.  Very routinely, in my previous roles, I used

17  software developed by Cellebrite.

18  Q   In what circumstances would you use -- is it Cellebrite or

19  Cellebrite?

20  A   I say Cellebrite.

21  Q   Okay.  In what sort of circumstances did you use that tool?

22  A   So, one of the applications for that software program is to

23  extract information from cellphones, directly.  Almost like

24  imaging a phone.  Like, you would say imaging a computer, you

25  extract that data from a raw phone.  The other applications of

SPECIAL AGENT NICHOLAS HANGGI - Direct

1   that program are processing Cloud storage returns, or in this

2   case, like an iCloud return from providers like Apple™.

3   Q   How many times do you think you have used it?

4   A   At least 50, very routinely, I use that application.

5   Q   Have you ever known it to produce an inaccurate result?

6   A   No.  Never.

7   Q   Let's talk about some other concepts.  During your time as

8   Digital Operations Specialist, did you hear of anything called

9   a hash value?

10  A   Yes.

11  Q   What is a hash value?

12  A   So, hash value is a fingerprint for a file.  What you do is

13  you take some type of algorithm, in this case the FBI uses

14  something called Message Digest 5, or MD5.  This is just an

15  algorithm whereby you input some type of data, it produces a

16  value for you, and we call that value a hash value, and that is

17  assigned to a specific file.

18          What we do is we assign hash values to files when we

19  first receive them, and then as those files move across

20  computers or across file shares, between hard drives, we can

21  verify the integrity of that file by ensuring that that hash

22  value does not change.

23  Q   Do you know FBI Special Agent Sarah Anderson?

24  A   Yes, yes, I do.

25  Q   How do you know her?

SPECIAL AGENT NICHOLAS HANGGI - Direct

1   *A*   We were colleagues when I worked in the Denver division of

2   the FBI.

3   *Q*   What did she ask you to do, in December of 2020?

4   *A*   So, she helped -- or pardon me, she asked me to help her

5   process data received by Apple™, from Apple™ by the FBI.  In

6   this case, it was an Apple™ iCloud return.

7   *Q*   Was it associated with a particular identifier?

8   *A*   Yes, yes it was.

9   *Q*   What identifier?

10  *A*   It was *kley@me.com* and also *kley@icloud.com*.

11  *Q*   How would Apple™ produce information to the FBI in response

12  to the warrant for information for that account?

13  *A*   So Apple™, on their end, found the information, pursuant to

14  that legal request, and they provided that data directly to the

15  FBI at a headquarters unit, which receives that data directly

16  from Apple™.  Then they placed a file, containing that legal

17  response, on OpWAN file share.

18  *Q*   Once it was placed on the OpWAN, how did you access it?

19  *A*   I created the file share, the folder that the file was

20  placed on.  The first thing I did, when I saw that it was

21  available, was I hashed it with an MD5 algorithm to create that

22  hash value so that when I copied it to my local computer for

23  processing, I could verify its integrity.

24        After I did copy that file to my local computer for

25  processing, I, again, verified its hash value and made intact,

SPECIAL AGENT NICHOLAS HANGGI - Direct

1    and then I processed that file inside of the Cellebrite

2    Physical Analyzer, which, as I discussed, is a software

3    application for processing digital evidence.

4    Q   Did you find, was the data in a ZIP file?

5    A   Yes, it was.

6    Q   What is a ZIP file?

7    A   So, a ZIP file is merely a compressed folder containing all

8    sorts of different data, but when we say *zipping*, it's just a

9    compression mechanism built into Windows and other types of

10   software applications.  You might be very familiar with it

11   actually, it's just a right click away on a Windows computer to

12   turn a folder into a comprised archive.

13   Q   The ZIP file that you saw on OpWAN, what was its title?

14   A   It was called PT1_production.zip.

15   Q   Did you look at the folder, PT1_production.zip file?

16   A   Yes I did.

17   Q   What were they named?

18   A   It's kind of hard to describe, but it was like APLI, then a

19   bunch of zeros, then it had confidential, and the file name as

20   well.

21   Q   Before your testimony today, did you compare those file

22   names on the certification provided by Apple™?

23   A   Yes, I did.

24   Q   Let's look at Government's Exhibit 1115, which is not in

25   evidence.  Do you see that in front of you?

SPECIAL AGENT NICHOLAS HANGGI - Direct

1   A   Yes, I do.

2   Q   Did the file names inside the PT1_production.zip match the

3   file names in Government's Exhibit 1115?

4   A   Yes, they did.

5          MR. FIELDS:  Your Honor, at this time, the government

6   would actually move for the admission of Government's Exhibit

7   1115.

8          THE COURT:  Any objection?

9          MR. SCHALL:  None.

10         THE COURT:  All right.  It's admitted.

11  Q   This Government's Exhibit 1115, is this a certification

12  from Apple™, describing the records that are produced?

13  A   Yes, it is.

14  Q   All right.  We can take that down.  So, after you had the

15  ZIP file, what did you do with it?

16  A   So, I copied the ZIP file from OpWAN to my local machine,

17  and then I ingested it, or uploaded it, in a sense, to the

18  Cellebrite Physical Analyzer software application, and then I

19  moved through the Apple™ iCloud processing Wizard, so to speak,

20  that allows me to process that ZIP file, and create reports for

21  the investigators to review.

22  Q   Did you take photographs of each step of the Wizard while

23  you were processing this?

24  A   I took screen shots of different boxes within that

25  application, to record, for my notes, the different options

SPECIAL AGENT NICHOLAS HANGGI – Direct

1   selected for processing that ZIP file.

2   Q   So, let's look at an exhibit that's not in evidence.

3   Government's Exhibit 564.  What is this?

4   A   So, this is a screen shot of one of the first windows that

5   pops up after you tell Cellebrite Physical Analyzer that you

6   want to process an iCloud return.  So, I selected the ZIP file,

7   and then after a little bit of processing, the application

8   poses this window and says, *Which of these options do you want*

9   *to select, for future processing or continued processing.*

10  Q   Is this a fair and accurate screen shot of that portion of

11  the Wizard?

12  A   Yes, it is.

13          *MR. FIELDS:*  At this time, the government would move

14  to admit Government's Exhibit 564.

15          *THE COURT:*  Any objection?

16          *MS. HUBBARD:*  No objection.

17          *THE COURT:*  It's admitted.

18  Q   And now let's look at Government's Exhibit 565, which is

19  not yet in evidence.  What is this?

20  A   This is a screen shot of, essentially, the next window

21  within Cellebrite Physical Analyzer, that records the different

22  options I select for processing that ZIP file.  Again, it's a

23  normal piece of software, and this is a normal window for

24  processing, in this case, the ZIP file, and this just records

25  the different options that I selected.

SPECIAL AGENT NICHOLAS HANGGI - Direct

1    *Q*   Fair and accurate screen shot of what you selected?

2    *A*   Yes, it is.

3          *MR. FIELDS:*  At this time, the government would move

4    to admit Government's Exhibit 565.

5          *THE COURT:*  Any objections?

6          *MS. HUBBARD:*  No objection.

7          *THE COURT:*  Five sixty-five is admitted.

8    *Q*   All right.  If we look here, some boxes are checked and

9    some are not.  How did you decide which ones to check and which

10   ones not to check?

11   *A*   I primarily kept the defaults, ensuring that most data

12   types were selected, as those, through my experience, have been

13   what investigators are most interested in.  You will see one of

14   them, you can't deselect and that's the timeline option and

15   then one of them *uncategorized* I left unchecked.  That's

16   because those items, when you look in the report, are

17   disorganized or not organized, much like the other categories

18   that have the checkboxes next to them.  And I left this

19   unchecked, only because we could always go back and generate

20   another report, and I know, from my experience, that most

21   investigators care about the items that have checkboxes next to

22   them.

23   *Q*   Do you see the one labeled SMS messages?

24   *A*   Yes, I do.

25   *Q*   What is an SMS message?

SPECIAL AGENT NICHOLAS HANGGI - Direct

1    A    An SMS is a simple text.  It's an older protocol used to

2    send messages between mobile devices, in comparison to an MMS,

3    which is multimedia protocol for sending messages.  But, SMS is

4    just the acronym for the actual protocol to send a text

5    message.

6    Q    All right.  Let's take that down.  We're going to look at

7    another exhibit, that's not yet in evidence.  It's Government's

8    Exhibit 566.  What is this?

9    A    This is a screen shot of the Cellebrite Physical Analyzer

10   tool, and what it is, is generating multiple -- taking the

11   previous reports that I generated and combining it into a

12   combined report.

13           So, you will see there's option one through option

14   seven.  Those correspond to the different items that I could

15   have selected after first ingesting the ZIP file, in a screen

16   shot we looked at a couple of slides ago.  Those options refer

17   to those different items within that ZIP file.  This is just me

18   creating a combined report of those separate reports.

19   Q    Is this a fair and accurate screen shot of the process of

20   creating one of those combined reports?

21   A    Yes, it is.

22       MR. FIELDS:  At this time, the government moves to

23   admit Government's Exhibit 566.

24           THE COURT:  Any objection?

25           MS. HUBBARD:  No objection.

SPECIAL AGENT NICHOLAS HANGGI – Direct

1          *THE COURT:*  It's admitted.

2     *Q*   All right.  Do you see, you know, that first option there,

       ends with .UFDR.

4     *A*   Yes, I do.

5     *Q*   What is a .UFDR file?

6     *A*   So that is Cellebrites proprietary format, for their

7     reports.  I couldn't tell you what it stands for, specifically,

8     those letters in the acronyms, but it's Cellebrite's file

9     extension for their report.

10    *Q*   Now let's look at Government's Exhibit 567, which is not

11    yet in evidence.  What is this?

12    *A*   This is, again, a screen shot of the Cellebrite Physical

13    Analyzer tool, and these are the processing options I used to

14    process the combining of those separate reports into a combined

15    report.

16    *Q*   Is it a fair and accurate screen shot of your process of

17    taking that combined report, and then further selecting these

18    identifiers?

19    *A*   Yes, yes, it is.

20          *MR. FIELDS:*  Your Honor, at this time the government

21    would move to admit Government's Exhibit 567.

22          *THE COURT:*  Hearing no objection to 567, it's

23    admitted.

24    *Q*   All right.  This one looks very similar to one that we

25    looked at earlier.  Why did you have to come back to this

SPECIAL AGENT NICHOLAS HANGGI - Direct

1    screen?

2    A    As I said, these are screen shots of the application, and

3    it's just a window of options presented by the application.

4    You have to go through these settings when you are generating a

5    report within the application.

6            I will note, the one difference between the combined

7    report and the previous reports -- the previous screen shot

8    that we saw, was I'm including the Cellebrite Reader, which is

9    the application used to look at the reports, there's a checkbox

10   next to that item.

11   Q    All right.  Now, let's look at Government's Exhibit 568,

12   which is not yet in evidence.  All right.  So, after you had

13   Cellebrite make the reports, what did you do with them?

14   A    So, after I generated all of the reports, and again that's

15   seven individual reports, as well as a combined report, I

16   copied all of those to a forensically prepared hard drive, and

17   I entered that hard drive into evidence.

18   Q    What is Government's Exhibit 568, up there in front of you?

19   A    It's a rendering of wipe log for the hard drive that later

20   became evidence that contained these Cellebrite reports.

21   Q    What is a wipe log?

22   A    A wipe log is what we used to indicate that a hard drive

23   has been forensically prepared or wiped.  When I say *wiped*,

24   what I mean is we write all of the bytes on that hard drive to

25   something that is known, a known pattern.  In this case, we

SPECIAL AGENT NICHOLAS HANGGI - Direct

1    used zeros.  All of the bytes were written to zero.  And we do

2    that, so that, in the course of our work, we reuse hard drives.

3    We don't want anything from previous cases to show up on this

4    evidence item for this particular case.

5          MR. FIELDS:  At this time government moves into

6    evidence Government's Exhibit 568?

7          THE COURT:  Any objection?

8          MR. SCHALL:  No.

9          THE COURT:  It's admitted.

10   Q    All right.  So, on this wipe blog, do you see *destination*

11   *disk*, and is there a serial number there?

12   A    Yes.  Yes there is.

13   Q    What is that?

14   A    The serial number is a unique identifier of that hard

15   drive, and that's actually assigned by the manufacture of the

16   hard drive.  In this case, it's highlighted.

17   Q    Let's take that down.  Did you check the hash values for

18   these Cellebrite reports you created?

19   A    Yes.  So, after I generated those reports, on my local

20   computer, I hashed those WFDR files, because again, that is the

21   proprietary file format used by Cellebrite.  I used the MB5

22   hash algorithm, which again, I have discussed, is the standard

23   within the FBI, and then after I copied those reports to the

24   hard drive, that would become evidence, I verified those

25   reports remained intact, and they did.

SPECIAL AGENT NICHOLAS HANGGI – Direct

1    Q   Let's look at Government's Exhibit 569.  Let's zoom in on

2    the top, so you can actually see all of that.  What is

3    Government's Exhibit 569?

4    A   This is a hash list of those report files, as well as the

5    initial evidence received on OpWAN, that PT1_protection.ZIP

6    file.

7           MR. FIELDS:  At this time the government move into

8    evidence Government's Exhibit 569?

9           THE COURT:  Any objections?

10          MS. HUBBARD:  No objection.

11          THE COURT:  It's admitted.

12   Q   All right.  Finally, let's look at Government's Exhibit

13   563, which is actually a physical exhibit.  So, if he could

14   have Mr. Keech's assistance, again.  It's the one in the

15   Redweld®.

16          THE COURTROOM DEPUTY:  Which one?

17          MR. FIELDS:  Yes, the --

18          THE COURTROOM DEPUTY:  This one here?

19          MR. FIELDS:  Not that one.

20          THE COURTROOM DEPUTY:  Hard drive?

21          MR. FIELDS:  Yep.

22   Q   Could you open up that Redweld® for us?  What do you see in

23   there?

24   A   It's a hard drive within a clamshell case clear.

25   Q   Can you see the serial number?

SPECIAL AGENT NICHOLAS HANGGI - Direct

1    A    Yes, I can.

2    Q    If you compare the serial number on the hard drive to the

3    serial number on Government's Exhibit 568, which we'll pull up

4    again, what do you notice?

5    A    They match.

6         MR. FIELDS:  Your Honor, at this time, the government

7    would move into evidence Government's Exhibit 563.

8         MS. HUBBARD:  No objection.

9         THE COURT:  It's admitted.

10   Q    Did you also create working copies of these Cellebrite

11   reports?

12   A    Yes, I did.

13   Q    What is a *working copy*?

14   A    A working copy is just a copy of a particular file that we

15   retain on our local computer or a file share, that we actually

16   interact with, and the reason we do that is to facilitate

17   easier use of the products that we generate in our digital

18   forensic processing.

19   Q    What did you do with those working copies?

20   A    So I -- they are exact copies of what was entered into the

21   hard drive, into evidence, and they remain on OpWAN for

22   investigators to access to facilitate their review.

23        MR. FIELDS:  Your Honor, may I have a moment?

24        THE COURT:  Yes.

25        MR. FIELDS:  No further questions for the witness,

SPECIAL AGENT NICHOLAS HANGGI - Cross

1    Your Honor.

2        THE COURT:  All right.  Thank you.  Why don't we take

3    a recess until, let's say, 10:40, and come back for

4    Cross-examination.  So, again, all of my previous instructions,

5    members of the, jury remain in place, and we will be in recess

6    until 10:40.

7        THE COURTROOM DEPUTY:  Court is now in recess.

8        (Jury out at 10:29 a.m.)

9        (In open court at 10:43 a.m.)

10        THE COURT:  Let's take our seats, while Mr. Keech

11    brings the jury back in.

12        THE COURTROOM DEPUTY:  All rise.

13        (Jury in at 10:44 a.m.)

14        THE COURT:  All right.  Welcome back.  Let's all take

15    our seats.  And, Ms. Hubbard, are you going to begin

16    Cross-examination?

17        MS. HUBBARD:  Thank you, Your Honor.  And, Mr. Keech,

18    I'm going to use this over here at different points, during the

19    the exam.

20                        **CROSS-EXAMINATION**

21    BY MS. HUBBARD:

22    Q    Good morning, Special Agent Hanggi.  My name is

23    Jamie Hubbard, and I represent Kimberley Tew.

24    A    Good morning.

25    Q    I want to talk to you about the program Cellebrite; is that

SPECIAL AGENT NICHOLAS HANGGI - Cross

1    right?

2    A    Cellebrite, yeah.

3    Q    Yeah.  Cellebrite, as I understand it, is a software that

4    interprets data that's produced, in this case, by Apple™, and

5    makes it, essentially, more user friendly?

6    A    That's correct.  It organizes the data.

7    Q    Okay.  So, it takes it from, kind of, whatever files it's

8    stored in, and put it into a program that allows you to, like,

9    filter the data by a date, for example?

10   A    Correct.

11   Q    Or filter the data by, like, a particular phone number or

12   user?

13   A    Yes.  Yes, it does.

14   Q    And does Cellebrite also have a function that sometimes

15   recognizes conversations between two people?

16   A    Yes, it does.

17   Q    And is that called Chats?

18   A    Yes.

19   Q    Okay.  And the Chats' function allows you, if you are

20   looking at one communication, to find if there's -- you know,

21   if that's in response to something that was sent to them?  The

22   back-and-forth between people?

23   A    So, what the tool does is it organizes the data that is

24   provided by Apple™ in the iCloud return, in this case Chats,

25   those are most likely found in a database of some sort, stored

SPECIAL AGENT NICHOLAS HANGGI – Cross

1   by the application on the device, and what Cellebrite does is

2   it just renders that data and organizes it for review by the

3   investigator.

4   Q   Okay.  So the data exists in databases, and Cellebrite

5   comes in and reads the data and might organize it in certain

6   ways?

7   A   That's correct.

8   Q   Okay.  And I believed you testified, on Direct, that you

9   have never seen Cellebrite make a mistake; is that right?

10  A   Not in my experience of using the application.

11  Q   Have you ever seen Cellebrite fail to recognize, like, a

12  Chat, or misinterpret the data in some way?

13  A   I have not seen the tool do that.

14  Q   Okay.  So, you -- the data might be there, and then

15  Cellebrite kind of does its overlay interpretation of the data,

16  right?

17  A   Its organizing, rendering the data for the investigator to

18  review it; that's correct.

19  Q   Can you remind me what your former title was.  I got lost

20  in the acronyms.

21  A   Prior to special agent I was a digital operation

22  specialist.

23  Q   So, as a digital operations specialist, was one of your

24  jobs to help with an ongoing -- help special agents who are

25  doing investigation that involves digital evidence and help

SPECIAL AGENT NICHOLAS HANGGI - Cross

1   them filter and search and sort that data in a way that would

2   be helpful for them?

3   A    In some cases, yes.  Specifically, my job is to physically

4   take requests for the investigative team.  Usually, that's just

5   processing the evidence and then providing it to them for

6   review.

7   Q    Okay.  So, by *processing the evidence*, you could get a

8   request to say, *Hey, can you help me find everything from a*

9   *certain phone number*?

10  A    Theoretically, yes, but I have never really been asked to

11  do that.  My job is to process the data, and then provide the

12  reports for the investigators to review.

13  Q    Okay.  So, finding everything that's on a certain number,

14  is not considered processing data?

15  A    When I use the term processing, I mean use the software

16  application to, essentially, run the application, and the

17  application does what it does, in this case.  It's organizing

18  the data.

19  Q    Okay.  So, let's just look at, kind of, the -- the data

20  that's available to be organized?

21  A    Okay.

22  Q    I'm going to put up what's already been admitted as 565.

23  Do you see that?

24  A    Yes.

25  Q    I believe you testified that this was a screen shot that

SPECIAL AGENT NICHOLAS HANGGI - Cross

1  you took when you were processing the Apple™ return, in this

2  case?

3  A   That's correct.

4  Q   And is this when you were making the seven separate UFDR

5  files?

6  A   That's correct.  This is a screen shot of the settings I

7  used when I processed those seven individual options and

8  created reports, individually, for those seven options.

9  Q   Do you know which of the seven this was for?

10 A   I do not.

11 Q   Okay.

12 A   But the options remain the same for all seven, that's why

13 there's only one screen shot.

14 Q   That makes sense.  I really just kind of want to use this

15 to talk through the types of data that's available.

16 A   Okay.

17 Q   So, it shows here the Apple™ return would have included

18 some data for a calendar.  Do you see that?

19 A   Yes, I do.

20 Q   And is that indicating that there was 2441 calendar

21 entries?

22 A   Yes.  The tools showing that it's -- parsing 2441

23 calendar -- calendar-types of data.

24 Q   Okay.  And is that, like, if I would go on my iPhone, and I

25 put like, trial, day six, today, is that considered one of the

SPECIAL AGENT NICHOLAS HANGGI – Cross

1    calendar entries that could be one of these 2441?

2    A    I don't know, specifically, what Cellebrite categorizes

3    calendar as.

4    Q    Okay.  Okay.  And then, we see chats, here, that's 149,986

5    chats that Cellebrite has identified in this?

6    A    That's correct.

7    Q    And again, the Chats are the conversations back and forth?

8    A    Yes.  I will say, in contrast, there's, additionally, MMS

9    messages and text messages.  So, Cellebrite is rendering a

10   different type of communication as Chats, versus all types of

11   communications between other people as Chats.

12   Q    Okay.  Perfect.  Let's jump over here.  So, we see, first

13   over on the second column is MMS messages 2,183?

14   A    That's correct.

15   Q    And MMS messages is, I believe you, said multimedia

16   messages; so pictures, videos, I think even emojis are

17   considered MMS; is that right?

18   A    Yes.  It's any type of communication that is more than just

19   text.

20   Q    Okay.  And then SMS messages, 79,092, those are just the

21   text?

22   A    Those are going to be what is commonly referred to as text

23   messages.

24   Q    Okay.  But if you use an emoji, it goes in MMS?

25   A    I don't completely understand the nuances of the protocols.

SPECIAL AGENT NICHOLAS HANGGI - Cross

1    In my experience, yes, it has to be more than just a simple

2    text, would be a multimedia message.

3    Q   So, I believe you said that the different kinds of

4    communications that are being processed in this screen are SMS,

5    MMS and Chats; is that right?

6    A   Yes.  Those are the different types of data types that are

7    going to be included in the report generated by Cellebrite.

8    Q   So, there would be almost 150,000 Chat messages -- oh, I

9    touched the screen and now it's doing things.  Sorry.  I should

10   just touch down here.  There's going to be 79,000 SMS messages,

11   and another 2,000 MMS messages; is that right?

12   A   Approximately, yes.

13   Q   Thank you.  I'm not that good at math in my head, so I'm

14   not going to try to add them all up.

15   Q   Let's look up -- there's also a data point called *Images*;

16   7,361 images.  Is that photographs and videos.

17   A   I believe it includes things like that.  Again, I don't

18   know how Cellebrite categorizes what they're including in the

19   images category.

20   Q   Okay.  And locations here, we see 2,135 locations,

21   associated with this file.  That is information like if you are

22   are allowing an app to track your location, like Google Maps,

23   to help you find directions, and it registers a data point with

24   a location, it would go in that folder, right?

25   A   I believe so.  It is 2,315.

SPECIAL AGENT NICHOLAS HANGGI - Cross

1   Q   I did a little bit of dyslexia.  Sorry.  Would that

2   include, like, if a picture is taken, and you have this -- you

3   have enabled.  Location enabled, would it show the location

4   there, as well?

5   A   Again, I'm not sure what Cellebrite includes as locations.

6   Again, what the tools is doing, is it's looking at the data

7   provided by Apple™, it's recognizing it in some sense as

8   determined by the programmers of this application, and then

9   this option, within the report generation, Wizard is just used

10  to select what you want to be included in that report or not

11  included in the report.

12  Q   It looks like you tried to be as inclusive as possible?

13  A   That's correct.

14  Q   Because you wanted to have the agents have the most data

15  available to help in their investigation?

16  A   The agents have always had all of the data available to

17  them.  What this tool is doing is merely organizing to

18  facilitate easier review.

19  Q   Sure.  If we look at the device info, it shows that there's

20  16 devices that have backed up to this account.  Does that look

21  right?

22  A   I don't know that that's what that means.  Again, device

23  info, I believe, refers to information about the device found

24  within the iCloud return.

25  Q   Can you say that again?  I'm sorry, I don't follow you?

SPECIAL AGENT NICHOLAS HANGGI - Cross

1    *A*   So, in contrast to it being 16 different devices, I believe

2    it's information about a device found within the iCloud return.

3    And again, I'm not the programmer for this application.  I

4    don't know what is included in that category of information.

5    *Q*   Okay.  But it had 16 different pieces of information

6    related to devices?

7    *A*   That's correct.

8    *Q*   Okay.  Go back here.  I believe you testified --

9          *MS. HUBBARD:*  Mr. Keech, can you help me get this

10   purple pink squiggle off?

11         *MS. WEISS:*  It's the bottom left, kind of like an

12   O-looking thing.  There you go.

13         *MS. HUBBARD:*  I did it, yeah.

14   *Q*   I believe you testified that this was, kind of, the screen

15   that popped up in the Wizard, when you first went to process

16   the iCloud in this case.

17   *A*   That's correct.  It's one of the first windows that pops

18   up, after you you tell the application what data you want

19   processed.

20   *Q*   Okay.  So, it's giving you seven different options to run

21   reports from, right?

22   *A*   It's seven different options to process within the tool;

23   that's correct.

24   *Q*   Yeah.  And my understanding is you ran each of these

25   separately, first?

SPECIAL AGENT NICHOLAS HANGGI - Cross

1  *A*    Yes.

2  *Q*    And then you did a combined, that combined all seven?

3  *A*    That's correct.

