1          IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLORADO

2

Criminal Action No. 20-cr-305-DDD

3

UNITED STATES OF AMERICA,

4

    Plaintiff,

5

vs.

6

1. MICHAEL TEW,
7  2. KIMBERLEY TEW,

8

    Defendants.
9  _____

10               **REPORTER'S TRANSCRIPT**
               JURY TRIAL, DAY 7

11  _____

12        Proceedings before the HONORABLE DANIEL D. DOMENICO,

13  Judge, United States District Court for the District of

14  Colorado, occurring at 9 a.m., on the 13th day of February,

15  2024, in Courtroom A1002, United States Courthouse, Denver,

16  Colorado.

17                   **APPEARANCES**

18        Bryan Fields and Sarah Weiss, Assistant U.S.

19  Attorneys, 1225 17th Street, Suite 700, Denver, Colorado,

20  80202, appearing for the Government.

21        Jason Dale Schall, Bowlin & Schall Law LLC, 7350 East

22  Progress Place, Suite 100, Greenwood Village, CO 80111 and

23  Kristen M. Frost, Ridley McGreevy & Winocur PC, 303 16th

24  Street, Suite 200, Denver, CO 80202, appearing for the

25  Defendant, Michael Tew.

1    David Scott Kaplan and Jamie Hughes Hubbard, Stimson

2  LaBranche Hubbard, LLC, 1652 North Downing Street, Denver, CO

3  80218, appearing for Defendant, Kimberley Tew.

4

5    TAMMY HOFFSCHILDT, FCRR, CRR, RMR, Official Reporter
              901 19th Street, Denver, Colorado 80294
6        Proceedings Reported by Mechanical Stenography
            Transcription Produced via Computer

7

8                **P R O C E E D I N G S**

9

10    (In open court at 9:00 a.m.)

11    THE COURT:  Good morning.  Please take your seats.

12  Welcome back, counsel.  So, I believe Mr. Keech said,

13  Mr. Schall, you might have something to discuss?

14    MR. SCHALL:  It felt wrong if we didn't have

15  something, Your Honor.  The only thing is I produced the

16  snippets to the government and I wasn't sure how the Court

17  wanted to receive them.  It's on Microsoft Teams link.  There

18  are six of them, easy to download, but wasn't sure how you

19  wanted to do that.

20    THE COURT:  Those are all of the snippets that you

21  discussed on Cross-examination; is that right?

22    MR. SCHALL:  That's right.  All from the July 7th,

23  2020, recording of Jonathan Yioulos, part of which was the

24  recorded call that the government introduced.

25    THE COURT:  So, unless there's some reason not to, I

1    think you can just mark them as whatever the appropriate

2    defense exhibit is, and I will accept them through Mr. Keech

3    that way.

4         MR. SCHALL:  Okay.

5         THE COURT:  Is there any reason not to do it that way,

6    Mr. Fields or Ms. Weiss?

7         MR. FIELDS:  No.  Logistically that makes sense

8    Your Honor.  I mean the government does have an objection to

9    the admission of those audio files, but we've already noted

10   that for the record.

11        THE COURT:  Yes.  And my thinking on the files, both

12   those and the calls, is that I'm going to allow the audio files

13   to be exhibits and not any transcripts.  So, that's kind of

14   where I am on that.

15        MR. SCHALL:  In terms of the mechanics of it,

16   Your Honor, do we need a physical copy of the recordings for

17   the jury or or will electronic files suffice?

18        THE COURT:  Mr. Keech --

19        THE COURTROOM DEPUTY:  I can put it on this.  This

20   will be for the cart in the jury room.

21        MR. SCHALL:  I can email it to him today.

22        THE COURT:  Okay.  All right.  Let's do that.

23   Mr. Kaplan?

24        MR. KAPLAN:  Can I be heard on this?

25        THE COURT:  Yes.

 1              MR. KAPLAN:  Your Honor, we would be objecting to the

 2     introduction of these snippets, and we had a chance to listen

 3     to them last night, at least the excerpted portions.  I had

 4     heard the whole audio, obviously, numerous occasions, and I

 5     think it's really grossly inappropriate to let these particular

 6     snippets in.  The Exhibit Y, basically, all it is is a

 7     character assassination -- not all of it, most of it, is a

 8     character assassination on Kimberley Tew, and I think that it

 9     is fully within the prohibitions that are in 403, in terms of

10     the introduction of character evidence.  We have objected to

11     that kind of evidence throughout these proceedings, but this is

12     particularly focused on simply bashing the character of

13     Kimberley Tew.  Exhibit Y talks about threatening texts, that

14     Mr. Yioulos talks about receiving from Kimberley Tew.

15              THE COURT:  Is it just why -- I mean I -- is why the

16     focus of your --

17              MR. KAPLAN:  No, no.

18              THE COURT:  Okay.

19              MR. KAPLAN:  No.  Matter of fact, Exhibit X, he talks

20     about that Ms. Tew was the driver of this, that it was being

21     done for her.  He thinks it was gambled away.  He thinks it was

22     a Bitcoin and gambling problem.  It is opinion evidence of the

23     worst kind, because especially not only is it opinion, but it's

24     opinion based on character.  Nevermind the fact that it's all

25     cumulative, because Mr. Schall had an opportunity to

1    Cross-examine and did Cross-examine on this, I believe over ...

2    over our objection.

3         Exhibit W, is again, cumulative.  Let me just see

4    there's one -- yes.  This is also his opinion, talking about

5    Ms. Tew, talking about what she was -- kind of her emotional

6    content in the background, her threatening behavior.

7         Exhibit V is not that, so if there's one that I'm not

8    objecting to, it would be Exhibit V.  Exhibit AA, is also

9    cumulative.  It talks about character, it is speculation, it

10   lacks relevance, it's highly prejudicial.  Talks about what he

11   thinks about the gambling, that he thinks it was Kimberley Tew,

12   that it was done to protect Kimberley.

13        So, all of this is, basically, except for the one,

14   character assassination.  If you look at 503, it's pretty clear

15   you can introduce evidence of character.  Obviously, if we

16   raised it, under circumstances, it should be shown to rebut it,

17   but the rules are pretty conservative about when character

18   evidence comes in.  This is not about truth or veracity, that

19   is more of an exception, that allows it to come in all the

20   time -- well, under certain circumstances, but it's more

21   liberal in terms of evidence that attacks the veracity of a

22   witness.

23        So, I would urge the Court to take a look at the

24   relevance and the prohibition in Rule 403 about introducing

25   this, and we would object.

MATTHEW MORGAN - Direct

1          THE COURT:  All right.  So, I will listen to it, after

2     Mr. Schall emails it and address that.  I -- my recollection of

3     it is that I will probably overrule that objection, but I will

4     listen to it before I make a final -- to them, before I make a

5     final decision.  So, thank you.

6          MR. KAPLAN:  Appreciate it.

7          THE COURT:  So, as I mentioned yesterday, my

8     expectation would be that unless Cross-examination takes

9     excessively long today, that the government should be able to

10    finish up today?  Is that --

11         MR. FIELDS:  That is our hope and expectation.

12         THE COURT:  Okay.  Good.  That's my expectation too.

13    So, to help us, why don't we go ahead and bring the jury in and

14    get started.

15         THE COURTROOM DEPUTY:  All rise.

16       (Jury in at 9:08 a.m.)

17         THE COURT:  All right.  Welcome back, ladies and

18    gentlemen.  Please take your seats, everyone.  We are going to

19    pick up where we left off with Mr. Morgan testifying.  He

20    remains under oath, and you may begin, Ms. Weiss.

21                        **DIRECT EXAMINATION**

22    BY MS. WEISS:

23    Q   Good morning, Mr. Morgan.

24    A   Good morning.

25         MS. WEISS:  Ms. Ortiz, can we start again with 1006 on

MATTHEW MORGAN – Direct

1    the screen?

2          THE COURTROOM DEPUTY:  What was the number?  Oh, okay,

3    I got it.

4          MS. WEISS:  Mr. Keech, I think we need you to turn

5    this on.  Thank you.

6    Q    Okay.  Mr. Morgan, yesterday we left off with one more

7    Count remaining, on this display chart, which is Count 40, at

8    the far left over here.  Can you pull up Count 40 from your

9    folders there?

10          All right.  Do we have a similar pattern of documents

11   in this folder, that we saw yesterday?

12   A    Yes.

13   Q    Okay.  And if you could please let us know the exhibit

14   numbers of the invoice, as well as the payment?

15   A    The invoice exhibit number is 973.  The payment is 40.

16   Q    And the bank statement?

17   A    And the bank statement is Exhibit 240.

18          MS. WEISS:  Okay.  And, Ms. Ortiz, can you pull up

19   240?

20   Q    And can you point out where we see the $95,000 ACH come in

21   on July 3rd, on this document?

22   A    Towards the top there.  Into account ending in -- or it's

23   right there, July 3rd, 2020, it's $95,000 deposit.  The

24   description is deposit ACH National Air.

25   Q    Okay.  If we could move on to Exhibit 1007.

MATTHEW MORGAN - Direct

1          *MS. WEISS:*  And the government would ask for

2     permission to display, not to admit, pursuant to yesterday's

3     ruling, and maintaining the same objection.

4          *THE COURT:*  Understanding the objections on both

5     sides, it can be shown.  Go ahead.

6          *MS. WEISS:*  Thank you.

7     *Q*    Okay.  Mr. Morgan, what is this chart?

8     *A*    This is a flow-of-funds chart that I created.

9     *Q*    Is this similar to the charts that we saw yesterday?

10    *A*    Yes.

11    *Q*    And what company does this chart cover?

12    *A*    The primary difference is in the upper left -- or

13    right-hand corner, this is for invoices that came through for

14    Aero Maintenance Resources.

15    *Q*    Can we walk through, just in a high level, it's the same

16    thing that you did yesterday, or the charts did yesterday --

17    *A*    Correct.  The upper left-hand corner is National Air Cargo.

18    The company that paid the invoices, and the money came out of

19    their accounts.  The upper right-hand corner is Aero

20    Maintenance Resources.  They are the ones that had invoiced the

21    entity, and then row of blue boxes, in the middle, are the bank

22    accounts that the deposits went into.

23    *Q*    Okay.  On some of these, are we also seeing some additional

24    transactions --

25    *A*    Correct.

MATTHEW MORGAN - Direct

1  Q   -- coming off the side?

2  A   The additional blue boxes are highlighting transfers out of

3  the accounts.

4  Q   Okay.  And did the transfers out correspond with the money

5  laundering counts in the Indictment?

6  A   Correct, yes.

7  Q   Okay.  So what we're going to do, Mr. Morgan, is do these

8  three at the same time.  If you could pull out Counts 17, 18

9  and 19.  And if you could just check the folders and read out,

10  first, the -- the exhibit number for the invoice, and the

11  exhibit number for the bank statement of the deposit for

12  Count 17?

13  A   The exhibit number for the invoice is 875, and then the

14  bank exhibit number for the bank deposit is 217.

15  Q   I'm sorry.  What was that?

16  A   For the deposit?

17  Q   Yes.  The bank statement?

18  A   Okay.  Yeah, it's two, one, seven.

19  Q   Two, one, seven.  Okay.  Thank you.

20  A   Correct.

21  Q   All right.  Can we do the same thing with Count 18?

22  A   The exhibit for the invoice is 875, and for the deposit

23  it's 217.

24  Q   Same thing with 19?

25  A   The Government's Exhibit for the invoice is 875, and the

MATTHEW MORGAN - Direct

1    bank statement is 217.

2          *MS. WEISS:*  Okay.  And then, could we also, Ms. Ortiz,

3    just pull up Government's Exhibit 48.

4    Q    And what is this document, Mr. Morgan?

5    A    This is a bank-provided withdrawal slip.

6    Q    For what amount?

7    A    The amount is $20,000.

8    Q    And by who?

9    A    Michael Tew.

10   Q    And was this conducted shortly after that deposit came in?

11   A    Yes.

12   Q    All right.  If we can go back to 1007, please.  Let's do 22

13   and 23, next.  And let's start with Count 22.  If you could

14   give us the exhibit number for the invoice and the exhibit

15   number for the payment?

16   A    The invoice is Government's Exhibit 903, and the account

17   that it is deposited into the Exhibit Number 52.

18   Q    Same thing for Count 23, please.

19   A    Count 23, the invoice was Government's Exhibit 903, and the

20   count it was deposited into is Government's Exhibit 52.

21   Q    All right.  Sticking with 1007, let's do 20, 21 and 24,

22   next.  Okay.  Starting with 20?

23   A    Twenty, 21 and...

24   Q    And 24.

25   A    Okay.  Okay.  For Count 20, the invoice is Government's

MATTHEW MORGAN - Direct

1    Exhibit 887, and the count it was deposited into is

2    Government's Exhibit 220.  Are you ready for 21?

3    Q    I am.

4    A    Okay.  Count 21, the invoice is Government's Exhibit 887,

5    and the account it is deposited into is Government's Exhibit

6    220.

7    Q    Okay.  And 24, next, please, sir?

8    A    And then Count 24, the invoice is Government's Exhibit 903,

9    and the account it was deposited into is Government's Exhibit

10   224.

11   Q    All right.  Going down 1007, to do 29 and 30, Counts 29 and

12   30.

13   A    Count 29, the invoice is Government's Exhibit 933, and the

14   account it was deposited into is Government's Exhibit 229.

15        Count 30, the invoice is Government's Exhibit 952 --

16   excuse me 954.  The account it was deposited into is

17   Government's Exhibit 230.

18   Q    Okay.  Looking back at your chart 1007, can we do 25, 26

19   and 27?

20   A    For Count 25, the invoice is Government's Exhibit 912, and

21   account it was deposited into is in Government's Exhibit 225.

22   Q    Count 26, next, please.

23   A    For Count 26, the invoice is Government's Exhibit 912, the

24   account it was deposited into is Government's Exhibit 225.

25   Q    Count 27, next?

MATTHEW MORGAN - Direct

1    A    Count 27, the invoice is Government's Exhibit 912, and the

2    account it was deposited into is Government's Exhibit 227.

3    Q    Let's take 28, 31 and 32.

4    A    Okay.  For Count 28, the invoice is Government's Exhibit

5    935, the account it was deposited into is Government's Exhibit

6    225.

7    Q    Is that 225 --

8    A    Two, two, eight.  Sorry.  Thank you.

9    Q    Count 31, sir.

10   A    Count 31, the invoice was 950.  The account it was

11   deposited into is 231.

12   Q    Okay.  Count 32.

13   A    Count 32 the invoice is Government's Exhibit 950, the

14   account it was deposited into is Exhibit 232.

15   Q    Let's do 33 and 34, next, sir.

16   A    Count 33, the invoice is Government's Exhibit 952.  The

17   account it was deposited into, is Government's Exhibit 232.

18   Q    Count 34?

19   A    Count 34, the invoice is Government's Exhibit 952, account

20   deposited into is Government's Exhibit 232.

21   Q    All right.  One more count, which is this one, Count 34, on

22   May 26th, 2020.

23        MS. WEISS:  Can we look at -- and I am actually going

24   to ask you, since it's our last chance here, Ms. Ortiz, to pull

25   up Government's Exhibit 959.  Okay.

1262
MATTHEW MORGAN - Direct

1    Q    Sir, is this the invoice that corresponds with Count 37?

2    A    Yes.

3    Q    Okay.  And turning to the second page, invoice number 8888,

4    could you walk us through the date on that invoice, and the

5    amount that is being billed?

6    A    The date on the invoice is May 1st, 2020, and the total

7    remaining or total due is $153,725.

8    Q    Turning to the next exhibit, Exhibit 37, is this another

9    instance where there's a partial payment, rather than full

10   amount invoiced?

11   A    Yes.

12   Q    What was the amount paid?

13   A    It was $85,325.

14   Q    What was the name entered into the bank system for this

15   invoice?

16   A    Global Fuel Logistics.

17   Q    And the account number?

18   A    Account ending in '5336.

19   Q    And as a reminder from yesterday, account '5336 was held by

20   who?

21   A    Michael Tew.

22   Q    Let's go on to Government's Exhibit 236.  Is this the bank

23   statement for the relevant time period?

24   A    Yes.

25   Q    And do we see '5336 reflected here?

MATTHEW MORGAN - Direct

1    A    Yes.

2    Q    All right.  I'm going to ask you to turn to the page marked

3    Navy 1350.

4    Q    And towards the bottom, do we see that early May deposit

5    from National come in, that we just saw reflected in that

6    payment record?

7    A    Yes.  On May 6th, transaction detail says, *Deposit ACH paid*

8    *from National Air for $83,325.*

9    Q    Eighty-three or 85?

10   A    I'm sorry, 85,325.

11   Q    And what happened on the same day?

12   A    On the same day?

13   Q    Yes.

14   A    There was a transfer from checking, Kimberley Tew, and then

15   a transfer to checking Kimberley Tew of $85,000, and then a

16   food transaction.

17   Q    And so, did that money that was deposited into '5336 get

18   transferred out that same today?

19   A    Yes.

20   Q    To a joint account?

21   A    Yes.

22   Q    Held by who, sir?

23   A    Kimberley Tew and Michael Tew.

24   Q    I'm going to ask you now to turn to Exhibit 1002.  What is

25   this document, sir?

1264

MATTHEW MORGAN - Direct

1    *A*    This is a chart that I created titled, Payments Of

2    Fraudulent Invoices By NAC Between August 2018 and July 2020.

3         *MS. WEISS:*  Your Honor the government would move to

4    admit Government's Exhibit 1002, which I believe there was not

5    an objection to, yesterday.

6         *THE COURT:*  Right.  I think we discussed this, and

7    it's admitted.

8         *MS. WEISS:*  Permission to display.

9    *Q*    Okay.  Mr. Morgan, can you please explain to the jury what

10   you did in this chart?

11   *A*    These are the invoices that we reviewed, and it's broken

12   out by quarter.  So, request for payment came in, this lists

13   who the request was from.  Again, broken out by quarter on the

14   left-hand side is the company or the entity that was making the

15   request, and then, at the bottom is the grand total, with

16   subtotals at the bottom.

17   *Q*    Okay.  And can we go across the rows and see how much was

18   paid out under each one of these names?

19   *A*    Correct.

20   *Q*    Kind of travel horizontally across your chart?

21   *A*    Okay.  The first row is Hannah Scaife.  There were three

22   payments totaling $50,000 in quarter three, 2018.  The next row

23   is 5530 Jessamine Development, in quarter three, 2018, there

24   was five payments totaling $75,000, quarter four, same year

25   there was one payment, totaling $30,000, for a grand total of

MATTHEW MORGAN - Direct

1    $105,000.

2            The next row was Meyers Consulting Group.  There were

3    five invoices or five payments, totaling $110,125, which is

4    also the grand total --

5    Q   I apologize.  Mr. Morgan, on the last three, why don't you

6    just read out the totals that are in the yellow.

7    A   Political Media, the total is $900,552.50.  Global Fuel

8    Logistics, the total is $1,388,338.  Aero Maintenance Resources

9    Sources, the grand total is $2,469,863, with a grand total of

10   all of those being $5,023,878.50.

11   Q   I have one more question, Mr. Morgan, for this chart,

12   before we move past it.  Visually, when we are looking at each

13   one of these individual companies, do they tend to stop after a

14   period of time?

15   A   Yes.

16   Q   And then does a new company come in, and they start using a

17   different one?

18   A   Yes.

19           MS. WEISS:  Could we please go to Government's Exhibit

20   1003.  And similarly, Your Honor, the government would ask to

21   admit this exhibit, which was not objected to yesterday as 1006

22   chart?

23           THE COURT:  Yes, as discussed, this is admitted.

24           MS. WEISS:  Okay.  And if we could display 1003,

25   please, sir, and I think we might be missing a line, Ms. Ortiz.

1266

MATTHEW MORGAN - Cross

1       Thank you.  Perfect.

2       Q    All right.  What is the title of this chart, Mr. Morgan?

3       A    The title of this chart is Deposits Of Fraudulent Invoices

4       By NAC Between August 2018 And July 2020.

5       Q    Okay.  And can you explain what this chart shows?

6       A    This is the accounts the payments were deposited into.

7       Q    Okay.  And were you able to tie out the same amount, that

8       we saw in the previous chart, that was billed into deposits?

9       A    Yes.

10             MS. WEISS:  Okay.  And, Ms. Ortiz, if we could blow up

11      that bottom blue corner.  Just the last cell.

12      Q    And, Mr. Morgan, what was the total amount deposited, based

13      on fraudulent invoices submitted to National by Michael and

14      Kimberley Tew?

15      A    The total is $5,023,878.50.

16             MS. WEISS:  Your Honor, may I have one moment?

17             THE COURT:  Yes.

18             MS. WEISS:  No further questions, from the government,

19      Your Honor.

20             THE COURT:  Thank you, Ms. Weiss.  Cross-examination,

21      Mr. Kaplan.

22                          **CROSS-EXAMINATION**

23      BY MR. KAPLAN:

24      Q    Good morning, Mr. Morgan.

25      A    Good morning.

MATTHEW MORGAN – Cross

1    Q    How are you?

2    A    Doing well.  Thank you.

3    Q    I'm going to pull some of these back up and ask a few

4    questions about them again.  If we could put 1001 up?  There we

5    go.  Now familiar to the jury.

6           These are the accounts that money went from NAC into,

7    right?

8    A    Correct.

9    Q    And all of the accounts show signatories that are

10   authorized to use each one of these accounts?

11   A    Correct.

12   Q    The only account that Ms. Kimberley Tew is associated with

13   is the '8486, Navy Federal Credit Union account, right?

14   A    Yes.

15   Q    So, to state the obvious, when you have gone through what

16   you just did with the government, all of the accounts, other

17   than that one, were exclusively controlled by somebody other

18   than Ms. Kimberley Tew?

19   A    Yes.

20   Q    When we're talking about Navy Federal Credit Union, account

21   '8486, you have described it, others have described it, as a

22   joint account; is that correct?

23   A    That's correct.

24   Q    All right.  So, a joint account means that either party

25   would have the ability to move money around, deposit, withdraw,

MATTHEW MORGAN - Cross

1   have control of that account?

2   A   Correct.

3   Q   And there were some places in your testimony where you had

4   referenced checking, Kimberley Tew, when it was relating to

5   this '8486 account; is that fair to say?

6   A   I think that's fair to say.

7   Q   Yes.  And we've had previous testimony having to do with

8   reading these account statements that have indicated, and I

9   want to know whether, in your review of them, it was

10  consistent, that sometimes when a name came up, as it related

11  to '8486 it would just say Kimberley Tew, even though that

12  account could be controlled by both Kimberley and Michael Tew?

13  A   Correct.

14  Q   So, I just want to clarify, for the jury, that when you are

15  looking up and saying checking account, Kimberley Tew, really

16  to complete that, if it was an '8486, it would be checking

17  account of Kimberley and Michael Tew?

18  A   They would be the signers on the account.

19  Q   Right.  You understand what I'm saying, sometimes both

20  names aren't there when you referenced them?

21  A   Right.

22  Q   And basically what you have done, with a lot more detail

23  than I'm about to describe it, is that you tracked the money

24  coming out of National Air Cargo into where -- what accounts it

25  went into.

MATTHEW MORGAN - Cross

1   Q   Correct.  That was primarily with all of the documents that

2   you have just gone through, in great -- greater detail, that's

3   what you did?

4   A   Yes.

5   Q   So, if we look at 1002.  If we could put that up?  What we

6   see here are the payments of the invoices by company?

7   A   Correct.

8   Q   And just to look at it a slightly different way, but with

9   the same information in 2018, when it came to Hannah Scaife,

10  Jessamine and Meyers Consulting Group, that was the year -- the

11  end of the year, basically quarter three and four, where any

12  money went into those three accounts --

13  A   On --

14  Q   -- from NAC?

15  A   These are the one -- yeah.  These are the names on in the

16  voices.

17  Q   Right.  Okay.  And -- okay.  We will get to the next one.

18  That's the name of the invoice, made out to these companies?

19  A   Correct.

20  Q   But, past Q4 of 2018, they were out of that picture?

21  A   Correct.

22  Q   And if you look, just roughly, the money that was paid to

23  those three, ended up being, oh, approximately $265,000 --

24  actually $265,125?

25  A   Okay.

MATTHEW MORGAN - Cross

1    Q    Is that right?

2    A    Yeah, that sounds correct.

3    Q    Okay.  And so the balance of these fraudulent invoices and

4    that were paid out went into Political Media, Global Fuel

5    Logistics and Aero Maintenance Resources, the balance being

6    somewhere four-million-seven-hundred-plus-thousand dollars?

7    A    Okay.  Give or take, yeah.

8    Q    Right.  Give or take.  Likewise, if you look at 1003,

9    please.  And 1003 is a little different way of looking at very

10   similar figures; is that right?

11   A    This is looking at where the deposits went.

12   Q    Okay.  The one before that was the companies that the

13   invoices were to, and this is where the actual deposits went?

14   A    Yes.

15   Q    The only deposits that went in, and I guess this is, in

16   some ways, a different way of saying the same thing, I asked

17   you about, before, but with some numbers attached to it.  The

18   only -- the only accounts that any of this money went into,

19   which was reflected in that first graph -- not graph, but

20   table, are -- that involves Ms. Kimberley Tew, is the ones that

21   were in '8486?

22   A    That's the one account that Kimberley and Michael are both

23   signers on the account.

24   Q    All of the other accounts, and this is just a

25   recapitulation in a different way of the first table, Kimberley

MATTHEW MORGAN – Cross

1  Tew does not have a controlling signatory responsibility?

2  A    She is not a signer on the account.

3  Q    Right.  And when you look at '8486, the activity in that

4  was really just in 2019, quarter one and quarter two?

5  A    Correct.

6  Q    Let's look at 1004, and we will just -- covered a lot of

7  this ground.  Just point a few things out.  So, again, this is

8  just what you have done in the remaining documents that we're

9  going to look at, the schematic, so to speak, is that this is

10  the invoices that created money coming out of Signature Bank

11  which is the National Air Cargo account, right?

12  A    Correct.

13  Q    And let me ask you something about this.  You looked at a

14  bunch of invoices, that you took to see what the invoices said

15  and then what they motivated, in terms of payment; what the

16  invoices created in terms of a expenditure and signature back,

17  right?

18  A    Yeah.

19  Q    A lot of what you showed the jury here were emails attached

20  to the invoices that you had an opportunity to review; is that

21  right?

22  A    Correct.

23  Q    And when you reviewed those invoices, those were invoices

24  that occurred kind of inside the National Air Cargo

25  organization?

MATTHEW MORGAN - Cross

1   A    I think some of those emails were outside of that, as well.

2   Q    But they were sent from somebody outside, and then into the

3   National Air Cargo for payment?

4   A    Correct.

5   Q    And many of the emails that were attached to that, perhaps

6   the majority, had Jonathan Yioulos' name somewhere involved?

7   A    That's correct.

8   Q    And so what you are seeing, in terms of tracking this, is

9   some of the inner workings of how National Air Cargo paid out

10  when invoices came in from vendors, that it looked like they

11  were responsible to pay?

12  A    Correct.

13  Q    Kimberley Tew was not on those correspondence, that were

14  going to NAC, that motivated the invoices?

15  A    Her name -- if I recall correctly, her name was not in the

16  *to* or *from*.

17  Q    And if we look at 1004, you see that it's the National Air

18  Cargo, the invoices, Signature Bank, got -- received invoices

19  for Hannah Scaife, Michael Meyers and Jessamine, the companies

20  that we just covered, right?

21  A    Correct.

22  Q    And then we look at where they were paid out.  Again, this

23  is basically what you are doing.  And on the last column, it

24  shows where they were paid, and then the counts that were

25  related to those payments?

MATTHEW MORGAN - Cross

1   A   Correct.

2   Q   So if we look at that column over to the right, where those

3   counts are shown, you can see that what's related to Count 1 of

4   the Indictment, that you reviewed, right?

5   A   Um, do you mean Count 2?

6   Q   Yes.

7   A   Okay.

8   Q   I mean, you had to review it to put it in your graph,

9   right?

10  A   Right.  Yes.

11  Q   Was that something the government gave you, in terms of

12  what account affiliated to what payment?

13  A   It's in the Indictment.

14  Q   Right.  So, you reviewed, in order to put it into this

15  particular graph, the Indictment?

16  A   Correct.

17  Q   You didn't create the Indictment?

18  A   No.

19  Q   You just reviewed it, to see what you could see, was

20  related between the counts and the movement of the money that

21  you have tracked?

22  A   Correct.

23  Q   All right.  So, when we look at this, we see that Count 2

24  was an invoice that ended up being paid into Michael Tew's

25  Guaranty Bank account '7867; is that right?

MATTHEW MORGAN - Cross

1    A    That's correct.

2    Q    That account is -- only names Michael Tew and Jon Yioulos?

3    A    Okay.

4    Q    Is that right?

5    A    I don't remember off the top of my head.  I would have to

6    review it.

7            MR. KAPLAN:  Could I have, to refresh his

8    recollection?

9            THE COURT:  Yes.  Mr. Keech.

10           MS. WEISS:  What are you showing him?

11           MR. KAPLAN:  The Indictment.

12           MS. WEISS:  Thank you.  I don't need to see it.

13           MR. KAPLAN:  Do you need a copy?

14           MS. WEISS:  Seen it once or twice.

15   A    It does say Jonathan Yioulos and Michael Tew.

16   Q    And that's where you would have drawn it from?

17   A    Correct.

18   Q    If you look at Counts 3, 4, and 5, that are also counts

19   that in each count mentions Michael Tew and Jon Yioulos?

20   A    Correct.

21   Q    Not Ms. Kimberley Tew?

22   A    Correct.

23   Q    And Count 3 and 4 are the money going from the Meyers

24   invoice, into an account controlled by Mr. Meyers?

25   A    Yes.

1275

MATTHEW MORGAN - Cross

1    Q    Moving on to Count 6, which is into Jessamine, and it

2    shows, November 27th, 2018, for $30,000, that is Count 6, that

3    also exclusively names Michael Tew and Jon Yioulos?

4    A    Correct.

5    Q    And then finishing, I believe this page off, Count 7, which

6    is another Mr. Meyers' account, showing December 12th, $25,000

7    amount, that's also a count in the Indictment that's only

8    Michael Tew and Jon Yioulos?

9    A    Correct.

10   Q    If you look at the dates of the ones that cover Counts 2

11   through 7, that we went over, and I have written, and you can

12   take a quick glance yourself, they cover the dates August 8th

13   2018 to December 21st, 2018; is that fair to say?

14   A    I'm sorry, can you repeat?

15   Q    Yes.  If you look at the dates that accompany these Counts

16   that we just went over, in the Indictment, the dates of these

17   Counts that you just described to the jury, begin August 8th,

18   2018, and end December 21st, 2018?

19   A    Um, December 12th, I believe.

20   Q    Maybe I trans -- yes.  You are right.  I did -- I

21   transposed them, where I used them.

22          That is within time period of Q3 and Q4 of 2018?

23   A    Yes.

24   Q    So, if we look back and -- put 1002 up for a quick moment.

25   So, if we look back and we see what was pointed out before

MATTHEW MORGAN - Cross

1    that, if you take a look at the companies that we just covered,

2    Ms. Scaife, Ms. Jessamine -- excuse me -- Ms. Scaife, Jessamine

3    Development and Meyers Consulting, those are all of the counts

4    that covered that period of time, 2018 Q3 Q4, that was

5    contained in your thousand four exhibit?

6    A    Yes.  Right.

7    Q    And what we've gone through, is that Ms. Kimberley Tew is

8    not mentioned in one of those counts?

9    A    Correct.

10   Q    If we can look at Exhibit 1005.  So, this is what you have

11   described as the money going out of National Air Cargo, going

12   into Political Media, as the result of an invoice or invoices,

13   and then how that money got distributed into other accounts,

14   correct?

15   A    Correct.

16   Q    And you can see that some went -- well, at least you show

17   an arrow, Political Media, although there's no specific Counts

18   addressed, you do say that there were deposits totaling

19   $41,500?

20   A    That's correct.

21   Q    And on the other side of this, you see money going into

22   Sand Hill, a company that had an account at Wells Fargo, '6934?

23   A    Correct.

24   Q    And the signatory on that is Michael Tew?

25   A    Yes.

MATTHEW MORGAN - Cross

1    Q   So, let's look, for a minute, at the beginning of -- excuse

2    me, at the middle of this, where it's '8486.  You see that ...

3    you show Counts -- or the ... the exhibit shows Counts 8, 9, 10

4    and 11?

5    A   Correct.

6    Q   And 8, 9, 10 and 11 are the Counts that are put into Navy

7    Federal Credit Union, '8486, the joint account, correct?

8    A   Yes.

9    Q   And if you look at Count 8, that's just a Michael Tew, Jon

10   Yioulos account?

11   A   In the Indictment, yes.

12   Q   Yeah.

13   A   In the Indictment.

14   Q   And if you look at Count 9 in the Indictment, it describes

15   the joint account, and the parties indicted are just Michael

16   Tew and Jon Yioulos?

17   A   Correct.

18   Q   If you look at Count 10, again, this is the account '8486,

19   that, at times, you referred to as the Kimberley Tew account;is

20   that correct?

21   A   Um ...

22   Q   In your previous testimony?

23   A   Possibly, yeah.

24   Q   All right.  But in Count 10, in this joint account, the

25   parties that are involved in the Indictment, and charged in the

MATTHEW MORGAN - Cross

1   Indictment, is not Ms. Kimberley Tew, but Mr. Michael Tew and

2   Mr. Jon Yioulos?

3   A    Correct.

4   Q    And, finally, Count 11 is the same, that it's the joint

5   account that, at times, have been referred to as Kimberley Tew

6   account, but in the Indictment, the individuals charged with

7   Count 11, is really Michael Tew and Jon Yioulos?

8   A    Correct.

9   Q    Let's look at 1006.  Repeating what the jury probably

10  knows, but for context, right now, National Air Cargo paid

11  invoices to Global Fuel Logistics, and Global Fuel Logistics

12  then paid it into these accounts?

13  A    Um --

14  Q    The money went --

15  A    The money went into these accounts, correct?

16  Q    Fair enough.  And when we look across, what we see is every

17  account that the money went into, on this exhibit, is an

18  account controlled by somebody other than Ms. Kimberley Tew?

19  A    Correct.

20  Q    If you look, for example, at the Michael Tew account, the

21  second one in from the left, that's the National -- excuse

22  me -- Navy Federal Credit Union, account '5336.  Do you see

23  that one?

24  A    Correct.

25  Q    There are a bunch of Counts there, and in each one of those

MATTHEW MORGAN - Cross

1    Counts, the language of the Indictment is exactly the same,

2    which is an Indictment that describes money going from a

3    Signature Bank account, which is a National Air Cargo account,

4    right?

5    A    Yes.

6    Q    Into a -- into the account that's at Navy Federal Credit

7    Union, '5336?

8    A    Right.

9    Q    And that's how the Indictment is fashioned and described

10   for those Counts, that are depicted as -- in the column I'm

11   just talking about?

12   A    Correct.

13   Q    And then let's look at 1007.  Signature account, at

14   National Air Cargo, invoices that went to National Air Cargo,

15   and then resulted in -- well, the invoices had to do with Aero

16   Maintenance Systems, which ended resulting in deposits being

17   made into these accounts?

18   A    Yes.

19   Q    And once again, which is reflective of really the very

20   first page, where you put the bank accounts, all of these

21   accounts are controlled by people, other than Kimberley Tew?

22   Signatories?

23   A    Yes.

24   Q    And they are familiar, at this point, in some manner, we've

25   got Michael Tew in '5336, Global Fuel Logistics, which is a

MATTHEW MORGAN - Cross

1    Michael Tew signed account, and Wells Fargo, Sand Hill, with a

2    Michael Tew, and Global Fuel Logistics, with Michael Tew as the

3    authorizing party?

4    A    Correct.

5    Q    And if you look at the first column, for instance, the

6    '5336, what you have done, when you looked at the accounts that

7    the money that was transferred, in that column, every count of

8    the Indictment that you see there, 25, '6, '7, '8, 31, 32, 33,

9    34 and 37, are described as just what this depicts; money going

10   from a signature account into the '5336 account?

11   A    Correct.

12   Q    And that's just across the board?  That's how -- that's

13   what you did.  You look at the next one, and the money going

14   into Michael Tew, each of those accounts, have that identical

15   language, the same language into each of these accounts, which

16   is, if you look at this, you can see that the money went from a

17   signature account into a Michael Tew controlled account?

18   A    Correct.  Or he is the signer on the account.

19   Q    Okay.

20        MR. KAPLAN:  If I can have a moment?  Nothing further.

21        THE COURT:  Thank you, Mr. Kaplan.  Mr. Schall?

22                     **CROSS-EXAMINATION**

23   BY MR. SCHALL:

24   Q    Good morning.

25   A    Good morning.

MATTHEW MORGAN - Cross

1    *Q*   I promise I will be brief.  You have given us enough time.

2          *MR. SCHALL:*  If you could, Ms. Rodriguez, pull up

     Government's Exhibit 203.

3

4    *Q*   Mr. Morgan, I think you said this is one of the records

5    that you reviewed?

6    *A*   Yeah.

7          *MR. SCHALL:*  Can you zoom in on the account holders,

8    please, Ms. Rodriguez?

9    *Q*   And, Mr. Morgan, does that show more than one account

10   holder?

11   *A*   It shows Michael Meyers and Somer Meyers.

12   *Q*   Do you know who Somer Meyers is?

