IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 20-cr-305-DDD

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

1. MICHAEL TEW,
2. KIMBERLEY TEW,

    Defendants.

_____

**REPORTER'S TRANSCRIPT**
JURY TRIAL, DAY 8
_____

    Proceedings before the HONORABLE DANIEL D. DOMENICO, Judge, United States District Court for the District of Colorado, occurring at 9 a.m., on the 14th day of February, 2024, in Courtroom A1002, United States Courthouse, Denver, Colorado.

**APPEARANCES**

    Bryan Fields and Sarah Weiss, Assistant U.S. Attorneys, 1225 17th Street, Suite 700, Denver, Colorado, 80202, appearing for the Government.

    Jason Dale Schall, Bowlin & Schall Law LLC, 7350 East Progress Place, Suite 100, Greenwood Village, CO 80111 and Kristen M. Frost, Ridley McGreevy & Winocur PC, 303 16th Street, Suite 200, Denver, CO 80202, appearing for the Defendant, Michael Tew.

1       David Scott Kaplan and Jamie Hughes Hubbard, Stimson

2   LaBranche Hubbard, LLC, 1652 North Downing Street, Denver, CO

3   80218, appearing for Defendant, Kimberley Tew.

4

5       TAMMY HOFFSCHILDT, FCRR, CRR, RMR, Official Reporter
            901 19th Street, Denver, Colorado 80294

6        Proceedings Reported by Mechanical Stenography
            Transcription Produced via Computer

7

8                 **P R O C E E D I N G S**

9       (In open court at 9:11 a.m.)

10          *THE COURT:*  Good morning.  Please take your seats.

11  All right.  Counsel, so, I think my plan this morning is mostly

12  to just try to finalize the jury instructions here, first.  I

13  do -- I do first want to just let you know, Mr. Schall I

14  listened -- I reviewed the snippets, I guess we're calling

15  them, and I have decided not to admit those as evidence.  I

16  appreciate the effort you went to, but for a few reasons I

17  think it would be improper to admit.

18          First, they're -- I don't think you did anything

19  wrong, but they add up to over 30 minutes, I think, which is

20  quite a bit longer than I had anticipated.  I think some of it

21  may be somewhat beyond the scope of what I had in mind, and

22  what we went over.  While I don't, necessarily, agree with

23  Mrs. Tew's argument that they are, sort of, inherently

24  prejudicial or opinion, I do think that, particularly playing

25  them now, at this point in the trial, sort of changes the

1    balance, to some extent, and maybe most importantly, I think

2    you and Ms. Frost, on Cross-examination and again yesterday,

3    culled out I think most of the important points, and that

4    admitting them now and playing them would be, sort of,

5    cumulative and unnecessary.

6        So, I'm not going to admit those.  Go ahead,

7    Mr. Schall.

8        *MR. SCHALL:*  Your Honor, Mr. Tew would just object to

9    the Court's decision, note that under Federal Rule of Evidence

10   106, the entire recording, arguably, could come in, not just

11   snippets, and because it was a single recording of which the

12   government took 35 minutes and introduced into evidence, and

13   even if the Court would not permit the 30 minutes, thereabouts,

14   of the defendant's snippets, some of which weren't even

15   objected to by Mrs. Tew, nor the government, it just seems like

16   a, throwing the baby out with the bathwater to Mr. Tew, but we

17   do consider it impeachment to Mr. Yioulos' testimony, at the

18   very least, if not, at the most, his own confession, which, at

19   times, differed dramatically about his testimony about coming

20   clean, about negotiating with the government, the agents, that

21   morning, to not have an attorney present, as well as things

22   that he said to agents, as showing a theme of this case,

23   Your Honor, that the investigation centered on Michael Tew and

24   was surprised when Kimberley Tew's involvement became known,

25   and so we, just for the purposes of the record, object to the

1    Court's decision.

2         THE COURT:  I appreciate that, and I don't entirely

3    disagree with you.  I think it's relevant, I think that's why I

4    allowed you to get into it on Cross-examination with

5    Mr. Yioulos.  I just don't think, given that you did do that,

6    effectively, I think -- I don't think that, additionally,

7    allowing in the tapes -- the audio, themselves, even if it is

8    considered the same recording under Rule 106, is necessary in

9    the interests of fairness.  But your objection is noted.

10         Can we then turn to the instructions and try to get

11   those as final as possible?

12         So, what I would like to do -- so, Mr. Jacobsmeyer has

13   an electronic copy pulled up, I believe, and is ready to, kind

14   of, go through that, as we go through the document that was

15   circulated yesterday, plus the tweak that I think he handed out

16   to Instruction Number 4, based on the proposed instructions.

17         So, we will just go through, and if you need to note

18   an objection, you can.  But I think we've discussed or thought

19   about most of these.  So hopefully we can go pretty quickly.

20         MS. WEISS:  Your Honor, can I briefly interrupt --

21         THE COURT:  Go ahead.

22         MS. WEISS:  -- before we jump in there?  Just before

23   we start furiously typing away at these, the government would

24   like to ask the Court to revisit its suggestion yesterday,

25   about pulling out Count 16, since it was inadvertently missed,

1    in our preliminary instructions and, sort of, thus far, the

2    pretrial preparations, which is a mea culpa on me and no one

3    else, that I missed that.

4         We do think that that would amount to, essentially,

5    sua sponte dismissal of a count without a legal grounds, just

6    for administrative purposes, and we note that the jury has had

7    the Indictment, in their jury books, the entirety of trial.

8    Nothing in trial has been so focused on Count 16, whether that

9    be in the government's presentation of the evidence or the

10   defendant's defenses, that I think that they are prejudiced,

11   and removing that Count, actually, I think, draws more

12   attention to a potential issue, rather than just simply saying,

13   this was a clerical error, Count 16 is charged against both

14   defendants.

15        *THE COURT:*  Yeah.  Well, I appreciate that.  I don't

16   think we would be pulling it out.  What you are asking me to do

17   is to add it back in.  It's not been in any of the proposed

18   instructions.  It hasn't been -- we have been issuing orders

19   and people have been filing motions, and responses to motions

20   for as long as I can remember, in this case, saying she was

21   charged with 13 counts, came up again yesterday, she was

22   charged with 13 counts, which I don't know how we all thought

23   that to be the case, when it's pretty clear from the

24   Indictment, but my position is that it's not a sua sponte

25   dismissal.  It's a forfeiture of it, by failing to raise this

1    until I brought it up yesterday.

2           So, I'm not inclined to do that.  I will let the

3    defendants respond, if they want, but I assume Mr. Tew takes no

4    position on that, but, Mr. Kaplan?

5           MR. KAPLAN:  Your Honor, I think the Court articulated

6    what we would say on behalf of Ms. Tew, and agree with the

7    Court's position.

8           THE COURT:  Okay.  Thank you.  So, I understand,

9    Ms. Weiss, and I don't really blame anybody.  Things happen.

10   But, at this point, we've tried the case, sort of, ignoring

11   that she is listed in Count 16, and I am -- you are not totally

12   wrong that there's some risk, I guess, that the jury could

13   notice that she is listed in the Indictment, but I'm not going

14   to add it back into the verdict form.

15          MS. WEISS:  Okay.  Just for purposes of the appellate

16   record, we maintain our objection on that issue, and I think

17   that in my midnight sleeping of this, the issue is the penalty

18   sheet is wrong, which I know when I was preparing the jury

19   instructions was what I had propped up, you know, next to my

20   monitor.  So, I think that that is indeed what the issue is

21   there.

22          THE COURT:  That makes sense, I appreciate that.

23          MS. WEISS:  Yep.  Yep.  Thank you.

24          THE COURT:  Okay.  Thank you.  So, I guess while we're

25   on that, are there any other changes that we would need to make

1    to the verdict form?

2         *MS. WEISS:*  I -- apologize.  I believe that Count 43

3    is a money laundering, spending count solely against Mrs. Tew.

4    The verdict form that was circulated before had it listed for

5    both defendants.  The one that I sent to Mr. Jacobsmeyer,

6    yesterday, when he asked us to do a final QC on those

7    documents, I did fix that.  So, that should be addressed, and I

8    did do a hard copy QC, away from a monitor, this morning, to

9    try and fix anything else, and the rest of it looks right.

10         *THE COURT:*  All right.  Thank you.  We will make sure

11   that's correct.  Mr. Jacobsmeyer?

12         *THE LAW CLERK:*  Was it the copy you sent yesterday,

13   12:28, Word version, that should make that correction that you

14   just mentioned?

15         *MS. WEISS:*  That is correct.  Yes.  It is on page 18

16   of that Word version.  Should have just Count 43, against

17   Kimberley Tew.

18         *THE COURT:*  All right.  Thank you.  Mr. Schall?

19         *MR. SCHALL:*  Only, Your Honor, the verdict form on

20   each count, I believe the one I saw, at least, has an extra

21   clause in each count that says, *Upon our oaths*, or something

22   like that, and I just thought it was unnecessary.  Maybe a

23   little too 19th Century for me, and would ask that that be

24   taken out.  It's just extra.

25         *THE COURT:*  I'm not very 19th Century either.  So,

1    does anybody object to making that change?  I don't feel as bad

2    about it if I'm not reading the whole thing out loud.

3         Why don't we take that out, Mr. Jacobsmeyer.  Thank

4    you for bringing us up-to-date Mr. Schall.

5         THE COURT:  So, we will make those changes to the

6    verdict form.  Let's turn to the instructions, themselves.

7    Obviously, the title will be finalized as *Final Instructions*.

8    I don't believe there's anything that we need to discuss as to

9    the first two.  And the third instruction we've made the change

10   requested to not capitalize *government*.  So, I don't think

11   there's anything with Instruction Number 3 anymore.

12        Instruction 4, there are a couple of things to

13   finalize.  First, it's, sort of, at the bottom of the first

14   page there, we inserted, most of the language that was proposed

15   this morning, regarding statements of counsel or witnesses

16   describing things as *fraud* or *conspiracy*.  If you read that,

17   it's not exactly what was proposed, but it's pretty close, and

18   I think is sufficient to instruct the jury on that issue.

19        Does anybody have any comments on that addition to

20   Instruction 4?  All right.  Hearing none --

21        MS. FROST:  Your Honor.

22        THE COURT:  Ms. Frost.

23        MS. FROST:  Just really quick.  I appreciate the copy

24   we got this morning.  For the record, we would ask that the

25   language -- the limiting instruction language that has been put

1  into Instruction 4 be it's own instruction, because it's, kind

2  of, lost in there.  So, that was one thought we had.

3       THE COURT:  All right.  Anybody else have thoughts on

4  that?  I'm going to leave it where it is.  I understand the

5  point, but I don't think it needs to be separated out.

6       The other thing we did to this is we did include the

7  paragraph about charts and summaries, given the -- given the

8  evidence, I think that's necessary.  Mr. Kaplan?

9       MR. KAPLAN:  Your Honor, I would just agree with

10  Ms. Frost on the separate, just join that request, and I don't

11  know that it's absolutely necessary, for the record, but we

12  objected to the summary charts.  So, to the extent that if the

13  Court is going to give the language, this language is

14  appropriate, but just to, I guess *belt and suspenders* on our

15  objection to them going before the jury.

16       THE COURT:  All right.  I think you have preserved

17  that, you have definitely have now.

18       MS. FROST:  On behalf of Mr. Tew, we would join

19  Mr. Kaplan's *belt and suspenders*.

20       THE COURT:  All right.  Okay.  So, I think that takes

21  care of Instruction 4.

22       I don't think there's anything on Instruction 5, to

23  discuss.  So, Instruction Number 6, is it still the case that

24  the defendants -- neither defendant is expected to testify?

25  Okay.  Given that, I think this instruction is appropriate.

 1    Take a second to look at it.  Meaning, we will take out that

 2    first short paragraph on the second page of the instruction,

 3    and use the longer paragraph, instead.

 4         All right.  So, it appears that everybody is in

 5    agreement with that.

 6         Instruction Number 7.  I think this instruction is

 7    fine, and I know there was some discussion about it, but given

 8    what happened in trial, I think Instruction Number 7 is

 9    appropriate.  Does anybody have anything to add on number 7?

10    Doesn't appear to.  Thank you.  So, we'll include that.

11         I think the discussions about Instruction Number 8

12    have been taken care of.  Mainly having to do with the title.

13    So, I don't think there's anything left on Number 8.

14         I think given where we are, that we will, obviously,

15    not include that bracketed paragraph at the end that's, sort

16    of, just a note, but the first paragraph of Instruction Number

17    9, does anybody have a problem with that?  I'm not really sure

18    we did a lot of that, but to the extent we did, the instruction

19    seems okay to me.  Okay.  So, we will just use Instruction

20    number 9.

21         Instruction -- former Instruction Number 10, I don't

22    think is necessary or appropriate in these circumstances.  The

23    only witness who had any issues involving addictive drugs was

24    Ms. Scaife.  My understanding of this instruction is it has to

25    do with present use, which I don't think is the case here.  So,

 1   I'm going to delete that, and I don't hear any objection to

 2   deleting former Instruction Number 10.

 3        So, new Instruction Number 10, has to do with sound

 4   recordings.  I think that's a pretty simple instruction, that

 5   will include the first part of that.  We're not admitting any

 6   transcripts, so the second part will be deleted.

 7        So, current Instruction Number 11 looks like we're all

 8   in agreement on that.

 9        Instruction Number 12, I think you -- is this one

10   where you want to do your *belt and suspenders* again?  My

11   understanding is that we're okay on the language of the

12   instruction, but there's objections to the underlying evidence;

13   is that right?

14        *MR. KAPLAN:*  That is correct.

15        *THE COURT:*  All right.  So, those objections are

16   noted, but the instruction will be included as written.  I

17   don't think there's any disputes at to Instructions 13, 14, 15

18   or 16.

19        Instruction Number 17, my inclination is not to

20   include this instruction at all.  I just don't think it's

21   necessary, and kind of just adds things that aren't --

22   aren't -- that could be confused, and don't add enough to

23   justify it, but I will hear discussion.

24        *MS. WEISS:*  Thank you, Your Honor.  It's the

25   government's position that proposed Instruction Number 17

1    accurately states the law and reflects, actually, somewhat of a

2    compromise position of the other alternative, which would be to

3    deliver the Tenth Circuit pattern instruction on deliberate

4    ignorance.  I do believe that Mrs. Tew's primary defense has

5    centered around, *I wasn't signatory on these other bank*

6    *accounts, and therefore, did not know or could not have known*

7    *how all of the money was ending up in the bank; that I was a*

8    *joint owner on*, and so, that is Pattern Instruction 1.37.  So,

9    we would ask the Court to just consider 1.37 versus 17.  We do

10   think that 17 is a little bit clearer and perhaps has been --

11   upheld and used by Judge Arguello for many years.  So, we think

12   it's a nice compromise and that is where we were trying to

13   start from.

14        *THE COURT:*  Okay.  I will let defense respond to that.

15   So, the position, I guess, is I think, if we don't give this,

16   we need to give the deliberate ignorance pattern instruction,

17   right?

18        *MS. WEISS:*  That's correct, Your Honor.  Thank you.

19        *MR. KAPLAN:*  Your Honor, I would just say that the

20   instruction, I believe it's ... my instructions have gotten a

21   little numbering wrong, that talks about direct and

22   circumstantial evidence, adds the language of inferences.  The

23   point that the government is making is contained in that

24   instruction.  So, in keeping with what the patterns are trying

25   to do, in addressing the government's concern, some of the

1522

1    identical language that's contained in this instruction is

2    contained there, also.

3        THE COURT:  Yeah.  I agree with that.  And I am trying

4    to look back up what the deliberate ignorance instruction would

5    be.

6        MS. WEISS:  I have a copy of that, Your Honor, if

7    that's helpful, just so that you are not scrolling through the

8    PDF, that is many, many pages long.

9        MS. FROST:  And, Your Honor, while we are doing that,

10   if I could, just on behalf of Mr. Tew, adopt Mr. Kaplan's

11   objection, and also this Instruction Number 17, also gets into

12   knowingly.  Knowingly is defined in other spots in the

13   instructions, and this just seems to demean the government's

14   burden of proof.  It's saying, *If we can maybe prove intent but*

15   *can't prove intent but hey convict because here's what you*

16   *should do*, and it's just really unnecessary.

17       THE COURT:  What do you think about the -- the

18   deliberate ignorance instruction?

19       MS. FROST:  Completely inapplicable to Mr. Tew, and we

20   would object.

21       MR. KAPLAN:  If I may have just a moment to read it

22   over, again?

23       THE COURT:  Sure.

24       MR. KAPLAN:  Your Honor, we would object to giving

25   this, and I am not sure in other context, but this is a

1523

1    conspiracy case, and Ms. Tew has to knowingly enter into an

2    agreement.  I think this compromises and confuses what the

3    government has to prove, to establish a conspiracy, and I don't

4    think, at this point, there's the kind of evidence that usually

5    gives rise to this instruction.  So, I think it has a greater

6    likelihood of confusing what the government has to prove to the

7    jury, when the jury reviews this in context of the other

8    instructions.

9         MS. WEISS:  And, Your Honor, just to supplement the

10   government's record, I don't believe knowingly is defined

11   anywhere else in the current instructions, specifically.

12        THE COURT:  I think that's right, and, typically, we

13   do have some definition of the mens rea that's required, don't

14   we?  I mean...

15        MS. FROST:  Yeah.  If I misspoke, my bad, Your Honor.

16   I thought it was defined, but we could define it, outside of

17   Instruction 17.

18        THE COURT:  I don't know that it is defined anywhere

19   else.  I think Ms. Weiss is correct about that, and so, is she

20   right that 17 is, sort is, a compromise between ... between the

21   pattern deliberate ignorance instruction?  Because, Mr. Kaplan,

22   I mean, you are right, it is a conspiracy case, but it's not

23   just the conspiracy case, even as to Mrs. Tew.  I'm looking

24   up -- Ms. Frost and I have a bit of an advantage on the rest of

25   you, having recently tried...

1          *MS. FROST:*  I'm doing the same exact thing.

2          *THE COURT:*  I will just -- here is what we did in the

3  *Cline* case that Ms. Frost and I recently tried.  We just had an

4  instruction that says, *Knowingly defined*, and it said, *When the*

5  *word knowingly or the phrase with knowledge is used in these*

6  *instructions, it means that the act was done voluntarily and*

7  *intentionally and not because of mistake or accident.  Although*

8  *knowledge on the part of the defendant cannot be established*

9  *merely by demonstrating that the defendant was negligent,*

10  *careless or foolish.  Knowledge can be inferred, if the*

11  *defendant purposely contrived to avoid learning all of the*

12  *facts,* and then we even had a typo in there.  *Knowledge can be*

13  *inferred, if the defendant was aware of a high probability of*

14  *the existence of the fact in question, unless the defendant did*

15  *not actually believe that fact.  Acting in good faith is*

16  *inconsistent with the intent to defraud*.  So that was a fraud

17  case.  *A person who acts on a belief or opinion honestly held*

18  *is not guilty under the statute merely because that belief or*

19  *opinion turn out to be inaccurate, incorrect or wrong.*

20          So, that is what we did in that recent case.

21          *MS. FROST:*  In that case, Your Honor, the government

22  had asked for the deliberate ignorance, we asked for the good

23  faith, and then you combined them into that instruction next.

24          *THE COURT:*  I think that's right.  Ms. Weiss?

25          *MS. WEISS:*  Yes.  And I believe -- and I am not

1525

1    unfortunately a very good oral processor, but I believe that's

2    very close to 1.37.  The only difference is what Your Honor

3    just read out *was purposefully contrived* versus *deliberately*

4    *blinded*.  We would object to a good-faith instruction in this

5    case.  I don't believe that there's been any sort of defense to

6    that end, and so that might be a little bit different than

7    *Cline*, which I only saw, I don't know, 30 minutes of.

8           THE COURT:  Yeah.  I think you are probably right

9    about that.  It is mostly the pattern instruction, I think,

10   with a couple of tweaks, plus the good-faith ... the good-faith

11   paragraph.  Let me see if I can manage to print this out, a few

12   copies for you, because I think we need something defining the

13   mens rea, and this is pretty close to the pattern.  The

14   government suggested their version is something of a

15   compromise, which, I don't know.  I could include just the

16   first paragraph of proposed 17.

17          MS. HUBBARD:  Can I just say how I understand the

18   decision is either to go with some version of what you have in

19   this or the pattern; is that kind of where we're --

20          THE COURT:  Probably.  Yeah.  I mean, I'm open to a

21   couple of tweaks, but I do think we need something.

22          MS. HUBBARD:  Yeah.  I don't disagree we need to

23   define mens rea.  If we could have just a minute to look at

24   these two?

25          THE COURT:  I think I printed out the *Cline* one, which

1526

1       maybe doesn't make a big difference, but ...

2              THE COURT:  Ms. Weiss.

3          MS. WEISS:  Thank you very much for printing this,

4       Your Honor.  It helps me tremendously.  I think the government

5       is fine with using the first paragraph from Cline, if that's

6       the defendant's preference.  The only change I would have is to

7       the third line up from the bottom of that first paragraph,

8       where it says, *learning all of the facts*.  I think I would just

9       ask to eliminate the word *all*.

10             THE COURT:  Okay.  So, what if we either do something

11      like that, or 17 without the last paragraph, which I'm not sure

12      makes sense in, kind of, the context we're talking about here?

13             MS. WEISS:  The government would be fine with either

14      one of those options, Your Honor.

15             THE COURT:  Thank you.

16             MS. FROST:  Your Honor, we would prefer the knowingly

17      defined instruction that you gave in *Cline*.

18             THE COURT:  Okay.  Without the last paragraph, I

19      think?

20             MS. FROST:  Yeah.  I think that's up to Mrs. Tew's

21      counsel to address that issue.

22             THE COURT:  So, Ms. Hubbard, Mr. Kaplan, do you have a

23      record you want to ...

24             MR. KAPLAN:  We do, Your Honor.  Just one second,

25      before we state our positions.

1          MR. KAPLAN:  Your Honor, our position is, in terms of

2    Instruction 19 -- well, either way --

3          MS. HUBBARD:  That's on the last trial.

4          MR. KAPLAN:  Right.  That's what I was saying.  We

5    would either want the Instruction 17, with just the first

6    paragraph, or the instruction you gave, that was just passed

7    out, which is labeled Instruction 19, with the second paragraph

8    left out.

9          THE COURT:  Okay.  Okay.  I understand.  I think ...

10   so, let's see, the government is okay with either of these,

11   with just the first paragraphs of either.  Mr. Tew prefers

12   what's essentially the pattern, you know, with a couple minor

13   adjustments that we gave in *Cline*, and Mrs. Tew prefers the

14   full *Cline*, with the good-faith discussion or -- what was

15   your -- or just the first paragraph of 17?

16         MR. KAPLAN:  That's correct.

17         THE COURT:  Okay.  All right.  All right.  I think

18   between those ... let me look at one thing.  I think what I

19   will do is use what we used in *Cline*, include the good faith,

20   which I think is -- there hasn't been a lot of evidence, but

21   the defense doesn't have to put on a lot of evidence.  But

22   accepting Ms. Weiss' request to take out the *all*, and then,

23   otherwise use the rest of *Cline*, minus the extra period, and so

24   that's what I will do with 17, and I think that means probably

25   everybody objects to the decision.

1      MS. HUBBARD:  Means you are doing something right,

2  Judge.

3      THE COURT:  The objections will be noted.  All right.

4  That's what we will do with 17.  Thank you for that.  I think

5  there are no disputes about 18.  I understand we will,

6  obviously, fill in the cross-references.

7      THE LAW CLERK:  Want to make sure everyone is on the

8  same page as to what the cross-references will be, given your

9  order just now.  Just to be clear, the knowledge and knowingly

10 references will refer back to the 17?  What we're doing with 17

11 now?

12     THE COURT:  I think that's right.  And I don't know

13 where we will -- I don't know what the agreement one -- it's

14 one of these ones we are getting to, right?

15     THE LAW CLERK:  I think there's a substantive

16 conspiracy instruction for that, and then the wire fraud

17 instruction, so those make sense.

18     THE COURT:  Right.  So, process-wise, once we get

19 through this, Mr. Jacobsmeyer will present full clean copies of

20 where we are, that's one important thing to make sure we get

21 right, we hand it out before we finalized it.  So, thank you,

22 Mr. Jacobsmeyer.

23      So, Number 19, the definition of Conspiracy To Commit

24 Money Laundering, I think we're okay?

25     MS. WEISS:  Excuse me, Your Honor?

1           THE COURT:  Yes.

2           MS. WEISS:  I apologize.

3           THE COURT:  Go ahead.

4           MS. WEISS:  Going back to 18.  I did notice, in my

5   attempts, at midnight, that this was the only instruction where

6   first, second and third are used, versus numbers, one, two,

7   three and four.  So, just for the sake of consistency, I wasn't

8   sure if you wanted to adjust that?

