```
                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLORADO

Criminal Action No. 20-cr-305-DDD

UNITED STATES OF AMERICA,

     Plaintiff,

vs.

1. MICHAEL TEW,
2. KIMBERLEY TEW,

     Defendants.
```
___

**REPORTER'S TRANSCRIPT**
JURY TRIAL, DAY 9
___

Proceedings before the HONORABLE DANIEL D. DOMENICO, Judge, United States District Court for the District of Colorado, occurring at 12 p.m., on the 15th day of February, 2024, in Courtroom A1002, United States Courthouse, Denver, Colorado.

**APPEARANCES**

Bryan Fields and Sarah Weiss, Assistant U.S. Attorneys, 1225 17th Street, Suite 700, Denver, Colorado, 80202, appearing for the Government.

Jason Dale Schall, Bowlin & Schall Law LLC, 7350 East Progress Place, Suite 100, Greenwood Village, CO 80111 and Kristen M. Frost, Ridley McGreevy & Winocur PC, 303 16th Street, Suite 200, Denver, CO 80202, appearing for the Defendant, Michael Tew.

1     David Scott Kaplan and Jamie Hughes Hubbard, Stimson
2  LaBranche Hubbard, LLC, 1652 North Downing Street, Denver, CO
3  80218, appearing for Defendant, Kimberley Tew.
4
5     TAMMY HOFFSCHILDT, FCRR, CRR, RMR, Official Reporter
      901 19th Street, Denver, Colorado 80294
6     Proceedings Reported by Mechanical Stenography
      Transcription Produced via Computer
7
8                    **P R O C E E D I N G S**
9     (In open court at 11:54 a.m.)
10       *THE COURT:*  Please take your seats.  So, welcome back.
11 As you know, we've now received two notes this morning from the
12 jury, both of them somewhat similar.
13       The first was at 11:15, said, *The jury cannot find*
14 *bank statements for NFCU, account '5336.  Can you please advise*
15 *on exhibit number or binder number*?
16       At 11:47.  The note says, *We are missing the November*
17 *2019 bank statement from Wells Fargo account, ending '6934.*
18 *Was it admitted?  Which exhibit number*?
19       So, my inclination is to essentially tell them that
20 they've received all of the evidence and been instructed and
21 that's all we're going to do.  Especially now that we've gotten
22 two of these.  If we try to start pointing them to things,
23 we're going to just be sitting here going through the whole
24 thing with them, which I'm not, obviously, not going to do, but
25 I will let you state your positions about what we should given

1  this.  Mr. Fields?

2  *MR. FIELDS:*  Your Honor, we agree with that.  We don't
3  think the Court should direct the jury to any particular item
4  of evidence, but the government's proposal would be to give the
5  jury a redacted copy of the exhibit list, and by *redacted*, I
6  mean we would exclude all of the exhibits that were not
7  admitted.  The descriptions on the exhibit list were designed
8  to be non-argumentative and relatively content neutral.

9  I do understand, from Ms. Hubbard, they have objection
10  to some of the descriptions with regard to text messages.  For
11  instance, the defense argued that the text messages that the
12  government says are between Jonathan Yioulos and Kimberley Tew,
13  weren't really with Kimberley Tew, and I think what the
14  government would propose, with that regard, is that we could
15  just say, *Text message on a date*.  These are very quick
16  redactions, the government could make, and I think it's within
17  the Court's discretion to give them the list of admitted
18  exhibits, to help them with their deliberations, and doing so
19  would direct them to a particular item of evidence and wouldn't
20  otherwise be argumentative.

21  *THE COURT:*  Okay.  I will get a response from the
22  defendants.  Mr. Schall.