4  *Q*    Okay.  I wonder if I could ask you a couple of questions

5  about -- it looks to me like we see a user ID *kley@icloud.com*,

6  and then we see a dash, 260992?

7  *A*    I see that.

8  *Q*    And then we also see a dash, and then a 262563?

9  *A*    I see that.

10  *Q*    Why are there two different numbers here?

11  *A*    I'm not sure.

12  *Q*    Okay.  Is this -- this is just how you got it from Apple™?

13  *A*    Again, I received information via OpWAN from Apple™.  When

14  I processed that file in the tool, this is what it renders.

15  *Q*    Okay.  And then, if we go over to the device ID side, as we

16  continue down that line, it looks like, and I am going to go

17  with the last four numbers here, looks like there's a device ID

18  for 253D, do you see that?

19  *A*    I do see that.

20  *Q*    And then device ID for BO3F?

21  *A*    I see that.

22  *Q*    And does -- that suggests to me that there was at least two

23  different devices uploading to this iCloud account?  Would you

24  just agree?

25  *A*    Um ... again, I don't know what those identifiers

SPECIAL AGENT NICHOLAS HANGGI - Cross

1  specifically respond or refer to.

2  Q    Okay.  You understand that Apple™ assigns a different

3  device ID to every device that it makes?

4  A    Like a serial number?

5  Q    Sure.

6  A    Apple™ assigns serial numbers to all of the things that

7  they manufacture.

8  Q    Okay.  We go down to the last three.  All of these last

9  three categories are titled -- these are the titles assigned by

10  Apple™, right?

11  A    So, these are the titles assigned by the Cellebrite tool.

12  Q    Okay.  So, the Cellebrite tool labels these folders?

13  A    Again, the tool is looking at the data provided by Apple™

14  and rendering it, and this is the screen shot of the options in

15  which I select which one I want to process the evidence with.

16  Q    Okay.  My understanding is Cellebrite is, essentially, just

17  organizing what Apple™ gave them?

18  A    That's correct.

19  Q    Okay.  So, then Apple™ has backup folders, it says at the

20  top, it says, *Select backup folder to use*?

21  A    Yes, I see that.

22  Q    There are seven backup folders here in the drop down?

23  A    I don't know that each one refers to a specific folder.

24  No.

25  Q    Okay.  Let's just focus on the last three.  We see the

SPECIAL AGENT NICHOLAS HANGGI - Cross

1    third from the bottom, it's called the *Blended Cloud Data*, for

2    the user ID that ends in '992?

3    A    Yes.

4    Q    Why is it called a *Blended Cloud Data*?

5    A    I'm not sure.

6    Q    Okay.  And then we see the next one, it's called, *Blended*

7    *Cloud Data* for the user ID ending in '262563, right?

8    A    I see that.

9    Q    Again, you don't know why Apple™ has called it the *Blended*

10    *Cloud*?

11    A    I don't understand the differences in these options, that's

12    why I processed them all individually, and provided them to

13    investigators for review.

14    Q    And then the final checkbox, *Backup Folder* is just a

15    general blended cloud data?

16    A    That's the option provided.  Yes.

17    Q    Okay.  And then, so you made seven different UFDR files,

18    one for each of those seven backup folders?

19    A    That's correct.

20    Q    And again, the UFDR file is the proprietary Cellebrite

21    software file that you need to, like, analyze the data?

22    A    It's the proprietary report format.  So, the UFDR file can

23    be loaded in the Cellebrite Reader tool, which allows you to

24    actually review the organized data.

25    Q    Okay.  And then once you have those seven separate UFDR

SPECIAL AGENT NICHOLAS HANGGI - Cross

1   files, you made a blended one, combined of all seven; is that

2   right?

3   A   Correct.

4   Q   Okay.  So, it would have, essentially, taken those seven

5   files we were looking at before, here, and made one report that

6   has all of the data that was in all seven of those?

7   A   That was my intention of creating a combined report.

8   Q   Okay.  And I believe then you testified that you loaded the

9   seven UFDR files, and then the combined, so the eighth UFDR

10  file, onto that hard drive?

11  A   So, it's the PT1_production.zip, the seven individual

12  files, and then I can't remember if the combined was included

13  or not, but that was just a working copy.  We look at the hash

14  list, we should be able to confirm that.

15  Q   Does that help?

16  A   Yes, it does.  So, exactly, yep, there's seven different --

17  there's eight reports, seven for each individual option.  The

18  combined report, and then the additional data received by

19  Apple™.

20  Q   Sorry.  I wasn't trying to make this a memory test.  So, I

21  wanted to make sure you -- and you loaded those eight reports

22  and the data, original data, onto the hard drive?

23  A   That's correct.

24  Q   And were you asked, at any point, later in the

25  investigation then, to go back and review the content of -- in

NICHOLAS HANGGI – Cross

1    these reports?

2    A   I was not asked to review content, to my knowledge.  My job

3    was just to process the data and provided it to the

4    investigators for review.

5    Q   Okay.  So, the investigators could have asked you to go

6    back and do more looking or more processing, and that didn't

7    happen, in this case?

8    A   Not to my knowledge.

9          MS. HUBBARD:  If I could have a minute, Your Honor?

10         THE COURT:  Yes.

11         MS. HUBBARD:  We have no further questions on behalf

12   of Mrs. Tew.

13         THE COURT:  All right.  Thank you, Ms. Hubbard.

14   Mr. Schall?

15                        **CROSS–EXAMINATION**

16   BY MR. SCHALL:

17   Q   Good morning.

18   A   Good morning.

19   Q   I will be very brief.  You have had a lot of roles

20   throughout your career with the FBI?

21   A   Yes.

22   Q   Moved up the ladder, if you will?

23   A   I would say moved sideways, but changed positions.  Yes.

24   Q   You get to carry a gun now?

25   A   (Nodding head.)  Yes.  They let me carry a gun.

NICHOLAS HANGGI - Cross

1   Q   Yeah.  And you have done a lot of work with different

2   programs produced by Cellebrite?

3   A   Yes.

4   Q   And are you familiar with the Cellebrite company?

5   A   Only so far as they develop these software applications.

6   Q   Are you familiar with the breadth of the software

7   applications that they produce?

8   A   Do you mean the number of software applications?

9   Q   No.  The breadth; meaning, the variety of tools that they

10  use?

11  A   I know they produce a multitude of tools.  I don't know all

12  of them.

13  Q   Sure.  You don't work for Cellebrite?

14  A   I do not.

15  Q   Can you give us the sense of the types of tools they

16  produce?

17  A   In general, they create digital forensic software

18  applications.

19  Q   And if I were to tell you that the Cellebrite company was

20  based out of Israel, would you agree with that?

21  A   My understanding is that is correct.

22  Q   And that it was founded, in part at least, by former

23  intelligence agents from Israel?

24  A   I don't know if that's true.

25  Q   Do you know if Cellebrite tools are utilized by the

NICHOLAS HANGGI - Cross

1    intelligence industry?

2    A    I don't know if that's true or not.

3    Q    Does the FBI utilize Cellebrite tools?

4    A    Yes.  The FBI pays for software applications developed by

5    Cellebrite.

6    Q    Does that include tools for the intelligence side of the

7    house?

8    A    I don't know what my intelligence colleagues use.  I can

9    tell you the FBI uses this tool.

10   Q    Is there -- if I were to proffer to you that there's a

11   distinction within the FBI between domestic investigations and

12   counterintelligence and foreign side, would you agree with

13   that?

14   A    Yes.  Internally we break down our investigations by

15   criminal violation.

16   Q    And have you ever been involved with anything other than

17   the domestic side?

18   A    I have been part of investigations where other nations or

19   individuals from other countries are involved.

20   Q    Did that involve the counterintelligence of the FBI?

21   A    I have assisted counterintelligence investigations.

22   Q    That's a distinct thing within the FBI.  There's walls

23   between counterintelligence and criminal investigations; is

24   that right?

25   A    That's correct.

NICHOLAS HANGGI - Cross

1    Q    And have you ever heard the counterintelligence side

2    referred to within the FBI as *the dark side*?

3    A    I have never heard that.

4    Q    How long have you been with the FBI?

5    A    I started as intern in 2015.

6    Q    And you have worked with the intelligence side of the

7    house?

8    A    I have assisted the national security side of

9    investigations.  Yes.

10   Q    In that assistance, did you use Cellebrite tools?

11   A    I can't recall specific instances, but Cellebrite is a tool

12   that the FBI uses during the course of investigations, which

13   may include national security investigations.

14        MR. SCHALL:  Nothing further, Your Honor.

15        THE COURT:  All right.  Thank you, Mr. Schall.  Any

16   redirect?

17        MR. FIELDS:  No, Your Honor.

18        THE COURT:  All right.  Thank you.  You are excused.

19   Thank you, sir.  Government ready to call another witness?

20        MR. FIELDS:  Thank you, Your Honor.  The United States

21   calls Matthew Vanderveer.

22        THE COURTROOM DEPUTY:  Please raise your right hand.

23       (**MATTHEW VANDERVEER** was sworn.)

24        THE WITNESS:  Yes.

25        THE COURTROOM DEPUTY:  Please be seated.  Please state

1    your name and spell your first and last name for the record.

2        *THE WITNESS:*  Matthew Vanderveer M A T T H E W,

3    V A N D E R V E E R.

4                          **DIRECT EXAMINATION**

5    *BY MR. FIELDS:*

6    Q    Good morning, Mr. Vanderveer.

7    A    Good morning.

8    Q    Where do you work?

9    A    I work at the Denver division of the Federal Bureau of

10   Investigation.

11   Q    What do you do there?

12   A    I'm a data analyst.

13   Q    What is a data analyst at the FBI?

14   A    Data analyst's primary job is to take large amounts of

15   digital evidence and make them easily reviewable by

16   investigators.

17   Q    How do you get that job?

18   A    I interned with the bureau my sophomore and senior year of

19   college.  I put in for this position during my senior year, was

20   accepted, I started in this position in June of 2020.

21   Q    What kind of training have you received from the FBI?

22   A    I have received digital forensic training in Quantico,

23   Virginia, in May of 2022.

24   Q    Have you, specifically, received training on how to

25   maintain the integrity of digital evidence?

MATTHEW VANDERVEER – Direct

1   A   I have.

2   Q   Describe that to us?

3   A   I have learned the importance of isolating digital evidence

4   from factors that could effect it; such as, the open Internet,

5   and using sandboxes to preserve that evidence.

6   Q   Sandboxes?  Are we talking about a literal sandbox?

7   A   Like a digital sandbox.

8   Q   What do you mean by that?

9   A   This is generally an area where evidence is again isolated

10  from outside sources; such as, the Internet.

11  Q   Let's talk about some of the programs you use to do your

12  job.  Does the FBI have servers and computers for maintaining

13  digital evidence?

14  A   They do.

15  Q   Have you heard of something called OpWAN?

16  A   OpWAN is one of the digital sandboxes, if you will.  It is

17  a place to review and preserve digital evidence, and it is not

18  connected to the Internet.

19  Q   Have you ever heard a program called Cellebrite?

20  A   I have.

21  Q   What is that?

22  A   Cellebrite is a forensic tool, forensic software, that

23  generally is used to process phone extractions and sometimes

24  legal process returns, which is iCloud widgets.

25  Q   Can you -- first all, let's scoot in a little bit closer.

MATTHEW VANDERVEER - Direct

1  Are you a little bit nervous today?

2  A   A little bit.

3  Q   Just speak clearly into the mic, if you don't mind.  So, we

4  can make sure our court reporter is getting it.  So, you were

5  describing Cellebrite.  How are you familiar with Cellebrite?

6  A   I have been trained to use it.  I was trained to use it in

7  May of 2022, and I have used it many times in the past couple

8  years.

9  Q   When you say *many*, how many times?

10 A   I would say at least 30 to 50 times.

11 Q   And any of the times you have used Cellebrite, have you

12 ever seen it produce an inaccurate result?

13 A   No.

14 Q   Does the FBI also have access to something called Analog

15 Forensic?

16 A   They do.

17 Q   What is that?

18 A   Analog Forensic is another software tool, similar to

19 Cellebrite, that provides slightly different views of the

20 evidence, but allows for, again, review of digital evidence.

21 Q   When you say *it allows for review*, what, exactly, does it

22 do?

23 A   It will take in whatever evidence it is given.  It will

24 allow you to -- one of the things it allows to do is navigate

25 the file structure of whatever evidence it is given.

MATTHEW VANDERVEER – Direct

1   Q   Sometimes, as a data analyst, do you use even more basic

2   programs like Microsoft Excel?

3   A   Yes.

4   Q   Describe your experience using Microsoft Excel?

5   A   Oftentimes investigators want the results that produce them

6   to be in Excel format, because it is very simple for them to

7   view and use.  So, many times I produce results to

8   investigators, in Microsoft Excel, so I have familiarity with

9   Excel.

10  Q   Software program files, do they have file extensions?

11  A   They do.

12  Q   What is a file extension?

13  A   File extension is something that you would see on any kind

14  of computer file.  It could be, you know, Word Document would

15  be DOCX, Excel Document would be Excel XS, and there's many

16  more beyond that.

17  Q   Excel, does it work with different file formats and

18  extensions?

19  A   Yes.

20  Q   What are some of the formats and extensions that work with

21  Microsoft Excel?

22  A   Probably the most common formats and extensions are Excel

23  XS, which is Xcel's native format, as well as CSV is another

24  very common format.

25  Q   CSV.  What is a CSV format?

MATTHEW VANDERVEER – Direct

1    *A*   CSV format is -- stands for comma-separated values.  It is

2    a older tabular format; meaning, there are rows and columns

3    within the data, and they are separated off into columns, are

4    separated by commas, in rare cases, sometimes they are

5    separated by a little delimiter, such as a tab.

6    *Q*   Have you ever heard of a file extension .db?

7    *A*   I have.

8    *Q*   What is a .db file extension?

9    *A*   A .db file is a database file.  Often it is a SQLite

10   database file.

11   *Q*   Are there -- well, first of all, you mentioned SQLite.

12   What is SQLite?

13   *A*   SQLite is a database engine.  It is -- essentially stores

14   data in tables, similar to Microsoft Excel, except you can have

15   multiple tables in one database.

16   *Q*   You mentioned Microsoft Excel.  Are there programs, just

17   like Excel opens XLSX.  Are there programs that would open a

18   .db file?

19   *A*   Yes.

20   *Q*   Are you familiar with those programs?

21   *A*   Yes.

22   *Q*   How are you familiar with them?

23   *A*   I often use one program in particular, SQLite DB Browser

24   for SQLite, which is readily available on the internet.  You

25   can download it.

MATTHEW VANDERVEER – Direct

1   Q   What kind of devices use these .db files?

2   A   They are often found on many kinds of digital devices,

3   oftentimes mobile phones, including iPhones.

4   Q   Are you familiar with an investigation into Michael and

5   Kimberley Tew?

6   A   I am.

7   Q   How are you familiar with that?

8   A   I was asked to assist on the investigation by the case

9   agent.

10  Q   Who was that?

11  A   Special Agent Sarah Anderson.

12  Q   What did she ask you to do?

13  A   She asked me to assist in the attribution of certain

14  messages to certain actors, back in, I believe... at some point

15  during the investigation.  I don't mean the exact time.

16  Q   Was this related to a certain iCloud account?

17  A   Yes.

18  Q   What was that iCloud account?

19  A   *Kley@me.com*.

20  Q   Had someone else at the bureau already processed that

21  account?

22  A   Yes.

23  Q   Who was that?

24  A   Digital Operations Specialist Nicholas Hanggi.

25  Q   What had he done?

MATTHEW VANDERVEER – Direct

1    A   He had taken the original iCloud return, and placed it into

2    evidence on a hard drive, and also made copies of that original

3    evidence and placed them on OpWAN.

4    Q   When you say the original evidence, what comprised the

5    original evidence?

6    A   The original evidence was a ZIP folder, with, you know --

7    additional files within that ZIP folder.

8    Q   Those were stored on Apple™?

9    A   Yes.

10   Q   When you were asked to look at that data, were you able to

11   look inside that folder?

12   A   The ZIP folder, yes.

13   Q   What was the name of the ZIP folder?

14   A   PT1_production.zip.

15   Q   Were you able to look inside of that?

16   A   I was.

17   Q   Was there a declaration in Apple™ inside of there?

18   A   There was.

19   Q   What did you see when you looked at that declaration from

20   Apple™ I?

21   A   I saw the files that Apple™ -- or the names of the files

22   that Apple™ had produced to investigators.

23   Q   Did you compare the -- what was on that, sort of,

24   declaration from Apple™, with what you were seeing inside that

25   PT1_production.zip folder?

MATTHEW VANDERVEER – Direct

1    A    Yes.

2    Q    What did you see when you compared them?

3    A    I saw that the production -- the files listed by Apple™, in

4    their declaration, matched what I was seeing inside the iCloud

5    return, in the physical files.

6    Q    Inside that PT1_production.zip file, did you find

7    comma-separated value files?

8    A    I did.

9    Q    How were they labeled?

10   A    These comma-separated value files were labeled

11   *messagesinicloud.scv*.

12   Q    Were you able to open those files?

13   A    Yes.

14   Q    How?

15   A    I was able to convert the file extension to Excel XS and

16   open them in Microsoft Excel.

17   Q    After you opened them and put them into Excel format, what

18   did you do with them?

19   A    I was able to view the data inside of them.  I was able to

20   filter the data by certain selectors; by *selectors*, I mean,

21   phones and emails that investigators desired to see.

22   Q    Did you produce those to the U.S. Attorney's?

23   A    I did.

24   Q    All right.  So, there's going to be another Redweld®.  It's

25   on the bottom right-hand corner of that cart, Mr. Keech, if you

MATTHEW VANDERVEER - Direct

1    could handle that -- hand that to Mr. Vanderveer?

2         *THE COURTROOM DEPUTY:*  There's a few of them over

3    here.  I want to make sure I get the right one.

4    Q    So, inside that Redweld® there's several folders.  The

5    first one, there, do you see it says, *first set*.  It's the one,

6    sort of, opposite the long folders.

7    A    Yes.

8    Q    Okay.  All right.  Before your testimony today, did you

9    review certain government exhibits?

10   A    I did.

11   Q    Okay.  Go ahead and take out that folder.  I know it's kind

12   of big.  All right.  So, there's a bunch of exhibit numbers

13   that I'm going to want you to read off.  I want to go slowly,

14   so that both the court reporter and everyone else can get them.

15   Can you go through those, read off the exhibit number in the

16   bottom right-hand corner of each one.

17   A    Okay.  605, 613, 614, 625, 639, 650, 673, 681, 689, 693,

18   697, 705, 707, 717, 747, 774, 775, 786, 788, 817, 820, 829,

19   830, 833, 837, 851, 857, 858, 865.

20   Q    What are those?

21   A    These are exhibits -- these are excerpts from the messages

22   iCloud spreadsheets.

23   Q    Did you review them before your testimony?

24   A    I did.

25   Q    Did you compare the content in those messages to what you

MATTHEW VANDERVEER – Direct

1    found in those comma-separated value files in the

2    PT1_production.zip file labeled *messages in iCloud*?

3    A    Yes.

4    Q    What did you find when you compared them?

5    A    I found the messages here were from the messages in iCloud

6    spreadsheets.

7    Q    Has anything been added to those exhibits?

8    A    Yes.

9    Q    What?

10    A    There's been a row ID added, row, and there has been colors

11    added to the spreadsheets.

12    Q    Was the content itself changed?

13    A    No.

14    Q    All right.  We can go ahead and set all of those aside.

15    Were there also Cellebrite files stored on OpWAN?

16    A    Yes.

17    Q    What was the name of those Cellebrite files?

18    A    Combined.UFDR.

19    Q    What do you have to do for open a .UFDR?

20    A    A .UFDR file is a Cellebrite format.  It can be opened

21    using Cellebrite Reader.

22    Q    Were you able to open it up using Cellebrite Reader?

23    A    I was.

24    Q    What did you see when you opened it up?

25    A    I saw iCloud data being rendered by Cellebrite.

MATTHEW VANDERVEER - Direct

1    Q   Were you able to look at that interface?

2    A   I was.

3    Q   What did you see when you reviewed that interface?

4    A   I was able to review data from the *kley@me* iCloud return.

5    Specifically, messages from that iCloud return.

6    Q   When you looked more closely at the messages, were you able

7    to see where it was drawing the data from?

8    A   I was.

9    Q   How were you able to do that?

10   A   I was able to observe the file path.  Cellebrite displays a

11   file path of where it is pulling data from in the iCloud

12   return, and I was able to recognize that the messages were

13   being pulled from database files within the iCloud return.

14   Q   Let's take a look at Government's Exhibit 718, which has

15   been shown, but not yet admitted.  It will show up there on

16   your screen.

17   A   Okay.

18   Q   May be having some technical difficulties.  If we are

19   that's okay.  I can use --

20        THE COURT:  Mr. Keech, are -- do we have it hooked up

21   to the right person?

22        THE COURTROOM DEPUTY:  That's the problem.  Yes.

23   Sorry, Your Honor.

24        MR. FIELDS:  Thank you, Your Honor.

25   Q   All right.  And let's go to page two, here.  All right.

MATTHEW VANDERVEER – Direct

1    So, what are you looking at?  What do you see there?

2    A    These are messages being rendered by Cellebrite.

3    Q    Can you tell where Cellebrite is pulling the data from?

4    A    Yes.

5    Q    How can you tell that?

6    A    I can tell based on the source file field in the box.

7         MR. FIELDS:  Your Honor, at this time I would ask for

8    permission to show this to the jury.  It's been shown to the

9    jury in the past.

10         THE COURT:  Okay.  Yes.

11   Q    All right.  So we're looking at here, on your screen there,

12   you can actually, sort of, draw on it.  Could you tell us where

13   on here, or I guess how, based on this, you can tell where

14   Cellebrite was drawing information from?

15   A    So, this source file field, I'm underlining here, I will

16   draw a box around it, this is where the messages are being

17   drawn from, is this SMS .db file.  It is -- it was part of

18   iPhone SE, a Second Generation iPhone SE, and it's stored in

19   the library SMS directory in the iCloud backup.

20   Q    .db, that's one of the file extensions you discussed with

21   us earlier?

22   A    Yes.

23   Q    Did you try to find that db file, in the underlying

24   production of -- from Apple™?

25   A    I did.

MATTHEW VANDERVEER - Direct

1    Q    How did you do that?

2    A    I was able to use Analog Forensic, which is one of the

3    other software tools I use.  Was able to navigate the file

4    structure of that ZIP folder and locate -- I was able to locate

5    database files within the --

6    Q    Once you had found that file, within the PT1_production.zip

7    folder, were you able to open it?

8    A    I was.

9    Q    How?

10    A    I was able to open the database files using SQLite

11    browser -- db browser for SQLite.

12    Q    Once you used that db browser to open that db file, were

13    you able to see the content of the messages?

14    A    I was.

15    Q    All right.  So, that Redweld® there, the rest of those

16    folders, except for the really long ones, there's a lot there,

17    let's go ahead and let's start with the first set.

18    A    Would that be second set, part two?

19    Q    Yep -- or second set, part one.

20          All right.  So, we're going to go through each of

21    these sets, and I want you to again read the exhibit number of

22    on each of those?

23    A    Read?

24    Q    Slowly, please.

25    A    628, 635, 637, 646, 685, 708, 715, 718, 730, 740, 760, 776,

MATTHEW VANDERVEER – Direct

1  784 and 787.

2  Q   Before we go on to the next step; 637, I think there might

   have been a little mistake.  That one look a little different?

4  Be sort of near the beginning, or does it look the same?

5  A   Six thirty-seven, um ...

6  Q   Nope, nope.  Mistake on my part, never mind.  So, you read

7  those off.  Let's go with the next set, please.  And let's read

8  off those exhibit numbers, as well.

9  A   The second set, part two?

10 Q   Yes, please.

11 A   Are you ready?

12 Q   Yes, please.

13 A   804, 805, 842, 883, 885,, 886, 895, 896, 897, 901, appears

14 to be all.

15 Q   Okay.  And the last set.

16 A   902, 915, 917, 925, 927, 932, 934, 937, 938, 941, 942, 946,

17 958, 960, 964, 966, 967, 970, 989, and 990.

18 Q   Just looked through a lot of documents.  What are those?

19 A   These are messages from a Cellebrite report.

20 Q   Did you compare what was rendered in those Cellebrite

21 reports, with the content in the underlying .db file that you

22 found in the PT1_production.zip, produced by Apple™?

23 A   Yes.

24 Q   When you compared that, what did you see?

25 A   I found the messages displayed in the Cellebrite rendering,

MATTHEW VANDERVEER - Direct

1    were found -- could be found in the database that I reviewed.

2          *MR. FIELDS:*  Your Honor, pursuant to the Court's Order

3    at **ECF Number 361**, the government would move into evidence all

4    of these exhibits, which I can read again, and I would just

5    note for the record that those last two, 989 and 990, were the

6    subject of the parties' pretrial briefing.

7          *THE COURT:*  Okay.  Ms. Hubbard.

8          *MS. HUBBARD:*  Your Honor, there's a number of issues.

9    I'm not sure the best way to raise them.

10         *THE COURT:*  Why don't you come up here, at least for

11   now.

12       (At the bench:)

13         *THE COURT:*  Let me just ask you, sort of, do you think

14   we should take a recess, and do it -- let the jury go?

15         *MS. HUBBARD:*  I think we can try.

16         *THE COURT:*  Go ahead.

17         *MS. HUBBARD:*  Your Honor, I believe this witness has

18   testified that the accurate -- that the data is accurately

19   reflected and that he crosschecked it, but he -- and I

20   confirmed this with Mr. Fields, but isn't involved with like

21   there's redactions on at least half of these.  So, I don't

22   think he has the personal knowledge as to the actual exhibit

23   that's being admitted.