13   *A*   I believe that's his wife.

14         *MR. SCHALL:*  If you could go to Exhibit 301,

15   Ms. Rodriguez?

16   *Q*   Can you see this, Mr. Morgan?

17   *A*   Yep.

18   *Q*   Do you see how a fair amount of the information is

19   redacted?

20   *A*   Yes.

21   *Q*   Did you redact it?

22   *A*   No.

23   *Q*   Do you know who did?

24   *A*   Um, like -- I don't know exactly who did it.

25   *Q*   Okay.  But is this a different account -- the first one was

MATTHEW MORGAN - Cross

1    for Regions Bank, with Michael and Somer Meyers.  Is that -- do

2    you remember that?

3    A    Yes.

4    Q    And this is also an account for Michael Meyers?

5    A    Correct.

6    Q    Would you agree with me if I said there would be no reason

7    for something to be redacted, if there wasn't something

8    underneath it?

9    A    I -- generally, my experience, yes.

10   Q    Right.  So it appears that a secondary holder of this

11   account was, for some reason, redacted on this?

12   A    It would appear, yes.

13         MR. SCHALL:  I you could pull up, Ms. Rodriguez, the

14   top of Government's Exhibit 1002.

15   Q    Mr. Morgan, you would agree with me that you are not a

16   juror?

17   A    Correct.

18   Q    And you are not a prosecutor?

19   A    Yeah, nope.

20   Q    And you did not draft the Indictment?

21   A    I did not.

22   Q    And it is not your job to determine evidence -- to

23   determine guilt or innocence?

24   A    That's correct.

25   Q    But you did produce Government's Exhibit 1002 and 1003?

MATTHEW MORGAN - Redirect

1   *A*   Correct.

2   *Q*   And you did use it in the title of those exhibits, the word

3   *fraudulent* –– words *fraudulent invoices*?

4   *A*   Correct.

5   *Q*   Were you instructed to use those words?

6   *A*   I do not recall exactly how the title was created.

7   *Q*   Okay.

8           *MR. SCHALL:*  Nothing further, Your Honor.

9           *THE COURT:*  Thank you, Mr. Schall.  Ms. Weiss, any

10  redirect?

11          *MS. WEISS:*  Yes.  Thank you, Your Honor.  Very

12  briefly.

13                    **REDIRECT EXAMINATION**

14  *BY MS. WEISS:*

15  *Q*   Hi, Mr. Morgan.

16  *A*   Hello.

17          *MS. WEISS:*  Can we please pull up Government's Exhibit

18  303?  Maybe let's just get the top half of it, Ms. Ortiz.

19  Okay.

20  *Q*   Mr. Morgan, this is part of the signature card for the Navy

21  Federal Credit Union accounts, right?

22  *A*   Correct.

23  *Q*   And there's one signature card that applies across all of

24  those accounts, regardless of whose name is ––

25  *A*   Yes.

MATTHEW MORGAN – Redirect

1    Q    And is that because Navy Federal Credit Union uses a

2    singular access number for a person?

3    A    Yes.  That's correct.  This is correct.

4    Q    Do you have an understanding of what you need to have in

5    your background to qualify for one of those accounts with Navy

6    Federal Credit Union?

7    A    It's my understanding, a relationship to someone who has

8    experience or some past history with the Navy.

9    Q    Okay.  And so, is this first page about membership

10    eligibility?

11    A    Yes.

12    Q    And what is the sponsoring members first and last name?

13    A    Sponsoring member first name is Dennis and the last name is

14    is Vertanen.

15    Q    V E R T A N E N?

16    A    Yes.

17    Q    Do you still have the Indictment in front of you?

18    A    Yes.

19    Q    Could you please use the case caption to refresh your

20    recollection on Kimberley Anne Tews' first and last names?

21         MR. KAPLAN:  Your Honor, he has not indicated that he

22    needs his recollection refreshed.

23         THE COURT:  Sustained.

24    Q    (By Ms. Weiss) That's correct.  My apologies.  Do you

25    remember Kimberley Ann Tews' maiden name?

MATTHEW MORGAN - Redirect

1    *A*    Yes, I do.

2    *Q*    Can you please tell us what it is?

3    *A*    I'm hoping I'm saying it correctly, Vertanen.

4    *Q*    I want to look at Count 37, which is the last one that we

5    looked at before, again.  And if we could pull up 1007, in the

6    mean time.

7            Mr. Morgan, do you recall you got several questions

8    from Mr. Kaplan about this column?  This is the Aero

9    Maintenance Systems.

10   *A*    Correct.

11   *Q*    That went to the Michael Tew '5336 account?

12   *A*    Correct.

13   *Q*    Okay.  And Michael Tew's name is the only one on that '5336

14   account?

15   *A*    Yes.

16   *Q*    Only a person with access?

17   *A*    Who is the signatory, yes.

18   *Q*    Is the signatory.  To make withdrawals?

19   *A*    Correct.

20   *Q*    Or initiate transfers?

21   *A*    Correct.

22   *Q*    We also looked, though, at the final page, which was the

23   bank statement from that '5336 account, right?

24   *A*    Yes.

25           *MS. WEISS:*  Can we turn back to that?  And again we're

1286
MATTHEW MORGAN - Redirect

1   going to go to Exhibit 236, at Navy 1350.  And once again,

2   Ms. Ortiz, if we could just blow up, starting 5-6, the deposit

3   through the transfer out.

4   Q   Okay.  Mr. Morgan, is this the $85,000 deposit reflected in

5   Count 37?

6   A   Yes.

7   Q   And what happens on that same day?

8   A   On that same day, there's a transfer in of 2,000 from

9   checking, Kimberley Tew, transfer to checking, Kimberley Tew,

10  for $85,000, and then a food transaction.

11  Q   Okay.  And the transfer to checking, Kimberley Tew, that's

12  the joint '8486 account, right?

13  A   I believe so, yes.

14  Q   Okay.  And that happened quite a few times, right?

15  A   Yes.

16  Q   And if we check the bank statements for '5336, will we see

17  transfers to a joint account held by both of them?

18  A   We should, yes.

19  Q   Okay.  And that's true, regardless of the company that was

20  invoicing?

21          MR. KAPLAN:  Leading, Your Honor.

22          THE COURT:  Sustained.

23  Q   Okay.  Did you see that happen more than once?

24  A   I did see it more than once.

25          MS. WEISS:  Okay.  Can we pull back up 1002, again?

MATTHEW MORGAN - Redirect

1  Q    Okay.  Mr. Morgan, we just saw an example of something that

2  was deposited, initially, into '5336, go into that joint '8486

3  account?

4  A    Yes.

5  Q    Okay.  And did you follow that same -- I believe

6  Mr. Kaplan's words were, *track the money* process for Global

7  Fuel Logistics?

8  A    Yes.

9  Q    Political Media?

10  A    Yes.

11  Q    Meyers Consulting Group?

12  A    Yes.

13  Q    5530 Jessamine?

14  A    Yes.

15  Q    And Hannah Scaife?

16  A    Yes.

17         *MS. WEISS:*  Thank you.  No further questions.

18         *THE COURT:*  All right.  Thank you, Ms. Weiss.  The

19  witness is excused and may step down.  Mr. Keech will take care

20  of the documents.  Thank you, sir.

21         It's a little bit early, but I kind of need to take a

22  break for a couple of reasons.  So, why don't we take a

23  ten-minute recess right now, and come back and continue.  So,

24  we will take a ten-minute recess.

25         *THE COURTROOM DEPUTY:*  All rise.

 1          (Jury out at 10:06 a.m.)

 2              THE COURTROOM DEPUTY:  Court is now in recess.

 3          (Recess at 10:06 a.m.)

 4          (In open court at 10:20 a.m.)

 5              THE COURT:  Please take your seats.  Can we bring the

 6      jury back in, and I think this the last witness for the

 7      government?

 8              MR. FIELDS:  It is for the government, Your Honor.

 9              THE COURT:  All right.  Thank you.

10              THE COURTROOM DEPUTY:  All rise.

11          (Jury in at 10:21 a.m.)

12              THE COURT:  Let's take our seats.  Welcome back.  The

13      government, I believe, is going to call its next witness.

14              MR. FIELDS:  Thank you, Your Honor.  The US calls IRS

15      Special Agent Lisa Palmer.

16              THE COURTROOM DEPUTY:  Please face me and raise your

17      right hand.

18          (**IRS SPECIAL AGENT LISA PALMER** was sworn.)

19              THE WITNESS:  I do.

20              THE COURTROOM DEPUTY:  Please be seated.  Please state

21      your name and spell your first and last names for the record.

22              THE WITNESS:  My name is Lisa Palmer, L I S A,

23      P A L M E R.

24              MR. FIELDS:  May I begin, Your Honor?

25              THE COURT:  Yes.

1    **DIRECT EXAMINATION**

2    *BY MR. FIELDS:*

3    *Q*    Ms. Palmer, where do you work?

4    *A*    I work for the Internal Revenue Service, in the Criminal

5    Investigation Division.

6    *Q*    What do you do for the IRS Criminal Investigations

7    Division?

8    *A*    I am a special agent.

9    *Q*    What is a special agent?

10   *A*    A special agent is a criminal investigator.  We are charged

11   with investigating allegations of tax crimes and related crimes

12   such as money laundering.

13   *Q*    Are you familiar with an investigation related to payments

14   made by National Air Cargo to Michael Tew?

15   *A*    I am.

16   *Q*    How are you familiar with it?

17   *A*    I was the primary case agent throughout the investigation,

18   especially during July 2020.

19   *Q*    Who were the subjects of your investigation?

20   *A*    Initially, the subject of our investigation was Michael

21   Tew, and that was expanded to include Jonathan Yioulos and

22   Kimberley Tew.

23   *Q*    During the course of your investigation, did you personally

24   meet with Michael and Kimberley Tew?

25   *A*    I did.

1    Q    Do you see them in the courtroom here today?

2    A    I do.

3    Q    Where are they?

4    A    Michael Tew is at the front table.  He is wearing a dark

5    suit with a white shirt and a tie.  Kimberley Tew is at the

6    back table.  She is wearing a pale blue shirt and a Navy skirt.

7              MR. FIELDS:  Your Honor, I would like the record to

8    reflect the in-court identification of the defendants.

9              THE COURT:  It does.

10   Q    Did you identify the phones that they used to communicate

11   with one another?

12   A    I did.

13   Q    Did investigators obtain communications between the two of

14   them?

15   A    Yes, we did.

16   Q    Did you identify some of those communications as being

17   related to the payments between National Air Cargo and Michael

18   Tew?

19   A    We did.

20   Q    Did you review them before your testimony?

21   A    I did.

22   Q    And are you prepared today to tell the jury about them?

23   A    I am.

24   Q    So, one quick topic, before we get into that.  As part of

25   your investigation, did you reach out to National Air Cargo, in

1    the summer of 2020?

2    A    I did.

3    Q    When was that?

4    A    I first spoke with representatives from National Air Cargo

5    on July 1st, 2020, and then later, I believe, on July 5th, I

6    met with them in person.  Those meetings continued on the 6th

7    and 7th.

8    Q    When were charges first brought against Michael Tew?

9    A    I believe the date was July 8th, 2020.

10    Q    When was the Indictment in this case filed?

11    A    I believe it was either the last week of January, 2021, or

12    the first week of February 2021.

13    Q    All right.  How did you go about figuring out what phones

14    were used by Michael Tew?

15    A    We looked at a bunch of different information sources.  One

16    of the first places we looked was on bank records, as part of

17    opening documents, most people provide an email address and

18    phone numbers.  From there we expanded our search.  We also

19    talked to people; such as, Mr. Yioulos, who provided Mr. Tew's

20    phone numbers.  We also looked at information attached to email

21    accounts, invoices and other communications.

22    Q    Let's look at Government's Exhibit 514, which is not yet in

23    evidence.  Give the computer a second to warm up.  There we go.

24    Do you recognize that?

25    A    I do.

1   Q    What is it?

2   A    This is subscriber information from AT&T®.  It appears to

3   be Michael Tew's phone number.  He had two phone numbers, this

4   particular one was 917-685-1312.

5        MR. FIELDS:  Your Honor, pursuant to the Declaration

6   at Government's Exhibit 1127, the government would move to

7   admit this document.

8        THE COURT:  Any objections?

9        MS. FROST:  No objection, Your Honor.

10       THE COURT:  Okay.  It's admitted.

11  Q    Let's zoom in up at the top.  What does it say for the

12  financial liable party?

13  A    Michael Tew.

14  Q    What is that contact home phone number?

15  A    It's 917-669-7473.

16  Q    What about the email address?  What do you see there?

17  A    Mtew@sandhillrp.com.

18  Q    Scroll down see a little bit.  User information, what --

19  for what phone is this record related to?

20  A    Phone number 917-685-1312.

21  Q    Do you see the billing party box there?

22  A    I do.

23  Q    Do you see an address?

24  A    I do.

25  Q    What is that address?

1  A   3222 East 1st Avenue Apartment 228, Denver, Colorado,

2  80206.

3  Q   Have you been to that building that is at 3222 East 1st

4  Avenue?

5  A   I have.

6  Q   Where did you go when you went to that address?

7  A   We went to Apartment 224.

8  Q   Who was there, when you went to Apartment 224?

9  A   Michael Tew and two minor children.

10  Q   All right.  That was Apartment 224.  Did you find any

11  evidence, during your investigation, that the Tews lived at

12  this other unit, Unit 228?

13  A   We did.

14  Q   What was that?

15  A   The 228 number, apartment, was used fairly consistently on

16  bank records, telephone records and such, prior to about

17  mid-2018.  After 2018, the Apartment 224, was used consistently

18  instead.

19  Q   This telephone number, '1312, were there other records

20  showing that Michael Tew used it?

21  A   Yes.

22  Q   Let's look at Government's Exhibit 303, which is already in

23  evidence, and if we could, let's go to page five.  Are you

24  familiar with this document?

25  A   I am.

1    *Q*    What is it?

2    *A*    It is the membership application which serves as kind of a

3    signature card for Michael and Kimberley's accounts at Navy

4    Federal Credit Union.

5    *Q*    Okay.  Let's go to page five.  Do you see down there at the

6    bottom, the joint owner information?

7    *A*    I do.

8    *Q*    Who do you see listed there?

9    *A*    Michael Tew.

10   *Q*    Okay.  And if we go to the next page, what do you see

11   listed as the primary phone number?

12   *A*    That same AT&T® ending in 1312.

13   *Q*    What do you see as the contact email address?

14   *A*    *Mtew@sandhillrp.com.*

15   *Q*    Let's look at Government's Exhibit 515, which is not yet in

16   evidence.  What is this?

17   *A*    AT&T® subscriber information for a phone number

18   917-669-7473.

19          *MR. FIELDS:*  Your Honor, pursuant to the Declaration,

20   at Government's Exhibit 1127, the government would move this

21   exhibit into evidence.

22          *THE COURT:*  Any objection?

23          *MS. FROST:*  No objection, Your Honor.

24          *THE COURT:*  Exhibit 515 is admitted.

25   *Q*    Now, you just read out a telephone number for us.  Where do

1    you see this on this document?

2    *A*    Under the user information.

3    *Q*    And then what do you see there for the name?

4    *A*    Michael Tew.

5    *Q*    And email address, again?

6    *A*    *Mtew@sandhillrp.com.*

7    *Q*    All right.  Were there other records showing that Michael

8    Tew also used this -- were there other records showing that

9    Michael Tew used this number ending in '7473?

10   *A*    Yes, there were.

11   *Q*    Let's take a look at Government's Exhibit 505, which is not

12   yet in evidence.  Are you familiar with these records?

13   *A*    I am.

14   *Q*    What are they?

15   *A*    These records reflect the purchase of an Audi®.  I believe

16   it was purchased in November 2019.

17          *MR. FIELDS:*  Your Honor, pursuant to the Declaration,

18   at Government's Exhibit 1131, the government would move into

19   evidence, Government's Exhibit 505.

20          *THE COURT:*  Any objection?

21          *MS. FROST:*  (Shakes head)

22          *THE COURT:*  It's admitted.

23          *MR. FIELDS:*  Could we go to page four, please?  And

24   let's blow up the top there.

25   *Q*    What is this

1  A   This is a retail installment contract for the purchase of

2  that Audi®.

3  Q   What do you see as the name there?

4  A   Michael Tew.

5  Q   What address?

6  A   It's 3222 East 1st Avenue, Apartment 224, Denver, Colorado

7  80206.

8  Q   What phone number did -- did Michael Tew leave here?

9  A   It's 917-669-7473.

10  Q   And the email address again?

11  A   Mtew@sandhillrp.com.

12  Q   Finally, let's look at Government's Exhibit 473, which is

13  not yet in evidence.  What is this?

14  A   This is a application information form from American

15  Express.

16      MR. FIELDS:  Pursuant to the Declaration, at

17  Government's Exhibit 1129, the government would move this

18  exhibit into evidence.

19      THE COURT:  Hearing no objection, it's admitted.

20  Q   All right.  Let's, if we can, just blow up the box around

21  application.  There we go.  What name do you see there?

22  A   Michael Tew.

23  Q   What do you see as the listed home telephone number?

24  A   The home telephone number is that same AT&T® number ending

25  '7473.

1    *Q*    What do you see listed as the business phone number?

2    *A*    That AT&T® phone number ending '1312.

3    *Q*    All right.  We can take that down, please.  How did you go

4    about figuring what phones were used by Kimberley Tew?

5    *A*    Similar process.  We obtained information, first, from

6    places such as banks, credit unions and then kind of expanded

7    our circle with interviews and also Court orders to email

8    providers, Internet service providers and ultimately with

9    interviews.

10   *Q*    Let's look at Government's Exhibit 516, which is not yet in

11   evidence.  What is this?

12   *A*    This is AT&T® subscriber information for the phone number

13   917-446-2046.

14        *MR. FIELDS:*  Your Honor, pursuant to the Declaration,

15   at Government's Exhibit 1127, government would move for the

16   admission of Government's Exhibit 516.

17        *THE COURT:*  Hearing no objection, it's admitted.

18   *Q*    All right.  Let's zoom in on the user information.  Who do

19   you see listed there as the user of 917-446-2046?

20   *A*    Kimberley Vertanen.

21   *Q*    Now, let's compare this one.  If we could put 516 on the

22   left and 515 on the right?  Okay.  If you zoom in there at the

23   top for the credit address on both of these documents.  What do

24   you see?

25   *A*    I see 3222 East 1st Avenue, Apartment 228, in Denver,

1    Colorado, for both of them.

2    Q    All right.  Finally, let's look at Government's Exhibit

3    303, one more time.  If we go to page two, what do you see here

4    for the personal information, for the user of this Navy

5    account?

6    A    The the person listed is Kimberley Tew, and the primary

7    phone number listed is 917-446-2046.

8    Q    All right.  And while we're here on page two, what is

9    listed as the email address associated with Kimberley Tew?

10   A    *Kley@me.com.*

11   Q    Was there other evidence indicating that Ms. Tew used that

12   email address?

13   A    Yes.

14   Q    What evidence?

15   A    Again, it was listed on multiple financial statements.  She

16   also provided it on an invoice that she provided to National

17   Air Cargo.  We obtained subscriber information from Apple™,

18   which listed Kimberley Tew as the owner of that account, and

19   also through interviews.

20   Q    Let's look at another exhibit that's not yet in evidence.

21   Government's Exhibit 313.  What is this?

22   A    It is customer information for Kimberley Tew.  I am -- give

23   me a moment.  I do not recall the financial institution.

24   Q    Let's move on to Government's Exhibit 474.  Do you

25   recognize this document?

1299

1    *A*   Yes.   That is the application for Kimberley Tew for an

2    American Express account.

3         *MR. FIELDS:*   Pursuant to the Declaration, at

4    Government's Exhibit 1129, the government would move for the

5    admission of Government's Exhibit 474.

6         *THE COURT:*   Hearing no objection, it's admitted.

7    *Q*   Let's zoom in on the application information, if we can.

8    What do you see listed as the name of this American Express

9    applicant?

10   *A*   Kimberley Vertanen.

11   *Q*   What address?

12   *A*   It's 3222 East 1st Avenue, Apartment 228, Denver, Colorado.

13   *Q*   What's the phone number.

14   *A*   It's 917-446-2046.

15   *Q*   Then down there at the bottom, do you see the contact email

16   address?

17   *A*   I do.

18   *Q*   What is it?

19   *A*   *Kley@me.com*.

20   *Q*   Let's look at another exhibit that's not yet in evidence.

21   That's Government's Exhibit 504.

22   *Q*   What is this?

23   *A*   This is account subscriber information from Google.

24        *MR. FIELDS:*   Pursuant to the Declaration, at

25   Government's Exhibit 1141, government would move for the

 1    admission of Government's Exhibit 504.

 2         *THE COURT:*  Any objection?  Hearing none, it's

 3    admitted.

 4    *Q*   What do you see listed at the top there for email address?

 5    *A*   *Kley@me.com*, spelled K L E Y at M E, dot com.

 6    *Q*   Who is that email associated with in this record?

 7    *A*   Kimberley Vertanen.

 8    *Q*   Are you familiar with Google Pay?

 9    *A*   I am.

10    *Q*   What is Google Pay?

11    *A*   It is part of a category called peer-to-peer payments, that

12    basically allow users to pay an email address or a phone number

13    directly, without the use of an intermediary bank.  Other

14    examples might include, CashApp or Venmo and PayPal.

15    *Q*   Now, this email address, *kley@me.com*, is it associated with

16    a certain Internet domain?

17    *A*   Yes.

18    *Q*   What is an Internet domain?

19    *A*   An Internet domain is basically -- at a high level, it's

20    going to be the @, whatever comes after the @.  Common ones are

21    Gmail, Outlook.com; however, companies will often pay for their

22    own domain, which means they're going to pay for the use of

23    that domain and they are also going to manage their own email

24    internally with the use of software.

25    *Q*   This domain, *me.com*, who does that belong to?

1    A    Apple.

2    Q    Did you obtain subscriber information for the *kley@me.com*

3    account?

4    A    We did.

5    Q    Let's look at Government's Exhibit 554, which is not yet in

6    evidence.  What is this?

7    A    This is the subscriber information from Apple for

8    *kley@me.com*.

9         MR. FIELDS:  Pursuant to the Declaration, at

10   Government's Exhibit 1140, the government would move for the

11   admission of Government's Exhibit 554.

12        THE COURT:  Any objection?

13        MS. HUBBARD:  Your Honor, I believe this is a two-tab

14   spreadsheet.  I believe this is only one page.  I would ask

15   that the entire thing be shown.

16        MR. FIELDS:  I agree with that, Your Honor.

17        THE COURT:  That's fine.  It's admitted.

18   Q    All right.  It's a long spreadsheet.  Let's see if we can

19   zoom in a little bit.  Let's zoom in, first of all, on the

20   customer name.  What do you see there?  If you can read it?

21   A    Kimberley Tew.

22   Q    Okay.  Zoom out.  Do you see, is that customer name

23   associated with certain email address?

24   A    It is.

25   Q    What is the email address?

1    *A*    *Kley@me.com.*

2    *Q*    And is that also associated with a certain telephone

3    number?

4    *A*    It is.

5    *Q*    What telephone number?

6    *A*    It is 917-446-2046.

7    *Q*    Then when we get over to street address, do you see a

8    couple of different addresses there?

9    *A*    I do.

10   *Q*    Do you see addresses in Denver, Colorado?

11   *A*    I do.

12   *Q*    What is that address?

13   *A*    It's 3222 East 1st Avenue.  Sometimes there's no apartment,

14   sometimes it says Apartment 228.

15   *Q*    Zoom back out.  Does that keep track of which devices are

16   associated with one of its email accounts at different times?

17   *A*    They do.

18   *Q*    So, what do you see for product description in that column?

19   *A*    So, I see three different iPhones, including iPhone SE

20   White, iPhone Success and iPhone 5, two AirPods Pro, two Apple™

21   Pencils, an iPad Air and then an MBA.

22   *Q*    Take that down.  Did you also obtain what is called header

23   information for emails sent from this *kley@me.com* account?

24   *A*    We did.

25   *Q*    What is header information?

1  *A*    Header information is basically -- it is the *to* and *from*

2  information on the emails that you can send.  It doesn't

3  contain any content.  So, subject headers, the emails,

4  themselves, are not contained, but it will include time, date,

5  sender, receiver.  And then anyone who has been copied or blind

6  copied on the account.

7  *Q*    Did you review that header information?

8  *A*    I did.

9  *Q*    What, if anything, did you see of significance in that

10  header information?

11  *A*    For which account?

12  *Q*    For the *kley@me.com*?

13  *A*    I do not recall, but if you wanted to -- if there was

14  something that could refresh my memory.

15  *Q*    We will move on.

16  *A*    Okay.

17  *Q*    Did you obtain Cellebrite reports from the FBI?

18  *A*    I did.

19  *Q*    How did the FBI get those Cellebrite reports over to you?

20  *A*    They provided me a hard drive, physical hard drive, that

21  contained the reports, and I picked it up from them, or they

22  gave it to me one day.  I don't remember if I went there or if

23  they came to me.

24  *Q*    Did you access the hard drive?

25  *A*    I did.

1    Q    What was on the hard drive?

2    A    The hard drive contained three files, there was a

3    Cellebrite executable, there was a Cellebrite file, a UFDR file

4    and then there was a text file containing the MD5 hash for the

5    combined UFDR file.

6    Q    Did you look at that hash file before your testimony?

7    A    I did.

8    Q    Let's look at Government's Exhibit 569, which is already in

9    evidence.  If we zoom in up at the top.

10            When you reviewed the hash, in that text file, on the

11    hard drive that you got from the FBI, and you compare it to

12    what's on Government's Exhibit 569, what did you see?

13    A    The file on the hard drive provided to me included the hash

14    value, second from the bottom, beginning 0027.

15    Q    What was the name of that file?

16    A    Combined .UFDR.

17    Q    We can take that down, please.  Does Cellebrite allow

18    agents to filter messages according to telephone number?

19    A    Yes, it does.

20    Q    Was a filtering process done in this case?

21    A    Yes.

22    Q    Were you given filtered messages between the telephone

23    numbers that we have been talking about?

24    A    Yes, I was.

25    Q    Those are the telephone numbers ending '1312, '7473 and

1    '2046?

2    A   Yes; that's correct.

3    Q   After being given those messages, did you take any steps to

4    determine whether what you were looking at were actually

5    messages between Michael Tew and Kimberley Tew?

6    A   Yes.  So, one was context clues; does it appear like these

7    two people are actually talking to each other?  Then, looking

8    at the contents of the messages, themselves, did -- were there

9    other clues or indicators that it was Michael and Kimberley?

10   So, for example, were there photos of their children?  Were

11   they talking about information that only Michael and Kimberley

12   would know?  Then, lastly, I took what was in the contents of

13   the messages and compared it to other evidence that I had

14   gathered for this case; such as, bank records, witness

15   statements, and in some cases other text messages, and overall,

16   the conclusion I came to was the text messages were indeed

17   between Michael and Kimberley.

18   Q   So, we have been talking about the *kley@me.com* account.

19   Did you identify any other emails accounts of interest to your

20   investigation?

21   A   Yes, we did.

22   Q   What email accounts?

23   A   There were several.  One was *chrisrncn@gmail.com*, another

24   was *meyersconsultinggroupinc@gmail.com*, we also had

25   *political.media.wdc@gmail.com*, and *accounting@globalful.co*.

1  *Q*  Let's start with that *chrisrncn@gmail.com* account.  What

2  was significant about that account?

3  *A*  That account was used to send email containing fraudulent

4  invoices to Mr. Yioulos' email at National Air Cargo.

5  *Q*  *Gmail.com*, who owns that domain?

6  *A*  Google.

7  *Q*  Did the investigative team obtain records from Google

8  associated with that account?

9  *A*  Yes, they did.

10  *Q*  Let's look at Government's Exhibit 520, which is not yet in

11  evidence.  What is this?

12  *A*  This is Google subscriber information for the account

13  *chrisrncn@gmail.com*.

14      *MR. FIELDS:*  Your Honor, pursuant to the Declaration,

15  at Government's Exhibit 1109, the government would move for

16  admission of Government's Exhibit 520.

17      *THE COURT:*  Hearing no objection, it's admitted.

18  *Q*  Before we get into this record, do you personally use

19  gmail?

20  *A*  I do.

21  *Q*  How do you create a gmail account?

22  *A*  You go to *gmail.com*, and you select -- you enter into what

23  your email address to be, hopefully it's available, and then

24  Google asks you to provide limited information about yourself,

25  your name, a backup phone number and backup email address, in

1   the event that you lose your password, so they can send a reset

2   code to those phone numbers and email accounts.

3   Q   When Google asked you for information, can you put in any

4   information you want?

5   A   Yes.

6   Q   So, if you wanted, to could you associate it with someone

7   else's name?

8   A   Yes.

9   Q   How would you do that?

10  A   You will just put in a different name.  I could put in that

11  my name is was *Diana Prince*, and that my email was *Wonder Woman*

12  *at Wonder Woman* and Google would not stop me.

13  Q   Let's look at Government's Exhibit 520, if we could.  Let's

14  blow up where -- you know, between this, sort of, hash tags.

15          All right.  So, what do you see listed there as the

16  name associated with this *chrisrncn@gmail.com* account?

17  A   Chris Rincon.

18  Q   Can you tell, from the face of the record, whether Chris

19  Rincon is the name of the person who actually created this?

20  A   No, I cannot.

21  Q   Now, let's look at the account recovery information.  So

22  first of all, as a personal user of gmail, do you know what the

23  account recovery function is?

24  A   Yes.

25  Q   What is it?

1    *A*    If you forget your password or get locked out of your

2    account, when you click *forgot password*, either the app or the

3    email, it will -- sorry, the app or the website, Google will

4    send a reset text message or reset email to whatever you list

5    as your recovery contact information.

6    *Q*    If you lose that account recovery, or don't have one, what

7    might happen to your access to the account?

8    *A*    You are locked out of the account permanently.  Ultimately,

9    the account will get deleted.

10   *Q*    What number is listed here, as the account recovery number,

11   associated with this *chrisrncn@gmail.com* account?

12   *A*    Michael Tew's AT&T® number 917-685-1312.

13   *Q*    If we could, let's put Government's Exhibit 520 on the

14   left-hand side of the screen, and then put Government's Exhibit

15   514 on the right-hand side of the screen.  What do you see when

16   you compare these two records?

17   *A*    The phone number listed on the AT&T® records is the same

18   phone number that's listed on the Google subscriber records.

19   *Q*    On the AT&T® record, who is that '1312 number associated

20   with?

21   *A*    Michael Tew.

22   *Q*    All right.  Going back just to Government's Exhibit 520.

23   Can you tell when this account was created?

24   *A*    I can.

25   *Q*    What do you see there?

1    *A*    It was created on August 22d, 2018.

2    *Q*    Can you circle that for us on your screen?  Thank you very

3    much.  Did you obtain header information for this account?

4    *A*    We did.

5    *Q*    When you reviewed that header information, what did you

6    discover?

7    *A*    Aside from a few cursory emails from Google, as part of

8    account setup, it appeared that this account was solely used to

9    communicate with *jyioulosnationalaircargo.com*.  I might have

10   that email address wrong, but it was the account used by

11   Mr. Yioulos, while he worked for National Air Cargo.

12   *Q*    All right.  Now, let's take that down, please.  Now, let's

13   talk about that *meyersconsultinggroupinc@gmail.com* account.

14   What was significant about that account?

15   *A*    That account was also used to submit false invoices to

16   National Air Cargo through Mr. Yioulos' email account during

17   the time of the fraud.

18   *Q*    Did investigators obtain a warrant to seize information

19   from Google, associated with that account?

20   *A*    We did.

21   *Q*    Let's look at Government's Exhibit 524, which is not yet in

22   evidence.  What is this?

23   *A*    This is the Google subscriber information for the

24   *meyersconsultinggroupinc@gmail.com* account.

25              *MR. FIELDS:*  Your Honor, pursuant to the Declaration,

1    at Government's Exhibit 1109, the government would move for

2    admission of Government's Exhibit 524.

3         THE COURT:  Hearing no objection, it's admitted.

4    Q    All right.  Up there at the top, what do you see is the

5    name associated with this account?

6    A    Meyers Consulting Group, Inc.

7    Q    All right.  If we go to account recovery.  What do you see

8    there this time?

9    A    It's blank.

10   Q    Well, do you see a contact email?

11   A    The email address that was created as part of it.

12   Q    But there's no recovery email?

13   A    Correct.

14   Q    So this one doesn't have an account recovery reference.

15   What steps did you take to figure out who might have used this

16   account?

17   A    We looked at the contents of the email account itself, as

18   well as how the account was used.  Since the account was used

19   to transmit the fraudulent invoices, there were few people who

20   could have created the account and had access to it.

21   Mr. Meyers, potentially, Mr. Yioulos, Mr. Tew, Mrs. Tew.

22        So, once we get into the actual emails, it became

23   clear that the account was used by one of the Tews, most likely

24   Kimberley Tew, based on emails within there.  Unlike the

25   Christian Rincon account, this account was used to obtain

1   marketing messages and a couple of receipts for items

2   purchased.

3   Q   Let's look at Government's Exhibit 980, which is not yet in

4   evidence.   Then 981, 982, 983, 984 and 985.   Go back to 984.

5        Those, 980, 981, 982, 983, and 984, were those some of

6   the receipts that you looked at?

7   A   Yes.

8        MR. FIELDS:   Your Honor, pursuant to the Declaration,

9   at Government's Exhibit 1116, the government would move for the

10  admission of those exhibits.

11       THE COURT:   Any objection to those?

12       MS. FROST:   No objection.

13       THE COURT:   All right.   Those are admitted.   Thank

14  you.

15  Q   All right.   And if we look at Government's Exhibit -- let's

16  go to -- well, let's stay here at 984.   So, what do you see --

17  well, first of all, what is this?

18  A   This is an order confirmation from *Zappos.com.*

19  Q   What is Zappos?

20  A   Zappos is online retailer.   I believe they started as a

21  shoe retailer, since expanded into clothing and apparel, in

22  general.

23  Q   What do you see as the shipping address there?

24  A   The shipping address is to Amy Tew, at 3222 East 1st

25  Avenue, Apartment 224.

1    *Q*    Who is Amy Tew?

2    *A*    I don't know.

3    *Q*    Let's go to Government's Exhibit 983.  What is this?

4    *A*    This is an order update for a Saks Fifth Avenue order.

5    *Q*    What is Saks Fifth Avenue?

6    *A*    Saks Fifth Avenue is high-end department store.

7    *Q*    And what do you see for an address and person associated

8    with this order?

9    *A*    Amy Tew, with an address of 3222 East 1st Avenue, Apartment

10   224, Denver, Colorado.

11   *Q*    Zoom out.  And Government's Exhibit 982.  What is this?

12   *A*    This is a shipping -- order confirmation from Lilly

13   Pulitzer.

14   *Q*    What is Lilly Pulitzer?

15   *A*    I believe that is a designer of women's apparel.

16   *Q*    What do you see there as the shipping to address?

17   *A*    Amy Tew, 3222 East 1st Avenue, Apartment 224, Denver,

18   Colorado.

19   *Q*    What's the phone number associated with this particular

20   order?

21   *A*    The AT&T® phone number for Kimberley Tew, 917-446-2046.

22   *Q*    Let's go back to Government's Exhibit 524.  All right based

23   on this record, can you tell when this account

24   *meyersconsultinggroupinc@gmail.com* was created?

25   *A*    It was -- or I can.  It was created on October 12th, 2018.

1    Q    What happens shortly after it was created?

2    A    Meyers Consulting Group sent their first invoice to

3    Jonathan Yioulos at National Air Cargo.

4    Q    Did you check to see exactly when that was?

5    A    I did.

6    Q    When was it?

7    A    I believe it was the same day.

8    Q    Can you tell, from this record, when the last time this

9    account was accessed was?

10   A    It was March 19th, 2020.

11   Q    If we scroll -- first of all, where do you see that?

12   A    Right there where it says last log ins.

13   Q    So there are two?

14   A    Yeah.

15   Q    Just for the record, what's the other one?

16   A    April 2, 2019.

17   Q    This March 19th, 2020 timeframe, what, if anything, is

18   significant about that?

19   A    A few things.  At that point in time, Mr. Yioulos was

20   sending payments not to Meyers Consulting Group, but instead to

21   Aero Maintenance Systems and Global Fuel.  However, on March

22   19th, *meyersconsultinggroupinc@gmail.com*, sent a vague email to

23   Mr. Yioulos saying something along the lines of, *I hear you*

24   *don't want to talk maybe we should email then*.  Despite the

25   fact that Meyers Consulting Group had not received payments

1    from National Air Cargo in several months, if not over a year.

2    Q   Did you look to see if there were communications between

3    the phones associated with Michael Tew and Kimberley Tew around

4    that period of time?

5    A   I did.

6    Q   Let's look at Government's Exhibit 937, which is already in

7    evidence.  All right.  This the first time we have seen one of

8    these.  Orient us to it.  What is this?

9    A   These are text messages or chat exchanges from Cellebrite.

10   If you could zoom in on the first message, I can kind of show

11   how to read it.  So, the blue messages generally appear on the

12   left, and they are going to be messages that were sent to the

13   phone number or account that the Cellebrite is extracted from.

14   The first line is going to be the actual phone number or email

15   address it came from.  In this case, the first message comes

16   from 917-669-7473, MT, that's based on information that was in

17   the Cellebrite, about the contact.  And then on the bottom

18   right of the message, will be the time and date of the message

19   and kind of in the middle is the message content.