9           THE COURT:  Yeah, that seems like a good idea.  We

10  might as well just number them, I think.  We will change those

11  to be consistent.  Thank you, Ms. Weiss.

12          MS. WEISS:  Yes.

13          THE COURT:  Nineteen.  I know the defendants have

14  objected to this.  This is how we laid it out in the

15  preliminary, so I have already, sort of, overruled that.  I

16  will accept those objections as continuing, unless there's

17  anything else, though, I think we can move on.

18              Instruction Number 20.  The government proposed some

19  additional language, but the -- I'm not going to add it, given

20  the pattern instructions.  You can preserve that.  We will

21  consider that preserved.

22          MS. WEISS:  Thank you, Your Honor.

23          THE COURT:  Okay.  Twenty-one, I think we're all on

24  board with.  Twenty-two, I understand that the defendants

25  object to this, as well, as confusing.  But again, I think this

1530

1    is a pattern instruction, so we will include it.

2           THE LAW CLERK:  I just wanted to raise for everyone to

3    consider what we will say about Count 16, as to Mrs. Tew, in

4    these final instructions or if that's going to be kept out?

5           THE COURT:  Yeah.  I'm not going to say anything about

6    it, I don't think, but, Mr. Kaplan.

7           MR. KAPLAN:  No, Your Honor, I just wanted to say one

8    additional thing as -- one additional comment as to the

9    Instruction 22.  I know it's pattern, I have said that before.

10   I want to specifically say that what's confusing, and I have

11   read it repeatedly, maybe it says this and maybe it doesn't, I

12   have a hard time figuring it out, but it strikes me that it's

13   confusing as to whether Ms. Tew could be found guilty of a

14   conspiracy, say the money laundering conspiracy, and this could

15   suggest that that is -- the result of that is that she could be

16   found guilty of the wire fraud.

17          I understand people probably spent a lot of time.

18   It's confusing for many different reasons.  But I just want to

19   put on the record that that's a fear, specifically, in reading

20   through this.

21          THE COURT:  Ms. Frost?

22          MS. FROST:  May I, Your Honor, agree with Mr. Kaplan?

23   When I read this, I get a headache.  I mean, it's very

24   confusing, and it ... you know, I don't know that a regular

25   juror reading this, is; A, going to get it; B understand -- and

1531

```
 1   I understand it's pattern, as well, difference between the
 2   conspiracy counts and the substantive underlying counts, and
 3   again, I just think it's kind of demeaning the government's
 4   burden here.  So I just wanted to make that extra record.
 5           THE COURT:  Okay.  I understand.  We do ask a lot of
 6   our juries, but I will overrule those objections, but they are
 7   noted.
 8           Twenty-three, I think there are no further issues to
 9   discuss.
10           Twenty-four, I think, is similar to others that we've
11   discussed.  We already laid the elements out this way in the
12   preliminary, so noting the objections, I will overrule it as to
13   24.
14           Twenty-five, I don't believe there are any issues.
15           Twenty-six, the main changes we made were to, sort of,
16   explain the verdict form a little bit.  I think that's helpful,
17   especially given the length of the verdict form here.  But if
18   there are no objections or proposed changes to that, I will use
19   proposed 26, as we have got it there, and I don't think there
20   are anymore issues, as to 27 or 28.
21           So, does anybody have anything we missed with the
22   instructions?
23           MS. FROST:  Just really quick, Your Honor.  In the
24   Word document I'm looking at from the Court, our objections
25   were embedded into that in comments, and I could be looking at
```

1     a different version, but Instruction 24 it says, *The*

2     *government's notation is Ms. Tew maintains her objection based*

3     *on the Hopp (phonetic) case.*  I just want to make sure that the

4     record is clear, is that Mr. Tew objected to Instruction 24.  I

5     conferred with Ms. Weiss about it, and I think she was supposed

6     to include us in that comment and probably --

7          *MS. WEISS:*  I missed it.  I apologize.

8          *MS. FROST:*  That's okay.

9          *THE COURT:*  Okay.  All right.  Well, that objection is

10    noted.  So, thank you.  Okay.  So, as I mentioned,

11    Mr. Jacobsmeyer is now going to clean that up, put in the

12    cross-references and print out for everybody a clean copy that

13    I hope is what we will be able to use.  He will come, pass that

14    around and have you look at it, sort of, as we can.

15         I guess my inclination would be go ahead and bring the

16    jury back in, finish with the witness and do the advisement of

17    the defendants, regarding their testimony.  At the end of, sort

18    of, while the jury can take a break and we can do that, look at

19    the actual finals, and just be ready to go.  It's 10 o'clock.

20    I'm still hoping we can do all of this before lunch.  I don't

21    know, you know, reading the instruction takes awhile, but my

22    hope is we can do all of that and closings before lunch, but I

23    don't know if you are going to take your full hour.  I think

24    you each have over an hour for each side, so I don't want to

25    split -- I definitely don't want to split up closings, so if we

1    have to take an early lunch and come back and do closings, I

2    would rather do it that way.  Mr. Kaplan?

3         MR. KAPLAN:  That's fine.  I'm not commenting on that,

4    but I am commenting something on the closings.  It was my

5    understanding, yesterday, both at about an hour.

6         THE COURT:  I think that's right.

7         MR. KAPLAN:  Yeah, a couple minutes.  Your Honor, in

8    preparing -- preparing closings, and given the nature of how

9    this trial proceeds, I don't anticipate needing more than 30

10   minutes, and if I do, just not significantly longer.  I

11   understand that the Court, originally, gave both the

12   prosecution and the defense the same amount of time to split.

13   I would request the Court consider being more flexible with the

14   amount of time that defense has.  I think, intuitively, it

15   seems fair to have one side equal the other side, but in a

16   circumstance where the defendants are at odds with one another,

17   that to suggest that we should split the time, because somehow

18   we can cover similar ground or not be repetitive or whatever

19   would have come into a sense of fairness about one side or the

20   other, it doesn't exist when, as we've discussed, and I am not

21   using this as a term of art, necessarily, but certainly

22   antagonistic.  So, I'm not asking the Court to consider giving

23   a significantly greater amount of time, but the addition to

24   respond, not only to the government's case, but also to the

25   positions that the codefendant's counsel has made, suggests

1534

1  that it's not necessary to split it up this way, given these

2  circumstances.

3       THE COURT:  Yeah.  I will be somewhat flexible about

4  it.  I don't think it's necessary for each defendant to have 45

5  minutes or anything like that, but if you go a little bit over,

6  I understand the situation everybody is in, and I think -- I

7  mean, I don't know, Mr. Schall, if you are planning to talk for

8  50 minutes.  I assume you are doing closing?

9       MR. SCHALL:  No, Ms. Frost is.

10      MS. FROST:  Our trial strategy is revealed.

11      THE COURT:  Are you talking for 50 minutes?

12      MS. FROST:  Well, Your Honor.

13      THE COURT:  I will be a little bit flexible.

14 Sometimes I feel I'm doing you guys a favor by cutting you off,

15 but.

16      MR. KAPLAN:  That's been said to me on more than a few

17 occasions, Your Honor.  So you are not alone, with that.

18      MS. FROST:  It's not just me.

19      THE COURT:  You guys should think about that every

20 once in awhile, maybe.  But I will be flexible, within reason.

21 I understand what's at stake and the situation everybody is in.

22      Okay.  Mr. Jacobsmeyer, do you have everything that

23 you need to finalize the instructions?

24      THE LAW CLERK:  Just one clarification, on 17.  My

25 understanding was that we're -- knowledge or intent one.  We're

1535

 1    using the *Cline* instruction, but there was one change --

 2              THE COURT:  Right.

 3              THE LAW CLERK:  -- about the word *all*, I think

 4    Mr. Schall helped me.  And could we -- I don't know if we

 5    decided on the title.  If it should be knowingly defined, as it

 6    was in *Cline* or we should keep --

 7              THE COURT:  Yeah.  That's what I want it to be, I

 8    think.

 9              THE LAW CLERK:  Then I think I have got it.

10              THE COURT:  All right.  So, you can work on that.  I

11    say we -- if we're ready to go ahead and bring the jury in.

12    Mr. Schall?

13              MR. SCHALL:  If it's correct that the attorneys won't

14    get a break, probably till noon, can we have two minutes to run

15    to the potty?

16              THE COURT:  Sure.

17              MS. WEISS:  Thank you.

18              THE COURT:  Not a bad idea.  All right.  Thank you.

19    Thank you.  Recess.

20        (Recess at 10:00 a.m.)

21        (In open court at 10:11 a.m.)

22              THE COURT:  All right.  Please take your seats.  Can

23    we go ahead and bring the jury in, Mr. Keech?

24              THE COURTROOM DEPUTY:  All rise.

25        (Jury in at 10:12 a.m.)

SPECIAL AGENT LISA PALMER - Cross

1    THE COURT:  All right.  Welcome back.  Please take

2  your seats.  We're going to pick up where we left off, which

3  was Cross-examination by Mr. Hubbard.  Go ahead.

4    Mr. Keech, if you could turn on the display?

5    THE COURTROOM DEPUTY:  Should be on you.

6                  **CROSS-EXAMINATION**

7  BY MS. HUBBARD:

8  Q    Good morning, Agent Palmer

9  A    Good morning, Ms. Hubbard.

10  Q    I want to reorient us from a place that we discussed

11  yesterday.  If you recall, this is Defense Exhibit N, which, I

12  believe, was the cookies related to the unicorn account which

13  backs up the Google Voice number?

14  A    Yes; that's correct.

15  Q    And it was *Colonel Mustard in the library with a*

16  *candlestick*.

17          So, I want to start today about talking about some of

18  these other businesses that Michael Tew was involved with

19  during the time period at issue here.  I believe we -- you

20  testified yesterday that you were aware Michael Tew had worked

21  somewhat, like a 1099 contractor for different companies?

22  A    Yes.

23  Q    And some of those companies were in the marijuana space?

24  A    Yes.

25  Q    And Bezzle brands, Canna Business Resources, we see those

SPECIAL AGENT LISA PALMER - Cross

1    there?

2    A    Yes.

3    Q    One of the other ones was Rose Capital Group?

4    A    I believe it was Rose Management Group.

5    Q    Thank you for that correction.  I think you are right.  So,

6    as part of your investigation, you subpoenaed records from Rose

7    Management Group?

8    A    Yes, we did.

9    Q    I'm going to show you an exhibit that has not yet been

10   admitted.  If you could look at the monitor here.  This has

11   been marked as Defense Exhibit A, and I am just going to flip

12   through these to make sure you are familiar with them.  Are you

13   familiar with these records?

14   A    I am.

15   Q    And are these records that you got access to, as part of

16   the investigation, through one of your tools?

17   A    Yes.

18   Q    And do you see here, the last page is a business record

19   certification from the company saying that these are records

20   kept in the ordinary course of their business?

21   A    Yes.

22        MS. HUBBARD:  Your Honor, I would move for admission

23   of Defense Exhibit A.

24        THE COURT:  Any objection?

25        MR. FIELDS:  No objection.

SPECIAL AGENT LISA PALMER - Cross

1              *THE COURT:* It's admitted.

2              *MS. HUBBARD:* If we could publish to the jury? I'm

3      just going to start here, on page one.

4      *Q*   Agent Palmer, this is, kind of, a standard 1099 form, I'm

5      sure, as an IRS agent, you have seen many times?

6      *A*   Many times.

7      *Q*   1099 Miscellaneous form as I understand it, is,

8      essentially, when you are compensating someone for work

9      performed, but the person is not an employee of the company?

10     *A*   Yes; that's correct.

11     *Q*   So, we see here, in 2019, Michael Tew, through his business

12     Sand Hill, was compensated by Rose Management Group in the

13     amount of $64,970?

14     *A*   Yes.

15     *Q*   And in 2018, Mr. Tew, again through Sand Hill, LLC, was

16     compensated by Rose Management Group, in the amount of $62,340?

17     *A*   Yes.

18     *Q*   And I won't go through 2017, since that's before the time

19     period we are talking about here.

20              Are these records, kind of, consistent with what your

21     general investigation showed, as far as Michael Tew working for

22     different entities, in this kind of contractor position?

23     *A*   Yes.

24     *Q*   And as you were reviewing communications and emails and

25     records, you came across information suggesting that Michael

SPECIAL AGENT LISA PALMER - Cross

1   Tew was communicating with these various businesses?

2   A   Yes.

3   Q   That he was having conference calls and meetings and that

4   kind of thing, related to these other businesses?

5   A   Yes.

6   Q   And that was for the period that we're talking about here,

7   2018 through to 2020?

8   A   Yes.

9   Q   And then, you also saw communications between the Tews,

10  Michael and Kimberley Tew, talking about the various work that

11  Michael was doing for these companies?

12  A   Yes.

13  Q   And how much he was being paid, the meetings he had, and

14  the travel he needed to do, that kind of thing?

15  A   Yes.

16  Q   All right.  Now, I want to go back to my favorite topic,

17  Cellebrite, and the iCloud data.  So, again, just to kind of

18  recap where we left off yesterday, yesterday we talked about

19  that really most of the communications that have been admitted,

20  in this case, came from that iCloud download?

21  A   Yes.

22  Q   Not all of them, I understand, but there's some screen

23  shots of actual messages on a phone, but most of them have come

24  from the iCloud data?

25  A   Yes.

SPECIAL AGENT LISA PALMER - Cross

1    *Q*    And the iCloud data, as processed by Cellebrite, your

2    review came from the combined file, after everything had been

3    dumped together?

4    *A*    Correct.

5    *Q*    And that sometimes the way it shows by Cellebrite, kind of

6    mixes -- well, we saw where it switches between phone numbers,

7    very rapidly?

8    *A*    Yes.

9    *Q*    Even though messages are all attributed to Michael Tew?

10   *A*    The messages are associated with the contact MT, within the

11   Cellebrite application.

12   *Q*    Right.  So we saw that it was switched between '7473 and

13   '1312?

14   *A*    Yes.

15   *Q*    We also saw that the *kley*, just because it says *kley@me*,

16   and the name Kimberley Tew, sometimes those messages weren't

17   attributed to Kimberley Tew?

18   *A*    Correct.

19   *Q*    And then I want to, kind of, move forward from that,

20   sticking in the Cellebrite data or the iCloud data, and talk

21   about those exhibits that were the one-sided text messages?

22   *A*    Okay.

23   *Q*    And I believe you testified yesterday that the presumption

24   is that those one-sided text messages are conversations;

25   whereas, half of a conversation between Jonathan Yioulos and

SPECIAL AGENT LISA PALMER - Cross

1   Kimberley Tew?

2   A   That was Mr. Yioulos' testimony.  Yes.

3   Q   Yes.  All right.  So, let's just look at one of those.

4   This one has has already been admitted, Government's Exhibit

5   708.  Familiar with this?

6   A   Yes.

7   Q   And I believe this is one of the exhibits that Mr. Yioulos

8   testified reflected a conversation between he and

9   Kimberley Tew, based on reference -- essentially, like

10  third-party references to the word Michael?

11  A   I would need to review the conversation to be sure, but

12  Mr. Yioulos did testify that many of the messages he recalled

13  being between him and Kimberley.

14  Q   We see here on page one, redaction, that was imposed by the

15  government?

16  A   Yes.

17  Q   And then we see here, again, towards the end, another

18  redaction, couple more redactions?

19  A   Yes.

20  Q   And you can't say whether you imposed these redactions or

21  someone else on the prosecution team did?

22  A   I just don't recall.

23          MS. HUBBARD:  Your Honor, I would like to have the

24  witness review an un-redacted version.  If I may approach?

25          THE COURT:  Okay.  Have you shared --

SPECIAL AGENT LISA PALMER - Cross

1          MS. HUBBARD:  Yep.

2          THE COURT:  -- a version?  Then yes, go ahead.

3          MS. HUBBARD:  Well, I have copies.  I shouldn't say, *I

4    have*.

5          THE COURT:  Oh, okay.

6    Q   And, Agent Palmer, if you want to just flip through those,

7    check the Bates numbers, whatever you want to do, to make sure

8    those are the same pages.

9    A   I have checked that they are the same pages.  Would you

10   like me to review the redacted areas?

11   Q   I just want you to verify they are the same pages.  So,

12   does that appear to be an un-redacted version of the same thing

13   as the Government's Exhibit 708?

14   A   Yes.

15         MS. HUBBARD:  Your Honor, I would move for admission

16   of Defendant's Exhibit BB.

17         THE COURT:  Any objection?

18         MR. FIELDS:  No objection.

19         THE COURT:  It's admitted.

20   Q   All right.  So, I want to start -- I'm going to show the

21   jury what is now Exhibit BB, and these are -- they go back to

22   front.

23   A   Right.

24   Q   As far as timing, right?  So, let's just go ahead and start

25   at the back.  And that first message at the back says, *We are*.

SPECIAL AGENT LISA PALMER - Cross

1    *I just thought it would be easier to go through one person.*

2    *It's nothing personal.  Seriously.*  Do you see that?

3    A    Yes.

4    Q    And that was not redacted in the government's version?

5    A    Correct.

6    Q    So, the message just above that, this one was redacted,

7    correct?

8    A    Yes.

9    Q    And if you could just kind of read, for us, this next --

10   well, I will just pull it up here.  Need to work on my call-out

11   skills.

12           So, this is the next previous one, I believe, that's

13   message 541.  Says, *Okay, call soon*.

14   A    Yes.

15   Q    Okay.  I want to highlight a couple, kind of, just features

16   of this and discuss.  So, we see here, there's a file number

17   associated, Chat-541?

18   A    Yes.

19   Q    And you recall testimony that Cellebrite organizes certain

20   things into chats?

21   A    Yes, I recall that testimony.

22   Q    And that was to indicate that it's one, kind of,

23   conversation, a chat, between the individuals?

24   A    I believe that's what Mr. Vanderveer or Mr. Hanggi said.

25   Yes.

SPECIAL AGENT LISA PALMER - Cross

1    *Q*   And I can't remember which one it is either; that's why I

2    keep saying*, that testimony.*

3         And there was also testimony about this being the

4    database, where the source file for these messages are.  Do you

5    see that, where I circled?

6    *A*   I see what you circled.  Yes.

7    *Q*   All right.  Now, I'm just going to pop out the message

8    right above that.  So, this is a message that was not redacted

9    in the government's version that says, *How so?  There's*

10   *literally no way I can do that.*

11   *A*   Yes.

12   *Q*   Did I read that right?

13   *A*   Yes.

14   *Q*   Okay.  And we see that this is Chat-540; whereas, the last

15   one was Chat-541, appears to be the message just before that,

16   in this chat string?

17   *A*   Yes.

18   *Q*   And it has the same source database that it's coming from?

19   *A*   Yes.

20   *Q*   And if we can go here to the messages before the actual

21   text of the message, is just the word*, Jesus*, but the data for

22   the messages on the prior page Chat-539, and the same database;

23   is that right?

24   *A*   Yes.

25   *Q*   So, it's suggesting that these all '539, '540, '541, they

SPECIAL AGENT LISA PALMER - Cross

1   are all in the same chat string?  That's what the data is

2   suggesting, right?

3   A    That's what the numbering suggests.  I don't know enough

4   about the inner workings of Cellebrite to draw that conclusion.

5   Q    All right.  So, I'm just going to get back to the

6   beginning, and look at these.  So, here we have -- we're on

7   page one now, front page.  This bottom message was not redacted

8   in the government's version, right?

9   A    Correct.

10  Q    That says, *Okay.  Again, you are putting this on me like

11  it's my fault*.  See this is Chat-531, in the same string, from

12  that same database?

13  A    Yes.

14  Q    And if we look at this portion, was redacted from the

15  Government's Exhibit 708, these messages appear to be in the

16  same chat string, '530, same database?

17  A    They are pulling from the same database, and they are

18  sequentially numbered.

19  Q    And these messages say, *I just sent you 40K*, and then the

20  other one says, *Plus you have another 30K in crypto*?

21  A    Yes, they do.

22  Q    Those again, were redacted from the government's version?

23  A    Yes, they were.

24  Q    I want to switch exhibits now, and go to Government's

25  Exhibit 707.  This was previously admitted.  The testimony was

SPECIAL AGENT LISA PALMER - Cross

1    that this was a message back-and-forth between Michael Tew and

2    Jonathan Yioulos?

3    A    Yes, I believe that was his testimony.

4    Q    And that's what these green and white spreadsheet-style

5    signifies, typically, Michael Tew and Jonathan Yioulos?

6    A    Yes; that's correct.

7    Q    And so the government, I believe, Jonathan Yioulos,

8    specifically testified about this, and testified that he had

9    reviewed it and he recalls this is a conversation between him

10   and Michael?

11   A    I believe that was his testimony.  Yes.

12   Q    All right.  I'm going to zoom in on this middle here.

13   Right here in the middle of this exhibit, 707, are those the

14   same message we just looked at?

15   A    Yes.

16   Q    Where Jonathan Yioulos is saying to Michael Tew, *I just*

17   *sent you 40K*?

18   A    Yes.

19   Q    And Jonathan Yioulos is saying, to Michael Tew, *Plus you*

20   *have another 30,000 in crypto*.

21   A    Yes.

22   Q    If we look a little earlier in this conversation, we see

23   another message here, where Jonathan Yioulos is saying, again,

24   to Michael Tew, *Okay.  Call soon*.

25   A    Yes.

SPECIAL AGENT LISA PALMER - Cross

1   *Q*   Just flip back to Defense Exhibit BB, and here we see this,

2   *Okay.  Call soon*, message on the string that the government is

3   representing is a conversation with Kimberley Tew?

4   *A*   I believe --

5   *Q*   Do you see that?

6   *A*   I do see that.

7   *Q*   And this was, again, redacted by the government in

8   Exhibit 707?

9   *A*   Yes, it was.

10  *Q*   Okay.  We're going through this similar exercise with

11  Exhibit 685, although I will warn you it's much longer, but if

12  you could check these to make sure they are the same.

13  *A*   Will do.  I will provide copies for you guys.

14          *MS. HUBBARD:*  That is for whoever.  Stickies are a

15  little aggressive.  Robb, would you hand her this one too?

16          *THE WITNESS:*  I have two defendant exhibits.  Is there

17  a corresponding one with redactions, that I can compare it to?

18          *MS. HUBBARD:*  Judge, did you get the one with

19  redactions, maybe?

20          *THE COURT:*  I did.

21          *MS. HUBBARD:*  Can you swap one of those?

22          *THE WITNESS:*  I have three copies of the same, so if

23  you want two of them.

24          *MS. HUBBARD:*  The un-redacted version is Defendant's

25  CC.

SPECIAL AGENT LISA PALMER – Cross

1          *THE WITNESS:*  Thank you.

2          *MS. HUBBARD:*  The redacted version has already been

3   admitted as 685.  Thank you.

4          *THE WITNESS:*  I verified the Bates numbers are the

5   same.

6          *MS. HUBBARD:*  Thank you.  Your Honor, I would move to

7   admit Defense Exhibit CC.

8          *THE COURT:*  Any objection?

9          *MR. FIELDS:*  No objection.

10         *THE COURT:*  It's admitted.

11  BY MS. HUBBARD:

12  *Q*   So, I just want to start with, quickly, going through 685.

13  We're only going to look at a couple of points on this one.

14         So, on page one, at the top, again, this is the

15  government's version, 685, we see the redaction up here at the

16  top?

17  *A*   Yes.

18  *Q*   And then I'm going to flip through a couple of pages.  We

19  see a redaction here, on page nine?

20  *A*   I do see it on my pages, but I do not see it on my screen.

21         *MS. HUBBARD:*  You are right.  I'm sorry.  I have got

22  to push the present button.  Thank you.

23  *Q*   So, I'm on page nine here, and I am just going to go

24  backwards.  You guys didn't get the two forwards in the first

25  place.

SPECIAL AGENT LISA PALMER - Cross

1  A    Gotcha.

2  Q    So, we can confirm that there are redactions that were

3  imposed by the government on page one and page nine of Exhibit

4  685.  If I could have you look at Defense Exhibit CC, and I am

5  going to give you the page number at the bottom.  It is

6  Cellebrite page number 279.  All right.  Am I showing you the

7  right one?  This is the one that was redacted in the

8  government's version?