23  *MR. SCHALL:*  Your Honor, we don't think the exhibit
24  list, in any form, should go back.  They have got their stuff,
25  they have got their job, let them do it.  Sure, it might

1 expedite things, but it's just introducing another element
2 to -- of a situation that's not within our province to do. So,
3 we would object to sending back any exhibit list.
4     *THE COURT:* All right. For Mrs. Tew.
5     *MR. KAPLAN:* Your Honor, we concur with what
6 Mr. Schall said. I think that document that is created for one
7 purpose is complicating, and what it suggests, if it goes back
8 with exhibits not there or not admitted, my speculation as to
9 that, it just is a component of information providing them that
10 you don't -- we can't even begin to understand what inferences
11 they could make from that.
12     *THE COURT:* All right. Well, I'm not sure I agree
13 it's quite that problematic, but at this point, my inclination,
14 and what I think I'm going to do, Mr. Jacobsmeyer wrote up a
15 proposed response that he can hand out, if he hasn't already.
16 But what I will do, is allow the government to, if they are
17 quick redactions, as you suggested, to have draw one up, that
18 you would propose and share it with counsel and with the Court,
19 electronically, and then I will consider it, if I decide it's
20 appropriate later. But for now, I -- read that and see what
21 you think of that for now. It could, I guess, be simplified,
22 if we need to. Mr. Kaplan.
23     *MR. KAPLAN:* Reviewing the response that the Court
24 proposed, we have no objections.
25     *THE COURT:* Thank you.

```
 1              MS. FROST:  We have no objection, Your Honor.
 2              MS. WEISS:  No objection from the government.
 3              THE COURT:  All right.  So, we will do that for now.
 4   If the government wants to propose a redacted one, we will
 5   consider it, especially if we start to get a sense that they
 6   are continuing to be confused, but for now, we will -- I will
 7   just give them that written response, not to make them march in
 8   and out, if that's all right, and then I will consider anything
 9   that the government submits, and I won't just give it to them
10   without having a chance to discuss it again, obviously.
11              MS. FROST:  That's what I was going to ask,
12   Your Honor.  The ability to lodge objections.
13              THE COURT:  Yeah.  I won't do anything without talking
14   to you.
15              MS. WEISS:  I will handle the redactions and circulate
16   it to everyone, including the Court and all parties.
17              MR. SCHALL:  Can I ask a question?  Are we talking
18   redactions like black boxes or new language?
19              MS. WEISS:  I was going to cut out those cells of the
20   table so it's just -- it doesn't even suggest -- which
21   numbers -- there were numbers that were intentionally omitted,
22   and so if we eliminate both those numbers and anything that
23   wasn't admitted, I think it even further, sort of, obscures
24   why, you know, certain numbers are missing --
25              MR. SCHALL:  Your Honor, as someone who has spent
```

1 hours of my life that I will never get back reading redacted
2 documents to figure out what was said beneath the redactions, I
3 think that's a horrible idea.
4     *THE COURT:*  Yeah.  This is just a list of exhibits.
5     *MR. SCHALL:*  But it says, *Text messages between JY*.
6 It's work product.  It's what it is.  It's not an exhibit.
7 It's not evidence.
8     *THE COURT:*  Right, it's just a list.
9     *MS. WEISS:*  And I am not suggesting black boxes, to be
10 clear.  I will edit the subject lines, as Mr. Fields proposed.
11     *THE COURT:*  Yeah.  Let's see what it looks like, and
12 we can then decide whether you are right.  So, that's what we
13 will do for now.  I will give the jury the proposed -- the
14 proposed response that was handed out, and then the government
15 will circulate their proposed list, and if I'm tempted to do
16 it, I will call you back.  If I'm not, I won't bother you.
17 Okay.  All right.  Thank you.
18     *THE COURTROOM DEPUTY:*  All rise.  Court is in recess.
19   (Recess at 12:01 p.m.)
20   (In open court at 5:03 p.m.)
21     *THE COURT:*  Good afternoon.  Please take your seats.
22 Counsel, I have been informed, by a note, from the jury
23 foreperson, stating that they have reached a verdict on all
24 charges.
25     So my plan will be, unless anyone has an objection, my