24         My understanding is that Agent Palmer did the

25   redactions, and has that knowledge, so I would object to

MATTHEW VANDERVEER - Direct                          1122

1    admission, at this point of the actual exhibits with the

2    modifications that were not made by him, and that he has no

3    knowledge of.

4            THE COURT:  Well, I was curious about those

5    redactions.  I am inclined to let them in, if we can figure out

6    a way to handle that.

7            MR. FIELDS:  The redactions were made by our staff,

8    Your Honor.  It's not the content that we want to introduce,

9    not all of those messages are relevant.  He has just confirmed

10   that I looked at the data, and confirmed that it's in the

11   underlying database.

12           THE COURT:  So I'm inclined to just have you ask,

13   clarify what he doesn't -- basically, what he just said.  The

14   part that we see, he recognizes.  He is not sure who did the

15   redactions.  I think that's fine, and then maybe you can

16   explain, if you want to go on, to explain it, with Agent Palmer

17   however, you can.  Is there something else?

18           MS. HUBBARD:  Well, I think, Your Honor, we get to

19   Cross-examine, we're entitled to probe strategic decisions as

20   to what the jury sees and doesn't see, and I don't think it

21   should be admitted.  I don't think this exhibit should be

22   admitted through a witness that doesn't have personal knowledge

23   of what the jury is seeing and not seeing, and it's really

24   important for several reasons.

25           THE COURT:  No, I don't disagree with that.  You

MATTHEW VANDERVEER - Direct

1    definitely have the right to probe that, but the fact that what

2    he is testifying to, he does know.  You can clarify that he

3    didn't make the redactions, then I think that satisfies that

4    requirement, and you can probe that more with him or with

5    whoever made the redactions, however you like, but I don't

6    think that makes them inadmissible.

7            THE COURT:  Anything else?

8            MS. FROST:  Could I have one second, Your Honor?

9            THE COURT:  Hm-hm.

10           MS. FROST:  Thank you.

11           MS. HUBBARD:  Just so I understand, you are going to

12   admit the redacted versions through this witness?

13           THE COURT:  Right.  As long as he acknowledges that he

14   is not responsible, maybe doesn't even know where the

15   redactions came from.

16           MS. HUBBARD:  Okay.

17           MR. KAPLAN:  Just trying to make it so she can hear.

18           MS. FROST:  That's rare.  No comment, anybody.  On

19   behalf of Mr. Tew, Your Honor, we would just make the same

20   ongoing objections.

21           THE COURT:  Okay.  Understood.  All right.  Thank you.

22           (In open court.)

23   Q    One followup question, Mr. Vanderveer.  When you looked

24   through those exhibits, do you see that certain portions of

25   them are blacked out, with redaction boxes?

MATTHEW VANDERVEER - Direct

1    A    Yes.

2    Q    Who applied those redactions?

3    A    I'm not sure.

4    Q    Did you do it?

5    A    I did not.

6         MR. FIELDS:  Your Honor, at this time, the government

7    would move for the admission of the following exhibits, and I

8    will read them off again.

9         THE COURT:  Do we need them read off again?  I

10   think -- I think we probably got them.  I was keeping track

11   over here.  Mr. Schall?

12        MR. SCHALL:  There was one exhibit, in the, I believe,

13   first batch of three, between 786 and 817 that I missed.

14        THE COURT:  All right.  Let's go over that first

15   batch, and read those -- why don't I have Mr. Fields read his

16   list and make sure that's accurate.

17        MR. FIELDS:  Okay.  628, 635, 637, 646, 685, 708, 730,

18   740.

19        THE COURTROOM DEPUTY:  I'm sorry, 715 and 718 were in

20   the list I wrote down.

21        MR. FIELDS:  715, 718, 730, 740, 760, 776, 784, 787.

22   That should take us through that first set, Mr. Schall.

23        MR. SCHALL:  It must have been the set before.

24        THE COURT:  Just go ahead and go through your list.

25        MR. FIELDS:  Okay.  All right.

MATTHEW VANDERVEER - Direct

1           THE COURT:  And I will ask the witness to make sure

2    that's accurate with what he reviewed too.

3           MR. FIELDS:  Okay.

4           THE COURT:  Go ahead.

5           MR. FIELDS:  Well, if we are also going to do the

6    witness, maybe it might be best, Your Honor, for the witness to

7    read them out, again

8           THE COURT:  That's fine.  Start with your second --

9           MR. FIELDS:  That would be the second set, first part.

10          THE WITNESS:  Is that 804 to 901, or?

11          MR. FIELDS:  Six twenty-eight to 787.

12          THE COURTROOM DEPUTY:  Second set started with 804.

13          MR. FIELDS:  The second set started with 804.  Do you

14   want to start there?  Let's start there.

15          THE WITNESS:  This is 804 to 901?

16          MR. FIELDS:  Yep.

17          THE WITNESS:  Okay.  Eight-oh-four, 805, 842, 885.

18          THE COURTROOM DEPUTY:  Eight eighty-three is in there,

19   as well.

20          THE WITNESS:  Eight eighty-three.  Yes, 886, 895, 896,

21   897, and 901, nine, zero, one.

22          MR. FIELDS:  And then the last set.

23          THE WITNESS:  It's 902, 915, 917, 925, 927, 932, 934,

24   937, 940 --

25          THE COURTROOM DEPUTY:  I did not have 940.  I had 938.

MATTHEW VANDERVEER - Direct                    1126

1    Is 940 in that batch, as well?

2                THE WITNESS:  Yes, 940.

3                MR. FIELDS:  And 938 is in there, as well.

4                THE WITNESS:  I do have 938, yes.

5                THE WITNESS:  Okay.  Thank you.

6                THE WITNESS:  Nine forty-one, 944.

7                MR. FIELDS:  Is there also a 942?

8                THE WITNESS:  942, 946, 958, 961, 960, 964, 966, 967,

9    989, 990, oh, and 970.

10               MR. FIELDS:  Nine-seventy?

11               THE WITNESS:  Nine-seventy, 989 and 990.

12               MR. FIELDS:  Mr. Keech, do you mind, I think it might

13   be helpful if you can read off your list of ones that you have

14   seen and compare it.

15               THE COURTROOM DEPUTY:  I guess.  It's chicken scratch.

16   All three lists or the last list?

17               MR. FIELDS:  All three, with the Court' permission.

18               THE COURT:  Go ahead.  If you have got it.

19               THE COURTROOM DEPUTY:  628, 635, 637, 646, 685, 708,

20   715, 718, 730, 740, 760, 776, 784, 787; second grouping, 804,

21   805, 842, 883, 885, 886, 895, 896, 897, 901; third set, 902,

22   915, 917, 925, 927, 932, 934, 937, 938, 940, 941, 942, 944,

23   946, 958, 960, 961, 964, 966, 967, 970, 989, and 990.

24               MR. FIELDS:  Your Honor, at this time the government

25   would move all of those exhibits into evidence.

MATTHEW VANDERVEER – Direct

1      *THE COURT:*  Does everybody have their lists complete?

2   Looks like it, and understanding the ongoing objections, I will

3   admit them.

4      Q    (By Mr. Fields) One last set.  Those are in the

5   longer folders.  Can you again read each of those exhibit

6   numbers off to us?

7   *A*   We have 656, 669, 696 and 752.

8   *Q*   Do those ones look a little bit different?

9   *A*   Yes.

10  *Q*   Were those printed from a program called Relativity?

11  *A*   Yes.

12  *Q*   Did you review the content of each of those Exhibits 656,

13  669, 696 and 752, and compare them with the underlying db file

14  that you found within the PT1_production.zip file?

15  *A*   I did.

16  *Q*   What did you see when you compared them?

17  *A*   I found the messages from each of these exhibits could be

18  found in the .db file.

19  *Q*   Do those similarly have black redactions around parts of

20  them?

21  *A*   Yes.

22  *Q*   Did you add those redactions?

23  *A*   I did not.

24  *Q*   Who did?

25  *A*   I do not know.

MATTHEW VANDERVEER – Direct

1          MR. FIELDS:  At this time, the government would move

2     for admission of Government's Exhibit 656, 669, 696 and 752.

3          MS. HUBBARD:  Same objection earlier, Your Honor.

4          THE COURT:  So, understanding that both parties have

5     the same objection, I will overrule it and admit those

6     exhibits.

7          MR. FIELDS:  Thank you, Your Honor.  May I have just

8     one moment?

9          THE COURT:  Yes.

10          MR. FIELDS:  Mr. Keech, one clarifying question.  Has

11     Government's Exhibit 605 been admitted?

12          THE COURTROOM DEPUTY:  Yes.  It was previously

13     admitted last week, Tuesday.

14          MR. FIELDS:  That's my understanding.  Okay.  Thank

15     you, Your Honor.  With that, no further questions.

16          THE COURT:  All right.  Thank you, Mr. Fields.

17     Counsel for the defendants.  Mr. Schall, I know you have

18     another obligation.

19          MR. SCHALL:  I think Ms. Hubbard is going to start,

20     Your Honor, but I don't know if the Court wants to take lunch

21     break early, or.

22          THE COURT:  All things considered, why don't we go

23     ahead and just recess until 1 o'clock, and we will just start

24     clean, with the Cross-examination then.

25          So again, members of the jury, please keep an open

MATTHEW VANDERVEER - Cross

1    mind.  Don't discuss the case or do any outside research.

2    Allow us to present the case here in court, and instruct you,

3    before you start to make up your mind or do any research.  With

4    those instructions still in place, we will recess until 1

5    o'clock.  Thank you.

6           THE COURTROOM DEPUTY:  All rise.

7       (Jury out at 11:47 a.m.)

8           THE COURTROOM DEPUTY:  Court is now in recess.

9       (Recess at 11:48 a.m.)

10      (In open court at 1:01 p.m.)

11          THE COURT:  Please take your seats.  Counsel, can we

12   go ahead and bring the jury back in?  Great.

13          THE COURTROOM DEPUTY:  All rise.

14      (Jury in at 1:03 p.m.)

15          THE COURT:  All right.  Let's all take our seats.

16   Ms. Hubbard will be beginning Cross-examination of our witness

17   who is still under oath.  Go ahead.

18          MS. HUBBARD:  Thank you.

19                         **CROSS-EXAMINATION**

20   BY MS. HUBBARD:

21   Q   Good afternoon, Mr. Vanderveer.

22   A   Good afternoon.

23   Q   I want to just make sure that I understand what your role

24   was, with respect to the documents that we looked through

25   today.  Okay?

MATTHEW VANDERVEER - Cross

1    A    Okay.

2    Q    So, my understanding is that you, essentially, were

3    provided a stack of documents by someone sitting over here at

4    the prosecutor's table?

5    A    That's correct.

6    Q    And they had already decided what would be in the

7    documents; that is, if it's a conversation, they had decided

8    where one exhibit was going to start and where it was going to

9    stop in the conversation?

10   A    That is correct.

11   Q    And before you saw the documents, there was already

12   redactions made?

13   A    Yes.

14   Q    And those, again, were not made by you.  They were made by

15   someone sitting over here at the prosecutor's table?

16   A    Yes.  I do not know who they were made by.

17   Q    Okay.  So, your job was to take the exhibits that have been

18   provided to you, by the prosecutors, and check those against

19   the data?

20   A    That's correct.

21   Q    Okay.  I want to look at a couple of things, with respect

22   to the exhibit, and I'm going to put on the screen Exhibit 650.

23   Does this look like one of the spreadsheets that you reviewed?

24   A    Yes.

25   Q    And I believe you testified that when you received it, the

MATTHEW VANDERVEER - Cross

1    color had already been added, as well?

2    A    Yes.  When I received it from the prosecutors.  Yes.

3    Q    The color does not appear in the data, itself?

4    A    It does not.

5    Q    Okay.  So, between getting the data and it being given to

6    you, someone put the color on these spreadsheets?

7    A    Could you repeat that, question, please.

8    Q    So, the someone else, not you, put the color on these

9    spreadsheets.  It's not on the raw data itself?

10   A    That's correct.

11   Q    And you checked the content of the data against the raw

12   data?

13   A    Yes.

14   Q    Okay.

15         MS. HUBBARD:  If we could -- I'm just going to zoom in

16   on some of these messages.

17   Q    This is a conversation between Jonathan Yioulos and Michael

18   Tew.  Is that what you understand it to be?

19   A    I did not closely analyze each conversation.  I was

20   spot-checking the message content.

21   Q    Okay.  Were you also checking telephone numbers?

22   A    I did not pay particularly close attention to the numbers

23   while I was checking them.

24   Q    I'm confused about how you can check the data without

25   checking the phone numbers?

MATTHEW VANDERVEER - Cross

1    *A*    Well, what is your question?

2    *Q*    Yeah.  So, it was my understanding that you checked the

     data on the spreadsheets against the data that was provided by

3

4    Apple™?

5    *A*    That is correct.

6    *Q*    And one of these columns, *message sender*, you see that?

7    *A*    Yes.

8    *Q*    It's 585-737-1709, is a phone number?

9    *A*    Yes.

10   *Q*    And did you check these phone numbers?

11   *A*    I did not check the phone number columns.

12   *Q*    Okay.  Did you check the message ID columns?

13   *A*    Which column are you referring to.

14   *Q*    Either one.

15   *A*    Are you talking about the message DCID?  I did not check

16   those columns.

17   *Q*    Did you check the message GUID column?

18   *A*    I did not.

19   *Q*    What did you check?

20   *A*    I checked the message text.

21   *Q*    Just the text?

22   *A*    I did.

23   *Q*    Okay.  Do you see the use of punctuation between these two

24   individuals who are speaking to each other?

25   *A*    I do.

MATTHEW VANDERVEER - Cross

1  *Q*   There's periods in the messages?

2  *A*   Yes.

3  *Q*   And apostrophes, where there's a contraction?

4  *A*   Yes.

5  *Q*   And question marks?

6  *A*   Yes.

7  *Q*   Does that -- to you, does that mean this message was sent

8  by a woman?

9  *A*   That does not necessarily mean that.

10 *Q*   Because males can use punctuation too?

11 *A*   That is correct.

12 *Q*   Show you another exhibit that's been previously admitted,

13 684.  Zoom in.  Do you see in the middle of the page here --

14         *THE COURTROOM DEPUTY:*  Did you say 684?

15         *MS. HUBBARD:*  Yes.

16         *THE COURTROOM DEPUTY:*  I show 685 as admitted.

17         *MS. HUBBARD:*  Apologies.  Skip that one and go to

18 another one.  I tried to keep up this morning, but I must have

19 missed this one.

20         *MS. HUBBARD:*  Do you have 863 as being admitted?

21         *THE COURTROOM DEPUTY:*  Yes.

22     Q   (By Ms. Hubbard) Okay.  Let's put that one up.  And

23 again, this middle column.  Do you see one of the people using

24 OMG, exclamation point?

25 *A*   I do.

MATTHEW VANDERVEER – Cross

1   Q   And are you familiar with that, in a text term?

2   A   I am.

3   Q   What do you understand it to be?

4   A   I understand it to be oh my God.

5   Q   Okay.  And again, you don't know who this conversation is

6   between, is my understanding?

7   A   I do not.  I would like to correct that.  I know the

8   numbers, looking at them.

9   Q   Okay.

10   A   But I did not check those when I checked.

11   Q   You know '1709 is Jonathan Yioulos?

12   A   I do.

13   Q   So, this is a conversation between Jonathan Yioulos and

14   someone?

15   A   Yes.

16   Q   Show you one more.  This is Exhibit 885, that I believe was

17   admitted this morning in your big stack.  I will let Mr. Keech

18   check that?

19        THE COURTROOM DEPUTY:  Yes, that's correct.

20        MS. HUBBARD:  Okay.

21   Q   And this, I'm going to zoom in a little, appears to be

22   between somebody using *kley@me.com*, and saying, *They had some*

23   *gambling winnings*, do you see that?

24   A   Yes.

25   Q   And that's one side of the conversation, and then if we

MATTHEW VANDERVEER – Cross

1    zoom in here, it looks like the other side of the conversation

2    is someone with a phone number 917-685-1312?

3    A    That is correct.

4    Q    And do you understand that to be Michael Tew's phone

5    number?

6    A    I do.

7    Q    And you know that, because you reviewed messages involving

8    Mr. Tew?

9    A    Yes.  Through correspondence with investigators.

10   Q    Right.  Go to the next page of those.  Do you also

11   understand that Michael Tew had a phone number that ended in

12   '7473?

13   A    I do.

14   Q    And do you see here that's Michael Tew using the OMG,

15   followed by multiple exclamation points?

16   A    Yes.

17   Q    And do you see here, it looks like I'm on page eight of

18   this conversation, that appears between Michael Tew and

19   somebody using *kley@me.com*, where Michael Tew, again, uses OMG

20   with multiple exclamation points?

21   A    I do see that, yes.

22   Q    And just to highlight, this is on the same... All right,

23   we're still looking at, just to orient you, we're still looking

24   at Exhibit 885.  Okay.  So, I'm going to go back to the

25   beginning, and just make clear, I understand.  So, these are an

MATTHEW VANDERVEER - Cross

1   example of the redactions that were already put on the

2   documents by the prosecution team?

3   A   Yes.

4   Q   Okay.  And you did not check the texts that are under here?

5   A   No.

6   Q   You were told, that doesn't matter and isn't important to

7   our case?

8   A   I was not told anything specific about the black boxes.

9   Q   So, you just ignored them, and checked what was left?

10  A   Yes.

11  Q   And that's true for the redactions on all of these pages?

12  A   Yes.

13  Q   Some of the messages you were asked to review were in what

14  I would call the *bubble format*.  Are you familiar with that?

15  Like where it has a bubble of text and has a bubble of text and

16  it looks like a conversation?

17  A   Like on an iPhone perhaps.

18  Q   Yes.

19  A   Yes.

20  Q   And some of the exhibits that you were asked to review had,

21  kind of, text in a bubble, but they were just one side?

22  A   Yes.  I do -- that seems familiar.  Yes.

23  Q   Okay.  And there was no, kind of, response, to whatever the

24  conversation was, in that string of messages?

25  A   Yes, that's correct.

MATTHEW VANDERVEER - Cross

1    Q   Were you -- you were not asked to look for any responsive

2    messages to those, in the string?

3    A   That was incorrect.  I was asked to spot check if -- or I

4    believe I was asked to see if I could find responses.

5    Q   Okay.  Tell us how you were asked do that?

6    A   This was a -- investigators asked me, I believe multiple

7    times, to see if I could, using the underlying data, determine

8    if there was any response.  Responding messages to those texts.

9    Q   Okay.  And tell us how you did that?

10   A   By analyzing the underlying databases, as I previously

11   mentioned in my testimony.

12   Q   Okay.  Because, in Cellebrite, once you locate a message,

13   you can click to see the messages that surround that, in the

14   data?

15   A   Could you repeat that question, please?

16   Q   Sure.  If you are asked by the prosecution team to examine

17   or to check one of the messages in the one-sided chat, right?

18   A   Yeah.

19   Q   Let's say that message says, *Hey, how are you doing*?

20   A   Okay.

21   Q   Okay.  Once you have -- once you have located that message

22   in the data, Cellebrite allows you then to go into the timeline

23   and see what was happening around then?

24   A   That's correct.

25   Q   And did you do that?

MATTHEW VANDERVEER - Cross

1   *A*   I do not recall a specific instance where I did that in

2   Cellebrite.  I conducted overall review of messages in

3   Cellebrite, but I didn't do a particularly deep dive in the

4   Cellebrite application.

5   *Q*   Gotcha.  You didn't do a particularly deep dive looking for

6   anything that was responsive to the one-sided messages?

7   *A*   I did in the database, in the underlying database file.

8   *Q*   Not in Cellebrite, itself?

9   *A*   Yes.

10  *Q*   Okay.  So, even though Cellebrite is intended to interpret

11  the data and make it more easy to use, you went back to the

12  original database?

13  *A*   Yes.

14  *Q*   Were you able to locate any of the responsive messages in

15  the database?

16  *A*   I did not.

17  *Q*   I'm going to show you ...

18          *MS. HUBBARD:*  Actually if I could have just a minute,

19  Your Honor?

20          *THE COURT:*  Okay.

21          *MS. HUBBARD:*  I have no further questions.

22          *THE COURT:*  Okay.  Thank you, Ms. Hubbard.  Any

23  Cross-examination on behalf of Mr. Tew?

24

25          *MS. FROST:*  Thank you, Your Honor.

1          *THE COURT:*  Go ahead.

2                              **CROSS-EXAMINATION**

3     *BY MS. FROST:*

4     *Q*     Thank you.  Good afternoon, Mr. Vanderveer.

5     *A*     Good afternoon.

6     *Q*     You stated you're nervous today?

7     *A*     Yes, ma'am.

8     *Q*     I'm not as scary as I look, promise.

9     *A*     Okay.

10    *Q*     Mr. Fields might object to that.  My name is Kristen Frost

11    and I represent Michael Tew.

12    *A*     Okay.  Nice to meet you.

13    *Q*     What office did you say you are based out of, again?

14    *A*     Denver FBI office.

15    *Q*     Okay.  Did you start with the bureau in 2020 as a full-time

16    employee or were you still an intern?

17    *A*     I was -- I became a full-time employee in June of 2020.  I

18    was an intern for two years prior to that, in the criminal

19    division.

20    *Q*     You have been there for about four years?

21    *A*     Total, I have been in the bureau for almost five -- or

22    excuse me -- I believe since the June of 2018.

23    *Q*     And you didn't receive training on Cellebrite until May of

24    2022?

25    *A*     Not formal training.

MATTHEW VANDERVEER - Cross

1   Q   So, your formal training for Cellebrite occurred in May of

2   2022?

3   A   That's correct.

4   Q   About a year and nine months ago?

5   A   That is correct.

6   Q   And since that time, in the last year and nine months, you

7   said you have had experience with Cellebrite 30 to 50 times,

8   approximately?

9   A   Yes, that's an estimate.  Yes.

10  Q   And you said it always produced accurate work in those 30

11  to 50 occasions?

12  A   Yes.

13  Q   But we can agree -- well, in those 30 to 50 occasions,

14  someone else, like what happened here, might be giving you an

15  extraction that someone else already did, right?

16  A   Yes.  That might be the case.  Yes.

17  Q   And that was the case here, right?

18  A   Yes.

19  Q   And Ms. Hubbard just asked you questions about that, but,

20  you know, you have no idea what the person doing the extraction

21  has actually done, before you receive the data, correct?

22  A   That's not entirely true.  I read Digital Operation

23  Specialist Haggi's notes and documentation, so I did have an

24  idea of what he had done.  I have also performed many of the

25  extractions myself and I know general standard procedure on how

MATTHEW VANDERVEER - Cross

1    they're done and how they are originally performed in

2    Cellebrite.

3            So, yes, it is true I did not perform this myself, but

4    I do have an idea of how that process works.

5    Q   So, let's break that down a little bit.  Of course, if you

6    are doing the Cellebrite data extraction yourself, you have

7    personal knowledge of what you are ticking and what you are

8    pulling out of Cellebrite, right?

9    A   Could you repeat that question, please?

10   Q   Sure.  When you do the extraction, yourself, personally,

11   you have personal knowledge as to the data you are pulling off

12   Cellebrite, correct?

13   A   Yes.  I do not want to speak too much to the capabilities

14   of Cellebrite, itself, but yes, I would have a greater

15   knowledge of what, holistically, is being ingested and rendered

16   by Cellebrite.

17   Q   Because you are the one doing the work, right?

18   A   That is correct.

19   Q   And so -- and you don't want to speak to functionality of

20   Cellebrite, specifically, on a high level, because, of course,

21   you are not an expert in Cellebrite, right?

22   A   I do not know the inner workings of Cellebrite, and how it

23   is written in code.

24   Q   Okay.  So, getting back to what you said a few minutes ago,

25   when you are doing the extraction, you have personal knowledge

MATTHEW VANDERVEER - Cross

1  about what is extracted from the device, because you have done

2  it yourself, right?

3  A    Yes.

4  Q    And when someone else does it, you don't have personal

5  knowledge about what was extracted, because you were not

6  sitting next to the person doing the actual extractions,

7  correct?

8  A    Not as much.

9  Q    And we can agree, Cellebrite, as a program, when you go

10  into it, and I know you are not an expert, but the person

11  extracting the data can select specific data to extract, right?

12  A    That is correct.

13  Q    For example, and for the record I'm holding up my iPhone in

14  my hand.  If my iPhone, that I'm holding, were to be extracted,

15  the entire contents of this iPhone could be extracted, right?

16  A    Yes, that's correct.

17  Q    Or alternatively, maybe just text messages between myself

18  and my esteemed colleague, Mr. Schall sitting over here.  You

19  would have the ability, as the person extracting the data, to

20  get just the text messages between me and Mr. Schall?

21  A    So, I would like to clarify that when, at least in my

22  experience, when a Cellebrite extraction is performed, say on

23  an iPhone, it will capture all of the data that it can, and

24  then it is processed in Cellebrite Physical Analyzer, which is

25  the tool that we use to process extractions.  In my experience,

MATTHEW VANDERVEER - Cross

 1   generally, that is a very large amount of data, and you have

 2   very little control over what gets originally, I guess,

 3   rendered in Physical Analyzer.  What you do have control over,

 4   is when you generate reports for investigators to review,

 5   that's not necessarily part of the extraction process, that's

 6   a -- it's generating a report.  But, generally, when an

 7   extraction is going to gather data that necessarily -- whoever

 8   is performing the extraction, doesn't have a lot of control

 9   over the original extraction of what gets pulled from the

10   phone.

11   Q   Sure.  Thank you for that clarification.  And so, the

12   person creating the report can, specifically, select what data

13   to include in the Cellebrite report?