20   Q   The time there, do you see UTC plus zero?

21   A   Yes.

22   Q   What is UTC?

23   A   That is Greenwich Mean Time.  So, to convert to Colorado

24   time, you would subtract six hours, to convert to Eastern time

25   you would subtract four hours and so on.

1    Q    All right.  Do you see a black box there?

2    A    I do.

3    Q    Who added those black boxes?

4    A    In some cases, I did.  In most cases it was someone at the

5    U.S. Attorney's Office, as part of our preparation of the

6    exhibits for trial.

7    Q    You added a black box to these exhibits.  What were you

8    trying to hide?

9    A    We were not trying to hide anything.  We, instead, are

10    trying to limit the exhibits to what was only relevant to the

11    messages, the actual charges.  In many cases, the messages

12    would jump from topic to topic.  Some topics would include

13    information about the Tews' physical health or about their

14    children, and we didn't want to include that information,

15    because we felt it wasn't necessary to the case.

16    Q    All right.  If we scroll down a little bit.  Again, just

17    orienting us here.  Do you see the box in green there?

18    A    Yes.

19    Q    What telephone number is that one associated with?

20    A    That's not associated with a phone number.  It's associated

21    with an email address.  *Kley@me.com.*

22    Q    Do you use iCloud?

23    A    I do.

24    Q    Can you send messages using iCloud?

25    A    Yes.

1    Q    How does that work?

2    A    You can associate your -- when you create your iCloud

3    account, you provide an email address, and you can send

4    messages using that email address or your phone number.  So, in

5    this case, the sender or of the green message is *kley@me.com*,

6    that account, and the receiver -- the blue messages are going

7    to be the external accounts.  From an iCloud, you can send from

8    both the phone number and the email address.

9    Q    Let's go back to our earlier discussion about

10   *meyersconsultinginc@gmail.com*, number.  Do you remember when

11   that account was last accessed?

12   A    The two days were March 19th, 2020 and April 2nd, 2020.

13   Q    These messages here, when were they sent?

14   A    March 17th, 2020.

15   Q    How many days before the *meyersconsultinggroupinc@gmail.com*

16   account was last accessed?

17   A    So, it's actually three days, because if we apply that UTC

18   time, this message, *We are coming back soon,* it was actually

19   sent at approximately 6 p.m. on March 16th, just because of,

20   again, that timezone conversion.  So, about three days before

21   the account was accessed.

22   Q    All right, so let's start at the top and read Government's

23   Exhibit 937?

24   A    *Michael, I'm still pressing Jon over texty.  He says now,*

25   *he hopes for tomorrow.  We are coming back soon.  It's getting*

1     *cold.*

2              *Kley@me.com, say, Jon, I'm not kidding, we are sending*

3     *you your BTC, and was going to send two BC, price is so low,*

4     *but just need some plan.*

5     Q    Keep scrolling down.  Go back up.  Have you grown up in the

6     Internet age?

7     A    Yes.

8     Q    Do you know some Internet slang?

9     A    Unfortunately.

10    Q    BC what is that short for?

11    A    Because.

12    Q    Now, let's look at Government's Exhibit 938, which is

13    already in evidence.  What is this?

14    A    This is another section of the Cellebrite chat report.

15    Q    What date?

16    A    March 18th, 2020.

17    Q    How many days before that

18    *meyersconsultinggroupinc@gmail.com* account was last accessed?

19    A    One.

20    Q    Let's read these, please.

21    A    *Kley@me.com, I messaged Jon.  Truthfully we owe him our*

22    *lives.  He saved us and helped us when no one would.  I thought*

23    *you guys were friends, but all you do is fight.*

24              Michael, *Did it go through, the message*?

25              *Kley@me.com, If more BTC would make this better, I*

1   *understand, and would do it for him.*

2          From my Google Voice.  *I don't know.  I don't want to*

3   *fight or demand or beg from him.  I thought you guys were*

4   *friends.*

5          Michael, *So did I.*

6          *Kley@me.com.  I told him I just want to drive off a*

7   *cliff.  It's really not worth it if he has lost his mind.  He*

8   *really did help us.*

9          Michael, *We don't have a choice, so he has to send*

10  *more.*

11         *Kley@me.com, I don't think he ever knew how bad it*

12  *was.*

13         *Why won't he just reply?*

14         Michael, *He claims he is busy.*

15         *Kley@me.com, he responded?*

16         Michael, *Truthfully he just hates us.  No, that's just*

17  *his MO.*

18         *Kley@me.com, I told her we are working with a*

19  *no-nonsense accountant.  And I am worried about bouncing*

20  *checks.*

21         Michael, *Okay.  Give it 30 minutes to see if he*

22  *responds.  I'm coming back in five.*

23         *Kley@me.com, if he really hates us, we should figure*

24  *something out and get immunity.*

25         Michael, *Yes, I agree.*

1    *Kley@me.com, I told him I would turn myself in and*

2    *negotiate immunity for you, so our kids have a shot.*

3    Q    Now let's look at Government's Exhibit 938 -- '39, which is

4    already in evidence.  What is this?

5    A    This is an email from *meyersconsultinggroupinc@gmail.com,*

6    to Jonathan Yioulos, at National Air Cargo.

7    Q    When was it sent, in relation to the text exchange that we

8    just looked at?

9    A    The next day.

10   Q    Now let's look at Government's Exhibit 940, which is in

11   evidence.  What is this?

12   A    That is a text message exchange from a Cellebrite report.

13   Q    Sent when?

14   A    March 20th, 2020.

15   Q    How many days after the email that we just looked at?

16   A    The following day.

17   Q    Can you read these for us?

18   A    *Kley@me.com I need to know if we will have money on Tuesday*

19   *and how much by next week.*

20        Michael, *I've been trying to find out.  Right now his*

21   *best answer is I hope.*

22        *Kley@me.com, So I am supposed to spend the whole*

23   *weekend wondering*?

24        Michael, *Jon will not answer.  What should I say to*

25   *him to make him answer?  I'm trying.  I'm telling him I have to*

1320

1    *know.  I need to know.*

2         *Kley@me.com, Are you serious?*

3    *Q*   Now let's look at Government's Exhibit 941, which is

4    already in evidence.  What is this?

5    *A*   Another text message exchange from Cellebrite.

6    *Q*   On what date?

7    *A*   March 22, 2020.

8    *Q*   How many days after that email from the

9    *meyersconsultinggroupinc@gmail.com* account?

10   *A*   Three.

11   *Q*   Please read this one for us.

12   *A*   *Kley@me.com, So is he sending on Tuesday for sure?*

13        Michael, *He didn't commit, because now he says he*

14   *can't log in from home.  I'm still trying to get him.  I mean,*

15   *he has to send.*

16        *Kley@me.com, Right.  But he can go to the office?  He*

17   *was there when?*

18        Michael, *He'll have to so yes.  He was there on*

19   *Friday.*

20        *Kley@me.com, So what is his problem?  He will*

21   *obviously have to go in for other things.  Is their banking*

22   *down?*

23        Michael, *He said banking is up; Signature is up.  He*

24   *just has stonewalled me, otherwise.  I keep pressing him.*

25        *Kley@me.com, Is he responding?  Can you get him to*

1   *send tomorrow*?

2          Michael, *He stopped responding.  He stopped responding*

3   *and told me to stop texting him.  I told him I need answers.*

4          *Kley@me.com*, *WTF?*

5          Michael, *I will call him.*

6          *Kley@me.com, Say we have shit that bounced that is*

7   *going to be submitted again.*

8          Michael, *I will tell him.*

9          *Kley@me.com, Better for tomorrow.  He's obviously*

10  *going into office.*

11         Michael, *He's going to have to go in tomorrow.  I*

12  *asked him.*

13         *Kley@me.com, Why is he being such a brat*?

14         Michael, *He hates me.*

15         *Kley@me.com.  Okay.  What do you want me to say*?

16         Michael, *Nothing.  Just try to get as much as I can as*

17  *fast as I can.*

18         *Kley@me.com, But that's not happening.*

19         Michael, *I'm trying being nice, I'm trying being mean,*

20  *I'm trying to threat, I'm trying to help him, I'm trying to*

21  *play ball, I'm trying every method, and he is not responding.*

22         *Kley@me.com, So it's not working.  Great.*

23         Michael, *It's not.*

24         *Kley@me.com, Stop.  I'm stressed out.  When you say*

25  *it's not, it's not.*

1    Michael, *Okay it's working.  I'm working on.  I will*

2    *call him.*

3    *Kley@me.com, That's a lot.  A lie, you just said it's*

4    *not --*

5    MS. HUBBARD:  Your Honor, I would object to the

6    dramatics of the reading.

7    THE COURT:  Okay.  If we can just read it straight, is

8    fine.  Thank you.

9    THE WITNESS:  *That's a lot, a lie, you just said it's*

10   *not.  You've given up.  You already said you would call him.*

11   Then Michael sent an attachment labeled screenshot

12   2020-03-22 at 16.0.05.jpeg.

13   Q   Lets look at page ten. Is this the screenshot?

14   A   It is.

15   Q   What do you see up there at the top?

16   A   I see a JY, and then underneath it is Jonathan.

17   Q   Would you read this one for us.

18   A   *So, no clue?  Is there like an email to someone with a*

19   *ransom request?  They just want cash?  You okay?  Are you*

20   *allowed to go into the office tomorrow?  Some of my stuff that*

21   *I wrote bounced, so I'm just figuring out on my end.  What*

22   *could you possibly want?  It's fucking Sunday.  Jesus, fuck.  I*

23   *can't tell you anything new.  I don't know anything.*

24   Q   Let's go back to page nine.  What's the response after that

25   screenshot?

1323

1   *A    From kley@me.com, He's abusive.  Say you confirmed last*

2   *week, I have shit that bounced.*

3   *Q*    Now let's go to page eleven.  Is there another screenshot

4   there?

5   *A*    There is.

6   *Q*    Let's go to page 12.  Is this that screenshot?

7   *A*    Yes, it is.

8   *Q*    Okay.  And keep going down.  Does it continue from the past

9   screenshot?

10  *A*    Yes, it does.

11  *Q*    Can you continue reading the new text?

12  *A    Seriously, though, I'm sick of this shit.  Like we'll*

13  *finish it this week, hopefully, that's all I can say.  I'm*

14  *literally done.*

15  *Q*    Let's go back to page 11.  What was the response after the

16  screenshot?

17  *A    Kley@me.com, Tell him to respond.  Because we don't want*

18  *Meyers Consuslting to go email or something.  I don't know what*

19  *you have said.  Say you need confirm, because he is sending*

20  *tomorrow.*

21          *Michael, I just said our checks bounced, and I am*

22  *trying to make a plan*.  And then another screenshot was sent.

23  *Q*    Let's look at page 14.  Is this the screenshot?

24  *A*    It is.

25  *Q*    What does it say?

 1   *A    Look, stop yelling at me.  I'm not yelling.  You stick your*

 2   *neck out there for Chris and the company for no money, and I*

 3   *might add that you set up all of his plans and put your ass on*

 4   *the line for him and have no clue what is going on over there.*

 5   *A, I just find that hard to believe or B, you're really going*

 6   *out on a limb for the guy and sticking your neck out there for*

 7   *this job with no plan.  Sure plans change but again hard to*

 8   *believe.*

 9       *The majority of our receivable are craf.  I told you*

10   *that we have zero visibility on their pay dates at the moment.*

11   *Should see money this week, but we don't know when.  So that's*

12   *the exact thing I have said before and I truly do not feel the*

13   *need to repeat.*

14   *Q*   Let's go back to page 13.  What was the response after that

15   screenshot?

16   *A*   Another screenshot.

17   *Q*   So now let's go to page 15.  Is this the screenshot?

18   *A*   Yes.

19   *Q*   Can you continue reading from where you left off last

20   time --

21   *A    I told you that I would update you when I know more, and I*

22   *will I always have.*

23   *Q*   Okay.  Back to page 13.  After those two screenshots, what

24   was the response?

25   *A    Kley@me.com, WTF?  This is more stressful.*

1325

1    Q    Now page 16.

2    A    *Say you need him to send something tomorrow.  Not all of*

3    *it, but something.*

4    Q    All right.  Before this time period, in March 2020, when

5    was the last time *meyersconsultinggroupinc@gmail.com*, had sent

6    an email to Jonathan Yioulos?

7    A    I don't recall exactly, but I believe it was either Q4 of

8    2018 or Q1 of 2019.

9    Q    Q1 and Q4, what does that mean?

10   A    Some time between October and December of 2018 or January

11   and March of 2019.

12   Q    All right.  Now let's talk about

13   *policiticalmedia.wdc@gmail.com*.  What was significant about

14   that account?

15   A    That account was used to send fraudulent invoices in the

16   name of Political Media to Jonathan Yioulos at National Air

17   Cargo.

18            MS. FROST:  Your Honor, I'm going to continue my

19   objection to the term *fraudulent invoices*; that's for the jury

20   to decide.

21            THE COURT:  Understand, but that's her

22   characterization.  Her characterization is her

23   characterization, not something that the jury has to defer to,

24   but go ahead.

25   Q    Did investigators obtain records from Google, associated

1    with that account?

2    A    We did.

3    Q    Let's look at Government's Exhibit 521.  What is this?

4    A    That is subscriber information for

5    *political.media.wdc@gmail.com* from Google.

6         *MR. FIELDS:*  Pursuant to the Declaration, at

7    Government's Exhibit 1109, the government would move for

8    admission of Government's Exhibit 521.

9         *THE COURT:*  Hearing no objections, 521 is admitted.

10   Q    What you do you see there for the name?

11   A    The name is Political Media.

12   Q    If we go to the account recovery information.  What do you

13   see listed there?

14   A    The AT&T® phone number associated with Michael Tew,

15   917-669-7473.

16   Q    What do you see as the recovery email?

17   A    *Mtew@sandhillrp.com*.

18   Q    Have you seen that email before?

19   A    Yes.

20   Q    Where?

21   A    It was listed on the AT&T® records we previously looked at.

22   I believe it was also listed on the Navy Federal Credit Union

23   information we previously looked at, and Sand Hill is Mr. Tew's

24   LLC that he uses for consulting.

25   Q    *Sandhillrp.com*, is that a domain name?

1   *A*   It is.

2   *Q*   Are you aware of any companies in the business of providing

3   domain names to customers?

4   *A*   Yes, I am.

5   *Q*   What are some of those companies?

6   *A*   HostGator and GoDaddy are two large ones.

7   *Q*   Did you obtain records from GoDaddy?

8   *A*   We did.

9   *Q*   Let's look at Government's Exhibit 513, which is not yet in

10  evidence.  What is this?

11  *A*   That is domain information for *sandhillrp.com* from GoDaddy.

12         *MR. FIELDS:*  Pursuant to the Declaration, at

13  Government's Exhibit 1108, the government would move for the

14  admission of Government's Exhibit 513.

15         *THE COURT:*  Hearing no objection, 513 will be

16  admitted.

17  *Q*   All right.  So, let's zoom in a little bit so we can read

18  this.  Now, you said this was *sandhillrp.com*.  Where do you see

19  that?

20  *A*   The second line where it says domain name.  The domain is

21  *sandhillrp.com*.

22  *Q*   Zoom out.  Let's go to page two.  What does it say there,

23  at the top?

24  *A*   It's a legal receipt for ShopperID.

25  *Q*   Let's fast forward a little bit to page five.  Is this

1    another receipt?

2    A    It is.

3    Q    If we zoom in there on the box, row number one, according

4    to this receipt, what was purchased?

5    A    The domain *michaeltew.com*.

6    Q    And if we look at the billing information, what do you see

7    there?

8    A    Michael Tew, and then the address is 3222 East 1st Avenue,

9    Apartment 228 Denver, Colorado.  The daytime phone number is

10   917-669-7473, email address is *mtew@sandhillrp.com*.

11   Q    Go back a little bit.  If you look, it's the row number

12   three, what do you see there?

13   A    It's the domain renewal for *sandhillrp.com* for two years.

14   Q    When was this receipt -- or I guess, when was that two-year

15   subscription purchased?  Can you tell from the receipt?

16   A    Up at the top, the date appears to be 2016.

17   Q    Now, if we go to page four.  Sorry, page three.  What is

18   this?

19   A    That is a legal receipt from GoDaddy.

20   Q    At what time?

21   A    Looks to be March 29th, 2018.

22   Q    About two years after the other receipt we looked at?

23   A    Yes.

24   Q    And then if you look inside the rows there, what do you see

25   as row number one?

 1   *A*    A domain renewal for *sandhillrp.com*, for one year.

 2   *Q*    Again, based on the receipt, who purchased that domain

 3   renewal for one year, in March 2018?

 4   *A*    Michael Tew.

 5   *Q*    All right.  Let's go back to Government's Exhibit 514.  I'm

 6   sorry 521.  Can you tell when this *politicalmedia.wdc@gmail.com*

 7   account was created?

 8   *A*    Yes, December 7th, 2018.

 9   *Q*    Now, where do you see that?

10   *A*    Right there, where it says created on.

11   *Q*    Now let's look at an exhibit that's already in evidence.

12   It's Government's Exhibit 687.  Are you familiar with this?

13   *A*    I am.

14   *Q*    Let's look at on the fourth line there.  What do you see?

15   *A*    At the moment, it's a little blurry.  Give me one moment.

16   It's dated December 7th, 2018, and from Michael, *If the invoice*

17   *comes from QuickBooks® can you just click the link to pay*?

18   *Q*    And on the sixth line?

19   *A*    *You will have in five minutes*.

20   *Q*    Now, let's look at Government's Exhibit 686, which is

21   already in evidence.

22        *THE COURTROOM DEPUTY:*  Actually, 686 is not in

23   evidence.

24        *MR. FIELDS:*  Oh, I apologize.

25   *Q*    Let's look at Government's Exhibit 686.  What is this?

1    A    This is an invoice from Political Media to Mr. Yioulos,

2    when he worked at National.  It's an invoice for $21,250.

3         MR. FIELDS:  Pursuant to the Declaration, Government's

4    Exhibit 1114, the government would move for admission of

5    Government's Exhibit 686.

6         THE COURT:  Hearing no objection, it's admitted.

7    Q    This invoice for Political Media, Inc.,  when was it sent?

8    A    December 7th, 2018.

9    Q    All right.  Let's talk about accounting@globalfuel.co.

10   What was significant about that account?

11   A    That account was used to email fraudulent invoices to

12   Mr. Yioulos, while he worked at National.

13   Q    And in the name of what company?

14   A    Two companies, Political Media -- not Political Media, my

15   apologies.  Global Fuel Logistics and Aero Maintenance Systems

16   Resource.

17   Q    Did you obtain records related to the globalfuel.co domain?

18   A    We did.

19   Q    Who had those records?

20   A    I believe that was also GoDaddy.

21   Q    Let's look at Government's Exhibit 512.  What is this?

22   A    That is domain information for particular ShopperID from

23   GoDaddy.

24        MR. FIELDS:  Pursuant to the Declaration, at

25   Government's Exhibit 1108, the government would move for the

1    admission of Government's Exhibit 512.

2              *THE COURT:*  Hearing no objection, 512 will be

3    admitted.

4    *Q*    All right.  Can you tell, based on this, what domain name

5    we're looking at?

6    *A*    Yes.  We're looking at *globalfuel.co.*

7    *Q*    Now let's look at page two.  What is this?

8    *A*    This is the receipt for a set ShopperID.

9    *Q*    On what date?

10   *A*    July 17th, 2019.

11   *Q*    What does it say for billing information?

12   *A*    Michael Tew, Sand Hill Research Partners, 322 East 1st

13   Avenue, Apartment 228.

14   *Q*    Now, let's go to page four.  Maybe there's not a page four.

15   Actually, sorry.  What I need here is row one, there.  What do

16   you see?

17   *A*    I see a one-year domain registration for *globalfuel.co.*

18   *Q*    Okay.  Let's take that down.  Do you remember telling us

19   earlier about those Cellebrite reports?

20   *A*    I do.

21   *Q*    What information was rendered using Cellebrite?

22   *A*    The contents of the *kley@me.com*, iCloud backup.

23   *Q*    Did, you know, the renderings of the content, associate

24   content with certain telephone numbers?

25   *A*    It did.

1    Q    Did you see any messages where there's only one side of a

2    conversation?

3    A    I did.

4    Q    Which side of the conversation could you see?

5    A    The side that was sending messages to *kley@me.com*, and the

6    associated phone numbers.  Not the messages that the

7    *kley@me.com* account had sent or those associated phone numbers.

8    Q    Who was associated with these, what I call, the one-sided

9    conversations?

10   A    Mr. Yioulos was one of them, and the other side was

11   presumed to be *kley@me.com* or Kimberley.

12   Q    At some point in your investigation, did you personally

13   encounter Kimberley Tew?

14   A    I did.

15   Q    Where did this encounter take place?

16   A    At the Yeti, in -- or in Glendale, near the Cherry Creek

17   mall.

18   Q    When did it take place?

19   A    Oh, I apologize.  I believe it was July 29, 2020.

20   Q    During that encounter, was it clear that you were working

21   to obtain text messages?

22   A    It was.

23   Q    What did Kimberley say to you about your efforts to

24   accomplish this task?

25   A    That she already wiped the devices.

1    Q    Was your encounter at the Yeti store recorded?

2    A    It was.

3    Q    Have you listened to that recording before your testimony?

4    A    I have.

5    Q    Have you specifically listened to an excerpt of that

6    recording related to this specific part of your encounter?

7    A    I have.

8    Q    Marked as Government's Exhibit 584?

9    A    It has.

10    Q    Is that a fair and accurate excerpt of that portion of the

11    report?

12    A    It is.

13         MR. FIELDS:  At this time, the government would move

14    for admission of Government's Exhibit 584.

15         THE COURT:  Any objections.  It's admitted.

16         MR. FIELDS:  Let's play Government's Exhibit 584,

17    please.

18         (Recording was played for the members of the jury.)

19    Q    Did you hear two voices there?

20    A    I did.

21    Q    Which voices do you hear?

22    A    The first voice belongs to Peter Dickerman, he is one of

23    our computer investigative specialists, who was with me that

24    day, the second voice belongs to Kimberley Tew.

25    Q    Let's take that down.  You testified earlier about the

 1    different devices associated with Michael and Kimberley Tew.

 2    Was there evidence that Michael and Kimberley Tew shared cell

 3    phones?

 4    A    Yes.

 5    Q    When you were looking at the Cellebrite, were some of the

 6    messages associated with email accounts instead of phone

 7    numbers?

 8    A    Yes.

 9    Q    If it was associated with just an email account, how did

10    you associate it with a particular person?

11    A    I would look at the context of the message itself, within

12    the larger chain.  So, where the corresponding messages coming

13    from, say, Michael's phone numbers or Kimberley's phone

14    numbers, and then I also looked at what was the message saying.

15    Did it make sense for it to come from one party or another?

16    And lastly, I looked at external factors; such as, deposits

17    into bank accounts, or other events we knew happened around the

18    same time, to take a best guess at attribution for who sent

19    those messages.

20    Q    Before your testimony here today, did you prepare a summary

21    showing communications between Michael and Kimberley Tew in

22    relation to other significant events?

23    A    I did.

24    Q    Describe to us what you did?

25    A    There were two processes.  One, ultimately, ended up in a

1    *James* log, or it was communications that were in -- we believe

2    to be in furtherance of the charges.  I looked at all of the

3    communications --

4            *MS. HUBBARD:*  Objection, Your Honor.  I'm not sure

5    where she is going with this, but it seems we're talking about

6    things that are inadmissible and used for other purposes in the

7    case.

8            *THE COURT:*  Yes.  Sustained.  If you could refocus,

9    please.

10   *Q*   How did you identify the events to put on your calendar?

11   *A*   I looked at all of the payments that were made from

12   National Air Cargo to the Tews, or their associated entities,

13   between approximately August 2018 and July 2020.  I also looked

14   at other relevant events that happened in that time period;

15   such as, the opening of accounts, the creation of new

16   businesses, and then I looked at text messages between Mr. and

17   Mrs. Tew, Mr. Tew and Mr. Yioulos, Ms. Tew and Mr. Yioulos, as

18   well as individuals such as Mr. Meyers, and any time we found

19   messages that we thought were relevant to the conspiracy, we

20   included them as an event on the calendar, so we could have a

21   better idea.

22           *MS. FROST:*  Object, again, to the use of conspiracy,

23   Your Honor, that's for the jury to decide.

24           *THE COURT:*  Understood.  Overruled.  Go ahead.

25           *THE WITNESS:*  To understand what happened over time,

1    and get, kind of, a high-level picture of what happened over

2    time.

3    Q    Let's look at Government's Exhibit 1008, page two.  What is

4    this?

5    A    This is the first month of the calendar that I created.

6    Q    If we scroll through, down to page 27.  Have all of the

7    months between July 2018 and July 2020?

8    A    Correct.

9    Q    Does it fairly and accurately identify the events that you

10   just described for us?

11   A    To the best of my knowledge yes.

12        MR. FIELDS:  Pursuant to Federal Rules of Criminal

13   Procedure 106, the government would move to admit Government's

14   Exhibit 1008.

15        MS. HUBBARD:  Your Honor, we either need to approach

16   on this or be heard outside of the presence of the jury.

17   Whatever is the Court's preference.  May take a little while.

18        THE COURT:  Why don't you approach for now.  We can

19   discuss it.

20      (At the bench:)

21        THE COURT:  Go ahead.

22        MS. HUBBARD:  Your Honor, this is not a 1006 exhibit.

23   She has testified that this is what she believes is relevant to

24   the conspiracy.  It's a calendar that has a series of very

25   short documents arranged by date and time.  It has highlights

1337

1    of days where there's a charge.  It has highlights for days

2    where there's a transfer.  It is an advocacy piece, not a 1006

3    exhibit.

4         *MR. FIELDS:*  Your Honor, it's not her conclusion as to

5    what is in furtherance.  It is actually Your Honor's conclusion

6    as to what is in furtherance.  Each of these text messages was

7    found by the Court, pursuant to its order at the *James* hearing,

8    to be in furtherance.  All it does is identify and say that

9    there was a message.

10        The coloring and the highlighting itself is not

11   argumentative.  It's simply a color, or something else.  It

12   doesn't actually say anything.  The entries, themselves, are

13   not argumentative, in any way.  They simply identify events,

14   and for purposes of Rule 1006, the government took the Court's

15   words to heart.  All of the records in the *James* log were too

16   voluminous to examine conveniently in court, which is exactly

17   why we prepared this calendar, so they don't have to go through

18   all of them.

19        *THE COURT:*  Can I -- is it in the books over there?

20   The electronic version is real annoying to try to work with.

21        Do you want to add something?

22        *MS. FROST:*  Can I just also, add, we join in the

23   objection and we also object under 403, that it's misleading

24   due to the highlighting, and cumulative, based on the

25   underlying data that's already been entered.

1    THE COURT:  All right.  She is, I think, grabbing the

2    book, so I can see the whole thing.

3    MR. FIELDS:  Their is an Excel spreadsheet that shows

4    the exhibit, but that was so you all can check to see if it was

5    accurate.  Is the Excel spreadsheet in there?  You know what, I

6    have it here in my book.

7    THE COURT:  Here we go.

8    MR. FIELDS:  There's 27 pages, is what we found.

9    THE COURT:  Okay.  These are the underlying instant.

10   There's no links or anything, right.  This is just underlining?

11   MR. FIELDS:  So, we did provide an Excel spreadsheet

12   with links for the defense, so they can check the accuracy.

13   All this did was sort of showed the defense where the

14   underlying exhibit was, so they could check to make sure it is

15   indeed the same, that it is accurate.

16   For purposes of today, we only want to admit this PDF,

17   pages 1 through 27, which were just the calendar.  The first

18   page is the key.

19   THE COURT:  Okay.  So, those are all, sort of, the

20   same.  Yeah.  I'm going to overrule the objection.  I

21   understand the point, but I think this is a summary that

22   accurately lists things.  It doesn't include advocacy.  It's

23   useful, and it's, obviously, voluminous, so I will overrule it.

24   Thank you.

25   (In open court.)

1        MR. FIELDS:  Thank you, Your Honor.  For purposes of

2   the record, the government would move to admit pages 1 through

3   27, of the PDF portable document format file that is

4   Government's Exhibit 1008.

5        THE COURT:  All right.  Mr. Keech, did you get that?

6        THE COURTROOM DEPUTY:  Yes, Your Honor.

7        THE COURT:  All right.  So those pages will be

8   admitted.  Go ahead.

9   Q    So, let's orient ourselves.  Let's go to December of 2018.

10  So, there's some colors and there's some texts.  First of all,

11  what does yellow mean?

12  A    Yellow means there's a wire fraud count charged in the

13  Indictment for that day, and the specific transaction listed.

14  Q    What does blue mean?

15  A    Blue means that there were no payments from National Air

16  Cargo that day.  If the blue box is empty, it means that no

17  evidence is associated with activities on that day.  If there's

18  texts within the box, it gives a very brief overview of the

19  evidence associated with activities on that day.

20  Q    What does green mean?

21  A    Green means a payment was received from National Air Cargo,

22  as part of this scheme, on that day, and it should list the

23  bank account that received the money.

24  Q    So, let's go to August of 2018.  What is the earliest

25  payment identified under calendar?

1    A    August 8th, 2018.

2    Q    And if we go to July, 2020, which will be on page 27 -- or

3    26 -- 27, next page.  What was the last payment identified on

4    your calendar?

5    A    July 3rd, 2020.

6    Q    Before your testimony, did you calculate the number of

7    weeks between those two entry points?

8    A    I did, and I am scared I'm going to get this number wrong,

9    but I believe it was ... 99.

10   Q    Of those 99 weeks, how many involved payments from National

11   Air Cargo to one of the companies identified by Jonathan

12   Yioulos?

13   A    That I do not recall, but it was greater than 50.

14   Q    Did you look to see whether -- during your review, whether

15   there were communications showing whether Michael or Kimberley

16   Tew were offering things of value to Jonathan Yioulos?

17   A    Yes, there were.

18   Q    Why did you do that?

19   A    Whenever you speak with a conspirator, you need to always

20   take what they say --

21        MS. FROST:  Objection, to the term *conspirator*,

22   Your Honor.

23        THE COURT:  Okay.  I'm going to overrule it, but I

24   will give an instruction at the close of the evidence, a

25   reminder of what we've already discussed.  So, go ahead.

1341

1    THE WITNESS: Whenever you speak with somebody who is

2    a conspirator, you need to take what they say with a grain of

3    salt, and you want to independently verify as much of what they

4    told you as possible, to see if you can, kind of, trust the

5    piece you can't verify.

6    One of the things that Mr. Yioulos told us, when we

7    initially approached him, was that he didn't really receive

8    much from the Tews as part of this fraud, but that they did

9    make several offers of Bitcoin to him, and then also offered to

10   pay off his debts, and give him a couple things of value.  So

11   we searched for statements that would corroborate what he had

12   told us.

13   Q   Let's look at page 11 of Government's Exhibit 1008.  What

14   happened on March 18th, 2019?

15   A   We identified three things, the first were text messages

16   between Michael and Kimberley here identified as MT and KT.

17   Text messages between Michael and Jonathan, identified as MT

18   and JY, and then also Political Media emailed Mr. Yioulos

19   identified as PM and JY.

20   Q   Let's look at Government's Exhibit 327, which of is not yet

21   in evidence.  What is this?

22   A   This is an account statement from that Navy Federal Credit

23   Union.  This particular one is for Michael Tew, and I believe

24   it's for the period of March 17th, 2019, through February 16th,

25   2019.

1    *MR. FIELDS:*  Pursuant to the Declaration, at

2    Government's Exhibit 1107, the government would move for the

3    admission of Government's Exhibit 327.

4    *THE COURT:*  Hearing no objection, 327 is admitted.

5    *THE WITNESS:*  My apologies.  I said February.  It was

6    April.

7    Q    Thank you.  Can we look at page two?  Do you see a bank

8    wire deposit there?

9    A    I do.

10    Q    On what date?

11    A    March 18th, 2019.

12    Q    And if we go down to March 19th, do you see another one?

13    A    I do.

14    Q    For how much?

15    A    For $15,000.

16    Q    Now, let's look at Government's Exhibit 730.  Go to page

17    two.  So, first of all, what are these?

18    A    These are text messages from the Cellebrite report.

19    Q    And if we look at that green box, go down a little bit,

20    what do you see there?

21    A    *Kley@me.com*, says, *Wire submitted*.

22    Q    On what date?

23    A    March 18th, 2019.

24    Q    Let's look at Government's Exhibit 731.  What is this?

25    A    Text messages between Mr. Tew and Mr. Yioulos.

1    *Q*    On what date?

2    *A*    March 18th, 2019.

3    *Q*    What do you see there, as the third message down?

4    *A*    Michael asked, *How much is owed on your student loans right*

5    *now*?

6    *Q*    Let's look at Government's Exhibit 917, which is in

7    evidence.  What is this?

8    *A*    These are text messages between Michael and Kimberley.

9    *Q*    Now, let's -- please start reading this for us.

10    *A*    Kimberley, *Did you talk to Jon*?

11           Michael, *Screaming match*.  *On way back, bringing your*

12    *doughnut*.

13           Kimberley, *Do we have enough for frap and doughnut*?

14    *But did you get anywhere with screaming match*?  *Tell him I'm*

15    *personally calling the local jail to have the guy she's having*

16    *an affair with pick him up.  I don't care if we all go down.*

17           Michael, *He didn't care.*

18           Kimberley, *Today*.

19           Michael, *I told him we're all going.*

20           Kimberley, *Tell him I'm calling.*

21    *Q*    Do you see screenshot there?

22    *A*    Yes.

23    *Q*    Let's go to page six.  What is this?

24    *A*    It's a screenshot of a conversation with JY, Jonathan.

25    *Q*    Read this one for us.

1344

1  A   Okay.  *I don't really know what to tell you.  It's not like*
2  *I'm lying.  I can't make money appear out of nowhere.  You are*
3  *being super unreasonable.  Over 2 MM out by this point, and*
4  *she's flipping out right now*?  *Let's get realistic.  I told you*
5  *Tuesday. I can guarantee that that's the best I can do.*  And
6  then there's the start of a photo.
7  Q   Go back up to page five.  What's the response after the --
8  actually I guess page seven.
9  A   There's another screenshot that's sent.
10  Q   Okay.  Let's look at page eight.  What do you see there?
11  A   It's a photo, and it shows a calculated balance of negative
12  $18,720.24.
13  Q   How can you tell that's a negative?
14  A   In accounting if something is a negative, it's usually put
15  in either parentheses or in red.
16  Q   Page nine, keep going down.  Is this a continuation of this
17  screenshot?
18  A   Yes.
19  Q   What does it say?
20  A   *Yes, I'm really lying.  I can't send money without having*
21  *the knowledge more is coming in.  I can send Monday for*
22  *Tuesday, as I have communicated.  If I knew money was coming*
23  *Monday, I might be able to float it, but I don't have that*
24  *knowledge*.
25  Q   Page ten.  Keep going.  Keep reading for us, please?

1345

1    A    Kimberley, *Tell him BTC is going up and the portfolio value*
2    *is increasing.*

3          Michael, *Already did.*

4          Kimberley, *How much is he sending?*

5          Michael, *I promise I have told him we've now doubled.*

6          Kimberley, *It's fine as long as there's a real plan.*

7          Michael, *He says at least 10 but that's not -- hut*
8    *that's not enough, and I am trying to get him to commit to a*
9    *plan to send more Tuesday.*

10         Kimberley, *He said in his text Monday for Tuesday.*

11         Michael, *Monday banks are closed and he is sending*
12   *today for Tuesday day. I have been texting with him.*

13         Kimberley, *But he said he could definitely send next*
14   *week? Monday at midnight? What will we do until then? I need*
15   *a real plan.*

16         Michael, *I was going to ask Mike for cash. We would*
17   *return to him next week, including some overage. He may have*
18   *it.*

19         Kimberley, *But what if we don't get cash this week?*

20         Michael, *That's what I'm trying to pin down Jon. He*
21   *said more craf is supposed to hit later in the week as well.*

22         Kimberley, *He's losing it.*

23         Michael, *bigger dollar sign. Yes he is losing it.*

24         Kimberley, *Something small can make him happy.*

25         Michael, *Yes. I'm calling him in 15 min.*

1      Kimberley, *Let's get him sports tickets.  Whatever you*
2  *think.  He's a kid.*
3      Michael, *Yeah, he flies places to see sports games.*
4  *What about in Vegas?*
5      Kimberley, *Well, he must have a favorite team.*
6      Michael, *Yeah Buffalo Bills.*
7      Kimberley, *Would he want to go see John Legend?  It's*
8  *a private concert.  Let's get him season tickets.  Like a box*
9  *or something.  Worth the cost.  Or a jersey?*
10     Michael, *Yeah, good idea.  For 2020 season.  It would*
11 *be so cheap in Buffalo for season tickets.  They're already*
12 *done with the season, so for next season.  He would rather have*
13 *that than John Legend.*
14     Kimberley, *Maybe both.  We meet him there.  He can't*
15 *pussyfoot if we are meeting in person.*
16     Michael, *Okay.*
17     Then Kimberley sent a link that appears to be Buffalo
18 Bills season tickets.
19     *Call them real quick to get price quote.*
20     Michael, *Okay.*
21     Kimberley, *On Best Tickets, so he knows you're not*
22 *kidding.  Club seats?  Oh, you can see through 3D viewer.*  Then
23 an image of some sort is sent.
24     *Text him what is the best seat for season tickets.*
25 *How much is a full season suite?  The 200 levels look a lot*

1  *nicer than the 100 level.*

2        Michael, *There are no good 100-level seats left any*

3  *way.  Sideline club indoor/outdoor, 2700 slash ticket, for the*

4  *best midfield seats.  You give 125 slash ticket now to secure*

5  *your spot, and in February they email you.  You can either pay*

6  *all at once or ten months interest free with payments starting*

7  *April.  MT club is all-inclusive, reserved indoor seating for*

8  *3270 slash seat.*

9        Kimberley, *KT club but suites.*

10       Michael, *But there's only four seats left.*

11       Kimberley, *Suites.*

12       Michael, *I'll ask.  90 K for 200 level suite for 12*

13  *people.  He said he has season tickets already thanks but no*

14  *worries.  He just bought regular seats.  He's sending 15 to 20*

15  *today will hit Monday at midnight, 35 to 50 Thursday for*

16  *Friday.*

17       Kimberley, *Can you secure 25 and 70?*

18       Michael, *I'll ask.*

19  *Q*   And what was that date?