9  A    Yes.

10 Q    And the message is from Jon, and it says, *Okay*.

11 A    Yes.

12 Q    And the time of that message is December 6th, 7:52 PM, and

13 this is going to get a little confusing, because it's UTC plus

14 zero.  It's going to be off by a couple of hours.  If you look

15 at something that's adjusted, right?

16 A    Yes.

17 Q    But 7:52:02, and that is Chat-693, in a different chat

18 string?

19 A    Yes.

20 Q    Right.  And again, from the same database?

21 A    Yes.

22 Q    Okay.  All right.  This is the message just above it, Jon

23 says, *What do you mean*, 692, same database, right?

24 A    Yes.

25 Q    So, these are moving in sequential order as we kind of

SPECIAL AGENT LISA PALMER - Cross

1   would expect by this point.  Down here we've got 691, and

2   then -- you can see there it goes back.  Right?

3   A   Yes, it does.

4   Q   All right.  This message on the page before, page 278, on

5   the Cellebrite, so this message number -- oop.  I'm on the

6   wrong page.  Oh, my gosh.  Turn the page.  Okay.  We're going

7   to find it.

8           Okay.  So, message number 690, here, in the middle of

9   the page?

10  A   Yes.

11  Q   Is redacted from the government's version?

12  A   Yes, I believe that's correct.

13  Q   And that's a message that says, *Please call me when you*

14  *can*?

15  A   Yes.

16  Q   And again, same chat string, same database?

17  A   Yes.

18  Q   The messages above 689 is not redacted?

19  A   Correct.

20  Q   I'm going to go back to the beginning and focus on this

21  other one that is redacted.  This top message is redacted, that

22  says, *I'm trying.  Not only is work the absolute worst right*

23  *now.  But we have no money to pay vendors at all.  Like,*

24  *everything is getting threatened to get cut off*?

25  A   Yes.

SPECIAL AGENT LISA PALMER - Cross

1   Q   That one, the data for it would be on the prior page?

2   A   Correct.

3   Q   But are you safe with me assuming that is would be 664,

4   given that the one below it is 665?

5   A   That's a safe assumption, but I cannot testify to that

6   fact.

7   Q   Of course.  Of course.  All right.  I want to show you,

8   now, an exhibit that has not yet been admitted.  It is a

9   government's exhibit.  Exhibit 684 should be on your screen,

10  Agent Palmer.

11          Are you familiar this conversation?  I'm happy to,

12  kind of, blow up the middle part, so you can look at it a

13  little better.

14          I believe you testified at a prior hearing about this

15  being a conversation between Mr. Yioulos and Mr. Tew?

16  A   Yes.

17          MS. HUBBARD:  Your Honor, we would -- oh, let me just,

18  also ask --

19  Q   This is from the iCloud data that there has been testimony

20  about?

21  A   Yes.

22          MS. HUBBARD:  Your Honor, I would move for admission

23  of Government's Exhibit 684.

24          THE COURT:  Any objection?

25          MR. FIELDS:  No objection.

SPECIAL AGENT LISA PALMER - Cross

1        *THE COURT:*  It's admitted.

2    *Q*   All right.  So, the jury now has 684 in front of it.  Do

3    you see this message*, Please call me when you can*?

4    *A*   Yes.

5    *Q*   And that is the same language that appeared on the text

6    string that was supposedly between Jonathan Yioulos and

7    Kimberley Tew?

8    *A*   Yes.

9    *Q*   And this, Government's Exhibit 684, is actually a message

10   between Jonathan Yioulos and Michael Tew?

11   *A*   Yes.

12   *Q*   And then do you also see, just below that, *I'm trying, not*

13   *only is the work -- is work the absolute worse right now.  But*

14   *we have no money to pay vendors at all.  Like everything is*

15   *getting threatened to get cut off?*

16   *A*   Yes.

17   *Q*   And that was, again, this message here that was redacted on

18   the government's exhibit?

19   *A*   Yes.

20   *Q*   So, what we see is at least two of the messages in this

21   string of messages that the government -- or that there has

22   been testimony between Jonathan Yioulos and Kimberley Tew -- or

23   actually conversations between Jonathan Yioulos and

24   Michael Tew?

25   *A*   The messages appear on the same report, but --

SPECIAL AGENT LISA PALMER – Redirect

1    *Q*    Sequentially numbered messages.  Yes.

2    *Q*    Pulled from the same database?

3    *A*    Yes.

4    *Q*    In the same chat string?

5    *A*    The same report within Cellebrite.

6    *Q*    Yeah.  And I believe there was testimony that Cellebrite

7    never makes mistakes?

8    *A*    I believe that's what they testified to.

9          *MS. HUBBARD:*  If I could have a moment, Your Honor?

10          *THE COURT:*  Yes.

11          *MS. HUBBARD:*  No further questions.

12          *THE COURT:*  All right.  Thank you very much,

13   Ms. Hubbard.  Any Redirect?

14          *MR. FIELDS:*  Yes, Your Honor.

15          *THE COURT:*  Give Ms. Hubbard a moment.

16          *MS. HUBBARD:*  Sorry, Your Honor.

17          *THE COURT:*  That's all right.

18                    **REDIRECT EXAMINATION**

19   *BY MR. FIELDS:*

20   *Q*    Ms. Palmer, I want to go right back to the exhibits that we

21   were just discussing.  Did you notice any patterns to the

22   redaction decisions?

23   *A*    The redaction decisions for the messages we just looked at

24   appeared to be redacted messages we could otherwise attribute

25   as being sent to Michael Tew, leaving the remaining messages as

SPECIAL AGENT LISA PALMER - Redirect

1   likely sent to Kimberley Tew.

2   Q   You reviewed a lot of cell phones, in your career?

3   A   I have.

4   Q   Do cell phones allow people to communicate via group text?

5   A   Yes, they do.

6   Q   What is a group text?

7   A   A group text is, basically, a message chain where, instead

8   of messages being sent from one participant to another

9   participant, it's from one participant to many participants.

10  Q   Did that pose any attribution challenges for you, when you

11  were reviewing these cell phones?

12  A   It did.

13  Q   How did you overcome those challenges?

14  A   A couple of different ways.  I have talked about some of

15  them at length already, in terms of looking at context clues,

16  for other things that we knew was going on, such as

17  surveillance from banks, other events that we knew transpired,

18  testimony from other witnesses, and comparison to other records

19  that we had, as part of the investigation as a whole.

20  Q   So, when you were reviewing these chats, were you looking

21  at them in isolation?

22  A   No.  We were looking at them one -- as one piece of, kind

23  of, the whole puzzle of the case.  You know, no fact in this

24  case stands in isolation, really.

25  Q   So, let's go back a little bit.  You were asked about

SPECIAL AGENT LISA PALMER - Redirect

1    telephone toll records.  Do you remember being asked about

2    those questions?

3    A    I do.

4    Q    Did investigators in fact obtain telephone toll records?

5    A    I believe we did, for certain accounts.

6    Q    Were you able to review them?

7    A    I was.

8    Q    When you reviewed them, what did you see?

9    A    I do not recall everything that was on them, but I don't

10   think that they were a perfect match, because of some of the

11   issues cited; such as, cell phone towers, versus voice over

12   internet protocols.  It's been quite awhile since I reviewed

13   those records.

14   Q    Let's talk about traditional telephone companies.  In this

15   modern age, can you communicate with other people outside of

16   the telephone companies?

17   A    Absolutely.

18   Q    Are you aware of something called an iMessage?

19   A    I am.

20   Q    What is an iMessage?

21   A    It is a message that is sent from one Apple™ product to

22   another Apple™ product, so an iPhone to an iPhone, iPad to

23   iPad, iPhone to iPad, et cetera.

24   Q    Let's say you are communicating on Apple™ devices, you have

25   AT&T® or some other, you know, great cellar network, using

SPECIAL AGENT LISA PALMER - Redirect

1   those iMessages, would those necessarily pass through AT&T® or

2   Verizon?

3   *A*   They might pass through in the sense that AT&T® would

4   provide the service, but it wouldn't necessarily be a cell

5   phone tower.  It would be Internet, right?  My SmartPhone has

6   Internet on it, not just traditional cell phone towers, those

7   messages might be relayed over the Internet versus the cell

8   phone tower.

9   *Q*   All right.  Do you remember being asked about how certain

10  messages were not associated with phone numbers, instead were

11  associated with a *kley@me.com*?

12  *A*   Yes.

13  *Q*   Who listed that email account in an application at Navy

14  Federal Credit Union?

15  *A*   Kimberley Tew.

16  *Q*   Who listed that email account as a contact to obtain an

17  American Express?

18  *A*   Kimberley Tew.

19  *Q*   Who was associated with that account in Apple™ subscriber

20  records?

21  *A*   Kimberley Tew.

22  *Q*   And you were asked a lot about assumptions yesterday.  Do

23  you remember that?

24  *A*   I do.

25  *Q*   As an investigator, do you make assumptions?

SPECIAL AGENT LISA PALMER - Redirect

1    *A*   We make lots of assumptions, but we make them based on

2    evidence, and when they are supported by facts.

3    *Q*   So, when you, as an investigator, are getting prepared to

4    make an assumption, what sort of things would you look at

5    before relying on that?

6    *A*   It would be, depending on the particular type of

7    assumption, if I'm looking at an assumption for attribution,

8    for a text message, for example, I start with the message in

9    front of me.  Is there something clear, where it says, for

10   example, *Hi, my name is Lisa Palmer*, might be a good indication

11   that was sent by Lisa Palmer.  You expand out.  What does the

12   rest of the messages around that message say?  Who was likely

13   to have control of the account or the devices that it was sent

14   from?  And beyond that, what other events were taking place

15   outside of that message?  It's not one single piece of

16   evidence.  It's going to be kind of totality of the

17   circumstances that makes us come to a particular conclusion or

18   assumption about who sent a message.

19   *Q*   Yesterday, Ms. Hubbard praised you for being so careful

20   when you were reading about the, sort of, *kley@me*?

21   *A*   Yes.

22   *Q*   When you were reviewing those messages, did you assume that

23   the *kley@me* messages were from a particular person?

24   *A*   In most instances, yes, there's an assumption of who

25   actually sent those messages, based on the context of that

SPECIAL AGENT LISA PALMER - Redirect

1   particular chain and some of the factors already mentioned.

2   Q   In other circumstances, did you question that assumption?

3   A   Yes.  Sometimes it was unclear who was using the -- who was

4   using the *kley@me.com* account, but it was always one of two

5   people.  It was always either Michael or Kimberley.  I never

6   found any evidence that anyone had access to that particular

7   account.

8   Q   Let's look at an example.  Let's look at Government's

9   Exhibit 886.  And if we could go to page 17, please.  All

10  right.  So do you see that second green box?

11  A   Yes.

12  Q   All right.  So, take this exercise with me.  If you were

13  looking only at that message, without any other information in

14  the entire universe, you are a brand-new investigator, you are

15  just looking at this, it just said *kley@me.com*, could you tell

16  who that was from?

17  A   Most likely it could be from Kimberley Tew.

18  Q   But?

19  A   But it's not conclusive on its own.

20  Q   So that you have other information from your investigation?

21  A   Yes.

22  Q   So, when was this message?

23  A   This message was sent November 1st, 2019.

24  Q   If we could, let's pull on up the -- let's keep this on the

25  left side of the screen if we can.  Try and see if the software

SPECIAL AGENT LISA PALMER - Redirect

1   works today.  On the right side of the screen, I want to pull

2   up Government's Exhibit 509.

3          What do you see over there in Government's Exhibit

4   509?

5   A   That is a screen shot of a reservation at the Wynn in the

6   name of Kimberley Tew, and the arrival date is October 30th,

7   2019, and the departure date is November 2nd, 2019.

8   Q   All right.  So, when you look at these records, like that,

9   were you able to form a lay opinion about who have might be

10  *rage betting* on dice?

11  A   Yes.

12  Q   Who?

13  A   Kimberley Tew.

14  Q   All right.  Let's look at another example.  Let's look at

15  Government's Exhibit 943.  All right.  If we could look at that

16  last line there.  All right.  Do you see ... all right.  What

17  is that last line there?

18  A   From Michael Tew, phone number ending '1312, *Withdraw 1K*

19  *from every card but nothing from '7782,* right?

20  Q   Now, let's look at Government's Exhibit 426.  Okay.  Go to

21  the last line on page on 943, please.  Okay.  So, do you see --

22  actually, so if we go up a little bit.  All right.  So, you see

23  you have *kley@me.com*, right?  What does it say there?

24  A   *Right*.

25  Q   Okay.  And then, do you see -- this is a little bit weird.

SPECIAL AGENT LISA PALMER - Redirect

1   Do you see in these blue messages that one is one number and

2   one is another?

3   A   Yes, I do.

4   Q   Who are those numbers associated with?

5   A   Both of those phone numbers are -- both of the blue phone

6   numbers, to be specific, the numbers ending in '3132 and the

7   number ending in '7473, are associated with Michael Tew.

8   Q   When you see that sort of discrepancy in the Cellebrites,

9   did that sometimes make you question the data a little bit?

10  A   Not really.

11  Q   Even so, did you look to corroborate it against other forms

12  of evidence?

13  A   Yes, we did.

14  Q   So, for instance, what does the last line say there in

15  Government's Exhibit 943?

16  A   *It's really snowing out.*

17  Q   And you have to do a little bit of math with me, if you

18  look at 3-28-2020, 5:08 AM, Universal Coordinated Time, so

19  approximately when is that in Denver?

20  A   Approximately 11:30 I believe.

21  Q   If you look over on Government's Exhibit 426, when you

22  pulled the ATM from the bank, what did you see?

23  A   That particular photo is dated March 27th, 2020, and it's

24  about 11:15 PM.

25  Q   What do you notice about the weather?

SPECIAL AGENT LISA PALMER - Redirect

1    *A*   It certainly does appear to be snowing.

2    *Q*   All right.  Let's look at one other example.  Let's look at

3    Government's Exhibit 787.  All right.  And let's read just --

4    this wasn't read yesterday.  So, let's read until we get to the

5    first green box, please?

6    *A*   Kimberley, *Really need your help to make sure we have*

7    *dollar sign tomorrow.  It's important.  Please respond.  Where*

8    *are you?  This is important.  If it doesn't hit tomorrow, I am*

9    *going to blow up.  Fuck.  When can he?  If he can't tomorrow,*

10   *when can he this week or something big?  Can he send 7*

11   *tomorrow?  We need something.  Tell him to think if something*

12   *for tomorrow.*

13          Then *kley@me.com*, *He says they may bounce payroll.*

14   *Q*   Now, let's keep going to the next box.  All right.  So,

15   let's -- if we could, let's keep the two blue boxes and the

16   green.  Do you see where, first of all, the blue box at the

17   top, what number is that associated with?

18   *A*   Kimberley Tew's phone number ending '2046.  The green box,

19   what is it associated with?

20   *A*   *Kley@me.com.*

21   *Q*   All right.  And then do we get a new phone in there?

22   *A*   We do.

23   *Q*   Which phone is that?

24   *A*   Michael Tew's phone number ending '7473.

25   *Q*   During your investigation, did you uncover evidence that

SPECIAL AGENT LISA PALMER - Redirect

1    phones would sometimes be switched around?

2    A    Yes.

3    Q    Did that sometimes pose challenges for attribution?

4    A    It did.

5    Q    So, would you be safe making an assumption in this

6    particular case?

7    A    Yes.

8    Q    And is that because you have other sources of evidence?

9    A    Yes.

10   Q    Let's look at Government's Exhibit 786.  If we could put it

11   on the right-hand side of the screen, while we leave 787, page

12   three, on the left-hand side.

13         All right.  So, that's way too small to read, but

14   let's look, if we can, on the third line.  Just blow up the

15   third line of the content, that white box there.  Okay.  What

16   did Jonathan Yioulos say to Michael Tew that day, June 12th,

17   2019?

18   A    *I have no money.  We might not make payroll.*

19   Q    All right.  So, when you were comparing these records, what

20   conclusions could you draw, after seeing things like this?

21   A    In this particular case, the green box, he says they --

22   *They may bounce payroll*, that likely was sent by Michael,

23   because Mr. Yioulos told Michael that National Air Cargo may

24   bounce payroll.

25   Q    So with this additional context, were you able to form lay

SPECIAL AGENT LISA PALMER - Redirect

1   opinions about who might be sending these various messages back

2   and forth?

3   A   Yes.

4   Q   Did you follow that process in your review of all of the

5   text messages that were part of your testimony?

6   A   Yes, I did.

7   Q   And in your lay opinion, were the messages between anyone,

8   other than Michael and Kimberley Tew?

9        MS. HUBBARD:   Your Honor, I would object to this

10  witness' testimony, starting to invade the province of the

11  jury, as far as what conclusions they should draw.

12       THE COURT:   Overruled.   He can ask her conclusions.

13  A   Yes.   In this case, Kimberley and Michael Tew were the only

14  people who appeared to have access to the kley@me.com account.

15  Q   All right.   Let's go to Defense Exhibit N, which, with

16  luck, should be in our computer.   There it is.

17       Do you remember being asked a lot of questions about

18  this particular record?

19  A   Yes, I do.

20  Q   When you were being asked questions, did you notice whether

21  or not you were asked any questions -- well, was there one of

22  these accounts that you were not asked questions about?

23  A   Yes.

24  Q   Which one?

25  A   Tennineprojects@gmail.com.

SPECIAL AGENT LISA PALMER - Redirect

1    Q    Before your testimony, were you able to review records

2    obtained from Google, and certified in their declaration,

3    related to *tennineprojects@gmail.com*?

4    A    Yes.

5    Q    When you reviewed those records what did you discover?

6    A    The *tennineprojects@gmail.com* account, the subscriber

7    information listed Kimberley Tew as the user of that account.

8    Q    All right.  You were also asked questions about that Audi®.

9    Do you remember?

10   A    Yes.

11   Q    Let's go back to Government's Exhibit 505.  Sorry.  I'm

12   going a little fast.  I will try to slow down.  Are you

13   familiar with these records?

14   A    I am.

15   Q    Who signed for the Audi®?

16   A    I believe Michael signed for the Audi®.

17   Q    All right.  Now, if we go to Government's Exhibit 506.

18   What is this?

19   A    This is the wire transfer, kind of, confirmation from

20   Continental Volkswagen for the payment for the Audi®.

21   Q    And based on your review of bank records, who actually made

22   that money transfer?

23   A    Michael.

24   Q    Now, let's look at Government's Exhibit 886, and if we

25   could go to page 12.  All right.  Let's scroll up a little bit,

SPECIAL AGENT LISA PALMER - Redirect

1    to give us a little bit more context.  All right.  So, could

2    you please start reading the green boxes?  Let's get to the

3    first blue box?

4    A    *Kley@me.com, And also owe Mora 4K, I think.  Paid my*

5    *Discover out of joint.  Transferred everything to joint for*

6    *what I have put $400 in savings.*

7    Q    And again, based, sort of, context, the review of the

8    messages, were you able to attribute the *kley@me.com* to anyone?

9    A    Yes.  In this case, they were attributed to Kimberley Tew.

10   Q    And what did that number ending '7473 tell Kimberley?

11   A    *I paid the car.  Did not pay Chase.  There's 25K in Wells.*

12   *Do you still want me to pay Chase?  Which account?  It's 2200*

13   *total. I will do whatever you want.*

14   Q    What's the date on that?

15   A    November 1st, 2019.

16   Q    Now, let's look at Government's Exhibit 400.  What do you

17   see there?

18   A    That is a photo of a Navy Federal Credit Union drive-up

19   window, and it appears to be Kimberley Tew in that a black car.

20   Q    All right.  Do you remember being asked about whether

21   Michael Tew was the one linked to Political Media?

22   A    Yes.

23   Q    Not Kimberley Tew?

24   A    Correct.

25   Q    Now, let's look at Government's Exhibit 740.  If we can go

1566

SPECIAL AGENT LISA PALMER - Redirect

1    to page two.  All right.  So, what do you see there in those

2    blue boxes?

3    A   The messages are coming from Kimberley Tew's phone number,

4    ending '2046.

5    Q   And is this another one where the *kley@me.com* attribution

6    was, maybe, slightly more complicated?

7    A   Yes.

8    Q   Who were you able to attribute the green box to, in this

9    case?

10   A   Michael Tew.

11   Q   Let's look at Government's Exhibit 742.  And if we can go

12   to page two.  We looked at this before, but just refresh us.

13   Do the numbers on this invoice match what was in the text

14   message?

15   A   Yes, they did.

16        MR. FIELDS:  Now, let's look at Government's Exhibit

17   741, and let's put it side-by-side, if we could, with 742, page

18   two.  And I got my exhibit numbers wrong, actually.  So, let's,

19   on the right, put 740, please, and then on the left, let's put

20   741.  So, we want 740 and 741.  If we can do it.  Sorry,

21   Veronica.  There we go.  All right.

22        So, first of all, to orient us, on what date were

23   these respective text communications sent and received?

24   A   I believe it's 4-3-2019, but that's a little small.

25   Q   Yeah.  Can we blow up 741 there, so it's not gibberish?

SPECIAL AGENT LISA PALMER - Redirect

1   A    Thank you.

2   Q    All right.  If we could blow up the other area.  Thank you.

3   A    April 3rd, 2019.

4   Q    All right.  So, in that Exhibit 741, on the right, what --

5   what number is being used to talk about an invoice?

6   A    The *kley@me.com* account is being used to talk about the

7   invoice.  How he is sending 9900.

8   Q    And the one on the right, 741, which devices are being used

9   there?

10  A    Michael's devices.

11  Q    So again, based on that context, what conclusions, if any,

12  were you able to draw here?

13  A    In this case, Michael Tew was the one sending messages from

14  the *kley@me.com* account.

15  Q    And to whom was he relaying information about this $9900

16  and an invoice with a prepayment for a subscription?

17  A    To Kimberley Tew.

18  Q    All right.  Now, let's go back to -- do you remember --

19  well first, one housekeeping matter.  Yesterday, let's pull up

20  Government's Exhibit 43.  Do you remember taking a look at that

21  yesterday?

22  A    Yes.

23  Q    What is that?

24  A    That is a Navy Federal Credit Union version of a withdrawal

25  slip.  Its their internal record of an in-person transaction.

SPECIAL AGENT LISA PALMER – Redirect

1          *MR. FIELDS:*  Pursuant to Declaration, Government's

2   Exhibit 1107, the government would move this into evidence.

3          *THE COURT:*  Any objection?  It's admitted.

4   *Q*   All right.  So, let's go back to those redaction boxes.  Do

5   you remember being asked about them by Ms. Frost?

6   *A*   Yes.

7   *Q*   You were also asked all of these questions about whether or

8   not you are a lawyer?

9   *A*   Yes.

10  *Q*   Are you a lawyer?

11  *A*   I am not a lawyer.

12  *Q*   But when you execute a warrant, do you get a document

13  that's been issued by a lawyer?

14  *A*   Yes, we do.

15  *Q*   Are you required to follow the law, as an agent?

16  *A*   Yes, I am.

17  *Q*   Does that require you to form opinions about what is

18  correct under the law?

19  *A*   Very carefully, generally with the advice of actual

20  lawyers, but yes, we have an understanding of what we're

21  allowed to do, within the bounds of a document, such as a

22  search warrant.

23  *Q*   So, when you get a warrant, does it have an attachment to

24  it that allows you to seize certain items, but not others?

25  *A*   Yes.

SPECIAL AGENT LISA PALMER - Redirect

1    *Q*   How do you make decisions then?

2         *MS. FROST:*  Your Honor, I'm going to object to outside

3    of the scope, at this point.

4         *THE COURT:*  I guess I will let you ask this one, but I

5    do think we're getting a bit outside of the scope, and I am not

6    sure of the relevance, but go ahead.

7    *Q*   You were asked about all of those redaction boxes.

8    *A*   Yes.

9    *Q*   Did the warrant allow you to see all information under the

10   sun?

11   *A*   Not all information under the sun.  No.  The attachment

12   would be limited to scope of the information that we were

13   allowed to seize, as part of our warrant.

14   *Q*   So, when you get a cell phone like that, are you able to

15   easily, sort of, parse the data?

16   *A*   It takes time, and a lot of effort.  We might be able to

17   easily parse down to a single conversation, but within a

18   conversation, all of the data and messages may not be allowed

19   to be seized, depending on what is written in the warrant.