1    plan will be to bring the jury back in, I will then review the
2    verdict form, to ensure that it's properly filled out.  I think
3    what I may do, given the length of verdict form, if it's, sort
4    of, all or nothing, I may just say that, rather than going
5    one-by-one, it's dramatic enough and tense enough as it is, if
6    it's more complicated than that, I may go one-by-one, then I
7    will let the parties review the form, if they want, just to
8    make sure I didn't misread it, and then I will ask Mr. Keech to
9    poll the jurors.  Does anyone have any objection to that plan?
10         *MR. FIELDS:*  No objection, Your Honor.
11         *MS. FROST:*  No objection, Your Honor, and just so you
12   aware, Mr. Schall couldn't be here.
13         *MR. KAPLAN:*  No objection.
14         *THE COURT:*  All right.  So, Mr. Keech, why don't you
15   bring the jury in, please.
16         *THE COURTROOM DEPUTY:*  All rise.
17      (Jury in at 5:06 p.m.)
18         *THE COURT:*  Welcome back.  Please take your seats.  So
19   I have been informed, by a note from the jury's foreperson,
20   that the jury has reached a verdict.  Would the foreperson
21   please stand and identify yourselves?
22         *THE JUROR:*  Caitlin Dugas.
23         *THE COURT:*  Thank you, ma'am.  Has the jury reached a
24   unanimous verdict concerning all claims and counts in this
25   case?

```
 1              THE JUROR:  We have.
 2              THE COURT:  Have you signed the verdict form?
 3              THE JUROR:  I have.
 4              THE COURT:  All right.  Would you please hand it to
 5    our court security officer, who will hand it to me.
 6              So I will now review the form and make sure that all
 7    have been filled in.
 8              THE COURT:  Madam foreperson, my review of the verdict
 9    form is that the jury has found the defendants guilty on each
10    count, except Count 48, as to Kimberley Tew, in which it has
11    marked not guilty.  Is this the jury's verdict?
12              THE JUROR:  Correct.
13              THE COURT:  All right.  I am now going to -- I will
14    ask Mr. Keech to share the verdict form with the parties, so
15    they may review it, and then Mr. Keech will poll the jury,
16    which means, ask each of you if that is your verdict.
17              Thank you, counsel.  So, as I stated, the verdict
18    form, the jury has found the defendants guilty on each count,
19    except Count 48, as to Kimberley Tew.
20              I will now ask Mr. Keech to poll the jurors.
21              THE COURTROOM DEPUTY:  Dennis Higbee, were and are
22    these your verdicts?
23              THE JUROR:  Yes.
24              THE COURTROOM DEPUTY:  Walter Cox, were and are these
25    your verdicts?
```

```
 1              THE JUROR:  Yes.
 2              THE COURTROOM DEPUTY:  Luann Pulling, were and are
 3   these your verdicts?
 4              THE JUROR:  Yes.
 5              THE COURTROOM DEPUTY:  Rachel Hautzinger, were and are
 6   these your verdicts?
 7              THE JUROR:  Yes.
 8              THE COURTROOM DEPUTY:  Emily Ho, were and are these
 9   your verdicts?
10              THE JUROR:  Yes.
11              THE COURTROOM DEPUTY:  David Bacon, were and are these
12   your verdicts?
13              THE JUROR:  Yes.
14              THE COURTROOM DEPUTY:  Emily VanFleet-Sneed, were and
15   are these your verdicts?
16              THE JUROR:  Yes.
17              THE COURTROOM DEPUTY:  Lin Litke, were and are these
18   your verdicts?
19              THE JUROR:  Yes.
20              THE COURTROOM DEPUTY:  Samantha Gambino, were and are
21   these your verdicts?
22              THE JUROR:  Yes.
23              THE COURTROOM DEPUTY:  Deborah Menendez, were and are
24   these your verdicts?
25              THE JUROR:  Yes.
```