14   A   That is correct, yes.

15   Q   And going back to my example, if you, for instance, were

16   just looking for text messages, between myself and Mr. Schall,

17   you could create a report that just shows those texts, as

18   opposed to everything that's on the iPhone?

19   A   You could select, if I -- yes, you could select text

20   messages.  You would not be able to select specific numbers,

21   like specific phone numbers when generating a report, but you

22   would be able to only select text messages and not other

23   artifacts.

24   Q   That's a human being that's going in to create those

25   reports, right?  That's not like it's generated by the computer

MATTHEW VANDERVEER - Cross

1    automatically?

2    A    Yes, it's a human being, yes.

3    Q    And so, if a human being make as mistake, for instance,

4    when they're created that Cellebrite report, the report might

5    not be accurate, right?

6    A    Theoretically, yes.

7    Q    If a human being selectively picks certain types of

8    communications to put in a report, the report might not be

9    thorough?

10   A    I would like to clarify, I guess, my last comment.  The

11   data rendered would be accurate.  Cellebrite cannot pull from

12   data that is not there.

13   Q    Sure.

14   A    But yes, may not be as thorough.  I would say if you were

15   to select all of the artifacts to generate a report.

16   Q    Right.  So, even though you have, in your last year and

17   nine months, have said that in your experience Cellebrite

18   reports are accurate, we can agree that people make mistakes,

19   sometimes, right?

20   A    Yes.

21   Q    And that sometimes these reports are selectively created?

22   A    Yes.  But the data, itself, couldn't be changed at that

23   process of generating a report.

24   Q    Sure.  But I'm talking about the human being that you are

25   relying upon, to grab the data and make the report?

MATTHEW VANDERVEER - Cross

1    A    Yes.  They could not select everything.  Yes.

2    Q    And again, along the lines of your testimony, that in your

3    experience, in the last year and nine months, you know, you

4    have viewed Cellebrite as accurate.  We can agree there's been

5    public criticism about the reliability of Cellebrite, right?

6    A    I'm not personally aware of that.

7    Q    You are not aware of a situation where there was

8    allegations that it was hacked by Signal?

9    A    I have heard rumors about that, but I have not read the --

10   or I do not know them in great detail.

11   Q    Okay.  Sure.  You have no personal knowledge of Cellebrite

12   being hacked by Signal?

13   A    I have not -- I have not had personal experience on that.

14   Q    You have done no research on that?

15   A    I believe I have been served documentation at a certain

16   point, but like I said, I did not go through it in great

17   detail.

18   Q    Because you are not an expert?

19   A    I'm -- I do not know Cellebrite like that.

20   Q    On Direct Examination, Mr. Fields put a lot of those file

21   folders with bulk exhibits in front of you?

22   A    Yes.

23   Q    And the last set of documents, if you recall, I think were

24   printed from Relativity?

25   A    Yes.

MATTHEW VANDERVEER - Cross

1    Q    And you explained to us that those -- why those documents

2    looked different than the prior documents that you had

3    reviewed, right?

4    A    I do not recall if I explained why.

5    Q    Well, we can agree they were printed off of Relativity?

6    A    Yes.

7    Q    Did you print them off Relativity?

8    A    No.

9    Q    Who did?

10   A    I don't know.

11   Q    No one told you?

12   A    No.

13   Q    Have you ever used Relativity?

14   A    Yes.

15   Q    Are you trained in Relativity?

16   A    I have not received formal training in Relativity.

17   Q    Ms. Hubbard put a few exhibits in front of you, a few

18   minutes ago, which were the spreadsheets with green columns?

19   A    Yes.

20   Q    One of them, for example, was Government's Exhibit 885?

21   A    Yes.

22   Q    And it sounds like there was substantial -- a substantial

23   part of the data included on the spreadsheets that you didn't

24   double check?

25   A    Yes.  I only checked the message body column.

MATTHEW VANDERVEER – Redirect

1   *Q*   And no one sitting over here, at this table, asked you to

2   double check the information that you didn't?

3   *A*   Not specifically, no.

4           *MS. FROST:*  May I have one minute, Your Honor —— one

5   second, I should say?

6           *THE COURT:*  Yes.

7           *MS. FROST:*  Thank you.  I have no more questions of

8   Mr. Vanderveer.

9           *THE COURT:*  All right.  Thank you.  Any Redirect?

10          *MR. FIELDS:*  Briefly Your Honor.

11                        **REDIRECT EXAMINATION**

12  *BY MR. FIELDS:*

13  *Q*   Mr. Vanderveer, do you remember being asked about these

14  questions about, sort of, double checking?

15  *A*   Which?

16  *Q*   Towards the end there, do you remember being asked whether

17  you double checked all of the other columns in the

18  spreadsheets?

19  *A*   Yes.

20  *Q*   When you were doing your review, did you check to determine

21  whether or not the data that you were reviewing, those folders,

22  actually matched the certification you got from Apple™?

23  *A*   I did double check that, at times.  Yes.

24  *Q*   And when you checked that, what did you discover?

25  *A*   I discovered that the data in those folders matched the

MATTHEW VANDERVEER - Redirect

 1   description that Apple™ provided.

 2   Q    You were also asked about, sort of, data being selective,

 3   right?

 4   A    Yes.

 5   Q    Your role at the FBI is what again?

 6   A    I'm a data analyst.

 7   Q    What do data analysts do?

 8   A    They take large amounts of data, make it more easily

 9   reviewable by investigators.

10   Q    Does that involve sometimes filtering data?

11   A    That is -- that is true, yes.

12   Q    When I use the term *filtering*, might mean different things

13   to different people, what does it mean to you?

14   A    Filtering, generally, would mean to limit the amount of

15   data to make it I guess more able to be wielded by

16   investigators, because often the amount of data that they get

17   is too large to go through one-by-one, manually.

18   Q    When Special Agent Anderson made her request of you, did

19   she ask you to filter data according to certain identifiers?

20   A    Yes.

21   Q    What identifiers did she give you?

22   A    Phone numbers and emails were given to me by the

23   investigative team, some of which have already been mentioned.

24        *MR. FIELDS:* I have no further questions.

25        *MS. WEISS:* Oh, Mr. Fields.

MATTHEW VANDERVEER - Redirect

1            MR. FIELDS:  Sorry.  Excuse me.

2            MR. FIELDS:  Sorry, one other topic.

3   Q   You were asked about Cellebrite being hacked.  Do you

4   remember those questions?

5   A   Yes.

6   Q   The FBI Cellebrite tools, where does it keep those tools?

7   A   I know the installers for those tools are kept on OpWAN.

8   I'm not sure if they are kept anywhere else, as well.

9   Q   Does the FBI do anything to make sure that those tools,

10  themselves, are not hacked by outsiders?

11  A   They would be kept on FBI systems, generally, to prevent

12  such things from happening.

13  Q   How would keeping them on these FBI systems protect that

14  from happening?

15  A   We take many precautions to secure our data and forensic

16  machines from outside influence; such as, hackers.

17  Q   When you were doing your review of the data that you

18  received from Apple™, in OpWAN, what steps did you take to make

19  sure that that data had not been hacked or otherwise corrupted?

20  A   I, essentially, did not move it on to places that I knew,

21  such as -- like, I didn't place the data on the Internet.  I

22  worked with it on bureau machines that I know to be secure, you

23  know, based on our organization security.

24          MR. FIELDS:  Thank you very much.  No further

25  questions.

MATTHEW MORGAN - Direct

1        *THE COURT:*  All right.  Thank you, Mr. Fields.  Thank

2   you, Mr. Vanderveer.  You may step down.  You are excused.

3        I believe the government has another witness to call.

4        *MS. WEISS:*  Yes, Your Honor.  The government calls

5   Matt Morgan.

6        *THE COURTROOM DEPUTY:*  Please raise your right hand.

7        (**MATTHEW MORGAN** was sworn.)

8        *THE WITNESS:*  Yes.

9        *THE COURTROOM DEPUTY:*  Please be seated.  Please state

10  your name and spell your first and last names for the record.

11       *THE WITNESS:*  My name is Matthew Edward Morgan,

12  M A T T H E W, last name, M O R G A N.

13                    **DIRECT EXAMINATION**

14  *BY MS. WEISS:*

15  *Q*   Good afternoon.  How are you?

16  *A*   Doing well, thank you.

17  *Q*   What is your educational background, sir?

18  *A*   My educational background.  I have a Bachelor's in

19  Accounting, Masters in Accounting and Masters in Information

20  Systems.

21  *Q*   Where do you work?

22  *A*   I work for the Federal Bureau of Investigations.

23  *Q*   What is your title?

24  *A*   My title is forensic accountant.

25  *Q*   How long have you worked at the FBI as a forensic

MATTHEW MORGAN - Direct

1    accountant?

2    A    I have worked at the FBI for 13 years.

3    Q    What did you do before becoming a forensic accountant with

4    the FBI?  Please let me finish.  Thank you.

5    A    Sorry.  Before forensic accounting, I was a internal audit

6    manager, did internal auditing, did financial auditing and some

7    accounting work.

8    Q    Can you please explain to the jurors what a forensic

9    accountant does for the FBI?

10   A    Of course.  A Forensic accountant is the one that follows

11   the money in our investigations.  We identify the source of

12   funds, the use of funds, and how those tie back to the

13   investigation that we're working on..

14   Q    Were you asked to perform a financial analysis in the

15   investigation of Michael Tew and Kimberley Tew?

16   A    Yes.

17   Q    And can you tell the jury, in broad strokes, what you were

18   asked to do?

19   A    I was asked to review, independently, obtain certified

20   records, financial records, and to trace the funds that went

21   into the accounts and the funds that went out of the accounts.

22   So again, the source of funds and the use of funds.

23   Q    Can you describe, in broad strokes, what types of records

24   you did to accomplish that or you reviewed to accomplish that

25   task?

MATTHEW MORGAN - Direct

1    A    Yes.  I looked at bank statements, supporting

2    documentation, so, the bank statements.  So, that would be,

3    deposit slips, withdrawal slips, checks, wire detail

4    information, and associated documentation that we obtained from

5    National Air Cargo.

6    Q    The associated documentation from National Air Cargo, did

7    that include invoices that were submitted?

8    A    Yes.

9    Q    And then, you mentioned supporting docs to the bank

10   statements, did that also include signature cards?

11   A    Yes, it did.

12   Q    Can you describe what a signature card is?

13   A    A signature card is used to open an account.  It identifies

14   the type of account.  It's a business account, an LLC, a

15   corporation, if it's an individual account, who the signers are

16   on the account, if it's a sole owner, if it's multiple owners

17   on an account.

18   Q    Okay.  We have a lot of housekeeping to start this day

19   with, and I am not sure if everything is still in the box on

20   the floor, but if we could, maybe, bring it up next to him on

21   the podium or put it up on the witness stand.

22         Thank you, Mr. Keech.

23         *THE COURTROOM DEPUTY:*  Put the box up here?

24         *MS. WEISS:*  Sure.

25   Q    All right.  Mr. Morgan, I'm hoping that you should have one

MATTHEW MORGAN - Direct

1    Redweld® that has some plain, non-labeled folders on it.  Can

2    we start with that?

3    A    Okay.

4    Q    All right.  Let's shift, now, to some bank records that

5    have not yet been admitted, in this trial.  The first folder,

6    and I am hoping it will all be in alphabetical order, should be

7    records from Access National Bank?

8    A    It is.

9    Q    Okay.  And is it your understanding that Access National

10   Bank merged with Atlantic Union Bank some time after the events

11   of this case?

12   A    Yes.

13   Q    Could you please tell us -- first of all, look at those

14   records, and tell us if these are some of the records that you

15   reviewed, as part of your financial analysis?

16   A    Yes, they do look familiar.

17   Q    Okay.  And could you read off the exhibit numbers in that

18   folder?

19   A    Yes, Government's Exhibit -- the 312, 312.

20   Q    Uh-huh?

21   A    And then Exhibit 354, 363, and that's it.

22        MS. WEISS:  Okay.  The government would move to admit

23   Exhibits 312, 354 and 363.

24        THE COURT:  Any objections?

25        MR. SCHALL:  Your Honor, was there certifications

MATTHEW MORGAN - Direct

1   behind these?

2          MS. WEISS:  There is, Your Honor.  If you just give me

3   one moment.

4          THE COURT:  Okay.  Thank you.

5          MS. WEISS:  Certification is 1100.

6          THE COURT:  All right.

7          MS. WEISS:  And 1135.

8          THE COURT:  Any objection, given that?  Okay.  Those

9   are admitted.  Go ahead.

10  Q   Turning to the next folder in your stack, Mr. Morgan.  Did

11  your records review also include records received from ANB

12  Bank?

13  A   Yes.

14  Q   Could you review the documents in that folder, and when you

15  are done, just look up.

16         Are those documents that you reviewed in connection

17  with this case?

18  A   Yes.

19         MS. WEISS:  Okay.  And the government would move to

20  admit the documents in that folder, and ask the witness to read

21  out those numbers.

22         MR. KAPLAN:  Could we identify the --

23         THE COURT:  Yeah.  Go ahead and read the numbers

24  please.

25  A   They are 207, 364.

MATTHEW MORGAN - Direct

1          MS. WEISS:  The government would move to admit,

2    pursuant to Certifications 1101 and 1102.

3          MR. KAPLAN:  No objection.

4          THE COURT:  All right.  Those are admitted.

5    Q   Moving to the next folder, Mr. Morgan.  Did your records

6    review include records -- bank records received from BBVA

7    Compass?

8    A   Yes.

9    Q   Could you look at the exhibits in that folder, and let me

10   know when you are done.

11   A   Okay.  I'm done.

12   Q   And could you read off the exhibit numbers?

13   A   Three eleven, 341.

14   Q   And are these records you reviewed in connection with this

15   investigation?

16   A   Yes.

17          MS. WEISS:  The government would move to admit,

18   pursuant to Certifications 1103 and 1104, Exhibits 311 and 341.

19          THE COURT:  Any objections?

20          MR. KAPLAN:  No.

21          THE COURT:  All right.  Those are admitted.

22   Q   All right.  Next folder, Mr. Morgan, should be Guaranty

23   Bank & Trust Company.  If you could look at those exhibits, and

24   let me know when you are ready.

25   A   Okay.

MATTHEW MORGAN - Direct

1   Q   Okay.  Did you review those records in connection with your

2   financial analysis in this case?

3   A   Yes.

4   Q   And I will read into the record, Exhibits 202, 302 and 310.

5   Are those the exhibits in front of you, sir?

6   A   Yes.

7           MS. WEISS:  Government would move to admit Exhibits

8   202, 302, and 310, pursuant Certification Number 1105.

9           THE COURT:  Hearing no objection, those will be

10  admitted.

11  Q   All right.  The next one is not in the folder, because it

12  is -- this is a big one.

13  A   Okay.

14  Q   Okay.  Are those all documents from Navy Federal Credit

15  Union?

16  A   Yes.

17  Q   Are those all documents that you reviewed as part of your

18  financial analysis in this case?

19  A   Yes, I believe so.

20          MS. WEISS:  The government would move to admit,

21  pursuant to 11 -- Certifications 1107, 1128 and 1139.  These

22  exhibits, which I can read off in sets, like Mr. Fields did.

23          THE COURT:  Sure.  Why don't you go ahead and read off

24  the numbers, please.

25          MS. WEISS:  First set is Exhibit 46, Exhibit 208,

MATTHEW MORGAN - Direct

1    Exhibit 209, Exhibit 210, Exhibit 212, Exhibit 225, Exhibit

2    228, Exhibit 231, exhibit 232, Exhibit 236, Exhibit 239,

3    Exhibit 240, Exhibit 246, Exhibit 303, Exhibit 304, Exhibit

4    314, Exhibit 315, and Exhibit 319.

5            THE COURT:  All right.  Mr. Keech, did you get all of

6    those?

7            THE COURTROOM DEPUTY:  Yes, Your Honor.

8            THE COURT:  Are those the documents the witness has in

9    front, are those the documents that you reviewed, sir?

10           MS. WEISS:  That's about half of them.

11           THE WITNESS:  There's additional ones.

12           THE COURT:  Okay.  Go ahead.

13           MS. WEISS:  The government would move to admit those

14   records, I just read out.

15           THE COURT:  Any objection as to those?  All right.

16   Those are admitted.

17   Q    Okay.  Continuing to the rest of the Navy Federal Credit

18   Union documents, sir.

19

20           MS. WEISS:  Government would seek to admit, pursuant

21   to the same Certifications 1107, 1128 and 1139, the following

22   exhibits:  Exhibit 324, Exhibit 325, Exhibit 328, Exhibit 329,

23   Exhibit 331, Exhibit 333, Exhibit 368, Exhibit 393, and Exhibit

24   394.

25           THE COURT:  Mr. Keech did you get all of those?

MATTHEW MORGAN - Direct

1          *THE COURTROOM DEPUTY:*  Yes, Your Honor.

2          *THE COURT:*  All right.  Those all of the Navy Federal

3   Credit Union?

4          *MS. WEISS:*  I believe so.

5          *THE COURT:*  All right.  Thank you.  Any objection to

6   admitting those.  All right.  Those are admitted.

7   Q   Okay.  Next folder should be a little bit smaller,

8   Mr. Morgan.  Can you please read off the exhibits in that

9   folder?

10  A   Two-oh-three, 205.

11  Q   Are those both exhibits that you received from Regions

12  Bank?

13  A   Yes.

14  Q   Did you review those records in connection with this

15  investigation?

16  A   Yes.

17         *MS. WEISS:*  Pursuant to the Declarations 1111 and

18  1143, the government seeks to admit Exhibit 203 and Exhibit

19  205.

20         *THE COURT:*  Hearing no objection, those are admitted.

21  Q   All right.  Next folder, Mr. Morgan.  Okay.  Are those

22  documents that the government received from Wells Fargo Bank?

23  A   There's one that I don't know if it belongs in here.

24  Q   Oh, my apologies, what number is that?

25  A   Three-oh-four.

MATTHEW MORGAN - Direct

1   *Q*   Right you are, sir.  Thank you for checking me on that.

2   With the exception of Exhibit 304, are those all documents that

3   you received from Wells Fargo?

4   *A*   Yes.

5   *Q*   And are these documents that you reviewed in connection

6   with this investigation?

7   *A*   Yes.

8          *MS. WEISS:*  And the government would now move to admit

9   the following documents, and I will read them out into two sets

10  again, if that's okay.

11         Exhibit 48, Exhibit 52, Exhibit 53, Exhibit 213,

12  Exhibit 217, Exhibit 220, Exhibit 224, Exhibit 229, Exhibit

13  230, Exhibit 245, Exhibit 250, Exhibit 306 and 307?

14         *THE COURT:*  Any objection to those?

15         *MR. KAPLAN:*  If we could just have the corresponding

16  certification numbers.

17         *MS. WEISS:*  The certifications are 1119 and 1120.

18         *THE COURT:*  Thank you.  With that clarification, those

19  are admitted.

20         *MS. WEISS:*  The next set of Wells Fargo records,

21  pursuant to the same certifications, is Exhibit 334, Exhibit

22  337, Exhibit 340, Exhibit 342, Exhibit 343, Exhibit 344,

23  Exhibit 345, Exhibit 382, and Exhibit 385.

24         *THE COURT:*  Hearing no objection to those.  Those will

25  be admitted.

                              MATTHEW MORGAN - Direct                    1160

1    Q   There should be one more little folder in there.  Is there

2    one more little folder in there?

3    A   There is.

4    Q   Is that Government's Exhibit 973?

5    A   Yep.

6    Q   Do you recognize that document?

7    A   Yes.

8    Q   And what is that document?

9    A   It is an invoice.

10   Q   Also email communication attached to that invoice?

11   A   Yeah.  It's an invoice on one side and email communication

12   on the other side.

13   Q   And is that a document that was received from National Air

14   Cargo?

15   A   Yes.

16   Q   One of the records that you would have received, when you

17   talked about invoices being reviewed?

18   A   Right, yeah, I believe so.

19        MS. WEISS:  The government would move to admit Exhibit

20   973.

21        THE COURT:  Any objection?  It's admitted.

22   Q   You can probably set all of those aside, just to give

23   yourself a little bit of room to work up there.

24        Okay.  I would ask to display to the witness,

25   Government's Exhibit 1001.  Do you recognize this document,

MATTHEW MORGAN - Direct                            1161

1   sir?

2   A    Yes.

3           MS. WEISS:    There are multiple pages to this document,

4   that we could scroll through, Ms. Ortiz.

5   Q    Do you recognize all of the pages of this document, sir?

6   A    Yes.

7   Q    How do you recognize them?

8   A    This is a chart, a table that I created.

9   Q    And can you read the title to the first page?

10  A    Yes.  It's Account Owners and Signers for Relevant Bank

11  Accounts.

12  Q    And then is there another, different title on the second

13  page?

14  A    Yes.  Additional Bank Accounts with Transfers from Relevant

15  Bank Accounts, ATM Withdrawals Cash Withdrawals and

16  Cryptocurrency Activities.

17  Q    Who prepared these charts, sir?

18  A    I created these charts.

19  Q    Did you prepare them as part of your forensic analysis in

20  this case?

21  A    Yes, I did.

22          MS. WEISS:    The government would move to admit Exhibit

23  1001, pursuant to Federal Rule of Evidence 1006.

24          MR. KAPLAN:    Could I have just one second?

25          THE COURT:    Yes.  Yes.

1           MR. KAPLAN:  Your Honor, as to this document, I'm just

2   going to object since there is added highlighting that I don't

3   think is appropriate for a summary exhibit.

4           THE COURT:  Okay.  I will overrule the objection, and

5   let it in, but with the understanding that he created the

6   document, including the highlighting.

7           MS. WEISS:  That is correct, Your Honor.  I will

8   elicit that testimony.  I would ask for permission to publish

9   Government's Exhibit 1001.

10          All right.  If we could begin with the horizontal line

11  in blue at the top.

12  Q   Mr. Morgan, can you walk the jury through each component of

13  the columns in this?

14  A   Of course.  The institution, is the bank account.  The bank

15  account that I reviewed.  The last four digits of the bank

16  account that I reviewed.  I do not include the full bank

17  account, but the last four digits.  The next column is the

18  account signer, authorized user or owner.  So, that would be

19  the individual on the bank account, that is in the second

20  column.  And the last column is the account status, with an

21  approximate date.  So, it's either going to have when the

22  account closed or appeared to have closed or the last

23  transaction that I had observed going through the account.

24  Q   Okay.  And when you say that these are all relevant bank

25  accounts in the title of this document, what makes them

MATTHEW MORGAN - Direct                                    1163

1    relevant to this investigation?

2    A    These are are accounts that received money directly from

3    National Air Cargo.

4    Q    Okay.

5         MS. WEISS:    And then if we could just blow up one or

6    two lines, Ms. Ortiz, just for an example to show the jury.

7    Q    And if you could walk us through, just pick your favorite

8    one or two, Mr. Morgan, and then let's talk about the last

9    column as well.

10   A    Um, sure.    Let's go with the first one.    ANB Bank is the

11   institution that provided documentation.    The relevant account

12   number that I received, National Air Cargo funds was '3099.

13   The signer on the account was Michael Meyers.    He was the sole

14   signer on that.    And the account was opened in December, on

15   December 5th, 2018.    I would have pulled that from a bank

16   signature card, and it appears that the account closed January

17   3rd, 2019, and that would have been observed in the bank

18   statement or associated bank document.

19   Q    Okay.    And did you review all of the records from

20   12-05-2018 through January 3rd, 2019?

21   A    Yes.

22   Q    For all of the accounts in this column that show an account

23   was closed, did you review that entire period of time?

24   A    Yes.

25   Q    Okay.    And then, taking -- let's take the next line down,

MATTHEW MORGAN - Direct

1    as the example.  Can you explain what you did with Access

2    National Bank, which has, sort of, a different designation in

3    that account status column?

4    A   The account was opened September 18th, 2014.  Transactions

5    were -- I observed and reviewed transactions through May 17th

6    of 2019, and the transactions after that date I did not review.

7    Q   Okay.  Does that indicate that the account, at least at

8    that point in time, still remained open?

9    A   Yes.

10   Q   Okay.  And so, those were the available records that were

11   received?

12   A   Correct.

13   Q   Can we turn now to the second page of this exhibit.  And,

14   as defense counsel noted there is some yellow highlighting on

15   this part of the chart.  So, can you explain why certain of

16   these rows are highlighted in yellow and then we will talk

17   about what this chart is?

18   A   Of course.  The yellow rows are the accounts that were in

19   the chart that we just discussed.  So, yellow rows are the

20   accounts that received funds directly from National Air Cargo.

21   The rows that are not highlighted, are rows that were received,

22   transferred or transactions into those accounts.

23   Q   Okay.  So, can you connect that to the title of this chart,

24   and sort of explain why things that aren't in yellow, would

25   still, nevertheless, be relevant?

MATTHEW MORGAN - Direct

1   A   Right.  And the relevant bank accounts would be accounts

2   that I would notice or I would observe transactions going

3   directly into one of the highlighted yellow accounts, and

4   shortly thereafter was a transfer or a transaction moving that

5   money to another account, and that would be one of the

6   non-highlighted rows.

7   Q   Okay.  I think I understand.  But you let me know if I

8   don't understand.

9   A   Of course.

10  Q   So, yellow highlighted accounts are ones that directly

11  received funds from National Air Cargo?

12  A   Correct.

13  Q   White rows are ones where funds in one of the yellow

14  columns might have then gone to one of the white columns?

15  A   Yes.

16  Q   Or rows.  I should be saying rows.  My apologies.

17      MS. WEISS:  All right.  And then, I would just like to

18  go back to the first page of this exhibit.  Sorry, Ms. Ortiz,

19  jumping around.  Can we just look at the bottom two rows?