20  *A*   January 17th, 2020.

21  *Q*   So let's go to Government's Exhibit 1008 and if we could,

22  let's go to page nine.  What happened after that conversation

23  on January 7th, 2019?

24  *A*   On -- can you repeat the date?

25  *Q*   What happened after that conversation on July -- sorry

1    January 7th, 2019?

2    *A*    The Navy Federal Credit Union account ending '8486 received

3    28,000 on January 22d, and that same account received 21,000 on

4    the 24th.

5    *Q*    Now let's go back.  Missed this one.  Let's go up to

6    Government's Exhibit 730.  Now, if you could scroll down, and

7    let's start reading after wire submitted.

8    *A*    Michael, *Play info greed*.

9    *Q*    Wait a second.  Let's go back up.  Why did you say that was

10    Michael?

11    *A*    Oh, I apologize, that was 100 percent a mistake on my part.

12    Kimberley, *Play info greed*.

13    *Q*    Next page.

14    *A*    *Ask him how much is student loans for both and mortgage.  I*

15    *cannot keep Christian calm for another week, and we need to*

16    *deal with our shit.  Fuck him, ask him how much he can send out*

17    *today.  It's more than you think.  And what?  It's not enough.*

18    *And you're falling for it.*

19    *Q*    Let's take that down.  Now let's look at Government's

20    Exhibit 1008.  Let's go to page 12.  What happened on April

21    3rd, 2019?

22    *A*    There were text messages between Michael and Kimberley,

23    text messages between Michael and Mr. Yioulos, and then

24    political email -- Political Media emailed Mr. Yioulos.

25    *Q*    Let's look at Government's Exhibit 740, which is in

1    evidence.  Would you read this for us?

2    A    Kimberley, *Please let me know what's going on.  I'm just*

3    *trying to hope for good news.  Please don't tell me bad news.*

4         Then *kley@me.com* sends, *He's sending 9900.  It's*

5    *complicated.  I have to add it to an old invoice that's already*

6    *in the system.  Has to be less than 10K.  Prepayment for*

7    *subscription, et cetera.  But he is sending.  It was tough.  So*

8    *we'll have another 9900 tomorrow.*

9         Kimberley, *From what account*?

10        *Kley@me.com, I know it's not perfect but it's*

11   *something.  I don't know.*

12        Kimberley, *From where?  To whom?  From what account*?

13        *Kley@me.com, To Political Media, not sure from what*

14   *account.*

15        Kimberley, *What?  Find out.*

16        *Kley@me.com, Prepaid subscription.*

17        Kimberley, *Is it actually going to Political Media*?

18   *Confirm what bank he is sending from.  If signature is closed.*

19        *Kley@me.com, He said the mandate is to use HSBC*

20   *exclusively, but they have not yet closed signature, but the*

21   *mandate is to not really use it, so he said he has it handled*

22   *internally, but this is it, because it will become obvious or*

23   *just impossible.*

24        Kimberley, *What does that mean?  Then we need to get*

25   *more.  Like pay the 37.5, and we are free.  Just pay an invoice*

1350

1     *twice.  Don't create a new one.*

2          *Kley@me.com, He won't do it.  I can't fight all day*

3     *together about this.*

4          Kimberley, *Don't send new invoice.  They still,*

5     *obviously, have a lot of money in that account.*

6          *Kley@me.com, You should text him then.*

7     Q    Now, let's look at 740, page two, and let's put that on the

8     right.  Put it on the right side of the screen, if we can.  And

9     then, on the other side of the screen, let's put Government's

10    Exhibit 742.

11         All right.  On 742, if we go to page two, and what do

12    you see on page two of 742?

13    A    It appears to be an invoice from Political Media, the last

14    line it says *Prepaid Portal Subscription, April through August*

15    *2019*.  The amount listed is $9,900.

16    Q    And what do you see when you compare that to Government's

17    Exhibit 740, page two?

18    A    The amount and description matches what was discussed in

19    the text messages.

20         *MR. FIELDS:*  At this time, I'm ready to go on to

21    another subject area.  I don't know what time you want to break

22    for lunch?

23         *THE COURT:*  Yeah.  I guess we may as well take a break

24    now.

25         So, let's take our lunch recess, until -- until 1

1    o'clock.  If counsel would be back slightly earlier than that,

2    just a few minutes earlier, in case we need to discuss

3    something but let's recess until 1 o'clock.  Thank you.

4          THE COURTROOM DEPUTY:  All rise.  Court is now in

5    recess.

6          (Recess at 11:56 a.m.)

7          (In open court at 1:01 p.m.)

8          THE COURT:  Good afternoon.  Please take your seats.

9    Before we get started, I wanted to just mention a couple of

10   quick things.  Number one, if the defense would recommend or

11   offer a suggested limiting instruction on the issue we have

12   been, sort of, talking about, about witnesses' characterization

13   and use of certain defendant terms like *conspiracy* or *fraud*, I

14   will entertain it, that way.  So, I will ask you to do that.

15         Speaking of the instructions, we're sort of -- we're

16   going to send out a redlined version, getting closer to the

17   final instructions.  Mr. Jacobsmeyer will be emailing that here

18   shortly.

19         One thing I would like you to make sure you look at,

20   carefully, is the verdict form, because I don't plan to read

21   that thoroughly to the jury, and so this will be, sort of -- we

22   won't have that opportunity to catch anything.  So, take a

23   careful look at the verdict form.

24         Speaking of which, when I was -- I don't know how

25   we've missed this, until now, but in the verdict form,

1    throughout this case, we have been proceeding as if Mrs. Tew is

2    only charged with wire fraud in Counts 21, 22, 25, 26, 31 and

3    32, which is what we said in the preliminary instructions, and

4    in various places, but she is actually also mentioned in

5    Count 16 in the Indictment, and we've never mentioned that,

6    ever.

7           So, my inclination is to leave that out of the verdict

8    form, and anything else, but think about it.  So, that's where

9    I am on that.  I just wanted to raise it, but we don't have to

10   deal with it this minute.

11          I would, if there's nothing else, like to have

12   Mr. Keech get the jury, if you would.

13          THE COURTROOM DEPUTY:  All rise.

14      (Jury in at 1:05 p.m.)

15          THE COURT:  Welcome back, ladies and gentlemen.  Let's

16   take our seats, and you may begin, Mr. Fields.

17          MR. FIELDS:  Thank you Your Honor.

18          MR. FIELDS:  Can we please look at Government's

19   Exhibit 1008, page 16?  Do we have the right input?

20          THE COURTROOM DEPUTY:  Actually, it's not.

21          MR. FIELDS:  Thank you.

22   Q   What happened on August 29th, 2019?

23   A   Wells Fargo account ending in '2064 received $45,000.

24   There were text messages between Michael and Kimberley.

25   Mr. Yioulos emailed another NAC employee.  Global Fuel

1    Logistics emailed Mr. Yioulos, and Wells Fargo account '2064

2    was open that day, and then we have money laundering Count 45

3    on that day.

4    Q    Let's look at Government's Exhibit 842, which is in

5    evidence.  If we could go to page 12.  Would you please read

6    this for us?  Let's go to page 14.

7    A    Michael -- Is this the correct page, now?

8    Q    No.  Go back one there.  There we go.

9    A    Michael, *I'm chasing Jon, sending him nasty texts now.  He*

10   *won't answer me and said he will call me this afternoon.*

11            Kimberley, *Tell him, fuck him and his midlife crisis.*

12   *If he doesn't call you within the next 20 minutes, I will*

13   *personally turn him in.  Fuck it.  He can't even help us at*

14   *this point.  And he's so abusive.  You are afraid to tell him*

15   *what's really needed.  He is going to tell you he can't send*

16   *anything or like 20.*

17            Michael, *He said he will make it work.  He will do*

18   *whatever he can to help.  He will call me at 1 eastern.  I told*

19   *him we could all just go to the SEC and turn everyone in.*

20            Kimberley, *No plan.  No clarity.  Make sure that*

21   *account is set up for online wires, like, today.  More than the*

22   *minimum, 150K-plus?*

23            Michael, *Okay.*

24   Q    Let's go back to 1008, page 16.  What happened -- so that

25   was August 29th.  Let's look at the next page.  What happened a

1354

1    few days after that exchanged?

2    *A*    Are you referring to September 4th?

3    *Q*    What happened on September 4th?

4    *A*    Navy Federal Credit Union, account ending '5336, received

5    $45,000, and we also have money laundering, Count 46.

6    *Q*    Let's look at Government's Exhibit 246, which I believe is

7    in evidence.

8    *Q*    Let's go to page eight.  Now, if we could, towards the

9    bottom there.  These transactions on September 4th.  What do

10   you see happening there?

11   *A*    I see a transfer from checking, Michael Tew, in the amount

12   of $45,000 coming into the account.

13   *Q*    And whose account is this?

14   *A*    This particular account it appears to be the Navy Federal

15   Credit Union account ending in; 8486, that is jointly held by

16   Mr. Tew and Mrs. Tew.

17   *Q*    Let's go back to Government's Exhibit 1008.  Let's go take

18   page 18, please.  What happened on October 25th, 2019?

19   *A*    Wells Fargo, account ending in '2064, received $43,000, and

20   then there are text messages between Michael and Kimberley.

21   *Q*    Government's Exhibit 883.  What are these?

22   *A*    Those are text messages from the Cellebrite report.

23   *Q*    From that same day, October 25th, 2019?

24   *A*    Yes.

25   *Q*    Please read these for us.

1  *A    Kley@me.com.  I really, really, really don't want to stress*

2  *you out, but we're going to need more money.  It's just not*

3  *enough.  With the negative accounts and bills we have to pay,*

4  *plus the car, and AN, that's over 60K.  It really leaves*

5  *nothing for Vegas.  Can he send another to arrive Monday?*

6        Michael, *I doubt it.  I'll see.  I guess we're fucked.*

7        *Kley@me.com, I need you to try.*

8        Michael, *Just forget the car.  I'll try.*

9        *Kley@me.com, we're going to Vegas down.  No.  Stop.*

10  *What's your balance in Wells?  I transferred money to your*

11  *'3494 account, so the check will clear.*

12        Michael, *14,019.15.*

13  *Q*  That reference to a '3494 account, does that mean anything

14  to you?

15  *A*  One of Michael's accounts at Navy Federal Credit Union

16  ended in '3494, I believe.

17  *Q*  Let's look at Government's Exhibit 220.  What is this?

18  *A*  That's a Wells Fargo bank statement for an account in the

19  name of Global Fuel Logistics, the time period appears to be

20  October 2019.

21        *MR. FIELDS:*  Pursuant to the, Declaration, at

22  Government's Exhibit 1119, the government would move for

23  admission of this exhibit.

24        *THE COURTROOM DEPUTY:*  Your Honor, 220 is already in

25  evidence.

1          MR. FIELDS:  Thank you.

2          THE COURT:  Go ahead.

3   Q   Let's look at page three.  What do you see there on October

4   25th, 2019?

5   A   I see a deposit from National Air, ACH for $43,000.

6   Q   And what do you see underneath that?

7   A   Looks like three wire transfer charges, and then three wire

8   transfers.  The transfers go to JPMorgan Chase Bank, in the

9   name of Mora Consulting.  Navy Federal Credit Union, in the

10  name of Kimberley Tew, and JPMorgan Chase Bank, in the name of

11  Mora Consulting again.

12  Q   Let's look at Government's Exhibit 316.  What is this?

13  A   That is the statement from Navy Federal Credit Union, in

14  the name of Kimberley Tew, for the period October 17th, 2019,

15  through November 16th, 2019.

16         MR. FIELDS:  Move for admission of this exhibit,

17  pursuant to the Declaration, at 1107.

18         THE COURT:  Hearing no objections, 316 is admitted.

19  Q   Let's look at Government's Exhibit 332.  What is this?

20  A   This is a statement from the Navy Federal Credit Union for

21  accounts in the name of Michael Tew, for the period of October

22  17th, 2019 through November 16th, 2019.

23         MR. FIELDS:  Pursuant to the Declaration, at

24  Government's Exhibit 11 -- 1107, the government would move for

25  admission of this exhibit.

1357

1    THE COURT:  Hearing no objections, it's admitted.

2   Q   Now, let's look at Government's Exhibit 883, if we could.

3   Let's put that over on the right.  And if we could go to page

4   six.  All right.  And do you see a transaction there, a number

5   mentioned at the bottom there?

6   A   Twenty-seven-fifty.

7    MR. FIELDS:  If you look at Government's Exhibit

8   332 -- sorry.  Government's Exhibit 220.  Could we put that on

9   the left?  Page three.  And on the right, can we have 883?

10   Page six again.  On the left, sorry, I need 220, on the left,

11   Ms. Ortiz.  I'm sorry about that.  And then on the right, 883,

12   please, 883, page six, and for 220, page three.

13   Q   Do you see any numbers that match?

14   A   I do.  The third wire on 10-25 is for 2750.

15   Q   All right.  And then, 883, over there on page six, what is

16   said up at the top there?

17    THE WITNESS:  Ms. Ortiz, would you mind zooming in?

18   Thank you.

19   A   Michael, *We have Coinbase too.  I can sell into either*

20   *Wells or Navy.  Up to 25K.*

21    *Kley@me.com, It's good luck if Jon* -- I'm sorry --

22   *It's good luck, even if Jon sends 25K*.

23   Q   What is Coinbase?

24   A   Coinbase is a place where users can basically pay US

25   dollars, or other traditional currencies, in exchange for

1    Bitcoin or other cryptocurrency; such as Ethereum or Cardano.

2    Q    Were you able to get records from them?

3    A    We were.

4    Q    Government's Exhibit 502, which is not yet in evidence.

5    Government's Exhibit 503.  What are those?

6    A    Those are photos from the account application and

7    subscriber information for Coinbase.

8         MR. FIELDS:  Pursuant to the declaration, at

9    Government's Exhibit 1136, the government would move those into

10   evidence, Your Honor.

11        THE COURT:  Any objections?  Those are admitted.

12   Q    Are we looking, now, at 503, is that account opening for

13   Kimberley Tew at Coinbase?

14   A    Yes.

15   Q    Let's go back to 502, just so we can see that.  What do you

16   see there?

17   A    A photo of Michael Tew.

18   Q    Now, let's go back to Government's Exhibit 1008, page 18,

19   please.  What do you see on October 31st 2019?

20   A    Navy Federal Credit Union, account ending in '5336 received

21   20...  Sorry, $23,750, and then there were text messages

22   between Michael and Kimberley Tew.

23   Q    If we go to the next page.  What do you see on November

24   1st, 2019?

25   A    Wells Fargo, account ending; 6934, received $49,750.  There

1    were text messages between Michael and Kimberley, and then we

2    have Money Laundering Count 52.

3    Q    Let's look at Government's Exhibit 885.  What is this?

4    A    Those or text messages between Michael and Kimberley from

5    the Cellebrite report.

6    Q    On what day?

7    A    October 31st.

8    Q    Can you please read these for us?

9    A    *Kley@me.com, I just won 13K.  Wrong $18,575 jackpot.  I*

10   *have 20K.  In blackjack inside.  What you doing*?

11        Michael, *Jon can send 50 today and 25 next week and*

12   *that's it.  What do you want*?

13        *Kley@me.com, Yes.  I have 30K in cash.*

14        Michael, *OMG, where should he send funds*?

15        *Kley@me.com, Want to deposit the cash at Navy today*

16   *and wire.  Yes.  Just waiting for payout.*

17        Michael, *Okay*.

18        *Kley@me.com I might have 40K.*

19        Michael, *Amazing.  50K coming in from Jon, 49,750.*

20        Kley@me.com, *Coming as soon as they hand me the money.*

21   *We did it baby.  I love you.*

22        Michael, *Incredible.  Of course we DF*.

23        *Kley@me.com, Send to WF?  Still waiting for payout.*

24        Michael, *He sent to Wells, so we can wire what we*

25   *need.  He couldn't do two separate accounts.*

1          *Kley@me.com, LOL, I sat down to smoke and won two more*

2    *jackpots.*

3          Michael, *OMG, you're totally in dire.  Incredible.  I*

4    *ordered you a diet Coke, whenever you come up.*

5          *Kley@me.com, Just kidding, four jackpots.  I'm coming*

6    *up.  Have so much money I can't fit it.*

7          Michael, *Holy shit.  This is insane.*

8          *Kley@me.com, five really coming up after this.  Six.*

9    *Waiting for another payout.  Was playing while I was waiting.*

10         Michael, *OMG.*

11         *Kley@me.com, I know.  Going to start getting heat.*

12   *Casinos don't like winners.*

13         Michael, *So what do we do*?

14         Then there's an attachment by *kley@me.com*.  It's a

15   photo.

16         *Plus, I have three flags.  And I am waiting on 2400*

17   *and 18 -- $1,860 payouts.*

18         And then there's what appears to be a screenshot.

19   *Q*   Is this that first screenshot here on page 12?

20   *A*   Yes.

21   *Q*   What's on page 13?

22   *A*   This appears to be a screenshot of account balances at Navy

23   Federal Credit Union.

24   *Q*   How do you know those are accounts balances at Navy Federal

25   Credit Union?

1361

1    *A*    I recognize -- so, one, it says *Everyday Checking, Share*

2    *Savings*, that indicates it's probably a financial institution.

3    Second of all, I recognize most of the last four, so we've

4    talked multiple times about the account ending in '8486.  I

5    also recognize the '3009, '4602, '4917 accounts, based on my

6    review of records.

7    *Q*    What are those accounts?

8    *A*    Those are accounts at Navy Federal Credit Union where

9    Kimberley Tew was a signer.

10   *Q*    Now, let's look at Government's Exhibit 886.  Is this a

11   text exchange on the next day?

12   *A*    Yes.

13   *Q*    Okay.  Well, actually, that UTC there, what does that mean?

14   *A*    That's that Greenwich Mean Time.  So, this message was

15   actually sent -- you are going to make me do math, Mr. Fields.

16   It was sent the evening of October 31st, not the early morning

17   of November 1st.

18   *Q*    Let's read this one -- well, actually, let's go to page

19   ten, please.  If we could, let's read to page 13.

20   *A*    *Kley@me.com, need to find out when Jon is sending next.*

21        Michael, *Okay.*

22        *Kley@me.com, I owe Craig 10.5 today.*

23        Michael, *Okay.*

24        *Kley@me.com, 25 to AN on Mon and 6K to James on*

25   *Monday.  I want to get another 5K of BTC, and also owe Mora 4K,*

1362

1    *I think.  Paid my Discover out of joint.  Transferred*

2    *everything to joint, for what I have put $400 in savings.*

3    Michael, *I paid the car.  Did not pay Chase.  There's*

4    *25K in Wells.  Do you still want me to pay Chase?  Which*

5    *account?  It's 2200 total.  I will do whatever you want.  I*

6    *ordered room service.  Las Vegas North Outlets outdoor are a*

7    *ten-minute drive.  They have Lulu but not Hanna or Janie.  Las*

8    *Vegas South Outlets are a bit further, opposite direction.*

9    *They don't have Lulu or Janie or Hanna.*

10    *Kley@me.com, Can you wire 2K to Mora and 10.5 to CW*

11    *simple*?

12    Michael, *Okay.  Packing everything up.  Both wires*

13    *sent.*

14    Q    Let's look at Government's Exhibit 32.  What is this?

15    A    This is a bank statement from Navy Federal Credit Union for

16    accounts in the name Michael Tew, for the period of October

17    17th, 2019 to November 16th, 2019.

18    *MR. FIELDS:*  Pursuant to the Declaration, at

19    Government's Exhibit 1119, government would move for admission

20    of this record.

21    *THE COURTROOM DEPUTY:*  Exhibit 332 it's already in.

22    *THE COURT:*  Go ahead.

23    Q    We go to page eight, please.  What do you see on October

24    31st, 2019?

25    A    I see a deposit ACH paid from National Air, in the amount

 1   of $23,700, an ATM withdrawal, an ATM fee, a transfer to

 2   checking, a transfer to checking in the name of Michael Tew, a

 3   transfer to checking in the name of Kimberley Tew, another one

 4   in the name of Kimberley Tew.  The transfers to accounts named

 5   Kimberley Tew is $15,000 and $5,000.

 6   Q   Now let's go to Government's Exhibit 52, page two.  What do

 7   you see there on November 1st?

 8   A   I see three wires.  First are the three service charges for

 9   the wires, food purchase, then a wire to Comerica Bank in the

10   name of Continental Volkswagen for $20,611.01, and then a 2,000

11   wire to JPMorgan Chase in the name of Mora Consulting, and a

12   $10,500 wire to BBVA USA, in the name of Craig Warner.

13   Q   Let's go back to Government's Exhibit 886, to page 15.

14   Let's read to page 20?

15   A   *Kley@me.com.  What did Jon say*?

16         Michael, *He doesn't know yet.  Will know Monday and*

17   *maybe Monday for Tuesday*.

18         *Kley@me.com, Holy shit I won four BTC.  I just lost*

19   *money downstairs and started rage betting on dice, LOL*.

20         Michael, *OMG that's insane score.  Great, that's so*

21   *amazing.  We're on way back.  Okay*?

22         *Kley@me.com, Where are you guys now?  Six BTC*.

23         Michael, *Holy shot*.

24         *Kley@me.com, I got down to $500 on dice and cashed out*

25   *6 BTC.  Six BTC equals $55,368.  Sending four to your Kraken*.

1    *We won't get until Monday, but that's fine.*

2        Michael, *Hon, are you sure you sent four BTC to*

3    *Kraken.  It's not showing up even as pending*?

4    Q   Were you able to obtain -- what is Kraken?

5    A   Kraken is similar to Coinbase.  It's an exchange where you

6    can exchange US dollars or other fiat currency for various

7    cryptocurrencies.

8    Q   Were you able to retain records for Kraken?

9    A   I was.

10   Q   Let's look at Government's Exhibit 500.  And Government's

11   Exhibit 501.

12   Q   What are those?

13   A   They are the account opening verification documents from

14   Kraken for the accounts in the name of Michael and Kimberley

15   Tew.

16       *MR. FIELDS:*  Pursuant to the Declaration, the

17   government would move to admit Government's Exhibit 500 and

18   501.

19       *THE COURT:*  Any objections?  Those are admitted.

20   Q   Five-oh-one, let's go to page two.  What is that?

21   A   Michael Tew's driver's license.

22   Q   Page three?

23   A   Michael Tew holding a photo -- holding his driver's license

24   and a statement with his signature.

25   Q   And let's go to 500, page two.  What is this?

1  A    Kimberley Tew's passport.

2  Q    All right.  During the course of your investigation, did

3  you obtain records from the Wynn Casino in Las Vegas?

4  A    We did.

5  Q    Let's look at Government's Exhibit 509, 510, and 511.

6  Those are each multipage documents, but do you know what each

7  of those are?

8  A    Yes.

9  Q    What are they?

10  A    They are records from the Wynn, some of them are like room

11  service charges, showing what happened at a room while they

12  were there.  There's also, I believe, records of how much money

13  was gambled.  How much money was lost.

14        MR. FIELDS:  Pursuant to the Declaration, at

15  Government's Exhibit 1121, the government would move to admit

16  those records.

17        MS. HUBBARD:  We would object under 401 and 403.

18        THE COURT:  Okay.

19        MS. FROST:  No objection, Your Honor.

20        THE COURT:  All right.  Overruled.  They are

21  admissible.  Go ahead.

22  Q    So, we're looking here at Government's Exhibit 511.  What

23  do you see as the address up at the top?

24  A    It lists 3222 East 1st Avenue Apartment 224 Denver,

25  Colorado.

1    *Q*    One of the text exchanges that we looked at earlier, there

2    was a reference to dice and to Blackjack, did you compare text

3    messages like that with the records that you received from the

4    Wynn?

5    *A*    Yes.

6    *Q*    What did you see when you made that comparison?

7    *A*    It appears that Kimberley was frequently gambling when they

8    reference being in Vegas or when she talked about gambling.

9    *Q*    Now, let's look at two records that are not yet in

10   evidence, 507 and 508.  What are those?

11   *A*    Those are records from the Wynn.

12        *MR. FIELDS:*  Pursuant that Declaration, again,

13   Government's Exhibit 1121, the government would move for

14   admission of Government's Exhibits 507 and 508?

15        *THE COURT:*  Any objections?

16        *MS. HUBBARD:*  Your Honor, renew our objection under

17   401, 403.  I would add the basis of 404.

18        *THE COURT:*  Okay.  Overruled.  Understood.  But go

19   ahead.  Those are admitted.

20        *MR. FIELDS:*  Looking here at Government's Exhibit 508,

21   could we zoom in on that, sort of, middle paragraph there?

22   *Q*    What does it say are the wins or losses for gambling that

23   year for Kimberley Tew?

24   *A*    For 2019, the estimated slot loss is $23,651.82, the table

25   loss for the year is $38,550.

1     MR. FIELDS:  Let's go back to Government's Exhibit

2  1008.  If we could go to page 20.

3  Q   What do you see on December 3rd, 2019?

4  A   Because the date is yellow, there's a wire fraud charge

5  that day.  Navy Federal Credit Union, account ending '5336

6  received $9550.  And there are text messages between Michael

7  and Kimberley.

8  Q   Let's look at Government's Exhibit 895.  What is this?

9  A   Text messages between Michael and Kimberley from the

10  Cellebrite report.

11  Q   How many days before that payment?

12  A   Two.

13  Q   If you could read this one for us, please.

14  A   Michael, *Hon, there's 919 left in the Global Fuel.  All of*

15  *the Wynn stuff hit.*

16     *Kley@me.com.  Okay.  So, hold off on depositing at*

17  *Sand Hill.*

18  Q   Let's look at Government's Exhibit 336.  What is this?

19  A   Wells Fargo business checking statement for Global Fuel

20  Logistics, for the month of December 2019.

21     MR. FIELDS:  Pursuant to the Declaration Government's

22  Exhibit 1119, the government moves for admission of this

23  exhibit.

24     THE COURT:  Hearing no objections, it's admitted.

25  Q   Let's look at Government's Exhibit 896.  What is this

1    A    Text messages between Michael and Kimberley.

2    Q    On what day?

3    A    December 2nd, 2019.

4    Q    Please read these for us.

5    A    *Kley@me.com, Can Jon send today*?

6         Michael, *Trying him; he has not responded.*

7         *Kley@me.com, What's up?  Please tell me you have good*

8    *news.*

9         Michael, *Working, on it, I think he is sending.*

10        *Kley@me.com, For tomorrow?  How much?  To Navy*?

11        Michael, *To Navy.  Not sure yet.*

12        *Kley@me.com, What's going on?  Can you tell me*?

13        Michael, *Waiting to hear from him if he can send and*

14   *how much, but cut off is soon, so I'll know shortly.  Trust me*

15   *I'm on it.*

16        *Kley@me.com, We are screwed if he doesn't.  How much*?

17        Michael, *I'm doing my best, really am.  Less than ten.*

18   *Not sure yet.  He needs invoices from me, so I'm working the*

19   *angles.*

20        *Kley@me.com, What?  He can't send 15 to 20*?

21        Michael, *No, he doesn't have.  9800 sent to Navy.*

22   *Best I could.*

23        *Kley@me.com, That's awesome thank you, is there a plan*

24   *for this week with him*?

25        Michael, *Tonight we're talking.  I'm doing my best.*

1    *He couldn't talk today in office.*

2    *Q*   Government's Exhibit 225.  What is this?

3    *A*   That is a Navy Federal Credit Union account statement for

4    Michael Tew for the period of November 17th, 2019, through

5    December 16th, 2019.

6         *MR. FIELDS:*  Pursuant to the Declaration, at

7    Government's Exhibit 1107, the government would move for

8    admission of this exhibit?

9         *THE COURTROOM DEPUTY:*  Number 225 is already admitted.

10        *THE COURT:*  Okay.

11   *Q*   Now let's go to 896, page five.  Do you see reference to a

12   number there?

13   *A*   I do.

14   *Q*   What numbers?

15   *A*   Ninety-eight hundred, sent to Navy.

16   *Q*   Now let's look at Government's Exhibit 225.  Let's look at

17   pages six through seven.  What do you see there?

18   *A*   I see on December 3rd deposit, ACH paid from National Air

19   for $9550.

20   *Q*   Let's go back to Government's Exhibit 1008, page 20.  Do

21   you see Government's Exhibit -- well, yeah.  What happened on

22   December 3rd?

23   *A*   Navy Federal Credit Union, account ending '5336, received

24   9550, there were text messages between Michael and Kimberley.

25   *Q*   Government's Exhibit 897.  What is this?

1    A    Text messages between Michael and Kimberley.

2    Q    On what day?

3    A    December 3rd, 2019.

4    Q    Read these for us, please.

5    A    *Kley@me.com, Jon needs to send today.*

6         Michael, *I had already asked Chris took all the money*

7    *in anticipation of more coming in this week, and the auto draws*

8    *put them over into the negative.  The only people that got paid*

9    *this week were us and Chris.  I did ask.  I can work on getting*

10   *more later this week if you want.  I promise you am doing*

11   *everything I possibly can to get us more money from him.*

12   *Everything.*

13        *Kley@me.com, He needs to send today.  I am freaking*

14   *out.*

15        Michael, *The bank won't send if they have a negative*

16   *balance.  It happened before.  Come up here then, if you are*

17   *free walking out.*

18        *Kley@me.com, We are stuck.*

19   Q    Let's go to Government's Exhibit 901.  What is this?

20   A    Text messages between Michael and Kimberley.

21   Q    Let's read this up to page 19?

22   A    Michael, *I got 5100, and with the fees that's what's left.*

23   *Zara closes the 9.*

24        Kimberley, *Played aggressive and even.*

25        Michael, *Cool.  That's fine.*

1           Then there is a screenshot.  It appears to be account

2    balances for Navy Federal Credit Union.

3    *Q*    Do you recognize the last four digits of those accounts?

4    *A*    I do.

5    *Q*    Whose accounts are those?

6    *A*    Michael's.

7    *Q*    Next page.

8    *A*    Michael, *I'm almost good with packing except WF need Y*

9    *finish our toiletries, and there's some things of yours in the*

10   *drawer.  I'm not sure what you are packing and what wearing*.

11          Kimberley, *I am frustrated.  I don't want to go home*

12   *empty after all of this*.

13          Michael, *I know you don't, but we're not.  We have so*

14   *much wonderful time planned away from here.  That's what*

15   *matters.  You're not going home empty-handed, but they will*

16   *keep you at those tables all night, if they can.  Get some food*

17   *in you*.

18          Kimberley, *Is 5K and bouncing tent enough to go?  I*

19   *will be more comfortable knowing Jon is sending before Friday*.

20          Michael, *I know, but I won't know that until tomorrow.*

21   *What can we do?  Stay?  Buy BTC?  Can we take a break and*

22   *strategize together?*

23          Kimberley, *Here?  Hell no*.

24          Michael, *Exactly*.

25          Kimberley, *Are you hungry*?

1    Michael, *Let's just get Jon to send Friday, work on it*
2  *from LA.  Yeah, and Alden is.  I can order.*

3    Kimberley, *Not for Monday though, right*?

4    Michael, *No, has to be Thursday for Friday, we have to*
5  *go and do one day at a time for now until tomorrow.  We can do*
6  *it, I know we can.  We've done harder.  Plan our next*
7  *adventure.*

8    Kimberley, *I'm up 2K.  Time to stop.*

9    Michael, *Perfect.*

10    Kimberley, *Order food.*

11    Michael, *For now.  Okay ordering now.*

12    Kimberley, *Maybe three.  I don't know.*

13    Michael, *That's great.*

14    Kimberley, *But will stop.*

15    Michael, *It's good.  Order in food ready in 15.*

16    Kimberley, *Do you need me to go?  I'm still playing.*
17  *Should I ask for a check?  I just won another jackpot.  No, we*
18  *will use for BTC.  Is there a Navy Federal in LA?*

19    Michael, *Okay.  Perfect idea.  Use it.  One in*
20  *Hawthorne.  If we take the 7 PM flight, we leave here at 5,*
21  *everyone sleeps until 12 ... we have five hours to sort of get*
22  *our shit together.  I would personally rather not push it off*
23  *like an entire day at the casino.  Just book a cheap van, get*
24  *on the plane and get there.  But Jon is not expecting to send*
25  *more money this week, and I have to convince him, which I may*

1373

1    *be able to, send more, tomorrow.*

2        Kimberley, *Can you come down to floor to grab 2K from*

3    *me?  I won.  We have to cancel car.  Isn't that what we started*

4    *with?  I'm not hungry.*

5        Michael, *Okay.*

6        Kimberley, *No, is it less.  I can't remember.*

7        Michael, *We started with 10,600 exactly.*

8        Kimberley, *Do we have a rental?  So we are up $103.*

9        Michael, *No.  I need to have a return ticket booked to*

10   *book a rental with Hertz using debit card.  Including rent and*

11   *Discover, we have just enough money now for the trip and rent*

12   *and Discover, if we wanted to stay to Saturday.*

13       Kimberley, *You need to deal with Jon first thing in*

14   *AM.  I'm serious.*

15       Michael, *Yes, I do.  But like you're going to have all*

16   *day at the casino tomorrow.*

17       Kimberley, *First thing in AM.  Funds are going to*

18   *Navy, right?*

19       Michael, *If you want.*

20       Kimberley, *Can you bring me the rest of the cash and*

21   *chip?  I'm at slots right outside coffee.*

22   Q   Let's stop there.  Let's go back to Government's Exhibit

23   1008.  Let's go to page 20.  What do you see after December

24   11th, 2019?

25   A   The next day, Navy Federal Credit Union, account ending in

1    '5336, received $24,500 and there's a wired charge on that day.

2    Q    Now, let's look at page 22.  What happened on February

3    12th, 2020?

4    A    There's a wire fraud charge that day, Navy Federal Credit

5    Union, account ending in '5336, received $33,000, and then

6    there are text messages between Michael and Kimberley.

7    Q    Let's look at Government's Exhibit 925.  What is that?

8    A    Text messages between Michael and Kimberley.

9    Q    On what day?

10    A    February 12th, 2020.

11    Q    Please read these for us.

12    A    Kimberley, *Did you talk to Jon?  All three of the payments*

13    *bounced.  Can you resubmit online via ACH.*

14          Michael, *I'm still sitting here waiting.  I'm going to*

15    *give it a few min, and then I'll just go to the place on*

16    *Federal.  I could have been there already.  I didn't know Jon*

17    *is with Chris right now in Florida.  Called him and he was*

18    *sitting right next to him, setting a time to speak.  I will*

19    *resubmit payment.  Do we know if Amex will --* sorry.  *Do we*

20    *know if Amex will auto resubmit or contact you first*?

21          Kimberley, *Did you talk to Jon?  He is definitely*

22    *pushing it through now?  Don't forget to pay.  Use Bitpay.  But*

23    *like ten sessions.  He says sending it now.*

24          Michael, *He says he is sending it all at once.*

25    Q    What is BitPay?

1    A    BitPay is a cryptocurrency associated company.  They

2    basically allow you to convert your crypto to cash.  I believe

3    they have, like, a debit card, and you can use that to use your

4    crypto-like cash.

5    Q    And what date were these text messages?

6    A    February 12th, 2020.

7    Q    Let's look at Government's Exhibit 410, which is in

8    evidence.  What do you see there?

9    A    That's a photo of Michael Tew at one of the Navy Federal

10   Credit Union branches, here in Colorado.

11   Q    On what date?

12   A    February 12th, 2020.

13   Q    Let's go back to Government's Exhibit 1008, page 22.  What

14   happened on February 15th, 2020?

15   A    On February 15th, there are text messages between Michael

16   and Kimberley.

17   Q    Let's look at Government's Exhibit 924, which is in

18   evidence.  What are these?

19   A    Text messages between Michael and Kimberley.

20   Q    On what date?

21   A    February 20 -- I'm sorry, February 15th, 2020.

22   Q    Can you please read these for us?

23   A    Michael, *Spoke to Jon, 50K Tuesday for Wednesday, 50K*

24   *Wednesday for Thursday or Thursday for Friday*.

25        Kimberley, *Do you think for sure?*

1        Michael, *Yes, I will try to get more but that's what*

2   *he has guaranteed.  Have the 10K, now what*?