20   *Q*   So, what are some of the methods that you use to

21   differentiate what you are allowed to seize versus what you

22   are --

23        *MS. FROST:*  I'm -- pardon me.  I'm going to lodge the

24   same objection, Your Honor.

25        *THE COURT:*  Overruled.

SPECIAL AGENT LISA PALMER - Redirect

1          THE WITNESS:  One of the things that we will do, is we

2     will actually have the Attachment B, is what we call, kind of,

3     the scope of the search warrant up, and reviewing that in real

4     time, as we review materials that were gathered as part of the

5     warrant, and the electronic warrant, it can take awhile to

6     actually get the data to you, depending on how long Google

7     takes to get it back, how long IT takes to actually process it,

8     but will compare them to make sure that we're not exceeding the

9     scope of the warrant with the data we're looking to seize.

10          MR. FIELDS:  Your Honor may have just one moment?

11          THE COURT:  Yes.

12          MR. FIELDS:  Your Honor, no further questions.  Thank

13     you.

14          THE COURT:  Thank you, Mr. Fields.  Agent Palmer, you

15     may step down.  Thank you.

16          THE WITNESS:  Thank you.

17          THE COURT:  Mr. Fields, Ms. Weiss will there be

18     further evidence?

19          MR. FIELDS:  Your Honor, the government has no further

20     witnesses, and the government would rest.

21          THE COURT:  All right.  Thank you very much.  So, I

22     think what we need to do, at this time, is allow the jury a

23     quick recess, while we take care of a few things and discuss a

24     few things.

25          So, I will ask the jury to be back at 11:15.  You are

1571

1    still under all of my previous instructions, not to make up

2    your mind, discuss the case or do any research until you have

3    gotten my final instructions, and heard closing arguments,

4    which will be soon, but until then, please keep those

5    instructions in mind.  All right.

6            THE COURTROOM DEPUTY:  All rise.

7        (Jury out at 11:03 a.m.)

8            THE COURT:  Okay.  Let's take our seats.  So, unless

9    there is anything anyone else needs to do, I assume -- or I

10   guess I will confirm that the defendants do not plan to put on

11   any witnesses or to testify, themselves?

12           MR. KAPLAN:  Your Honor, before that, we would just

13   like to raise a Motion For Judgment Of Acquittal, at this

14   point.  No argument.  Just in the light most favorable to the

15   People, they have not well-established offenses in the

16   Indictment, and particularly as it relates to Ms. Tew, the wire

17   fraud counts have not sufficiently provided the elements

18   necessary to convict.

19           THE COURT:  All right.  Thank you.  Mr. Kaplan.

20   Ms. Frost?

21           MS. FROST:  And can I just go up here?

22           THE COURT:  Sure.

23           MS. FROST:  Your Honor, on behalf of Mr. Tew, we would

24   also move, pursuant to Rule 29, for a Motion For Judgment Of

25   Acquittal, even looking on all counts, at the evidence in the

1572

1  light most favorable to the government, the government hasn't

2  sustained its burden.  We would also renew our Motion For

3  Severance.  We will renew all objections made during trial, and

4  also renew any objections we lodged under 404(b), with respect

5  to evidence that came in, just so that the record is preserved.

6      THE COURT:  Okay.  Thank you, Ms. Frost.

7      MS. FROST:  Thank you.

8      MS. HUBBARD:  Sorry, Your Honor.  One more thing, just

9  again, for purposes of the record, since the government's case

10  is officially closed, we have an obligation to renew or Motion

11  To Severe, again, for purposes of the record.

12      THE COURT:  Okay.  Thank you.  I guess I will give the

13  government a moment to respond, if you would like.

14      MS. WEISS:  Thank you, Your Honor.  The defense

15  counsel, both sides, accurately stated the law, the standard

16  for determining whether to grant one of these motions is taken

17  in the light most favorable to the government, and whether a

18  reasonable jury could find the defendant guilty, beyond a

19  reasonable doubt.  The government would submit that it has in

20  the hundreds of evidence -- hundreds of exhibits and testimony

21  of, I think, we were up to eight or nine witnesses, has met

22  that standard and we would ask that the motions be denied.

23      THE COURT:  All right.  Thank you.  So, I agree with

24  Ms. Weiss.  I will deny those motions.  I think, given the

25  standard, which requires viewing evidence in the light most

1    favorable to the government, that the evidence is sufficient on

2    each of the counts to allow a jury, if they choose, to find the

3    defendants guilty.  The rest of the objections are noted.

4         So, with that, would -- am I right that there will be

5    no witnesses called on behalf of the defendants?

6         *MS. HUBBARD:*  (Nodding head.)

7         *MS. FROST:*  (Nodding head.)

8         *THE COURT:*  So, I think I would like to advise the

9    defendants now, then I will probably take a quick recess, for

10   us, I think, and then come back, and I think I should have you

11   say that you rest on the record, and then go straight into

12   instructions, then take our lunch break, and then come back and

13   do closings.

14        So, as to the instructions, I will just -- I will

15   mention, I noticed one thing in the last instructions, as we're

16   giving them a copy of the Indictment, they already have a copy

17   of the Indictment, was provided at the preliminary

18   instructions.  I don't feel like printing it out again is

19   necessary or helpful, so I'm just going to change, basically

20   the -- that last instruction to, *You have received a copy of*

21   *the Indictment, and it's been included in your binders*, and

22   that's the only change I had.

23        I think what I would like to do is do this, take a

24   quick break, give you a chance to read over the instructions,

25   one more time, and and then when we come back we will finalize

 1    them, before we bring the jury back in.  But now, I would like

 2    to advise the defendants regarding their right to testify or to

 3    remain silent.  I think I will explain this to both of the

 4    defendants, and then ask Mr. Tew first and then Mrs. Tew, if

 5    they understand.

 6         So, please, both of you pay attention, as I explain

 7    that you do have the right to testify in this matter.  You

 8    have -- you also have a constitutional privilege against

 9    self-incrimination, which means you cannot be compelled to

10    testify.  Your attorney may have given you advice regarding

11    your decision to testify or not to testify, but the ultimate

12    decision is solely yours, and yours alone.  If you decide to

13    testify, you will waive your privilege against

14    self-incrimination, and the government may Cross-examine you

15    regarding the matters about which you testify.  The government

16    may also introduce evidence of prior convictions or prior

17    statements, if any.

18         If you decide not to testify, no presumption or

19    inference of guilt may be drawn from the fact that you did not

20    testify, and I will instruct the jury in that matter, if you

21    request.

22         So, Mr. Tew, having been advised of these things, do

23    you wish to waive your right to testify?

24              THE DEFENDANT:  Yes, Your Honor.

25              THE COURT:  All right.  Is your decision made of your

1    own free will, after consultation with your attorneys?

2              THE DEFENDANT:  Yes.

3              THE COURT:  Thank you.  Mrs. Tew, having been advised

4    of these things, do you wish to waive your right to testify?

5              THE DEFENDANT:  I think I have a right to testify, if

6    I want to.

7              THE COURT:  I'm sorry?

8              THE DEFENDANT:  Because of the proffers.

9              THE COURT:  Well, you do have the right to testify,

10   but given the proffer would, potentially, come in, but you

11   understand that you have the right to testify, right?

12             THE DEFENDANT:  Um, my lawyers have explained that to

13   me.

14             THE COURT:  And there are potential consequences of

15   testifying, including that the proffer could come in, if you

16   say anything that contradicts what you said in the proffer,

17   right?  And so you understand, though, that that's your choice

18   about how to balance the costs and benefits?

19             THE DEFENDANT:  Um ... yes, I do understand that.

20             THE COURT:  Okay.  And your decision, given that, is

21   not to testify?

22             (Pause).

23             THE DEFENDANT:  Even if I wanted to, I wouldn't say

24   yes.  So I'm just going to say no.  I don't want to testify.

25             THE COURT:  You don't want to testify.  Okay.  Here's

1    what I'm going to do, I'm going to take our little ten-minute

2    recess right now, and I will come back, and you can think about

3    it, discuss the potential benefits and costs again, with your

4    attorneys, and make sure that you understand that you do have

5    the right to testify, although there are consequences,

6    particularly so in this case, that you need to consider, and I

7    want to make sure you understand those consequences, and make a

8    fully informed and voluntary decision.

9         So, why don't we take a ten-minute recess, come back,

10   I will doublecheck with Mrs. Tew that she really has decided

11   not to testify, and we will finalized the instructions, and

12   then I will read the instructions.  So, let's take a ten-minute

13   recess.

14        *THE COURTROOM DEPUTY:*  All rise.  Court is now in

15   recess.

16        (Recess at 11:12 a.m.)

17        (In open court at 11:24 a.m.)

18        *THE COURT:*  All right.  Please take your seats.  All

19   right.  So, back to Mrs. Tew.  You have the right to remain

20   silent or testify.  Having heard my advisement and had an

21   opportunity to discuss this with your attorneys, do you wish to

22   waive your right to testify?

23        *THE DEFENDANT:*  I do.

24        *THE COURT:*  All right.  Thank you.  Is your decision

25   made of your own free will, after consultation with your

1    attorneys?

2          THE DEFENDANT:  It is.

3          THE COURT:  All right.  Thank you, Mrs. Tew.  All

4    right.  So, I think then that the next step is to make sure

5    everyone is okay with the instructions.  I understand all of

6    the objections are preserved, but the last version we handed

7    out, can we go ahead and start printing out hard copies, and

8    getting them ready for the jury, while we finish up?  Anything

9    else?

10          MR. KAPLAN:  Based on my review, yes, Your Honor.

11          THE COURT:  Thank you, Mr. Kaplan, Ms. Weiss?

12          MS. WEISS:  Yes.

13          THE COURT:  All right.  Very good.  Mr. Jacobsmeyer

14   will be finishing that up.  I have one request, though, to make

15   which is, as I'm reading the instructions, will the parties

16   waive having Ms. Hoffschildt type out what I'm saying, since we

17   will have the written version?

18          MR. FIELDS:  (Nodding head.)

19          THE COURT:  The parties have indicated that they waive

20   the transcription of reading of the instructions, so thank you

21   for that.

22          So, we will come back out, I will ask the defense if

23   they plan to put on any evidence, allow you to state whatever

24   you need to state, and then go straight into my instructions.

25   I may add -- I will have to say something, I guess, about going

```
 1    to lunch afterwards, but I think we will be ready to do that.

 2    So I think --

 3              MR. SCHALL:  Can I ask a question?  Am I right that

 4    the jury will have lunch in there?

 5              THE COURT:  Yes.

 6              MR. SCHALL:  So, we won't have to worry about --

 7              THE COURT:  Yeah.  We ordered them lunch.  Even though

 8    I'm going to be in trouble with the AO for getting them lunch,

 9    before they are, technically, deliberating, but yes, we did.

10    So, why don't you go ahead and bring them back in.

11              THE COURTROOM DEPUTY:  All rise.

12         (Jury in at 11:28 a.m.)

13              THE COURT:  All right.  Let's take our seats.  Welcome

14    back, ladies and gentlemen.  Thank you, again, for your

15    patience.

16              As you heard, government has rested its case.  Will

17    Mr. Tew be presenting any witnesses?

18              MR. SCHALL:  No witnesses or additional evidence for

19    Mr. Tew, Your Honor, and we would rest.

20              THE COURT:  Thank you, Mr. Schall.

21              THE COURT:  And for, Mrs. Tew?

22              MR. KAPLAN:  We will not be presenting any additional

23    evidence or witnesses, and we also rest.

24              THE COURT:  Okay.  Thank you, very much, Mr. Kaplan.

25    So, ladies and gentlemen, both parties have now rested, and I
```

1579

1    now will give you your final instructions.  We will then take

2    our lunch break, and you will then hear closing arguments after

3    lunch.  So you will still, even though I'm giving you the

4    instructions now, and Mr. Keech and Mr. Jacobsmeyer will hand

5    out a copy of the instructions, so you can follow along and

6    take notes, if you wish, even though I'm instructing you now,

7    during lunch, you are still not quite ready to begin

8    deliberations.  So, you will still have to find something else

9    to discuss during lunch, keep an open mind and not begin

10   deliberations or make up your mind until you have heard all of

11   the instructions and closing arguments, and then I will give

12   you your final charge and then you will begin the case.

13          So, in a moment, we will be giving each of you a copy

14   of the written instructions.  When you -- you will be allowed

15   to keep those when you go back, though.  I will give you

16   your -- the official copy of the instructions.  If there's ever

17   a discrepancy between the copy you are given now or between

18   what you hear me say, and the written official instructions

19   that will go back with you, when you begin deliberations, it's

20   the written final official instructions that are to govern the

21   case.

22          Mr. Keech, are you ready?

23          *THE COURTROOM DEPUTY:*  Yes, Your Honor.

24          *THE COURT:*  Thank you.

25          *THE COURT:*  Okay.  I believe everybody -- not quite.

1    All right.  So, now I believe everyone should have a copy of

2    these instructions.  As I said, you can follow along.  You

3    don't have to, you can continue to take notes but, you don't

4    have to.  So, final jury instructions.

5              (Whereupon the jury instructions were read to the

6    members of the jury.)

7              THE COURT:  So, those are the final jury instructions.

8    We will now be taking a lunch break, and then return for

9    closing arguments.  Let's take a lunch break until 1:15.

10             As I mentioned, even though you have now received all

11   of the evidence and heard the instructions, you are not allowed

12   to begin deliberations until after you have heard the closing

13   arguments, and I will then send you back to deliberate.  So,

14   you continue to be under the instructions I have previously

15   given you about not discussing the case, even among yourselves,

16   or with anyone else, until I tell you you may do so.  Unless

17   there's anything else, I think we should recess until 1:15.

18   All right.  Thank you.

19             THE COURTROOM DEPUTY:  All rise.

20        (Jury out at 12:11 p.m.)

21             THE COURTROOM DEPUTY:  Court is now in recess.

22        (Recess at 12:12 p.m.)

23        (In open court at 1:19 p.m.)

24        THE COURT:  Please take your seats.  Counsel, are we

25   prepared for closing arguments?

1            *MR. FIELDS:*  We are, Your Honor.

2            *THE COURT:*  And does the government plan to reserve

3    time for rebuttal?

4            *MR. FIELDS:*  We do, Your Honor.

5            *THE COURT:*  Okay.  All right.  Thank you.  I will just

6    have you try to keep track of that, unless Mr. Keech is going

7    to give a warning?

8            *MR. FIELDS:*  We will try to keep track of it

9    ourselves.  Thank you.

10           *THE COURT:*  All right.  Mr. Keech, can we go ahead and

11   get the jury?

12           *THE COURTROOM DEPUTY:*  All rise.

13       (Jury in at 1:21 p.m.)

14           *THE COURT:*  All right.  Let's all take our seats,

15   please.  Members of the jury, as I mentioned, the next step is

16   for you to hear the closing arguments of the parties.  We will

17   begin with the government, then each defendant, then the

18   government, if they choose, will have a bit of time at the end

19   for rebuttal argument, since it has the burden of proof.  I

20   remind you that these arguments are not evidence, and should

21   not be considered as such.  The government may begin.

22           *MR. FIELDS:*  Thank you, Your Honor.

23   May I begin, Your Honor?

24           *THE COURT:*  Yes please do.

25                          **CLOSING ARGUMENT**

1              MR. FIELDS:  May it please the Court, and members of

2      the jury.  Last week, my colleague, Ms. Weiss, told you that

3      this is the story of how Michael and Kimberley Tew betrayed the

4      people who trusted them.  To steal $5 million in just two

5      years.

6              Now, ladies and gentlemen, you have seen the evidence,

7      you know the story.  You know how they did it.  Mechanics of it

8      were simple, false invoices for money.  You saw a lot of

9      documents in this case, but fraud is not about documents.  It's

10     about people.  The documents were easy, especially if, like,

11     Michael and Kimberley, you knew how National operated.  The

12     part that took real planning, the part that took the most

13     effort, the part that really required the manipulation and the

14     deception, that was the part that involved people.  The social

15     engineering.

16             For two years, Michael and Kimberley, and I am going

17     to use their names together, because as we will see, there's

18     overwhelming evidence that they acted together, Michael and

19     Kimberley Tew played with others' emotions, to satisfy their

20     own greed.  They saw what made other people vulnerable, and

21     they ruthlessly exploited those vulnerable.

22             Michael Tew, CFO, making six figures, the genius that

23     would turn National around after it's bankruptcy, and while you

24     graduate with sterling credentials and the sort of articulate

25     confidence that gave someone the ear like Chris Alf.  The kind

1    of person that someone, like Jonathan Yioulos, might look up as

2    a mentor.  The kind of person that someone like Jonathan

3    Yioulos, might try to cultivate as a friend.  Michael Tew saw

4    that, but he also also saw a mark.  Someone he could

5    manipulate.

6         When his six-figure salary wasn't enough to keep his

7    wife happy, he turned to fraud.  Just one time.  Just this

8    once.  And they convinced Jonathan to help, just that once,

9    just one last time.  And once that decision had been made,

10    Jonathan was trapped.

11         That friendship with Michael Tew it was just another

12    false pretense.  A false invoice for a personal connection.

13    But it got worse, because Michael and Kimberley were a team.

14    Michael turned to fraud, to help his wife get what she wanted,

15    but Kimberley made her own decisions.  She was her own person.

16    Smart, another graduate of a top business school.  Someone

17    Chris Alf thought would also be an asset to the company.  She

18    took the initiative.  She -- while Michael used the promise of

19    friendship, she took a different tact to get what she wanted.

20    She used fear.  And this toxic team-up, Michael holding out the

21    false promise of friendship, and Kimberley holding up the real

22    threat of jail or personal ruin, was enough to keep

23    Jonathan Yioulos enthrall for two years.

24         But Yioulos wasn't alone.  You saw how Kimberley

25    manipulated her friend Hannah.  Yioulos was vulnerable because

1584

1   he was looking for a mentor.  He was looking for someone that

2   he looked up to.  Hannah was vulnerable, because of her

3   addiction.  Kimberley exploited that vulnerability.  Figured

4   she could use her friend as part of this fraud.  She figured

5   that putting Hannah's name on things, would end up being okay,

6   because who would believe a drug addict?  Michael agreed with

7   this.  You heard him describe Hannah to Jon, reassuring Jon

8   things would be okay, because she is a lunatic, in rehab.  Just

9   like Michael had done with Jon, Kimberley had to do with

10  Hannah.  She tried to use friendship as a means of

11  manipulation, send her a slide show of the times together, play

12  on emotion, but when that didn't work, she fell back on fear.

13  She threatened to do exactly what Hannah was most afraid of,

14  exactly what she ended up getting to do here in federal court,

15  reveal Hannah's deepest shames and regrets.  Another false

16  invoice for a personal connection.

17         Meyers, too.  That was supposed to be two nerds of a

18  feather flocking together.  The modern yearning for community

19  and friendship, but Kimberley could see that Michael Meyers was

20  in over his head.  He was a construction worker, trying to cash

21  in on the crypto craze.  She promised him riches, seduced him

22  with that promise, and then once he was completely reliant on

23  her, once he had invested everything, he had all of that blood,

24  sweat and tears, from his construction work, she cashed in on

25  that desperation, to manipulate him into helping her score that

1585

1    ultimate NAC jackpot.

2         Ladies and gentlemen, this is not a crazy case.  It is

3    sad.  It is unnecessary, but it's not crazy.  At least that

4    word is being used to say what happened here is somehow

5    unbelievable or subject to doubt.  What happened here is as old

6    as human history.  What you just saw is an age-old tale of

7    greed, petty entitlement and predator exploitation.

8         If you spent the whole trial trying to figure out what

9    is behind the charges in the Indictment, trying to figure out

10    that secret story in the background that Mr. Schall hinted

11    might be there, you should know now there are no monsters

12    lurking in those shadows.  The evidence, here, brought to light

13    exactly what was going on.

14         Michael Tew worked with Jonathan Yioulos, to steal

15    millions, so he could maintain a CFO lifestyle, without CFO

16    responsibilities, and Kimberley Tew, for her part, she

17    encouraged it, so she could keep gambling with other people's

18    money, without suffering any consequences.

19         But, ladies and gentlemen, life is about consequences.

20    It's about the choices we make.  Michael Tew chose to steal

21    money.  Kimberley Tew chose to encourage it.  Both could have

22    stopped at any time.  They didn't.  They chose to continue,

23    because they thought they would get away with it.  They made

24    these choices, and now it is up to you to decide whether those

25    choices amount to the crimes with which they have been charged.

1          And so what I will do, for the next 30 minutes or so,

2    is explain why the evidence here, the evidence, ladies and

3    gentlemen, not some behind-the-scenes drama, shows that Michael

4    and Kimberley Tew are guilty, beyond a reasonable doubt.  So, I

5    submit that the evidence presented here today shows two major

6    facts on which there is no doubt.

7          National was the victim a fraud.  You saw those

8    invoices.  Those companies provided no services, and NAC paid

9    $5 million for nothing in return, and the money paid out on

10   those invoices, ultimately, benefited Michael and Kimberley

11   Tew.

12         The Scaife money went directly to Michael, and for

13   awhile Michael and Kimberley tried to use intermediaries, like

14   Michael Meyers Consulting Group or Jessamine Development, but

15   even there they ultimately benefited, and because

16   intermediaries carry risks, remember you heard Michael Meyers

17   talk about the precautions people would take to make sure that

18   he didn't take the money and run with it.  Michael and

19   Kimberley ultimately settled on having the money go directly

20   into bank accounts that they controlled.  There is no doubt

21   about these facts.  You saw the invoices.  You saw the bank

22   records.  But this is a criminal trial, so the issue in the

23   case is this, whether these defendants, signatories on those

24   bank accounts, who lived with each other and communicated

25   daily, did they know that this money wasn't theirs?  That they

1    were spending the proceeds of a fraud?  Ladies and gentlemen,

2    of course they knew.  Special Agent Palmer was Michael Tew's

3    greatest fear.

4                  (Portion of a recording played.)

5                  It would take them straight to Michael and Kimberley

6    Tew's doorstep, which is where the agents ended up in July of

7    2020, ready to confront the Tews with what had happened.  And

8    what did Michael Tew say when they asked him who have you been

9    talking to at National?  He gave them some name, Jacob.  That

10   wasn't true, ladies and gentlemen.  Michael Tew knew exactly

11   what the agents were doing there, and what was going to happen.

12                  So, what you saw, throughout this trial, are these six

13   fake companies, Hannah Scaife, 5530 Jessamine Development,

14   Meyers Consulting Group, Arrow Maintenance Resources, Political

15   Media, Global Fuel.  The investigator, once they saw all of

16   that money going into the accounts, as you know, they went to

17   National and they talked to Abby Schwartz.  So, what does she

18   do?  She starts going through all of those invoices, and you

19   heard her testimony, as she is sitting there, late at night,

20   going through all of these invoices, trying to figure out, *Why

21   is the FBI at our doorstep?  What is going on*?  And that

22   sinking feeling, as she started to go through all of the

23   invoices, and realized the pattern, and the pattern was that

24   someone she trusted, someone that she had worked with, day

25   after day after day, had been defrauding the company that she

1   had been working for, for about 15 years.

2          You heard Abby Schwartz talk about that sense of

3   betrayal.  You heard Jonathan Yioulos admit to it.  Yeah, I

4   lied to her for years, day after day.  And who asked him to do

5   that?  Michael Tew.  You saw payment after payment.  You saw

6   all of these records; deposit after deposit, into the Tew's

7   bank accounts, over $5 million.  Gone.

8          You have seen how Michael and Kimberley knowingly

9   participated in this.  You saw them at the banks, so happy to

10  get the proceeds of their fraud.  There's Kimberley Tew, that

11  big smile on her face, getting thousands of dollars.  There's

12  Michael Tew at the bank, also ready to get his gift from Jon,

13  from that day.

14         And you have seen inside the conspiracy.  You have

15  seen inside all of the shadows, all of the things that they

16  didn't want to come to light.  You saw Michael's texts with

17  Jon.  Early on, talking about, *Hey, Jon, confirming the money*

18  *is out.  Just sent it to you.  Thank you.  What is your Bitcoin*

19  *address*, because that's how they were going to keep Jon

20  involved for a little while.  *He got it.  You happy?*  And of

21  course, everyone is happy, at least at the beginning.  *Thank*

22  *you.  And thank Kimberley for me too*, because remember she is

23  the one who is handling all of the Bitcoin.

24         And you saw Jon's texts with Kimberley.  Very early

25  on, *Hey Kimberley, I need an invoice.*  From the very beginning,

1    she knows that this is a false scheme, needs a W-9.  Michael

2    copied on the email.  This is while he is still working there.