1   *THE COURTROOM DEPUTY:*  Reginald Sanders, were and are
2   these your verdicts?
3       *THE JUROR:*  Yes.
4       *THE COURTROOM DEPUTY:*  Caitlin Dugas, were and are
5   these your verdicts?
6       *THE JUROR:*  Yes.
7       *THE COURTROOM DEPUTY:*  The jury has been polled,
8   Your Honor.
9       *THE COURT:*  Thank you very much.  Ladies and gentlemen
10  of the jury, you have now completed your duties, in this case.
11  In a moment I will discharge you with the thanks of the Court.
12  Given all of my previous discussions about discussing the case
13  or anything like that, you may have questions about whether you
14  may do so, now.  The answer is yes.  You may now discuss this
15  case or your service with anyone, but it's up to you, if you
16  choose to do so.  No one can force you to talk about it, and if
17  you -- if anyone persists in asking you about this case, you
18  should reach out to me or Mr. Keech, if you no longer wish to
19  discuss it with anyone.
20      In addition, our local rules of criminal procedure
21  prohibit parties or their attorneys from contacting jurors,
22  unless they have obtained an order from me, allowing them to do
23  so.
24      I'm going to ask you to briefly wait for me, after
25  you're discharged, so I can talk to you, shortly, about that,

1  and just thank you in person.

2  So you are now discharged from your duties in this
3  case. I, and the parties, thank you for your service.
4  Mr. Keech -- or actually, if our court security officer will
5  take you back to the deliberation room, you can gather your
6  stuff. I will come in a few minutes and just thank you, in
7  person, and try to answer any questions you might have, but
8  thank you, again.

9  (Jury out at 5:14 p.m.)

10  *THE COURTROOM DEPUTY:* All rise.

11  (Jury out at 5:14 p.m.)

12  *THE COURT:* Okay. Let's briefly take our seats. So
13  the probation office is ordered to conduct a presentence
14  investigation and to file a presentence report.

15  We have the motion regarding presentencing release.
16  As I indicated before, I understand the government's position
17  is that that should not be granted. My view though, is that
18  the defendants have not displayed any reason to think that they
19  are a danger to the community or that they are a flight risk.

20  I understand that the calculus changes a bit, after
21  conviction, but I am inclined to allow them to remain on bond,
22  but to add in the location-monitoring condition; meaning, GPS
23  monitoring. I think it's standalone monitoring, which will
24  ensure that the probation office is able to keep track of them,
25  and to limit travel outside of Colorado, which I can't remember

1 is -- may already be one of the conditions.

2 So, that's my position on that. Do the parties wish to
3 address that any further. Mr. Fields?

4 *MR. FIELDS:* I do, Your Honor. I know it's late, but
5 with the Court's indulgence, I would like to make argument?

6 *THE COURT:* Okay. Go ahead.

7 *MR. FIELDS:* Your Honor, so I guess I will just get
8 right to it. Right now, as the Court knows, under 3143, the
9 law presumes that there will be detention. It's the
10 defendants' burden, and they have to show it by clear and
11 convincing evidence.

12 In that regard, the Court cannot, as a matter of law,
13 conclude that mere compliance with their conditions up to this
14 point are sufficient to overcome that burden. That's *United*
15 *States vs Hanhardt*, 173, it's a District Court case, but I
16 think it captures the consensus of the Courts. That Court
17 right there wrote that, *It is not unusual for persons seeking*
18 *presentence release to point to their compliance with pretrial*
19 *release orders as evidence that they will appear for*
20 *sentencing. This argument is routinely rejected because prior*
21 *to trial there's the possibility of no imprisonment, which*
22 *evaporates upon a finding of guilt*, and that's also consistent
23 with the Senate Committee Report that actually accompanied the
24 Bail Reform Act of 1984. There was not to be a presumption in
25 favor of release; in fact, the opposite.