20  Q   All right.  Can you explain the significance of these two

21  bank accounts?

22  A   Yes.  These two accounts were the National Air Cargo

23  accounts that were sending money to the accounts above that,

24  before this.

25  Q   So, Mr. Morgan, all of the invoices that we're going to

MATTHEW MORGAN - Direct                                    1166

1    talk about, did they all come from one of these two Signature

2    Bank accounts?

3    A    Yes.

4    Q    Let's turn next to Government's Exhibit 1004.  If we could

5    display that, please.  What is this document?

6    A    This is a Flow Of Fund chart that I created.

7    Q    And did you create this chart in preparation for your

8    testimony, in this case?

9    A    Yes.

10   Q    And is everything in this chart related to the documentary

11   evidence that you reviewed during your financial analysis?

12   A    Yes.

13            MS. WEISS:  The government would seek to admit Exhibit

14   1004, pursuant to Federal Rules of Criminal Procedure 1006.

15            MR. SCHALL:  Your Honor, we would object, as this

16   exhibit references counts of the Indictment which we do not

17   believe are appropriate for such exhibit.  This witness has not

18   testified that he reviewed any Indictment as part of his

19   duties.

20            MR. KAPLAN:  Your Honor, may we approach?  I think if

21   we do it once, we may --

22            THE COURT:  Sure, sure.  Thank you.

23       (At the bench:)

24            MR. KAPLAN:  So, we may have made some record on this

25   before, some discussion, in addition to what Mr. Schall said,

MATTHEW MORGAN - Direct                    1167

 1   about putting the counts in, and he may not -- I don't know if

 2   he has sufficient knowledge or review of the Indictment, but

 3   besides that, I think the appropriate use of the exhibit is to

 4   take large amounts of information and reduce it, so that it's

 5   not unwieldy for a jury to understand.  I get it, we all know

 6   that.  But what it's not supposed to do, in terms of the

 7   summary, is to pick and choose and turn it into argument.  If

 8   they have taken all of that information, and somehow condensed

 9   it, so that they knew how many were Hannah Schaiffe, how many

10   were Michael Meyers, how many were Jessamine Development, maybe

11   put totals in it, and so that is something that is more easily

12   understood.  It is, in my estimation, it's a condensing of

13   voluminous information, to make it is more accessible for the

14   jury.

15        This, at most, displayed by the counts, is a

16   persuasion piece.  It picks just the ones that they want to use

17   to establish the counts in the Indictment, and being a little

18   presumptuous, but also other numbers and other deposits that

19   establish, perhaps, conspiracy, you know, perhaps other

20   important individual items.  That's a demonstrative chart for

21   closing.  It's a pretty good one, but it's not a summary chart

22   simply to condense.  It is a persuasion piece.

23        And so, to the extent -- quite frankly, while we're up

24   here, for this one, which just does what I'm talking about.

25   Talks about the company, it takes voluminous material, it

MATTHEW MORGAN - Direct                                    1168

 1    condenses it, and we're back to here, we have the same kind of

 2    persuasion piece, that's using this witness to establish the

 3    counts, including selected items, that, generally speaking,

 4    before they are condensing it, and I would say the same sort of

 5    stuff, where it's one thing to say, voluminous material, that

 6    went from National to Global Fuel Logistics, I get it.  If they

 7    wanted to condense how many went in, what they were involved

 8    with, that's fine, but when you start picking and choosing,

 9    it's persuasion.  I think it's very effective.

10           THE COURT:  You've got to speak up a little bit.

11           MR. KAPLAN:  It's not a summary chart.

12           THE COURT:  Did you have anything to have -- hang on.

13           MR. SCHALL:  Mr. Kaplan said it all in much more

14    detail than I did, Your Honor.  We agree with what he is

15    saying.  We would reiterate what he is saying.  This is

16    appropriate for argument.  It's not the witness' job.

17           THE COURT:  Any response?

18           MS. WEISS:  Your Honor, we can use the word summary or

19    we can use the word condensed.  It's a summary chart.  It

20    summarizes voluminous records.  Just the ones we went through

21    to admit, just the ones that are, sort of, stragglers out

22    there, that we have not produced on the exhibit, it's being

23    summarized in the chart.  It's appropriate to list a count of

24    the Indictment next to it, when it just lists the date, and the

25    information.  It's the exact same thing in a chart, in an

MATTHEW MORGAN - Direct

1    Indictment.  There's nothing argumentative about pointing out

2    the date of the transaction, with respect to this date.

3        THE COURT:  Yeah.  So, I'm going to let you use them

4    as -- can you list the numbers, because I think you are right

5    that these are not summaries, as I understand Rule 1006.  You

6    can use them with him as demonstratives and in closing.  So,

7    you can show them, but I'm not going to admit them as evidence

8    that goes back with the jury.  You can walk him through it, if

9    you need to.  So, can you read the numbers?  I agree with you,

10   as you showed them, but I'm going to treat it that way.

11       MR. KAPLAN:  With my distinctions?

12       THE COURT:  Yes, that's right.

13       MR. KAPLAN:  It's 1004, 1005, 1006, 1007.

14       THE COURT:  Okay.  So, those you can use as

15   demonstratives, but they won't be admitted.  The two that you

16   showed me, those I think are fine as evidence to go back under

17   1006, right?

18       MR. KAPLAN:  One thousand two and 1003, and 1001 has

19   already been dealt with.

20       THE COURT:  You can use them, but I won't send them

21   back as evidence.

22       MS. WEISS:  I will warn you, Your Honor, I think I

23   estimated an hour for Mr. Morgan.  If those are not going back

24   to the jury, I'm going to take this much more slowly, so the

25   jury has an opportunity to take notes.

MATTHEW MORGAN - Direct

1          *THE COURT:*  Okay.  All right.

2          (In open court)

3    *Q*   Okay.  Mr. Morgan, you still have displayed in front of you

4    Exhibit 1004, correct?

5    *A*   Correct.

6    *Q*   The government would ask for permission to display, not

7    admit, Exhibit 1004.

8          *THE COURT:*  Yes.

9          *MR. KAPLAN:*  Your Honor, if I may just add to the

10   record, that I just want to be clear, that I understand the

11   Court's ruling, we would also object to these as demonstratives

12   to be shown right now.  I just want the record to reflect that.

13         *MR. SCHALL:*  Mr. Tew joins in that.

14         *THE COURT:*  Okay.  Understood.  That's overruled.  We

15   will allow it to be displayed.  Go ahead.

16   *Q*   Okay.  Now, that the jury can see this document, sir could

17   you please provide them with an overview of this chart, and

18   what it shows

19   *A*   Yes.  This is a flow of funds, upper left-hand corner is

20   National Air Cargo the blue box and working to the right there

21   were three invoices totaling $50,000, in quarter three, 2018,

22   they were invoiced under the name Hannah Scaife, and they were

23   paid, into, in the upper right-hand corner, the account of

24   Michael A Tew, which is the Guaranty Bank account, ending in

25   7867.  The next section is -- oh, and below it are the dates,

MATTHEW MORGAN - Direct

1    that the transaction was deposited into the account, and then

2    the amount.  The next row, essentially is five invoices

3    totaling $110,125 that occurred in quarter four, 2018.  They

4    were invoiced under the name of Michael Meyers, and were

5    deposited into two different Michael Meyers' accounts, first

6    one ending in 3099.  You can see the two transactions that

7    occurred into that, the date that it is deposited and then, the

8    amounts, so 25,000 and 15,125, and below that is the second

9    Michael Meyers account that funds were deposited into, ending

10   in '4514 Regions Bank that occurred October 26th, 2018 for

11   30,000, October 30th, 2018, for 10,000, November 20th, 2018,

12   for 30,000.

13            And then the last section is six invoices totaling

14   105,000 that occurred in quarter three and quarter four 2018,

15   that were invoiced in the name of 5530 Jessamine Development,

16   LLC.  They went into two different accounts that were held by

17   5530 Jessamine Development, one ending in 0984, that's BBVA

18   account, and the second one could being JPMorgan Chase account

19   ending 2743.  Then going down from there are the individual

20   transactions.

21   Q   Next to the individual transactions what are these numbers

22   on the far right?

23   A   The indictment those are the counts that tie-out.

24   Q   Did you review that Indictment?

25   A   Yes.

MATTHEW MORGAN - Direct

1    Q    Mr. Morgan we're going to take this slowly, because, this

2    chart is for display only and we're going to go through each

3    one of the counts that are referenced in this chart, underlying

4    documents that support it?

5    A    Okay.

6    Q    Okay.  And let's just start with you generally describe

7    when you say tie it out, what kind of documents you look at to

8    tie-out each one of the charges, in the Indictment the wire

9    fraud charges?

10   A    Yeah.  To tie it out I took a look at signature pink

11   document where I could see the money coming out of a National

12   Air Cargo account.  So withdrawal out of that account.  I

13   reviewed an invoice, or some type of documentation that

14   indicated that National Air Cargo had notification to pay these

15   transactions, and then I looked at the bank account, where the

16   money was deposited into.

17   Q    Okay.  So, there's an invoice, there's an ACH, there's a

18   deposit apologize for my handwriting going to give up on me,

19   and then the final deposit over there, right?

20   A    (Nodding head.) correct.

21   Q    I'm sorry, yes, just follows your chart, right?

22   A    Yeah.  Yes.

23   Q    Probably not quite where it needs to be above your little

24   bubbles.

25         All right.  Let's do that for Count 2.  You should

MATTHEW MORGAN - Direct

1    have in the Redweld for the rest of the box, individual folders

2    for each wire fraud count.

3    A    All right.

4    Q    All right.  Let's start with Count 2 of the Indictment.

5    Mr. Morgan can you please identify the first exhibit in this

6    folder and I would ask for permission to display that exhibit

7    which is already in evidence.

8    A    Okay.  Exhibit --

9          THE COURTROOM DEPUTY:  What was that number.

10          MS. WEISS:  601.

11    Q    (By Ms. Weiss) All right.  What is document 601, sir

12    A    601 is a email with subject ACH invoice.

13    Q    Okay.  And on the second page?

14    A    The second page is a document is the invoice.

15    Q    Okay.  If you could please read out, sir, the name of the

16    company, the date, if there is one, and the amount of the

17    invoice?

18    A    The name of the company is Hannah Scaife CPA, the amount

19    due is 15,000 the date of in the invoice is August 7th, 2018.

20    Q    And if we could please go back to page one of this exhibit.

21          MR. KAPLAN:  I have lost what he is looking at, now.

22          THE COURT:  It's Exhibit 601, right.

23          MS. WEISS:  Yes.

24          MR. KAPLAN:  Sorry, I didn't catch it.

25          THE COURT:  That's all right.

MATTHEW MORGAN - Direct

1       Q    (By Ms. Weiss) On page one of 601, sir does this

2   indicate where that invoice was to be paid to

3   A    Yes.

4   Q    All right.  Could you please read that information out?

5   A    Yes.  15,000 ACH, Michael Tew, Guaranty Bank & Trust

6   Company company, account ending in 7867.

7   Q    Okay.

8            THE COURT:  Hold on.  Can I -- somebody I think has a

9   phone or something that's giving some feedback.

10           THE WITNESS:  My apologies, it was I moved it off the

11  cord.

12           THE COURT:  Thank you very much sorry to interrupt go

13  ahead.

14           MS. WEISS:  No, go ahead.

15      Q    (By Ms. Weiss) Let's now move to Government's Exhibit

16  2 which is already in evidence, display that.  What document is

17  this, Mr. Morgan and how does it relate to Count 2 of the

18  Indictment

19  A    This is a bank statement from Signature Bank, the account

20  holder is National Air Cargo Holdings, Inc., this is where I

21  would observe the money being taken out of the -- withdrawn out

22  of the account.

23  Q    Okay.  And Count 2 of the Indictment if you could turn to

24  the Bates number ending SIG 008 for this one.  Count 2 of the

25  Indictment charges a wire fraud on August 8th, 2018, in the

MATTHEW MORGAN - Direct                    1175

1    amount of $15,000.  Do you see that on this statement, sir?

2    A    Yes.  In the blown up section there on August 8th, there's

3    automated payment, for $15,000, NACH, Inc. is the entity.

4    Q    Let's see where that payment went.  Please turn to

5    Government's Exhibit 202, which is already in evidence.

6    Q    What is this document, sir?

7    A    This is a bank statement from Guaranty Bank & Trust Company

8    company in the name of Michael A Tew with the account ending

9    7867.

10   Q    Is that the same information that was in that email that we

11   noted at the beginning?

12   A    Yes.

13   Q    Okay.  Can we on the first page look at which is G U A R,

14   47 do we see that deposit of $15,000?

15   A    Yes the third transaction is down, deposit, deposit column

16   on August 8th, there's $15,000 deposit activity description

17   says NACH, Inc. Michael Tew.

18   Q    Let's turn back to 1004.

19   Q    Could you please walk us through where on this 611

20   demonstrative we see count 2, walk us through the three

21   documents that we just looked at?

22   A    The first blew square would be the National Air Cargo, the

23   Signature Bank account where we saw the money was withdrawn

24   from, that was based upon Exhibit 601, which has than email

25   with an attached invoice from Hannah Scaife, directing the

MATTHEW MORGAN - Direct

1    payment to go into account 7867, the last blue box is the

2    account 7867, with that first transaction being deposited

3    August 8th, 2018, for $15,000.

4    Q    Let's look at the next Count, Count 3, can you maybe circle

5    on the screen where we see that?

6    A    I'm sorry do you want know do that.

7    Q    Yeah just do it with your finger?

8    A    Right there.

9    Q    It's pretty good.  Is that --

10         MR. SCHALL:  Your Honor, in light of our prior

11   objections, referencing the Indictment, and it not coming into

12   evidence except as a demonstrative, not sure that this is any

13   different.

14         THE COURT:  Well, so, overruled.  The -- he testified

15   about his -- what he is talking about and obviously, the jury

16   will be instructed about their ultimate decision, not the

17   witness'.  But go ahead.

18         MR. KAPLAN:  Your Honor can I add to that just while

19   there's a break here.

20         THE COURT:  Sure.

21         MR. KAPLAN:  I also add the objection, that a witness

22   shouldn't be able to create evidence tying it up.  That's a

23   juror's function so I would object to him using the Indictment

24   to support the government's case, when that's the function of

25   the jury to decide.

MATTHEW MORGAN - Direct

1          THE COURT:  Well it is of course the function of the

2     jury to decide, but they can use the Indictment to explain and

3     the dates and the information in the Indictment, and he -- he

4     can testify to his understanding, but it is the jury's

5     decision, of course.  But go ahead.

6          Q    (By Ms. Weiss) Okay.  Let's look at count 3 the

7     $30,000 deposit on 10-26-18.  Should have a folder for Count 3

8     sir

9     A    Yep I got it.

10    Q    All right.  What is the first document in that folder, sir?

11    And can we please display it on the screen at the time,

12    Ms. Ortiz?

13    A    First document I'm looking at is 540.

14    Q    That should be 540 Ms. Ortiz there's a typo.  Okay.

15    A    It's an invoice to National Air Cargo signed sincerely

16    yours, Meyers Consulting Group.

17    Q    What is the date on that invoice?

18    A    The date is October 12th, 2018.

19    Q    And the invoice number?

20    A    The invoice number is 79466.

21    Q    Okay.  And are there wire instructions at the bottom of

22    this invoice?

23    A    Yes.  The bottom of the invoice there are wiring

24    instructions to Regions Bank, Michael Meyers, account ending in

25    '4514.

MATTHEW MORGAN - Direct

1    Q    Please turn to the next document in this Exhibit.  And that

2    should be 647 I believe?

3    A    Yes.

4    Q    And if we could please turn to the second page of that

5    exhibit.  I believe the jury has seen these before but could

6    you please walk us through what we're seeing here?

7    A    Yes, this is a bank document, from Signature Bank it's a

8    payment confirmation,.

9    Q    And could you walk us through the account that came out of?

10   A    Of course, the debit account, is '5529, the effective date

11   is October 26th, 2018, and the transaction is 30,000 dollars,

12   listed as Michael Meyers checking account account ending in

13   '4514.

14   Q    Okay.  All right.  Let's look at Government's Exhibit 3,

15   next.

16   A    Okay.

17   Q    What is this document, sir?

18   A    This is a bank statement, from Signature Bank, the account

19   holder is National Air Cargo Holdings, and it starts out with

20   the account ending in '5529.

21   Q    Okay.  Let's turn to the page marked SIG 21.  Do you see

22   the 10-26-18 deposit of $30,000 reflected here on this page,

23   that corresponds with Count 3?

24   A    Yes.

25   Q    And could you just for the record, read out what we're

MATTHEW MORGAN - Direct

1    seeing?

2    A    Of course this is the withdrawal from the Signature Bank

3    account, held by National Air Cargo holdings, which occurred

4    October 26th, for $30,000.  And the account ending in '5529 --

5    or yeah '5529.

6    Q    Okay.  Let's look next at where that money went.  Next

7    document, in this folder is Government's Exhibit 305.  Okay.

8    What are we seeing here sir?

9    A    This is a bank signature card from Regions Bank, it is for

10   a Michael Meyers who is the sole owner.

11   Q    And if we could zoom in and just see where the account

12   number is for my benefit Ms. Ortiz.  Thank you.  That's farther

13   down there we go.  Wonderful.

14   A    That's for account number '4514 in the energy of the page.

15   Q    Can you read that again?

16   A    Full number 0258904514.

17   Q    Thank you.  Final document, associated with Count 3.  Is

18   Exhibit 203 already in evidence.  Okay.  And do we see the

19   10-26, $30,000 deposit on this sheet?

20   A    Yes, at the -- on this bank statement for Michael Meyers

21   account ending '4514 towards the bottom in the didn't and

22   credit section, we see 10-26, the line that says NACH, Inc. ACH

23   Michael Meyers, 30,000.

24   Q    Could we go back to 1004, please and display that.  And so

25   once again, the documents that we just looked at, sir, take us

1180
MATTHEW MORGAN - Direct

 1    through your chart how?

 2    A    In the upper left-hand corner is the light blue box

 3    National Air Cargo who pay in the voice out of the Signature

 4    Bank account, if you go follow the line down to the ride first

 5    one there are five invoices, totaling $110 and 125 that

 6    occurred in quarter four, 2018, they were invoiced by

 7    Michael Meyers or that was the name on the invoice they were

 8    deposited into the Michael Meyers' account ending in '4514, and

 9    that's regions bank account.

10    Q    Let's move on to Count 4, next.  All right sir, can you

11    read off the number of the exhibit that's first in your folder

12    for Count 4?

13    A    649.

14    Q    Okay.  Permission to display, Government's Exhibit 649.

15    What is this document, sir?

16    A    This is an email.

17    Q    And can you read out who it is to only from?

18    A    The to is *jyioulos@nationalcargo,* the from line is Meyers

19    Consulting Group, Inc.  It occurred Tuesday, October 30th,

20    2018, and subject is October invoice.

21    Q    And does this document reference attaching an invoice?

22    A    It does.  It says, *I have attached the invoice as*

23    *requested*.

24    Q    Next document in your folder, sir.

25    A    It's 537.

MATTHEW MORGAN - Direct

1    Q    Okay.  And what is this document, sir?

2    A    This is an invoice from National Air Cargo holdings Inc,

3    dated October 30th, 2018, invoice number 79487, states

4    consulting fees for $10,000, signed by or says sincerely yours,

5    Meyers Consulting Group, with instructions to pay Regions Bank,

6    the name on the account is Michael Meyers with account ending

7    in '4514.

8    Q    What is the next document in your folder, sir?

9    A    It's Document three.

10   Q    And what document is this?

11   A    This is a bank statement from Signature Bank, the account

12   holder is National Air Cargo Holdings, the account number ends

13   in '5529.

14   Q    Okay.  And turning to page 21 of this document.  Do we see

15   that $10,000 deposit on October 30th?

16   A    Yes.  The bottom of the page, the transaction occurred on

17   October 30th, it was reflected on the statement that date, as

18   an outgoing wire for 10,000 to Michael Meyers Regions Bank

19   account ending in '4514.

20   Q    Okay.  Next document, in your folder sir?

21   A    305.

22   Q    Is this the same signature card that we just looked at with

23   the previous count?

24   A    Yes.

25   Q    Okay.  And if we can now turn to Government's Exhibit 203,

MATTHEW MORGAN - Direct

1   which is in evidence.  And do you see that 10,000 dollar

2   deposit?

3   *A*   Yes, at the bottom of the page, on October 30th, says wire

4   transfer, National Air C. for 10,000.

5   *Q*   Okay.  Let's return to 1004, please, sir.  And please walk

6   us through how those documents show up on your chart?

7   *A*   All right.  The top left-hand corner blue box, says

8   National Air Cargo they paid the invoice, the 10,000 invoice,

9   out of the Signature Bank account, it is included as one of the

10  five invoices list there had that occurred in quarter 2018, it

11  was invoiced by Michael Meyers that was the name on the account

12  that was also deposited on the right hand side is the

13  Michael Meyers '4514, the Regions Bank account ending in '4514

14  the second transaction beneath that box on October 30th, 2018

15  was $10,000 that would be observed in bank statement.

16  *Q*   Okay.  Let's move on to Count 5, please.

17  *Q*   Ready?

18  *A*   Yeah.

19  *Q*   Okay.  Count 5 is here, right?

20  *A*   Yes.

21  *Q*   Okay.  All right.  Let's start with the first document in

22  your folder.  What is that, sir?

23  *A*   It's Government's Exhibit 683, it is an email to K singer

24  at National Air Cargo from jyioulos@nationalaircargo, subject

25  is missing Meyers invoice, appears to be attached PDF

MATTHEW MORGAN - Direct

1    attachments and it says these are two invoices that were

2    missing from the account.  Please apply the one payment sitting

3    open to invoice 79488 and I 49489 today.

4    Q    Okay.  Let's look at the next document in your folder for

5    Count 5.  And what -- what number is that sir?

6    A    That's 541.

7    Q    Could you describe what 541 is?

8    A    This is invoice to National Air Cargo, the invoice is 79448

9    invoice number, dated November 30th, 2018, for consulting fees

10   for $30,000, with instructions on the bottom, to send money to

11   Regions Bank in the name of Michael Meyers with account ending

12   '4514.

13   Q    Okay.  And that invoice number it was the same as the one

14   referenced on the email we just read?

15   A    Yes, it is.

16   Q    Let's turn to the next document in your folder for Count 5.

17   Is that Government's Exhibit 5 all right in evidence and what

18   is this document, sir this?

19   A    Is a bank statement from Signature Bank, holder of the

20   account is National Air Cargo Holdings last four digits of the

21   account are '5529.

22   Q    Okay.  Let's turn to the page marked SIG 27 at the bottom.

23   And do we see the November 20th, 2018 $30,000 invoice being

24   paid?

25   A    Yes.  So November 20th, these a payment out of the

MATTHEW MORGAN - Direct

1   Signature Bank at National Air Cargo of $30,000.

2   Q   Okay.  Next document n this folder, please.

3   A   305.

4   Q   Okay.  And what is that document, again?

5   A   This is the signature card for Regions Bank, the account

6   holder is Michael Meyers who is the sole owner, it's for the

7   account that ends in '4514.

8   Q   Okay.  And then finally, what is the last document in that

9   your folder?

10  A   It's Exhibit 205.

11        MS. WEISS:  Ask for permission to display 205.

12  Q   And do we see that $30,000 deposited into Michael Meyers'

13  account on November 20th?

14  A   Yes.  Couple lines down, there's on November 20th, which

15  ties back to the Signature Bank account NACH, Inc., ACH

16  Michael Meyers for 30,000.

17  Q   And returning to 1004.  Please walk us through how the

18  documents we just reviewed go along with your chart?

19  A   Yes.  National Air Cargo was the entity paying the funds

20  out, we looked at the Signature Bank account Exhibit 5, we saw

21  the funds come out the $30,000, withdraw there, and supporting

22  documentation, being the second blue box as we go down from

23  Michael Meyers, indicating where it should be paid and how, and

24  then, the last column over on the side, the -- based on those

25  instructions it was deposited into account '4514 that's a

1185

MATTHEW MORGAN - Direct

 1    Regions Bank account, and then we look at Exhibit 205 we saw on

 2    November 20th, 2018 there was a $30,000 deposit.

 3    Q    Okay.  Let's go on to Count 6 sir, 11-27, $30,000 charge.

 4    All right.  Start with the first document, in your folder,

 5    marked Count 6?

 6    A    It's Government's Exhibit 674.

 7    Q    And permission to display.  Okay.  And generally what is

 8    this document?

 9    A    From the header section it is invoice requesting a payment

10    of to 5530 Jessamine for $30,000.

11    Q    And if we could please turn to page I think it's three or

12    four back Mr. Morgan.  In that case see 60165 and what is this,

13    sir?

14    A    This is a bank provided document from Signature Bank,

15    payment confirmation, where we see NACH debt count being '5529,

16    on November 27th, 2018, with a request for payment of 5530

17    Jessamine Development account ending 0987 for $30,000.

18    Q    Okay.  Next page, in this folder?

19    A    675.

20    Q    And what is this document, sir on the first page?

21    A    This an invoice just with subject being invoice.

22    Q    And who is it from?

23    A    It is from Chris Rincon.

24    Q    And who is it to?

25    A    It is jyioulos@nationalaircargo.

MATTHEW MORGAN - Direct

1   Q   And the date?

2   A   The date is Monday, November 26th, 2018.

3   Q   Okay.  And is there an attachment indicated?

4   A   There is an attachment.

5   Q   What is the attachment named?

6   A   Invoice.

7   Q   A P D F?

8   A   Correct.

9   Q   Thank you let's turn to the final page of the same Exhibit

10  which is NAC-E-172834.  Maybe just get rid of the white space

11  sprays for me.  Thank you.  Mr. Morgan please walk us through

12  what we're seeing on the screen now I this is invoice from 5530

13  Jessamine Development, LLC payable to -- invoice for National

14  Air Cargo holding, payable to 5530 Jessamine Development n

15  voice number 7321122, due date of November 1st, 2018,

16  description is service fees, and the fee and the total are

17  $30,000.