3        Kimberley, *I need at least half in BTC.*

4        Michael, *Okay, so 5K BTC?  I'll go buy now at the Dry*

5   *Creek gas station and get gas.*

6        Kimberley, *I need like $6500 in BTC.*

7        And then there's a screenshot or a photo.

8        Michael, *Okay.*

9   *Q*   Is this that screenshot?

10  *A*   Yes.

11  *Q*   What is that?

12  *A*   That's a QR code of a Bitcoin wallet, a public address.

13  *Q*   Next page.

14  *A*   Michael, *Here now.*

15  *Q*   Now, let's go back to Government's Exhibit 1008, page 23,

16  please.  What happened on March 10th, 2020?

17  *A*   There's a wire fraud charge, Navy Federal Credit Union

18  received $35,000.  There are text messages between Michael and

19  Kimberley.

20  *Q*   Government's Exhibit 932.  These text message exchanges

21  that day?

22  *A*   Yes.

23  *Q*   Please read them for us?

24  *A*   Michael, *No job.  Job.  Job.  Job.  Jon.*

25        Kimberley, *No.  When I said you needed to get Monday.*

1    *You screamed fuck, fuck.*

2            Michael, *Because I don't know if I can.  And he needs*

3    *invoices.  He has been hounding me.  I will end up fighting*

4    *with either him, you or Alden.  Going to Navy.*

5            Kimberley, *how much did you withdraw from Global?*

6    *Don't go to Navy.  It's a waste of time and I didn't mean don't*

7    *buy BTC.  Fuck me.*

8            Michael, *I got the 2 at L, from global.  At the ATM*

9    *now.*

10   Q    Those were on what date?

11   A    March 6th, 2020.

12   Q    Let's go back to our calendar, 1008, page 23.  Was there a

13   conversation on March 10th?

14   A    Yes.

15   Q    Let's look at Government's Exhibit 934.  Is this that

16   conversation?

17   A    Yes.

18   Q    Please read it for us.

19   A    Kimberley, *Can you go to Navy and withdraw 20 to buy BTC*?

20           Michael*, Okay.  The only Navy that will do 20K is*

21   *Centennial FYI.*

22           Kimberley, *How much will Aurora do*?

23           Michael, *10K that's it.  I can call ahead and see if*

24   *they will do more.  Jon said end of the week for rest, but he*

25   *is confirming today when.  I can wire out same day from*

1    *DigitalMint.  They just need to send by 2:30 our time.*

2          Kimberley, *You can't do more than five?  End up week,*

3    *so sending tomorrow, right*?

4          Michael, *Tomorrow is Wednesday.  I have a feeling he*

5    *will do pry tomorrow and part Thursday.  I mean selling.  We*

6    *need to put money back into the account when we have it.*

7    Q    Let's look at Government's Exhibit 421.  What is this?

8    A    That's an ATM photo from one of the Navy Federal Credit

9    Union ATMs.  It's dated March 11th, 2020.

10   Q    Is that the day after the text exchange we looked at?

11   A    Yes.

12   Q    But what time in the morning is that?

13   A    Midnight, basically 12:12 a.m.

14   Q    Now, let's look at Government's Exhibit 1008, again, page

15   23.  What happened on March 20th, 2020?

16   A    There's a wire fraud charge, and Navy Federal Credit Union

17   account ending in '5336 received $22,500.

18   Q    Were there texts that day, as well?

19   A    Yes, there were.

20   Q    Let's look at Government's Exhibit -- as well as two days

21   prior?

22   A    Yes.

23   Q    Let's look at Government's Exhibit 938.  What are these?

24   A    Text messages between Michael and Kimberley.

25   Q    Please read them for us.

1    *A    Kimberley, I messaged Jon truthfully we owe him our lives*

2    *he helped save us --* sorry.  *He saved us and helped us when no*

3    *one would.  I thought you guys were friends, but all you do is*

4    *fight.*

5    Q    Stop there.  Did we read this one earlier?

6    A    Yes.

7    Q    Now, let's look at Government's Exhibit 403.  What is this?

8    A    That's a photo from a ATM at Navy Federal Credit Union,

9    dated March 20th, 2020.

10   Q    Let's go back to our calendar.  Page 23.  After getting

11   that $22,500 on March 20th, 2020, were there additional

12   conversations?

13   A    Yes.

14   Q    Look at Government's Exhibit 942.  What is this?

15   A    Text messages between Michael and Kimberley.

16   Q    How many days after getting the money?

17   A    Three.

18   Q    Please read them for us?

19   A    Kimberley, *We bounced rent, just got the notice.  Jon has*

20   *to send today.*

21        Michael, *I'm trying.*

22        Kimberley, *Are you getting anywhere with Jon*?

23        Michael, *He's in the office dealing with this hack.*

24   *I'm texting him, but he not committing yet.  He is not*

25   *committing to send today.*

 1          Kimberley, *Fuck.  And tomorrow?*

 2          Michael, *Working on it now.  Pushing him to ducking*

 3   *just send something already.  He says tomorrow, but won't say*

 4   *how much.*

 5          Kimberley, *At least a range.  Who are you on the phone*

 6   *with?  Hello.  Who are you on the phone with?  Why won't he*

 7   *send something today?  It would be blended in with everything*

 8   *else that was overdrawn and didn't go out.*

 9          Then there's a screenshot.

10          Michael, *Should I try at the desk?  Or just ATM.*

11   Q    Is this next page the screenshot?

12   A    Yes.

13   Q    What is that?

14   A    It appears to be a screenshot from either the Wells Fargo

15   app or their website, giving a code to use at a Wells Fargo

16   ATM.

17   Q    Next page.  Oops, that's it.  All right.  Let's go back to

18   our calendar, 1008, and if we could go to page 26.  What

19   happened on June 25th, 2020?

20   A    There are text messages between Michael and Kimberley and

21   Navy Federal Credit Union, account ending '3094 received

22   $71,550.

23   Q    Let's look at Government's Exhibit 967.  What is this?

24   A    Text messages between Michael and Kimberley.

25   Q    Please read these for us.

1    *A    Kimberley, Just to be safe should you go to Jon for another

2    30?*

3            *Michael, I'll ask.  I don't know what he will do.  Are*

4    *you mad at me?*

5            *Kimberley, I'm scared.  How do it all?  Can you figure*

6    *out a plan?  Plan?  I'll make it happen today.*

7            *Michael, Yes.  I don't know how much you owe.  Don't*

8    *worry about Jon.  We can send him little bits as we go.  He is*

9    *not answering.  He is on with Chris.  I promise I will get him.*

10   *He won't call her.  He said JT will get her antenna up, and*

11   *she'll just call Lori.  He did say he will probe her in person*

12   *in the office tomorrow, which will make sense, and he will see*

13   *what else he can learn.  At gas station.*

14           *Kimberley, Whatever.  If this was you, you would be*

15   *freaking out.  I thought Lori and Abby hate each other*?

16           *Michael, Lori hates everyone until she doesn't.  She's*

17   *a lunatic.  It could be nothing.  We haven't done anything*

18   *wrong.  Certainly not to them.*

19   *Q*   All right.  During your review of the text messages, did

20   you look for anything indicating that Michael and Kimberley

21   were communicating with someone named Michael Meyers?

22   *A*   I did.

23   *Q*   Did you find anything?

24   *A*   I found some messages, yes.

25   *Q*   Let's look at Government's Exhibit 804.  What is this?

1   A    Those are text messages between Michael and Kimberley.

2   Q    And at what time?

3   A    July 6th, 2019.

4   Q    Let's go to the next page.  And if you could, let's start

5   reading from there?

6   A    Kimberley, *What did you withdraw last night from each*?  And

7   then there's a screenshot of a text message conversation.

8        *This is why I'm asking about Jon*.

9   Q    Let's go to the next page and look at that screenshot.

10  What is that screenshot?

11  A    That's a screenshot of communications with Meyers, whale

12  emoji, Mike.  It appears that it says, *nor the fucking patience*

13  *to pussyfoot around any longer* and then there's a photo of a

14  1099 from National Air Cargo, and then Michael Meyers said,

15  *This is what I am talking about, this is not mine to deal with*.

16  Q    Let's go to the prior page.  What's the message after that

17  screenshot?

18  A    *This is why I'm talking about Jon*.

19  Q    What is the response?

20  A    *Kley@me.com, 320, from '3494, 420 from '5336, 200 from*

21  *'8486*.

22  Q    There's a bunch of numbers there.  Do those mean anything

23  to you?

24  A    The second set of numbers are the last four of accounts in

25  the name of Michael Tew in Navy Federal Credit Union and the

1383

 1    last one is the joint account that both Michael and Kimberley

 2    were signers on.

 3    Q   Let's go to page four.  That's it.  Now, let's look at

 4    Government's Exhibit 805.  What is this?

 5    A   Text messages between Michael and Kimberley.

 6    Q   Same time period as the messages we were looking at

 7    earlier?

 8    A   I believe it's the next day.

 9    Q   Okay.  Are there two screenshots here?

10    A   Yes.

11    Q   Let's look at the next page.  Is this one of them?

12    A   Yes.

13    Q   And the next page another one?

14    A   Yes.

15    Q   Who is this one from?

16    A   This is from someone named Chris.

17    Q   What does it say?

18    A   *Prove me wrong by paying me back.  LOL, I am spending all*

19    *of the money I have on an attorney.  I will put back everywhere*

20    *that you paid me back.  Okay.  You are on online slandering me.*

21    Q   Let's go to the next page.  Please read these.

22    A   Michael, *He's just empty threats*.

23            Kimberley, *No, Mike is dumb.  So dumb.  Dumb enough to*

24    *do it*.

25            Michael, *Nothing on Bitcoin talk*.

1    Q    Let's go to page six.  Another screenshot there?

2    A    Yes.

3    Q    Let's look at page seven.  Is this the screenshot?

4    A    Yes.

5    Q    What does it say up at the top?

6    A    Chris.

7    Q    Please read these for us?

8    A    *You are getting yourself arrested.  If you keep up with the*

9    *lies.  I haven't done anything illegal.  According to you.*

10   *Keep telling yourself that.  And the fact that you're inferring*

11   *I have, is really sick.  Pay me back and fast, and we are good.*

12   *We part ways.  I'm not inferring anything, like you do with me.*

13   *I have facts.  You will never see a penny, if you don't*

14   *apologize.  That's a different thing.*

15   Q    Let's go back.  All right.  Let's read the messages after

16   that screenshot?

17   A    Kimberley, *I think Mike already did something.  He posted*

18   *an image on ICQ but deleted it.  We need to go to the police*

19   *about Christian.*

20   Q    Let's go to page -- keep reading?

21   A    Michael *Okay.  In car.  They're talking to each other.  I*

22   *can't imagine it's anyone else.*

23              Kimberley, *Who?*

24              Michael, *Mike and Chris.*

25              Kimberley, *How do you know?  Call Mike.  I mean Mike*

1    *will tell you.  I can't text him.*

2    Q   All right.  Now, let's go to page 36.  All right.  Please

3    read these.

4    A   Michael, *She's transferring now.  Yeah.  So how do you send*

5    *Christian money?  When does it ever end?  You can't send him a*

6    *penny.  The only thing that concerns me about Chris and Mike is*

7    *National.  It will never end.*

8         I apologize, I misread that.  That message, first one

9    is from Kimberley.  *The only thing that concerns me about Chris*

10   *and Mike is National.*  Then Michael responds, *It will never*

11   *end.*

12   Q   Okay.  Let's go back to Government's Exhibit 1008, page 26.

13   What happened on June 30th, 2020?

14   A   Navy Federal Credit Union, account ending in '3094,

15   received $95,000, and Global Fuel Logistics emailed Jonathan

16   Yioulos.

17   Q   Where were you on July 1st, 2020?

18   A   I was here in Denver.

19   Q   What happened on July 1st, 2020?

20   A   Myself and FBI Special Agent Sarah Anderson contacted -- we

21   made contact, our first overt contact with someone at National.

22   We spoke to several people that day, including Abby Schwartz,

23   Chris Alf and I believe Brian Boyd.

24   Q   Let's look at the next page of this Exhibit.  What happened

25   between Jonathan and Kimberley that day?  There were text

1    messages between Jonathan and Kimberley.

2    Q    Government's Exhibit 972.  Did you take this photograph?

3    A    I did.

4    Q    What is it?

5    A    It's a photograph of Mr. Yioulos' phone, particular text

6    message exchange between Mr. Yioulos and phone number beginning

7    I believe it's 469.

8    Q    Did you try to gather more information about that telephone

9    number?

10   A    I did.

11   Q    What did you do?

12   A    I obtained subscriber information and header information

13   from Google.

14   Q    Let's look at Government's Exhibit 522.  Which is not yet

15   in evidence.  What is this?

16   A    These are records from Google, regarding the use of that

17   Google Voice number.

18        MR. FIELDS:  Pursuant to the Declaration, at

19   Government's Exhibit 1125, the government would admit this

20   record into evidence.

21        THE COURT:  Any objections?

22        MS. HUBBARD:  Your Honor, we would ask for the

23   entirety of the Google Voice records related to this account to

24   be admitted as part of the exhibit.

25        THE COURT:  Do we have the remainder of the records?

1    MR. FIELDS: We didn't mark them as an exhibit, but

2  the defense has them and we have no objection if the defense

3  wants to admit.

4    MS. HUBBARD: I have marked as a defense exhibit one

5  other page, so if the government is not going to object to me

6  using that during Cross, I think we can handle it that way.

7    THE COURT: Okay. Let's handle it that way. Thank

8  you. So this will be admitted then.

9  Q  All right. Have you, personally, used Google Voice?

10 A  I have.

11 Q  What is Google Voice?

12 A  It's a Voice Over IP service. So, you can, basically, get

13 a phone number to use from Google, that instead of connecting

14 to traditional like signal cellphone towers, just works over

15 the Internet.

16 Q  When you use the service, does it ask you for information?

17 A  It does.

18 Q  What information?

19 A  Your name, your email account, and I believe that's it.

20 Q  Can you put in any information you want?

21 A  Yes, you can.

22 Q  So again, could you put in the name of someone else, if you

23 wanted to?

24 A  I could.

25 Q  What name is listed here?

1   A   Kimberley Tew.

2   Q   Did you look for other indications that Kimberley Tew used

3   Google Voice?

4   A   I did.

5   Q   Government's Exhibit 1008, page 12.  What happened on April

6   23rd, 2019?

7   A   Navy Federal Credit Union, account ending '8486, received

8   $18,750 and text messages between Michael and Kimberley.

9   Q   Now, let's look at Government's Exhibit 760.  What is this?

10  A   Text messages between Michael and Kimberley.

11  Q   And do you see an attachment there first?

12  A   I do.

13  Q   Let's look at the next page.  What is this?

14  A   Those are the settings for Google Voice number.

15  Q   Do you see email account associated with it?

16  A   I do not.

17  Q   Well, do you see forward --

18  A   Yes.  Forward messages to email *kley@me.com*.

19  Q   This number here, does it match the number that sent the

20  text to Jonathan Yioulos?

21  A   It does.

22  Q   As a user of Google Voice, do you know how many numbers you

23  can get?

24  A   I don't off the top of my head, but I know you can get more

25  than one, at once.

1    Q    Let's go back to Government's Exhibit 1008, page 23.  Were

2    there text messages on March 18th, 2020?

3    A    There were.

4    Q    Let's look at Government's Exhibit 938, page two.  We

5    looked at this a little bit earlier.  What does it say up there

6    at the top?

7    A    From my Google Voice.

8    Q    Now, let's go back to Government's Exhibit 1008, page 26.

9    Maybe.  What happened the -- let's go, actually, to page 27.

10   What happened on the day after that text message was sent?

11   A    Are you referring to the messages on July 1st?

12   Q    Yeah.  What happened after July 1st?

13   A    Global Fuel Logistics emailed an invoice to Mr. Yioulos.

14   Q    All right.  Let's take that down.  And now let's -- can you

15   look at Government's Exhibit 427.  Do you recognize the person

16   in this photograph?

17   A    I do.

18   Q    That photograph rather pixilated?

19   A    It is.

20   Q    Even though it's pixilated, how are you able to identify

21   the person in that photograph?

22   A    This photograph does not exist in isolation on its own.

23   There are other images, from that same bank branch that day,

24   about the same time, that clearly show Ms. Tew, and based on

25   her outfit and her general characteristics, as well as the

1390

1    timing, I'm comfortable that that is Kimberley Tew.

2    *Q*   Do you see -- let's zoom in on this photo, 427.  Is there a

3    date on it?

4    *A*   It is.  It's June 11th, 2019.

5    *Q*   Showing Government's Exhibit 414, which is in evidence.  Is

6    this that same date?

7    *A*   It is.

8    *Q*   And what do you see?

9    *A*   I see Kimberley Tew holding a brown bag in what appears to

10   be a pale pink shirt.

11   *Q*   What did you notice when you compared this photograph with

12   427?

13   *A*   I believe this photograph appeared to be several minutes,

14   maybe a half-hour later, and it appears to be the same

15   location, and I visited that location.

16        *MR. FIELDS:*  Your Honor, at this time the government

17   would move for admission of Government's Exhibit 427.

18        *THE COURT:*  Any objections?  It's admitted.

19   *Q*   Let's go back to 427.  Let's go back to -- let's go

20   Government's Exhibit 961.  What is this?

21   *A*   Text messages between Michael and Kimberley.

22   *Q*   What date?

23   *A*   June 9th, 2020.

24   *Q*   All right.  What does it say?

25   *A*   *Jon sent 93,* from Michael.

1           Michael, *Done here.  How much from the bank*?

2           Kimberley, *What can you get*?

3           Michael, *I may be able to get 20 again.*

4           Kimberley, *Okay.*

5           Michael, *Have to ask when I get there, I guess.  Is*

6    *that okay*?

7           Kimberley, *Okay.*

8           Michael, *The bank, finishing up.  The manager wants to*

9    *speak with me.  Can't wait to see what he has to say.*

10          Kimberley, *What the fuck?  Before you got your cash.*

11   *Don't take shit from them.*

12          Michael, *No.  As I'm finishing up.  I'm not.*

13          Kimberley, *Did they give you the cash*?

14          Michael, *They're all being really nice.  Like overly*

15   *nice.  I got the cash.  She's doing the report.*

16          Kimberley, *They probably got in trouble.*

17   *Q*   What date is that?

18   *A*   June 9th, 2020.

19   *Q*   Let's look at Government's Exhibit 420.  What is this?

20   *A*   That is a photo of Navy Federal Credit Union branch here in

21   Colorado, dated June 9th, 2020.

22   *Q*   Let's go to Government's Exhibit 1008, page 23.  What

23   happened on March 27th, 2020?

24   *A*   Navy Federal Credit Union, account ending '5336, received

25   $32,300.  Then text messages between Michael and Kimberley.

1    Q    Let's look at Government's Exhibit 943.   Zoom in.   What are

2    these?

3    A    Text messages between Michael and Kimberley.

4    Q    Please read them for us.

5    A    Kimberley, *Don't withdraw from my card end* --

6              THE COURTROOM DEPUTY:   This exhibit is not in

7    evidence.

8              MR. FIELDS:   I'm sorry.   Let's back up.   I apologize.

9    Thank you, Robb.   I apologize to the Court.

10   Q    All right.   Let's look at Government's Exhibit 1008,

11   page -- well, let's actually take that out.

12             Did you find any evidence that Michael Tew was using

13   the money that he received from National to buy cryptocurrency?

14   A    I did.

15   Q    What about Kimberley Tew?

16   A    I found evidence that Kimberley was using the money from

17   the false invoices to buy cryptocurrency, as well.

18   Q    How were you able to figure that out?

19   A    Couple of different ways.   One was as we discussed

20   previously, text messages and context clues, based on the text

21   messages.   We looked at bank records, specific transactions,

22   and then much of the cryptocurrency was purchased at what I

23   refer to as Bitcoin ATMs, where you can buy Bitcoin or other

24   cryptocurrency with cash.   Those ATMs frequently take photos or

25   video of the transactions when they are happening, and so I was

1393

1    able to obtain some of those photographs, and the supporting

2    transaction records.

3    Q    Let's look at Government's Exhibit 471 and 472.  What are

4    those?

5    A    Those are transaction details from Red Leaf Chicago, which

6    does business as Digital Mint, that's a Bitcoin ATM company.

7            MR. FIELDS:  Pursuant to the Declarations at 1132 and

8    1133, the government moves for admission of those exhibits.

9            THE COURT:  Any objections?  Those are admitted.

10   Q    All right.  Let's look at Government's Exhibit 1008, page

11   13.  What happened on page 16th, 2019?

12   A    Navy Federal Credit Union account, ending in '8486,

13   received $19,900.

14   Q    And what happened on May 20th, 2019?

15   A    There were text messages between Michael and Kimberley.

16   Q    Let's look at Government's Exhibit 776.  Let's go to page

17   two.  All right.  And let's go from here.

18   A    This is a picture of a Chase deposit slip, and at the top

19   is written *No Refund For Bitcoin*.

20   Q    Next page.  Can we go to the next page?

21   A    Michael sends an attachment that's a photo.  Then says,

22   *Call me.  All cards saying we are at limits.  Have not tried*

23   *the '9396 cards.  Nothing.*

24   Q    What is that?

25   A    That appears to be a screen -- a picture of a Bitcoin ATM

1394

1    screen.

2    *Q*   Next page?

3    *A*   Kimberley, *Okay.  One second.  Deposit $1,220 into that*

4    *account.*

5          Michael, *Okay.  I'm so sorry.  Our cards are all*

6    *jammed up.*

7          Kimberley, *Is nothing coming in tomorrow?*

8          Michael, *No.  I have to pressure him in the AM very*

9    *hard.*

10         Kimberley, *Great.*

11         Michael, *Have cash.*

12   *Q*   Did you find examples of days where Michael was putting

13   money from National into Bitcoin ATMs?

14   *A*   Yes, I did.

15   *Q*   Let's look at Government's Exhibit 1008 again, page 24.

16   What happened on April 30th, 2020?

17   *A*   Navy Federal Credit Union, account ending '5336, received

18   $36,240 from National.

19   *Q*   Did you look at the underlying bank records and follow the

20   transfers from there?

21   *A*   I did.

22   *Q*   Government's Exhibit 322.  What is this?

23   *A*   It's a bank -- credit union statement from Navy Federal

24   Credit Union, for accounts in the name of Kimberley Tew, for

25   the period April 17th, 2020, to May 16th, 2020.

1        MR. FIELDS:  Pursuant to the Declaration, at 1128, the

2   government would move for admission of this exhibit.

3        THE COURT:  Hearing no objection, it's admitted.

4   Q   And you mentioned this Red Leaf Chicago?

5   A   Yes.

6   Q   Do Bitcoin ATMs take photographs of their users the way

7   regular ATMs do?

8   A   They do.

9   Q   Did you ask Red Leaf Chicago for pictures of ATMs?

10  A   I did.

11  Q   Did you obtain photographs from April 30th, 2020?

12  A   I did.

13  Q   Let's look at -- these are not yet in evidence, 477, 478,

14  479, 480, 481, 482, and 483.  What are those?

15  A   Those are all photos from Bitcoin ATMs operated by Red Leaf

16  Chicago.

17        MR. FIELDS:  Pursuant to Declaration, at Government's

18  Exhibit 1132, the government would move for admission of those

19  exhibits.

20        THE COURT:  Any objections?  Those are admitted.

21  Q   Did you also obtain records showing transactions with

22  related cryptocurrency exchanges?

23  A   I did.

24  Q   Let's look at Government's Exhibit 570, which is not yet in

25  evidence.  What is that?

1    *A*    These are transaction records from Kraken.

2    *Q*    For what user?

3    *A*    I believe these were from Michael Tew's account.

4          *MR. FIELDS:*  Pursuant to the Declaration, at

5    Government's Exhibit 1106, the government move for admission of

6    this exhibit.

7          *THE COURT:*  Hearing no objection, it's admitted.

8    *Q*    After gathering all of these photos, the bank deposits, did

9    you prepare an exhibit to help organize it all?

10   *A*    I did.

11   *Q*    What did you do?

12   *A*    I did a couple of different things.  I started with a map

13   of Denver, because I wanted to see where the transactions took

14   place in the city, and once I identified relevant locations, I

15   then started adding in financial transactions from bank

16   records, generally, Navy Federal Credit Union, and then I took

17   those records and photos, if I had them, and also added in the

18   Bitcoin ATM transactions, based again on the transaction

19   summaries that we had and the photos provided by Red Leaf

20   Chicago, and I put them together to, kind of, see what

21   happened, in real time, once cash was obtained from Navy

22   Federal Credit Union, where did it go?

23   *Q*    Let's look at Government's Exhibit 1024, which is not yet

24   in evidence.  This one of the summaries that you prepared?

25   *A*    Yes it is.

1    MR. FIELDS: Pursuant to Rule 611, I would ask for

2    permission to publish this. I don't intend to admit it.

3    Relates to all of the exhibits that have already just been

4    admitted.

5    THE COURT: Okay. Understanding that it's being

6    displayed as a demonstrative, not admitted, any objection?

7    MS. FROST: We would just object to, again, the

8    witness reading from a demonstrative, because it hasn't been

9    admitted.

10   THE COURT: Okay. Overruled. You can use it as

11   described. Go ahead.

12   Q   All right. This described transaction on April 30th, 2020?

13   A   A series of transactions, yes.

14   Q   Let's go to the next page. So what is this?

15   A   One of the places I like to start, when I have multiple

16   accounts that I'm looking at, is kind of a flowchart of what

17   came in and what went out. So, in this case, the green box on

18   the top left shows an incoming ACH from National Air Cargo on

19   April 30th. It went into the account at Navy Federal Credit

20   Union, in the name of Michael Tew, ending '5336. Once the

21   money was in the account, I looked, at a high level of where

22   the money went. The goal was not to account for every single

23   transaction in this flow chart, just, kind of, the larger

24   dollar value ones, to get a general understanding of where the

25   money went.

1    So, I was able to see there was a $26,000 transfer

2    from Mr. Tew's account, into the joint account, held by Michael

3    and Kimberley, and then there were also two $5,000 transfers to

4    accounts in the name of Kimberley Tew.  From there, the money

5    that went to the joint account, there was a $9,000 cash

6    withdraw, then another $15,000 transfer to an account in the

7    name of Michael Tew, ending '3494, and then there was a $12,000

8    wire to Kraken.  There were also approximately a thousand

9    dollars worth in ATM withdrawals out of both of the accounts in

10   the name of Kimberley Tew.

11   Q   Let's go to the next one.  What is this?

12   A   I mentioned I started with a map of Denver, that arrow

13   shows the very approximate location of the Navy Federal Credit

14   Union, where that $9,000 cash was withdrawn, and based on bank

15   records, I believe it happened at about 2 PM.

16   Q   Next one.  What is this?

17   A   Those -- that is the Navy Federal Credit Union statement,

18   showing the $9,000 cash withdrawal from the joint checking

19   account, and then also ATM withdraw the next day.  But you can

20   see, within the description, it actually says April 30th, 2020,

21   even though it's dated 5-1 on the bank statement.

22   Q   Next one what is this?

23   A   That's a photo from Navy Federal Credit Union ATM.  It's

24   dated April 30th, 2020.

25   Q   Next one.

1    *A*    So, next, the arrow shows the very approximate location of

2    one of the Digital Mint Bitcoin ATMs.  It's located on Colfax,

3    and based on the Bitcoin ATM records, it appears that they

4    purchased about $11,300 worth of Bitcoin.

5    *Q*    Next page, and the next page, next page, next page, next

6    page, next page.

7           So, the previous pages we were looking at, what were

8    those?

9    *A*    Those were photos from Red Leaf Chicago, each photo

10   corresponded to a single transaction in that spreadsheet.  The

11   only thing I added to those photos was I added the time.  I got

12   the time by comparing the image, name itself, which was the

13   transaction identifier, to the actual record in the underlying

14   transaction details, which contain the date and time.

15   *Q*    Then what's here?

16   *A*    The next arrow was the approximate location of another Red

17   Leaf Chicago Bitcoin ATM, about 6 PM, another $28,000 of

18   bitcoin was purchased.

19   *Q*    Next page.  Is this photographs?

20   *A*    Yes.

21   *Q*    Next page.  Did you find a similar example involving

22   Kimberley Tew?

23   *A*    I did.

24   *Q*    Let's look at Government's Exhibit 1008, page 23.  March

25   6th, 2020, what happened?

1400

1   *A*   Wells Fargo, account ending '2064, received $24,200 from

2   National, and then there were text messages between Michael and

3   Kimberley.

4   *Q*   Did you also follow these bank -- follow the money from

5   those transactions?

6   *A*   I did.

7   *Q*   Let's look at Government's Exhibit 320, which is not yet in

8   evidence.  What is this?

9   *A*   That's a bank statement from Navy Federal Credit Union, for

10  Kimberley Tew's accounts, the time period is February 17th,

11  2020 through March 16th, 2020.

12        *MR. FIELDS:*  Pursuant to the Declaration, at

13  Government's Exhibit 1128, the government would move for the

14  admission of this record.

15        *THE COURT:*  No objection, so it's admitted.

16  *Q*   Similarly, did you look for photographs from Bitcoin ATMs

17  on that day?

18  *A*   I did.

19  *Q*   Let's look at Government's Exhibits 475 and 476, which are

20  not yet in evidence.  What are these?

21  *A*   They are photos of Kimberley Tew at the Bitcoin ATM

22  operated by Red Leaf Chicago.

23        *MR. FIELDS:*  Pursuant to the Declaration, at

24  Government's Exhibit 1132, the government would move for

25  admission of these records, Your Honor.

1401

1        THE COURT:  Any objections?

2        MS. FROST:  No objection.

3        THE COURT:  They are admitted.

4    Q   Did you prepare a similar summary slide?

5    A   I did.

6    Q   Does it fairly and accurately describe the exhibits that we

7    were just talking about?

8    A   It does.

9        MR. FIELDS:  Your Honor, pursuant to the Rule 611, the

10   government would ask for permission to publish Government's

11   Exhibit 1025, but not admit.

12       MS. HUBBARD:  I'm going to object under 401, 403.

13       THE COURT:  Can we, actually, pull it up?  I can't see

14   it.  Okay.  So, could you scroll through it?  So, I will

15   overrule it.  It's admitted.

16       MS. FROST:  And, Your Honor, just we would lodge the

17   same objection, as we did to the other exhibit.

18       THE COURT:  Understood.  Overruled.

19       MS. HUBBARD:  Sorry, Your Honor, and just for purposes

20   of the record, I think you said it was admitted.  My

21   understanding it's just being displayed, not admitted.

22       THE COURT:  I'm sorry.  Right.  Yes.  Overruled, but

23   you are allowed to display it.  Sorry.

24       MR. FIELDS:  Thank you, Your Honor.  Getting late in

25   the afternoon.  I promise we're almost done.

1402

1     *THE COURT:*  Keep me on track.  Thanks.

2  Q   Let's go to page two of this.  Okay.  What is this?

3  A   This is very much the same as the previous exhibit, just a

4  flowchart showing the high-level transactions.  Again, it does

5  not capture every transaction, just the larger ones.

6          On March 6th, there was incoming ACH from National Air

7  Cargo, in the amount of $24,700, went into Wells Fargo ending

8  in '2094 in the name of Global Fuel Logistics.  From there

9  there was a $16,500 wire transfer into Kimberley Tew's account,

10  ending in '3009.  And as you can see, there are then subsequent

11  transfers to other accounts in the name of Ms. Tew, before

12  $45,000 of cash is withdrawn from the Navy Federal Credit

13  Union, ending in '4602.  And the photos, which, if we go to the

14  next slide, you can see, more clearly, is a photo of the cash

15  withdrawal at Navy Federal Credit Union that day.

16  Q   Let's go to the next page.  Same day?

17  A   Yes.

18  Q   And then the next page.  And then what do we see here?

19  A   Kimberley Tew, it appears that she was at the Bitcoin ATM

20  in two transactions.  You can see the amounts there, Bitcoin

21  was purchased using cash.

22  Q   All right.  So, we saw an example with Michael an example

23  with Kimberley.  Did you find an example where both Michael and

24  Kimberley put money from National into a Bitcoin ATM?

25  A   I did.

1  *Q*   Let's go to Government's Exhibit 1008, page 26.   What

2  happened on June 23rd, 2020?

3  *A*   Navy Federal Credit Union, account ending in '3094,

4  received $97,545 from National.

5  *Q*   Let's look at Government's Exhibit 346.   What is this?

6  *A*   A Navy Federal Credit Union statement for Global Fuel

7  Logistics.   I believe it is for the month of -- of June 2020.

8      *MR. FIELDS:*   Pursuant to the Declaration, at

9  Government's Exhibit 1128, the government moves for admission

10  of Government's Exhibit 346.

11      *THE COURT:*   Hearing no objections, it's admitted.

12      *MR. FIELDS:*   Mr. Keech, was Government's Exhibit 330

13  admitted?

14      *THE COURTROOM DEPUTY:*   No, it was not.

15  *Q*   Let's look at Government's Exhibit 330.   What is that?

16  *A*   That is a -- sorry -- Navy Federal Credit Union statement

17  for it appears -- thank you.   June 17th, 2019 through -- July

18  16th, 2019.

19  *Q*   And Government's Exhibit 381, what is that?

20  *A*   That is a Navy Federal Credit Union statement for accounts

21  in the name of Kimberley Tew, from June 17th, 2019, to July

22  16th, 2019.

23      *MR. FIELDS:*   Pursuant to the Declaration, at

24  Government's Exhibit 1107, the government would move for

25  admission of Government's Exhibits 330 and 381.

1404

 1          THE COURT:  Hearing no objection, those will be

 2     admitted.

 3     Q   Did you try to find out if there were photographs from

 4     Bitcoin ATMs on June 23rd of 2020?

 5     A   Yes.

 6     Q   Let's look at Government's Exhibit 484, not yet in

 7     evidence, 485, 486, 487, 488, 489, 490, and 491.  What were

 8     those?

 9     A   Those were photos from a Bitcoin ATM operated by Red Leaf

10     Chicago.

11          MR. FIELDS:  Pursuant to the Declaration, at

12     Government's Exhibit 1132, government would move for admission

13     of those exhibits.

14          MS. HUBBARD:  Would object under the grounds of

15     cumulative.  I don't think we need a play-by-play,

16     second-by-second.

17          THE COURT:  Objection.  Understood, but overruled.

18     Those are admitted.

19     Q   Did you prepare a similar summary slide?

20     A   I did.

21     Q   Let's look at Government's Exhibit 1026.  Does it

22     accurately describe certain transactions from the exhibits that

23     we just talked about?

24     A   It does.

25          MR. FIELDS:  Your Honor, similarly, pursuant to Rule

1   611, I would ask for permission to publish this exhibit, but I

2   do not intend to admit it.

3        *THE COURT:*  Okay.  Understanding the same objections

4   apply, I will overrule those, and allow you to display it.

5   Q   Let's look at page two.  What is this?

6   A   Again, this is a high-level flowchart showing what happened

7   to the funds.  The first, in the green box, is the $97,545 ACH

8   from National Air Cargo into the Global Fuel Logistics account

9   at Navy Federal Credit Union.  Then, through a series of

10  transfers, the money was disbursed to accounts in the name of

11  both Michael and Kimberley Tew.

12  Q   Next page.  What is this?

13  A   This is a photo from Navy Federal Credit Union, one of

14  their branches here in Colorado, dated June 23rd, 2020.  It

15  says 5:07 PM at the top, but the photographs are in central

16  time, so the time says 6:07 PM.

17  Q   Next page.  What is this?

18  A   It's a photograph of Michael, at one of the Bitcoin ATMs

19  operated by Red Leaf Chicago.  The time on this one is 5:27 PM.

20  I added the time.  The rest is just the photo from Red Leaf

21  Chicago.

22  Q   Where did you get the time from?

23  A   The time was on the transaction, and I misspoke earlier.

24  The time is also in the name of the photo, as well as that

25  unique transaction ID.

1  *Q*   Name of the photo, talking about the digital file?

2  *A*   Yes.

3  *Q*   And let's just keep scrolling through these.  Okay.  As

4  part of your investigation, did you look at bank reports

5  showing transactions happening after money from National Air

6  Cargo hit certain bank accounts?

7  *A*   Yes, I did.

8  *Q*   Were you looking for large dollar transactions in

9  particular?

10  *A*   I was.

11  *Q*   Why?

12  *A*   There's many different types of money laundering, but one

13  which is United States Code --

14       *MS. FROST:*  I object, that this question, and answer

15  being provided, calls for a legal conclusion, and she is not an

16  attorney.

17       *THE COURT:*  Yeah.  Could you rephrase the question to

18  focus, sort of, on the factual matters?

19  *Q*   Were you looking for transactions of over $10,000?

20  *A*   I was.

21  *Q*   Did you find any such transactions?

22  *A*   I did.

23  *Q*   Before your testimony today, did you prepare visual

24  summaries to help show certain transactions to the jury?

25  *A*   I did.

1    Q   Describe what you did?

2    A   I looked for each of the charged money laundering counts.

3    Basically, a way to explain what can be a complex charge, for

4    money laundering, we need to show that the --

5           MS. HUBBARD:  Objection, Your Honor.

6           THE COURT:  Sustained.  Just -- just answer the

7    question, and he can followup, if you need more detail.

8    Q   The summary slides that you prepared, what did you put into

9    each summary?

10   A   The relevant financial information related to each charge.

11   So, generally speaking, it would be the bank statement, that

12   the transaction came out of, as well as any supporting

13   documents; such as, receipts, invoices, confirmations, wire

14   transfers, as well as any supporting text messages or emails

15   that were related to a particular charge.