3    And then, of course, you saw Michael and Kimberley's

4    conversations with each other, while this was going on.  They

5    are excited.  They are getting everything that they want.  *Jon*

6    *is going to send 50 today and 25 next week*, and that's it.

7    What do you want?  It's like ordering groceries.  We are just

8    going to order another $50,000 from National or another

9    $25,000.  Yes.  And their plan worked.

10              (Portion of the recording played.)

11              Until finally, in Buffalo, on July 7th, 2020, you

12   heard Yioulos' testimony about what happened.  He gets fired.

13   He immediately knows that this is the day of reckoning, and he

14   walks outside, and what does he see?  Two people standing on

15   the sidewalk.  But he knows they are not just two people.  They

16   are federal agents.  And instead of being afraid that that day

17   had finally come, Yioulos is relieved.  He finally had the

18   opportunity, finally had the opportunity to get out of this,

19   and so he took the courage, and he did, and you heard him

20   testify in court.

21              But the Tews had planned ahead for this, ladies and

22   gentlemen.  They knew for two years this day was going to come.

23   So, what were they going to do?

24              (Portion of the recording played.)

25              Over and over again, they talked about this.

1590

1    Basically, their contingency plan is, *Yeah, we're going to*

2    *steal $5 million.  We are going to live really high for two*

3    *years, but it's going to be okay, because one of us is*

4    *eventually going to get out of this.  One of us is going to*

5    *negotiate immunity.  One of us can get out of this.*

6         They already had a plan in place to do exactly what

7    they have been doing in court for the past eight days.  Blame

8    each other for what's going on.  That was their backup plan,

9    because they knew that this day would come.

10        Let's talk about the wire fraud counts, right.

11    There's -- those are Counts 2 through 40 of the Indictment

12    that's been in your binder.  The first element there is was

13    there a scheme to defraud?  Ladies and gentlemen, there was a

14    scheme.  It was relatively simple.  It was, *want, take, have*.

15    You saw how the scheme operated.  Matt Morgan outlined all of

16    the flows of money into the accounts, over the course of these

17    two years.  These slides that you are looking at here, this is

18    just 2018.  Really early on in the scheme.  Just three months,

19    you are looking at about $260,000 into these companies.  Then

20    it moves on to Political Media, Global Fuel Logistics and Aero

21    Maintenance Resources.

22        The next element you are going to have to look at is

23    the use of these interstate wires.  All right.  I submit to you

24    that has been established beyond a reasonable doubt.  You will

25    remember it was a short ten-minute period in the whole scheme,

 1   was an element of the crime.  Meghan Oakes, testifying by

 2   video.  She was with Fidelity Information Services.  What she

 3   told you is that all of the wires for Signature Bank were

 4   routed through servers in Wisconsin and Arizona.  There's your

 5   interstate commerce.  And even that, if you didn't believe

 6   that, you have Jonathan Yioulos' testimony.  He was in Buffalo,

 7   New York the entire time.  Michael Tew was here in Colorado.

 8   The only way that National was going to get money all the way

 9   from Buffalo into Michael Tew's pockets in Colorado, was using

10   the interstate banking system; that Automated Clearing House.

11        So the wires, themselves.  So, here is a quick tip for

12   when you are deliberating.  When you are going through the

13   government's exhibits, Exhibit 2 is the wire related to

14   Count 2.  Exhibit 3, the wire related to Count 3.  For these

15   Exhibits, 2, 3, 5 and 7, which you will see, are the Signature

16   Bank statements identifying those wires.

17        For some of the other ones -- well, then on the other

18   side of it, you will see the receipt, right?  So, Government's

19   Exhibit 202, is where the wire actually went into, right.  So,

20   if you are looking at Count 2, Exhibit 2 is the outgoing wire,

21   202 is what account did it go into.  So, you can easily

22   identify that during your deliberations, and that's the same

23   from Counts 2 through 40.

24        There are a couple of exceptions.  So, sometimes the

25   same wire will be on the same exhibit, right.  So, Counts 3 and

1    4 are both on Exhibit 203, et cetera, or for these counts,

2    Counts 8 through 40, what you have is the signature, ACH detail

3    that Jonathan Yioulos printed out, corresponding bank

4    statement, will be Exhibit 208, and then again, sometimes there

5    are some exceptions, because some of these are on the same bank

6    statement.  So you can see those there.  Count 14, relates to

7    Count-- Exhibit 46, and the reason for that, as you might

8    imagine, we get to the money laundering is that Exhibit 46

9    relates to the Count 46, which is the money laundering count.

10   But generally, you can see the, sort of, numbering scheme

11   there, and that should help with your deliberations.

12        These are just some of the exceptions that you see up

13   there.  So, for instance, Count 36, 37, 38, they are all on

14   236.  When you get the exhibit list, if you see something

15   intentionally blank, probably means it was on the previous

16   exhibit.

17        So, now we get to the false pretenses, that's the next

18   element of our wire fraud.  What you saw there, here are the

19   pretenses, six fake vendors, all connected to Michael and

20   Kimberley.  Hannah Scaife, CPA, that's the first one.  Michael

21   started this with Hannah Scaife back in August 2018.  You saw

22   these emails.  You saw Jonathan describe them.  You saw how

23   weird it is that Michael Tew, while he is still working at

24   National, says don't pay this consultant directly, pay me, and

25   then I will pay them.  Kimberley was in on the beginning too.

1    Hannah Scaife is Kimberley's connection, right.  And so you

2    heard Hannah.  You also saw the text messages.  Jon to

3    Kimberley, *Scaife, need a W-9.  Just sent Michael an email.*

4    *It's super important I get those things*.  And then you heard

5    Michael describing them.

6              (A portion of the recording was played.)

7              5530 Jessamine Development, Michael was behind that.

8    You saw that in the Google records.  You saw how he created

9    that email account that was used to send these messages.  And,

10   ladies and gentlemen, if there is a story behind the story

11   here, it's this, Jonathan Yioulos thought that this email

12   actually came from the real Christopher Rincon.  He actually

13   thought those emails came from Michael Meyers.  He really

14   thought that the Tews were being blackmailed, and that someone

15   was threatening them, and that's why they needed the money.

16   That was another deception, ladies and gentlemen, and layers of

17   deception, because Michael and Kimberley, again, playing on

18   friendship, help out your friends here, we are being

19   blackmailed, at the same time they are deceiving Jon, and they

20   are playing into his fears.

21             Kimberley was also part of 5530 Jessamine Development.

22   You saw how texts show her role.  This is Jon to Kimberley and

23   Michael.  So, Michael talks to Jon about Christian.  Kimberley

24   knows more about this, and of course, she is freaking out,

25   because, as you remember from Meyers' testimony, the whole

1    reason Christian Rincon or Jessamine Development got in is

2    because they are all, sort of, this crypto community; that's

3    what Meyers told you.

4         And then Meyers Consulting Group.  Again, Kimberley

5    promised Meyers all of these riches, and then she tried to

6    recruit him into being the fraud, but here's the thing, ladies

7    and gentlemen, Meyers and Scaife, you heard their testimony,

8    some of this was a bridge too far for them.  Sure, they are

9    willing to help out a little bit, but when Hannah was asked to

10    open an account and get about $20,000 of National money and a

11    1099, nope, not crossing that bridge.  And the same with

12    Meyers, which is why the Tews had to do this themselves.

13        Kimberley creates the Meyers Consulting Group email

14    account.  You saw the receipts inside of that account, showing

15    her control of it.  See how she is connected there by the

16    number and the address.  And then, here's this, remember how

17    Kimberley is such a whiz with visuals, those of you paying real

18    careful attention will remember Government's Exhibit 986, which

19    is an invoice she submitted to National for legitimate work.

20    When you are back in that jury room, compare it to the ones

21    submitted by Meyers.  It's the same templet.  They look exactly

22    the same.  This is all Kimberley Tew.

23        And then they use Meyers as a scare tactic.  Again,

24    putting fear into Jon, right?  This is Michael to Jon, *It's

25    just becoming ridiculous, Jon doesn't want to do it.*  But they

1    keep pushing him to do it, and one way they do that is by

2    playing into his fear, that whole sort of convoluted back story

3    about Michael Tew's termination.  Why are we listening to this?

4    What's going on?  Well, it becomes an instrument for

5    controlling Jon.  Michael gets fired, because someone Kimberley

6    owes a debt to calls, National, and Jon is terrified that the

7    same thing is going to happen to him, and so the Tews play on

8    that fear, and you saw this over and over again.  This is

9    Michael to Jon, *When Kimberley told me that this call was going*

10   *to happen to National, I didn't believe it.  I felt the same*

11   *way, but it could happen to you, Jon, unless you keep sending*

12   *us money.*  And here you go.  Again, Jonathan Yioulos wants to

13   believe that his friends, the Tews, are actually being

14   blackmailed.  They are not.  This is all another deception.

15   This email address, controlled by Michael Tew.  So, Jonathan

16   gets it, he thinks someone else, not the Tews, is going to

17   report them.  Put me in touch with your CFO or legal team.

18   This is terrifying to him, right.  He thinks it's someone else.

19   It's actually Michael playing him the entire time.

20           And then, Michael Meyers, same thing.

21           (A portion of the recording was played.)

22           Mixtures of truths, half truths and deceptions, right.

23   Ladies and gentlemen, Michael Meyers was a real person.  You

24   met him.  Michael Tew actually personally met with him.  This

25   guy, who was a criminal, right.  No.  He was someone else that

1    Kimberley was dealing with.  Another mark.  You saw how they

2    used that, they used Michael Meyers, they used these deceptions

3    to continue Jonathan Yioulos.  And then they move on to

4    Political Media.  So, Kimberley had to use some of her friends,

5    Hannah, Michael Meyers, eventually, as, you know from Yioulos'

6    testimony, if they used the same vendors over and over again it

7    would be too much, people would know.  So now, it's Michael's

8    turn to betray a friend.  To use one of his friends on the

9    invoices.  That was Political Media.

10            (A portion of the recording was played.)

11            You saw how Michael created the email account that was

12    used to submit all of those invoices.  And again, he is using

13    this sort of veneer of legitimacy.  Political Media, a real

14    company, he has got a real friend, but is he doing everything

15    he can to hide it.  And instead of -- instead of doing -- you

16    know, putting themselves out there, they are trying to use

17    these other people to take the fall for them.  Political Media,

18    Michael Meyers, Hannah Scaife, anyone but the Tews.

19            Michael told Jon to use Political Media for these

20    invoices, and Kimberley knew about it.  This idea that

21    Kimberley doesn't know what's going on, that, you know, she is

22    not on the bank accounts, you saw the inside, you saw these

23    text messages.  She clearly knows what's going on, because

24    Michael is telling her in these updates.  *Hey, let me know*

25    *what's going on.  What account is Jon going to send the money*

 1    *from*?  *To Political Media?  I'm not sure from what account.*

 2    *What?  Find out*.  Is it actually going to Political Media?

 3    Kimberley Tew knows what's going on.  If you look at those

 4    exhibits, you saw them several times, you can see, especially

 5    that one exchange, where Michael says, you know, *It was*

 6    *actually really hard.  We had to work really hard on this*

 7    *invoices, had to be a prepaid subscription, $9900.  Kimberley*

 8    *is really worried about it*.  Michael is talking her through,

 9    reassuring they move on to Global Fuel.  You saw how eventually

10    Jonathan -- they ran out of companies, and Jonathan said you

11    should set up your own company.  We are sendng out too much to

12    Political Media, it's going to get too much attention.  So

13    Michael creates Global Fuel.

14            You saw Raeesa Telly, she was the representative from

15    the corporate agent, who talked about how Michael set it up.

16    Walked you through exactly how all of that works.  You saw how

17    Michael described setting up Global Fuel in that phone call.

18    You know his grand plan, he is always thinking a couple of

19    layers deep, National used to have a base in Michigan, so I'm

20    going to use this Michigan company, and to make sure that no

21    one can trace it back to us, we're going to put it in my

22    in-laws' names.  We are going to put it in the name of the

23    Vertanens.  No one will be able to know that.  They won't see

24    the names right away.  You heard all about that on the call.

25    Kimberley knew all of this.  None of this was a surprise.

1598

1            *Ask Jon if he is sending wires to GF*; Global Fuel.

2    *You should say something to him now.  They might call the*

3    *office.*  Again, *You should tell Jon that other people are going*

4    *to call the office, unless he does this.  I will tell him but I*

5    *don't want to freak him out.*  Michael, again, trying to be the

6    good guy.

7            Over time, the plan had to change and evolve.  You saw

8    how each of these companies, they start off using one, they get

9    too much in, so they move on to the next, until, finally, they

10   run out of friends and they start having to use their own

11   companies, Sand Hill.  Jonathan Yioulos, you heard how he

12   didn't want to use it.  It was going to be too obvious to

13   everyone at National who remembered Michael Tew; that's part of

14   the deception there, SHI, LLC, and then finally Global Fuel and

15   Aero Maintenance.  And you could see this actually in the

16   summary charts, these six fake vendors, and how they were used.

17   You could see that in the timing.  You can see that on all of

18   these payments here, right.  How there is this stepladder

19   approach, that's because they have to use these different

20   companies at different times.

21           Now, let's talk about the third element of our scheme.

22   Did they really intend to do this?  Could it really have all

23   been an accident?  Is it all just, you know, all of this money

24   is coming in, they don't know exactly where it's from or why,

25   maybe Michael is still entitled to it?  The answer to that,

1    ladies and gentlemen, is clearly no.  You saw this, Michael's

2    role, again, is to appeal to Yioulos' friendship, that desire

3    for, sort of, mentorship.  Promising him this is going to be

4    the last time, Jon, and we are going to let you go.  We will

5    get you those invoices.  You will be able to button things up,

6    and finally quit your job.  When that didn't work, bribes,

7    Bills tickets, we will pay off your mortgage, your student

8    loans, get you some Jon Legend tickets.

9         Sometimes Michael would just play dumb.  You know, *You

10   always increase it.  It was supposed to be this amount*.

11   Michael is like, *No, I flipped it*, but that's just greed.  He

12   always wants as much as he can, when he can.

13        And Michael, being the good guy, Kimberley is keeping

14   Jon on the hook through other means.  Kimberley would sometimes

15   be nice, send him some of those Bitcoins.  Remember she is

16   supposed to be this Bitcoin whiz.  He is going to get double

17   his investment.  But when Jon stopped responding?  You saw the

18   response.  Kimberley again, the specter of Michael Meyers,

19   horror movie Mike Meyers, reemerging several months later, to

20   threaten Jon, and so they worked together.

21        This text message, ladies and gentlemen, 941,

22   basically captures the entire approach.  Michael Tew being

23   brutally honest with Kimberley Tew.  This is what he is doing

24   to Jonathan Yioulos.  *I'm trying to be nice, try being mean,*

25   *trying to threaten, tried to help him, I have tried to play*

1    *ball.  I'm trying every method*.  But Jon wasn't responding.

2          Kimberley, always ready with the fear, will send that

3    Meyers email or something, I don't know what he said.

4    Kimberley, Kimberley, would always up the ante.  She would

5    threaten Jon's CPA license.  *You are going to lose your*

6    *license, Jonathan, unless you send the money.*  Claims she would

7    call Jon's girlfriends, giving him the number for the Erie

8    County Sheriff's Department, where he lived, and then think

9    about this, ladies and gentlemen, if you have any doubt about

10   those text messages, think about the testimony, and is that

11   consistent with what others said about Kimberley's behavior?

12   Think about Abby talking about, Kimberley would call National

13   when Michael was still there.  *You need to get us money now.*

14   Screaming at employees and driving them to tears.

15         Kimberley's role was the enforcer.  Michael would say,

16   *I'm chasing Jon.  I'm sending these nasty texts*.  And

17   Kimberley, Kimberley is brutal.  *If he doesn't call you within*

18   *the next 20 minutes, I will personally turn him in.*

19         Kimberley felt entitled to all of this.  She would get

20   upset when she didn't get enough money.  Government's Exhibit

21   865.  This is the one where she picks up Michael's phone, so

22   it's one of those green and white messages.  *We're all in this*

23   *together, Jon.  You are with us now.  You need to keep sending*

24   *money*.  Trying to defend Michael.  And Jon telling her, point

25   blank, *I have sent you guys, at this point,* in 2019, *a little*

1    *over 1.3 million already.*  Kimberley, she is like, *It's not*

2    *that much.  There's always more.  Once in awhile.*  Ladies and

3    gentlemen, it was not once in awhile.  It was five-figure

4    invoice by five-figure invoice for two years.

5            (A portion of the recording was played.)

6            So now I want to walk through the counts that

7    Kimberley is charged with in particular.  You heard a lot about

8    how, you know, Kimberley is only charged in a couple different

9    counts.  You have a jury instruction, the number of counts does

10   not matter, but I'm going to use these, because they illustrate

11   the conspiracy, Count 12 Wire Fraud.  *It's good luck if Jon*

12   *will send us $25,000.*  They are clearly communicating about

13   trying to get more money from Jon, and you see, later, all of

14   these payments coming in.  And then once the money hits the

15   accounts, where does it go?  It gets transferred to Kimberley

16   Tew, or it's used to pay Mora Consulting.  These other people

17   to whom Kimberley owes money.  Or it's withdrawn as cash for

18   Kimberley to do whatever she wants with it.

19           Same with Count 22.  This is one where Kimberley is in

20   Vegas.  *Where should he send the money?*  Where can Jon stake

21   your gambling?  *50K coming in from Jon.*  He gives an exact

22   number.  And if you had any doubt about the authenticity of

23   these texts, again you can cross-reference it with the other

24   evidence, and you can see it's very consistent.  There it is.

25   Exact number that was sent.

1        Count 25, *Jon needs to send today, I am freaking out*.
2   And the reason she is freaking out, is because this is just
3   after one of her Las Vegas junkets, she has lot a lot of money.
4   You can look at the bank statements.  You can see she needs
5   money from Jon.  They are not going to have enough money to pay
6   rent, not going to have enough to pay all of their expenses,
7   all of it was gambled away.

8        Count 2, Kimberley, she knows exactly which accounts
9   these are going to.  *The funds are going to Navy, right*?  Sure
10  enough there they are.  And you see those transfers, and you
11  can see the money at the Wynn, all being gambled away.

12       Count 28, *Did you talk to Jon, all of those payments*
13  *bounced*.  And then it's transferred.

14       Same with Count 31.  *How much did you withdraw from*
15  *Global*?  Again, Global Fuel, she knows exactly what's going on.
16  You saw those bank records.

17       Same with Count 32.  *I need to know if you will have*
18  *money on Tuesday and about how much*?  She needs it for her
19  speculative Bitcoin ventures, for her gambling.

20       Let's talk about the money laundering.  So money
21  laundering you will see all of those instructions, not going to
22  go through them here, quickly, because, you will have them.  I
23  submit that there's no dispute that these transactions are more
24  than $10,000.  There's no dispute that they came from the
25  fraud.  All you have to do is compare the amounts with those

1  invoices, and there's no dispute that this all happened here in

2  the United States.

3       So, similar to the wire fraud counts, you just look

4  for those withdrawals slips, you can see them in the exhibits.

5  So, Count 42, that's Exhibit 42, Count 43, et cetera, et

6  cetera.

7       Count 46 is a little different, because it's a

8  transfer.  So, these are the counts that Special Agent Palmer

9  walked you through during her testimony, right.  So, you can

10  see the money coming in, and you know that it's money from the

11  fraud, because there were no other deposits, no other activity

12  in the account, until there's one of those transfers.  So, the

13  transfer is $10,000 or more of money, that they got from

14  National as part of the fraud.

15       And then this Audi®, you saw that, as well.  Kimberley

16  knew all about these banks accounts.  *I really, really, really,*

17  *don't want to stress you out Michael, but we're going to need*

18  *more money.*  It's just not enough.  It was never enough.  The

19  negative accounts, accounts plural, she knows what's going on

20  with the accounts.  *All of the bills that we have to pay, plus*

21  *the car, and AN.*  Those are the initials for another one of her

22  investors.  *That's over 60K.  How are we going to pay for all*

23  *of those, Michael?  Especially if I have to go to Las Vegas.*

24       She has always had plan, and the plan always involves

25  more fraud, more invoices, more money from Jon.  Kimberley knew

1    about these bank accounts, ladies and gentlemen.  You have

2    heard a little bit about, you know, this idea that she didn't

3    know what was going on, or because it is a joint account,

4    Michael is the one going there.  But she is the connection to

5    Navy Federal Credit.  She is the primary account holder.  If

6    you go through all of the text messages that were admitted into

7    evidence, you will see constant references to all of their bank

8    accounts.  This is someone who keeps careful attention of their

9    finances.

10          How did they spend the money?  Well, ladies and

11   gentlemen, you know that too; gambling, luxury apartment in

12   Cherry Creek, a new Audi® and $2.4 million at crypto currency

13   ATMs all over Denver.

14          There's Michael Tew putting all of that money into

15   those Bitcoin ATMs.  There's Kimberley doing the same.  You saw

16   how Special Agent Palmer traced the money from National into

17   the accounts, the cash withdrawals, and then the maps, showing

18   them going over, depositing money, $2500 by $2500, just sitting

19   there in front of those machines.

20          If you go to Exhibits 470 and 471, you will see the

21   amounts.  Sitting there, feeding these Bitcoin ATM machines for

22   all of this cryptocurrency speculation.

23          Let's talk about the tax charge.  Those are the last

24   four charges in the Indictment.  The elements are Michael Tew

25   was required to file tax return, and he failed to file a tax

1605

1    return, and he knew he was supposed to file a tax return.

2    There's no doubt about this, ladies and gentlemen.  Michael

3    Tew, Stern Business School graduate, working as the CFO, with

4    his own, sort of, consulting corporation.  Look at this

5    exhibit.  This is his agreement with Chris Alf.  He is

6    acknowledging that he has to pay his taxes, and then you heard

7    the testimony of Roman Hernandez, about how no taxes were filed

8    in each of those years.

9         Roman Hernandez told you that if you make over a

10   certain threshold, jointly it's around $26,000, you are

11   required to file a tax return.  Chris Alf told you about

12   Michael Tew's salary back in 2016, 2017 and 2018, it's six

13   figures.  Michael Tew knew he had to pay a tax return, and if

14   you listen carefully to the calls with Jonathan Yioulos, you

15   will hear Michael talk about, remember Yioulos was little bit

16   worried, Michael wasn't paying his taxes.  *Is that going to*

17   *attract heat from the IRS*?  Michael assures him, *Don't worry,*

18   *I'm getting the taxes in order*.  Not just the taxes for Global

19   Fuel, but his personal taxes.  He knows.

20        So, conspiracy, interdependence, and on that one I

21   want you to look at Government's Exhibit 917.  It's the

22   conspiracy in microcosm.  That exhibit is one of the text

23   chats.  Michael and Kimberley are, sort of, having a dispute,

24   Kimberley is worried that Jon is not going to send the money.

25   So Michael with text screen shots of his conversations with Jon

1    to Kimberley, so they can all talk about it together.  They are

2    all working together, each of them has their own role, and they

3    are all, sort of, working together to do different things.

4         So, the conspiracy charges, ladies and gentlemen, all

5    a conspiracy is, is an agreement, to do the criminal thing.  So

6    if you conclude that Michael and Kimberley agreed to do all of

7    that fraud, agreed to submit those invoices, agreed to get that

8    money, that's guilty of a conspiracy.

9         Now, blaming each other is not a legal defense.  One

10   can be a little bit more involved.  One can be more in the

11   background than the other, but if they agreed to it, and they

12   are each benefiting from it, that's not a defense.  And you see

13   this, actually, in the jury instructions here.  You should

14   separately consider the evidence for each defendant.  And just

15   because there might not be as much evidence as one defendant as

16   another, it doesn't matter, if you weigh each one separately.

17        Now, the final invoice was paid just days before they

18   were caught.  This is in June and July.  The IRS and the FBI

19   are finally closing in.  July 3rd, this is just four days

20   before Jonathan Yioulos gets fired.  None of this would have

21   stopped, ladies and gentlemen.  The only thing that made it

22   stop is those agents showing up, and even on July 8th, Michael

23   Tew was getting interviewed by the FBI on the IRS, and he still

24   can't help himself.  He still is asking, Jonathan Yioulos for

25   more money, right.  They are going to need the money, so that

1    they can start planning the rest of their lives.  None of this

2    would have stopped.

3            This is Kimberley, just days before July 1st, asking

4    for more money.