1    The Bail Reform Act was, in many ways, a response to,
2    among other things, Hinkley's attempted assassination of
3    Reagan. There were real concerns about how the law was being
4    applied at the time, and the Senate responded with this.
5    In addition, the government would note that even if
6    the Court doesn't want to rely on that presumption, there are a
7    host of reasons in favor of detention in this case.
8    First, Kimberley Tew has tried to tamper with
9    witnesses several times during this investigation. First and,
10   sort of maybe most dramatically, she tampered with her
11   husband's attempt to cooperate. Her husband was in the process
12   of cooperating with federal officials. As the Court has heard
13   about the, so called, Yeti incident, Kimberley Tew tracked him
14   down, found him there --
15   *THE COURT:* Let me interrupt you. What does that have
16   to do with release?
17   *MR. FIELDS:* I think it goes to that attempt to tamper
18   with that witness, the attempt to tamper with Hannah Scaife,
19   goes to their efforts to, sort of, undermine the possibility
20   that this day would come and their, sort of, hope that
21   eventually that it would not come, and I think that there is
22   every reason to believe that they thought they were going to be
23   able to manipulate others, and the Court, to escape justice and
24   not end up detained.
25   Moving on from there, Your Honor, I would just note

1  that the underlying conduct that drove this fraud, Kimberley's
2  gambling, all of the, greed continues.  In October of 2023, a
3  Denver District Court imposed a civil fraud judgment against
4  Kimberley Tew related to her Bitcoin investment scam.  The
5  Court heard about this a little bit during the course of the
6  trial, but that continues.  There's good reason to think that
7  it continues.
8      The government has obtained bank records for Michael
9  Tew's accounts, for the past year.  Somehow, I don't know what
10 he put into his CJA affidavit, but he is -- those bank accounts
11 show that he is receiving tens of thousands of dollars every
12 month.  Every month, tens of thousands of dollars disappears
13 from the account into Bitcoin exchanges.
14     The Tews are continuing with that cryptocurrency
15 speculation.  They now have a lot of incentive to flee.  The
16 sentencing guidelines in this case are over ten years.  The
17 evidence at trial showed that they deposited approximately $2.4
18 million from this fraud scheme into cryptocurrency, which is
19 difficult to trace.  The government has done what it can, but a
20 lot of that money could still be out there.  They certainly
21 have the means to flee.
22     In addition to that, you have the bank records that I
23 just proffered to the Court, showing all of that.  If the Tews
24 did lie in their CJA affidavit, I think that goes to, sort of,
25 the disrespect for the law, and the likelihood that they are

1  not going to follow any conditions of release.  They have --
2  Michael Tew has been able to work remotely and continue
3  employment despite the pendency of this case.  There's every
4  reason to think that he could do that.
5        Kimberley Tew is a gambler.  She just made the
6  ultimate gamble with this trial and lost.  She is impulsive,
7  and there's every reason to think they could make the rash
8  decision to try to flee, and if they did that, they would have
9  plenty of resources to sustain themselves wherever they might
10 go.  They have the means, as we've seen, to create false email
11 accounts, use other people's identities, all of the things that
12 they would need to do to successfully do that.
13       So that goes to risk of flight, but as to danger to
14 the community, if they are really continuing with this
15 cryptocurrency scheme, the Courts have said that that is
16 sufficient.
17       So, in that regard, I would point the Court to *United*
18 *States vs Provenzano*, Third Circuit case, 605, F.2d, 85.  What
19 the Court said there, is that, sort of, propensity to commit
20 further crime, including economic crime, is a harm that is
21 cognizable under the Bail Reform Act, and that is sufficient
22 reason to detain someone.
23       Taking all of that aside, Your Honor, if you also look
24 at, sort of, the other factors that the Court has to consider,
25 right; person's character, their mental condition, history of