18  Q   Okay.  Moving along to the next document, in folder.  Can

19  we please display Government's Exhibit 5.  And what is this

20  document, sir?

21  A   This is a bank statement from Signature Bank, National Air

22  Cargo Holdings is the account holder account ends in '5529.

23  Q   Okay.  And if we could please turn to the page marked SIG

24  28 at the bottom.  Do we see that $30,000 invoice from 5530

25  Jessamine being paid automatic on or around November 27th?

MATTHEW MORGAN - Direct

1    A    Yes.  The second transaction into this account on November

2    27th, automated payment, NACH, Inc. for 30,000 dollars is noted

3    there.

4    Q    Okay.  Let's see where it went.  Next folder or next

5    document in your folder, I apologize, sir?

6    A    311.  And if we could look at both pages, of that.

7    A    Okay this is a signature card from BBVA Compass, the

8    account title is 5530 Jessamine Development Inc, and second

9    page, the sign nor is Christain Rincon.

10   Q    What's the account number reflected on that?

11   A    Sorry.  Yes account number is at the top of the first page,

12   0987.

13   Q    Okay.  Let's move on to the next document, in the folder

14   for Count 6.

15   A    Government's Exhibit 341.  And this is the bank statement

16   from BBVA Compass, the account holder is 5530 Jessamine

17   Development Inc, the account number off the middle of page ends

18   in 0987.

19   Q    If we could turn to page two of this exhibit.  Do we see

20   that 30,000 dollar invoice from 5530 Jessamine be paid -- into

21   this account, my apologies?

22   A    Yes.  The second line, that occurred on November 27th,

23   description is credit for NACH, Inc., was a deposit for

24   $30,000.

25   Q    Okay.  And then, if we could actually just look at the next

MATTHEW MORGAN - Direct

1    three lines after that, as well.

2    A    11-27, there was a withdrawal for 3,000 titled check

3    cleared, another transaction, on 11-27 and outgoing wire to

4    sand hill Inc for 9,500 and then the next transaction, also on

5    November 27th, was to Michael Tew for $17,400.

6    Q    You are the forensic accountant, what is 17,400 plus 9,500?

7    A    26,900.

8    Q    Did that in coming credit of 30,000 and outgoing amount of

9    wires to Sand Hill LLC and Michael Tew they all occurred on the

10   same day?

11   A    Yes .

12   Q    And if we could go back to 1004.  And again if you could

13   just walk the jury through how those documents correspond to

14   the chart?

15   A    Starting in the upper left-hand corner National Air Cargo

16   blue box, they are the ones that paid the invoices this invoice

17   looked at was one of five invoices that totaled $110,125, that

18   occurred in the fourth quarter 2018.  The blue box is

19   Michael Meyers.  Took a look at emails and the invoice from

20   Michael Meyers or at least addressed by Michael Meyers going --

21   Q    Mr. Morgan I'm going to stop you briefly just look at the

22   folder that you have in front of you again you might be getting

23   tired?

24   A    Oh yeah I'm sorry.  Thank you.

25   Q    We were looking at Count 6?

MATTHEW MORGAN - Direct

1    A    Correct.  I apologize.

2    Q    To go through that throw of funds again, right hand corner

3    National Air Cargo, going straight down very last line that

4    goes across, in the row, what we looked at was one of six

5    invoices that totals 105,000 dollars, that occurred in the

6    third and fourth quarter of 2018.  They were invoiced by -- the

7    name on the invoice was 5530 Jessamine Development, Inc, and it

8    was deposited into the BBVA account, 0987 below that is the

9    transaction date and the transaction amount, tied out.

10   Q    Let's go on to Count 7 .  Okay.  Mr. Morgan, if we could

11   have the number of the first exhibit associated in your folder

12   with Count 7?

13   A    This is Government's Exhibit 543.

14   Q    And what is this document, sir?

15   A    This is an invoice to National Air Cargo holding Incs,

16   dated December 11th, 2018, invoice number 79490, for

17   description, consulting fee, the amount of $25,000, it says

18   sincerely yours, Meyers Consulting Group, the wire instructions

19   are to ANB Bank, Michael Meyers, ending in account ending in

20   3099.

21   Q    Okay.  What is the next document?

22   A    Government's Exhibit 692.

23   Q    All right.  And if we could just look at the top invoice,

24   or top email.  Who is that to?

25   A    This is to Jonathan Yioulos.

MATTHEW MORGAN - Direct

1    Q    From?

2    A    From Meyers Consulting Group Inc.

3    Q    Sent date?

4    A    The date is December 11th, 2018.

5    Q    And the subject line?

6    A    Subject line is final invoice.

7    Q    And is the date that this email was sent, the same as the

8    date on the invoice, 79490, that we just looked at?

9    A    Yes.

10   Q    Okay.  What is the next document in your folder associated

11   with Count 7?

12   A    Government's Exhibit 7.

13   Q    And what is that document, sir?

14   A    It is a bank statement from Signature Bank, the account

15   holder is National Air Cargo Holdings account ends in '5529.

16   Q    And if we could go to signature 33.  Do we see the $25,000

17   payment on or around 12-12?

18   A    Yes.  In the middle of the page there's a document on

19   12-12, indicating that there was a $25,000 withdrawal.

20   Q    Okay.  And I am not sure that we've blown up the right

21   thing there Ms. Ortiz so I'm going to ask you to just -- okay

22   there are two $25,000 payments on 12-12 so can you clarify for

23   the record which one you are referring to?

24   A    It would be the middle one.

25   Q    This one that I marked here?

MATTHEW MORGAN - Direct

1    A    Yeah.

2    Q    The reference number 194036?

3    A    Correct.

4    Q    Okay.  What the next document associate inned your folder

5    with count 7?

6    A    Government's Exhibit 301.

7    Q    If you could please display that Ms. Ortiz.  And -- yeah,

8    thank you.  All right.  What is this document, sir?

9    A    It's titled account information sheet, essentially the

10   signature card, the name on the account is Michael Meyers, and

11   then, the account -- let's see account ending in it's not

12   jumping out at me.

13   A    I'm sorry at the bottom thank you, 3099.

14   Q    Okay.  What is the next document in your folder associated

15   with Count 7?

16   A    Exhibit 207.

17   Q    All right.  And do we see that $25,000 invoice and ACH

18   payment being made into Michael Meyers' account ending in 3099?

19   A    Yes.  So on 12-12, 2018, there was a deposit or a credit as

20   the statement says, $25,000, and farther off to left indicating

21   ACH for invoice 79490.

22   Q    And is that the same invoice number that we saw on our

23   first document in this folder?

24   A    Yes.

25   Q    Thank you.

MATTHEW MORGAN - Direct

1      MS. WEISS:  Your Honor we're slightly above our normal

2  break time, but, it might be the natural place to let the jury

3  have a break and then move on to the next.

4      THE COURT:  I think that's a good idea.  Thank you.

5  So let's take ten minute recess.  Thank you.

6      THE COURTROOM DEPUTY:  All rise.

7  (Jury out at 2:53 p.m.)

8      THE COURTROOM DEPUTY:  Court is now in recess.

9  (Recess at 2:53 p.m.)

10  (In open court at 3:10 p.m.)

11      THE COURT:  Please take your seats.  Mr. Keech can you

12  get the jury.

13      THE COURTROOM DEPUTY:  All rise.

14  (Jury in at 3:11 p.m.)

15      THE COURT:  All right.  Let's take our seats.

16  Ms. Weiss when you are ready you may begin.

17      MS. WEISS:  Thank you, Your Honor.  Ms. Ortiz, can we

18  display 1004, again.

19  Q   Okay.  Mr. Morgan, where we left off is we just finished up

20  Count 6 -- or I'm sorry, Count 7, and I wanted to ask you,

21  before we moved on, what are the other payments that don't have

22  something in that column?

23  A   Those are transactions where I was able to tie-out and

24  observe funds being deposited into those accounts where the

25  source was National Air Cargo.

MATTHEW MORGAN - Direct

1    Q    Okay.  But they were not individually charged?

2    A    Correct.

3    Q    And then just to clarify, these numbers, do they add up to

4    what's here?

5    A    Yes.

6    Q    Okay.  All right.  And then, this started around what month

7    and year?

8    A    August of 2018.

9    Q    And then, ended around what month and year on this chart?

10   A    December 2018.

11   Q    Okay so from the period of August 2018 through December

12   2018, how much was paid out of National Air Cargo?

13   A    Approximately $260,000.

14   Q    In four months?

15   A    Correct.  Okay.  Mr. Morgan, can we please display, what is

16   Government's Exhibit 1005, and again the government would only

17   ask for permission to display as a 611 rather than a 1006,

18   maintaining its same position as before.

19        THE COURT:  Okay.  And understanding the defendant's

20   objections to these, I will allow this to be displayed.

21        Q    (By Ms. Weiss) Okay.  Mr. Morgan, can you please

22   provide an overview of what this chart depicts for the jury

23   A    This is similar to -- this is a chart, that I created,

24   similar to the one that we looked at.  It's a flow of funds.

25   At the top left-hand corner, is National Air Cargo which paid

MATTHEW MORGAN - Direct                          1194

1   out 28 invoices for a total of 900,552.50 --

2   Q    Let me pause you there.  Was it 28 or was it 38?

3   A    38.

4   Q    Thank you.

5   A    To occur in the fourth quarter 2018 and ended quarter three

6   2020.  These are invoices that were indicated it was for

7   Political Media and it went into the three accounts that are in

8   the middle of the chart, and working from the left to the right

9   there are two deposits, for total of 41,500, that occurred in

10  the fourth quarter, 2018, and the first quarter 2019.  There's

11  a total of 31 deposits, for a total of 769,377.50, that

12  occurred in quarter one and quarter two, 2019, and then, to the

13  right, there are five deposits, that are 89,675, that occurred

14  in quarter two and quarter three, 2019, that went into Wells

15  Fargo account ending 6934.

16       Below those three boxes are the individual account

17  transactions, because of the number of invoices and deposits,

18  they are not all listed like the previous one.  And then, just

19  in the middle, with the account ending '8486, they are the

20  accounts the specific date and the transaction amount.

21  Q    Okay.  And is this the account that was held jointly in the

22  name of Kimberley and Michael Tew?

23  A    Yes.

24  Q    Okay.  Do exactly what we were doing before, starting with

25  Count 8.  All right.  Mr. Morgan, what the first document in

MATTHEW MORGAN - Direct

1    the folder before you, marked Count 8?

2    A    Government's Exhibit 716.

3    Q    Okay.

4         MS. WEISS:    Permission to display 716, which is

5    already in evidence.

6    Q    Could you read, first, what this first page is.

7    A    This first page is an email from Political Media, to

8    jyioulos@nationalaircargo.    The subject is invoice from

9    Political Media, Inc.    The date is February 7th, 2019, and

10   there is invoice 6775 is attached as a PDF document.

11   Q    Okay.    If we could next turn to the page the same exhibit

12   that ends 11475.    And what is this document

13   A    This is an invoice, Political Media invoicing National Air

14   Cargo, invoice 6775.    The date is February 7th, 2019.    The

15   activity talks about add placement and marketing add placement

16   services.    The balance due is $15,250.

17   Q    Okay.    Let's turn to the next exhibit in the folder

18   associated with Count 8.    And that should be Exhibit 8.

19   A    Yes.

20   Q    Once again, the jury has seen some of these before,

21   Mr. Morgan, but can you walk us through what we're looking at

22   here?

23   A    This is document from Signature Bank.    It says completed

24   ACH transaction details.    The debit account is '5545 effective

25   date is February 8th, 2019, it's going to credit destination

MATTHEW MORGAN - Direct

1    account section, the account is '8486 the name is Political

2    Media, and the amount is $15,250.

3    Q    Okay.  The next document, under Count 8?

4    A    Three, zero, three.

5    Q    And what is this, sir?

6    A    This is a signature, electronic signature card for Navy

7    Federal Credit Union.

8    Q    Okay.  And does this indicate all of the accounts

9    associated with Kimberley Tew?

10   A    That's correct.

11   Q    Okay.  And I believe -- one moment, here.  Okay.  And then,

12   if we can move to the next document, in your folder, for count

13   8?

14   A    208.

15   Q    And what is this, sir?

16   A    This is a bank statement from Navy Federal Credit Union.

17   Q    Okay.  And if we could just blow up this bottom box here,

18   please Ms. Ortiz.  Okay.

19         Do these statements apply to multiple bank accounts?

20   A    Yes there are four accounts.

21   Q    Is that going to be true for all of the Navy Federal Credit

22   Union?

23   A    That is correct.

24   Q    That we see?

25   A    That is correct.

MATTHEW MORGAN - Direct

1  Q   And that application that we looked at -- or that signature

2  card, that applies to all of them I that is correct.

3  Q   Okay.  Can we blow that up, again, sorry Ms. Ortiz.  Fancy

4  foot work today.  All right.

5       And which account was the one held jointly with

6  Michael and Kimberley Tew?

7  A   It's the first one, '8486.

8  Q   All right.  If we could now turn to the page marked Navy,

9  24.  Do we see a deposit of $15,250, the same amount as that

10 wire ACH around 2-8?

11 A   Yes.  I guess three quarters of the way down the page, 2-8

12 is the date says deposit ACH paid from National Air ACH, was

13 the amount is $15,250.

14 Q   And can we tell from the column right next to it,

15 approximately how much was in the account before that point?

16 A   Yeah.  So if you look at the line above that, the ending

17 balance on that February 7th, was 477.75.

18 Q   Okay.  And then we get the deposit, right?

19 A   Correct.

20 Q   Okay.  And then, if we could just blow up the top,

21 Ms. Ortiz, to confirm what account we're looking at here again.

22 A   It's account ending in '8486 it's notes that it is a joint

23 owners, Michael Tew.

24 Q   Okay if we could go back to 1005.  And we were on Count 8,

25 correct?

MATTHEW MORGAN - Direct

1    A    Correct.

2    Q    All right.  So, if you could just walk us through the

3    various steps that we took through the documents to get down to

4    accounting?

5    A    So in the upper left-hand corner, is a box National Air

6    Cargo this is the account the transaction was paid out of the

7    from Signature Bank, it was paid the invoice said it was

8    Political Media the upper right hand column, indicates

9    Political Media in between that the arrow that was one of 38

10   invoices totaling 900,552.50, and it was paid into the Navy

11   Federal Credit Union account '8486, that's the last four digits

12   that's the middle blue box, and that was one of 31 deposits

13   that I observed going into that account, for a total of

14   769,377.50.

15   Q    And then that's how we got down here to Count 8?

16   A    That is correct.

17   Q    Let's talk about count 9 next which subpoena that

18   2-20-2019, another $15,250.  All right.  Mr. Morgan, is the

19   first document in your folder for Count 9 Government's Exhibit

20   719?

21   A    Yes.

22   Q    Great.  If you could walk us through this first page?

23   A    This is an email to jyioulosnationalaircargo.com, it's from

24   Political Media, it was sent Tuesday, February 19th, 2019, the

25   subject is invoice from Political Media Inc, and there's a PDF

MATTHEW MORGAN - Direct

1    attachment invoice 6786.

2    Q   Okay.  Up here where I circled.  All right.  If we could go

3    to the page of this document, that ends 82729, I believe it's

4    the final page.

5    Q   Okay.  Could you walk us through this invoices, and

6    Ms. Ortiz if you don't mind -- perfect?

7    A   This is a Political Media invoice, invoice number 6789,

8    dated February 19th, 2019, it's bill to --

9    Q   And I am going to pause you there, was it 678?

10   A   I'm sorry 6786.

11   Q   Okay.

12   A   Dated February 19th, 2019, it's billed to National Air

13   Cargo group Inc, for activities at the add placement and

14   marketing and add placement services, is the balance due,

15   $15,250.

16   Q   Okay.  Display the next document in this folder, which I

17   believe is Government's Exhibit 9.  Okay.  What are we seeing

18   here?

19   A   This is a Signature Bank document, it's titled completed

20   ACH transaction details, it is for debit account is '5545.  The

21   effective date is February 20th, 2019, under credit destination

22   accounts, the account deposited it will be into is '8486, the

23   name is Political Media, the amount is $15,250.

24   Q   Now, this and again it says the invoice number here, right?

25   A   Yes.

MATTHEW MORGAN - Direct

1    Q    And then, here, that's the same '8486 account we were just

2    looking at?

3    A    That is correct.

4    Q    In the name of Michael and Kimberley Tew?

5    A    Yes.

6    Q    But that is not what is indicated here?

7    A    That is correct.

8    Q    All right.  The next document should be Government's

9    Exhibit 303.  Is that the same signature card we looked at

10   before?

11   A    That is the same signature.

12   Q    Okay.  Skip that one, and go on to the next document, in

13   this folder which should be Government's Exhibit 209.

14   A    Okay.

15   Q    And once again, is this a Navy Federal Credit Union account

16   statement?

17   A    Yes.

18   Q    And it has the account statements for multiple different

19   accounts on there?

20   A    That is correct.

21   Q    Okay.  Let's go to page Navy 31.  And do we see a -- that

22   ACH paid in to this account on or around February 20th?

23   A    Yes, on February towards the bottom of the document o

24   February 20th, the line reads deposit ACH paid from National

25   Air ACH, amount is $15,250.

MATTHEW MORGAN - Direct

1    Q    Okay.  And, Mr. Morgan, what was the balance the day

2    before?

3    A    The balance the day before, if you go up to February 19th,

4    that would be the end of the day balance, and it's $750.30.

5    Q    Okay.  And what was the balance in this account, the first

6    date of this statement period?

7    A    One thousand -- or this statement period?  I'm sorry.  At

8    the beginning of the statement period, on February 17th, at the

9    top of the page, the balance was $51.45.

10   Q    Okay.  And then, again, just to confirm, for the record,

11   whose account statement are we looking at here?

12   A    At the top of the page we see statement of account for

13   Kimberley Tew, it's a checking account Everyday Checking ending

14   in '8486, joint owner is Michael Tew.

15   Q    And the majority of the account activity between those

16   dates is what?

17   A    As I run my finger down, it's Zelle payments, Google Pay

18   Visa documents, transfers from checking, POS debt card.  Their

19   is another debt credit for HomeGoods.  Several transactions for

20   Google.  A Zelle to Michael May, Visa Direct, and just a lot of

21   small transactions.

22   Q    Okay.  What happens this day, when that $15,250 comes in?

23   A    On that same day, that $15,250 came in, there is a bank

24   wire deposit of $7,843.98, a wire fee, a withdrawal by wire of

25   5,000, an ATM withdrawal at Bellco of $600.

MATTHEW MORGAN - Direct

1   Q   And then if we could turn to the next page, Ms. Ortiz, and

2   just review the other activity from that same date as that

3   deposit on 2-20.

4   A   On 2-20, so, the top, there's a small transaction for $4.25

5   to Level Up Clean Juice®.  Transfer to checking, for Dennis

6   Vertanen.  Transfer to shares, again Dennis.  Transfer to

7   shares, for Dennis.  So, four different transactions equaling

8   $800, on the last transaction, that occurred on 4 -- excuse me

9   on 2-20, February 20th, it is $4,615 transfer to checking.

10  There's an ending balance for the day of $13,311.03.

11  Q   If we can go back to 1005, please.  So again, can you walk

12  us through, on your chart, how we get down to Count 9?

13  A   Yes.  Upper left-hand corner is National Air Cargo, that's

14  where the transaction was paid out of, with the Signature Bank

15  statement.  We observed that.  It was one of 38 invoices,

16  totaling $900,552.50, that occurred in quarter four 2018, and

17  went through quarter three 2020.  The invoice was Political

18  Media, on the upper right-hand corner.  Going down below that,

19  to the middle box, that was one of 31 invoices for a total of

20  $769,377.50 from National Air Cargo into the Navy Federal

21  Credit Union account ending in '8486, with the names Kimberley

22  Tew and Michael Tew on it.  Below that is the detail --

23  transaction detail, February 20th, 2019, $15,250 and that's

24  Count 9.

25  Q   Let's go to Count 10, for $38,000.  Could we please display

MATTHEW MORGAN - Direct                    1203

1    the first document in that folder, marked Count 10, which

2    should be Government's Exhibit 737.  And let's start with

3    reading out just the header of them mail?

4    A    This an email from Political Media.  It's an at gmail dot

5    com account.  It's *jyioulos@nationalaircargo* account.  The

6    subject is invoice from Political Media, Inc.  The date is

7    March 28th, 2019, and there's an attachment invoice 6976

8    Political Media, and it's a PDF.

9    Q    Okay.  Let's go on to the last page of this same Exhibit.

10   Should be 11495.  And please walk us through this document?

11   A    This is a Political Media invoice, that's the header, it's

12   billed to National Air Cargo Group, the invoice number 6976,

13   the date is March 28th, of 2019.  The activity is fuel

14   consulting and procurement, government relations, consulting,

15   and the total balance due is $38,000.

16   Q    Bless you.  Okay.  Can we look at the next document in your

17   folder for Count 10, which should be Government's Exhibit 10.

18        MS. WEISS:  And again, Ms. Ortiz, if you could just

19   make it bigger for me?  Thank you.

20   Q    All right.  Okay.  So walk us through this document?

21   A    This is Signature Bank completed ACH transaction details,

22   is the title.  This is a transaction from debit account '5549

23   National Air Cargo Group, effective date is March 29th, 2019.

24   The credit destination accounts indicates account ending in

25   '8486.  The name says Political Media, Inc., for $38,000.

MATTHEW MORGAN - Direct

1   Q   Okay.  And just for purposes of the record, what is the

2   last four on the account again?

3   A   The -- which -- the debit account is '5545, and the credit

4   account is '8486.

5   Q   Again, is that the same joint account we have been seeing?

6   A   Yes.

7   Q   And is the name Michael Tew and Kimberley Tew listed here?

8   A   Yes.

9   Q   Listed on that document?

10  A   I'm sorry, can you repeat that?

11  Q   Is Michael and Kimberley Tew listed on that document?

12  A   No.

13  Q   Okay.  Is the next document, Exhibit 303, that same

14  signature card?

15  A   Yes.

16  Q   Skip over looking at that again, and move on to

17  Government's Exhibit 210.  All right.  Mr. Morgan, might be

18  familiar with these types of statements, but once again, is

19  this a Navy Federal Credit Union statement?

20  A   Yes.

21  Q   Does it apply to multiple accounts?

22  A   Yes.

23  Q   Including the account ending in '8486?

24  A   That's correct.

25  Q   What is the statement period?

MATTHEW MORGAN - Direct

1    A    The statement period is March 17th of 2019, through April

2    16th, 2019.

3    Q    Okay.  Let's look at the page marked Navy 44, please.  And,

4    is this a statement for that joint bank account ending in

5    '8486?

6    A    Yeah.  Looking at the top of the statement you could see

7    that it ends in '8486.  Joint owner with Michael Tew.

8    Q    Who is the other owner of the --

9    A    Statement of account for Kimberley Tew.

10   Q    Thank you.  Do we see that $38,000 invoice and ACH being

11   paid into this account?

12   A    Yes.  Toward the bottom of the statement, March 29th,

13   there's a description, detail says, deposit ACH paid from

14   National Air and the amount is $38,000.

15   Q    Okay.  If we could go back to 1005, please.  And walk us

16   through, again, how we got from the top of your chart down to

17   Count 10.

18   A    The top of the chart, top left-hand corner, the blue box,

19   National Air Cargo, this is where the money came out of the

20   Signature Bank account.  It was paid, based upon an invoice

21   that said Political Media, and during the time period listed

22   there are a total of 38 invoices, for a total of $900,552.50

23   that were paid based on Political Media invoices.  Going down

24   to the next row of blue boxes, the center one there was a total

25   of 31 deposits for a total of a $769,377.50, in the first and

MATTHEW MORGAN - Direct

1   second quarter of 2019, that were deposited or I observed

2   deposited into the account ending in '8486, Navy Federal Credit

3   Union account held by Kimberley Tew and Michael Tew, and below

4   that is the detailed, on March 29th, 2019, $38,000 deposit, and

5   it was Count 10.

6   Q   Let's go on to the next count, which is April 11, 2019.

7   Okay.  Mr. Morgan, is the first document in your folder 743?

8   A   Yes.

9   Q   Okay.  Can we please display Government's Exhibit 743.

10  Let's do the same thing where.  We look at the top header of

11  the email.  And if you could just summarize that for the

12  record.

13  A   This is an email to *thoward@nationalaircargo,* from

14  *jyioulos@nationalaircargo.com*, sent April 4th, 2019.  Subject

15  is invoice -- or it's a forwarded email saying, Invoice from

16  Political Media, Inc.  There's an invoice at 7004,

17  *politicalmedia.pdf* attached.

18  Q   Just below that did it say who that -- who the original

19  email was from?

20  A   Yes.  Just below that, we see it's email from

21  *politicalmedia@gmail* account, sent Wednesday, April 3, 2019, to

22  Jonathan Yioulos, at National Air Cargo.

23  Q   Okay.  If we could now please turn to the last page of this

24  exhibit, which is 5793.  And if you could walk us through this

25  invoice, sir?

MATTHEW MORGAN - Direct

1    A    This is an invoice with the header being Political Media.

2    It's a bill to National Air Cargo Group.  The invoice number is

3    7004.  The date is April 3rd, 2019.  It's activity is Prepaid

4    Portal Subscription, and there's a credit applied.  The balance

5    due is $11,250.