16   Q   Let's look at Government's Exhibit 42.

17          MS. HUBBARD:  Your Honor, just a heads up, that

18   there's going to need to be discussion outside the presence of

19   the jury as to this series of exhibits.  So, I don't know if

20   you want do that at sidebar or take an afternoon break.

21          THE COURT:  We're getting about to the time for a

22   break.  So, this one, maybe not, but it may make sense to go

23   ahead and take about a 15-minute recess, but if counsel would

24   stay, we can discuss that.

25          So, I will let the jury go.  Again, ladies and

1    gentlemen, all of my previous instructions remain in place and

2    we will be in recess until about 2:45.

3                 THE COURTROOM DEPUTY:  All rise.

4         (Jury out at 2:32 p.m.)

5                 THE COURT:  All right.  Let's take our seats and you

6    can step down, at this point, too.

7                 THE WITNESS:  Thank you, Your Honor.

8                 THE COURT:  So, Mr. Kaplan, did you want to explain --

9    or Ms. Hubbard -- you can always get up and stretch if you need

10   to, but I might call on you.  So, be careful.

11                MS. HUBBARD:  Thank you, Your Honor.  Apologies.  I

12   may have jumped the gun just slightly on this, but I think I

13   was guessing where Bryan was headed -- Mr. Fields was headed,

14   and it's my anticipation that they are going to walk through a

15   series of slides with the witness, that, you know, it was

16   interesting hearing Agent Palmer's testimony about what her

17   goal was in preparing these slides.  It was her view of how to

18   explain to the jury the complex concept of money laundering in

19   a simple way.  And that, Your Honor, is the role of closing

20   argument, to pull out aspects of evidence that has been

21   admitted, and make your argument as to how the government has

22   believed it has proven each of its claims.

23                I don't believe that's appropriate for a witness to do

24   from the witness stand.  I think these are argumentative

25   slides, argumentative evidence, that is not appropriate to come

 1    from the witness stand, as opposed to counsel in a closing

 2    argument.

 3         THE COURT:  So, let me just ask you this.  So, we get

 4    into this with some of the other items, you know, we were

 5    talking about Rule 1006, and I think I agree, those are not

 6    really proper summaries, but you are allowed to use

 7    illustrative and demonstrative exhibits, that don't have to be

 8    summaries, but can be, sort of, someone's depiction of relevant

 9    information.  You can have drawings or computer models or

10    things like that.  Why is this not akin to that?

11         MS. HUBBARD:  Your Honor, I would cite back to the --

12    we filed this in -- I can't remember whether it was a trial

13    brief or a motion in limine, apologies, before trial started,

14    and the Tenth Circuit has said, essentially, there's a balance

15    on these kinds of things, and it really gets into the realm of

16    what's helpful to the jury and what crosses the line into being

17    something that is appropriate for argument, because as the

18    Court knows, the jury is going to receive an instruction that

19    arguments aren't evidence, and that's very different than the

20    situation when you have somebody, under oath, testifying from

21    the witness stand, that is evidence, and so it's a matter of

22    drawing the line and where does the Court want to draw the

23    line, in that respect?

24         THE COURT:  Yeah.  That makes sense to me, and maybe I

25    should get from Mr. Fields like a list of what we're talking

1    about, and I can look at it while we are on the break and just

2    see, since, as you point out, it's, sort of, a fact-intensive

3    thing, but I will let Ms. Frost and Mr. Fields talk.

4    Ms. Frost?

5         MS. FROST:  Yes, Your Honor.  We would just join in

6    the objection on behalf Mr. Tew, based on the fact that it does

7    cross the line into argument.

8         THE COURT:  Okay.  So, Mr. Fields, if you could just

9    point me to what we're going to be talking about here?  And I

10   will just tell you, my initial thought is, as I sort of

11   sustained, kind of, the objection about having her say, *Well

12   here is why I think this is what I think is relevant to money

13   laundering*.  That bothers me, a little bit.  Maybe goes over

14   this line.  But if we're talking about -- if you, instead, say

15   on such and such date, like if you can tie it to dates or

16   transactions, I have less of a problem.  I don't know if that's

17   where we are headed.

18        MR. FIELDS:  It is where we are headed, Your Honor.  I

19   would say, I actually agree with Ms. Hubbard's summary of the

20   law.  We don't intend to have any argument.  Government's

21   Exhibit 1009, we can put that up right now, real quickly.  So,

22   this is one of those examples, right?  And the next slide.  So,

23   there's no argument here.  It's just, sort of, you know, very

24   clearly, like, what the exhibit is.  There's no, sort of,

25   assertions of fact.  Next page.  And it's just, sort of,

1    done -- we've done in advance what we would otherwise do in

2    TrialDirector®, in terms of looking at the various exhibits.

3    And the next page, and the next page, next page.  And so, you

4    can see, you know, there are boxes there drawing attention, but

5    again, it's something that we would do through TrialDirector®.

6    And it's just to show, you know, proceeds from the fraud, and

7    then, you know, there was not $10,000 in the account

8    beforehand.  So the transfer that went out, was, at least,

9    $10,000 worth of fraud proceeds.  Although, she won't actually

10   say that, because that could be potentially argument, but you

11   can illustrate it through the bank records, and we prepared

12   these slides so we can move through them a lot faster rather

13   than pulling them up individually.

14        THE COURT:  Is this another one that you are intending

15   to just show and not send back?

16        MR. FIELDS:  Correct, Your Honor.  The underlying

17   records will have been admitted, but this will not go back.

18   It's to, sort of, walk them through the exhibits faster.

19        THE COURT:  Any response to that?  Because, this seems

20   okay to me, as long as -- I don't like to tell witnesses what

21   to say and what not to say, as long as the witness isn't trying

22   to say, This is Count 5 in my view, I'm okay with this as used

23   just to help walk through, not as an exhibit that would be sent

24   back.  Ms. Hubbard?

25        MS. HUBBARD:  Just going to say, could we go back to

```
 1    the first page, because I believe it has the Count?

 2              MS. FROST:  I was just thinking that.

 3              MS. HUBBARD:  So, I think that's problematic.

 4              MS. FROST:  I do too.

 5              THE COURT:  Yeah.  I'm okay with that.  I think that

 6    that's, again, as long as we're not sending it back, the

 7    government can say, this is Count 42, the date, as long as the

 8    witness doesn't get into explaining their view of what amounts

 9    to money laundering.

10              So, I do want to, actually, take a recess, but I'm

11    going to allow this to be used.

12              Mr. Keech, you can probably tell the jury we will give

13    them an extra five minutes.

14              Obviously, you don't have to make a decision now, but

15    do -- do the defendants, sort of, know or have an inclination

16    about whether they will be calling any witnesses?  I'm just

17    trying to make a plan for tonight and tomorrow.

18              MS. FROST:  On behalf of Mr. Tew, I think probably no

19    witnesses, but play the clips, assuming they are admitted.

20              MR. KAPLAN:  Likewise, on behalf of Ms. Tew.

21              THE COURT:  I have gone partway through that, and I

22    want to think about -- I don't have a decision yet, on the

23    clips.  Okay.  I appreciate that.

24              Okay.  So, let's us take about a ten-minute recess.

25    Thank you.
```

1        *THE COURTROOM DEPUTY:*  All rise.

2        (Recess at 2:40 p.m.)

3        (In open court at 2:54 p.m.)

4        *THE COURT:*  All right.  Please take your seats.  I

5    think we should go ahead, if we can, and bring the jury back.

6        *THE COURTROOM DEPUTY:*  All rise.

7        (Jury in at 2:55 p.m.)

8        *THE COURT:*  All right.  Let's take our seats, and

9    Mr. Fields, you may begin.

10        *MR. FIELDS:*  Thank you, Your Honor.

11    *Q*   Let's go back to Government's Exhibit 470 -- actually 471

12    and 472.  Remind us, these spreadsheets that are 471, '72, what

13    are they?

14    *A*   They are transactions from purchases of cryptocurrency at

15    Bitcoin ATMs owned and operated by Red Leaf Chicago.

16    *Q*   Do they show the amount of money collected by those ATMs?

17    *A*   Yes.

18    *Q*   Where do you see those on the sheets?  Let's use 472 for an

19    example?

20    *A*   If you look at the third column, which says *Collected*.  So,

21    the settlement date is the transaction date, collected is the

22    amount of cash that the machine collected for the transaction.

23    *Q*   When these were produced to you, were they produced in

24    Excel?

25    *A*   I believe one was a CSV file, but yes.

1414

1    *Q*   Are you able to, sort of, easily tabulate the total amount

2    collected in these spreadsheets?

3    *A*   Yes.

4    *Q*   When did you that, what was the total amount collected at

5    these Bitcoin ATM machines during this period?

6    *A*   Excuse me.  For just the Red Leaf Chicago records, it was

7    $2.429 million.

8    *Q*   All right.  Now, we are talking about summary charts.  Did

9    you prepare summary charts related to specific transactions?

10   *A*   I did.

11   *Q*   Let's look at Government's Exhibit 42.  What is

12   Government's Exhibit 42?

13   *A*   This appears to be -- it's a document from Navy Federal

14   Credit Union, and it's for a specific transaction, in this

15   case, a withdrawal.  This one was for a cash-out withdrawal of

16   $15,000 on, I believe that's, June 4th, 2019.

17        *MR. FIELDS:*  Pursuant to the Declaration, Government's

18   Exhibit 1107, the government would move for admission of

19   Government's Exhibit 42.

20        *THE COURT:*  Hearing no objections, 42 is admitted.

21   *Q*   Now let's look at Government's Exhibit 242.  What is this?

22   *A*   That is a Navy Federal Credit Union statement for accounts

23   in the name of Kimberley Tew, for the period of May 17th, 2019,

24   through June 16th, 2019.

25        *MR. FIELDS:*  Your Honor, pursuant to the Declaration,

1    that same declaration, the government moves for the admission

2    of this exhibit.

3              THE COURT:  Hearing no objection, it's admitted.

4    Q   Now let's look at -- it's not in evidence.  Let's look at

5    Government's Exhibit 1009.  What is Government's Exhibit 1009?

6    A   This is a summary chart that I made of the financial

7    transaction on June 4th, in this case, a withdraw $15,000, and

8    it's documents used related to that transaction.

9    Q   Okay.

10             MR. FIELDS:  Your Honor, pursuant to Rule 611, I would

11   ask for permission to publish this exhibit.

12             THE COURT:  All right.  Understanding our previous

13   discussion, I will allow it to be published.

14   Q   All right.  Let's look at the next page, please.  All

15   right.  What document is -- what document did you identify

16   here?

17   A   Exhibit 242, page one and page ten of -- it's a Navy

18   Federal Credit Union statement for accounts in the name of

19   Kimberley Tew, and the relevant pages relate to Everyday

20   Checking, account ending in '8486, which is the account where

21   both Michael and Kimberley are signatories.

22   Q   Did you look to see what the balance of the money in that

23   account was, before June 4th, 2019?

24   A   I did.

25   Q   What did you discover when you did that?

1416

1    A    The balance on the -- in the account, at the end of June

2    3rd, 2019, was negative $229.03.

3    Q    Let's go to the next slide.  Was there a deposit into the

4    account that day?

5    A    There was.

6    Q    What was the deposit?

7    A    It was $53,500 deposit from National Air Cargo.

8    Q    Next page.  What happened after that?

9    A    I'm unsure if it happened after.  It was listed after it on

10   the statement, but I don't actually know the timing of it.

11   There were two additional deposits from Google Pay, in the

12   amounts of $300 and $700.

13   Q    Total of a thousand dollars?

14   A    Yes.

15   Q    What happened that same day, on June 4th, 2019?

16   A    There was a $15,000 cash withdrawal by Michael Tew.

17   Q    And the next page.  So, Government's Exhibit 42, looks like

18   there's a red box there.  What does that red box show?

19   A    Those show the specifics of the transaction.  So you can

20   see that the total cash out amount is $15,000, and then Navy

21   Federal Credit Union said they had a state issue driver's

22   license to identify the person conducting the transaction and

23   there's a driver's license number listed.

24   Q    Did you look elsewhere for that driver's license?

25   A    I did.

1    Q   And what did you find?

2    A   I found that that driver's license number was associated

3    with Mr. Michael Tew.

4    Q   What is shown there, as part of Government's Exhibit 303,

5    which is already in evidence?

6    A   That's the account -- the applicant information for Michael

7    and Kimberley, when they applied to be members of Navy Federal

8    Credit Union and um...

9    Q   Need us to zoom in?

10   A   I apologize.  It's just slightly faint.  On the right, you

11   can see that the driver's license number presented for Michael

12   Tew matches the driver's license number in Exhibit 42.

13   Q   Let's go to the next page.  This is Government's Exhibit

14   501.  What did you see when you looked at 501 and you compared

15   it to those bank documents we looked at earlier?

16   A   This photo of Michael's driver's license, the driver's

17   license number matched the driver's license number in Exhibit

18   303 and Exhibit 42.

19   Q   And the next page.  And then, when you looked at that

20   deposit, that was into the account, and you compared it to

21   invoices, what did you see?

22   A   This particular invoice from Political Media, listed the

23   $53,500 deposit, and even listed the date of the June 4th,

24   2019, as part of the invoice.

25   Q   And the next page.  Is that -- when you looked to see who

1    had submitted the invoice, what did you see?

2    A    The invoice was part of an email that was sent to

3    *jyioulosnationalaircargo.com.*

4    Q    All right.  Now, let's look at Government's Exhibit 43,

5    which is not yet in evidence.  What is that?

6    A    That is a transaction detail from Navy Federal Credit

7    Union, related to a transaction on June 11th, 2019.

8    Q    All right.  Did you prepare another summary chart related

9    to this transaction?

10   A    I did.

11   Q    Let's look at, again, Government's Exhibit 1010.  Is this

12   another summary chart describing exhibits that are already in

13   evidence?

14   A    Yes.

15        MR. FIELDS:  Your Honor, again, pursuant to Federal

16   Rules of Criminal Procedure 611, we would ask for permission to

17   publish.

18        THE COURT:  Understanding the previous objections

19   apply to this, as well, I will allow it to be published.

20   Q    Now, let's look at the next page.  All right.  Did you

21   check to see what the balance in the account for Navy Federal

22   Credit Union was, at the end of the day, on June 10th, 2019?

23   A    I did.

24   Q    What did you discover when you looked to see what the

25   balance in that account was?

1   *A*   The balance was $1,230.99.

2   *Q*   When you looked -- let's go to the next page.  When you

3   looked to see any deposits into that account, the next day,

4   what did you find?

5   *A*   There was a deposit from National Air Cargo, in the amount

6   of $28,000 into the account.

7   *Q*   And if you go to the next day, what did you find when you

8   looked for additional deposits?

9   *A*   There were no additional deposits on this day.

10  *Q*   All right.  Then did you look to see whether there were any

11  withdrawals from that account?

12  *A*   I did.

13  *Q*   Let's look at the next page.  And what did you see when you

14  looked to determine whether or not there were withdrawals?

15  *A*   There was a $15,000 cash withdrawal, on that day, from the

16  joint checking account ending in '8486.

17  *Q*   Did you look for the underlying withdrawal slip?

18  *A*   I did.

19  *Q*   Look at the next page.  What did you see when you found

20  that withdrawal slip?

21  *A*   In this case, we saw the amount was $15,000, and the ID

22  type was a passport, and then there's a passport number listed.

23  *Q*   Did you look for that passport in other documents?

24  *A*   I did.

25  *Q*   What did you find?

1    *A*    I found the passport was the same number in the application

2    for the account, Exhibit 303, and we also identified the

3    passport number in several other documents.

4    *Q*    Let's look at the next slide.  What is this?

5    *A*    That is Kimberley Tew's passport.

6    *Q*    Was it provided as part of records from a cryptocurrency

7    exchange?

8    *A*    It was.

9    *Q*    Next page.  Did you also look for photographs that might

10   have shown the transaction that day?

11   *A*    I did.

12   *Q*    What did you find?

13   *A*    We found that Navy Federal Credit Union had provided photos

14   related to transactions that occurred on June 11th, 2019.

15   *Q*    And then did you look to see whether or not that

16   transaction or any deposits were associated with invoices?

17   *A*    I did.

18   *Q*    Let's go to the next page.  What did you find?

19   *A*    This particular deposit, the $28,000, was associated with

20   this particular invoice from Political Media, invoice number

21   7312.

22   *Q*    Did you look to see what email account had submitted that

23   invoice?

24   *A*    Yes.

25   *Q*    Next slide.  What did you find?

1   *A    Political.media.wdc@gmail.com*, submitted the invoices to

2   *jyioulos@nationalaircargo.com.*

3   *Q*   All right.  Now, let's look at Exhibit 44.  What is this?

4   *A*   This is a withdrawal slip from Wells Fargo.

5          *MR. FIELDS:*  Pursuant to the Declaration, at

6   Government's Exhibit 1119, the government would move for the

7   admission of Government's Exhibit 44?

8          *THE COURT:*  Hearing no objections, it's admitted.

9   *Q*   Did you prepare a similar summary slide related to this

10  transaction?

11  *A*   I did.

12  *Q*   Government's Exhibit 1011.  Is this that summary?

13  *A*   Yes.

14         *MR. FIELDS:*  Pursuant to Federal Rules of Criminal

15  Procedure 611, government would ask for permission to publish?

16         *THE COURT:*  Understanding all of the previous

17  objections apply to this, as well, I will allow it to be

18  published.

19  *Q*   Let's look at page two.  All right.  Did you look to

20  determine what the balance in this account was on June 27th, at

21  the end of the day, on August 27th, 2019?

22  *A*   At the end of the day on August 26th?  I did.

23  *Q*   Oh sorry, thank you.  What did you find?

24  *A*   The balance was $50.74.

25  *Q*   Did you look to determine whether or not there were any

1    deposits into the account later on?

2    A    I did.

3    Q    The next slide.  When you looked for that, what did you

4    find?

5    A    On August 27th, there was a $45,000 deposit from National

6    Air Cargo.

7    Q    Did you look for additional deposits into that account?

8    A    I did.

9    Q    Go to the next slide.  What did you find?

10   A    There were no additional deposits.

11   Q    Did you then look to see whether or not any of that money

12   had been withdrawn?

13   A    I did.

14   Q    Government's Exhibit 44.  What did you see when you did

15   that?

16   A    There was a $22,000 withdrawal by Michael Tew on August

17   28th, 2019.

18   Q    Did you compare this withdrawal slip to the bank statement?

19   A    I did.

20   Q    And if we go to the next slide.  What did you find?

21   A    The bank statement for the Sand Hill account listed a

22   $22,000 withdrawal on August 28th, 2019.

23   Q    That payment from National Air Cargo, did you look to see

24   whether or not it was associated with any invoices?

25   A    I did.

1    Q    Next slide.  What did you find?

2    A    I found that this particular payment was associated with

3    Global Fuel Logistics, invoice 1011.

4    Q    Next page.  Is this that invoice, or portion of it?

5    A    Yes.

6    Q    And what did you see when you compared the amount of that

7    was deposited in the account with the invoice?

8    A    They were the same.

9    Q    Did you also look for contemporaneous telephone messages

10   between Michael and Kimberley Tew?

11   A    I did.

12   Q    Were you able to find one for this particular transaction?

13   A    I was.

14   Q    Government's Exhibit 989.  Is this that exchange?

15   A    Yes.

16   Q    All right.  If we could, could you read it for us starting

17   with underneath the screenshot.

18   A    Kimberley Tew, *Hold off on Mora.  Sam has cashed deposit*

19   *for 2.5 percent around 17.5K at Bank of America.*

20        Michael, *Okay.  Getting 22 now.*

21        Kimberley, *Are you with the teller*?

22        Michael, *In line.  I'm next.*

23        Kimberley, *Bank of America, 17,740 --*

24   Q    You can stop there.  Okay.  Now, let's look at Government's

25   Exhibit 45, which is not yet in evidence.  What is this?

1    *A*   That is a withdrawal slip from Wells Fargo.

2              *MR. FIELDS:*  Pursuant to Declaration, at Government's

3    Exhibit 1119, the government would move for the admission of

4    this exhibit.

5              *THE COURT:*  Hearing no objection, it's admitted.

6    *Q*   Did you similarly prepare a summary related to this

7    transaction?

8    *A*   I did.

9    *Q*   Let's look at Government's Exhibit 1012.  Are these those

10   summary slides?

11   *A*   They are.

12   *Q*   Did they describe evidence that's already -- or exhibits

13   that are already in evidence?

14   *A*   They do.

15             *MR. FIELDS:*  Your Honor, again, pursuant to Rule 611,

16   the government would ask permission to publish Government's

17   Exhibit 612.

18             *THE COURT:*  Again, understanding the same objections

19   apply, I will allow it to be published.

20   *Q*   All right.  If you go to the next page.  Did you look to

21   see what the beginning balance in the account was on August

22   29th, 2019?

23   *A*   I did.

24   *Q*   What did you see when you did that?

25   *A*   The balance was zero.

1   Q   Did you next look to determine whether or not there were

2   any deposits into that account?

3   A   Yes.

4   Q   Next slide.  What did you find when you did that?

5   A   There was a $25 deposit, with an uncertain origin.

6   Q   Were there any other deposits?

7   A   I do not believe so.

8   Q   Okay.  And now, if you go to August 29th, 2019, what you

9   did you see when you looked for deposits on that day?

10  A   There was a $45,000 deposit from National Air Cargo group.

11  Q   After that $45,000 had been deposited, did you look to see

12  whether or not there were any withdrawals?

13  A   I did.

14  Q   Next page.  What did you see?

15  A   There was a $25,000 cash withdrawal by Michael Tew.

16  Q   And similarly, did you look to determine whether or not the

17  deposit was associated with a particular invoice?

18  A   I did.

19  Q   Next page.  When you did that, what did you find?

20  A   This payment was associated with Global Fuel Logistics,

21  invoice number 1023.

22  Q   Go to the next page.  And when you compared the invoice to

23  the amount that was deposited, what did you discover?

24  A   This particular invoice listed a $45,000 payment, basically

25  due, as well as $45,000 payment already made.

1    Q    Now, let's look at Government's Exhibit 1013, which is not

2    yet in evidence.  Is this another summary that you prepared,

3    related to transactions on September 4th, 2019?

4    A    Yes.

5              MR. FIELDS:  Your Honor, similarly, the government

6    would ask for permission to publish under Rule 611.

7              THE COURT:  Yeah.  With the same previous

8    understanding, permission is granted to publish.

9    Q    All right.  Ms. Palmer, did you look to determine what the

10   balance in the account was, on a particular day in this period?

11   A    I did.  The balance in the account on September 3rd, 2019,

12   was $11.42.

13   Q    Did you look to see if there were any subsequent deposits?

14   A    I did.

15   Q    What did you discover when you looked for deposits?

16   A    There was a $45,000 deposit from National Air.

17   Q    Did you then look for other transfers or withdrawals?

18   A    I did.

19   Q    Go to the next page?  What did you discover.

20   A    There was a $45,000 transfer from this particular account

21   ending '5336, and the transfer went to checking, and it says

22   Kimberley Tew, but did not specify the account number.

23   Q    So then, did you look for Kimberley Tew's accounts at Navy

24   Federal Credit Union?

25   A    I did.

1    *Q*    And if we go to the next page.  When you did that, what did

2    you discover?

3    *A*    There was a $45,000 deposit from checking, in the name of

4    Michael Tew, into the joint account, the account ending '8486,

5    on that same day, September 4th.

6    *Q*    So, by looking at these two transactions, what were you

7    able to determine?

8    *A*    The money was transferred from Michael's account ending

9    '5336, in the amount of $45,000, to the joint account in the

10   name of Michael and Kimberley, account ending in '8486.

11   *Q*    All right.  Again, did you look to determine whether or not

12   the deposit into the account was associated with a particular

13   invoice?

14   *A*    I did.

15   *Q*    Let's go to page number seven.  What did you discover?

16   *A*    This was associated with Global Fuel Logistics, invoice

17   1023.

18   *Q*    Now, when you compare the amount on that invoice, to the

19   amount that was deposited, what did you discover?

20   *A*    On this particular invoice, there was a 50 percent deposit

21   due for $45,000, as well as a 50 percent payment of $45,000

22   that had been paid per the invoice.

23   *Q*    All right.  Now, let's look at Government's Exhibit 47.

24   It's not yet in evidence.  What is this?

25   *A*    This is a wire transaction from Wells Fargo to Mora

1    Consulting.

2            MR. FIELDS:  Pursuant to the Declaration, at

3    Government's Exhibit 1119, the government would move for the

4    admission of Government's Exhibit 47?

5            THE COURT:  Hearing no objection, 47 is admitted.

6    Q    Did you, similarly, prepare a set of summary slides related

7    to this transaction?

8    A    I did.

9    Q    Government's Exhibit 1014.  Are these those summary slides?

10   A    They are.

11           MR. FIELDS:  Your Honor, ask for permission to publish

12   1014.

13           THE COURT:  All right.  With the understanding about

14   the previous objections permission to publish is granted.

15   Q    Did you look to determine what the amount -- what the

16   balance in the account was associated -- before this

17   transaction?

18   A    I did.

19   Q    Go to the next page.  What did you discover?

20   A    The balance on the prior day was $37.15.

21   Q    Did you then look for deposits?

22   A    I did.

23   Q    What did you see when you looked for deposits?

24   A    The following day, there was a deposit for $33,500, from

25   National Air.

1    Q    And did you look for downstream transactions?

2    A    I did.

3    Q    Look at the next page.  What did you discover?

4    A    There's a $15,000 wire transfer and corresponding service

5    charge.  The wire transfer was to JPMorgan Chase, in the name

6    of Mora Consulting.

7    Q    Did you look for that underlying record?

8    A    I did.

9    Q    Did you find it?

10   A    I did.

11   Q    Let's go to the next page.  What is Government's Exhibit 47

12   here?

13   A    This is the wire transaction for that particular wire.

14   Q    Again, did you look to determine whether or not the amount

15   that had been deposited was associated with any particular

16   invoice?

17   A    Yes, I did.

18   Q    Go to the next page.  What did you discover?

19   A    This particular payment was associated with the Aero

20   Maintenance Systems, invoice number 634.

21   Q    When you compared the amount on that invoice, to the amount

22   that had been deposited, what did you see?

23   A    I believe they were not quite the same.

24   Q    So, what did you have to do, at that point?

25   A    At that point, we -- I went through records we had obtained

1    from National, to tie invoices to payments.  One of the main

2    places I looked was a report generated by Abby Schwartz, which

3    listed the entries within Microsoft Dynamics AX, which usually

4    also listed the invoice number that a payment was associated

5    with.

6    Q    Did you also look to determine whether or not there were

7    text communications between Michael and Kimberley, related to

8    this transaction?

9    A    I did.

10   Q    Did you find any?

11   A    I did.

12   Q    Let's look at the next slide.  Is this from Government's

13   Exhibit 990?

14   A    Yes, it is.

15   Q    And what does it say?

16   A    This is a screenshot, with Mora, surfer emoji, Mike.  And

17   Mr. Mora says, *On its way*.  And the owner of the device says,

18   *Cool.  Thanks*.  Mr. Mora says, *NP*.  Then the owner of the

19   device asks, *Can I wire 15 to you to send 14 to Gemini?*

20   *Michael sent you an email, because my phone died*.  And Mr. Mora

21   says, *Sure*.

22   Q    And then did you continue to excerpt portions of that text

23   communication?

24   A    I did.

25   Q    The next page.  And what did you see?

1  *A*   Kimberley asks, *Did you send wires to anything*?

2         Michael says, *No, I didn't know what you wanted.  What*

3  *do you need*?

4  *Q*   Next page.

5  *A*   Michael says --

6         *MS. HUBBARD:*  Your Honor, I would specifically object

7  to these pages as not just being clips from admitted evidence.

8         *MS. FROST:*  I will join in that objection.

9  *Q*   Let's look at Government's Exhibit 990.  Let's go to page

10 three.  Do you see those same text messages here?

11 *A*   Not on this page.

12 *Q*   And let's go the next page.  Go back up.  Back up.  All

13 right.  Read this for us, please.

14 *A*   Do you... Kimberley, *Do you know what your online wire*

15 *limit is*?

16 *Q*   Next page.  Michael, *Coming down.  I'll check.  It shows in*

17 *the last 30 days, I have only sent 61K.  So we should be good.*

18 *Since August 22, before that was August 15th.  So anything*

19 *August 15th and before should have rolled off.  Mora emailed*

20 *just now, he is okay with the 14K.*

21        Kimberley, *I have been texting him.  Your email went*

22 *into his spam*.

23        Michael, *Wire sent*.

24 *Q*   Is this a surfer emoji message?

25 *A*   Yes.

1    *Q*   All right.  Now, let's look at Government's Exhibit 48.

2    What is this?

3    *A*   That is a withdrawal slip dated September 26th, 2019.

4         *MR. FIELDS:*  Your Honor, pursuant -- from what bank?

5    *A*   Wells Fargo.

6         *MR. FIELDS:*  Pursuant to the Declaration, Government's

7    Exhibit 1119, the government would move into evidence,

8    Government's Exhibit --

9         *THE COURTROOM DEPUTY:*  Your Honor, Exhibit 48 was

10   previously received.

11        *MR. FIELDS:*  Thank you.

12        *THE COURT:*  Thank you.

13   *Q*   Did you prepare a similar summary slide related to this

14   transaction?

15   *A*   I did.

16   *Q*   Let's look at Government's Exhibit 1015.  These those

17   summaries?

18   *A*   Yes.

19        *MR. FIELDS:*  Pursuant to Rule 611, the government

20   would ask for permission to publish.

21        *THE COURT:*  All right.  With our previous

22   understanding regarding the objections, permission to publish

23   is granted.

24   *Q*   Go to the next page.  Did you look to determine what the

25   balance in the account was as of September 24th?

1    *A*    I did.

2    *Q*    What did you discover?

3    *A*    The balance was $6.60.

4    *Q*    Did you look to see whether or not there was any money

5    deposited into that account?

6    *A*    I did.

7    *Q*    Next page.  What did you discover?

8    *A*    There were no transactions on the bank statements on

9    September 25th.

10   *Q*    When you kept looking, go to the next slide, what did you

11   discover?

12   *A*    On September 26th, there was a $52,750 deposit from

13   National Air.

14   *Q*    Did you then look to see what was done with that money?

15   *A*    I did.

16   *Q*    Go to the next slide.  What did you find?

17   *A*    There was a $20,000 cash withdrawal by Michael Tew on

18   September 26th, 2019.

19   *Q*    Is that what's -- is this that withdrawal slip?

20   *A*    Yes.

21   *Q*    Did you also look at the underlying bank statement?

22   *A*    I did.

23   *Q*    And did you also look to determine whether or not the

24   amount that had been deposited was associated with a particular

25   invoice?

 1  *A*   I did.

 2  *Q*   What did you find?

 3  *A*   This particular payment was associated with Aero

 4  Maintenance Systems, invoice number 697.

 5  *Q*   Let's look at Government's Exhibit 864.  Is this a text

 6  exchange on that day?

 7  *A*   Yes.

 8  *Q*   And let's -- first of all, do you see those attachments up

 9  at the top?

10  *A*   I do.

11  *Q*   Let's look at the next page.  Are these those attachments?

12  The next page.  Next page.  Next page.  Okay.  Let's go back to

13  page one.

14  *A*   They were those attachments.

15  *Q*   And what is said after those attachments?

16  *A*   *I don't know what* -- Kimberley, *I don't know what routing*

17  *number to use.  Her address is our home address*.

18  *Q*   Let's go to page four, five.  Okay.  Keep reading.

19  *A*   Kimberley, *Send 5K, actually send* 7K.

20          Michael, *Use our address right*?

21          Kimberley, *Can you please go to WF to withdraw 20K and*

22  *deposit at ATM immediately?  BTC is dropping in price again*.

23          Kimberley -- or specifically *kley@me.com, Okay*.

24  *Q*   All right.  Let's take that down.  Now, let's look at

25  Government's Exhibit 49.  What is this?

1    *A*   That is a withdrawal slip from Wells Fargo, dated September

2    27th, 2019.

3           *MR. FIELDS:*   Pursuant to the Declaration, in

4    Government's Exhibit 1119, the government would move this

5    exhibit into evidence.

6           *THE COURT:*   Hearing no objection, it's admitted.

7    *Q*   Did you prepare similar summary slides related to this

8    transaction?

9    *A*   I did.

10   *Q*   Look at Government's Exhibit 1016.  Are these those summary

11   slides?

12   *A*   They are.

13          *MR. FIELDS:*   Pursuant to Federal Rules of Criminal

14   Procedure 611, the government would ask permission to publish.

15          *THE COURT:*   All right.  With our previous

16   understanding still in place, permission granted.

17   *Q*   Did you look to determine what the balance in the Wells

18   Fargo account was on September 24th, 2019?

19   *A*   I did.

20   *Q*   What did you find?

21   *A*   It was $6.60.

22   *Q*   Did you then look to see whether or not there were any

23   deposits on subsequent days?

24   *A*   I did.

25   *Q*   Go to the next page.  What did you see on September 25th?

1    A    There were no deposits on September 25th.

2    Q    Next page.  What did you find on September 26th?

3    A    That same deposit from National Air Cargo, previously

4    discussed, in the amount of $52,750.

5    Q    You kept looking for deposits when you went to the next

6    day.  What did you find?  Next slide.

7    A    There was another $60,000 deposit from National Air.

8    Q    Did you then look for withdrawals?

9    A    I did.

10    Q    Go to the next page.  What did you find?

11    A    There was a $20,000 cash withdrawal conducted on September

12    27th, 2019, by Michael Tew.

13    Q    Did you compare that withdrawal slip to the underlying bank

14    statement?

15    A    I did.

16    Q    Go to the next page.  What did you find?

17    A    The $20,000 cash withdrawal on the bank statement.

18    Q    And again, did you look to determine whether or not those

19    deposits from National were associated with particular

20    invoices?

21    A    I did.

22    Q    Go to the next page.  What did you find?

23    A    This one was associated with Aero Maintenance Systems,

24    invoice 697.

25    Q    Now, let's look at Government's Exhibit 50.  What is this?

1    *A*    A withdrawal slip from Wells Fargo dated June 1st, 2019.

2          *MR. FIELDS:*  Pursuant to the Declaration, at

3    Government's Exhibit 1119, the government would move this

4    exhibit into evidence.

5          *THE COURT:*  Hearing no objection, it's admitted.

6    *Q*    Did you prepare similar summary slides related to this

7    transaction?

8    *A*    I did.

9    *Q*    Exhibit 1017.  Are these those summary slides?

10   *A*    They are.

11         *MR. FIELDS:*  Pursuant to 611, the government asks for

12   permission to publish.

13         *THE COURT:*  All right.  With our previous

14   understanding, permission granted.

15   *Q*    Did you look to determine what the balance in that account

16   was, on October 1st, 2019?

17   *A*    I did.

18   *Q*    What did you discover?

19   *A*    The balance was 5.65.

20   *Q*    Did you look to determine whether or not there were any

21   deposits?

22   *A*    Yes.

23   *Q*    Go to the next page.  What did you find?

24   *A*    On October 1st, there was a $75,000 deposit from National

25   Air.

1  Q   Did you look to see whether or not there were any other

2  deposits?

3  A   I did.

4  Q   What did you find?

5  A   There were no other deposits on that day.

6  Q   Did you look for withdrawals?

7  A   I did.

8  Q   And what did you find?

9  A   Twenty-thousand dollar cash withdrawal, and I said earlier

10  it was June, that's a ten, not a six.  So, it's October 1st,

11  and it's for $20,000 in the name of Mr. Tew.

12  Q   So, even though you know, might look like a six, how did

13  you determine it was actually from October?

14  A   I compared it to all of the other records provided by Wells

15  Fargo, related to this account, and based on other transactions

16  on the bank statements, as well as other withdrawal slips that

17  were provided by Wells Fargo, it became clear that this

18  particular withdrawal slip was the one for the $20,000 on

19  October 1st, 2019.

20  Q   Did you compare the amount that had been deposited into the

21  account with invoices?

22  A   I did.

23  Q   And when you did that, what did you find on the next page?

24  A   It was associated with Aero Maintenance Systems, invoice

25  number 1017.

1    *Q*    Now, let's look at Government's Exhibit 51.  What is this?

2    *A*    This is a withdrawal slip from that Wells Fargo, and it's

3    dated October 2d, 2019.

4          *MR. FIELDS:*  Pursuant to the Declaration, in

5    Government's Exhibit 1019, the government would move for

6    admission of this exhibit.

7          *THE COURT:*  Hearing no objection, it's admitted.

8    *Q*    Did you prepare a similar summary slide?

9    *A*    I did.

10   *Q*    Let's look at Government's Exhibit 1018.  Is this that

11   summary?

12   *A*    It is.

13         *MR. FIELDS:*  Your Honor, pursuant to Federal Rules of

14   Criminal Procedure 611, the government ask for permission to

15   publish.

16         *THE COURT:*  Given our previous understanding,

17   permission is granted.

18        *Q*    (By Mr. Fields) Is this for that same date?  Did you

19   look to determine what the amount in the account was on October

20   1st, 2019?

21   *A*    I did.

22   *Q*    Similarly, what was it?

23   *A*    It was still $5.65.

24   *Q*    And then did you then look for those deposits?

25   *A*    I did.

1    *Q*    Did you already discuss these?

2    *A*    Yes.