5            Ladies and gentlemen, I started this off by talking

6    about, sort of, life and consequences.  So, let's step back and

7    look at the big picture.  Michael and Kimberley Tew are

8    corrupt.  They corrupted the people around them to their own

9    advantage; created these fake invoices, these fake companies,

10   and everything they did was designed to give them an excuse,

11   but what they did was inexcusable.  They preyed on Jon's fears,

12   for years.  They laughed and gambled the money away.  They took

13   trips to Vegas, they went shopping, Bitcoin ATMs.  I encourage

14   you, when you go back to the jury room, to look at Government's

15   Exhibit 1008, that's the calendar of events that shows you day

16   by day, week by week.  Between the first and the last payment

17   there are 99 weeks, 88 of them involved a payment from

18   National, 86 involved some communication in furtherance of the

19   fraud, that's 85 percent of that two-year time period involved

20   some activity related to the crime, and every day for that

21   period, Michael and Kimberley lived together, they manipulated

22   Jon together, for a time they manipulated Michael Meyers

23   together, and other times they commiserated about Hannah.

24           Jon gave them opportunity after opportunity to stop.

25   There was -- when there was a final invoice.  They could have

1    said, *That's it, it's done*.  They didn't make that choice.

2    When one company started to get so many invoices, they risked

3    getting caught, they could have stopped then.  They didn't make

4    that choice.  When their friend Jon said he couldn't sleep at

5    night, because he was afraid it was *straight-up jail time* if

6    they got caught, they could have stopped, but they didn't make

7    that choice.  Instead, every day for years, Michael and

8    Kimberley Tew were presented with the same choice over and over

9    again, continue to cheat National out of money, abuse their

10   friends, or simply say I don't want to do this anymore.

11        All of the evidence in this case, when taken together

12   proves, beyond a reasonable doubt, each of the elements of the

13   crimes charged here.  There's no dispute National was the

14   victim of a fraud.  Millions of that money went to accounts

15   controlled by the Tews, and so now it's up to you.

16        We respectfully request that you hold the defendants

17   accountable for the choices they made, because under the law

18   choices have consequences, and if you consider the evidence and

19   apply your common sense, you will reach the only verdict

20   supported by the evidence.  You will choose to check each of

21   the boxes on your verdict form, guilty, because Michael and

22   Kimberley Tew are guilty on all counts.  Thank you.

23        THE COURT:  Thank you, Mr. Fields.  Who will be going

24   first for the defendants?  Ms. Frost.

25        *MS. FROST:*  I will, Your Honor.  Can I have a second

 1   to set up?

 2             THE COURT:  Yes.

 3         MS. FROST:  Thank you.

 4         THE COURT:  Why don't we just take a five-minute

 5   break, since it's going to be awhile.  Why don't we take a

 6   five-minute recess.  We will be back.

 7             THE COURTROOM DEPUTY:  All rise.

 8       (Recess at 2:11 p.m.)

 9       (In open court at 2:20 p.m.)

10         THE COURT:  Please take your seats.  Are we ready to

11   bring the jury back?  Please do, Mr. Keech.

12             MS. FROST:  May I approach the ...

13             THE COURT:  Yes.

14         MS. FROST:  I asked Mr. Keech to give me a warning.

15             THE COURT:  Okay.

16         THE COURTROOM DEPUTY:  All rise.

17       (Jury in at 2:21 p.m.)

18         THE COURT:  Let's all take our seats and get settled,

19   and Ms. Frost will be presenting closing arguments on behalf of

20   Mr. Tew.  You may go ahead.

21             MS. FROST:  Thank you Your Honor.

22                        **CLOSING ARGUMENT**

23         MS. FROST:  Mr. Schall told you, in opening statement,

24   this was going to be a crazy case, notwithstanding the

25   government claiming it's not crazy.  What we know is true, is

1    that the government witnesses, in this case, took the stand and

2    told you how crazy the situation is, and they told you,

3    importantly, who the crazy one is.

4         We have heard things about gambling, Bitcoin,

5    prostitution, drug use, algorithms, a fake wedding, blackmail,

6    extortion, and we've heard a lot about manipulation.

7    Manipulation on the part of Kimberley Tew.  Most every witness

8    who was not a law enforcement witness or an accountant came in,

9    explained to you how Kimberley Tew manipulated him or her, and

10   she did the same thing to her husband, Michael Tew.

11        In opening, we told you to look out for the story

12   behind the Indictment, because the Indictment, it's just words

13   on a piece of paper.  That's all it is.  It's the government's

14   story about what they think happened here.  And when something

15   doesn't fit the government's story, they try and distract you

16   with this, that and the other, but it's your job, now, as the

17   finder of facts, and the jury, in this case, to hold the

18   government to their very, very high burden, to prove every

19   single element of all 59 counts that they've lodged against

20   Mr. Tew, beyond a reasonable doubt.  And what does that burden

21   fall on?  Jonathan Yioulos.  The complicated, cooperator.

22        You know what is not complicated about Mr. Yioulos?

23   His last name.  Because you can't spell Yioulos without I O U.

24   That's what Mr. Yioulos owes the government, an I O U.  He is

25   bought and paid for.  He is a cooperator.  He has agreed to do

1   whatever they want, as part of his Plea Agreement, so that he

2   receives his lower sentence.  So that he got his two counts as

3   opposed to his 40 counts.  So that he can ensure and help

4   ensure this government team to get convictions in this case, so

5   that he doesn't have to pay all of that $5 million of

6   restitution back himself.

7          Now, part of the job of being a cooperator is it

8   compromises your integrity.  It makes you say things that you

9   might not otherwise think are the truth, but as the cooperator,

10  you know that you have agreed to say what they believe the

11  truth is.

12         He was on the stand for almost three days here.  We

13  saw him on Direct and Cross-examination.  His testimony,

14  remember it.  It was coached, it was sanitized, and it was

15  rehearsed.  And we know that, because we heard some of the

16  statements he initially made, when he spoke with law

17  enforcement in 2020, he didn't know he was being recorded, he

18  gave his version -- or he started to give his version of

19  events, and those initial words weren't sanitized.  They

20  weren't coached, at that point.  Because Mr. Yioulos had no

21  idea he would end up getting indicted down the road, that he

22  would flip, that he would end up meeting with prosecutors, over

23  and over and over again.  Needing to get a lawyer to protect

24  himself.  Needing to sign a Plea Agreement with these people

25  over here, saying, *I will do what you tell me to, so that I*

1    *don't go to jail.*  And so, compare his words in this courtroom,

2    that you heard, to what he told agents back in 2020.

3            Now, a great example of this, is this word *conspiracy*.

4    Sixty-four times Mr. Yioulos used the word *conspiracy* in his

5    testimony in this trial.  I mean, you want to talk about

6    coached.  I think if the government would have asked

7    Mr. Yioulos, *Where do you live, sir*?  His answer would have

8    been, *I live on conspiracy lane, in conspiracy ville, in the*

9    *county of conspiracy*.  Sixty-four times.  This is not a man

10   that uses the type of word *conspiracy*, in his normal

11   vocabulary, and you know how you know that, based on some of

12   the recordings the government just played for you in its

13   opening statement, and there's plenty more for you to listen

14   to, if you want to listen to the way that Jonathan Yioulos

15   really speaks, he uses swear words, he uses slang, he doesn't

16   use the word conspiracy.  The government put that word in his

17   mouth, because they need to prove a conspiracy, beyond a

18   reasonable doubt.  Not one, but two.

19           And so, how do they do that?  They get their witnesses

20   to say the buzzwords.  And you are going to get a jury

21   instruction, and in the instruction it's going to tell you that

22   you are the finders of fact.  Just because the government

23   witness got on the witness stand and said, there was a

24   conspiracy, there was a fraudulent invoice, doesn't mean that

25   you accept that witness' assertion as true.  And an interesting

1      part of the trial was when Mr. Yioulos was being

2      Cross-examined, on this point, magically stops using the word.

3      We took a break, there was a lunch break, Mr. Schall had been

4      Cross-examining Mr. Yioulos pretty vigorously on this concept.

5      All of a sudden, after the lunch break, when Mr. Yioulos goes

6      outside to talk to his lawyer, he stops using the word

7      conspiracy.  Mr. Schall then asked questions about that very

8      concept, and here's what he says.

9              QUESTION:  *Is Michael stupid?*

10             ANSWER:  *Depends.  I mean, to expect myself and as a*

11     *part of this ...* He was about to use his conspiracy buzzword

12     right there, but he didn't, because his lawyer, wisely, told

13     him, on the lunch break, *Hey, Jon, stop using the word*

14     *conspiracy.  You sound like a fool*.  And so there's Mr. Schall

15     then asking him, *When you paused there, were you about to say*

16     *as part of a conspiracy*?  Yioulos says, *Yes*.  Mr. Schall says,

17     *Why didn't you*?  Mr. Yioulos says, *I just said the word this,*

18     *instead*.  That answer was a lie, he is lying about his own

19     lies.  He is no victim of Michael Tew.

20             His first words, which stand in stark contrast to the

21     transcript, from this trial, we're looking at, were, as we've

22     heard, *I think it has been Kimberley all along.  I think she*

23     *gambles the fuck out of the money, I think she truly loses it*

24     *all.  The real driver of all of this was Kimberley.  Michael*

25     *was not doing this for any kind of benefit.  I think they*

1    *gambled everything they had away.  This one woman had us both*

2    *by the balls.  And we were both kind of helpless.*  Those are

3    Mr. Yioulos' true words from 2020.  These words, from 2024, are

4    coached, sanitized and not to be believed.

5         Here is another example.  He says, he is coming clean,

6    right?  Now, let's step back, before we, kind of, dive into why

7    you can't believe that Mr. Yioulos was coming clean in this

8    process.

9         We've heard that he had his own side hustle,

10   fraudulent conspiracy with someone else at National, that had

11   nothing to do with Michael Tew.  That was going on in 2017, and

12   he had to fall on his sword about his side-hustle fraud that

13   had nothing to do with Michael Tew, because he is a cooperator,

14   right?  And he, of course, lied by omission.  The first time he

15   talks to the federal government, he doesn't come running in

16   saying, *Hey, I have got information about Michael Tew, but let*

17   *me also tell you about my misdeeds and my federal crimes, and*

18   *my federal conspiracies that have nothing to do with Michael*

19   *Tew.*  Mr. Yioulos didn't do that.  He was covering his tail

20   when he first walked in.  He committed fraud on his own, in

21   2017.  He is no victim of Michael Tew.  He knows how to commit

22   fraud.  He knows how to make fake invoices.  He knows how to

23   work with someone at National, not Michael Tew, another man, to

24   steal.

25         He also committed other crimes, such as tax evasion,

 1   by not declaring money, money laundering.  Mr. Yioulos

 2   committed numerous federal crimes on his own, we've heard of at

 3   least four, that have nothing to do with Michael Tew.  We also

 4   have heard that he has a serious gambling addiction too.  It's

 5   not just Kimberley Tew.  He likes to gamble so much that he was

 6   playing sports betting when, you know, he got to Colorado.  He

 7   explained that to you on the witness stand.  He is the one who

 8   deleted his text messages.  Remember, that's another crime.

 9   One of the crimes I was referring to, destruction of evidence.

10   This isn't about him coming clean.  He couldn't even come clean

11   when he was caught red-handed in court on the conspiracy lie.

12           Now, he had to admit that he downplayed his own sins

13   in front of the federal government, the first time he went in

14   to talk to them, because he knew that he would get

15   Cross-examined by us about his lies and his sins, had he not

16   generally told the jury about it.  But with respect to that

17   lie, yesterday, I phrased it with Agent Palmer as a lie by

18   omission, right?  When questioned about that lie, his excuses

19   in this trial, about not telling -- initially disclosing to the

20   government that he committed his own fraud, he said, I just

21   wasn't thinking of it at the time.  It wasn't at the top of my

22   mind.  *Well, no one, specifically, asked me about the fraud I*

23   *committed in 2017; that had nothing to do with Michael Tew.*

24           Patently unbelievable excuses for his own bad behavior

25   that they're trying to clean up years later.  That is not on --

1   that is not believable, and so he is not coming clean, because

2   if you are really coming clean, this would be weighing on your

3   conscience, that you committed another fraud, and you would go

4   in and tell these people that.

5        And again, here is what some of his testimony was on

6   that topic. *So, when you told the jury yesterday that you were*

7   *at a point that you needed to come clean about everything, what*

8   *you meant was come clean about Michael Tew and Kimberley Tew?*

9   *Of course*, he says. *Not come clean about the Jon the*

10  *fraudster, pre-Michael and Kimberley Tew?  Yes.*

11       Again, more lies about his own lies.  And there's

12  evidence, I mean this prior fraud from 2017, this prior invoice

13  fraud, involving National, his employer, is not a fiction.  It

14  happened, and he didn't get prosecuted for it, because he is a

15  cooperator.  And because he did this, here is his plea deal.

16  One of the things that he actually did say, that was truthful,

17  was that he expects a lower sentence, and to avoid jail,

18  because he entered this guilty plea and agreed to testify for

19  the government, against Michael Tew.

20       And think about what law enforcement said, as they

21  started turning him.  *We can help get things back on track for*

22  *you, Mr. Yioulos.  The first one in, is going to get the best*

23  *deal.*  Well, he went from 40 counts to 2.  Mr. Yioulos, so

24  concerned about his own criminal liability, and this is back in

25  that 2020 interview, *If you give me your word I'm not going to*

1   *be arrested today, I won't call a lawyer, and I will talk to*

2   *you*, and that's what happened.  Ever since then he has been

3   saving his own tail.

4        And you notice, when he testified, when he tries to

5   give a little bit of the truth, like when he says, *Hey, I liked*

6   *Michael.  Michael was a good worker.  He was is good guy.*  That

7   is the truth, but then he knows he is going off his script with

8   the government, so he quickly keeps, you know, backtracking, to

9   get in line, with, he knows, they want him to say, because if

10  you look at his Plea Agreement here on this slide, paragraph

11  three, *The defendant agrees to testify fully and truthfully at*

12  *any proceeding here, as requested by the government.*  Well,

13  when it says *fully and truthfully*, who determines the truth?

14  It's not me.  It's not even Mr. Yioulos.  It's what they

15  believe the truth is, and if he gets up there and goes off

16  script, he is violating his Plea Agreement and he is in big

17  trouble.

18        Here is another part of his Plea Agreement, where he

19  had to stipulate to these facts.  But if you notice, he sold

20  Bitcoin, according to the government, that netted approximately

21  a hundred-thousand dollars.  They are the ones that determine

22  the facts.  But he also separately did harm to National, and

23  there's the $60,000 that he stole from them in 2017.

24        There he is.  There's nothing real about this guy.

25  Not even his wedding.  He had a wedding, but he didn't get

1    married.  Mr. Schall said, *Well, that's kind of weird, isn't*

2    *it*?  And he said, *Well, not to me*.  We've got a fake wedding,

3    and for all we know, maybe his fake wife is smart to not marry

4    him right now, because she doesn't want to be on the hook for

5    the $5 million in restitution that Mr. Yioulos now owes to

6    presumably an insurance company, because National got paid

7    back, as we heard, for most of this.  Maybe she says, *I'm not*

8    *marrying you, because you have a $5 million debt on you, to*

9    *them, that you agreed to as part of your Plea Agreement.*

10          Now, $5 million sure can get you far in a casino; $5

11   million is sure a lot of sports betting money, but what it also

12   is, is part of Mr. Yioulos' motivation to ensure that there's a

13   criminal conviction in this case, because if there is, Michael

14   or Kimberley Tew might be on the hook for that $5 million too,

15   and it will save Mr. Yioulos a lot of money if someone else has

16   to help him pay that back.  So think of that.

17          He is also a bad liar.  If you take a look at

18   Government's Exhibit 975, this is the consensual call that,

19   when he, immediately, agreed to, you know, work with the

20   government, to do a call with Michael, and ask him questions

21   and try to set Michael up.  They have this conversation where

22   Mr. Yioulos is talking about these fake people and these fake

23   invoices, and he is trying to elicit Michael Tew to say certain

24   things, and he actually says to Michael, *Oh then, I was at*

25   *Starbucks isn't it funny, the woman in front me, her name was*

1    *Jessica Thompson*, and Michael says, *Come on, they actually put*

2    *last names on Starbucks cups*?  You know, *No*.  Everyone knows

3    they don't do that.  This is Mr. Yioulos', like, bad attempts

4    at being a bad liar, and the other reason we know he is a bad

5    liar, is because we all saw his demeanor on this witness stand

6    for days.

7            Now, you are going to get an instruction, you are the

8    judges of credibility.  You have to consider his testimony with

9    caution and give it great care, or, as Agent Palmer and I

10   discussed yesterday, take it with a grain of salt.  Take what

11   he had to say about agreements, conspiracies and false invoices

12   with a grain of salt, because what the evidence shows, when you

13   go back, is Jon, the fraudster, advising how to commit fraud,

14   teaching, being the fraud master, this text message, from a

15   certified public accountant, who is apparently an expert at

16   cooking the books, says, *I would rather not use Sand Hill but*

17   *in this emergency situation I can.  That's why you should set*

18   *up a legitimate corporate for the fuel consulting.*  Jon is no

19   victim.  Jon, the fraudster, saved Michael Tew, in his phone,

20   as a contact name as JB.  Michael Tew didn't do that.  The only

21   two people in this case he is -- pardon me -- one of the two

22   people in this case that said they deleted evidence.

23           Now, when you get your credibility instruction, it

24   will refer you to certain questions about -- that would guide

25   you in gauging someone's credibility.  Such as, did the witness

1    have any particular reason not to tell the truth?  The answer

2    for Mr. Yioulos, yes.  Did the witness have a personal interest

3    in the outcome of this case?  We already covered that.  You

4    know he doesn't want to be on the hook for $5 million on his

5    own.  He wants no jail.  Did the witness seem to have a good

6    memory?

7            Now, remember, Mr. Yioulos claimed to have a

8    photographic memory.  When the government put texts in front of

9    him that he had not seen in years, he sat there saying, *Oh,*

10   *yeah, I totally remember this conversation.  I have a*

11   *photographic memory.*  Now, that's odd for two reasons, first of

12   all, because you have seen the amount of text messages, at

13   issue in this case.  You know, based on your life experience

14   and your common sense, that sometimes we can text thousands and

15   and thousands of texts a week, but Mr. Yioulos is conveniently

16   sitting up there remembering a text from whenever-years ago.

17   No.  It's because the government put it in front of his face,

18   and he knows his job is to be a *yes man*.  He doesn't have a

19   photographic memory.  And keep in mind, that when,

20   conveniently, he is Cross-examined, he starts to say I don't

21   remember a lot.  Right?  Because it's the defense attorney

22   asking him questions.  When they ask, he remembers, when we

23   ask, *I don't remember*.  It's not photographic, that's not his

24   memory, and that was another lie he told in this trial.  And

25   you know how we know, because Abby Schwartz, her first -- the

1621

government talked about her going through invoices and we heard

about that, but her first reaction, and again her initial

statements, *Off the top of my head, no one but Yioulos could*

*have set this fraud up*.  And that was heartfelt testimony, and

that resonates, because Mr. Tew didn't have access to the

accounting software.  He wasn't the bookkeeper.  He didn't

control the finances.  Abby did, Jon did, Chris Alf did.

And by the way, she got a little emotional at the end

of her testimony, when she was talking about feeling betrayed.

She wasn't talking about Michael Tew.  One of her last answers

said, *It was very discouraging.  You're friends with someone.*

*You're friends with someone, and this is kind of what they do.*

*It was heartbreaking.*  She was friends with Jonathan Yioulos.

She was not friends with Michael Tew.  She barely saw Michael.

She didn't know what he did for a job, because he is in Denver,

she is all the way in New York.  Her and Jon go out to happy

hour.  They are colleagues in the office.  Not Michael.  Those

tears were about Jonathan Yioulos.

Now, the story behind the Indictment.  The government

mentions there's no secret story here.  This is the Indictment,

we charge this, this must be true.  Well, my position is that

the story isn't secret anymore, because you know what we've

heard?  We've heard a ton of evidence about how the government

got the story wrong, with respect to Michael Tew, and they do

make mistakes, believe it or not, and this one they jumped the

1622

1    gun about Michael, about who he is, about his relationship with

2    Kimberley, about what was really going on here, and when they

3    jumped the gun, it was too late, and later on, all this crazy

4    stuff comes -- starts to come out about Kimberley Tew, and who

5    she is running around with and who she is manipulating and what

6    she is doing to her own husband.

7         Ask yourself, what's really going on here?  Does it

8    make sense to you that Michael Tew sits here with 59 counts,

9    based on what you have heard throughout this entire trial?

10   Kimberley Tew was driving the bus.  They were not teammates.

11   Who got what?  Well, that's no secret story either.  Jonathan

12   Yioulos got Bitcoin, that he sold for a hundred thousand

13   dollars, 60,000 of his own fraud.

14        Kimberley Tew got control.  She got money to feed her

15   uncontrollable gambling habit.  So uncontrollable that she gets

16   herself involved with these crazy people, like Craig Faigin,

17   who is not made up.  He is real.  We've heard about him by

18   three witnesses.  He was threatening Michael and Kimberley.  He

19   threatened Chris Alf, Chris Alf's wife.  He called the office

20   at National.  You heard Abby Schwartz say, *Oh, my God this*

21   *employee was so upset she was harassed by this guy,*

22   *Craig Faigin, blowing up our phone threatening Michael Tew*.

23   And he comes into the picture because of Kimberley Tew's

24   uncontrollable gambling addiction.

25        You saw the documents from the Wynn Casino you --

1    those are Government's Exhibit 507 to 511.  Go take a look at

2    them again.  She is in Vegas, like almost a monthly basis, five

3    times, from the middle to the end of the year.  You saw her

4    losses.  They were incredible.  At the table and at the slot

5    machines.  Thousands and thousands of dollars.  That's on her.

6    She is the gambler, not Mr. Tew.

7              THE COURTROOM DEPUTY:  Twenty-five minutes.

8              MS. FROST:  Thank you Mr. Keech.

9              THE COURTROOM DEPUTY:  You are welcome.

10             MS. FROST:  She got Luluemons.  She got Christian

11   Louboutins.  She got expensive materials from Zappos.  Not

12   Mr. Tew.  What did Mr. Tew get?  Well, before we get there,

13   what did Christopher Alf and National get?  They got reimbursed

14   by an insurance company.  The only thing they didn't get

15   reimbursed for was the American Express charges, which, by the

16   way, it's very important to understand that is not part of the

17   Indictment.  The American Express testimony, exhibit -- charges

18   are not part of the story in this piece of paper, but to the

19   extent you want to consider it, it seems like there's $42,000,

20   approximately, that National is out.  Otherwise, they were paid

21   back.  And as far as that American Express card is concerned,

22   that is on Kimberley Tew.  She is the one running to King

23   Soopers.  She is the one running to Target.  She is the one

24   running around, and there's not a person that could come in

25   here and say, *We know Michael Tew used that card*.  And you know

1624

1   why she used that card?  Look at her texts.  Look at the way

2   she speaks to Michael.  Look at the way she speaks to other

3   people.  Screaming, threatening.  Crazy.

4        What did Michael Tew get?  I'm holding up the

5   government's exhibit, the infamous Wells Fargo money bag.  It's

6   empty.  He got nothing.  Nothing.  He got 59 charges.  You

7   didn't hear that he is buying all of these lavish things for

8   himself; that he is going on trips; that he is acting like some

9   fraudster that had a motivation based on greed.  He got

10   nothing.  Kimberley Tew was driving the bus.  She got the

11   money, she gambled it all away.

12        THE CLERK:  Twenty-eight minutes.

13        MS. FROST:  Thank you.  And speaking of National Air

14   Cargo Holdings odd crazy thing about this case is, you know, we

15   heard, there were billions, there's no financial harm, going on

16   right now.  We heard that Chris Alf was sad about this, not

17   mad; 6' to $700 million, pardon me, gross, last year.

18        But what's so interesting is on the day that Mr. Alf

19   testified, one of his planes was on the front page of the *New

20   York Times*, on the very same day he testified, that's a

21   National plane, and as Jonathan Yioulos said, war is great for

22   the company.

23        Let's talk about Mrs. Tew's influence.  She gets

24   people to do crazy things.  I don't know what kind of spell

25   Ms. Tew has cast over people like Hannah Scaife,

1    Michael Meyers, Mr. Tew, but boy is it some magic sauce.  You

2    hear from Mr. Yioulos, she is constantly yelling at him,

3    threatening him, hounding him for more money.  She is the

4    background of Michael Tew's phone calls.  She is responding as

5    if she is Michael Tew on his email.  She is in his emails.