1  drug use, the Court -- it was a brief mention during the trial
2  court record, but the Court probably heard reference to Michael
3  Tew's use of cocaine.  There's also evidence in the record of
4  Kimberley Tew's use of illicit drugs.  That's among the things
5  that she was -- the friendship with Hannah Scaife involved.
6  All of that adds to the, sort of, increased likelihood that
7  they might flee.  Drugs can make people even more impulsive and
8  these are bound to be very stressful times coming up.
9           So all of those, I think, even if the presumption
10 didn't apply, and it does here, they have the burden of showing
11 by clear and convincing evidence, even if the presumption
12 didn't apply, there would still be plenty of grounds to detain
13 them.
14          Lastly, Your Honor, if Your Honor is inclined to still
15 let them go, the government would ask for much more stringent
16 conditions; home detention with a monitor would be appropriate.
17 Also ask for a condition that Kimberley Tew not gamble, in any
18 form.  She not enter any casinos.  We would ask for a condition
19 that pretrial services approve any financial transaction, other
20 than rent, of more than 1,000 dollars to make sure they are not
21 imposing significant financial harms on others.  And on that,
22 Your Honor, what I would say, you know, that's the government's
23 fallback position, but we still don't think that's going to be
24 enough to really ensure that these defendants are going to show
25 up, and that there's not going to be ongoing financial harm, as

1  they sort of continue these cryptocurrency schemes, and their
2  manipulations of others.
3      So, for all of those reasons, we do not think the
4  presumption is overcome.  The law requires they be detained.
5  There's no longer a presumption of liberty.  They are guilty
6  and they are facing -- even if the Court varied downward,
7  substantially, like, let's say 50 or 60 percent, they would
8  still be facing years in prison, and people have fled and done,
9  sort of, foolish things for less, and I think all of the
10 evidence at trial showed that these are defendants have done
11 foolish and impetuous things in even less stressful
12 circumstances.
13     *THE COURT:*  Okay.  Thank you, Mr. Fields.  I'm going
14 to go talk to the jury.  I appreciate it.  I'm not changing my
15 mind, right now.  I will consider a motion to modify
16 conditions.  I think the only thing that's changed is the
17 convictions, which is not insignificant.  It's mostly
18 significant to me for the last reason you mentioned, that
19 there's no longer a presumption of liberty that should apply.
20 I don't think it makes it -- in this case, the evidence was
21 fairly strong, from the beginning, and I don't think that the
22 conviction makes it all that much more likely that they are
23 going to flee.  I haven't seen any real evidence, other than
24 that drug use had much to do with any of this or would have
25 anything to do with this.

1       So, in my view, I do feel it's clear and convincing
2  evidence based partly on their conduct in the pretrial release,
3  partly on their showing up for trial, despite the significant
4  costs -- or the significant risk.  I know they have children,
5  and significant ties that make it difficult and unlikely to
6  flee, and I have heard a lot of these arguments repeatedly
7  before, when we were going through similar things, when we were
8  taking off ankle monitors and those sorts of things, and none
9  of those things have come to pass.
10      I am -- I will consider, certainly, some of the
11 additional conditions that the government suggested may make
12 sense.  I certainly understand those.  But for now, I'm going
13 to allow the defendants to remain free on bond.  Although, I
14 understand the government's position.
15      Are this any other matters we need to take up now,
16 that can't be done in writing.  Mr. Kaplan?
17      *MR. KAPLAN:*  I don't believe so, Your Honor.
18      *MS. FROST:*  Nothing on behalf of Mr. Tew, Your Honor.
19      *THE COURT:*  All right.  Well, thank you, all.  I
20 appreciate everyone's hard work in this case, and I will take a
21 recess.  Thank you.
22      *THE COURTROOM DEPUTY:*  All rise.  Court is in recess.
23   (Recess at 5:26 p.m.)
24
25

1    **REPORTER'S CERTIFICATE**

2    I certify that the foregoing is a correct transcript from
3    the record of proceedings in the above-entitled matter.  Dated
4    at Denver, Colorado, this 20th day of October , 2024.

5

6                                        *S/Tamara Hoffschildt*
                                         Tamara Hoffschildt
7