6    Q    Okay.  Let's look next at Government's Exhibit 11.  Please

7    walk us through this document, Mr. Morgan.

8    A    This is a Signature Bank completed ACH transaction details

9    document.  It is for a debit account of '5545, the effective

10   date is April 4th, 2019.  Skipping down to credit.  Destination

11   accounts.  The account is '8486, checking.  The name listed is

12   Political Media.  The amount is $11,250.  The invoice is 7004.

13   Q    And again, this a joint banking account of Michael and

14   Kimberley Tew?

15   A    Yes, it is.

16   Q    Is that the name that's on this ACH payment?

17   A    That is not the name.

18   Q    Next document in your folder is that same signature card.

19   We can skip looking at that, again, and move on to the next

20   document, which should be Government's Exhibit 210.

21   A    I have got 303.

22   Q    Oh, 303 is that signature card?

23   A    Oh, okay.  Thank you.

24   Q    Yeah.  Government's Exhibit 210, Mr. Morgan, is what?

25   A    This is a Navy Federal Credit Union bank statement.

MATTHEW MORGAN - Direct

1    Q    Okay.  And for what period?

2    A    Covers a period of March 17th, 2019 to April 16th, 2019.

3    Q    Multiple accounts again?

4    A    That's correct.

5    Q    Same joint account listed first?

6    A    Correct.

7    Q    '8486?

8    A    That's correct.

9    Q    Let's go to Navy 46, next.  Do we see the April 4th, 2019,

10   $11,250 deposit that is in Count 11 of the Indictment?

11   A    Yep.  At the top of the statement we can see it's Everyday

12   Checking account.  The statement account for Kimberley Tew.

13   The joint owners being Michael Tew.  Farther down, on April

14   4th, there's a deposit ACH paid from National Air, the amount

15   is $11,250.

16   Q    If we could return to 1005.  Okay.  Can you walk us through

17   how we got through Count 11 again.

18   A    Upper left-hand corner, the blue box, National Air Cargo

19   paid the transaction, out of the Signature Bank account, that

20   was one of 38 invoices paid from Political Media.  Going down,

21   to the center box, it was deposited into Kimberley Tew and

22   Michael Tew's account, ending in '8486.  And it is the fourth

23   transaction down, that occurred, April 4th, 2019, for $11,250.

24   It's Count 11.

25   Q    Okay.  Once again, Mr. Morgan, not all of the transactions

MATTHEW MORGAN - Direct

1    are reflected on this particular page?

2    A    That is correct.

3    Q    Okay.  Including the ones that went to the other accounts?

4    A    That is correct.

5    Q    Those were not charged as separate counts in the

6    Indictment?

7    A    Yes.

8    Q    Okay.  And then, the totals, this $900,000, how do you get

9    to that number?

10   A    That is 38 deposits or 38 -- excuse me, that was 38

11   invoices, that totaled the $900,552.50.

12   Q    Okay.  How do you reach that number with the other numbers

13   on the screen?

14   A    Those are the deposits that were observed into the

15   accounts.

16   Q    Okay.  These?

17   A    Yeah.  Yes.

18   Q    I don't know if you can see my markings on the screen?

19   A    Yes, yes.  I can see it.

20   Q    So it's the $41,500 that went to the Political Media

21   Lawrence Ward account?

22   A    That is correct.

23   Q    Plus the $769,377.50 that went into the joint account, and

24   then the $89,675 that went to the Sand Hill, Wells Fargo,

25   Michael Tew account?

1210
MATTHEW MORGAN - Direct

1    *A*    That is correct.

2    *Q*    One other brief thing, before I go on.  There are some

3    accounts that are past Count 40 on this sheet.  Are those the

4    money laundering counts?

5    *A*    Yes.

6         MR. KAPLAN:  Objection.

7         THE COURT:  Overruled.  She can ask -- he can read

8    what is in the Indictment.  He is not offering it -- overruled.

9    *Q*    You will be relieved to know that I'm not going to go into

10   this with you, today.  Okay.

11        If we could please move to Government's Exhibit 1006,

12   the government would ask to display this exhibit, not admit it,

13   pursuant to the Court's prior ruling, but maintains its same

14   position.

15        THE COURT:  So, understanding that the defense

16   objects, I will allow it to be published, but not admitted.

17   *Q*    Okay.  Mr. Morgan, can you please explain what we're

18   looking at here?

19   *A*    This is similar to the previous charts, just a flow of

20   funds from National Air Cargo, invoiced from Global Fuel

21   Logistics accounts, that were deposited into a Global Fuel

22   Logistics account, a Michael Tew account.  Another Global Fuel

23   Logistics account at Wells Fargo, and finally Sand Hill, LLC

24   account at Wells Fargo, ending in '6934.  Below those are the

25   transactions that are highlighted transactions that

MATTHEW MORGAN - Direct

1   corresponded to the account.

2   Q    Okay.  And there were a total of how many invoices?

3   A    There was a total of 27 invoices, totaling $1,388,338.

4   These occurred between quarter three, 2019, through quarter

5   three, 2020.

6   Q    Okay.  And, to be clear, this just reflects the invoices

7   associated with Global Fuel Logistics?

8   A    That's correct.

9   Q    None of the other companies?

10  A    Can you repeat that question?

11  Q    None of the other companies that were invoicing National?

12  A    Yes, that is correct.

13  Q    This is just Global Fuel?

14  A    Correct.

15  Q    Go ahead and do what we have been doing before, and we will

16  do Count 12.  If we could please display Government's Exhibit

17  841, already in evidence.  All right.  If you could walk us

18  through the beginning of this email?

19  A    The header is invoice to, *jyioulosnationalaircargo.com*.

20  It's from an accounting person.  It was sent Wednesday, August

21  28th, 2019.  Subject is invoices from Global Fuel Logistics,

22  and there are four PDF files.  First one is

23  *scanaugust28th2019@17.30.PDF*.  Next one is GFL Invoice 987,

24  National Airlines, next on is GFL Invoice 972,

25  *nationalairlines.pdf*.  Last one is GFL Invoice 763, National

MATTHEW MORGAN - Direct

1   Airlines.

2   Q   Go a little bit out of order.  Start with this one.

3   Invoice 763.  If you could please turn to page of this email

4   ending in 145797.  Could you walk us through this invoice?

5   A   This is an invoice from Global Fuel Logistics.  It is

6   sent -- sent to National Airlines.  The invoice number is 763.

7   The date is July 1st, 2019.  The description, fuel

8   consultation, with pricing amount, provider efficiency

9   analysis, in parens, administrative fee for a total due of

10  $152,000.

11  Q   What's the city and state of the -- this company, Global

12  Fuel logistics?

13  A   Address -- city is Troy, and the state is Michigan.

14  Q   Let's move to the next document, Government's Exhibit 12.

15  All right.  Sir, can you walk us through this?

16  A   This is a Signature Bank completed ACH transaction details.

17  The debit account being '5545, effective date is July 24th,

18  2019.  The credit destination accounts, it's an account ending

19  in '5336.  The name Global Fuel Logistics, and the amount is

20  $45,000.

21  Q   Okay.  And the next document in your folder should be that

22  same signature card, right?

23  A   Correct.

24  Q   Which applied for all of the National credit union

25  accounts?

MATTHEW MORGAN - Direct

1   A    Yes.

2   Q    Let's look at the next document.  Do we -- what is this

3   document, first of all?

4   A    This is a bank statement from Navy Federal Credit Union.

5   The account addressed to Michael Tew, for the period of July

6   17th, 2019, through August 16th, 2019, and on the bottom

7   there's at least three different accounts.

8   Q    Do we see an account ending in '5336 like we saw with the

9   ACH payment?

10  A    Yes.  It's the middle account.

11  Q    And once again, the ACH reflected whose name or what name?

12  A    Global Fuel Logistics.

13  Q    Let's turn to the page marked Navy 512.  Do we see that

14  $45,000 ACH being paid into this account, around July 24th?

15  A    Yes.  Towards the bottom, dated July 24th, there's a

16  description detailed, says deposit ACH paid from National Air

17  Cargo.  The amount is $45,000.

18       MS. WEISS:  Okay.  Can we grab the next few lines

19  down, Ms. Ortiz?  We can just do to the bottom if that's

20  easiest.

21  Q    What happened the same day that that deposit came out?

22  A    The same day there's some additional transactions that

23  occurred, there is a wire fee, a withdrawal by wire, transfer

24  to checking, which would be Kimberley Tew's checking, a

25  transfer from checking, Kimberley Tew's checking, a transfer

MATTHEW MORGAN - Direct

1    from checking, Kimberley Tew checking, an ATM fee, an ATM

2    withdrawal.

3    Q   Let's focus on what happened just, sort of, first all.  The

4    withdrawal by wire, how much was that for?

5    A   $5,000.

6    Q   And the transfer to checking?

7    A   There is one for 39,000.

8    Q   Okay.  And again who did that go to?

9    A   Um, 44,000.

10   Q   Who did that go to?

11   A   That went to Kimberley Tew, 39,000, and I would have to

12   refresh my memory regarding withdraw by wire for 5,000.

13   Q   But at least 39,000 of that 45,000 went into Kimberley

14   Tew's account on the same day?

15   A   That is correct.

16   Q   Even though '5336 is held only in Michael Tew's name?

17   A   That is correct.

18   Q   Let's go back to 1006.  And please walk us through, on your

19   chart, how we get down to Count 12?

20   A   Upper left-hand corner, National Air Cargo, paid out of

21   Signature Bank, the amount of $45,000.  It was paid based on an

22   invoice from Global Fuel Logistics, in the upper right-hand

23   corner.  That was one of 27 invoices totaling $1,388,338,

24   occurring between quarter three, 2018, to quarter three, 2020.

25          Going down to the next series of boxes, second one in,

1    it was deposited into and account, Navy Federal Credit Union

2    ending '5336, Michael Tew.  It was one of 15 deposits, totaling

3    $820,068, occurring in quarter three 2019, and quarter two,

4    2020, and below the box, first -- first transaction, 7-24-2019,

5    $45,000, Count 12.

6    Q   Mr. Morgan, we just saw that $45,000, 39,000 of it got

7    transferred out the same day.  Did you always put a transfer

8    out on this chart?

9    A   No.

10   Q   Okay.  Let's go to Count 13, which is on the far right.

11   August 7, 2019, in the amount of $13,500.  Okay.  Let's start

12   with Government's Exhibit 841.  Is this the same email that we

13   just looked at?

14   A   Yes, it is.

15   Q   Are we just going to focus on a different invoice this

16   time?

17   A   Yes.

18   Q   Is that Invoice Number 972?

19   A   Yes.

20   Q   Okay.  Let's go to the page of this exhibit marked 145796.

21   If you could please walk us through this invoice this?

22   A   This is an invoice from Global Fuel Logistics with a Troy,

23   Michigan address.  It's to National Airlines.  The Invoice

24   Number is 972.  The date is August 7th, 2019.  There's several

25   lines here, for description with a total being due of $94,500.

MATTHEW MORGAN – Direct

1   Q   Okay.  Can we move to Government's Exhibit 13 next?  What

2   is this document?

3   A   This is a Signature bank completed ACH transaction details,

4   with the debit account of; 5545, effective date August 7th,

5   2019.  Going down to the credit destination accounts.  It was

6   account '6934.  The name is SHI, LLC, and the amount is

7   $31,500.

8   Q   Okay.  Couple of things that I want to try and tease out

9   here.  The name listed on this is not the same as the name on

10  the invoice?

11  A   Correct.

12  Q   And the amount is less than the invoice, right?

13  A   Correct.

14  Q   Were there instances where we saw or when you saw, during

15  your record review, that a full invoice wasn't paid at one

16  point?

17  A   Yes.

18  Q   Maybe multiple payments?

19  A   Correct.

20  Q   Or maybe just not paid the whole thing?

21  A   Yes.

22  Q   Okay.  So, '6934 is their account number.  Let's look at,

23  that corresponds to in the next document, which is Government's

24  Exhibit 213.  All right.  What are we looking at here,

25  Mr. Morgan?

MATTHEW MORGAN - Direct

1   A   This is a Wells Fargo bank statement.

2   Q   Okay.  And I believe this is the first time we've seen a

3   Wells Fargo statement.  So if we could just blow up the account

4   number, which is on the middle right-hand side.  All right.  If

5   you could read into the record what the account number was?

6   A   Full account number is?

7   Q   Please.  Thank you.

8   A   Sorry.

9   Q   Please.  The full one.  Thank you.

10  A   7596376934.

11  Q   The same four that we just saw on the ACH?

12  A   Yes.

13  Q   What's the name on the account?

14  A   The name on the account is Sand Hill, LLC.

15  Q   And I apologize, I have missed a document.  Let's back up

16  to Government's Exhibit 306.  Is this the signature card for

17  that Sand Hill, LLC, Wells Fargo account?

18  A   Yes, it is.

19  Q   And if we could -- yes.  Pull up the related customer

20  information.  Who does it indicate is the owner of this

21  account?

22  A   Under related customer information it's Michael A Tew.  And

23  it's Sand Hill, LLC.

24  Q   And so, under customer one name is which name?

25  A   Sand Hill, LLC.

MATTHEW MORGAN - Direct

1    *Q*   Customer two name?

2    *A*   Michael A. Tew.

3    *Q*   Okay.  What is the account relationship?

4    *A*   Sand Hill, LLC is the sole owner, Michael Tew is the

5    signer.

6    *Q*   And again, what are the last four?

7    *A*   The last four digits of this account are '6934.

8    *Q*   All right.  Let's go back to the bank statement, which is

9    213.  And the ACH we just saw was for $31,500, on August 7th,

10   2019.  If we can turn to WFB 726.  Do we see that ACH deposit

11   hit Sand Hill, Michael Tew's Wells Fargo account?

12   *A*   Yes.  Towards the top, on August 7th, there's a

13   transaction, the description is National Air ACH, has SHI, LLC,

14   and the deposit amount is $31,500.

15           *MS. WEISS:*  Ms. Ortiz, can we pull the next four or

16   five transaction up?

17   *Q*   What happened in this account immediately after or on the

18   same day, as that $31,500 deposit from National Air Cargo hit

19   this account?

20   *A*   The next two lines are a wire transfer services charge for

21   $30 each.  The third line after that is a wire transfer to Navy

22   Federal Credit Union for 10,000, and benefit -- beneficiary is

23   Michael Tew.  The next line is a transfer wire transfer to

24   JPMorgan Chase account.  Beneficiary is Mora Consulting, for

25   $15,000.

MATTHEW MORGAN - Direct

1    Q    There's one more after that.

2    A    The one more is a withdrawal for $5,000, on August 7th.

3    Q    And it says withdrawal what, after that?  Can you read that

4    full line?

5    A    Of course.  It's a withdrawal made in branch slash store.

6    Q    Can we pull back out of that.  So, the balance just before

7    that wire hit was what, Mr. Morgan?

8    A    On August 6th, the day before, the balance was 990.20.

9    Q    Okay.  And within a day has the vast majority of that money

10   been moved out?

11   A    Correct.

12   Q    Okay.  Let's return to 1006, please.  And if you could just

13   walk us through, how, on this chart, we get down to Count 13,

14   based on the documents we just saw?

15   A    In the upper left-hand corner there's a box labeled

16   National Air Cargo, that paid the 31,500 from the Signature

17   Bank account.  It was based on an invoice from Global Fuel

18   Logistics, which was one of 27 invoices totaling $1,388,338,

19   that occurred between quarter three, 2019, to quarter three,

20   2020.

21        Going down the next row of boxes.  All the way to the

22   right, it was one deposit totaling -- one of eight deposits,

23   totaling $241,500, that occurred in quarter three, 2019.  That

24   was deposited into the Wells Fargo account ending in '6934,

25   that we looked at, in the account being -- excuse me -- Sand

MATTHEW MORGAN - Direct

1   Hill, LLC with Michael A. Tew being the signer.

2           Below that box are three transactions, but the first

3   one we're looking at was the deposit that occurred August 7th,

4   2019, for 31,500, which ties out to Count 13.

5   Q   Okay.  And once again, we saw a lot of that money come

6   straight out the same day?

7   A   Yes.

8   Q   But that is no reflected on your chart?

9   A   Correct.

10  Q   Okay.  Let's move on to Government's Exhibit -- I'm sorry

11  Count 14.  The first document in that folder is Government's

12  Exhibit 841.

13          Mr. Morgan, is this the same email that we looked at

14  before?

15  A   Yes.

16  Q   But we're going to do the final invoice.  And is that

17  Invoice Number 987?

18  A   Yes.

19  Q   Okay.  Let's look at the page marked 145795.  And if you

20  could walk us through this invoice.

21  A   This is -- the header information is from Global Fuel

22  Logistics, located in Troy, Michigan.  It's to National

23  Airlines.  It's Invoice Number 987, dated August 20th, 2019.

24  The description, spare parts, inventory assessment, and the

25  total is $9,500.

MATTHEW MORGAN - Direct

1   Q   Can we look next at Government's Exhibit 14, already in

2   evidence.  Okay.  Can you walk us through this payment?

3   A   This is a Signature Bank completed ACH transaction detail.

4   The debit account being '5545.  The effective date is August

5   20th, 2019.  Skipping down to the credit destination accounts,

6   it's going to account '5336.  The name listed is Global Fuel

7   Logistics, and the amount is $9,500.

8   Q   Okay.  So, this detail actually shows Global Fuel Logistics

9   the company that invoiced National?

10  A   That's correct.

11  Q   But we've seen this '5336 number, right?

12  A   Yes.

13  Q   We will skip the signature card here and move on to

14  Government's Exhibit 46?

15  A   Okay.

16  Q   And show that next.  Who does the account '5336 belong to?

17  A   Michael Tew.

18  Q   Can we please turn to the document or the page marked Navy

19  522, next.  And we're looking for the ACH that got paid out for

20  $9500, around 8-19.

21  A   So, at the very top, right after the beginning balance of

22  613, on 8-19, there's transaction detail, says deposit ACH paid

23  from National Air Cargo, in the amount is 9,500.

24      MS. WEISS:  Okay.  Ms. Ortiz, can we now pull up all

25  of the transactions that occurred through 8-21, the next 48

MATTHEW MORGAN - Direct

1    hours after that deposit hit.

2    Q   Can you summarize what sort of transactions we're seeing

3    here, and you don't need to do every single one, but just give

4    us a summary.

5    A   Of course.  The first three transactions we see are

6    approximately $600 being transferred into a checking account of

7    Kimberley Tew, that would be at Navy Federal Credit Union, and

8    then a couple withdrawal fees, ATM fees, followed by three ATM

9    withdrawals, with locations of Aurora, Denver, listed.  So, one

10   in Aurora, two in Denver, $603 each, a wire fee, and then a

11   withdrawal by wire of $5,000.

12   Q   Okay.

13   A   And then the activity is very similar to what we just saw.

14   A couple more ATM withdrawal fees, a couple ATM withdrawals at

15   a Chase Bank in Denver, Colorado, for $603.  Continuing down,

16   some additional transfers to checking, with names of Michael

17   Tew and Kimberley Tew.  So various accounts.  There's money

18   transferred into those.

19   Q   Okay.

20   A   I should note also that's a transfer to and a transfer

21   from, that's included in there.  So $105 transfer from.  It

22   continues down with additional transfers from checking.  Let's

23   see, getting down to the $500.

24   Q   Okay.  What was the ending balance of the account within 48

25   hours of that deposit hitting of 9500?

1223

MATTHEW MORGAN - Direct

1    A   So, at the end of the day, on August 21st, ending balance

2    was $414.

3    Q   Let's go back to 1006.  And if you could walk us through

4    that Count, which was Count 14?

5    A   Okay.  Starting in the upper left-hand corner, National Air

6    Cargo paid the invoice out of Signature Bank account, that was

7    one of 27 invoices, for a total of $1,388,338, that occurred in

8    quarter three 2019 to quarter three 2020.  The box on the

9    right-hand side is the invoice from Global Fuel Logistics.  The

10   transaction was deposited into the second blue box in the

11   center, the Michael Tew account, at Navy Federal Credit Union,

12   ending in '5336.  That was one deposit of fifteen, totaling

13   $820,068, occurring in quarter three, 2019, and quarter two,

14   2020.  And right below the box is the first Count, on April

15   24th, 2019, and the second one is August 19th, 2019, the $9,500

16   to be traced, which is Count 14.

17   Q   Okay.  Let's go to Count 15, which is over here, sir.  And

18   the first document in your folder should be Government's

19   Exhibit 844?

20   A   That's correct.

21   Q   Great.  Can you walk us through this email?

22   A   It is email to *jyioulos@nationalaircargo*.  It is from an

23   accounting person.  It was sent Thursday, August 29th, 2019.

24   Subject is Global Fuel updated invoice.  There's a PDF

25   attachment called GFL-invoice 1001 National Airlines.

MATTHEW MORGAN - Direct

1   Q   Is that invoice attached on the second page of that Exhibit

2   844?

3   A   Yes.

4   Q   Okay.  Take a look at that.  And similar to what we have

5   seen, with the other Global Fuel Logistics, what is this?

6   A   It's an invoice from Global Fuel Logistics located in Troy,

7   Michigan, to National Airlines.  The invoice number is 1001,

8   dated August 22, 2019, with a description of pallet

9   maintenance, slat extension, maintenance overview, with a total

10  due of $55,000.

11  Q   Okay.  And so this is an invoice from August 22d?

12  A   Correct.

13  Q   All right.  Let's move on to the next Document, which is

14  Government's Exhibit 15.  Do we see a payment made out that

15  day?

16  A   We do.

17  Q   Okay.  And what was that payment?

18  A   That is the document Signature Bank account, payment of

19  28,000.

20  Q   And what was the account number?

21  A   The account number, the debit account is '5545, and the

22  credit account is '6934.

23  Q   And what was the name?

24  A   SHI, LLC.

25  Q   Okay.  So not Global Fuel Logistics?

MATTHEW MORGAN - Direct

1    A    Correct.

2    Q    But the same day as that invoice?

3    A    Yes.

4    Q    All right.  Turning to the next document, in your folder.

5    Is that Government's Exhibit 306?

6    A    Yes.

7    Q    Is that the same signature card for the Sand Hill, LLC,

8    Michael Tew Wells Fargo account?

9    A    Yes.

10   Q    Let's turn to the next document, which should be

11   Government's Exhibit 213.  And again, is this the account

12   statement for Sand Hill, LLC, '6934 bank account?

13   A    Correct.

14   Q    Okay.  Can we go to page 728.  Do we see a $28,000 deposit

15   associated with that National Air ACH, on or around August 22d?

16   A    Yes.  On August 22d there's a deposit, the description,

17   National Air ACH, SHI, LLC, again $28,000 deposit.

18           MS. WEISS:  Okay.  Can we pull down through the first

19   line of 823, Ms. Ortiz.

20   Q    That ACH came in on 8-22.  Please summarize what happened

21   the rest of that day?

22   A    There are three transactions for wire transfer service

23   charge, followed by a $7,000 wire transfer to a JPMorgan Chase

24   account, beneficiary being Mora Consulting, followed by a wire

25   transfer to a federal credit account, Michael Tew, of $5,000,

MATTHEW MORGAN - Direct

1    followed by a $9,000 withdrawal made in a branch store for

2    9,000, followed by a wire transfer to JPMorgan Chase Bank, with

3    the beneficiary being Mora Consulting for $4,000, followed by a

4    non-Wells Fargo ATM withdrawal for $603 dollars, a Denver

5    Colorado location, followed by a transaction fee, followed by

6    an ATM withdrawal at a same ATM at Denver, Colorado for 383,

7    followed by another transaction fee, followed by a transaction

8    at Trader Joe's, lastly a Zelle payment to Tew, Kimberley on

9    8-22.

10   Q   Within a day of that $28,000 coming in, what was the ending

11   balance?

12   A   The ending balance on August 22d, within the day, was a

13   negative 23.26.

14   Q   And did that incur any fees?

15   A   That did incur a fee, on the 23rd, an overdraft fee.

16   Q   Does that indicate what that overdraft fee was associated

17   with?

18   A   It was associated with the Zelle transfer to Tew,

19   Kimberley.

20   Q   Can we go back to 1006, please.  And can you walk us

21   through our chart, how we got to Count 15?

22   A   In the upper left-hand corner, blue box, says National Air

23   Cargo.  This is where the transaction was paid out of the

24   Signature Bank account.  The invoice said Global Fuel

25   Logistics.  It was one of 27 invoices, for total of $1,388,338,

MATTHEW MORGAN - Direct

 1    that occurred in quarter three 2019, quarter three 2020.

 2        Going down the next row, blue box to the far right, it

 3    was deposited into an account titled Sand Hill, Michael A. Tew

 4    and Wells Fargo account, ending '6934, that was one of eight

 5    deposits, totaling $241,500 that occurred in quarter three,

 6    2019.  Below the blue box, it is the second line.  Again,

 7    that's the date, the August 22d, 2019, the deposit date,

 8    28,000, the deposit amount and that ties out to Count 15.

 9    Q   Let's do Count 16 next.  Count 16, is this $45,000 charge

10    on 9-4-2019.  Okay.  What's the first document in your folder,

11    Document 845?

12    A   (Nodding head.)

13    Q   Are you nodding your head?  We need an oral answer.

14    A   I have it, yes.

15    Q   Thank you.  Okay.  Can you please walk us through the

16    initial email?

17    A   It is a email to *jyioulos@nationalaircargo,* it is from an

18    accounting person.  It was sent Thursday, August 29th, 2019.

19    The subject is invoices from Global Fuel Logistics, Inc.

20    There's three attachments, labeled GFL dash invoice 1023

21    National Airlines dot PDF.  Second one is GFL dash invoice 1011

22    National Airlines dot PDF, and the last one is GFL dash invoice

23    1001, National Airlines dot PDF.