3    *Q*    After you looked for those deposits, did you look for

4    additional withdrawals?

5    *A*    I did.

6    *Q*    Let's keep going.  And what did you find?

7    *A*    There were no other deposits into the account on October

8    1st or October 2nd.

9    *Q*    What did you find on October 2nd?

10   *A*    A $12,000 withdrawal, conducted by Michael Tew.

11   *Q*    Did you compare that against the bank statement?

12   *A*    I did.

13   *Q*    And what did you find?

14   *A*    $12,000 cash withdrawal made in a branch/store.

15   *Q*    Similarly, did you look to see whether or not the amount

16   that had been deposited was associated with a particular

17   invoice?

18   *A*    It was.

19   *Q*    Which invoice?

20   *A*    Aero Maintenance Systems, invoice 1017.

21   *Q*    Let's look at Government's Exhibit 506, which is not yet in

22   evidence.  What is this?

23   *A*    This is either the first page or just one page of records

24   provided by Continental Volkswagen, related to the purchase of

25   an Audi®.

1     MR. FIELDS:  Pursuant to the Declaration, at 1131, the

2  government would move for the admission of this exhibit,

3  Your Honor?

4     THE COURT:  Hearing no objections, it's admitted.

5  Q   Now, let's look at Government's Exhibit 469.  What is this?

6  A   This is a wire transaction report for a wire from an

7  account in the name of Sand Hill, at Wells Fargo, to an account

8  in the name of Continental Volkswagen.

9     MR. FIELDS:  The government would move for admission

10  of Government's Exhibit 1019 -- sorry 469.

11     THE COURT:  All right.  It's -- 469 is admitted,

12  hearing no objection.

13     MR. FIELDS:  Thank you.

14  Q   Did you prepare a similar batch of summary slides?

15  A   I did.

16  Q   Let's look at Government's Exhibit 1019.  Are these those

17  summary slides?

18  A   They are.

19  Q   In particular, during your investigation, did you determine

20  or did you look to see if the Tews had purchased any items?

21  A   I did.

22  Q   What item did you focus your attention on?

23  A   The purchase of a black Audi®, in late 2019.

24  Q   Did you look to see from what account that Audi® was

25  purchased?

1    A    I did.

2    Q    All right.  Let's look.  When you looked at the beginning

3    balance in that account, on November 1st, 2019, what you did

4    you see?

5    A    Beginning balance on November 1st, 2019, was $9.15.

6    Q    Did you then look for deposits?

7    A    I did.

8    Q    What did you find?

9    A    On November 1st there was a $45,000 deposit from National

10   Air.

11   Q    Did you look for other deposits?

12   A    I did.

13   Q    What did you find?

14   A    There were no other deposits on that day.

15   Q    Did you then look for records associated with that Audi®?

16   A    I did.

17   Q    Government's Exhibit 505, when you did that, what did you

18   see?

19   A    Mr. Tew purchased the Audi®, and there was an outstanding

20   balance of $20,611.01.

21   Q    Did you look for financial transactions in that amount?

22   A    I did.

23   Q    When you did that, what did you find?

24   A    A wire transfer from Wells Fargo, the account in the name

25   of Sand Hill, to Comerica Bank, in the name of Continental

1    Volkswagen, for the same amount.

2    Q    Did you look at the underlying bank statement?

3    A    I did.

4    Q    What did you find?

5    A    This would be the wire transaction report.

6    Q    Next page.

7    A    But it's also reflected on the bank statement.

8    Q    Did you compare the amounts that have been deposited with

9    invoices?

10   A    I did.

11   Q    When you did that, what did you find?

12   A    This was associated with Aero Maintenance Resources,

13   invoice 2110.

14   Q    Did you also look for text message communications related

15   to this transaction?

16   A    I did.

17   Q    Let's look at Government's Exhibit 886.  What is this?

18   A    Text messages between Michael and Kimberley Tew.

19   Q    We saw this a little bit earlier, but if we go down.  Okay.

20   Next page.  Keep going.  Stop there.  Do you see up there, at

21   the top, that message on 11-1-2019?  What does Michael Tew say

22   there?

23   A    *I paid the car.  Did not pay Chase.  There's 25,000 in*

24   *Wells.  Do you still want me to pay Chase?  Which account?*

25   *It's 2200 total.  I will do whatever you want.*

1    Q    Okay.  Now, let's look at Government's Exhibit 1020, which

2    is not in evidence.  Are these summary slides related to a

3    transaction on February 20th, 2020?

4    A    They are.

5         MR. FIELDS:  Your Honor, pursuant to Federal Rules of

6    Evidence 611, the government would ask for permission to

7    publish.

8         THE COURT:  Again, with our previous understanding,

9    permission to publish is granted.

10   Q    Did you look to determine what the balance in the account

11   was, as of February 19th, 2020?

12   A    I did.

13   Q    What was the balance?

14   A    It was $.41.

15   Q    Did you look for deposits?

16   A    I did.

17   Q    When you did that, what did you discover?

18   A    There was a $95,000 deposit from National Air, into the

19   account on February 20th.

20   Q    Did you look for other deposits?

21   A    I did.

22   Q    Did you find any?

23   A    There were not any additional deposits on that day.

24   Q    Did you then look for withdrawals?

25   A    Yes.

1445

1   Q   What did you find?

2   A   There was a $20,000 withdrawal on that day, by Michael Tew.

3   Q   Did you compare that to the bank statement?

4   A   I did.

5   Q   What did you find?

6   A   I found record of the $20,000 withdrawal, made in a

7   branch/store.

8   Q   Did you look and compare the amount that had been deposited

9   from National, did you compare it to any invoices?

10  A   I did.

11  Q   When you did that, what did you discover?

12  A   This was associated with Aero Maintenance Resources,

13  invoice 3004.

14  Q   Now, let's look at Government's Exhibit 55 -- or 54.  What

15  is this?

16  A   This is a withdrawal slip, in the amount of $15,000.

17        MR. FIELDS:  Pursuant to the Declaration, at

18  Government's Exhibit 1119, the government would move for

19  admission of this exhibit?

20        THE COURT:  Hearing no objection.  It's admitted.

21  Q   Did you prepare a summary similar to this transaction?

22  A   I did.

23  Q   Let's look at Government's Exhibit 1021.  Are these those

24  summary slides?

25  A   They are.

1      *MR. FIELDS:* Pursuant to Federal Rules of Evidence

2      611, the government would ask for permission to publish.

3      *THE COURT:* With our previous understanding,

4      permission to publish is granted.

5  *Q* Did you look to determine what the balance in the account

6      was, as of February 19th, 2020?

7  *A* I did.

8  *Q* When you did that, what did you discover?

9  *A* The balance was $25.41.

10 *Q* Did you look for deposits?

11 *A* I did.

12 *Q* When you did that, what did you discover?

13 *A* A $95,000 deposit from National Air.

14 *Q* Did you look for additional deposits?

15 *A* I did.

16 *Q* What did you discover?

17 *A* No additional deposits on February 20th or February 21st.

18 *Q* Did you then look for withdrawals?

19 *A* I did.

20 *Q* What did you find?

21 *A* There was a $15,000 cash withdrawal, by Michael Tew, on

22     February 21st 2020.

23 *Q* Did you look to compare the amount that had been deposited

24     with particular invoices?

25 *A* I did.

1    Q   When you did that, what did you discover?

2    A   It was associated with an Aero Maintenance Resources

3    invoice, invoice 3004.

4    Q   Okay.  Two more, we're almost done.  Government's Exhibit

5    55.  What is this?

6    A   Withdrawal slip from Wells Fargo.

7            MR. FIELDS:  Pursuant to the Declaration, at

8    Government's Exhibit 1019, the government would move for

9    admission of this exhibit.

10           THE COURT:  Hearing no objection it's admitted.

11   Q   Did you prepare a similar summary slide?

12   A   I did.

13   Q   Is that Government's Exhibit 1022.

14   A   Sorry.  Yes.

15   Q   Does it similarly describe transactions in the account on

16   that date?

17   A   It does.

18   Q   All right.  So, again, I think he already looked at this.

19   What was the balance in the account, as of February 19th, 2020?

20   A   Twenty-five dollars and 14 cents.

21   Q   Did you look for subsequent deposits?

22   A   I did.

23   Q   What did you see on February 20th?

24   A   A 95,000 deposit from National Air.

25   Q   Did you look for any other deposits from February 20 and

1448

1    all the way to February 26th?

2    A    I did.

3    Q    What did you see?

4    A    There were not any additional deposits into that account

5    during that period.

6    Q    What about February 27th?  What happened?

7    A    There was another deposit into the account, it was a

8    $40,000 deposit from National Air.

9    Q    And what happened that same day?

10   A    There was a cash withdrawal of $20,000, by Michael Tew.

11   Q    Did you compare that to the bank statement?

12   A    I did.

13   Q    What did you find?

14   A    The $20,000 withdrawal was listed on the bank statement.

15   Q    Those amounts that have been deposited into the account,

16   did you compare them against invoices?

17   A    I did.

18   Q    What did you find?

19   A    They were from invoice or -- they were from -- invoice from

20   Aero Maintenance Resources, invoice number 3004.

21   Q    Last one.  Government's 56.  What is this?

22   A    Withdrawal slip from Wells Fargo.

23        MR. FIELDS:  Pursuant to the Declaration, at

24   Government's Exhibit 1119, the government would move for the

25   admission of these exhibits -- or this exhibit.

1    THE COURT:  Hearing no objection, it's admitted.

2    Q    Did you prepare a similar summary slide?

3    A    Yes.

4    Q    That Government's Exhibit 1023?

5    A    Yes.

6    Q    Did you look to see what the balance in the account was on

7    March 2nd, 2020?

8    A    I did.

9    Q    When you did that, what did you discover?

10    A    The balance was a negative $4.79.

11    THE COURTROOM DEPUTY:  Your Honor, does he want the

12    jury to see this?

13    MR. FIELDS:  Is 239 in evidence?

14    THE COURTROOM DEPUTY:  This is ... did you say 1026?

15    MR. FIELDS:  Yes.  This is 1023.  Similarly, pursuant

16    to Rule of Evidence 611, Your Honor, I ask for permission to

17    publish.

18    THE COURT:  Okay.  Given our previous understanding,

19    you may publish it.

20    MR. FIELDS:  Thank you, Mr. Keech.  I'm sorry about

21    that.

22    Q    All right.  So what was the balance in the account?

23    A    Negative $4.79.

24    Q    Did you look for subsequent deposits?

25    A    I did.

1    Q    When you did that, what did you discover?

2    A    A $36,500 deposit from National Air.

3    Q    Did you look for additional deposits?

4    A    I did.

5    Q    What did you find?

6    A    There were no additional deposits on that day.

7    Q    Did you then look for any withdrawals?

8    A    I did.

9    Q    What did you find?

10    A    There was a $20,000 withdrawal, by Mr. Tew, on March 3rd,

11    2020.

12    Q    Similarly, did you look to determine whether or not the

13    amount that had been deposited was associated with any

14    invoices?

15    A    We did.

16    Q    When you did that, what did you discover?

17    A    This particular payment was associated with Aero

18    Maintenance Resources, invoice 3101.

19    Q    Now, let's look at Government's Exhibit 954 -- sorry, 931.

20    What is this?

21    A    These are text messages between Michael and Kimberley.

22    Q    On that same day?

23    A    Yes.

24    Q    What do they say?

25    A    Michael, *Get 20 or less* --

1       *THE COURTROOM DEPUTY:*  Your Honor, this exhibit is not

2    in evidence.

3            *MR. FIELDS:*  I'm sorry.

4            *THE COURT:*  Okay.

5    *Q*   What is Government's Exhibit 931?

6    *A*   Text messages between Michael and Kimberley from Cellebrite

7    report.

8    *Q*   Is this one of the Cellebrite reports that you received

9    from the FBI?

10   *A*   Yes.

11           *MR. FIELDS:*  Your Honor, the government would move for

12   the admission of Government's Exhibit 931.

13           *THE COURT:*  Any objection?

14           *MS. HUBBARD:*  We would object on authentication,

15   foundation, and 401, 403.

16           *MS. FROST:*  Same objection, Your Honor.

17           *THE COURT:*  Overruled, for the reasons previously

18   discussed.  Go ahead, it's admitted.

19   *Q*   What does it say

20   *A*   Michael, *Get 20 or less.  On way to Wells*.  *What am I*

21   *doing*?

22           Kimberley, *We talked about it I was sleeping.*

23           Michael, *You said less than 20.  Getting 20.  Going to*

24   *BTC ATM.  Should I just go to Navy and try to resolve the*

25   *account issue*?

1452

1        Kimberley, *Where are you now?  It took 20 minutes to*

2    *get the money*.

3        Michael, *Yes*.

4        *MR. FIELDS:*  All right.  Your Honor, may I have just a

5    moment?

6        *THE COURT:*  Yes.

7        *MR. FIELDS:*  No further questions for this witness,

8    Your Honor.

9        *THE COURT:*  All right.  Thank you, Mr. Fields.

10   Cross-examination, Ms. Frost?

11       *MS. FROST:*  Thank you.

12       *THE COURT:*  All right.  Go ahead.

13                       **CROSS-EXAMINATION**

14   *BY MS. FROST:*

15   Q   Good afternoon, Agent Palmer.

16   A   Good afternoon, Ms. Frost.

17   Q   We can agree, you didn't go to law school, right?

18   A   I did not.

19   Q   You are not a lawyer?

20   A   I am not lawyer.

21   Q   You work for the IRS?

22   A   I do.

23   Q   And because you are not a lawyer, not, obviously, qualified

24   to do what lawyers do, right?

25   A   Correct.

1  Q   You are an accountant?

2  A   Yes.

3  Q   And you have been sitting here since trial began, of

4  course, right?

5  A   That's correct.

6  Q   You have been sitting over here at the government's table

7  with Mr. Fields?

8  A   Yes, that's correct.

9  Q   With Ms. Weiss, right?

10 A   Yes.

11 Q   And that's because they are, obviously, lawyers, right?

12 A   Correct.

13 Q   And that's because you're known as the advisory witness.

14 You are sitting there, to help the government, correct?

15 A   Yes; that's correct.

16 Q   You help them with witness issues, right?

17 A   Yes.

18 Q   Help with preparing exhibits, like that calendar you made

19 up, that we have talked a lot about, 1008?

20 A   Yes.

21 Q   And you are there in that capacity, because you're part of

22 the prosecution team, sitting there with them, to help them

23 throughout this trial, correct?

24 A   Yes.

25 Q   During your Direct Examination, you referred to

1454

1     *conspirators*.  You used the word *conspirators*, right?

2     A    Yes.

3     Q    And again, we can agree, you are not qualified to draw

4     legal conclusions, because you don't have a legal background,

5     correct?

6     A    Correct.

7     Q    And we can agree that, in this case, it's the job of the

8     jury, over here, to determine whether there was an -- a

9     conspiracy that existed, right?

10    A    Correct.

11    Q    Not yours?

12    A    Correct.

13    Q    You have, repeatedly, used the term *fraudulent invoices*,

14    over and over again?

15    A    Yes.

16    Q    Same thing, it is the jury's job to determine whether fraud

17    occurred here, not yours, correct?

18    A    Correct.

19    Q    When you were talking about conspirators, you said

20    something along the lines that, *As an investigator, you have to*

21    *take what they say with a grain of salt, sometimes,* right?

22    A    Yes; that's correct.

23    Q    And that you need to then go verify what a cooperator --

24    pardon me -- what a conspirator tells you, so that you can see

25    if there's any truth to it, right?

1    *A*    To the extent possible, yes.

2    *Q*    And that's what you mean -- you meant by *taking what they*

3    *say with a grain of salt*, initially?

4    *A*    Yes.

5    *Q*    Well, trust but verify, we should say, right?

6    *A*    Yes.

7    *Q*    You have heard that saying before?

8    *A*    Yes.

9    *Q*    And it turns out, in this case, that you needed to take

10   Mr. Yioulos with a grain of salt, the first time you talked to

11   him, right?

12   *A*    Could you clarify what you mean, please?

13   *Q*    Sure.  Well, Mr. Yioulos didn't know that he was being

14   recorded, right?

15   *A*    I would have to look at a transcript to be sure, but I

16   believe shortly into the interview, we did tell him the

17   conversation was being recorded, but I would have to refresh my

18   memory with the transcripts.

19   *Q*    Okay.  Well, we can do that; but that interview was on July

20   7th, 2020?

21   *A*    Yes.

22   *Q*    And you were with another agent?

23   *A*    Yes.

24   *Q*    And we can agree that at the beginning of your interview,

25   Mr. Yioulos was walking out of work, correct?

1   *A*   Yes.

2   *Q*   You approach him with another agent?

3   *A*   Yes.

4   *Q*   We can agree, at the moment that you approach him, you did

5   not inform him that you had your audio recorder on, correct?

6   *A*   Correct.

7   *Q*   We can agree that if he was informed, it wasn't until quite

8   awhile into the conversation?

9   *A*   I'm not sure what you mean by *quite awhile* or what specific

10  amount of time you are referring to.

11  *Q*   Okay.  Well, will you trust me, as an officer of the Court,

12  if I say it wasn't -- you didn't tell him that the interview

13  was being recorded?

14  *A*   At the start, yes.

15  *Q*   Mr. Yioulos had already deleted text messages, at that

16  point in time, correct?

17  *A*   Yes, he had.

18  *Q*   And you know, of course, as an investigator, that deleting

19  text messages related to a federal investigation is a crime in

20  and of itself?

21  *A*   Yes, it is.

22  *Q*   Destruction of evidence?

23  *A*   Yes.

24  *Q*   Potentially, tampering?

25  *A*   I'm not familiar with the elements of tampering.

1    Q    Because you are not a lawyer?

2    A    Correct.

3    Q    But we can agree that it's destruction of evidence, right?

4    A    Yes.

5    Q    So, Mr. Yioulos had already committed his own crime, of

6    destruction of evidence, before talking to you, in July of

7    2020?

8    A    Yes.

9    Q    You learned that, throughout your investigation, correct?

10   A    Yes.

11   Q    So, it's fair to say that you probably should take someone,

12   who destroys evidence, with a grain of salt?

13   A    Probably.

14   Q    During this interview, and you know this because you have

15   been sitting here throughout the entire trial, you heard all of

16   Mr. Yioulos' testimony, right?

17   A    Yes.

18   Q    We can agree that during that same interview, Mr. Yioulos

19   failed to disclose his own side-hustle fraud that he had

20   committed, before he was allegedly working with Mr. Tew to

21   defraud, right?

22   A    Yes, he failed to disclose.

23   Q    Meaning, well -- spent a long time with him that day,

24   didn't you?

25   A    I certainly did.

1    Q    And so did your co-agent, right?

2    A    Yes, he did.

3    Q    And at the beginning of the interview, you told Mr. Yioulos

4    that, *We can help things get back on track for you.  The first*

5    *one to talk to us, is going to get the best deal?*

6    A    I'm not sure of my exact words, but that sounds like what I

7    said.

8    Q    If I'm quoting you from transcripts, would you agree with

9    me?

10   A    If you are quoting me from the transcript, then, yes, I

11   agree that's what I said.

12   Q    Okay.  And so, you say that, at the beginning of the

13   interview, to Mr. Yioulos, and at that point, after you advised

14   him, basically, like *Hey, you come to us, you get the best deal*

15   *if you come now,* it's not like he came clean and said, *Oh, and*

16   *by the way, I have been defrauding my employer with this guy*

17   *Tom Seifert for the last several months and it has nothing to*

18   *do with Michael Tew*?

19   A    Correct.  He did not say that.

20   Q    And we can agree that, you know, we can call that a lie by

21   omission, right?  Like, he is omitting important information,

22   and he is not telling it to you, about his own separate crimes?

23   A    Correct.

24   Q    And we can agree that you should probably take someone that

25   lies by omission to federal agents with a grain of salt?

1   *A*   Yes.

2   *Q*   Mr. Yioulos quickly then says, not that long after, *If you*

3   *can give me your word that I'm not going to be arrested today,*

4   *I won't call an attorney?*

5   *A*   I believe he did say that.  Yes.

6   *Q*   And right before he says that, you're kind of advising him

7   like, *Hey, you can get a lawyer if you want, but it would be*

8   *better if you just talked to us now, because, you will get a*

9   *better deal*, right?

10   *A*   I don't recall my exact words, but if I could refresh my

11   memory with the transcript I would be happy to.

12   *Q*   Sure.  Before we get there, we can agree, I mean, look,

13   your job is to try to interview Mr. Yioulos, and get as much

14   information out of him for your investigation, right?

15   *A*   Yes.

16   *Q*   That's a hundred percent your job?

17   *A*   Yes.

18   *Q*   And so, of course, it's easier for you, as the

19   investigator, to interview him, if he doesn't have an attorney,

20   present?

21   *A*   Generally, yes, but not always.

22   *Q*   Well, of course it is, right?  Because there's no annoying

23   lawyer, like me, getting involved in the process, right?

24   *A*   I wouldn't describe all attorneys as annoying, but I see

25   your point.

1460

1    Q    Okay.  That wasn't my question.  It's easier for you to

2    interview an unrepresented person, because it's just -- there's

3    no one interfering with your question requesting, right?

4    A    Again, generally, but not always.

5    Q    Okay.  Well, needless to say, Mr. Yioulos doesn't choose to

6    get an attorney, he chooses to talk to you, so long as he is

7    not getting arrested today, right?

8    A    That's correct.

9    Q    And you know, you have a long, detailed conversation about

10   what he has to say, right?

11   A    Yes.

12   Q    He lies to you?

13   A    If you could specify the lies.

14   Q    Well, we already establish the lie by omission, about his

15   own side-hustle fraud?

16   A    Yes.

17   Q    And he didn't volunteer the fact that he had deleted or

18   destroyed evidence related to Michael Tew, at that point,

19   correct?

20   A    I do not recall exactly when he told us that he deleted the

21   text messages on his phone, but it may have been during that

22   first interview.  I just don't recall the exact date.

23   Q    Okay.  And you don't recall, even though you have sat in

24   this trial for seven days now?

25   A    I don't recall the specific date that he told us that.  We

 1    spoke to him for approximately, oh, four or five hours on the

 2    7th, and then another four or five hours on the 8th, and I am

 3    unsure on which date he told us about the text messages.

 4    Q    And you are, what we call, the lead investigator in this

 5    case, right?

 6    A    Yes, I am.

 7    Q    And that's part of the other reason you are sitting at the

 8    table with the prosecution team throughout this trial?

 9    A    Yes, it is.

10    Q    And you have been working on this case for, like, four

11    years?

12    A    I have.

13    Q    That's a long time?

14    A    It is.

15    Q    Were you -- you were with the service, what, for two years,

16    when you got on to this case?

17    A    I graduated from the academy in February 2018.  So,

18    approximately two years out of the academy.

19    Q    Okay.  So, you were two years out of the academy.  Is this

20    the first real big criminal investigation that you worked on?

21    A    It was not the first real big criminal investigation I

22    worked on, but it was the first that was my case versus

23    somebody else's case.

24    Q    Sure.  And is this your first time testifying in a jury

25    trial?

1    *A*    It is my first time testifying in a jury trial.

2    *Q*    And it looks like you have had a lot of supporters over

3    here all day.  Are those people from your office back there?

4    *A*    They are.

5    *Q*    They are coming to support you?

6    *A*    And this case, in general.  And financial cases don't go to

7    trial very often.  So, when a case comes, we usually have a lot

8    of people from the agency to see, because they are rare.

9    *Q*    Okay.  So, this is your first time testifying in a trial?

10   *A*    Yes, it is.

11   *Q*    Your first time subject to Cross-examination?

12   *A*    No.

13   *Q*    True.  Getting back to the interview with Mr. Yioulos.  He

14   tells you, during the interview that, *The real driver of all of*

15   *this was Kimberley?  He was not doing this for his benefit, at*

16   *all.  I think that they literally gambled everything that they*

17   *had away,* correct?

18   *A*    I believe that is exactly --

19            MS. HUBBARD:  Your Honor, I'm going to object 401, 403

20   and outside of the scope of Direct.

21            THE COURT:  Okay.  Overruled.  And I understand the

22   objection, though.

23            MS. FROST:  May I proceed, Your Honor?

24            THE COURT:  Yes.

25   *Q*    Mr. Yioulos said, *This one woman had us both by the balls,*

 1    *and we were both kind of helpless*?

 2              *MS. HUBBARD:*  Object to cumulative, Your Honor.

 3              *THE COURT:*  Overruled.  I know this has come up

 4    before, but I will let you ask this question.  Go ahead.

 5    A    Yes, he said that.

 6    Q    And he said, *I truly think Michael tried to end it a bunch*

 7    *of times*?

 8    A    Yes, he said that.

 9              *MS. FROST:*  Can I see Exhibit 937, please, which has

10    been admitted into evidence.  And actually, can you go to the

11    bottom black box on the page and blow that up?

12    Q    Mr. Fields -- and I think this is the exact exhibit he

13    used -- asked you questions about some redactions that -- we've

14    seen a lot of redactions, haven't we?

15    A    Yes, we have.

16    Q    And they look like what's showing up on the screen right

17    now, in Exhibit 937, right?

18    A    Yes; that's correct.

19    Q    And you testified that you were the one that made these

20    redactions?

21    A    A lot of redactions were made.  I testified that I had made

22    some, but they were also made by individuals at the US

23    Attorney's Office.  I would not be able to tell you if I

24    redacted this particular document or another.

25    Q    Sure.  And Mr. Fields told you what to redact?  It's not

1464

1    like you chose, yourself, what to redact?

2    A    It was a discussion amongst the prosecution team.

3    Q    Okay.  But ultimately, the prosecutor would make that

4    decision, not you, as the agent, right?

5    A    Correct.

6    Q    And so, ultimately, Mr. Fields, Ms. Weiss, the prosecutors

7    on this case, are saying redact these particular portions,

8    correct?

9    A    Yes, I suppose.

10   Q    And some of what is redacted here are pictures of Mr. and

11   Mrs. Tews' twin daughters, right?

12   A    Correct.

13   Q    So, you are trying to hide the fact that they have kids

14   from the jury, by redacting these pictures and the text

15   messages?

16   A    No.  Generally, we redacted them because they were not

17   relevant to the specific charges, as well as to try and protect

18   the privacy of the children.

19   Q    Okay.  Now, you just used a word *relevant*, to the specific

20   charges, and again, your job today is not to determine what is

21   relevant, of course, that's Judge Domenico's job, right?

22   A    Correct.

23        MS. FROST:  And you can take that down, please.  Can

24   we see Government's Exhibit 980, please?

25   Q    We talked about this exhibit on your Direct Examination?

1    A    (Nodding head.)

2    Q    This is the Lululemon® receipt?

3    A    Yes.

4    Q    And Lululemon® is an athletic store, right?

5    A    Yes.

6    Q    Kind of high-end, more expensive athletic -- athleisure

7    wear, as it became known during COVID?

8    A    Yes.

9         MS. FROST:  And can we move to page two?

10   Q    This receipt, of course, is for things like Wunder Crop,

11   Wunder Under Tights, which are pants?  All of these are women's

12   clothing items, correct?

13   A    To the best of my knowledge, yes.

14   Q    Okay.  Well, and we can agree that you haven't seen Mr. Tew

15   wear Lululemon® Wunder Under Tights while we have been sitting

16   in this trial, right?

17   A    No, I have not.

18        MS. FROST:  Okay.  And we can take that down.  Can I

19   see, please, Exhibit 983?

20   Q    This is the Saks Fifth Avenue receipt you talked about on

21   your Direct Examination, for an *Amy Tew*?

22   A    Yes.

23        MS. FROST:  Move down to -- well, can you blow up the

24   bottom half of the receipt, please?

25   Q    Christian Louboutin.  Those are fancy, expensive, high-end

1    high heals, right?

2    A    I'm not sure that these are high heels, but they are shoes.

3    Q    Designer shoes?

4    A    Yes.

5    Q    And it looks like this particular pair is size

6    six-and-a-half?

7    A    Yes.

8    Q    For $995?

9    A    Yes.

10   Q    And the 36.5, that's a European size, right?

11   A    Yes.

12   Q    And we can agree these are women's shoes?

13   A    To the best of my knowledge, yes.

14   Q    And there's no evidence that Mr. Tew wears high heels that

15   are size-six-and-a-half, correct?

16   A    I do not know Mr. Tew's shoe size.

17   Q    You have no evidence that Mr. Tew is into designer women's

18   heals?

19   A    I have not seen Mr. Tew wear a pair of designer women's

20   heals during this trial.

21   Q    But you have seen Mrs. Tew wear high heels throughout this

22   trial, correct?

23   A    She has worn high heels throughout this trial.

24         MS. FROST:    Okay.    We can take that one down.    And can

25   I see 984, please?

1           MS. FROST:  This is the Zappos® receipt.  Can we move

2     to the second page, please?  And just kind of blow up the top.

3     Q    And again, these are all women's items, and we know that

4     because the receipt specifically refers to it being female,

5     correct?

6     A    Yes.

7     Q    And, similarly, we have no evidence that Mr. Tew wears

8     women's clothing at all, right?

9     A    I have no evidence to support that.

10    Q    No evidence that he is into that kind of thing, huh?

11    A    None that I'm aware of.

12          MS. FROST:  Okay.  We can take that down.  Can we see

13    Exhibit 938, please?  And can you just maximize the -- yeah.

14    Q    This last text, and you have testified to a lot, a lot of

15    texts between Mr. and Mrs. Tew, right?

16    A    Yes.

17    Q    Looking at this last one, from *kley@me.com*, Kimberley Tew,

18    *I told him* -- this is to Michael, right -- *I would turn myself*

19    *in and negotiate immunity for you, so our kids have a shot*.

20    When Kimberley Tew is saying *for you*, she means Michael Tew,

21    right?

22    A    That's the conclusion that I would draw.

23    Q    Right.  It's the only conclusion to draw.  And what she is

24    saying is she is going to turn herself in, so that Michael Tew

25    can take care of their kids, so that the kids have a shot?

1468

1    A    Yes.  That's what the message says.

2    Q    And what that means is, they don't have a shot with

3    Mrs. Tew?

4              MS. HUBBARD:  Objection, Your Honor, 403, speculative.

5              THE COURT:  Sustained.

6              MS. FROST:  We can take that down.

7    Q    As the main investigating attorney -- pardon me -- as the

8    lead investigator, in this case, you are aware that Mr. Tew

9    actually called -- or I shouldn't say *call*, but reported

10   instances where he thought he was being threatened by

11   Craig Faigin?

12   A    Are these the IC3 reports?

13   Q    Yeah.  When he reports with the FBI Craig Faigin's

14   threatening behavior?

15   A    Yes.

16   Q    So, he filed, actually, three reports; meaning, Mr. Tew,

17   with the FBI, to report Craig Faigin, right?

18   A    That's correct.

19   Q    And he was reporting Craig Faigin for threatening him via

20   text message, right?

21   A    Yes.

22   Q    For threatening his wife, Mrs. Tew, via text message?

23   A    Yes.

24   Q    And for threatening his employer, NAC, at the time?  The

25   whole testimony we heard about Lori Alf, right?

1    A    Yes, I believe so.

2    Q    Mr. Tew filed a report with the FBI that Faigin was

3    continuing to harass all of them, right?

4    A    I believe so, yes.

5    Q    And that Faigin, according to Mr. Tew's report to the FBI,

6    was a known criminal that had been convicted of cyber-related

7    crime in the past, right?

8    A    I do not recall the specifics within the IC3 report, but if

9    you could refresh my memory I would be happy to.

10   Q    Sure.

11   A    Thank you.

12         MS. FROST:  Mr. Keech.  Sorry, Your Honor.  I forgot

13   to ask if I could refresh the witness' memory

14         THE COURT:  Yes, of course.  Go ahead.

15         MS. FROST:  Pardon me.  Sorry.

16   Q    Is your memory refreshed, agent?

17   A    Yes.  Thank you.

18   Q    So, Mr. Tew, in his reports to the FBI, is saying that this

19   Craig Faigin is a menace to society, right?

20   A    Yes.  Harassing behavior.

21   Q    And harassing behavior.  Thank you.  And he is saying that

22   he fears that by the time law enforcement takes action, it's

23   going to be too late?

24   A    He did report that.

25   Q    I want to talk to you a little bit about your testimony

 1    regarding the documents from the Wynn, in Vegas.

 2              *MS. FROST:*  Can we see Exhibit 508, please?  And can

 3    you kind of just blow up the top half of this letter?

 4    *Q*   First of all, this letter, from the Wynn, is addressed to

 5    Kimberley Tew, not Michael Tew, right?

 6    *A*   Correct.

 7    *Q*   And then, here, we have losses related to tables in the

 8    amount of $38,550?

 9    *A*   Yes.

10    *Q*   That's for the year 2019 only?

11    *A*   Yes.

12    *Q*   And then up here, we've got losses of $23,651.82,

13    specifically for slot losses, in 2019?

14    *A*   Yes, that's what the record says.

15    *Q*   Yeah.  So, you know Mrs. Tew is gambling a lot?  We can

16    agree, right?

17    *A*   Yes.

18    *Q*   And losing a lot?

19    *A*   According to this document, yes.

20              *MS. FROST:*  Can we see 507, please?

21    *Q*   This is also from the Wynn, right?

22    *A*   Yes.

23    *Q*   And it shows various dates that are connected to Mrs. Tew

24    gambling at the Wynn, correct?

25    *A*   Correct.

1    Q    This is in-person; this isn't some online gambling,

2    connected to the Wynn, right?

3    A    That's my understanding, yes.

4    Q    And so here, at the beginning, this indicates that Mrs. Tew

5    is at the Wynn, on July 6th of 2019?

6    A    Yes.

7    Q    And then several weeks later, she is there August 31st, of

8    2019?

9    A    Yes.

10   Q    And September 1st, right?

11   A    Yes.

12   Q    Through September 4th?

13   A    Yes.

14   Q    And the records indicate she is gambling, gambling,

15   gambling, the whole time she is there?

16   A    The records indicate that she is gambling.

17   Q    And then she is there again on October 26th or 28th, right?

18   A    Yes.

19   Q    Through October 31st?

20   A    Yes.

21   Q    Actually, November 1st, right?

22   A    Yes.

23   Q    And then, again, November 27th, of 2019 through the 29th?

24   A    Yes.

25   Q    So, that is about five trips that Mrs. Tew made to Las

1    Vegas, in 2019?

2    *A*    On that page, yes.

3          *MS. FROST:*    Thank you.    You can take that down.

4    *Q*    You heard, obviously, all of the lay witnesses testify last

5    week, right?

6    *A*    Yes.

7    *Q*    And you're familiar with the Indictment in this case?

8    *A*    I am.

9    *Q*    And we can agree that, you know, Michael Meyers, for

10   instance, when you interviewed him, essentially, confessed to

11   money laundering, right?

12   *A*    I did not interview him.    One of my colleagues did.

13   *Q*    Okay.    We can agree that he, essentially, confessed to one

14   of your colleagues that he was involved in this thing?

15   *A*    He did admit to his involvement in this, when we

16   interviewed him.    When I say *we*, I mean IRS, not me personally.

17   *Q*    Right.    Thanks for that clarification.    He admitted to

18   being in this with Mrs. Tew, right?

19   *A*    Yes.

20   *Q*    To buying and selling Bitcoin with her, right?

21   *A*    Yes.

22   *Q*    He admitted to buying and selling Bitcoin with proceeds

23   from criminal activity?

24   *A*    I believe that's what he said.    Yes.

25   *Q*    Okay.    And we can agree that's similar to what Mr. Tew is

1473

1    charged with, right.

2    A    On some level, but I believe the scope is different.

3    Q    Let me put it this way, Mr. Tew is charged with money

4    laundering, right?

5    A    Yes.

6    Q    And Michael Meyers never got indicted in this case, despite

7    his admissions?

8    A    Correct.

9    Q    And then you have got Mr. Yioulos, who, we know, you have

10    got to take with a grain of salt?  We've established that,

11    right?

12    A    Yes.

13    Q    And Mr. Yioulos gets charged, in this case, but he only

14    gets charged with 40 counts, right?

15    A    Correct.

16    Q    And inevitably he pleads to two?

17    A    He did plead to two.

18    Q    We've got Mrs. Tew, who, you know, everybody has talked a

19    lot about, right?

20    A    Yes.

21    Q    And she is only charged with 13 counts in this Indictment?

22    A    That's correct.

23    Q    But yet Mr. Tew is charged with 59 counts?

24    A    That's correct.

25         MS. FROST:  May I have a moment, Your Honor?

1          THE COURT:  Yes.

2          MS. FROST:  I have no further questions of

3    Agent Palmer.

4          THE WITNESS:  Thank you, Ms. Frost.

5          MS. FROST:  You are welcome.

6          THE COURT:  Thank you, Ms. Frost, Ms. Hubbard?

7                    **CROSS-EXAMINATION**

8    BY MS. HUBBARD:

9    Q    Good afternoon, Agent Palmer.

10   A    Good afternoon, Ms. Hubbard.

11   Q    I want to start where Ms. Frost left off; and that is, the

12   Indictment, in this case?

13   A    Okay.

14   Q    Ms. Frost pointed out that Mr. Yioulos only pled guilty to

15   two counts, right?

16   A    Yes, that's correct.

17   Q    And that Mrs. Tew is charged with 13 counts?

18   A    I believe that number is correct.

19   Q    And that Mr. Tew is charged with 59 counts?

20   A    Again, I believe that's correct.

21   Q    Ms. Frost tried to convey the message to the jury that that

22   was somehow unfair?