6         Hannah Scaife describes how she is emotionally

7    manipulative, verbally abusive.  She talks about the trip where

8    they went to the Vail.  They are all in the car, including

9    Michael Tew, and Kimberley Tew is calling him a monkey and a

10   horrible father, in front of her children.

11        *MR. KAPLAN:*  Objection, Your Honor, improper argument.

12        *THE COURT:*  Overruled.

13        *MS. FROST:*  We heard what she convinced Hannah Scaife

14   to do in other ways.  To have an affair with her boss, Sandy

15   Goldfarb, to sell her body for money.  And Hannah doesn't know

16   Michael Tew.  She brings in nothing about Michael Tew to this

17   case.

18        We have got Michael Meyers driving across state lines.

19   Kimberley saying, go do this, go do that.  He is following

20   Kimberley's lead.  And as he said to you, *Yeah, it's crazy I*

21   *was doing that.  It didn't make a whole lot of sense.  Like it*

22   *was like she cast a spell on me.*

23        And then we've got other people, like Abby Schwartz,

24   that talks about Ms. Tew calling and screaming at her to give

25   her money, so much so that Ms. Schwartz asks that she never

1    speak to Mrs. Tew again.  Chris Alf talked about it, that you

2    know, when asked how Michael puts up with Kimberley screaming,

3    Chris Alf kind of said, *I have no idea how he puts up with*

4    *that*.  Even the bank teller, Brittney Perry, described her as

5    paranoid and upset.  And the list doesn't end there.

6         Kimberley Tew to Michael Tew, *Figure out if you want*

7    *to be in this family.  You were extremely rude to me*.  Michael

8    Tew is running around working, trying to keep his family safe

9    from these crazy people that Ms. Tew got herself involved with.

10   He is filing reports with the FBI about it, that are getting

11   ignored, while she is off gambling, making her own decisions,

12   and this is how she is speaking to Mr. Tew.

13        Now, the government has the burden to prove each and

14   every element beyond a reasonable doubt.  This is an extremely

15   extremely, high, high burden.  The highest possible, because if

16   they are going to bring the charges, they better prove it.  You

17   are going to hear that you are going to get a jury instruction

18   that you must find them not guilty, Mr. Tew, if they don't

19   satisfy this extremely high burden, and the burden never shifts

20   to Mr. Tew, ever.

21        You are going to see that reasonable doubt is based on

22   reason and common sense, and that if you hesitate to act, being

23   a reasonable person, that's reasonable doubt.  If it would make

24   you hesitate to rely and act upon it, in making the most

25   important decisions of your life.  So, if you go back there and

1    think something doesn't feel right to me, I'm hesitating, I'm

2    pausing, that is reasonable doubt.

3           Now, in closing, I just want to remind you, at the

4    beginning of this case, that Mr. Schall brought up the analogy

5    of three parts of a fire, that Jon was the one who pressed the

6    button to unleash the funds, and added oxygen to the fire; that

7    Kimberley Tew's gambling and manipulation is fire that -- is

8    the fire that couldn't be put out.  Michael Tew couldn't even

9    put out that crazy fire.  Nobody could put it out.  Michael Tew

10   is the fuel that gets destroyed, used up and ravaged by

11   Mrs. Tew and Mr. Yioulos.

12          You now have the power, ladies and gentlemen, you are

13   going to go back there, and you are going to get down to the

14   bottom of what happened here, and it's not a secret anymore.

15   The power is with you.  Think about everything that does not

16   make sense.  Michael Tew is only guilty of being married to

17   Kimberley Tew.  You have the power, go back and do the right

18   thing and say not guilty.  Thank you.  Thank you, Your Honor.

19          THE COURT:  Thank you, Ms. Frost.  Mr. Kaplan.

20                      **CLOSING ARGUMENT**

21          MR. KAPLAN:  This scheme was conceived, implemented

22   and maintained by two people.  Those two people are Jonathan

23   Yioulos and Michael Tew.  There's been a lot said now about Jon

24   Yioulos, and I don't need to repeat all of what was described

25   about his situation, how he testified, what he had to gain;

1    that has been already reasonably expressed.  But there are a

2    few things that I want to point out about it.  Mr. Yioulos,

3    when he gets on the stand, still seems to be incapable of

4    recognizing his own responsibilities.  You see, to be incapable

5    of recognizing how key of a component he was in the scheme to

6    defraud NAC.  And he seemed to, at one point, talk about how

7    what he did for, two years before, in a bizarre description and

8    explanation, was part of his job.  How detached from what he

9    did, and how he was involved, do you have to be, to say that?

10   And to not recognize that for two years he had been lying to

11   his co-workers, to his boss, to anybody who had anything to do

12   with the finances of NAC.  This is a man that was capable of

13   spending those two years not recognizing that what he was doing

14   was a component part in sucking money out of the very business

15   that he professed to appreciate, to enjoy, and to be a part of.

16        Why is that important?  Well, what's important about

17   that is that if he takes the stand, you have to evaluate what

18   the truthfulness of his descriptions and what he is describing

19   and explaining.  And it's impossible to do that, if you are

20   going to take what he said, in terms of a description of what

21   had occurred, you better have documentation.  You better be

22   able to affirm it and confirm it, other than with just his

23   statement, because we know what his capabilities are.  And in

24   terms of what he said, when he was up there, he looked around

25   and he said, you know, if I trash Michael Tew, then based on

1    all of the documentation I have to have caused a problem for

2    myself.  So what does he do?  He invites Kimberley Tew as the

3    person.  Just, *It must have been her.  I guessed it was her.*

4    *It's my opinion it was her*.  But that doesn't comport with the

5    documents and the facts and what he was involved in as he

6    testified for two-and-a-half days.  It is not consistent with

7    that.  As if that was what was driving him and what was driving

8    Michael Tew.

9         What's surprising is that the government hitches their

10   wagon to this.  Again, I'm not talking about the documents and

11   the factual things that you can establish, when people came up

12   and showed you this.  I'm talking about getting up before you,

13   and talking about the bad woman, the evil woman, that they came

14   up in the first witness that they put on, and then started

15   again when they first took this podium to discuss what was

16   going on.  And relying on who for this?  Out of the gate,

17   Mr. Yioulos.

18        And who continues this assault in order to try to

19   explain away the documents and what happened, and what I will

20   be referring, to throughout this closing, the charges in the

21   Indictment, which you have, which is what your responsibility

22   is to determine, in terms of who is guilty and who is not and

23   who is guilty of what and who is not.  It's this document.  And

24   we will return to that.

25        But Michael Tew's lawyers, every chance they have, and

1630

1    in closing, gets in front of you and say, *It's his wife.*  Don't

2    look at the documents that we're about to talk about.  It's

3    just, what else are they going to say?  Jump on the Yioulos

4    bandwagon, try to convince you that it was some other person

5    than what Michael has done, and what you heard about that, day

6    in and day out.

7         Michael Tew, their client, is overwhelmingly guilty of

8    conspiring with Mr. Yioulos in every aspect of the mechanics of

9    this fraud.  Michael Tew is overwhelmingly guilty of

10   orchestrating and creating the false invoices and the false

11   companies with Jonathan Yioulos.

12        Their client, Michael Tew, is overwhelmingly guilty of

13   transferring the funds, along with Jonathan Yioulos, out of NAC

14   and into accounts that he controlled.  That doesn't take

15   somebody's opinion, that doesn't take just the general

16   character bashing, the bad woman, the -- the unpleasant person.

17   That's in the documents.  And that is what you have to evaluate

18   to find Kimberley Tew guilty of charges that are in the

19   Indictment.

20        And it's not just Mr. Yioulos that gets up and tries

21   to avoid his responsibility through blaming Ms. Kimberley Tew.

22   It's not Michael Tew that's trying to avoid responsibility by

23   blaming Kimberley Tew.  The government gets up here and does

24   the same thing.  They come up here and say -- Mr. Fields comes

25   up and says, *Treat them independently.  You have to find the*

1    *elements of the offense against each one of them independent.*

2    But that's not the first thing out of his mouth.  The first

3    thing out of his mouth is to come up here and say, *Well, I'm*

4    *going to talk about the Tews.  I'm going to talk about*

5    *Kimberley and Michael Tew.*  It was towards the end of his

6    presentation, where he has to follow the law, and explain that

7    that despite his combining these two people, for purposes of

8    establishing his case, you don't do that, and he knows you

9    don't do that, but that's not what he did.  Instead, what he

10    did is every chance he got to combine them, and try to not have

11    you look at the independent behavior and responsibilities of

12    each one, as documented in days and days of testimony, and the

13    reason each one of these groups of people will come in here and

14    do it, whether it's Jon or Michael or the government, is

15    because they got some problems proving the counts in the

16    Indictment when it comes to Kimberley Tew.

17         They have to hitch her -- their wagon to her wagon.

18    They've got to combine it and make it unclear and elevate

19    Kimberley Tew's responsibility, and that's what they've

20    attempted to do.

21         It's surprising the similarities of these positions?

22    But you know why?  It's because there is some desperation.  And

23    so, instead what they do is they present evidence to make it

24    look like Kimberley Tew is unpleasant.  You know when you take

25    a little bit of step back from that, I'm not suggesting here

1    that she has done everything right and she is pleasant with

2    everybody that she speaks with.  You have heard evidence.  I'm

3    not going to suggest that.  But sit back and think about what

4    did that look like, when you think back upon it?  It certainly

5    wasn't the kind of stuff that Jonathan Yioulos liked to say.

6    They like to repeat.  That she has people by the ... testicles.

7    That Jonathan Yioulos couldn't do anything or Michael Tew

8    couldn't do anything to separate them from this woman.  No.

9    Because the behavior they're talking about is not as they

10   suggest.

11         The government also includes a lot about the American

12   Express, to show, again, what else can we do that is separated

13   from the counts in the Indictment?  What else can we suggest

14   that makes her somebody that you wouldn't like, that has

15   nothing to do with that what she is charged with?  Let's do the

16   American Express.  Is there an American Express count in here

17   that she is charged with?  No.  There is not.  But we're going

18   to include that in our presentation to try to convince you that

19   she is guilty of something independent of what she is charged

20   with.

21         Jonathan Yioulos says, well, she is unpleasant.  I

22   hear her in the background.  He also said that over the course

23   of the two years he dealt 99.9 percent of the time with Michael

24   Tew; not half the time; not three-quarters; not 80 percent of

25   it.  That was his numbers, 99.9 percent of the time he is

1    dealing with Michael Tew.  You know why you don't have that

2    impression?  You don't have that impression because the

3    government decided, instead of bringing in, in some sort of

4    proportionate way, the number of times that people dealt with

5    Kimberley Tew and the number of times they dealt with Michael

6    Tew, and especially the number of times that Michael and Jon

7    spent together, we're not going to do that.  We're going to put

8    every time that Jon had anything to do talking and having it

9    unpleasant with Kimberley Tew, so that it looks like Kimberley

10   and Michael are working with him, you know, the same amount of

11   time.  But that ain't 99.9 percent of the time.  Texts, phone

12   calls, emails, correspondence about the invoices.  Why do they

13   do it?  Because they've got to find a way to make Kimberley Tew

14   more involved, more responsible than in what is a scheme, that

15   you know what it was about.  And it was a scheme where Michael

16   Tew and Jonathan Yioulos figured out how to do invoices, fake

17   invoices, create companies, get them through NAC, get it into

18   the accounts payable.  All that very sophisticated kind of

19   behavior that the government says that Kimberley Tew knows.

20   Kimberley Tew doesn't know that.

21         Does Kimberley Tew know how to go under the radar of

22   the auditors at NAC?  No.  Does Kimberley Tew know what kind of

23   business would pass the muster at AC for the accounts payable?

24   No.  Does Kimberley Tew know how sophisticated or increase

25   sophistication of the invoices or how they -- no.  That is a

1    plan, plain and simple, and done day in and day out between

2    Michael Tew and Jonathan Yioulos.

3         So, we have Jon saying he didn't like her.

4    Hannah Scaife, they bring her up a lot.  They mentioned things

5    that happened 2012 and 2016.  They talk about a drive in

6    Colorado.  You know, whatever their situation was between them,

7    they were friends, they ceased to be friends.  Ms. Scaife came

8    up and said, you know, when I really needed money, when I

9    couldn't pay my rent, the person that I went to, to help me

10   pay, was a friend.  My mother gave me a hundred dollars and

11   Kimberley Tew paid the rent.

12        Now, it just so happened that instead of paying the

13   rent, she took the money for Botox and a hairdo, but that's the

14   relationship that was there between Kimberley Tew and

15   Ms. Scaife.

16        Chris Alf they brought up here.  They asked questions

17   about what he thought.  Mr. Schall Crossed.  You know what he

18   said, he said, *Yeah, she was a little out of the sorts when she*

19   *called up and said it was my American Express problem.  My*

20   *problem.  Let me pay it back*, when she thought that her husband

21   was going to lose the job.  He said, *Yeah, she was out of sorts*

22   *I had dinner with her.  She was a bright person.  We had dinner*

23   *a couple times*.

24        Michael Meyers talked about the division of the two

25   experiences that he had.  He was doing cryptocurrency, he was

1635

1    trying to get a edge like other people were and he was dealing

2    with Kimberley Tew about that, but when it came down to who was

3    agitated and who was upset, when Michael Tew actually showed up

4    and said, *Meet me at the bank, I want the money, you are going*

5    *to come in and then I'm going to go in and I am going to be the*

6    *one that's unpleasant with the teller*, and when all is said and

7    done, after all of that dust settled, and there was the

8    problems with Michael Meyers and cryptocurrency, what did he do

9    when it was all over?  He called Ms. Tew and said, *Let me try*

10   *and invest.  I still like that idea*.  So that was her

11   horrendous behavior with Michael Meyers.  Who, by the way, they

12   also brought in, in terms of stretching what they had in order

13   to include Ms. Tew in this with Michael Meyers being the expert

14   on punctuation and text messages.  Going through, in one

15   series, *This is Michael, this was Kimberley, this was Michael*,

16   which is a theme in terms of how they made much of their case

17   in terms of looking at the communications and the Cellebrite

18   stuff.

19          Certainly, they don't rely on Michael Meyers to

20   determine who is the individual talking to.  But the reality of

21   it was he was dealing with Ms. Kimberley Tew with an algorithm

22   having to do with cryptocurrency, that he dealt with other

23   people with, and he dealt with Michael Tew, when it's time to

24   meet somebody.  He never even met Kimberley Tew.

25          Abby Schwartz talks about that it had to be

1636

1    Mr. Yioulos.  And it's true, Kimberley Tew was probably

2    unpleasant with her.  She seemed like a perfectly pleasant

3    person when Kimberley Tew called and said she wanted the money,

4    and she wanted it quickly, and Ms. Schwartz said, *I don't have*

5    *the authority to do it*.  And she didn't like the way she was

6    dealt with, and she told -- told everybody that she didn't want

7    to speak with Ms. Tew.  The truth is, when Ms. Tew was calling

8    her, Mr. Alf had okayed the prepayment.  It was money that was

9    stressful for Ms. Tew, and she wanted it, and she dealt with it

10   in an improper way, but not in the wrong way.  It was an

11   unpleasant way, and after Ms. Schwartz said I don't want to

12   talk to her again, she never spoke to her again, that was the

13   end of the communication.

14          So, when you look back to see, Oh, this brazen, bad

15   woman that they have described, evidence of her being that

16   aggressive, and the people they brought up to establish it,

17   think about that, and see just what did they bring before you,

18   as evidence?  Evidence of a criminal case, worthy of a criminal

19   conviction in a Federal District Court?  That's not the kind of

20   evidence you can base it on.

21          So, what have they based it on?  Ms. Tew is charged in

22   counts having to do with wire fraud, not the 39 counts that

23   Michael Tew is charged with.  And if you look at it, Counts 2

24   through 20 don't even mention Kimberley Tew.  When you look in

25   the Indictment, look at 2 through 20, doesn't even mention.

 1    And what is 2 through 20?  What is contained as part of that?

 2    Well, they had summary exhibits and they showed you what --

 3    what that was a part of, and if you look at the summary exhibit

 4    or you remember the summary exhibit, 1004, you will see that

 5    it's the summary exhibit.  It will come up in a second, I'm

 6    sure.  That has to do with -- with the very early part of this

 7    invoice situation.  Where the invoice was provided by Michael

 8    to Jon, and the payments were paid, and what you will see --

 9    are we going to get it up?

10            *MS. HUBBARD:*  In a minute.

11            *MR. KAPLAN:*  What you will see in the beginning of

12    this, in one of the summary exhibits, that I'm sure that you

13    will recall, is the ones that had to do with Jessamine, with

14    Hannah Scaife and with Meyers, which they've talked about, they

15    talked about it in his closing, and those three that ended up

16    being Counts 2, 3, 4, 5, 6 and 7.  Not counts that Ms. Tew

17    Indicted.  They can talk about those as if Ms. Tew was behind

18    them and was part of it.  Look at the Indictment, look at those

19    events, look at those companies, and you will see, despite them

20    talking about Ms. Tew's involvement with those companies and

21    that she was involved with Michael Meyers, Ms. Scaife,

22    Jessamine, not in here, and those were events that happened

23    early on.  What happens after that?  That's Q3 and Q4 of 2018?

24    What happens after that?  They were never involved again.  They

25    are there, they talked about it, she is not charged, and that's

1  the end of it.  But what picks up after that?  Political Media,

2  Global Fuel and Aero Maintenance Resources.  And why do those

3  get picked up?  You know why.  Because Jonathan Yioulos,

4  apparently the innocent Jonathan Yioulos, said to Michael Tew,

5  *We don't do enough with Political Media*.  All right.  We'll

6  start with Political Media, but after we did that, that had

7  nothing to do with Ms. Tew, he said, *There's too much money*

8  *going through Political Media, we have got to come up with some*

9  *names of companies that won't have a red flag*.  *So, let's think*

10 *of something called Global Fuel Logistics.  It sounds like*

11 *something in this business, and let's think of Aero Maintenance*

12 *Resources, and let's use them*.  That is a sophistication,

13 that's a knowledge of the company.  That is somebody who was

14 the chief financial officer speaking to the comptroller about

15 how to continue this act.  Bequest of Michael Tew, with the

16 cooperation with Mr. Yioulos, and that's what takes this

17 further.

18        So, if you look at the counts that we're really

19 talking about, that Ms. Tew is involved in, and it is not as

20 many counts as Michael Tew for a good reason, and even the

21 counts that she is involved in, is not established by the

22 evidence that has been presented over the course of the last

23 eight days, and if you look at them -- by the way, there was a

24 Count 16 that's no longer -- it's in the Indictment and it's

25 not one of the counts that you are going to pay any attention

1639

1    to.  It's no longer part of the case.  But if you look at

2    Count 21, 22, 25, 26, 31 and 32, the six counts of the wire

3    fraud, they all are the same in the Indictment.  And I really

4    urge you ... to look, because in these counts, what it shows,

5    in the last column that says *Transaction*, on the Indictment,

6    when you go back there, the transactions that the government is

7    saying that they can establish have Kimberley Tew convicted of

8    a crime, each one of these is money from Signature Bank, the

9    account we know '5545, no doubt it's an NAC account, and each

10   one going into Global Fuel Logistics, into Sand Hill, into a

11   Michael Tew account, at Navy Federal Credit Union, and another

12   Michael Tew account at Navy Federal Credit Union.

13          That's the wire fraud, ladies and gentlemen.  That's

14   the wire fraud they charged.  That's the elements that need to

15   be established for wire fraud.  That's the elements and the

16   counts in here.  Look at it, that they're trying to establish

17   and hold Kimberley Tew responsible for, but that money went

18   from NAC into accounts controlled by Michael Tew.

19          I didn't draw this up.  We didn't draw this up.  The

20   government drew this up.  Government charged it this way.  And

21   they have not proven the wire fraud, which is the transfer of

22   the money through this invoice scheme, and to the accounts

23   payable, into accounts controlled by Michael Tew, that's what

24   wire fraud is.  That's what he is guilty of, and not Ms. Tew.

25          You know, there's this question about '8486, the joint

1    account.  In every one of the accounts that the government

2    talked about on their summary exhibit, where money went into,

3    there was only one that Kimberley Tew was a signatory on, and

4    it was the joint account, and I know you have heard it, but

5    what's important about that is still, despite knowing that the

6    number of times that a witness came in, including Mr. Morgan,

7    the forensic accountant, that when they saw the Kimberley Tew

8    name, they said, *Oh, that's accounts of Kimberley Tew*.  Well,

9    we know it's not an account of Kimberley Tew, right?  It's a

10   joint account with Kimberley and Michael Tew.  And why is that

11   important?  Well look at the -- at the Indictment again.  If

12   you will remember, the summary exhibit, I believe they showed

13   in closing here, when it talks about the National Air Cargo

14   into Political Media, and then how that money went to the other

15   accounts.  It went to Political Media, it went to this '8486

16   account, the joint account, and you know what's interesting,

17   when you look at the Indictment, and I want you to pay

18   particular attention to Counts 8, 9, 10 and 11, when we're

19   talking about this, it goes into that account, and 8, 9, 10 and

20   11 are '8486 account numbers.

21          *THE COURTROOM DEPUTY:*  You have used 28 minutes.  I'm

22   sorry.

23          *MR. KAPLAN:*  Thank you.  Eighty-four, eighty six

24   account numbers, that's the joint account.  Do you see the

25   government charging Kimberley Tew there?  No, you don't.  What

1    you see the government charging is Michael Tew and Jonathan

2    Yioulos.  So, this idea that if it magically appears in '8486,

3    because it's a Kimberley Tew account, well, we know it's a

4    joint account, and what did the government choose to do in

5    those counts that it went into?  An '8486 account, they didn't

6    say, *Well, if it's '8486 it's a joint account, must be*

7    *Kimberley Tew*.  No.  Take a look at what they did, I didn't

8    write the Indictment.  And what they did in Count 8, 9, 10, 11

9    the money went from Signature Bank to '8486, and you know who

10   they thought the Indictment should include, as the people

11   responsible for those counts?  Michael Tew and Jonathan

12   Yioulos.  Have they established wire fraud for the case -- for

13   the counts involving Kimberley Tew?  No, they have not.

14          And in terms of the -- in terms of the money

15   laundering, you will have to remember it was the last -- last

16   day of testimony, when Ms. Palmer was on the stand for quite a

17   bit of time, and those Counts are 1, 2, 3, 4, 6, Money

18   Laundering Counts, but let's take a quick view through them.

19   The first one is Count 41, Money Laundering and what the

20   government did, in their summary exhibits, and they did it for

21   every one of them, they came up with a summary exhibit and they

22   showed all of the other exhibits, and how it kind of connected

23   up, and what they showed each time was that there was an

24   invoice provided Jonathan Yioulos by Michael Tew.  We know the

25   drill, now.  Invoice that goes to Jonathan Yioulos, but gets

1    paid, the money goes into what?  It goes into one of these

2    accounts, and now they are thinking, if I have got to find

3    money laundering, I have got to somehow get it into Kimberley

4    Tew's hands.  That's what those summary exhibits did.  They,

5    each one of them, said the same scheme that we're talking

6    about, but what they had to add, what they had to put up in the

7    bubbles and in text messages was somehow Kimberley Tew having

8    something to do with that.  The first one they did, they show

9    all of the money going in, which we know happens.  There's no

10   mystery to that.  But Kimberley Tew at the bank.  Kimberley Tew

11   is at a bank taking out money before that invoice was even paid

12   by National Air Cargo.  Was even paid.  But that's a count of

13   money laundering.  Let them say that's a count of money

14   laundering.  Here you have it.  Before it was even paid.

15   That's not criminal conduct that they have established beyond a

16   reasonable doubt.

17           And if you go quickly through the remaining ones

18   Count 44, same drill.  Goes -- I don't want -- you will see it.

19   Those are the documents, and then it's withdrawn by, and then

20   what happens?  What happens is they throw a bubble up there

21   that says Kimberley Tew's link, because there was some

22   communication that had to do with it, and what's the

23   communication they put up, to tie Ms. Kimberley Tew into this?

24   Cash deposits of 2.5 percent around 17.5 Bank of America.

25   That's the day, that's the communication that connects

1    Kimberley Tew.

2            Count 47, same documents, we know the drill.

3    Withdrawal, wire transfer, and in the summary, the government

4    puts up the bubble wire sent.  Oh, that's enough to get her

5    involved.