24    Q   Okay.  Let's start with the top one, Invoice 1023.  Can you

25    please turn to the page 145921.  Walk us through what we're

MATTHEW MORGAN - Direct

1    seeing here?

2    A    This is an invoice, Global Fuel Logistics, in Troy,

3    Michigan, to National Airlines.  The Invoice Number is 1023,

4    dated August 29th, 2019.  The description is Trailing Edge Flap

5    Maintenance Review, with a 50 percent deposit due, with a total

6    remaining of $45,000.

7    Q    Can we please turn to Government's Exhibit 16.  What do we

8    see here, sir?

9    A    This is a Signature Bank completed ACH transaction details

10   document, the debit account is '5545.  The effective date is

11   September 4th, 2019.  Skipping down to the credit destination

12   accounts, the account is '5336, the name is Global Fuel

13   Logistics for $45,000.

14   Q    Okay.  Have we seen that '5336 account before?

15   A    Yes.  Yes, we have.

16   Q    Okay.  We will skip over the signature card then and move

17   on to the statement, which should be Exhibit 46, I believe.

18   A    I have got it.

19   Q    Okay.  And again, is this the Michael Tew Navy Federal

20   Credit Union statement?

21   A    Yes, it is.

22   Q    Including the Account '5336?

23   A    Yes.

24   Q    And do we see on -- well, let me ask you to turn to Navy

25   524.  And do we see a $45,000 deposit into this account on or

MATTHEW MORGAN - Direct

1    around September 4th?

2    A    Yes.  The top of the document, we know that it's account

3    '5336 on 9-4.  There's a deposit.  The transaction detail says

4    deposit, ACH paid from National Air.  Over to the side, the

5    amount of $45,000, and it lists balance of $45,011.42.

6    Q    What's the interaction between those two numbers?

7    A    The deposit is 45,000 and after the deposit $45,011.42 is

8    the balance in the account.

9    Q    Okay.  Can we move up one line and look at what the balance

10   was in the account before that $45 from National came in?

11   A    At the end of the day, September 3rd, the balance was

12   $11.42.

13   Q    Okay.  And then, can you please look down and just grab

14   through 9-4, the same day as that deposit came in.  What was

15   the activity after that deposit came in on 9-4?

16   A    There are two -- let's see.  There's two transfers into the

17   account, Kimberley Tew, and then an ACH fee, and then a

18   withdrawal an ATM withdrawal at the in Las Vegas, for 606.99,

19   looks like it's the Wynn Las Vegas, transfer of $45,000, to

20   Kimberley Tew account.

21   Q    So, the same day that deposit came in?

22   A    Yes, correct.

23   Q    Can we look at the next document, in your list, which

24   should be Government's Exhibit 246.

25   A    Okay.

MATTHEW MORGAN - Direct

1    *Q*    All right.  And if we can go to Navy 14.  And do we see

2    that $45,000 transfer from Michael Tew's '5336 account, into

3    this account?

4    *A*    Yes.  The bottom of the statement page, September 4th,

5    there is a transaction which says transfer from checking,

6    Michael Tew, for $45,000, which ties back to that previous

7    statement.

8            *MS. WEISS:*  Okay.  And then, if we could just blow up

9    the account information at the top and confirm which account

10   we're looking at, Ms. Ortiz?

11   *A*    This account ending '8486.

12   *Q*    Okay.  So that $45,000 went into Michael and Kimberley's

13   joint account?

14   *A*    Correct.

15           *MS. WEISS:*  Okay.  If we can pull down, sort of, the

16   next few transactions, and the ones, sort of, at the beginning

17   of the following page, Ms. Ortiz.  Actually, just keep going.

18   If we could do like maybe the top half.

19   *Q*    Mr. Morgan, does this indicate -- any of the activity on

20   this bank statement indicate where Michael or Kimberley Tew

21   might have been around the time that $45,000 deposit came in

22   that from national?

23           *MR. KAPLAN:*  Objection, Your Honor, draws conclusions.

24           *THE COURT:*  Overruled.

25           *MS. WEISS:*  Just asking him to read the lines, yeah.

MATTHEW MORGAN - Direct

1    Thank you.

2          THE COURT:  Go ahead.

3    A    There's a transaction on September 5th, kind of in the

4    middle of the screen, at Walmart® Super Center in Las Vegas,

5    followed by a transaction on Southwest Airlines®.

6          MS. WEISS:  Actually, Ms. Ortiz, can we go back to the

7    last page, and just pull the stuff at the bottom?

8    Q    This is a little easier to see.  Okay.

9    A    There are two transactions on 9-4 for an ATM in Las Vegas,

10   at the Wynn in Las Vegas for 606.99, Google Pay transaction and

11   debit card transaction for $3,124.95 at the Wynn.

12   Q    All the same day?

13   A    Correct.

14   Q    Where that transfer came in?

15   A    Yes.

16   Q    Can we go back to 1006, please.  And, Mr. Morgan, if you

17   could walk us through how we got through Count 16, including

18   the box at the end.

19   A    We started at the upper left-hand corner, National Air

20   Cargo out of the Signature Bank paid the $45,000.  It's from

21   invoice labeled Global Fuel Logistics, it was one of 27

22   invoices, totaling $1,388,338, that occurred in quarter three,

23   2019, through quarter three 2020.

24          If you go down to the second row of boxes, second one

25   in, that was deposited into a Navy Federal Credit Union account

MATTHEW MORGAN - Direct                                                1232

1    ending in '5336, with the name Michael Tew, that was one of 15

2    deposits totaling $820,068, occurring in quarter three, 2019,

3    and quarter two, 2020.

4          Below the blue box, the third line, is Count 16, which

5    is the deposit, September 4th, 2019, for $45,000.  There's then

6    an arrow to the left, which we traced over to a transfer into a

7    Navy federal account ending in '8486 on the same date,

8    September 4th, 2019.

9    Q    Okay.  And, Mr. Morgan, I think we've got time for one or

10   two more.  Can we stick with this chart and go to Count 35.

11   All right.  So Count 35 is this 4-16-2020, 68,000.

12         If we could please look at the first document in your

13   Count 35 folder, which is Government's Exhibit 953.

14   A    Okay.

15   Q    Okay.  And what is this first piece of information?

16   A    It's an email communication to

17   *jyioulos@nationalaircargo.com.*  It's from an accounting person,

18   which was sent Monday, April 27th, 2020.  Subject is invoice

19   for Global Fuel Logistics, Inc., and has one attachment labeled

20   GFL dash Invoice 7988 National Airlines dot PDF.

21   Q    Okay.  Is the next page of this exhibit that invoice?

22   A    Yes.

23   Q    We don't need to read all of it out, but?

24   A    It is.

25         *MS. WEISS:*  Can we display it please Ms. Ortiz?  It's

MATTHEW MORGAN - Direct

1    113463.

2    Q    Okay.  Is that Invoice Number 7988 indicated at the top?

3    A    Yes.

4    Q    And then what was the total on this purported invoice?

5    A    Total remaining is $124,785.

6    Q    Okay.  Moving on to Government's Exhibit 35.  What do we

7    see here, sir?

8    Q    This is a Signature Bank Completed ACH transaction details,

9    debit account is '5545, effective date is April 16th, 2020.

10   The credit destination account is '5336.  The name on the

11   account is Global Fuel Logistics, and the amount is $68,255.

12        MS. WEISS:  Could we blow up the ACH versus the

13   invoice, please Veronica -- Ms. Ortiz?  I'm sorry.  And

14   actually I was hoping to get -- yes.  That's perfect.  Okay.

15   Q    So, the invoice date here is what?

16   A    The invoice date is April 15th, 2020.

17   Q    Okay.  And the effective date of the wire transfer?

18   A    Is April 16th, 2020.

19   Q    Okay.  Are you aware of April 15th as a significant date to

20   most Americans?

21   A    Yes, it's tax day.

22   Q    All right.  We're familiar with this '5336 account, by this

23   point, correct?

24   A    Yes.

25   Q    If we could skip the signature card again, sir, which is

MATTHEW MORGAN - Direct

1    Government's Exhibit 303, for the record, and we'll just move

2    to the account statement Government's Exhibit 232.

3    Q    Okay.  Is this the Michael Tew Navy Federal Credit Union

4    statement again?

5    A    Yes, it is.

6    Q    Including the statement for '5336?

7    A    Correct.

8    Q    Can we turn to page 1337?  Did we see an ACH deposit in the

9    amount that matches the amount of the ACH that we just looked

10   at on or April 16th?

11   A    Yes.  On April 16th there's a transaction.  The transaction

12   detail says it's a deposit dash ACH paid from National Air, in

13   the amount is $68,255.

14   Q    That was looks like the ending balance for that month, that

15   statement period I suppose.  April 16th, 2020?

16   A    The ending balance for the April 16th, 2020, is $4,558.27.

17   Q    Okay.  So, roughly, how much had been moved out of the

18   account within a day?

19   A    Approximately 64,000.

20   Q    Let's go back to 1006, and again, you don't have to read

21   out the totals, but just show us how how we get down to Count

22   35?

23   A    The upper left-hand corner, we see National Air Cargo.

24   They paid this transaction out of the Signature Bank account.

25   This is based upon on the left invoice, Global Fuel Logistics.

MATTHEW MORGAN - Direct

1    The transaction was deposited into a Navy Federal Credit Union

2    account, ending in '5336.  Michael Tew is on the account.  And

3    if you go farther, the fourth line down, on the transaction

4    that occurred on April 16th, 2020, is what we looked at for the

5    amount deposited of $68,255, and that ties out to Count 35.

6    Q    Okay.  Let's go on to Count 36, next.  All right.  Let's

7    start with Government's Exhibit 955.  Should be the first one

8    in your folder.  Okay.  And if we could just do the to/from,

9    subject and invoice number?

10   A    The email header information is to

11   *jyioulos@nationalaircargo.com*.  It is from an accounting

12   person.  It was sent Monday, May 11th, 2020.  The subject is

13   invoice for Global Fuel Logistics, Inc., with an attachment of

14   GFL dash invoice, 8011 National Airlines dot PDF.

15   Q    Okay.  And this was sent what date?

16   A    Monday, May 11th, 2020.

17   Q    Okay.  Let's look at the invoice that's attached.  What's

18   the date on the invoice?

19   A    The date on the invoice is April 25th, 2020.

20   Q    So a little bit later?

21   A    Correct.

22   Q    Okay.  And the invoice number matches?

23   A    Correct, 8011.

24   Q    All right.  How much was this invoice for?

25   A    This invoice was $83,090.

1236
MATTHEW MORGAN - Direct

1   Q   Okay.  Let's look at Government's Exhibit 36, next.  Very

2   familiar with these, so can you just tell us the company name,

3   the account, last four of the account that it was paid to and

4   the amount?

5   A   Company name is Global Fuel Logistics.  The last four is

6   '5336, amount is $46,850.

7   Q   So once again, did you see invoices that were for a larger

8   amount than an actual payment?

9   A   Correct.

10  Q   All right.  If we could skip the membership card again, and

11  just move to the statement.  Should be Government's Exhibit

12  236.  And again, our ACH indicated that this went to the '5336

13  account.  Could we please turn to Navy 1349.  And if we could

14  grab the amount in this -- the balance in this account.  The

15  day before that ACH hit and the day that it hit.  And if you

16  could walk us through that, Mr. Morgan.

17  A   The ending balance on the account ending '5336, on April

18  27th, was $715.65.  On April 28th, there is a deposit ACH paid

19  from National Air for $46,850, bringing the balance to over

20  $47,000.

21  Q   Okay.  Let's stick with what is left on that page.  Let's

22  just look at the what happened over the next couple days of

23  activity.

24  A   The next couple days of activity included several transfers

25  from, and several transfer -- yeah, several transfers from and

MATTHEW MORGAN - Direct

1    several transfers to accounts in the name of Michael Tew or

2    Kimberley Tew.  There are a couple an ATM fees and an ATM

3    withdraw at a location -- Bank of America location in Denver,

4    Colorado, for $603, and then again all of these transfers at

5    the bottom, it's just ATM fees.

6    Q    Okay.  And was most of that money moved out of that account

7    within a day or two?

8    A    Yes.

9    Q    All right.  Let's go back to 1006.  And again we just

10   looked at Count 36, I believe?

11   A    Correct.

12   Q    Correct, Mr. Morgan?

13   A    Yes.

14   Q    Let's look at Count 38.  All right.  Is your first document

15   number 959?

16   A    Yes.

17   Q    And what is this, sir?

18   A    This is an email to *jyioulos@nationalaircargo*.  It is from

19   an accounting person.  It was sent Wednesday, June 3rd, 2020.

20   The subject is invoices for May 2020.  There are three PDF

21   attachments.  The first one being GFL dash AMR dash invoice,

22   8888, National Airlines.  The second is GFL dash invoice, 9014

23   National Airlines, and the third is GFL dash invoice, 9071

24   National Airlines.

25   Q    Okay.  Let's just look at the 9014 invoice.  And that, for

MATTHEW MORGAN - Direct

1  the record, is the page ending in 107686.  We see the invoice

2  number 9014 at the top, correct?

3  *A*   Correct.

4  *Q*   And once again, we won't go through everything that's

5  itemized here, but what is the total of this invoice?

6  *A*   The total remaining is $159,882.

7  *Q*   And that was just one of three submitted that day?

8  *A*   Yes.

9  *Q*   Let's look at Government's Exhibit 38, next.  How much did

10  National pay out on May 13th?

11  *A*   May 13th, National paid out $82,422.

12  *Q*   And what was the name on that particular ACH?

13  *A*   It was -- the name is Global Fuel Logistics.

14  *Q*   And the bank account?

15  *A*   The bank account ends in '5336.

16  *Q*   And once again, whose bank account is that?

17  *A*   That is the Tew account, Michael Tew.

18  *Q*   And the amount is 82,000?

19  *A*   82,422.

20  *Q*   Skip the signature card again, and go to the bank

21  statement, which is 236.  Another Navy Federal Credit Union

22  statement?

23  *A*   Correct.

24  *Q*   Michael Tew?

25  *A*   Yes.

MATTHEW MORGAN - Direct

1   Q   57336?

2   A   Yes.

3   Q   All right.  Let's go to Navy 1351.  Let's grab the ending

4   balance before and then the ACH deposit.  What was the ending

5   balance in this account as of May 12th?

6   A   As of May 12th, ending balance was $334.36.

7   Q   And what date was the deposit or the ACH that came in from

8   National?

9   A   The deposit was May 13th.  Says deposit, ACH paid from

10  National Air for 82,422.

11          MS. WEISS:  Okay.  And let's look and take the next

12  two transactions, Ms. Ortiz.

13  Q   What happened the same day that that $82,000 came in?

14  A   The money was transferred into a checking account, Michael

15  Tew, and a checking account of Kimberley Tew, $80,000 total,

16  two transactions of 40,000 each.

17  Q   So the majority of that 82,000?

18  A   Correct.

19  Q   All right.  Mr. Morgan, I'm determined.  Let's go back to

20  1006 and do Count 39.  The first document in your folder,

21  Government's Exhibit 959.

22  A   Okay.  Okay.  Got it.

23  Q   Is that the same email that we looked at before?

24  A   Yes, it is.

25  Q   Okay.  Let's look at the other invoice from Global Fuel

MATTHEW MORGAN - Direct

1   Logistics, 9071.  That is 107687 at the bottom?

2   A   Yes.

3   Q   Great.  The invoice number, for the record, sir?

4   A   9071.

5   Q   And the date?

6   A   The date is May 20th, 2020.

7   Q   Okay.  And then if we can scroll down and look at the total

8   on this invoice?

9   A   The total is $164,065.

10  Q   Next up, Government's Exhibit 39.  How much was paid on

11  this particular invoice, sir?

12  A   $78,565.

13  Q   And was the name listed on the ACH payment?

14  A   The name listed is Global Fuel Logistics.

15  Q   And the account number?

16  A   The account number ends in '5336.

17  Q   Let's go to the statement.  Which is Government's Exhibit

18  239.  Is this Michael Tew's Navy Federal Credit Union account

19  statement for the relevant time period?

20  A   Yes.

21  Q   Do we see the account ending in '5336?

22  A   Yes.

23  Q   Let's move to Navy 1365.  And do we see the deposit

24  associated with that ACH payment from National Air Cargo?

25  A   Yes.  On May 21st, deposit, says ACH paid from National

MATTHEW MORGAN - Direct

1    Air, amount is 78,565.

2    Q    Okay.  And that was on May 21st?

3    A    That's correct.

4    Q    For an ending balance of what, sir?

5    A    The ending balance of that was $80,164.42.

6    Q    Let's turn to the next page, which is 1366, and look at

7    just 5-26.  Was there a significant transfer on 5-26, sir?

8    A    Yes.  Towards the bottom, there's a $75,000 transfer to

9    checking, Kimberley Tew.

10   Q    Leaving a balance after that of what?

11   A    $2,148.15.

12   Q    If we could go back to 1006.  And if you could just walk us

13   through, very quickly, in the last couple minutes, how we got

14   to Counts 38 and 39?

15   A    The upper is National Air Cargo.  We saw a withdrawal out

16   of that account, the Signature Bank account.  It was based on

17   invoice from Global Fuel Logistics, the upper right-hand

18   corner.  The deposit went into a Michael Tew account, Navy

19   Federal Credit Union, ending in '5336, and then this is

20   Count 39, at the very bottom, transaction occurred May 21,

21   2020, for a total in the amount of $70,565.

22   Q    Okay.

23        MS. WEISS:  There's one more count on this page, but I

24   think we leave it until tomorrow.

25        THE COURT:  Yes, I agree.  Thank you.  So, we will be

MATTHEW MORGAN - Direct

1    recessing for the evening.  Excuse me.  Members of the jury,

2    again, you are not to discuss the case with anyone, including

3    one another, not to do any research about the case or anyone

4    involved in it, and you are to keep an open mind, until you

5    have heard all of the evidence, my instructions and the closing

6    arguments.

7         So, those instructions remain in place, and we will

8    see you at 9 o'clock tomorrow.

9         THE COURTROOM DEPUTY:  All rise.

10    (Jury out at 4:55 p.m.)

11         THE COURT:  All right.  Let's briefly take our seats.

12    You may step down, sir.  Thank you.  Counsel, I don't know if

13    there's anything you need to bring up.  I want to ask

14    Ms. Weiss -- I know you warned me that you were going to take

15    more than an hour, but you have taken three-and-a-half hours,

16    now, and I guess the fact that those charts were doing that

17    much work for you makes me more comfortable that it was correct

18    to leave them out of the evidence, but you can't take this long

19    to go through these.  So, you are going to have to find a way

20    to speed it up.

21         So that's my -- that's where we are tomorrow.  I mean,

22    you are going to have to find a way to go faster.  I don't want

23    to have witnesses here, at least prosecution witnesses, on

24    Wednesday.

25         MS. WEISS:  Understood, Your Honor.

MATTHEW MORGAN - Direct

1      THE COURT:  So, figure it out.  Is there anything else

2  besides that?  I mean, I guess I want you to start thinking a

3  little bit about timing questions in general, more than just

4  that, about when we're going to be able to do instruction

5  charge conference, when we're going to do -- when we're going

6  to do closings.  I think I told you I do instructions -- the

7  bulk of the final instructions before closing arguments.  So,

8  we probably should try to do those together.  I'm guessing

9  maybe we get to those Wednesday, both instructions and

10  arguments hopefully Wednesday morning, depending on what kind

11  of defense -- what kind of evidence the defense wants to put

12  on.

13      So, just start thinking about that.  I don't know that

14  there's too much to discuss about it, at this point, but I

15  would like you to have some idea in mind of what you think

16  about those things, how long you expect to take for closing

17  arguments.  I know you both -- both sides have quite a bit of

18  time.

19      So, if there's nothing else, I will just leave it at

20  that, and we can meet again at a little before 9.

21      Is there anything else you need to raise?

22      MR. KAPLAN:  I was just going to mention that you had

23  mentioned to us, to remind -- well, to talk and then remind you

24  social security number redactions.

25      THE COURT:  Yeah.  Thank you.  That came up again

MATTHEW MORGAN - Direct

1    today, obviously.

2           MS. FROST:  That was the issue I was going to raise.

3    Okay.

4           MS. FROST:  We had conferred with the government, our

5    position, correct me if I'm wrong, Mr. Schall, we want that

6    information completely redacted.

7           MR. SCHALL:  With the fallback position of the first

8    five, nine digits redacted.

9           THE COURT:  Okay.  Does the government have a position

10   on that?

11          MR. FIELDS:  We do, Your Honor.  We don't think the

12   redaction is required under Rule 49.1.  If you look at the

13   advisory committee note to that particular rule, you will see

14   that the note -- that rule was designed to protect against the

15   sort of public filings of those informations.  So things that

16   might be on Pacer, things like that.  Here in the courtroom, we

17   don't expect that any of the jurors are going to be taking that

18   information out.  Exhibits will remain here.  Even their

19   notebooks remain here.  So we're not concerned about, sort of,

20   the privacy lost, and the full social security numbers are

21   relevant.  They help to identify the various people, sort of,

22   put together the various evidence.

23          Finally, because we are not required to do it is what

24   it really amounts to is, sort of, a resource strain, having our

25   staff go through and redact each of these exhibits when we're

MATTHEW MORGAN - Direct

 1   not required to do so, is a significant resource strain on the

 2   U.S. Attorney's Office and one that we don't think we should

 3   have to bare.

 4           THE COURT:  Okay.  I will -- at least once it was read

 5   into the transcript too, but, other than, I will take that

 6   under advisement, and think about it.  Is there anything else?

 7           MS. FROST:  As you do take that under advisement,

 8   Your Honor, I just want to point out that witness' information

 9   is redacted; such as, addresses and the like.  I saw bank

10   statements of Michael Meyers this afternoon, his address was

11   blacked out.  So, I think that Mr. Tew should have the same

12   right to privacy, particularly when it comes to a social

13   security number.

14           THE COURT:  Okay.  Thank you.  I appreciate that.  All

15   right.  We will be in recess until 9 o'clock.

16           THE COURTROOM DEPUTY:  All rise.  Court is now in

17   recess.

18       (Recess at 5:00 p.m.)

19                              **INDEX**

20   **Item**                                                   **Page**

21   ITEM                                                      PAGE

22           WITNESSES

23     SPECIAL AGENT SARAH ANDERSON

24           Direct Examination By Mr. Fields            1022

25           Cross-examination By Mr. Schall             1047

1        Cross-examination By Mr. Kaplan                    1051

2     ROMAN HERNANDEZ

3        Direct Examination By Mr. Fields                   1052

4        Cross-examination By Ms. Frost                     1068

5     SPECIAL AGENT NICHOLAS HANGGI

6        Direct Examination By Mr. Fields                   1073

7        Cross-examination By Ms. Hubbard                   1090

8        Cross-examination By Mr. Schall                    1103

9     MATTHEW VANDERVEER

10       Direct Examination By Mr. Fields                   1107

11       Cross-examination By Ms. Hubbard                   1129

12       Cross-examination By Ms. Frost                     1139

13       Redirect Examination By Mr. Fields                 1147

14    MATTHEW MORGAN

15       Direct Examination By Ms. Weiss                    1150

16    Exhibits              Received

17    555                   1032

18    556                   1033

19    557                   1035

20    558                   1042

21    559                   1044

22    560                   1044

23    561                   1044

24    562                   1046

25    101-104               1060

MATTHEW MORGAN - Direct

```
1    105, 110-112              1062
2    106-109                   1062
3    1115                      1081
4    564                       1082
5    565                       1083
6    566                       1085
7    567                       1085
8    568                       1087
9    569                       1088
10   563                       1089
11   628, 635, 637             1127
12   646, 685, 708             1127
13   715, 718, 730             1127
14   740, 760, 776             1127
15   784, 787                  1127
16   804, 805, 842             1127
17   883, 885, 886             1127
18   895, 896, 897             1127
19   901 902, 915, 917         1127
20   925, 927, 932             1127
21   934, 937, 938             1127
22   940, 941, 942, 944, 9461127
23   958, 960, 961               {
24   964, 966, 967             1127
25   970, 989, 990             1127
```

MATTHEW MORGAN – Direct    1248

| 1  | 656, 669, 696 & 752 | 1128 |
| 2  | 312, 354, 363 | 1154 |
| 3  | 207, 364 | 1155 |
| 4  | 311, 341 | 1155 |
| 5  | 202, 302, 310 | 1156 |
| 6  | 46, 208, 209 | 1157 |
| 7  | 210, 212, 225 | 1157 |
| 8  | 228, 231, 232 | 1157 |
| 9  | 236, 239, 240 | 1157 |
| 10 | 246, 303, 304 | 1157 |
| 11 | 314, 315, 319 | 1157 |
| 12 | 324, 325, 328 | 1158 |
| 13 | 329, 331, 333 | 1158 |
| 14 | 368, 393, 394 | 1158 |
| 15 | 203, 205 | 1158 |
| 16 | 48, 52, 53 | 1159 |
| 17 | 213, 217, 220 | 1159 |
| 18 | 224, 229, 230 | 1159 |
| 19 | 245 250, 306, 307 | 1159 |
| 20 | 334, 337, 340 | 1160 |
| 21 | 342, 343, 344 | 1160 |
| 22 | 345, 382, 385 | 1160 |
| 23 | 973 | 1160 |

24                          **REPORTER'S CERTIFICATE**

25      I certify that the foregoing is a correct transcript from

MATTHEW MORGAN - Direct

1    the record of proceedings in the above-entitled matter.  Dated

2    at Denver, Colorado, this 20th day of October, 2024.

3

4                                    *S/Tamara Hoffschildt*
                                     Tamara Hoffschildt
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25