23   A    I'm not sure.

24         MS. FROST:  I am going to object about*, The message*

25   *that Ms. Frost is trying to convey to the jury*, Your Honor.

1        *THE COURT:*  Sustained.

2   *Q*   The charges in the Indictment are linked to actual

3   transactions that occurred at different banks, and money moving

4   between accounts?

5   *A*   Yes; that's correct.

6   *Q*   And Mr. Tew is charged with 59 counts, because he is

7   central to the transactions that are charged in this case?

8   *A*   Yes.

9   *Q*   He was in direct communication with Jonathan Yioulos?

10  *A*   Yes; that's correct.

11  *Q*   The money, as you sat here and listened to the last witness

12  testify, went into a variety of bank accounts, all of which

13  Michael Tew was a signer on?

14  *A*   I do not believe Mr. Tew was a signer on the Regions Bank

15  account, or a couple of accounts associated with Jessamine

16  Development.

17  *Q*   You are right.  I apologize for that.  He was a signer on

18  all of the accounts, other than Mike Meyers and Jessamine

19  Development?

20  *A*   I believe that's correct.  Yes.

21  *Q*   And we're going to go back through these a little bit, but

22  Mr. Tew was going in and withdrawing the money almost every

23  time?

24  *A*   Almost every time, yes, but not every time.

25  *Q*   That's right.  And so, Mr. Tew -- I'm just going to move to

1    those documents.  Give me just a second to get this set up.  So

2    many exhibits in this case that our software freezes.

3            All right.  So, I want to look at some of these.  I

4    believe you called them *summary exhibits*, that you put

5    together, related to certain counts of the Indictment?

6    A    Yes.

7    Q    And this one relates, specifically, to Count 42, which the

8    only person charged on this is --

9            *MS. HUBBARD:*  Can we show it to the jury, as they were

10   before?

11   Q    The only person charged on Count 42 is Michael Tew?

12   A    Yes; that's correct.

13   Q    And in the documents, themselves, we see the name

14   Kimberley Tew, on this bank account statement.  My

15   understanding as to why Kimberley Tew's name is there, is

16   because the money, the cash withdrawal, you are trying to show

17   the balance on that joint account '8486?

18   A    So, the statements for the '8486 account would appear on

19   the statements in the name of Kimberley Tew, despite the fact

20   that Michael was a joint owner.  They did not appear on the

21   statements that were just in his name.  So, for this particular

22   transaction only, Michael was charged, and the specific record

23   I'm looking at, on this page, just shows the balance in the

24   account in the day prior to the transaction.

25   Q    And what you are trying to show here is that this deposit

1477

1    went into the joint account that Michael Tew is a signer on?

2    A    Correct.

3    Q    And that's the basis for charging Michael Tew with this

4    count?

5    A    May I see the other slides?

6    Q    He withdrew the money?

7    A    I think it's on this slide.  Yes.  He withdrew the money,

8    in this case, correct.

9         MS. HUBBARD:  And I want to look at 1014.  Oh, I'm

10   sorry, 1013.

11   Q    This is another one where only Michael Tew is named?

12   A    Correct.

13   Q    And I had thought Kimberley's name appeared somewhere in

14   there, but I might have been wrong, in my notes.

15        All right.  I want to walk through, briefly, with you,

16   this summary slide of 1010, which is the account where

17   Kimberley Tew is named, and she is the only person named, and I

18   want to help understand some things about this.

19        So, this is -- again, we see Kimberley Tew on the

20   statement, because we're looking at that joint account?

21   A    Correct.

22   Q    And like I just said, that joint account appears only on

23   Kimberley Tew's bank statements?

24   A    Correct.

25   Q    And we saw the $28,000 deposit into NAC, on June 11th?

1    A    Yes; that's correct.

2    Q    And then a withdrawal by Kimberley?

3    A    Correct.

4    Q    And then you have it linked to this invoice, and the

5    invoice is dated June 14th, but wasn't sent, I believe -- you

6    have July 3rd on here?

7    A    I believe that's correct, yes.

8    Q    That is three or so weeks after Ms. Tew withdrew any money

9    out of the this account?

10   A    Yes; that's correct.

11   Q    And this invoice was sent from the Political Media email

12   account?

13   A    Yes; that's correct.

14   Q    And that Political Media email account is linked to

15   Michael Tew?

16   A    Yes; that's correct.

17   Q    So, even on the Count where Kimberley Tew is named, we

18   actually see Michael Tew submitting the invoice?

19   A    The account associated with Michael submits the invoice;

20   that's correct.

21   Q    Three weeks after the money is actually withdrawn?

22   A    Yes; that's correct.

23   Q    And 1011 is a Count against Michael and Kimberley?

24   A    Yes; that's correct.

25   Q    And that relates to a $22,000 withdrawal from a Wells Fargo

1479

1   account, in the name of Sand Hill?

2   A   Yes; that's correct.

3   Q   And the only signer on this account is Michael Tew?

4   A   Yes; that's correct.

5   Q   And the person who withdrew the money, that is charged in

6   this Count, was Michael Tew?

7   A   Yes; that's correct.

8   Q   And again, you see this tied to an invoice from -- related

9   to Global Fuel Logistics?

10  A   Yes; that's correct.

11  Q   And that's a company associated with Michael Tew?

12  A   Yes; that's correct.

13  Q   He set up the company?  We saw those documents admitted?

14  A   Yes; that's correct.

15  Q   And he is associated with the email accounts linked to

16  Global Fuel Logistics?

17  A   Yes.

18  Q   And Kimberley Tew's link to this is some text messages?

19  A   Yes; that's correct.

20  Q   Exhibit 1014 is another one where both Kimberley and

21  Michael are named?

22  A   Yes.

23  Q   It relates to a $15,000 withdrawal from a Wells Fargo

24  account, and the Wells Fargo account, if I remember correctly,

25  is also Michael Tew, is the only signer on that account?

1    *A*    Yes; that's correct.

2    *Q*    And Michael Tew also -- this shows a wire transfer from

3    Sand Hill, which is Michael Tew's company, to Mora Consulting?

4    *A*    Yes.

5    *Q*    And again, it's -- it's linked to an invoice related to

6    Global Fuel, which is Michael Tew's company?

7    *A*    Yes.

8    *Q*    And Kimberley's only link are some text messages?

9    *A*    Yes.

10   *Q*    There was testimony, I believe it was actually in a

11   question from Mr. Fields, that the Tews purchased an Audi®.  Do

12   you remember that?

13   *A*    Yes, I do.

14   *Q*    You have seen the documents related to that Audi® purchase?

15   *A*    I have.

16   *Q*    Mrs. Tew is not on these documents, is she?

17   *A*    I don't recall every page, but I do not believe she is on

18   those documents.

19   *Q*    The Audi® was purchased by Mr. Tew?

20   *A*    That's what I believe the document says.  Yes.

21   *Q*    I'm just going to scroll through here and highlight a

22   couple of things.  That's the installment contract in

23   Michael Tew's name alone?

24   *A*    Yes.

25   *Q*    The sales agreement in Michael Tew's name alone?

1    *A*    Yes.

2    *Q*    The title registration is in Michael Tew's name alone?

3    *A*    Yes.

4    *Q*    I won't bore the jury with anymore of these pages, but

5    there's a Count, in this Indictment, related to the purchase of

6    the Audi®?

7    *A*    Yes, there is.

8    *Q*    And Michael Tew is the only person named in that charge?

9    *A*    Correct.

10   *Q*    All right.  Count 56 is another one that names Michael and

11   Kimberley, and it's a $20,000 withdrawal, and this is that

12   Wells Fargo bank account and Global Fuel Logistics that Michael

13   Tew is the only signer on that account?

14   *A*    Yes.

15   *Q*    Global Fuel Logistics is Michael Tew's company?

16   *A*    He is associated with the creation docs and the domain.

17   *Q*    Best we can tell, Michael Tew set up the company and was

18   also associated with the domain name and the email address?

19   *A*    Yes.

20   *Q*    And he actually withdrew the money that is actually charged

21   in this Count?

22   *A*    That's correct.

23   *Q*    This one I notice is a little bit confusing.  The title

24   here says a *March 2nd, invoice from Global Fuel*, but then I see

25   that the email isn't sent until May.  Do you see that?

1    *A*    Yes, I do.

2    *Q*    Okay.  So, I don't know what the date on the invoice may

3    have been March 2d, but looks like it wasn't actually sent for

4    months after this withdrawal was made?

5    *A*    That's correct.

6    *Q*    And again, we see Kimberley Tew is linked through these

7    text messages, right?

8    *A*    Yes.

9    *Q*    And there's some discussion where it's unclear Michael's

10   going to withdraw the money, and he is talking, allegedly, to

11   Kimberley about it?

12   *A*    Allegedly, yes.

13   *Q*    So again, Kimberley's involvement is through these text

14   messages?

15   *A*    Yes.

16   *Q*    We've talked a little bit about -- just in going through

17   this -- about who the different email accounts are associated

18   with?

19   *A*    Yes.

20   *Q*    I just want to make sure we're on the same page about that.

21   *Globalfuel.co* domain name is linked to Michael Tew?

22   *A*    Yes; that's correct.

23   *Q*    *Sandhillrp.com* domain is linked to Michael Tew?

24   *A*    Yes.

25   *Q*    The backup recovery phone number for the *chrisrncn@gmail* is

1   Michael Tew's phone number?

2   A   Yes.

3   Q   *Policiticalmedia.wdc@gmail.com*, the recovery number is

4   Michael Tew's?

5   A   Yes.

6   Q   You talked with Mr. Fields about this Google Voice

7   screenshot that Mr. Yioulos showed you, at some point during

8   your meetings with him?

9   A   Yes.

10  Q   And I believe Mr. Yioulos testified that he thought this

11  message was from Kimberley Tew, because it refers to *Michael* in

12  the third person?

13  A   Yes.

14  Q   And so you did your investigative work and requested

15  records related to this phone number, right?

16  A   Yes.

17  Q   And we looked at some of those earlier, with Mr. Fields,

18  and that was this subscriber information?

19  A   Yes.

20  Q   And I believe your testimony was that you have personal

21  knowledge of setting up different Google accounts?

22  A   Yes.

23  Q   And you know that anyone can type anything into the system

24  to open an account?

25  A   Absolutely, anything.

1    Q    Anything.  As long as it's available, Google will give it

2    to you?

3    A    Yes.

4    Q    And we've seen Google accounts with full-on backup

5    information of recovery email, recovery phone number, and then

6    we've seen Google accounts with none of that?

7    A    That's correct.

8    Q    And Google is not too discriminating when it comes to

9    allowing people to open?

10    A    No they are not.

11    Q    Okay.  I'm going to show you --

12         MS. HUBBARD:  Your Honor, this has not been admitted.

13    This is part of the same Google records that I referred to

14    earlier, that I had marked as a defense exhibit.  If I could

15    get this to switch to my exhibits.

16    Q    Are you familiar with this page?  It's on the -- marked as

17    Defense Exhibit N?

18    A    Yes, I am.

19    Q    And is this part of those same Google records that were

20    returned in response to a subpoena that you issued to Google?

21    A    It was a Court Order.  I don't remember what kind of Court

22    Order, but yes, they are responsive to that.

23    Q    Can I tell you, I don't understand all of the differences

24    between all of those things?

25    A    I'm glad it's not just me.

1           *MS. HUBBARD:*  Your Honor, I would move for admission

2    of Defense Exhibit N.

3           *MR. FIELDS:*  No objection.

4           *THE COURT:*  Okay.  It's admitted.

5           *MS. HUBBARD:*  Publish to the jury, please.

6    *Q*   Agent, my understanding -- so this relates to that

7    *unicornkt@gmail* account that is behind the Google Voice number?

8    *A*   Yes.

9    *Q*   My understanding is that this data, that Google collects,

10   that is related to cookies associated with the

11   *unicornkt@gmail.com*?

12   *A*   Yes, that's my understanding.

13   *Q*   Can you explain for the jury what a -- your understanding

14   of what a cookie is?

15   *A*   The easiest way, I think, to explain, is that when you

16   access a website or a service, there are data packets that are

17   sent back-and-forth between the user and the service.  These

18   little data packets can help the service identify you over

19   time, if you leave the website and come back, or if you close

20   the app and come back.  In this case, Google actually linked

21   accounts based on cookie usage, to say, *Hey, we think these*

22   *accounts are related in some way.*

23   *Q*   That was a much better explanation than I could have done.

24   All I know about cookies, is when I go to a new website, it

25   gives me that annoying popup?

1    *A*   Correct.

2    *Q*   If these cookies are linked to the *unicornkt* account, does

     that suggest that the same person has been using *the*

4    *unicornkt*'s account as maybe some of these other accounts?

5    *A*   Less the same computer so much as the same devices.

6    *Q*   Same devices.  Great.  Okay.  So let's look at a couple of

7    these.  One of them is *accounting@globalful.co*.

8    *A*   Yes.

9    *Q*   That is an email account associated with Michael Tew?

10   *A*   The domain is associated with Michael Tew.

11   *Q*   Thank you.  And the next one down is *mtew@eadifx.vc*?

12   *A*   Yes.

13   *Q*   Are you familiar with that domain name?

14   *A*   I'm sure I knew it at one point.  I don't recall it.

15   *Q*   And *M Tew* is the initials for Michael Tew?

16   *A*   It is.

17   *Q*   Initial and last name?

18   *A*   Yes.

19   *Q*   The next one we see is *mtew@bezzlebrands.com*?

20   *A*   Yes.

21   *Q*   And did you learn, in the course of your investigation,

22   that one of the companies that Michael Tew was doing,

23   contracting work with, during this period was a company called

24   *Bezzle*?

25   *A*   Yes.

1   Q   And then the next one down is *mtew@cannibasreourses.com*?

2   A   Yes.

3   Q   And did you also learn, as part of this investigation, that

4   Michael Tew was involved with various cannabis-related

5   companies?

6   A   Yes.

7   Q   And again, that's during this same time period 2018 to

8   2020.

9   A   Yes.

10  Q   Because he was a contractor who worked with different

11  entities on a 1099 basis?

12  A   Yes; that's correct.

13  Q   Then we see the next one is *mtew_x@boldrosecapital.com*?

14  A   Yes.

15  Q   And did you learn -- you also learned, as part of your

16  investigation, that Rose Capital Group was another group that

17  Michael Tew was doing work with during this period?

18  A   Yes.

19  Q   Again, that's on a 1099 basis?

20  A   Yes.

21  Q   And then the next one is *tewmichael8@gmail.com*?

22  A   Yes.

23  Q   And then the last one is actually the email account that's

24  tied to the Google Voice?

25  A   Yes.

1  *Q*    And that is *unicornkt1981*?

2  *A*    Yes.

3  *Q*    All right.  I want to dive in, with you, into the

4  communications --

5  *A*    Okay.  Let's do it.

6  *Q*    -- into Cellebrite, and the data that was collected in this

7  case?

8  *A*    Okay.

9  *Q*    Because as we looked at before, much of the way that

10  Kimberley Tew is linked to any of this stuff, is through the

11  text messages?

12  *A*    Correct.

13  *Q*    So, my understanding is that a warrant was issued to Apple™

14  to data stored a Kimberley Tew iCloud?

15  *A*    Yes.

16  *Q*    That is the *kley@me.com* account?

17  *A*    Yes.

18  *Q*    And yesterday we saw, when Mr. Hanggi was on the stand,

19  that there were seven backup files that were returned by

20  Apple™, related to that account?

21  *A*    I believe that's the correct number.  Yes.

22  *Q*    And three of them, at least, had some title that indicated

23  they were blended in some way?  Blended cloud data?

24  *A*    I think that's what I recall.

25  *Q*    I can show the exhibit, if that would help?

1   *A*   That would help.  Thank you.

2   *Q*   Sure.  This is, I believe, what Mr. Hanggi was looking at,

3   when we were talking to him about this.  This is the *seven*

4   *buckets*, as I call them, of data, that we're given to them by

5   Apple™.  Do you remember that?

6   *A*   Yes.

7   *Q*   And three of them here at the bottom are these *blended*

8   *datas*.  Do you see those?

9   *A*   Yes.

10  *Q*   And at least two different device IDs are associated with

11  the account?

12  *A*   Yes.

13  *Q*   And Mr. Hanggi testified that he did seven backup files,

14  UFDR files, one for each of these, and then made a combined

15  report?

16  *A*   Yes; that's correct.

17  *Q*   And I believe your testimony today was that the only UFDR

18  file that you utilized was that combined report?

19  *A*   Yes.

20  *Q*   So, it was the one that had everything from all seven of

21  these buckets put together?

22  *A*   Yes.

23  *Q*   Rather than play a memory game, I'm just going to show you

24  Exhibit 567, which was previously admitted.

25  *A*   Thank you.

1490

1  Q    And this is -- if you see at the top, it's for that

2  combined report, which is the one he reviewed.  And on this

3  exhibit, it shows that there's device info data, 25 different

4  pieces of device info data --

5  A    Yes.

6  Q    -- do you see that?  And...  Well, I don't have it.  You

7  looked earlier, with Mr. Fields, at an Exhibit 554, that showed

8  multiple different devices that were associated with the *kley*

9  account?

10 A    Yes.

11 Q    There was two or three phones, a couple iPads that I

12 remember seeing.  Does that sound right?

13 A    That sounds right.  I don't remember the exact device list.

14 Q    And I would show you, but I think that's actually an Excel

15 document that I don't have in my software.  So, and have --

16 have you spent a fair amount of time, kind of, parsing those

17 communications that were in the combined Cellebrite file?

18 A    Yes.

19 Q    And so, you know that in the *kley* cloud, was a lot of

20 Michael Tew's data?

21 A    Yes.

22 Q    And I wanted to just look at a couple of those, for

23 illustrative purposes.  This, for example, is, essentially, a

24 conversation, for lack of a better word, that I believe

25 Mr. Yioulos testified, as between Mr. Yioulos and Mr. Tew?

1    *A*    Yes.

2    *Q*    But this came from that iCloud account?

3    *A*    Yes.

4    *Q*    So, Mrs. Tew is not involved in this conversation?

5    *A*    To the best of my knowledge, she was not a party to this

6    conversation.

7    *Q*    Yet it is stored in her iCloud?

8    *A*    Yes.

9    *Q*    And this is another one of those conversations, between

10    Mr. Yioulos and Mr. Tew?

11    *A*    Yes.

12    *Q*    And again, this shows that it came from the *kley* iCloud?

13    *A*    Yes.

14    *Q*    So a conversation that, as far as we know, Mrs. Tew is not

15    involved with, but it is stored in her iCloud?

16    *A*    Yes; that's correct.

17    *Q*    And in general, in this case, there seem to be, kind of,

18    three or four different format types of conversations, and when

19    we see these, kind of, green and white spreadsheets, generally,

20    those are conversations between Jonathan Yioulos and

21    Michael Tew?

22    *A*    Generally, yes.

23    *Q*    And then we've also seen the, what I call, bubble

24    conversations, that are generally between Mr. and Mrs. Tew?

25    *A*    Yes.

1    *Q*    And then we've seen the one-sided text conversations --

2    well, I'm going to use conversation loosely, because it's

3    one-sided?

4    *A*    Yes.

5    *Q*    And those have, generally, been offered as

6    Jonathan Yioulos' side of a conversation, that he thinks was

7    with Kimberley Tew?

8    *A*    Yes; that's correct.

9    *Q*    And then there's just a couple that are produced in a

10   different format, that we're not going to talk about.

11   *A*    Okay.

12   *Q*    So, looking at some of those different categories of

13   communications --

14            *MS. HUBBARD:*  Mr. Keech, was 794 admitted today?

15            *THE COURTROOM DEPUTY:*  It was not.

16            *MS. HUBBARD:*  Okay.  Skip that one.  Let me go to 961.

17   Was that admitted?  I have it that it was?

18            *THE COURTROOM DEPUTY:*  Yes.

19   *Q*    Okay.  This is one of, what again, I would call the bubble

20   conversations.

21   *A*    Yes.

22   *Q*    Okay.  And one of the ways, I believe you -- one of the

23   things you testified to was that -- well here, let's just zoom

24   in and talk about it.  The specifics.

25            So, this was -- I just picked a random message, to

1   talk about the format.  The phone number associated here is

2   associated to Michael Tew?

3   A   Correct.

4   Q   And we have the MT, my understanding is that data is just

5   provided by Cellebrite, based on how the -- how the phone

6   number is stored in the cloud, or in the device?

7   A   Yes; that's what I believe.

8   Q   And we have the content, and then some data about the time

9   it was sent and read and that kind of thing.  And then we have,

10  at the bottom here, these *source info*, that was testified to

11  yesterday, as coming from the .db, SMS .db, database?

12  A   I can tell you what is on the screen.  I don't have an

13  intimate understanding of the works of Cellebrite.  All I can

14  tell you, if that's what it says, that's what it says.

15  Q   Sure.  That was, actually, my point.  Is it comes from

16  Cellebrite?

17  A   Okay.

18  Q   Not you, right?

19  A   Yes.

20  Q   And the same thing over here with these messages.  The ones

21  on the right are, generally, attributed just to the *kley@me.com*

22  account, right?

23  A   Yes.

24  Q   And Cellebrite assigns that to the name Kimberley Tew,

25  right?

1    *A*    Correct.  That information was provided by Cellebrite.

2    *Q*    And you know, having reviewed a lot of these

3    communications, that sometimes the content of the message,

4    based on the context, it's pretty clear that the person sending

5    a message under the *kley* account, is actually not

6    Kimberley Tew?

7    *A*    There are occasions where it does appear to be Michael Tew

8    sending messages using the *kley@me.com* account.

9    *Q*    So generally, when you are, kind of, trying to understand

10   these conversations, it seems like if it's a message that's

11   between a cell phone number and the *kley* account, say, if it's

12   Michael's cell phone on one side and the *kley* account, you are

13   assuming that it's Michael texting from his cell phone to

14   Kimberley, on some other device?

15   *A*    That's the assumption.

16   *Q*    And that assumption kind of -- it requires -- you are

17   assuming that the message being attributed to Michael's cell

18   phone number that that's a reliable attribution?

19   *A*    Yes.

20   *Q*    All right.  I want to look at this.  Again, we're looking

21   at 961.  And on this first page, the only one that's not

22   redacted is one message that appears to be sent from '7473,

23   Michael Tew's cell phone number, right?

24   *A*    Yes.

25   *Q*    And I'm going to scroll forward, and cull out a couple of

1    these.

2         We see that that next message, somehow, switches to

3    the '1712, Michael Tew cell phone number?

4    A    Yes.

5    Q    And then there's a message attributed to the *kley@me.com*?

6    A    Yes.

7    Q    And then the next message, somehow, switches back to the

8    '7473 cell phone number.  And if we look at the time here,

9    Cellebrite is saying that this message from the '1312 number

10   was at 9:44:52.  Do you see that?

11   A    Yes.

12   Q    And then, less than two minutes -- well, right about two

13   minutes later, is Michael Tew sending from a different cell

14   phone number?

15   A    Yes.

16   Q    And I just scrolled forward a couple of pages.  And so

17   here, we have at 10:18:58, Michael Tew supposedly sending from

18   a '7473 number, right?

19   A    Yes.

20   Q    And then less than two minutes later, about

21   minute-and-a-half later, it's switched to the '1312 number?

22   A    Yes.

23   Q    And on the next page, at 10:20:53, we are on the '1312

24   number?

25   A    Yes.

1496

1    *Q*    And then 33 seconds later, he is texting from the '7473

2    number?

3    *A*    Yes.

4    *Q*    And again, this is Cellebrite interpreting the data and

5    producing these reports?

6    *A*    Correct.

7    *Q*    Oops.  Finally, on the next page, start in the middle.  We

8    have the '1312 number, at 10:21:21.  Literally two -- is that

9    two-whatever-milliseconds later, is '7473 number?

10   *A*    Yes.

11   *Q*    I don't know whether that's a millisecond or not.  I'm just

12   making that up, but it's very close in time?

13   *A*    Yes.

14   *Q*    So, the government has the ability to subpoena phone

15   records?

16   *A*    We have the ability to issue a Court Order at various times

17   to obtain cell phone records.

18   *Q*    Right.  So, you can ask the Court to issue an order to a

19   cell phone provider, that would give a record of phone

20   communications?

21   *A*    It will give a record of phone communications, but not all

22   communications on our phones actually go through, like, cell

23   phone towers and cell phones -- sorry -- cell phone towers and

24   phone companies.  Sometimes they go through Internet, instead

25   of cell towers, basically.

1    Q   Sure.  But you could have, in this case, subpoenaed phone

2    records from Michael Tew's '1312 number or '7473 number or

3    Kimberley Tew's number?

4    A   Yes.  I believe we could have.

5    Q   And then you could have cross-referenced those with the

6    Cellebrite records to check for accuracy, as to whether these

7    messages really were bouncing around between Michael Tew's

8    multiple phone numbers?

9    A   We could have.  The same limitations would apply, that cell

10   phone records may not be a complete record, because the various

11   ways that cell phones transmit data.

12   Q   Sure.  But, it would have been a way to check for accuracy?

13   A   Yes.

14   Q   So, we talked, just for a minute, about the fact that not

15   everything that's attributed to the *kley@me.com* appears to be

16   actually said by Kimberley Tew, and I just want to look at an

17   example of that.  So, I'm going to show, I believe this is 730,

18   which I believe has been admitted.  Just jump at me if I'm

19   wrong.

20         THE COURTROOM DEPUTY:  Yes, it's admitted.

21   Q   And this is an example of, on the left, in the blue, we see

22   Kimberley Tew's '2046 number, right?

23   A   Yes.

24   Q   And then someone appears to be responding to her from the

25   *kley@me.com*?

1    *A*    Yes.

2    *Q*    And then Mrs. Tew's '2046 number responds, right?

3    *A*    Yes.

4    *Q*    So, I noticed, actually during your Direct testimony, I

5    appreciated that you were quite careful in saying when a

6    message came  from *kley@me.com*, you were careful in identifying

7    it as such?

8    *A*    I tried to be.  I was not perfect.

9    *Q*    Because, even though it says Kimberley Tew, in the green

10   bubble, that is just from Cellebrite?

11   *A*    Correct.

12   *Q*    And that is not proof that Kimberley Tew actually sent that

13   message?

14   *A*    On its own, it is not proof.

15   *Q*    And 989, I believe, this is another example.  On the left,

16   we see a conversation between '7473, that's Michael Tew's

17   number, and '2046, right?

18   *A*    Yes.

19   *Q*    And then when we get down here to where there's something

20   on the right, that whoever is responding from the *kley@me* is

21   responding to messages sent from '2046?

22   *A*    Yes; that's correct.

23   *Q*    And sometimes, in the middle of one of these chains, it may

24   even switch who is supposedly sending from the *kley*?

25   *A*    Yes.

 1    Q    All right.  Let's look at an example of that, 760.  And so,

 2    at the beginning of this text chain, we see '2046 on the left,

 3    and it looks like some response coming from someone using the

 4    *kley@me*?

 5    A    Yes.

 6    Q    Whoever is responding, is being attributed to the *kley@me*?

 7    A    Yes.

 8    Q    And again, the next message is the '2046?

 9    A    Yes.

10    Q    I think I must have been looking at an unredacted version

11    of this.  I don't know.  My notes say that it switches to

12    Michael, but I was probably looking at an unredacted version.

13    So, I will see if I can find that, and then I will show it to

14    you can again.

15          Some of these messages -- well, let me just back up a

16    little bit, and kind of orient us with these, as to something.

17    So each of these messages has, the bottom right, what we call a

18    Bates number?

19    A    Yes.

20    Q    And that's this SW underscore FIL, and then an eight-digit

21    number?

22    A    Yes.

23    Q    And that is a way that, as people involved in the court

24    system, we apply Bates numbers to documents, to make sure that

25    we're we're talking about the same page number or keeping track

1    of, kind of, what's been produced and not?

2    A    Yes; that's my understanding.

3    Q    And then these -- many of these communication pages also

4    then have, kind of, a secondary number just above it?

5    A    Yes.

6    Q    And that is, typically, like the page number of the

7    Cellebrite report?

8    A    Yes.

9    Q    So, for example, this was page 339 of however long this

10   report was?

11   A    Yes.

12   Q    And in general, a conversation is going to appear on

13   sequential pages?

14   A    Generally speaking, yes, but I'm not involved with the

15   Bates Stamp process, so I can't speak too much as to why things

16   may be out of order or anything of that nature.

17   Q    Okay.  And I understand that sometimes we've looked at

18   these text chains where there's a picture?

19   A    Yes.

20   Q    And that, for example, may not be sequential in the report?

21   A    Correct.

22   Q    But then sometimes these conversations appear to just be

23   kind of constructed oddly.  I wanted to ask what you knew about

24   that.  This is Exhibit 917.  If we look down here, we see we're

25   starting on page 2468 of this report?

1    A    Yes.

2    Q    And we go to 69, 70, and then we go to 535.  Anything you

3    can tell us about why page 535 appears in the middle of this?

4    A    I can't speak to this particular exhibit.  However, when I

5    reviewed conversations between Michael and Kimberley, there

6    would be multiple... not versions, but different compilations,

7    and sometimes the compilations would include different messages

8    on the same date.  So, in this case, it could be that the first

9    section was from, I will call it, report one, and then the

10   second section, where it jumps, is the same date, but in a

11   separate report.

12           The first report may include Michael's two phone

13   numbers and Kimberley's number, and then the second report

14   would include one of Michael's numbers and Kimberley's number

15   and *kley*.  So, that could account for this, but I cannot speak

16   to this particular exhibit.  That would just be one example.

17   Q    Okay.  So, when reports were run, using the Cellebrite

18   data, you could run them in different ways to produce different

19   results?

20   A    Not exactly.  When you were looking at the chat, with the

21   messaging function, within Cellebrite it will list -- it's like

22   an Excel spreadsheet.  So, the first line will list the final

23   date and the participants, and then the next line will list the

24   final date and the participants, and you might actually see

25   line one contains phone one, two and three, and then line two

 1    also contains phone one, two and three.  And all we did, to run

 2    those reports, was select each line individually and run it.

 3    Q    Sure.  So, depending on how you are filtering the data, it

 4    can produce different results?

 5    A    I would argue Cellebrite filtered the data, rather than us.

 6    Q    Okay.  So then, how -- what kind of limitations you are

 7    putting on, which phone numbers you are selecting, which dates

 8    you are selecting, can produce different reports that have

 9    different amounts of pages and different content?

10    A    We truly just selected each line, individually.  We did not

11    filter -- let me rephrase, there was a filter team that did

12    filter by dates, as part of our review process.  But, for this,

13    we did not select dates.  It was just, you check a box, and

14    export that single line, and all of the text messages or MMS

15    messages contain within as a single report.

16    Q    So, here we have a conversation that jumps from page 2469

17    of one report, then the next one is redacted, although it

18    appears to be the next, sequentially numbered page, and then we

19    go to page 535 of a different report?

20    A    That is a likely explanation.

21    Q    And then we go to page -- well, then we have a picture, and

22    then we go to page 536.  Do you see that?

23    A    Yes.

24    Q    And then we're -- picture, picture, and then we're back to

25    2470?

 1   *A*    Yes.

 2   *Q*    Oops.  Can't read my notes.  All right.  This is another

 3   one that, the first page you can't tell, because the exhibit

 4   sticker is on top, but I see here, we're at page 134, then we

 5   jump to 654.  Even though this is supposed to be a

 6   conversation?

 7   *A*    Yes.

 8   *Q*    And then 655, '56, 657, picture.  So we jumped about 4- or

 9   500 pages in there?

10   *A*    The page numbers did jump.  Yes.

11   *Q*    I'm going to switch topics briefly, and talk about the

12   redactions, which I know you have already covered twice, but I

13   want to followup a little bit differently than that.

14   *A*    Okay.

15   *Q*    Just to recap, you made some redactions, the prosecution

16   team made some redactions.  You can't say why all of them were

17   made?

18   *A*    Not without reviewing what was redacted in each specific

19   instance.

20   *Q*    Generally, what was redacted was what was either deemed not

21   important for the government's case or something related to the

22   Tew's family, or things you didn't think should be part of the

23   case.

24   *A*    Correct.  So, a grocery list or photos of children.

25   *Q*    Okay.

1           MS. HUBBARD:  I'm going to show you Government's

2     Exhibit 792.

3           THE COURTROOM DEPUTY:  Your Honor, this exhibit is not

4     admitted.

5           MS. HUBBARD:  It's not admitted.

6           THE COURTROOM DEPUTY:  Jury can't see it.

7           THE COURT:  Okay.  Ms. Hubbard, I hate to interrupt,

8     but can I actually ask counsel to approach?

9        (At the bench:)

10          THE COURT:  So it's -- it's 5 o'clock,.

11          MS. HUBBARD:  I still have a little ways.

12          THE COURT:  And I assume you have a little bit of

13    Redirect?

14          MR. FIELDS:  A little bit, Your Honor.

15          THE COURT:  Given that, we could try to finish it up

16    or we could let them go.  My inclination, though, would be if

17    we let them go, have them come back at 9:30 or 10, or

18    something, and then we can do most of the charge conference,

19    and you guys can tell me if you think I can do the advisement

20    of the defendants about whether they are going to testify or

21    not, even though we have a few minutes left, you guys can

22    figure out -- I can do that after.  It only takes a few

23    minutes, if I need to do it after.

24          MR. KAPLAN:  Do it before or after.

25          THE COURT:  We could surely knock some stuff out, come

1    back and finish, and then we will go from there.  So, I think

2    we should do that.  Let them go.

3         MS. FROST:  Sure.

4         THE COURT:  So, I think I will -- probably like to do

5    is have them come at 9:30, and us -- do you think we need more

6    than a half-hour to do -- we are pretty close on the stuff

7    don't you?  So if come at 9, and they come at 9:30?

8              (In open court.)

9         THE COURT:  Ladies and gentlemen of the jury, so I

10   interrupted Ms. Hubbard because I would like to try to keep my

11   promises to juries.  It is 5 o'clock.  We're not quite done,

12   but we're getting close.  Still, I'm going to let you go, and

13   we have a few things that we have to work out in the morning,

14   and so I'm going to let you go until 9:30 tomorrow.  You don't

15   have to be back until then.  Please do be back then.  We're

16   still, as I said, not quite done.  So, all of my instructions

17   about keeping an open mind, not discussing the case with each

18   other or anyone else, not doing any research, all of those

19   instructions are still important, and I still request that you

20   comply with them, and with that we will see you at 9:30

21   tomorrow.

22         THE COURTROOM DEPUTY:  All rise.

23      (Jury out at 5:01 p.m.)

24         THE COURT:  I think we discussed everything I need to

25   discuss.  So, I will just say we are in recess until -- we will

1    be back at 9 o'clock tomorrow.

2         (Recess at 5:02 p.m.)

3                              **INDEX**

4    **Item**                                              **Page**

5    ITEM                                                   PAGE

6              WITNESSES

7       MATTHEW MORGAN

8            Direct Examination By Ms. Weiss         1255

9            Cross-examination By Mr. Kaplan         1266

10           Cross-examination By Mr. Schall         1280

11           Redirect Examination By Ms. Weiss       1283

12      IRS SPECIAL AGENT LISA PALMER

13           Direct Examination By Mr. Fields        1289

14           Cross-examination By Ms. Frost          1452

15           Cross-examination By Ms. Hubbard        1474

16   Exhibit              Received

17   42                   1414

18   44                   1421

19   45                   1424

20   47                   1428

21   49                   1435

22   50                   1437

23   54                   1445

24   55                   1447

25   56                   1449

| | | |
|---|---|---|
| 1 | 242 | 1415 |
| 2 | 316 | 1356 |
| 3 | 320 | 1400 |
| 4 | 322 | 1395 |
| 5 | 327 | 1342 |
| 6 | 330 & 381 | 1404 |
| 7 | 332 | 1357 |
| 8 | 336 | 1367 |
| 9 | 346 | 1403 |
| 10 | 427 | 1390 |
| 11 | 469 | 1441 |
| 12 | 473 | 1296 |
| 13 | 474 | 1299 |
| 14 | 475 &476 | 1401 |
| 15 | 477-483 | 1395 |
| 16 | 484-491 | 1404 |
| 17 | 500 & 501 | 1364 |
| 18 | 502 & 503 | 1358 |
| 19 | 504 | 1300 |
| 20 | 505 | 1295 |
| 21 | 506 | 1441 |
| 22 | 507 & 508 | 1366 |
| 23 | 509-511 | 1365 |
| 24 | 512 | 1331 |
| 25 | | |

1508

```
 1   Exhibit              Received
 2   513                    1327
 3   515                    1294
 4   516                    1297
 5   520                    1306
 6   521                    1326
 7   522                    1387
 8   524                    1310
 9   554                    1301
10   570                    1396
11   584                    1333
12   686                    1330
13   931                    1451
14   980-985                1311
15   1003                   1265
16   1008, pages 1-27       1339
17   1008, 471 & 472        1393
18   1127                   1292
19   1002                   1264
20                   DEFENDANT'S EXHIBITS
21   Exhibit              Received
22   N                      1485
23
24
25
```

1          **REPORTER'S CERTIFICATE**

2          I certify that the foregoing is a correct transcript from

3     the record of proceedings in the above-entitled matter.  Dated

4     at Denver, Colorado, this 20th day of October, 2024.

5

6                                    *S/Tamara Hoffschildt*
                                     Tamara Hoffschildt
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25