6            *THE COURTROOM DEPUTY:*  Thirty-three minutes.

7            *MR. KAPLAN:*  Your Honor, if I could --

8            *THE COURT:*  Couple more minutes.

9            *MR. KAPLAN:*  A little more time.  Forty-eight, same

10    drill, invoice created, money deposited to Sand Hill,

11    withdrawn, and then the bubble.  You know, the bubble comes up,

12    and what it says, to involve Kimberley Tew in it, is *can you*

13    *please come to Wells Fargo*?  Do we have that?  The bubble says

14    *Can you please go to Wells Fargo to withdraw 20,000*, *deposit*

15    *ATM immediately Bitcoin is dropping in price again*.  All right.

16    The money laundering that they're trying to do, is when the

17    money gets taken out by Michael Tew, and somehow they have to

18    come up with a connection, in order to have Kimberley Tew

19    somehow involved in a criminal conduct in the elements that you

20    will read in the instructions.

21            So, the instructions will also tell you that knowing

22    of the scheme, Instruction 20, knowing of it, without having

23    established yourself as part of an agreement to participate in

24    it.  It's not just that you are the wife of somebody who is

25    involved in this.  It's not just that you know what it is.

1    Look at number 20.  Instruction 20 will tell you it

2    takes more than that.  Proof is not sufficient ... if it merely

3    shows that the defendant knew about the existence of the

4    conspiracy or was associated with members of the conspiracy.

5    Rather, the evidence must show that the defendant knowingly

6    joined the conspiracy with the intent to advance its purposes.

7    So this, let's see what we can do to rope Kimberley

8    Tew into the crime part of this.  Doesn't make her a pleasant

9    person.  Doesn't make her somebody that didn't have her own

10   concerns and behaviors, but we're -- you are here, we are here,

11   and you are here, to determine whether she is guilty of the

12   crime.  And in order to do that, you have to look at the

13   elements of the offense, and give -- breath life into those

14   elements.

15   It's not the behavior of her being an unpleasant

16   person, that is what's being evaluated.  Nobody told them the

17   charges that they should pursue, and the counts they should put

18   up, but once they do that, you have to look to see whether they

19   apply to Kimberley Tew and they just don't.

20   The Court told you, you have to follow the law.  You

21   don't sit here and think, do I like her?  Did she work

22   perfectly?  Was she pleasant to everybody?  That's not it.

23   Look at the elements and look at the counts in the Indictment,

24   and see, before you find somebody guilty in a federal district

25   criminal court of crimes, then they should at least have to

1    live up to their burden of proof of beyond a reasonable doubt

2    for the charges that they put in their Indictment, and the

3    transactions that they list, accompanying each of those

4    charges, and they have not been able to do that.  Thank you.

5         THE COURT:  Thank you, Mr. Kaplan.  Mr. Fields, the

6    government has a few minutes left.

7                        **CLOSING ARGUMENT**

8         MR. FIELDS:  Thank you, Your Honor.  Ladies and

9    gentlemen, I know it seems like it was a long time ago.  I

10    promise I will be brief.

11        I told you earlier that fraud is about people.  Fraud

12    is about people being manipulated.  But it is also about

13    documents, and the one thing that you didn't hear about, over

14    the last hour, are all of the documents that are in evidence.

15    So, what I want you to do, when you go back, are these things.

16    First of all, you should remember that Jonathan Yioulos is a

17    liar.  He is a fraudster.  He admitted to you that he lied to

18    the people closest to him.  All of his work colleagues, for

19    years, every day he worked next to Abby Schwartz, every day he

20    would send her these invoices, every day they would have this

21    camaraderie, working really hard to make sure that National

22    could do what it needed do.  This is not an easy business.  You

23    heard Chris Alf talk about this.  Day after day there's cash

24    crunches, a lot of stress, vendors are not getting paid, not

25    enough fuel for the planes, right?  The stakes are pretty high.

1646

1    Sometimes talking about military supplies and things like that.

2    They are all, sort of, working together.  They all think

3    they're trying to work for the common good, to get National

4    working, and Abby Schwartz finds out that Jonathan is lying to

5    her.  He has been lining his own pockets.  He got money out of

6    this.  He got Bitcoin, right?

7         No one wants to do jury duty.  It is a lot of

8    responsibility.  So, unfortunately, what you have to do is you

9    have to go back into that jury room, and you cannot -- you

10   should take everything that Jonathan Yioulos said with a grain

11   of salt.  You should read that jury instruction, and you should

12   understand that the testimony of someone like Jonathan Yioulos,

13   is not to be trusted.  Trust, but verify.  You heard that

14   phrase, as well.  So what you have to do, unfortunately, and

15   it's a lot of work, but it's your duty, is to go back and check

16   everything that was said against the documents, right?  Against

17   those cell phone messages, that no one thought were going to

18   see the light of day.

19        Jonathan Yioulos didn't prepare those text messages

20   after he pleaded guilty.  Those happened in real time, while

21   they were committing the crime.  Same with Michael and

22   Kimberley Tew.  So, you have to go back and you have to do

23   that.  But the good news, is you have some of the tools that

24   you need.  You could look at Government's Exhibit 1008, which

25   gives you a summary of each of the dates in which these various

1647

1    people were in communication with each other.  Each of the

2    days, money was deposited at National.  You compare that to the

3    bank records, and you, yourself, can go and you can see where

4    this money went.  You can see that it went into these accounts

5    by Michael Tew, as you were told, and then where is it

6    transferred to.  Transferred frequently to Kimberley Tew.  You

7    can look at the ATM photos of Kimberley taking out money or

8    Michael taking out money, both of them working together, to do

9    all of this.  That, unfortunately, is what you have to do for

10   all of the counts in the Indictment.  It takes a lot of work

11   and I would encourage you to do it, because, at the end of the

12   day, the government's burden is heavy, beyond a reasonable

13   doubt.  You have to go back there and check and make sure that

14   there's nothing -- there's no reasonable doubts, and when you

15   do that, you will find, again, that this case is not crazy.  We

16   are talking about timeless stories of, sort of, greed and

17   entitlement and just impulse-control issues.  These are people

18   who couldn't stop themselves, day after day.

19          Let's talk a little bit about, sort of, the charging

20   decisions, right?  You heard a lot about that.  When you go

21   through your jury instructions, you are are not going to find a

22   jury instruction that says, because one person is charged with

23   fewer counts they are not guilty.  Instead, what you are going

24   to do, is you are going to look and see an instruction labeled,

25   at the top, Conspirators' Liability For Substantive Counts, and

1    what you will see, when you look at that, when you look at the

2    Judge's instruction, you will see, that when you join a

3    conspiracy, you are responsible for the acts of your

4    co-conspirators.

5            So, it doesn't matter that Kimberley Tew has only been

6    charged in a few counts.  She is charged with the conspiracy,

7    because day after day she and Michael, together, made a

8    conscious choice.  They made a choice to continue getting money

9    from National.  They made a choice to manipulate their friends,

10   and when they ran out of friends to use, they created their own

11   company, and they continued to use this sort of manipulative

12   tactic, friendship, and the fear to keep Jonathan Yioulos

13   involved.

14           So, the number of times, right, Jonathan Yioulos maybe

15   only dealt with Kimberley Tew 1 percent of the time, right.

16   The way I want you to think about that is sometimes people can

17   have a higher impact with that 1 percent than they can with

18   more frequent communications, and when you look at the text

19   messages, you will find that the evidence supports that.

20   Jonathan Yioulos didn't want to talk to Kimberley Tew, because

21   she was very blunt.  You know, you get these four-letter

22   epithets.  *I don't care about his midlife crisis.  I don't care*

23   *about all of these things.  I just want my money.*

24           Michael was a little bit more articulate.  Again,

25   that, sort of, toxic manipulation that they had going on for

1    years.

2              The bank accounts.  So, when you go through the bank

3    accounts, you will see that Kimberley Tew sees a lots of

4    transfers.  Yes, it's a joint account, but look and see how

5    it's used.  You will see all of the gambling at the Wynn.

6    Receipts for the clothes.  Both of these people are benefiting.

7              Well, let's stop there.  What about Michael Tew,

8    right?  You got this idea like Michael Tew didn't get anything

9    out of this.  And so here are, sort of, my final comments on

10   this.  Here we are on Valentines Day, February 14th, 2024, and

11   what you are going to be doing is evaluating the ultimate toxic

12   relationship.  You are dealing with people who manipulated

13   their friends for years.  When you go back and you look at

14   those text messages, I want you to think a little bit about how

15   they might have manipulated each other for years.  How they

16   always had this backup plan, that they were going to blame the

17   other.  One was going to get immunity.  One of them is going to

18   get away with it, and how that plays out here in federal court.

19             And think about sometimes the ups and the downs.  So

20   you will see some of those messages.  You already saw some of

21   them.  They are at the Wynn.  Kimberley Tew is winning.  She is

22   elated.  *Michael, I just won this big jackpot*.  There's whole

23   exchange, *Michael, I love you.  We did it, baby.  We're finally*

24   *winning.*  They are feeling good, at that time.

25             Fast forward to another time.  Suddenly it's fear.

1650

1     It's manipulation.  It's, *Michael, I need my money*.  So, what

2     did Michael get out of this?  In a weird way, this is a story

3     as old as time, this is a story about love.  It's a toxic love,

4     and it's one that ruined everyone around them for two years,

5     and now it's your job to go back there, to look through all of

6     that, and to come back with the only verdict that is consistent

7     with the evidence.  Michael and Kimberley Tew are guilty of

8     Conspiracy To Commit Wire Fraud, Wire Fraud, conspiracy to

9     spend that money in amounts greater than $10,000, and Michael

10    Tew is guilty of not filing his taxes.  Thank you.

11         *THE COURT:*  Thank you, Mr. Fields.  All right.

12    Members of the jury, you have now heard the evidence.  You have

13    been instructed as to the applicable law, and you have heard

14    the parties' closing arguments.  I remind you, that the

15    arguments of counsel are not evidence and counsels' description

16    of the law or the instructions are not the law or the

17    instructions.  My instructions are what you must follow.

18         But you will, in a moment, retire to commence

19    deliberations.  Remember that during deliberations, you may

20    only discuss the case when all of your fellow jurors are

21    present.  You can deliberate for as long as you need, to reach

22    a verdict.

23         If I haven't heard from you today, in about an hour or

24    so, we will come check on you, and dismiss you for the day, and

25    we will return tomorrow, at whatever time you all choose to

1    return, assuming you do that.

2            So, at this point, I will ask Mr. Keech to swear in

3    our court security officer.

4            *THE COURTROOM DEPUTY:*  Please raise your right hand.

5            (Court security officer was sworn.)

6            *THE COURT:*  All right.  Thank you.  So I have one more

7    thing to do before you go back.  As I told you, at the start of

8    the case, 12 of you are the regular jurors, in this case, and

9    one of you has been our alternate.  Unfortunately, the time is

10   now to say goodbye to our alternate.  Ms. Szymanski, that is

11   you.

12           I do want to thank you for all of the time that you

13   put in here.  You served an important role.  Even though we're

14   letting you go, at this point, defendants have a constitutional

15   right to have a jury of 12 persons, and in this case, we didn't

16   need to use our alternate to ensure that right was protected,

17   but by being here, you are an important part of our process,

18   and I thank you, again, for your service.  So, you are free to

19   go, ma'am.

20           I'm going to hand the official instructions and

21   verdict form to our court security officer, who will bring them

22   back with the jury.

23           *THE COURTROOM DEPUTY:*  All rise.

24       (Jury out at 3:45 p.m.)

25           *THE COURT:*  All right.  Let's take our seats.  Do we

 1    have any matters to take up at this time counsel?

 2              *MS. HUBBARD:*  I have a motion I can make at anytime.

 3              *THE COURT:*  Go ahead.

 4              *MS. HUBBARD:*  I'm going to do the awkward stand --

 5              *THE COURT:*  You can probably spin it around if you

 6    want.

 7              *MS. HUBBARD:*  You trust me?

 8              *THE COURT:*  I don't know which is more awkward.

 9              *MS. HUBBARD:*  I always get so nervous with all of the

10    cords.

11              Your Honor, we would renew and supplement, our Motion

12    For A Mistrial that was raised earlier in the case.  As

13    mentioned previously, pretty much every lay witness, fact

14    witness, that was brought here to testify by the government,

15    their testimony involved some aspect of what we would consider

16    inadmissible evidence.  Supplementing the record I made

17    earlier, I want to reference 404(b).  So, the government

18    ordered February 9th, 2021 to disclose any 404(b) evidence, 21

19    days before trial.  We raised, in our motion in limine, though,

20    we thought some of what the government was putting in their

21    trial brief smelled like 404(b).  The government assured it

22    wasn't, that it was all intrinsic to the case, and I believe

23    the evidence, as it has played out at trial, shows that much of

24    what they asked these fact witnesses, lay witnesses about, was

25    not in any way intrinsic to the fraud here.  For example,

1653

1    Hannah Scaife testifying about her friendship with Kimberley

2    Tew from 2012 to 2014, is in no way intrinsic to the facts of

3    this case.  Hannah Scaife testifying about the trip she made to

4    Colorado, in 2016, where she watched Mrs. Tew verbally demeanor

5    her husband.  Again, no way intrinsic to the facts of this

6    case.

7            Abby Schwartz testifying about getting a nasty phone

8    call, before the time period of this conspiracy, in no way

9    intrinsic to the facts of this case.

10           Chris Alf, testifying about his, what he thought was

11    just an incredibly difficult situation for Michael Tew to be

12    living in.  That one may be a little bit closer to the line,

13    but certainly not necessary and intrinsic to the case.

14           Each of those, plus probably others, that I can't

15    think of right now, are precisely 404(b), and how do we know

16    that, because look at the slides the government put up during

17    their closing argument.  One of the slides was Kimberley Tew

18    threatened people, right.  The tool that she had against

19    Jonathan Yioulos was threats.  And how do we know that she used

20    those threats?  Because that's exactly what she had done in the

21    past.  That's what the slide said.  I'm paraphrasing, but

22    essentially, the point was we know Kimberley Tew threatened

23    Jonathan Yioulos, because that's what she did to Hannah Scaife,

24    that's what she did to Abby Schwartz, that is -- that's what

25    she did to all of the these people in the past, that's what she

1654

1    did to Michael Meyers.  She threatened people.  She abused them

2    all during time periods that are outside of this conspiracy.

3    That is exactly what 404(b) prohibits.  It is bringing in prior

4    events that reflect negatively on my client, and arguing that

5    because she did those things in the past, she must have done

6    what she is charged with here.  That was 404(b) evidence.  It

7    was not properly disclosed.  By the government failing to

8    disclose that evidence, they deprived the Court of the ability

9    to make findings that are required, prior to trial, as to

10   whether there's an appropriate use for this evidence or not.

11           It also deprived the Court of the ability to give an

12   appropriate limiting instruction, because if it had been

13   admissible, under some other rule, including 404(b), then the

14   Court would have been required to give an instruction to the

15   jury that they can only consider Ms. Tew's friendship with

16   Hannah Scaife in 2012 for one particular purpose, that was

17   identified by the government, that the government had met their

18   burden, and had been determined and found by the Court.  None

19   of that occurred in this case, because rather than following

20   the procedures that are outlined and required by the rules, the

21   government just slammed it in.  They just called these fact

22   witnesses to the stand, they asked them questions about things

23   that had nothing to do with this conspiracy.  And it was

24   unfairly prejudicial to my client.

25           In addition to that, then they ask the same fact

 1   witnessess, essentially, for victim impact statements from the

 2   Court.  I won't belabor that, because I already made the

 3   record.  The case law is clear, the only case law that I could

 4   find, Your Honor, that relates to the ability of witnesses to

 5   sit on a stand and talk about how they are impacted by these

 6   offenses comes in the context of death penalty cases.  In the

 7   second phase, when you are talking about whether someone should

 8   be executed or their life should be spared.  In those

 9   situations, the Courts allow some evidence from a victim or a

10   family member, about how their life has been impacted by the

11   offense, by the crime.  That makes perfect sense to me.

12         In this situation, it was improper, for the government

13   to ask questions of a witness who flew here from Buffalo, and

14   is a nice accountant woman, about how Jonathan Yioulos broke

15   her heart and made her cry on the stand.  That was totally

16   prejudicial.  It was improper for the government to bring in

17   these witnesses, time after time.  Have Chris Alf testify about

18   the cancer his wife was going through.  Hannah Scaife

19   testified, at length, about her recovery process.  All of that

20   has nothing to do with the charges in this case.  It is of no

21   relevance or of the most minimal relevance, and it is hugely

22   prejudicial against my client, and on those bases, I would move

23   for a mistrial.

24         THE COURT:  All right.  Thank you, Ms. Hubbard.  I

25   will allow the government to respond, if they would like.

1          MR. FIELDS:  Thank you, Your Honor.  So, I think that

2    conflates a couple of different things.  Let's first talk about

3    this sort of 404(b) argument.  So first, when it comes to what

4    is or is not intrinsic, when it comes to loose discussions

5    about the past, we're dealing with a two-year conspiracy,

6    right, and so, when the government was referring to what

7    happened in the past, there were certainly threats involving

8    Michael Meyers, threats involving Hannah Scaife, those occurred

9    within the period of the conspiracy.  And the Court will

10    probably recall that in particular, with Hannah Scaife, where

11    the threat came up, was right around the end of 2020/2021 when

12    the government was preparing charges, Hannah Scaife testifies

13    that she gets a message, a threat from Kimberley Tew, saying

14    Kimberley is going to reveal her sexual history on her blog,

15    that's certainly relevant, goes to consciousness of guilt.

16    It's actually very much a part of these charges.  It's

17    intrinsic, it's not 404(b).

18          With Meyers, same thing.  We're dealing with conduct

19    that was within the conspiracy.  His testimony all took place

20    within this time period, and was related to how the Tews were

21    able to manipulate people to get them to work in the scheme.

22    How they were able to deceive them and get them to further

23    their criminal ends.  So that is intrinsic.  It's consistent

24    with the Court's finding earlier on that those were intrinsic.

25          The separate issue of what Ms. Hubbard calls victim

1    impact statements, first of all, she says the case law is

2    clear, but I think she just admitted that she couldn't really

3    find any cases, and I think the reason for that is because this

4    kind of testimony is really common.

5         These are people who definitely had an axe to grind,

6    Your Honor.  Abby Schwartz could be furious with the Tews.  She

7    knew that's where the money went.  Chris Alf, same thing.

8    Hannah Scaife, same thing.  Meyers, same thing.  And there is

9    very clear case law from the Supreme Court, all the way on

10   down, through the ages of the common law, that evidence of bias

11   is always relevant, that was the import of that testimony, that

12   was the Court's finding already, and none of that was in any

13   way improper.

14        The idea that, you know, this wasn't noticed.  Again,

15   if it's intrinsic, the Tenth Circuit law on that is also clear.

16   It's not 404(b), and that was the finding before the case.

17        With regard to ... well, actually that's it.  So, for

18   all of those reasons, Your Honor, the government would urge the

19   Court to deny the Motion For Mistrial.

20        *THE COURT:*  All right.  Thank you, Mr. Fields.  Does

21   Mr. Tew have anything to say about this?

22        *MS. FROST:*  Just really quickly, Your Honor.  I know

23   we're all ready for a break, at this point.  Pursuant to the

24   close of trial, the government's case, the defense resting, I

25   just renew, for the record, our Rule 29 motion, the Motion For

1    Severance, and I take no position on Mrs. Tew's Motion For

2    Mistrial and any other objection lodged against 404(b)

3    evidence, just to preserve the record.

4         *THE COURT:*  Okay.

5         *MR. KAPLAN:*  Your Honor, just to make it quick, I

6    would join the Rule 29 at the end of the case also and the

7    severance.

8         *THE COURT:*  Understood.  Okay.  I'm going to deny all

9    of those motions, even though I think they are properly

10   preserved.  I think as to the Motion For Severance, obviously,

11   I have given a written ruling.  I think the rest of the trial,

12   sort of, highlighted what you were talking about, but doesn't

13   change the analysis for me in anyway, other than to, sort of,

14   show there would be a real risk of allowing defendants to, sort

15   of, manipulate the process into a severance, by pointing the

16   finger at each other, which is always a risk in cases like

17   this, as we recognize.  So, I don't think I have too much to

18   add to that.

19        As to the, again, the Rule 29, I have already

20   explained my position on that.  I don't think I need anymore

21   explanation.  As to the mistrial motion, again, I think that as

22   to the victims testifying about how this impacted them, or how

23   this made them feel, I do think it's relevant.  I do think, as

24   I said before, the government was entitled to try to blunt any

25   potential attacks, I think it was pretty clear, at least with

1    Ms. Scaife, that that was going to be something that was done,

2    and I think that to the extent -- I don't think they were long

3    questions or a large part of the questioning, and I think that

4    for that reason I don't agree with the motion still on that.

5         As to the 404(b), my recollection is that while there

6    may have been a couple of things that were non-intrinsic

7    perhaps the most obvious one being the ski, the question about

8    the drive on the ski trip, sort of, not really sure how that's

9    connected, exactly, with this fraud, but I guess even that one,

10   perhaps, could be said to tie in that -- to the theory that the

11   Tews, or Mrs. Tew, in that case, was looking for friends who

12   were vulnerable and that she took advantage of, which is the

13   government's theory of the case as to her, obviously, and that

14   makes it I guess intrinsic.  The ski-trip stuff may have gone a

15   bit beyond that, but I don't think it warrants a mistrial, so

16   I'm going to deny those motions.

17        Is there anything else to take up right now?

18   Mr. Schall.

19        *MR. SCHALL:*  I feel bad, I'm the only one that hasn't

20   spoke, Your Honor, so just hoping for some direction about what

21   you want from us for the next hour?

22        *THE COURT:*  So, I would be surprised if we got a

23   verdict in the next hour, but if we do, you should be within

24   ten minutes or so of the courthouse, and make sure Mr. Keech

25   knows how to get ahold of you, and then, I don't know if you

1660

1    think we need to come back if they -- if we check in and they

2    tell us they are not ready, my plan would be just tell them

3    they can go and come back whenever they want.  We don't need to

4    do anything in the courtroom, unless you think we need to.

5          So if you -- if you are comfortable with that, stick

6    around and make sure Mr. Keech knows how to get ahold of you,

7    and I will check -- I won't, but someone will check on them a

8    little before 5, and if they tell us we are going to go home,

9    we will just let you know that we're going to all go home, and

10   then I will get a time from them about when they will plan to

11   be back and you should -- you don't have to come in, but be

12   relatively close, so that if we do get a verdict we can not

13   take anymore of their time than necessary.  Is that enough

14   instruction?  All right.  Okay.  Thank you all.  We will be in

15   recess.

16         *THE COURTROOM DEPUTY:*  All rise.  Court is in recess.

17         (Recess at 4:00 p.m.)

18         (In open court at 4:53 p.m.)

19         *THE COURT:*  Please take your seats.  So counsel, as

20   you know, we received a note from the jury.  All it says, *We,*

21   *the jury, cannot reach any verdict today without the evidence.*

22   *We would like to adjourn and resume tomorrow morning at 9 AM*.

23   I think this is okay to explain, without the presence of the

24   defendants, and so I think I'm just going to have Mr. Keech

25   tell them that's perfectly fine, and we will do the same.

 1          Again, you don't need to be here, but be reachable and

 2   close enough.  So, we will -- we will let the jury know that

 3   that's fine, as far as we're concerned, and then we will be in

 4   recess.  Thank you, all.

 5        (Recess at 4:54 p.m.)

 6                              **INDEX**

 7   **Item**                                                          **Page**

 8   ITEM                                                              PAGE

 9            WITNESSES

10     SPECIAL AGENT LISA PALMER

11          Cross-examination By Ms. Hubbard                     1536

12          Redirect Examination By Mr. Fields                   1553

13   CLOSING ARGUMENTS

14     By Mr. Fields                                             1582

15     By Ms. Frost                                              1609

16     By Mr. Kaplan                                             1627

17     By Mr. Fields                                             1645

18

19   Exhibit                Received

20   43                        1568

21   684                       1552

22                       DEFENDANT'S EXHIBITS

23   Exhibit                Received

24   A                         1538

25   BB                        1542

1662

CC                          1548

**REPORTER'S CERTIFICATE**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.  Dated at Denver, Colorado, this 20th day of October, 2024.


                                    *S/Tamara Hoffschildt*
                                    Tamara Hoffschildt