1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 20-cr-305-DDD

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

1. MICHAEL AARON TEW
2. KIMBERLY ANN TEW,

    Defendants.
_____

**REPORTER'S TRANSCRIPT**
James Hearing
_____

    Proceedings before the HONORABLE DANIEL D. DOMENICO, Judge, United States District Court for the District of Colorado, occurring at 9:30 a.m., on the 19th day of December, 2023, in Courtroom A1002, United States Courthouse, Denver, Colorado.

**APPEARANCES**

    Bryan Fields and Sarah Weiss, Assistant U.S. Attorneys, 1225 17th Street, Suite 700, Denver, Colorado, 80202, appearing for the Government.

    Jason Dale Schall, Bowlin & Schall Law LLC, 7350 East Progress Place, Suite 100, Greenwood Village, CO 80111, appearing for the Defendant, Michael Aaron Tew.

1    David Scott Kaplan, Stimson LaBranche Hubbard, LLC,

2    1652 North Downing Street, Denver, CO 80203, appearing for the

3    Defendant, Kimberly Ann Tew.

4    Proceeding Recorded by Mechanical Stenography, Transcription
     Produced via Computer by Tammy Hoffschildt, 901 19th Street,
5        Room A251, Denver, Colorado, 80294, (303) 947-1905

6                              **PROCEEDINGS**

7    (In open court at 9:37 a.m.)

8        THE COURT:  Good morning.  Please take your seats.

9    We're here for a *James* hearing in case number 20-cr-305, United

10   States versus Michael Aaron Tew and Kimberley Ann Tew.

11       Why don't I begin by having counsel introduce

12   themselves for the record.

13       MR. FIELDS:  Good morning, Your Honor.  Bryan Fields,

14   for the United States, joined by my co-counsel, Sarah Weiss,

15   who will be entering her appearance this afternoon.  We are

16   joined by IRS Special Agent Lisa Palmer.

17       THE COURT:  All right.  Welcome.  Thank you.  For the

18   defendants.

19       MR. SCHALL:  Jason Schall, on behalf of Michael Tew,

20   who is present with me here at counsel table.

21       THE COURT:  Welcome.

22       MR. KAPLAN:  Good morning, Your Honor.  David Kaplan,

23   appearing on behalf of Ms. Kimberly Tew, who is present.  Also

24   at counsel table is Brenda Rodriquez.  She is paralegal in my

25   office and I request permission that she, at least for this

1    hearing, be able to stay at the counsel table?

2         THE COURT:  Sure, that's fine.  Thank you.  All right.

3    Thank you all for being here.  So, as I said, the main reason

4    we're here for is what's called a *James* hearing.  I will admit

5    I have only done a few of these, so I will rely a bit on

6    counsel to make sure we stay on track and don't waste our time,

7    but cover everything we need to.

8         I know there are also a couple of other motions that

9    we may want to discuss, but my thought was we would start by,

10   maybe, I would give a little bit of my thoughts on the *James*

11   issues, as I understand it, so far, then let the government,

12   since it's their burden, sort of, present their -- whatever

13   argument and evidence they want to on that, and then have a

14   discussion of it after that, but if there's a better way to do

15   it, I'm open to it.

16        My take is, it seems that the two conspiracies, which,

17   for purposes of this hearing, are not necessarily have to be

18   criminal conspiracies, but do seem to overlap with the alleged

19   conduct in this criminal conduct, in this case.  The evidence

20   that those conspiracies existed is pretty overwhelming, and I

21   don't think is totally contested, for purposes of this hearing.

22   There are then, to me, the more interesting or difficult

23   questions that we may need to focus on more than that, would be

24   which of the statements the government seeks to introduce were

25   in furtherance of the conspiracies, that the government is

1    saying existed here, which may not have been; and then issues

2    regarding timing of when certain people were or were not part

3    of those alleged conspiracies within the statements, I think

4    there are a few categories that we've identified as being,

5    potentially, governed by the same questions and possibly

6    answers, including statements made by Mrs. Tew before she may

7    have joined the conspiracy, statements, sort of, in general,

8    about gambling activities and other things, some of those may

9    be in furtherance of the alleged conspiracy, some it's not so

10   clear.  Statements made by -- or to Mr. Yioulos, after he had,

11   essentially, become a cooperator, and then statements where we

12   are not quite sure whether someone received the statements or

13   who may have received them.  Those are the categories -- the

14   main categories I have identified that the defendants seem to

15   contest in this case.  Obviously, there may be others, and

16   there may be subcategories, but I thought I would throw that

17   out as the things that seem to have stood out to me as

18   questions I would like to get answered today.

19        So, that's, sort of, where I stand.  Mr. Fields, this

20   is, sort of, your obligation here, so if you have a plan or a

21   suggestion, I would like to hear it now.

22        MR. FIELDS:  Thank you, Your Honor.  So, I think there

23   are two ways to proceed.  Government is prepared to go down

24   both routes.  The first is that, as I understand the briefing

25   papers, it sounds like the defendants are not really arguing

against the existence of a conspiracy; it's more, sort of,

nibbling around the edges, looking at particular statements.

So, given the extensive proffer, all the exhibits that we're

prepared to offer into the hearing today, one way to proceed

would just be to go through each of those individual objections

for statements, and I would proffer that evidence to the Court

with the relevant exhibits.  I think that would be relatively

short and quick.

The other option is we have the agent ready to go,

we're prepared to offer extensive testimony today, proving, by

a preponderance of the evidence, all of the things set forth in

the *James* proffer, and then the defendants, if they feel like

it's important, could Cross-examine the agents on those various

aspects.

THE COURT:  All right.  Why don't -- why don't I let

defense counsel weigh in on both the process and any thoughts

they have on that.

MR. SCHALL:  May I have one moment, Your Honor?

THE COURT:  What's that?

MR. SCHALL:  May I have one moment to speak with my

client?

THE COURT:  Of course.

(Discussion off the record.)

MR. SCHALL:  Thank you, Your Honor.  With respect to

what Mr. Fields said, at first, I do think the arguments here,

1    on behalf of Mr. Tew, have to do with statements, whether or

2    not they are in furtherance of a conspiracy, and in that

3    regard, we believe the testimony of the agent could be helpful,

4    and perhaps limited to the extent of the categories -- the

5    contested categories.  I don't know that we need a full ...

6    eight-hours worth of testimony, but that's where we are at.

7         THE COURT:  Okay.  That makes sense to me.

8    Mr. Kaplan?

9         MR. KAPLAN:  Your Honor, I would agree to that, and,

10   obviously, what has been commented on is evident in the paper,

11   depending on how the government wants to proceed.  I will leave

12   it to their own devices on that, but there are a limited number

13   of actual statements that were contested, and so, I know that

14   the government may want to give context.  Like I said, I will

15   leave it to them to present their case.

16        The only other thing -- so I'm in agreement with

17   Mr. Schall.  The only other thing I wanted to mention, the

18   government can address also is, is that they did file a motion

19   in limine that they wanted to use this for a dual purpose, and

20   I just wanted to raise, you know, that as a discussion, and how

21   the Court would like to proceed or the government wants to

22   proceed, based on the papers.  So, I think that should, at

23   least, broach that topic.

24        THE COURT:  I appreciate that.  Maybe we should go

25   ahead and figure out what we're going to do with that.  I mean

1     I think that was filed relatively recently, so you haven't had

2     a chance to respond in writing, but if you have a position on

3     what we should -- if we can at least use this to streamline

4     that process, it seems useful, even if we don't fully resolve

5     it today.  I don't know what your position is.

6          MR. KAPLAN:  Right.  I do appreciate the Court

7     recognizing that we just received it, so we didn't file

8     responses.  I had an opportunity to take a look at it, but not

9     in great detail.

10         One thing that comes to mind, for instance, is their

11    certifications.  I have not been able to compare every

12    certification that we received to show that, you know, for

13    instance, authenticates all that they are trying to submit.

14         I don't have any objection, though, and I am going to

15    let the government speak further on it, if we combine some of

16    that today, but I defer to the government on that.

17         THE COURT:  Okay.  Mr. Schall, did you want to say

18    anything about that?

19         MR. SCHALL:  Only that there's some benefit to having

20    efficiencies here, Your Honor.  I think we all recognize that,

21    and getting to the root of trial issues.  We have not

22    responded, in writing, as to the motion, of course, but if

23    there's middle ground that could be considered, we might be

24    good with that.

25         THE COURT:  All right.  So, Mr. Fields, given the,

SPECIAL AGENT LISA PALMER - Direct

1    sort of, timing, to the extent there's things you can bring out

2    that would be useful, you might as well do that now, but I

3    will, of course, let the defense respond to that, both today

4    and in writing, if that makes sense, but we will, sort of,

5    depend on you to help us with that.

6            *MR. FIELDS:* Absolutely, Your Honor.

7            *THE COURT:* Why don't you go ahead, given what we

8    heard, it sounds like we have at least the outlines of a plan.

9            *MR. FIELDS:* Thank you, Your Honor. The United States

10   would call Special Agent Lisa Palmer.

11           *THE COURTROOM DEPUTY:* Please raise your right hand.

12         (**SPECIAL AGENT LISA PALMER** was sworn.)

13           *THE WITNESS:* I do.

14           *THE COURTROOM DEPUTY:* Please be seated. Please state

15   your full name and spell your first and last names for the

16   record.

17           *THE WITNESS:* My name is Lisa Ann Palmer, L I S A,

18   P A L M E R.

19           *MR. FIELDS:* Your Honor, may I begin?

20           *THE COURT:* Yes.

21                        **DIRECT EXAMINATION**

22   *BY MR. FIELDS:*

23   *Q*   Ms. Palmer, where do you work?

24   *A*   I work for the Internal Revenue Service, in their Criminal

25   Investigation Division.

9

SPECIAL AGENT LISA PALMER – Direct

1  Q   Were you assigned to an investigation involving Michael Tew

2  and Kimberly Tew?

3  A   I was.

4  Q   What were your responsibilities?

5  A   My responsibilities were to investigate allegations of

6  fraud on the part of Mr. and Mrs. Tew.

7  Q   Was the FBI also involved in the investigation?

8  A   They were.

9  Q   What is National Air Cargo?

10  A   National Air Cargo is an airline and cargo freight

11  forwarding company, um.

12  Q   Does it have subsidiaries?

13  A   It does.

14  Q   How many?

15  A   My understanding is there's three companies; there's

16  National Air Cargo Holdings and then there's National Air Cargo

17  and National Airlines.

18  Q   When we are talking about National Air Cargo, we are going

19  to be talking about all three of those as one entity.  Do you

20  understand?

21  A   Yes.

22  Q   Where are its offices?

23  A   Their primary offices are in Florida and in Buffalo, New

24  York.

25  Q   Have agents interviewed its owners?

10

SPECIAL AGENT LISA PALMER - Direct

1    A    Yes.

2    Q    Who are they?

3    A    Chris and Lori Alf.

4    Q    Are they referred to as CA and LA in the *James* log?

5    A    Yes, they are.

6    Q    During your investigation, did you also talk to someone

7    named Abby Schwartz?

8    A    Yes.

9    Q    Is she referred to as AS in the *James* log?

10   A    She is.

11   Q    Who is she?

12   A    She was the director of accounting at National Air Cargo,

13   but she wore many hats and did many different back-office roles

14   during the investigation.

15   Q    During your investigation, did you become aware of someone

16   named Jonathan Yioulos?

17   A    I did.

18   Q    Who was he?

19   A    He was the controller of National Air Cargo and a member of

20   he -- became a target of our investigation.

21   Q    Did he also have a title of director of finance, at some

22   points?

23   A    He did.

24   Q    Did he work at National Airlines between August 2018 and

25   July 2020?

SPECIAL AGENT LISA PALMER – Direct

1    *A*    Yes.

2    *Q*    And while he was there, did he work closely with Michael

3    Tew?

4    *A*    He did.

5    *Q*    While employed at National Airlines, did Michael Tew have a

6    corporate credit card?

7    *A*    Yes, he did.

8    *Q*    Was it an American Express card?

9    *A*    It was.

10   *Q*    What happened with that card, around July 2018?

11   *A*    National Air Cargo got notifications that their corporate

12   Amex account was close to maxed out.  The business was unsure

13   why.  They looked into it.  Mr. Tew's Amex card had tens of

14   thousands of dollars of charges that did not appear to be

15   authorized by the business or related to the business.

16   *Q*    Who, at National Airlines, was tasked with investigating

17   that?

18   *A*    I'm not sure of everybody, but Jonathan Yioulos was

19   involved.

20   *Q*    And what did they find out?

21   *A*    They found out that the Tews had been using the National

22   Air Cargo Corporate Amex card to purchase gift cards.

23   *Q*    And as a result of that incident, how did that affect, sort

24   of, NAC's internal auditing functions during the period in,

25   sort of, the fall of 2018?

SPECIAL AGENT LISA PALMER – Direct

1  *A*   There was increased scrutiny on the expenditures on the

2  Amex cards.

3  *Q*   Was Michael Tew fired from National Airlines in September

4  of 2018?

5  *A*   He was.

6  *Q*   According to Lori Alf, what happened?

7  *A*   According to Ms. Alf -- Ms. Alf, and a gentleman by the

8  name of Craig Feigin, he reached out to Ms. Alf and said that

9  Ms. Tew owed him a debt, and that if National Air Cargo didn't

10  make good on the debt, Mr.-- Craig was going to release lewd

11  photos of their daughter; Ms. Alf's daughter.

12  *Q*   After that happened, what did -- internally what did

13  National Airlines do?

14  *A*   It basically began to investigate, look into that, because

15  Mr.-- Craig contacted multiple people at the company, in

16  addition to Ms. Alf, and ultimately they decided to terminate

17  Mr. Tew's employment.

18  *Q*   Let's back up a little bit.  Government's Exhibit 600, is

19  that the government's *James* log?

20  *A*   Yes, it is.

21  *Q*   Did you review it before your testimony?

22  *A*   I did.

23  *Q*   Does the number of the exhibits that are presented here

24  today, or sort of gathered, do they correspond in the numbers

25  in the *James* log?

SPECIAL AGENT LISA PALMER – Direct

1   *A*   They do.

2   *Q*   How so?

3   *A*   If you have the first entry in the *James* log, the support

4   for that entry will be 601.  So it's take the entry in the

5   *James* log and add 600.

6   *Q*   You testified earlier that Jonathan Yioulus was one of the

7   people investigating these American Express charges.

8   *A*   Yes.

9   *Q*   At that time, did he consider Michael Tew both a personal

10  friend and a professional friend?

11  *A*   Yes.

12  *Q*   Did he help out his friend with that American Express

13  investigation?

14  *A*   Yes, he did.

15  *Q*   How so?

16  *A*   He informed Mr. Tew about what was going on with the

17  investigation, as it progressed in real time.

18  *Q*   And why was that important?

19  *A*   It became a financial driver for the Tew's need for money.

20  It was a rather large bill, I believe it was around $45,000

21  that they were going to be expected to pay.

22  *Q*   Are there entries in the *James* log discussing the American

23  Express card, all around the context of the fraud scheme?

24  *A*   Yes.

25  *Q*   Are those entries discussed in Government's Exhibits 606,

SPECIAL AGENT LISA PALMER – Direct

1    633, 636, 650, 659, 679, 685, 693, 707, 708 and 756?

2    A    Yes.

3    Q    All right.  Let's look at Government's Exhibit 707.

4         THE WITNESS:  Could I have the original binder, with

5    707?  Thank you.

6         Q    (By Mr. Fields) Do you see Government's Exhibit 707

7    in front of you?

8    A    I do.

9    Q    Now, this is the first time we have looked at one of these

10   exhibits.  Is this a spreadsheet of data?

11   A    It is.

12   Q    Where did you obtain this data?

13   A    From an FBI analyst.

14   Q    And the underlying information, how did you obtain the text

15   messages in this case?

16   A    We executed a search warrant on the iCloud backup for the

17   kley, spelled K L E Y, at me dot com account, from Apple.

18   Q    Let's talk about that kley account.  During your

19   investigation did you gather evidence about who used the

20   kley@me.com account?

21   A    Yes, we did.

22   Q    What was the evidence?

23   A    The evidence came from a couple different categories.  One

24   was information on bank records; such as, bank applications,

25   where the email account was associated with Kimberly Tew, and

SPECIAL AGENT LISA PALMER – Direct

1   accounts held in the name of Kimberly Tew.  Another place is we

2   looked at emails obtained from National Air Cargo, and the

3   email address was given to National Air Cargo as Kimberly Tew's

4   email account.

5   Q   So, for example, Government's Exhibit 303, is that the bank

6   application to the Navy Federal Credit Union?

7   A   Would you mind showing me Exhibit 303?  Yes.

8   Q   If we go to page two.  What does it list as the email

9   address?

10  A   Kley@me.com.

11  Q   For which applicant?

12  A   For Kimberly Tew.

13  Q   Also list a phone number there?

14  A   It does.

15  Q   What is that phone number?

16  A   The phone number is 917-446-2046.

17  Q   All right.  So going back to Government's Exhibit 707, this

18  spreadsheet.  The information that Apple provided, did it come

19  in these, sort of, raw spreadsheets?

20  A   As far as I'm aware.  Yes.

21  Q   And it's got these various different fields, including one

22  over here, message sender.  Sometimes it's blank and sometimes

23  it's populated a with a phone number.  Do you see that?

24  A   It did.

25  Q   What does it mean when it's blank?

SPECIAL AGENT LISA PALMER - Direct

1  A  It means that the sender is the account that was -- the

2  phone number that was associated with the kley@me account.  So

3  if you look at the first row, the sender is blank, but in

4  message DCID, that gives you the sender, the actual phone

5  number that sent it.

6  Q  And that phone number, 917-669-7473, are you familiar with

7  that phone number?

8  A  I am.

9  Q  How are you familiar with that phone number?

10  A  That is one of Michael Tew's phone numbers.

11  Q  Who told you that was one of his phone numbers?

12  A  Jonathan Yioulos.

13  Q  Is that also verified in AT & T® records?

14  A  It is.

15  Q  If we look at Government's Exhibit 515?  Is this subscriber

16  information from AT & T®?

17  A  It is.

18  Q  Do you see the name there at the top?  Whose name is that?

19  A  Michael Tew.

20  Q  Do you see an address there?

21  A  Yes.

22  Q  Are you familiar with that address?

23  A  I am.

24  Q  How so?

25  A  During the course of our investigation the Tews resided at

SPECIAL AGENT LISA PALMER - Direct

1    3222 East 1st Avenue.  They resided in two different apartments

2    depending on the timeframe.

3    Q    Do you remember the apartments?

4    A    224 and 228.

5    Q    Did you, personally, visit them at one of those apartments?

6    A    I did.

7    Q    Which apartment?

8    A    I do not recall.  I would have to check the warrant.

9    Q    But it was at that building?

10    A    It was at that building.  Yes.

11    Q    What does it list here, as the contact home phone for

12    Mr. Tew?

13    A    It's 917-669-7473.

14    Q    Going back to Government's Exhibit 707.  This exchange, did

15    it occur on January 17th, 2019?

16    A    It did.

17    Q    How can you tell?

18    A    The column with the header, message time.

19    Q    And again if it's blank, what does that mean?

20    A    If the message time is blank?

21    Q    No.  If the message sender is blank?

22    A    That means it was sent by the account -- the phone number

23    associated with kley@me.com.  In this case, the phone number in

24    the message DCID column.

25    Q    Sometimes that message-center column is populated with a

SPECIAL AGENT LISA PALMER - Direct

1    number, 585-737-1709.  Are you familiar with that number?

2    A    I am.

3    Q    Whose number is that?

4    A    Jonathan Yioulos'.

5    Q    How do you know that?

6    A    He told us and we looked at his phone.

7    Q    Is that also verified by Verizon subscriber records?

8    A    It is.

9    Q    So, if you could here, let's start with the top message

10   body, and I want you to read down, all the way to where you can

11   see on the screen.

12   A    *Michael, call when can, just tried you.  Let me know when*

13   *you have a few minutes, talked to Amex.*

14        *Jonathan, okay.  Call soon.*

15        *Michael, we're all going to blow up.  I can't pay that*

16   *bill.  I don't have a choice it's 45,000.  Jonathan, I just*

17   *sent you 40,000.  Plus you have another 30,000 in crypto,*

18   *that's 70,000 you got in two fucking weeks, and you said it's*

19   *to pay the Amex, that's a ton of money, and you act like you*

20   *are starving.  I don't even make 70,000 cash in a year after*

21   *taxes are taken out and you have gotten that in two weeks.*

22   *Michael, I have a shit ton of bills.*

23        *Jonathan, okay?  And I can't physically send you*

24   *anymore.*

25   Q    All right.  So that bill for 45K, is that significant to

SPECIAL AGENT LISA PALMER - Direct

1   you?

2   A    Yes.

3   Q    How so?

4   A    That was the amount that was charged to Mr. Tew's corporate

5   American Express card.

6   Q    Let's take a step back a little bit and talk about Jonathan

7   Yioulos.  Has he pleaded guilty to the conspiracy charged in

8   this case?

9   A    He has.

10  Q    Has he agreed to cooperate under the terms of a formal

11  cooperation agreement?

12  A    He has.

13  Q    Have you, personally, interviewed him as part of your

14  investigation?

15  A    I have.

16  Q    In sum and substance, what did Yioulos tell you about his

17  participation in a fraud scheme?

18  A    Mr. Yioulos said that his role in the conspiracy, in the

19  fraud scheme, was to send money to the Tews, or to individuals

20  or businesses they designated, and then he was to take the

21  invoices and support provided by the Tews or the individuals or

22  businesses they designated, save them in the National Air Cargo

23  Systems and kind of hide the transfer of funds so they wouldn't

24  be caught and theft would not be revealed.

25  Q    Were certain corporations used as an instrument of the

SPECIAL AGENT LISA PALMER - Direct

1   concealment?

2   A   Yes.

3   Q   What were those companies?

4   A   So the companies were 5530 Jessamine Development, Meyers

5   Consulting Group, Political Media, Global Fuel Logistics and

6   then Aero Maintenance Resources, which was a subsidiary of

7   Global Fuel Logistic.

8   Q   Was there also a CPA firm?

9   A   There was.

10  Q   What was it called?

11  A   Hannah Scaife, CPA.

12  Q   Are those abbreviated in the *James* log as HS, CPAs, MCG,

13  5530JD, PM?

14  A   Yes.

15  Q   According to Yioulos, what was each person's role in the

16  various scheme?

17  A   Mr. Yioulos' prime contact for the scheme was Mr. Tew, and

18  Mr. Tew, generally speaking, directed where the payments were

19  going to go, which accounts they were going to go into and how

20  much they were for.  The Tews -- Mr. Tew, generally, would ask

21  for money, Mr. Yioulos would try to meet that number and to

22  send what he could.

23          Mr. Yioulos also received communications from what he

24  believed to be representatives at Jessamine Development, at

25  Meyers Consulting Group and at Political Media.  Those would be

SPECIAL AGENT LISA PALMER – Direct

1    invoices, sometimes the amounts on the invoices would require

2    Mr. Yioulos to send additional funds.

3    Q    Did Mr. Yioulos sometimes interact with Kimberly Tew,

4    directly?

5    A    He did.

6    Q    How so?

7    A    Kimberly, largely, based on what we found, would text

8    Mr. Yioulos, occasionally, she would also join in on phone

9    calls with Mr. Yioulos and Mr. Tew.  She frequently would ask

10   for money and the status of various payments and sometimes

11   invoices related to the fraud.

12   Q    What was Jonathan Yioulos hoping to get out of the scheme?

13   A    Initially, it appeared, he wanted to help Mr. Tew.  As

14   discussed, he considered Mr. Tew a personal and professional

15   friend.  Mr. Tew (sic) gave Bitcoin to Mr. and Mrs. Tew and he

16   wanted his Bitcoin back.

17   Q    Now let's go back to this American Express fraud.  Let's

18   look at Government's Exhibit 606.  Do you see that in front of

19   you?

20   A    I do.

21   Q    All right.  When was this text exchange?

22   A    The text exchange is dated August 13th, 2018.

23   Q    All right.  Who is it between?

24   A    It's between Mr. Yioulos' phone number, ending 1709, and

25   Mr. Tew's phone, number ending in 7473.

SPECIAL AGENT LISA PALMER - Direct

1  Q   All right.  And what does Mr. Yioulos say in the physical

2  message?

3  A   *Jonathan, yeah call me.  Abby be on me a bit about Amex*

4  *charges FYI.*

5      *Michael, yes, re Abby, call you later.  We will*

6  *discuss how to handle it.*

7  Q   What was Abby's role at this time?

8  A   Abby was involved in the finance and specifically

9  accounting functions and she was very involved in the Amex

10  investigation as to what happened and why the funds had been

11  charged to the card.

12  Q   Look at Government's Exhibit 601.  Do you recognize this

13  exhibit?

14  A   I do.

15  Q   Now, it's three pages.  First page, is that an email?

16  A   Yes.

17  Q   Second page, is this an invoice?

18  A   Yes.

19  Q   Then a followup email?

20  A   Yes.

21  Q   So looking at that followup email, that email address,

22  mtew@ctr.nationalairlines.com, who used that address?

23  A   Michael Tew.

24  Q   How do you know that?

25  A   We spoke to individuals at National Air Cargo, said that

SPECIAL AGENT LISA PALMER – Direct

1    was the email address that had been assigned to Michael Tew.

2    Q   And do you see a signature block there?

3    A   I do.

4    Q   There's a telephone number, it's not the 7473 number.  Is

5    it a different number?

6    A   It is.

7    Q   What is the telephone number there?

8    A   It's 917-685-1312.

9    Q   Who used that telephone number?

10   A   Michael Tew.

11   Q   How do you know that?

12   A   Mr. Yioulos told us and we got subscriber information from

13   AT & T®.

14   Q   Now, if you could, when was this email sent?

15   A   The email was sent on August 7th, 2018.

16   Q   And we previously looked at Government's Exhibit 606.  Does

17   this email predate that discussion about Abby and Amex charges?

18   A   It does.

19   Q   What does this email say?

20   A   This email says, *Expect invoice for the financial*

21   *consultant attached.  I can send you the agreement with the*

22   *consultant if need be.  Easier to send the money to me and I*

23   *will pay them.*  Then there's wire information for a bank

24   account, at Guaranty Bank & Trust Company in the name of

25   Michael Tew.

SPECIAL AGENT LISA PALMER – Direct

1    Q   Are you familiar with that bank account?

2    A   I am.

3    Q   How are you familiar with it?

4    A   We obtained records from Guaranty Bank & Trust Company,

5    signature card and account statements and transaction details

6    for that account.

7    Q   Who was the sole signatory on that account?

8    A   Michael Tew.

9    Q   So the money for this invoice to Hannah Scaife, CPA, who

10   did that money go to?

11   A   It went to Michael Tew.

12   Q   Now, let's look at Government's Exhibit 602.  Is this

13   another text message exchange?

14   A   It is.

15   Q   Between who?

16   A   Between Michael Tew's phone number, ending 1312, and

17   Jonathan Yioulos, ending 1709.

18   Q   What's the date?

19   A   The date is August 7th, 2018.

20   Q   Same day as the emails.

21   A   It is.

22   Q   All right.  If you could, start with *received* and please

23   read down to *thank you*.

24   A   *Michael.  Received.*

25           *Jonathan yeah call me, as soon as you can, leaving in*

SPECIAL AGENT LISA PALMER - Direct

1    *a minute.*

2           *Michael, will resend asap.  Thank you.  Should I email*

3    *Kim to pull it?*

4           *Jonathan, working from my computer now.  Send your*

5    *invoice with Just Feign Consulting invoice attached to fees.  I*

6    *will be working for 1.5 hours.*

7           *Michael, will do.  You're a good man, not sure why you*

8    *are doing this for me.  Just need to get out of the Sam,*

9           *Jonathan, All good.  You work your ass off.  Let's*

10   *just keep rolling, guarantee account?  15,000 ACH today right,*

11   *ACH it our, out,*

12          And I can't see who sent the next one.

13   *Q*   Sorry about that.

14   *A*   *Michael, thank you.  Sent you invoice to load into system.*

15   *Q*   *Send your invoice with Just Feign Consulting invoice attach*

16   *for fees*; is that a reference to the invoice we saw in his

17   Government's Exhibit 601?

18   *A*   No.

19   *Q*   Do you know what that invoice refers to?

20   *A*   According to Mr. Yioulos, prior to using -- deciding to use

21   Hannah Scaife, CPAs, they were going to use Feign Consulting as

22   the name.

23   *Q*   So it was going to be a different consulting company?

24   *A*   Correct.

25   *Q*   Now, *You are a good man not sure why you are doing this for*

26

SPECIAL AGENT LISA PALMER - Direct

1  *me*; what is that in reference to?

2  A   Sending the $15,000 to Michael Tew's account.

3       MR. KAPLAN:  Your Honor, I object, as to speculation.

4       THE COURT:  Yeah.

5       MR. KAPLAN:  Unless she has a greater foundation, but

6  just asking her --

7       MR. FIELDS:  I can follow up, Your Honor.

8       THE COURT:  Yeah.  I mean, I will take it for what it

9  is, but if you want it to have more weight, go ahead.

10      Q   (By Mr. Fields) What was your foundation for that?

11  A   Mr. Yioulos told us that Mr. Tew had asked for more money,

12  for a raise of sorts or an advance, and the Alfs had denied

13  that, and so this was a way to send Mr. Tew more money.

14  Q   Did Mr. Yioulos find out that these Hannah Scaife, CPA

15  invoices, were false?

16  A   Yes.

17  Q   Who told him that?

18  A   Michael.

19  Q   Have agents interviewed Hannah Scaife?

20  A   Yes.

21  Q   In sum and substance, what did she say?

22  A   She is not and never has been a CPA, and that she did not

23  receive any money from National Air Cargo.

24  Q   Did she submit invoices to National Air Cargo?

25  A   She did not.

SPECIAL AGENT LISA PALMER - Direct

1    *Q*   Now, you said *for participation in the scheme*.  What was

2    Yioulos hoping to get?

3    *A*   Yioulos was hoping to get his Bitcoin back and at times

4    there was talk of getting additional funds, but he, most

5    frequently, discussed getting his Bitcoin back from the Tews.

6    *Q*   Are their references to that in the text messages?

7    *A*   There are.

8    *Q*   Look at Government's Exhibit 605.  Who is this exchange

9    between?

10   *A*   This exchange is between Michael Tew's phone number, ending

11   7473, and Jonathan Yioulos' phone number, ending in 1709.

12   *Q*   And what does Jonathan Yioulos ask Michael Tew in that

13   first message there?

14   *A*   *Hey, no rush, but when do you think you will send the BTC*

15   *back, just so I will have a timeframe*?

16          *Michael, checking, BRB, been phone glued to ear since*

17   *like 6:30.*

18          *Jonathan, all good, no worries.*

19          *Michael, you'll get it, I promise, haven't gotten off*

20   *phone*.

21   *Q*   And now let's look at Government's Exhibit 609.  Who is

22   this exchange between?

23   *A*   This exchange is between Michael's phone, number ending

24   7473, and Jonathan Yioulos' phone number, ending in 1709.

25   *Q*   Who sent the first message?

SPECIAL AGENT LISA PALMER - Direct

1   A   Jonathan.

2   Q   And then who responded?

3   A   *Sent the confirm.  We will be in a nonprofit board of*

4   *directors retreat until 2 today.  Shoot me, haha. Please send*

5   *BTC back this weekend if possible.  Thanks.*

6        *Michael, you're the man.  It's coming.  I promise.*

7   *She's working on it today.*

8   Q   The *she* there, do you know who Michael Tew is referring to?

9   A   Kimberly.

10  Q   How do you know that?

11  A   Mr. Yioulos described how Kimberly was an active

12  participant within the crypto community, and his general

13  understanding was that he had sent the money to the Tews for

14  Kimberly to use and potentially turn into an even greater

15  amount, so by taking advantage of trading opportunities

16  convert, like, say one Bitcoin to two Bitcoin or to 1.2

17  Bitcoin.

18       MR. KAPLAN:  Your Honor, I'm going to object to that,

19  that was speculation.  It was --

20       THE COURT:  No.  Overruled, that was based on what

21  Mr. Yioulos explained to her.

22    Q    (By Mr. Fields) Now let's look at -- excuse me, just

23  a moment, Your Honor.

24  Q   Government's Exhibit 614.  Who is this exchange between?

25  A   Jonathan Yioulos and Michael's phone, ending in 1312.

SPECIAL AGENT LISA PALMER – Direct

1   Q   And what's the time period heard?

2   A   These messages are dated August 23rd, 2018.

3   Q   Okay.  Who sent the first message?

4   A   Mr. Yioulos.

5   Q   Could you please read this exchange for us?

6   A   *Jonathan, hell yes.  Thank you, and thank Kimberly for me*

7   *too.*

8       *Michael, that account number for Jessamine Development*

9   *was wrong.  Guy gave us the wrong account number.  There's only*

10  *one five in the account number.  The account number is listed.*

11      *Jonathan, yes.*

12      *Michael -- can you zoom in?*

13      *MR. FIELDS:  Yep.*

14  A   Thank you.

15      *THE WITNESS:  Can you resubmit.*

16   Q   (By Mr. Fields) it's easier to look at the paper?

17  A   Yeah.  Sorry.

18      *Jonathan, yes.*

19      *Michael, not your fault.  Thanks.  Guy gave bad wire*

20  *instructions.  Thanks.  That wire is out, funds hit, thank you,*

21  *finally.*

22      *Jonathan, no problem.*

23   Q   All right.  That first reference, there, *Hell yes, thank*

24  *you, and thank Kimberly for me, too.*  Jonathan Yioulos tell you

25  what that was about?

SPECIAL AGENT LISA PALMER – Direct

1    A    The Tews sent Mr. Yioulos Bitcoin back.

2    Q    Was that why Mr. Yioulos thanking Kimberly?

3    A    Because it was his understanding that Kimberly had helped

4    obtain the Bitcoin for him.

5    Q    All right.  There's a reference here to this Jessamine

6    Development.  What did see Mr. Yioulos tell you about Jessamine

7    Development?

8    A    From his point of view, Jessamine Development was a company

9    that Mr. Tew and Mrs. Tew had told Mr. Yioulos to send the

10   National Air Cargo funds to, and at some point the information

11   from the Jessamine contact was the wrong routing information;

12   didn't work.

13   Q    If we look at Government's Exhibit 612.  Is this an email?

14   A    Yes.

15   Q    And page two here is this another email?

16   A    Yes.

17   Q    Who is the email from?

18   A    The email is from Chris RNCN at gmail dot com.

19   Q    This Jessamine Development, who was its purported

20   proprietary?

21   A    Christain Rincon.

22   Q    Is there also attached to this email a wire confirmation?

23   A    There is.

24   Q    What's the date?

25   A    August 23rd, 2018.

SPECIAL AGENT LISA PALMER – Direct

1    Q    Is that the same date as the exchange that we just talked

2    about, where Jonathan Yioulos was thanking Kimberly for the

3    Bitcoin?

4    A    Yes.

5    Q    And the invoices submitted by 5530 Jessamine Development,

6    what was Yioulos' understanding, as to legitimacy of those

7    invoices?

8    A    They were invoices for services and goods that were never

9    rendered to National Air Cargo.

10   Q    Are there text message exchanges in which Michael Tew

11   discusses that with Jonathan Yioulos?

12   A    Yes.

13   Q    Did you review those before your testimony today?

14   A    I did.

15   Q    And are those Government's Exhibits 614, 621, 623, 625,

16   628, 639, 640, 645, 646, 662, 665, 670, 673, 676, 678, 681,

17   682, 689, 690, 697, 707 and 708?

18   A    They are.

19   Q    Let's move on to a different topic.  Let's look at

20   Government's Exhibit 619.  Is this a text message exchange?

21   A    Yes.

22   Q    Does it look a little bit different than the ones we have

23   been looking at, between Jonathan and Michael Tew?

24   A    It does.

25   Q    Why does it look different?

SPECIAL AGENT LISA PALMER - Direct

1    A    The ones we've looked at so far have been from the

2    spreadsheets that the FBI analyst provided to me, that was

3    based on the information from the iCloud warrant.  This

4    particular exchange came out of the Cellebrite Reader.

5    Q    What is a Cellebrite Reader?

6    A    Cellebrite Reader is a software, commonly used in

7    investigations that allows us to look at and parse cell phone

8    data in a more user friendly way.

9    Q    The Cellebrite data, did it show to whom these text

10   messages were sent?

11   A    They were sent to the kley@me.com account.

12   Q    And these text exchanges, did it appear that exhibits like

13   this, there was only one side of the exchange?

14   A    Yes.

15   Q    What made you think that?

16   A    We -- so the way the Cellebrite Reader works, is the

17   messages on the left are going to be messages sent to the

18   account, and messages on the right will be messages sent from

19   the account.  There are no messages on the right, in this case,

20   indicating that the owner of the account did not have messages

21   responding to this within the account when we executed the

22   search warrant.

23        We believe that there is -- this is part of a

24   conversation, based on the context clues from the messages.

25   For example --

SPECIAL AGENT LISA PALMER - Direct

1          MR. KAPLAN:  Your Honor, I'm going to object to what

2    she believes.

3          THE COURT:  I will overrule it, but I understand it's

4    just her belief, but go ahead.

5     Q    (By Mr. Fields) Could you please keep describing the

6    context you were looking at?

7    A    Sure.  So, if you look at -- if you look at this exchange,

8    it does appear that Mr. Yioulos, he is responding to something.

9    The statements do not make sense on their own, unless there's

10   another person that is participating in the conversation, whose

11   messages are not present in the search warrant returns.

12         MR. KAPLAN:  Again, I'm going to object to the

13   opinion.

14         THE COURT:  Overruled.

15    Q    (By Mr. Fields) Now let's look at --

16         MR. FIELDS:  Just one second, Your Honor.  I'm

17   reconfiguring the outline to narrow it down.

18         MR. FIELDS:  Let's look at Government's Exhibit 628.

19         MR. KAPLAN:  Excuse me, I didn't hear that?

20         MR. FIELDS:  Six twenty-eight.

21    Q    (By Mr. Fields) Scroll down here to --

22         MR. SCHALL:  Your Honor, if I may, just briefly?  This

23   question might be for Mr. Fields.  Might be inappropriate, but

24   I might have missed whose Cellebrite device this was extracted

25   from?

SPECIAL AGENT LISA PALMER – Direct

1        Q    (By Mr. Fields) Can you remind us the Cellebrite --

2   what data set was Cellebrite pulling from to render these

3   images?

4   A   It was the search warrant returns for the kley@me.com

5   account.

6   Q   All right.  If we look here on page ten through eleven.

7   Well, first all, we have been scrolling through this, and you

8   should look at the exhibit itself.  Is this another one of the

9   examples where there appears to be only one side of the

10  conversation?

11  A    Yes.

12  Q   Were you able to determine to whom these messages were

13  directed?

14  A    These messages were directed at Kimberly Tew.

15  Q   How do you know that?

16  A   So, if you look at the next message, at the start of the

17  next page, it says, *Just sent Michael an email it's super*

18  *important I get these things.*  There were two people who had

19  access to the kley@me.com account, and those were Michael and

20  Kimberly.  So it would be unusual for Mr. Yioulos to refer to

21  the sender in like the third person.  So, if it wasn't Michael,

22  it was sent to Kimberly.

23  Q   Did Mr. Yioulos also tell you that he exchanged text with

24  Kimberly too?

25  A   Yes, he did.

SPECIAL AGENT LISA PALMER - Direct

1   *Q*   When he sent texts to Kimberly Tew, what number would he

2   use?

3   *A*   There was a number we spoke of earlier that ended in 2046.

4   They would have gone to that phone number.

5   *Q*   This kley@me.com account contain other texts to 2046?

6   *A*   Yes.

7   *Q*   Let's look at another example.  Let's look at Government's

8   Exhibit 636, first, and then we're going to look at 635.

9   *Q*   Is this an exchange between Jonathan Yioulos and

10  Michael Tew?

11  *A*   Phone number ending 7473.

12  *Q*   And if you could start with the second message from the

13  bottom.  Could you read that one for us.

14  *A*   From Mr. Yioulos.  Don't forget -- I'm sorry.  *Don't forget*

15  *delete texts from both phones.  I'm doing that now.  It needs*

16  *to happen.*

17  *Q*   Now let's look at Government's Exhibit 635.  All right.  Is

18  this another one of those one-sided exchanges?

19  *A*   Yes, it.

20  *Q*   To whom was -- to whom were these text messages sent?

21  *A*   We believe these were sent to Kimberly's phone.

22  *Q*   Okay.  And again, if we look here on page two, do you see

23  one of those context clues you have been using?

24  *A*   Yes.

25  *Q*   What's the context clue here?

SPECIAL AGENT LISA PALMER - Direct

1  *A*   The message reads, *You are really not.   Just deep breaths.*

*I talked to Michael.   We have to delete all text records.*

*We'll figure this out.*

4  *Q*   *I talked to Michael*, who is that in reference to?

5  *A*   Michael Tew.

6  *Q*   And did you talk to Jonathan Yioulos about these exchanges,

7  involving deletion?

8  *A*   We did.

9  *Q*   What did he say?

10 *A*   He said he deleted his messages with the Tews.

11 *Q*   And when analysts looked for messages from Kimberly Tew, to

12 Jonathan Yioulos, within the cell phone return, could they find

13 anything?

14 *A*   No messages.   I believe there were some screen shots of

15 conversations that were in other contexts, but no messages on

16 the phone.

17 *Q*   Now let's look at just one more example.   Now let's look at

18 one more example.   Government's Exhibit 718.   All right.   Is

19 this yet another of those examples where there appears to be

20 only one side of the conversation?

21 *A*   Yes.

22 *Q*   I'm on page five here.   On that page, do you see another

23 one of those context clues?

24 *A*   I do.

25 *Q*   What do you see?

SPECIAL AGENT LISA PALMER - Direct

1   *A*   At the bottom of the page, the text message from

2   Mr. Yioulos reads, *Why wouldn't you have said something?  Why*

3   *wouldn't Michael have*?  *Why didn't I get emails?  I'm not*

4   *saying you are lying but I'm just asking these questions*.

5   *Q*   And on page eight, do you see another reference to mileage?

6   *A*   I do.

7   *Q*   What do you see there?

8   *A*   Mr. Yioulos sent a message, *I have sent Michael the new*

9   *address a bunch of times*.

10  *Q*   What's the next message there?

11  *A*   *I can't fucking log into my Binance right now and haven't*

12  *been able to for awhile because I lost my authenticator.  Why*

13  *wouldn't you confirm the address with me*?

14  *Q*   What is Binance?

15  *A*   Binance is a -- we call them cryptocurrency exchange.  It's

16  a place where you can convert fiat currency; such as, the US

17  dollar or euros to cryptocurrency; such as, Bitcoin, Ether

18  Ripple, things of that nature.

19  *Q*   Are you personally familiar with how these exchanges

20  operate?

21  *A*   Yes, I am.

22  *Q*   So the reference to an authenticator there, what is that?

23  *A*   Many of these companies require two-factor authentication;

24  such as, not just a user name and password, but perhaps a

25  one-time code sent to a phone number or an authenticator app

SPECIAL AGENT LISA PALMER – Direct

1   that will give you one-time use code to verify it is you,

2   rather than just a password.  It's considered a more secure way

3   to authenticate to services.

4   Q   These references to an address, are we talking about a

5   physical address?

6   A   No.

7   Q   Based on context, this authenticator and Binance, what is

8   *address*?

9   A   It is a cryptocurrency address.  A place where you can give

10  a public address, so people can send you money in whatever

11  cryptocurrency you are interested in.

12  Q   And have you talked to Jonathan Yioulos; did he use

13  cryptocurrency exchanges?

14  A   Yes, he did.

15  Q   And again, when Jonathan Yioulos was dealing with

16  cryptocurrency and the Tews, who was the primary interface

17  there?

18  A   His primary interface was Michael Tew.

19  Q   Who primarily handled the Bitcoin, as far as Jonathan

20  Yioulos understood?

21  A   Kimberly.

22  Q   And then here, on page 12, do you see that large

23  alphanumeric string?

24  A   I do.

25  Q   What is that consistent with?

SPECIAL AGENT LISA PALMER - Direct

1    A    That is consistent with a public address for a

2    cryptocurrency; such as, Bitcoin.

3    Q    And now here, on page 14, do you see these two messages

4    here at the top?

5    A    Yes.

6    Q    What do those say?

7    A    *Like what the fuck.  I have done nothing but try to help.*

8    *You know how much has been sent*.  Next message, *criminal*?

9    *Never said that.*  Okay.

10   Q    Next two, on page 15?

11   A    *Scream at him.  Right.  Just let me deal with Michael.*

12   Q    And then at the bottom there?

13   A    *Because you're extremely rude and confrontational and think*

14   *I'm some sort of rat trying to fuck you guys over.*

15   Q    Now let's look at Government's Exhibit 717 -- or ... 717

16   well, actually, first of all, while we are on 718, what's the

17   date there?

18   A    The date is February 19th, 2019.

19   Q    Government's Exhibit 717.  Do you see that in front of you?

20   A    I do.

21   Q    Is this another text message?

22   A    It is.

23   Q    Between who?

24   A    Michael Tew's phone number, ending 7473, and Jonathan

25   Yioulos' number ending 1709.

SPECIAL AGENT LISA PALMER – Direct

1    Q    What date?

2    A    February 19th, 2019.

3    Q    Same date as the other exchange that we looked at?

4    A    Yes.

5    Q    The one where Jonathan is referring to Michael in the third

6    person?

7    A    Yes.

8    Q    Now, this one, at the top, who does he refer to there?

9    A    Kimberly.

10   Q    In the third person?

11   A    Yes.

12   Q    And if you could read this exchange for us, please?

13   A    *Jonathan, and now Kimberly is texting me.  This is awesome,*

14   *it's like clockwork.*

15        *Michael, I told her not to.  I'm on a conference call.*

16   *Ring you after.*

17        *Jonathan, okay.  Done helping you.  Your wife is now*

18   *sending emojis calling me a rat.  Fucking brilliant.  Send a*

19   *revised one.  Need it to say March not February.  Actually,*

20   *it's fine.*

21        *Michael, okay, for now it's a mistake.  Okay.  Yes*?

22        *Jonathan, it's done.*

23   Q    Did we see a reference to rat in Government's Exhibit 718?

24   A    We did.

25   Q    And again, sort of looking at context clues, what is the

SPECIAL AGENT LISA PALMER - Direct

1    use of rat, in each of these exchanges tell you?

2    A   It is a common term used for somebody who has snitched or

3    talked to law enforcement about criminal acts.

4    Q   Now, the last exchange in Government's Exhibit '17, *because*

5    *you are extremely rude and confrontational and think I'm some*

6    *sort of rat trying to fuck you guys over*.  What did Jonathan

7    Yioulos say about his communications with Kimberly?

8    A   He remembered this exchange and that Kimberly would

9    sometimes call him a rat or say other things that he perceived

10   as threatening.

11   Q   And eventually what did Jonathan Yioulos do to Kimberly

12   Tew, as far as text messages go?

13   A   He blocked her number and refused to speak with her.

14   Q   Are there references to that, in the text messages?

15   A   Yes.

16   Q   And again, in the July 2020 calls, that we will talk about

17   later on?

18   A   Yes.

19   Q   All right.  Are there other examples of these, sort of,

20   one-sided conversations?

21   A   Yes.

22   Q   And when you attributed those conversations to Jonathan

23   Yioulos to Kimberly Tew, did you use the same context clues we

24   have been talking about?

25   A   Yes.

SPECIAL AGENT LISA PALMER - Direct

1   Q    All right.  Now, let's talk about those bank transactions.

2   Let's look at ... look at Government's Exhibit 885.  All right.

3   So, we're here on page two.  Who is this exchange between?

4   A    This exchange is between Michael Tew, phone number ending

5   1312, and the kley@me.com account.

6   Q    Now, it just says kley@me.com.  When an FBI analyst looked

7   at the underlying tables, was he able to determine the phone

8   that was actually being used to send that message?

9   A    Yes.

10  Q    Was that phone ending 2406?

11  A    For this message, yes.

12  Q    What does Kimberly Tew say there?

13  A    *In blackjack, inside, what you doing.*

14  Q    And then what does Michael say?

15  A    *John can send 50 today and 25 next week and that's it.*

16  *What do you want*?

17  Q    The reference to John there, who is the John?

18  A    Jonathan Yioulos.

19  Q    And send what?

20  A    Money.

21  Q    And if we look at -- let's look at another example.  Now

22  let's look at Government's Exhibit 901.

23  Q    We're on page four here.  First all, who is this exchange

24  between?

25  A    This exchange was between Michael Tew ending 7374 and

SPECIAL AGENT LISA PALMER – Direct

1    Kimberly Tew ending in 2046.

2    Q    What's the date?

3    A    December 11th, 2019.

4    Q    All right, and what did Kimberly Tew say in that exchange?

5    A    *I will be more comfortable knowing Jon is sending before*

6    *Friday.*

7    Q    And then, look at page five there, what does Michael Tew

8    say?

9    A    *Let's just get Jon to send Friday, work on it from LA.*

10   Q    All right.  And then, down here, towards the bottom, read

11   the last three texts?

12   A    *Kimberly, I just won another jackpot.  No, we will use for*

13   *BTC.  Is there a Navy Federal in LA*?

14   Q    The reference to Navy Federal, is that significant to you?

15   A    Yes it is.

16   Q    How so?

17   A    Toward the middle and end of the alleged fraud, the primary

18   bank accounts used by the Tews were located at Navy Federal

19   Credit Union, that's frequently where the Tews made large cash

20   withdrawals, after the fraudulent deposits from National Air

21   Cargo.

22   Q    Let's look at one other example.  Let's look at

23   Government's Exhibit 847, and we're looking at page four, here.

24   Do you see that?

25   A    I do.

SPECIAL AGENT LISA PALMER - Direct

1   Q   Now, first of all, before we get to page four, up at the

2   top, do you see references to the gambling?

3   A   I do.

4   Q   And do bank records confirm that the Tews were in Las

5   Vegas, at the time?

6   A   They do.

7   Q   Now, at the bottom of page four, what -- well, first of

8   all, who sent that text message?

9   A   The green messages are from Kimberly Tew, phone ending

10  2406, the blue messages are from Michael Tew, ending 7473.

11  Q   What did that Kimberly Tew ask in that message?

12  A   *How far is Navy Federal*?

13  Q   What is the response?

14  A   *Michael, Navy federal is 15-minute drive west.  BTC ATM is*

15  *30 minutes back, northeast from here.*

16  Q   BTC, we have seen that acronym before, what does that

17  stand?

18  A   For Bitcoin.

19  Q   Do they sometimes use that for colloquially for all types

20  of cryptocurrency?

21  A   I believe so, yes.

22  Q   What does Kimberly Tew say?

23  A   *We will do BTC when we get back, stick with me.*

24  Q   And keep reading the change?

25  A   *Michael, I'm sticking with you, you are coming back in an*

SPECIAL AGENT LISA PALMER - Direct

1   *hour or you are saying figure it out later.*

2          *Kimberly Hi*, heart emoji, *let's go get that money from*

3   *NFCU 26K bring it back here.*

4   Q   When was this exchange?

5   A   September 4th, 2019.

6   Q   Let's look at Government's Exhibit 47-- 46, sorry.

7   Apologies.  Let's go to page eight.  Do you see a deposit on

8   September 4th, 2019?

9   A   I do.

10  Q   That the same date as the exchange that we just looked at?

11  A   Yes, it is.

12  Q   Scroll out a little bit.  Do you see an account number up

13  there?

14  A   I do.

15  Q   What are the last four digits of it?

16  A   5336.

17  Q   Who is the primary signatory on that account?

18  A   Michael Tew.

19  Q   The transaction that you see there for 45 -- oops.  For

20  $45,000, what does it say as a description for it?

21  A   Deposit, ACH paid from National Air, ACH 090419.

22  Q   Is that one of the payments based on a fraudulent invoice

23  that we talked about earlier?

24  A   Yes.

25  Q   And then, shortly after there, do you see a transfer on

SPECIAL AGENT LISA PALMER – Direct

1    September 4th, 2019?

2    *A*    I do.

3    *Q*    What is the transfer?

4    *A*    It says transfer to checking, Kimberly Tew.

5    *Q*    So on the same day that Kimberly Tew is telling Michael,

6    you know, *We need to get to NFCU*, what happened in the NFCU

7    account?

8    *A*    The money from National Air Cargo was deposited into an

9    account in the name of Michael Tew, that money, that $45,000,

10   appears to be moved into an account in the name of Kimberly

11   Tew.

12   *Q*    Now, are there other examples of the Tews spending

13   proceeds?

14   *A*    Yes.

15   *Q*    Are those in Government's Exhibits 803, 847, 884, 886, and

16   901?

17   *A*    Yes.

18   *Q*    Now, let's look at ... Government's Exhibit 898.  First of

19   all, before we leave the topic of gambling, did the topic of

20   gambling also come up in the calls in July of 2020?

21   *A*    Yes, it did.

22   *Q*    In sum and substance, what did Michael Tew say about

23   gambling?

24   *A*    Kimberly liked to gamble.

25   *Q*    Did they talk about, in the context of the money that the

SPECIAL AGENT LISA PALMER - Direct

1  Jonathan Yioulos was sending to the Tews?

2  A  Yes, they did.

3  Q  Okay.  This is another exchange in December of 2019.  Do

4  you see that there?

5  A  I do.

6  Q  So again, orient us, Government's Exhibit 898, and whose in

7  green and who is blue?

8  A  Green is Kimberly Tew's phone number, ending 2046, and

9  Michael Tews phone number, ending 7473, is blue.

10  Q  All right.  And what does Kimberly Tew say to Michael Tew

11  here?

12  A  *Kimberly, can you transfer 20 from joint to 3494?*

13  *Michael, okay*.

14  Q  That reference to joint, did the Tews have a joint bank

15  account?

16  A  Yes, they did.

17  Q  What were the last four digits of that account?

18  A  I believe 8486.

19  Q  Where was that account at?

20  A  Navy Federal Credit Union.

21  Q  And now look at Government's Exhibit 225.  Go to page six.

22  What do you see there in December 3rd?

23  A  A deposit ACH paid from National Air, for $9,550.

24  Q  So another payment based on a fraudulent invoice?

25  A  Yes.

SPECIAL AGENT LISA PALMER - Direct

1    Q    And December 3rd, is that just the day before the exchange

2    that we just looked at?

3    A    Yes.

4    Q    Are there other examples of the Tews discussing banking

5    transactions right around the time period that they were

6    receiving fraud payments from Jonathan Yioulos?

7    A    Yes.

8    Q    Do the Tews also make transactions at Bitcoin ATMs?

9    A    They did.

10   Q    Are you personally familiar with Bitcoin ATMs?

11   A    I am.

12   Q    How so?

13   A    As part of a project we met with employees of the Bitcoin

14   ATM company, including some C-suite executives and discussed

15   how the Bitcoin ATMs worked.  What, sort of,

16   know-your-customer-requirements they were required to have in

17   place.  And then I have also visited many, within the Denver

18   metro area, to kind of document where they are, what sort of

19   circumstances surround them.

20            For example, if there are in a gas station, does the

21   gas station have a separate entrance?  Are there video cameras

22   on it, that sort of thing, to understand the general

23   environment.

24   Q    In general terms what is a Bitcoin ATM?

25   A    A Bitcoin ATM it's a machine, similar to an ATM, where

SPECIAL AGENT LISA PALMER – Direct

1    individuals can go and convert fiat currency for

2    cryptocurrency.  Usually, you can give the ATMs cash, to obtain

3    Bitcoin.  In very limited circumstances, you can actually give

4    the ATMs your -- some of your Bitcoin and get cash out.

5    Q   Did Michael Tew text photographs of Bitcoin ATM

6    transactions to Kimberly?

7    A   Yes.

8    Q   Did this happen around the time that the Tews were

9    receiving proceeds from Jonathan Yioulos?

10   A   Yes.

11        MR. FIELDS:  Are there examples of that in

12   Government's Exhibits 776, 792, 797, 798, 809, 810, 819, 824,

13   834, 835, 836, tell me if I'm going too fast 838, 839, 846,

14   847, 850, 852, 855, 859, 868, 870, 871, 872, 920, 923, and 924?

15   A   Yes.

16        Q   (By Mr. Fields) Now, we've done this a couple times,

17   where I have done this long list of numbers, and you

18   immediately say yes.  How are you so sure?

19   A   Prior to my testimony, I worked with you to create these

20   lists, and you gave me a list that you were planning to read

21   and I went through and I checked every entry on the *James* log.

22   And if there were ones I didn't agree we discussed them

23   afterwards.  Some I ended up agreeing to and some we removed,

24   because we decided there was a conflict.

25   Q   So you have confirmed that these entries in the *James* log

SPECIAL AGENT LISA PALMER – Direct

1    relate to the Bitcoin ATMs?

2    A    Yes, I have.

3    Q    All right.  Sometimes in the *James* log are there references

4    to Vapor and Vapor Jungle?

5    A    Yes.

6    Q    What's the significance of that?

7    A    It's my understanding that the store Vapor Jungle has a

8    Bitcoin ATM at their store.

9    Q    All right.  Now, let's talk about -- let's look at

10   Government's Exhibit 505.  Are these business records obtained

11   from McDonald Automotive Group?

12   A    They are.

13   Q    On this first page here, what name do you see?

14   A    Michael Aaron Tew.

15   Q    What is the amount listed there?

16   A    It's $20,611.01.

17   Q    What did the Tews purchased with $20,611.01?

18   A    They purchased a car, an Audi®.

19   Q    Let's look at Government's Exhibit 878.  All right.  On

20   page three there, do you see a list of items?

21   A    I do.

22   Q    Now, first all, who sent this message?

23   A    Kley@me.com.

24   Q    And again, who is this exchange with?

25   A    Michael Tew, phone number ending 7473.

SPECIAL AGENT LISA PALMER – Direct

1    Q    Who is in blue and who is in green?

2    A    Michael's phone is in blue and Kimberly's iCloud account is

3    in green.

4    Q    So, this list of items to be paid here, that we see in 878,

5    look at the bottom there, under additional items, what do you

6    see as item number four?

7    A    $8,500, and in parentheses, BTC for Jon.

8    Q    Again, what did Jonathan Yioulos say about the Tews?

9    A    Mr. Yioulos loaned Bitcoin to the Tews and wanted it back.

10   Q    And then what do you see at the top there, item to be paid?

11   A    Number one, the $21,000, in parentheses, Audi®.

12   Q    Now, let's look at Government's Exhibit 879.  I'm sorry,

13   before we leave that exhibit, what's the date?

14   A    October 17th, 2019.

15   Q    Do the Tews purchase the Audi® in October of 2019?

16   A    They did.

17   Q    Do you see, on October 19th, 2019, is this a message also

18   from Kimberly Tew?

19   A    It is.

20   Q    What does it say?

21   A    *Jon has to send something Monday, right?  Because we need*

22   *to put the car behind us and book everything thing for Vegas.*

23   Q    *Car behind us*, what car are they talking about?

24   A    That Audi®.

25   Q    Further discuss the use of scheme proceeds to purchase the

SPECIAL AGENT LISA PALMER - Direct

1   Audi®, Government's Exhibit 868, 869, 870, and 884?

2   A    Yes.

3   Q    All right.  Two more categories of text messages here.

4   Let's talk about Meyers Consulting Group for a moment.

5   Actually, before I leave this topic.  Do you see additional

6   items there, at the bottom?  This is going back to Government's

7   Exhibit 878.  Do you see one, two and three?

8   A    Yes.

9   Q    The initials AN, is that significant to you?

10  A    Yes.

11  Q    What -- how so?

12  A    There were transactions within the bank accounts sending

13  money to someone with the initials AN, that name also

14  corresponded to text messages describing the need to send funds

15  to AN.

16  Q    Was Kimberly Tew interviewed by a team of agents on January

17  27th, 2020?

18  A    She was.

19  Q    What did she tell that agent about Bitcoin trading?

20  A    She engaged in Bitcoin trading with lots of different

21  people, and she kept a ledger of her transactions and amounts

22  that she showed.

23  Q    Do messages in the James log reference Matthew Mora, Craig

24  Warner, Erin Newstorph, Sandy Goldfarb and David Blumenfield?

25  A    Yes.

SPECIAL AGENT LISA PALMER - Direct

1    Q   Are these people to whom she owed debts?

2    A   My understanding, based on the messages, yes.

3    Q   Is there evidence, in the text of Kimberly, using proceeds

4    from Jonathan Yioulos to pay off those debts?

5    A   Yes.

6    Q   All right.  Michael Meyers.  Let's look at Government's

7    Exhibit 647.

8    Q   Go to page two here.  Who is this email from?

9    A   This email is from meyersconsultinggroupinc@gmail.com.

10   Q   Does it have an attached invoice?

11   A   It does.

12   Q   And do you see an account number and a bank?

13   A   I do.

14   Q   Who is this sole signatory on that account number?

15   A   Mike Meyers, Michael Meyers.

16   Q   Have agents interviewed Michael Meyers?

17   A   We have.

18   Q   In sum and substance, what did he tell agents?

19   A   He said that he had traded Bitcoin with Kimberly Tew, and

20   she had told him that Michael had lost his job at National Air

21   Cargo.  Mr. Meyers agreed to accept funds from National Air

22   Cargo after Mr. Tew was fired, and provided bank account and

23   routing information for the Tews for that purpose.

24   Q   Now, the email address that sent these invoices -- well,

25   first of all, the invoices, according to Jonathan Yioulos, were

SPECIAL AGENT LISA PALMER - Direct

1    those invoices legitimate or illegitimate?

2    A    They were not.

3    Q    Was the illegitimacy of those invoices discussed between

4    Jonathan and Michael Tew?

5    A    Yes.

6    Q    Meyersconsultinggroupinc@gmail.com, was a search warrant

7    executed on that account?

8    A    It was.

9    Q    Did you gather any evidence about who was using that

10   account?

11   A    Yes.

12   Q    What evidence?

13   A    We obtained the Google subscriber information, showing what

14   had been provided to Google when the account was set up.  Then

15   we looked at the emails within the account to see how the

16   account was being used, to see if there were any additional

17   clues that would lead us to attribution.

18   Q    What did you find?

19   A    We found that the account was likely used by Kimberly Tew,

20   based on order confirmations from various retailers.

21   Q    And what about those various order confirmations from

22   retailers made you think it was Kimberly Tew?

23   A    The items were often either women's clothing or clothing

24   for children and the -- not the billing -- the shipping address

25   was often to Amy Tew, located at 3222 East First Avenue,

SPECIAL AGENT LISA PALMER - Direct

1  Denver, Colorado.

2  Q   Amy Tew, not Kimberly Tew?

3  A   Correct.

4  Q   During your investigation, did you find out who Amy Tew

5  was?

6  A   We did.

7  Q   Based on your investigation, did anyone named Amy Tew ever

8  live with Kimberly or Michael Tew?

9  A   Not to my knowledge.

10 Q   All right.  So this bank account, did Jonathan Yioulos send

11 money to these bank accounts?

12 A   He did.

13 Q   Who told him to send the money to those bank accounts?

14 A   The invoices that he received, as well as Michael Tew.

15 Q   Let's look at Government's Exhibit 1004.  Do you see that

16 in front of you?

17 A   I do.

18 Q   What is this?

19 A   This is a chart that was put together by the FBI forensic

20 accountant who assisted on this investigation.

21 Q   And does it show a Michael Meyers receiving money?

22 A   It does.

23 Q   Approximately how much?

24 A   Approximately $110,000 went into accounts in the name of

25 Michael Meyers.

SPECIAL AGENT LISA PALMER - Direct

1    Q    Now, this money that was sent to Meyers, would it need to

2    be reported on an IRS-1099?

3    A    It would.

4    Q    What is an IRS-1099?

5    A    A form 1099 is an income return that businesses file at the

6    end of the year.  They file a copy with the IRS, they send a

7    copy to the recipient.  It lists all of the income that was

8    received through contracting work to that individual or

9    business during the tax year.

10   Q    Did Michael and Kimberly Tew discuss this issue?

11   A    They did.

12   Q    Let's look at Government's Exhibit 804.  Do you see here on

13   a page two?

14   A    Yes.

15   Q    In blue, who is sending these messages?

16   A    Kimberly Tew's phone number, ending in 2046.

17   Q    All right.  The message that we're looking at, does that

18   appear to be a screen shot?

19   A    It does.

20   Q    Okay.  Would you read the message underneath it?

21   A    *This is why I'm asking about Jon.*

22   Q    If we look at the next page.  Is this a larger rendering of

23   the screen shot?

24   A    Yes, it is.

25   Q    What is it?

SPECIAL AGENT LISA PALMER – Direct

1    *A*   It's a screen shot of a conversation with a contact labeled

2    *Meyers*, whale emoji, *Mike*.

3    *Q*   Do you see the photograph there?  You have to cock your

4    head a little bit, but if you do that, what does that say?

5    *A*   That appears to be a copy of a form 1099 for the tax year

6    2018, from National Air Cargo Holdings to Meyers Consulting

7    Group.

8    *Q*   What does Meyers say?

9    *A*   Meyers says, *This is what I'm talking about.  This is not*

10   *mine to deal with*.

11   *Q*   Did Mike Meyers and Michael Tew discuss this tax issue

12   directly?

13   *A*   Yes.

14        *MR. SCHALL:*  Your Honor, if I may, the point of

15   clarification, if the government can answer, is the indication

16   or the assertion that Michael Meyers is a co-conspirator, and

17   that his statements are pursuant to this hearing, or that they

18   are introducing the statements between the defendants about

19   what Michael Meyers said?

20        *MR. FIELDS:*  Your Honor, I can address that later when

21   we do legal argument or I can address it now.

22        *THE COURT:*  If you have a quick explanation, go ahead.

23        *MR. FIELDS:*  Your Honor, Michael Meyers is not a

24   charged co-conspirator nor is it alleged that he is part of the

25   conspiracy.  Let me just ask a couple of follow-up questions to

SPECIAL AGENT LISA PALMER - Direct

1  the agent.

2          *THE COURT:*  Okay.

3      Q   (By Mr. Fields) Was there any evidence that Michael

4  Meyers submitted false invoices to National Airlines?

5  *A*   No.

6  *Q*   Who sent the false invoices to National Airlines?

7  *A*   The Tews.

8  *Q*   Did Michael Meyers make any false statements to National

9  Airlines?

10  *A*   Not as far as I'm aware.

11  *Q*   But did he receive -- did he receive money from National

12  Airlines?

13  *A*   He did.

14  *Q*   And from there, did the Tews discuss the money that they

15  received?

16  *A*   Yes.

17          *MR. FIELDS:*  All right.  So, I will respond to the

18  legal argument in just a second, Your Honor.  There's just one

19  more exhibit that I would like to take a look at.

20          *THE COURT:*  Okay.

21  *Q*   Let's take a look at Government's Exhibit 752.  Who are

22  these texts between?

23  *A*   Michael Meyers and Kimberly Tew's iCloud account.

24  *Q*   Do you see this message on April 1st -- or April 12th,

25  2019?

SPECIAL AGENT LISA PALMER - Direct

1   *A*   I do.

2   *Q*   All right.  And what does it say?

3   *A*   *If you don't respond I assume you are going hostile.  We*

4   *wanted to help you with your tax situation.  If I don't hear*

5   *from you, I assume we're not working together.*

6   *Q*   The next one?

7   *A*   *She made promises to you, because she was also promised*

8   *things.  She was not stringing you along.  This is the way*

9   *these things go sometimes.  Sometimes it's awesome and*

10  *sometimes it's bad.  But it's never as bad as you think.*

11  *Q*   All right.  Is there evidence in the text messages that the

12  Tews gave money to Meyers to help him pay the taxes that he

13  owed on the proceeds that he received from National Airlines?

14  *A*   Yes.

15           MR. FIELDS:  All right.  Your Honor, with regard to

16  the Mike Meyers situation, the government's argument here is

17  that the statements from Michael Tew to Mike Meyers are in

18  furtherance of the conspiracy, because Michael Tew is in a

19  conspiracy of Kimberly Tew and they need to pay Mike Meyers to

20  keep him quiet so he doesn't go report any of this to National

21  Airlines or anyone else.  So Mike Meyers is not a

22  co-conspirator, but Michael Tew's messages are in furtherance

23  of the conspiracy and then Mike Meyers' messages, in order to

24  understand Michael Tew, they are non-hearsay context, and

25  there's a Tenth Circuit case cited in the government's *James*

SPECIAL AGENT LISA PALMER - Direct

1    proffer.

2         THE COURT:  Okay.

3         MR. FIELDS:  Now let's talk about the July phone

4    calls.

5         THE COURT:  Actually, why don't we take a quick break

6    now, before we move on to a different topic, just so we can

7    have a quick stretch.  How about a ten-minute recess, and then

8    we will return.

9         MR. FIELDS:  Thank you.

10        THE WITNESS:  Thank you, Your Honor.

11        THE COURTROOM DEPUTY:  All rise.  Court is now in

12   recess.

13        (Recess at 11:08 a.m.)

14        (In open court at 11:20 a.m.)

15        THE COURT:  Let's take our seats, and the witness is

16   still under oath, so I think we are ready to just jump right

17   back in.

18        MR. FIELDS:  Thank you, Your Honor.

19        Q    (By Mr. Fields) Special Agent Palmer, let's talk

20   again about Jonathan Yioulos.  At some points during the

21   conspiracy, did he talk about going to the authorities?

22   A    He did.

23   Q    What did he tell you about that?

24   A    Periodically, he felt like he should go to the authorities,

25   to report the scheme, but he never did.

SPECIAL AGENT LISA PALMER - Direct

1    Q    Now, are there references to that in the text messages?

2    A    Yes.

3    Q    Including, previously, do you remember a text message about

4    a rat?

5    A    Yes.

6    Q    What is a rat?

7    A    A rat, within my profession, generally means someone who

8    has talked to the authorities about criminal activities, often

9    it's an insider; another term might be a snitch.

10   Q    The Tews discuss sometimes being nervous about Jon?

11   A    They did.

12   Q    Let's look at Government's Exhibit 829.  Is this a text

13   exchange between Michael and Kimberly?

14   A    I apologize, my screen is not working.  Based on my paper

15   documents, yes.

16        MR. FIELDS:  Okay.  No worries.  Are you okay -- do

17   you want to use the paper or the screen?

18        THE WITNESS:  I can use the paper.  I just want to

19   make sure the screens are on elsewhere.

20        MR. SCHALL:  Ours are down too, Your Honor.  I think

21   he is firing it up.

22        MR. FIELDS:  Oh, you know what, actually, sorry, I

23   apologize, Your Honor, that was completely my fault.  My laptop

24   was not plugged in.

25        THE COURT:  All right.  We'll blame you.  There we go.

SPECIAL AGENT LISA PALMER - Direct

1      Q    (By Mr. Fields) All right.  What do you see up at the

2  top there?

3  *A*   At the top, the blue messages all appear to be -- or no,

4  the blue messages are from two different numbers.  First two

5  are from Kimberly Tew, ending 2046, the third message is from

6  Michael Tew, ending 7473.

7  *Q*   What did it say at the top?

8  *A*   I feel like it's all dependent on Jon, who is clearly*

9  *losing it, and that makes me nervous, I just want to know a*

10 *time.*

11 *Q*   What does Michael say?

12 *A*   I will get it I promise, I promise.*

13 *Q*   Periodically, do they take steps to reassure Mr. Yioulos?

14 *A*   They did.

15 *Q*   What steps did they take?

16 *A*   They tried to talk to him, kind of talk him through his

17 fears, let him know it was going to be all right.  They did, on

18 many occasions, send his Bitcoin back, then only to demand it

19 back later.  They would also occasionally threaten him.

20 *Q*   Did they also offer him other inducements?

21 *A*   They did.

22 *Q*   Like what?

23 *A*   They discussed paying off his student loans and his home

24 mortgage, and they discussed giving him Buffalo Bills season

25 tickets.

SPECIAL AGENT LISA PALMER - Direct

1   Q   And had they discussed how they needed invoices as a cover

2   story in case they got caught?

3   A   Yes.

4   Q   So let's look at just one example of that.  Let's talk --

5   look at Government's Exhibit 670.  I apologize, let's look at

6   673.  Is this an exchange early on in the conspiracy, November

7   of 2018?

8   A   Yes.

9   Q   All right.  Who is it between?

10  A   Mr. Yioulos' phone number, ending 1709, Michael Tew, ending

11  7473.

12  Q   All right.  And if you look at that bottom message there,

13  is that from Jonathan?

14  A   Yes.

15  Q   All right.  And what does he say there?

16  A   *Look, you are worried about it all coming back to you, I*

17  *get it, but this is the only way.  There's several emails from*

18  *me, telling me to pay Jess with the invoices, and the only way*

19  *I can justify this and protect us both in an audit, is with an*

20  *agreement.  Auditors won't ask why.  They will just want a*

21  *copy.  That's it, Chris, National Chris, will be none the*

22  *wiser*.

23  Q   *National Chris*, is that Chris Alf, one of the owners?

24  A   Yes.

25  Q   Now let's look forward to the end of the conspiracy.  Let's

SPECIAL AGENT LISA PALMER – Direct

1   look at Government's Exhibit 968.

2   Q   Is this an exchange in June 2020?

3   A   It is.

4   Q   Who is it between?

5   A   Kimberly Tew's phone number, ending 2046 and both of

6   Michael Tew's phone numbers, one ends 1312, one ends 7473.

7   Q   Would you please read this?

8   A   *Kimberly, what's going on with Jon?  We need an update on*

9   *this crap.*

10       *Michael, he's on audit falls with Marcum all morning.*

11  *He is texting no news.  He hasn't talked to anyone yet.  He is*

12  *working until midday.*

13  Q   Please keep reading.

14  A   *Kimberly, but, you will find out the story.  Not about*

15  *money.*

16       *Michael, yes both, 100 percent.*

17  Q   Now let's look at Government's Exhibit 971.  Is this

18  another exchange between Michael and Kimberly?

19  A   Yes.

20  Q   What date?

21  A   July 1st, 2020.

22  Q   And what does Kimberly say in those messages?

23  A   *Please, you need to talk to Jon, this week.*

24  Q   Please keep reading?

25  A   *Please stick with me.  Please, I know you are afraid of*

SPECIAL AGENT LISA PALMER - Direct

1    *Jon. Weren't they supposed to have a meeting tomorrow*?

2    Q    Please keep reading.

3    A    *Does it still say pending?*

4         *Michael, says pending.   The meeting F was supposed to*

5    *be today.   There's no meeting and nothing scheduled.   Lori is*

6    *on her way to the Hamptons with Chris.*

7    Q    Did you talk to Jonathan Yioulos about what was happening

8    with National Airlines, at the end of June, first part of July

9    2020?

10   A    Yes, I did.

11   Q    What was happening?

12   A    What was happening is my FBI counter partner and I

13   scheduled an interview with Alfs and with representatives at

14   National Air Cargo as part of our investigation.

15   Q    And when did you first approach National Airlines.

16   A    We first spoke to them on July 1st.   I'm unsure of the date

17   that the FBI contacted them to arrange the interview.

18   Q    As a result with your contact with National Airlines, what

19   happened?

20   A    We had several calls with representatives of National Air

21   Cargo on July 1st.   Early on in the calls, the prosecutorial

22   team figured out that the Tews had a conspirator at National

23   Air Cargo, and we figured out it was Mr. Yioulos.   By the end

24   of the calls, on July 1st, the representatives at National Air

25   Cargo had also figured that out.

SPECIAL AGENT LISA PALMER - Direct

1   *Q*   Had Jonathan Yioulos been approached yet?

2   *A*   He had not.

3   *Q*   What did you ask the National Airlines to do after you

4   figured out Jonathan Yioulos had been defrauding them?

5   *A*   National Air Cargo had made the decision to fire

6   Mr. Yioulos.  We asked them to hold off for a day or two, so

7   the prosecution team could get out there to approach

8   Mr. Yioulos after he had been fired.

9   *Q*   Independently, on top of that, are there references in

10  these messages to audits?

11  *A*   Yes.

12  *Q*   This exchange, the one we just looked at, was on July 1st.

13  Let's look at Government's Exhibit 972.  This one looks really

14  different.  Why does it look different?

15  *A*   That's a photograph that I took of Mr. Yioulos' phone,

16  during my trip to Buffalo, New York, following the July 1st,

17  interviews.

18  *Q*   All right.  And when was this text message sent?

19  *A*   This text message was sent on July 1st, 2020.

20  *Q*   That number there at the top, is that who sent the text?

21  *A*   Yes.

22  *Q*   Do you recognize that number?

23  *A*   I do recognize that number.

24  *Q*   So, before we get into the number, let's -- can you please

25  read the exchange for us.

SPECIAL AGENT LISA PALMER - Direct

1    *A    From the sender, OMG, thank you, OMG.  You have saved me*

2    *and my family, I mean that.  Don't send anything until the*

3    *fall.  I'll figure out how to break news to Michael.  He is*

4    *going to be livid, but also thank you so much, Jon.  I just*

5    *don't know what to say.  No chance at sending anything today*

6    *and tomorrow, like splitting it or best just at once?  I don't*

7    *know how it works, that's Michael's atrea -- area.*

8         *Jonathan, I can't right now, unfortunately.  I'm not*

9    *in the office right now.*

10        Sender, *Totally get it, Jon.  OMG, thank you.  Thank*

11   *you.*

12   *Q*   So, this number, it's not associated with a name, we have

13   not seen it, yet, during this presentation.  Did Jonathan

14   Yioulos know who this number was from?

15   *A*   Mr. Yioulos believed the messages were coming from Kimberly

16   Tew.

17   *Q*   Why did he think that?

18   *A*   Context clues.  There were only three people that knew

19   about the payments that he had made; himself, Michael and

20   Kimberly.  This message references Michael in the third person,

21   implying that the sender is Kimberly.

22   *Q*   Had the Tews asked for money from National Airlines?

23   *A*   Yes.

24   *Q*   From Jonathan?

25   *A*   Yes.

SPECIAL AGENT LISA PALMER - Direct

1    Q   If you look at Government's Exhibit 973.  Is this another

2    one of those?

3    A   Yes.

4    Q   We have not discussed it, but very briefly, these emails

5    from accounting person at globalfuel.co, who are those from?

6    A   Michael Tew.

7    Q   How do you know that?

8    A   We -- a couple of different things.  At this point in the

9    conspiracy, Mr. Yioulos had largely refused to speak to

10   Kimberly.  The domain globalfuel.co, we obtained records from

11   GoDaddy showing the person who set up that domain.  It was

12   Michael Tew, and he was the responsible party for billing, and

13   then lastly, during the recorded calls on July 7th and July

14   8th, Mr. Tew talks about the accounting person and the invoices

15   for Global Fuel and Aero Maintenance Resources.

16   Q   All right.  And so this email was sent on July 2nd?

17   A   It was.

18   Q   It was an invoice for July 1st, 2020?

19   A   It was.

20   Q   Same day as the text saying *OMG, OMG thank you*.

21   A   Yes.

22   Q   So let's go back to that text.  Government's Exhibit 972.

23   So, Yioulos thought it was from Kimberly.  Is there other

24   evidence suggesting it was also from Kimberly?

25   A   Yes.

SPECIAL AGENT LISA PALMER – Direct

1    Q    The phone number is a Google voice number.  We obtained

2    Google subscriber records for this phone number.

3    Q    Let's look at Government's Exhibit 522.  Are these those

4    Google records?

5    A    They are.

6    Q    What does it say there?

7    A    The information that was provided to Google said the first

8    and last name of the user of this account was Kimberly Tew.

9    Q    Who gives this information to Google?

10   A    The person who sets up the Google Voice account.

11   Q    Well, is it possible that -- so, is it possible someone

12   could just put someone else's name there?

13   A    Absolutely.

14   Q    Is it verified by Google?

15   A    No.

16   Q    Is there other evidence that you uncovered, during the

17   course of the investigation, suggesting that Kimberly Tew used

18   Google Voice to contact Jonathan Yioulos?

19   A    There's evidence that Kimberly Tew used Google Voice.

20   Q    Let's look at Government's Exhibit 760.  Is this an

21   exchange between Kimberly and Michael, again?

22   A    Yes, it is.

23   Q    And that first image there is a screen shot on page two

24   here.  What is that?

25   A    It's the details of the Google Voice number.  It's a screen

SPECIAL AGENT LISA PALMER – Direct

1    shot of those details sent by Kimberly Tew's phone.

2    Q   But that's a different Google Voice number, right?

3    A   It is.

4    Q   Now let's look at ... Government's Exhibit 938.  Is this

5    another exchange between Michael and Kimberly?

6    A   It is.

7    Q   And what is the message up at the top?

8    A   *I messaged Jon.  Truthfully, we owe him our lives.*

9    Q   And here on page two, what does it say?

10   A   From my Google Voice, *I don't know.  I don't want to fight*

11   *or demand or beg from him.  I thought you guys were friends.*

12   Q   So does that suggest that Kimberly Tew sometimes used

13   Google Voice to talk to see Jonathan Yioulos?

14   A   Yes, it does.

15   Q   All right.  So we talked about July 1st.  Now let's look at

16   Government's Exhibit 971.  All right.  July 7th, 2020.  What

17   happened on July 7th, 2020?

18   A   I believe that was the day that National Air Cargo fired

19   Mr. Yioulos, myself and an FBI agent met Mr. Yioulos outside of

20   National Air Cargo after he had been fired and approached him

21   asking if he would consent to an interview.

22   Q   What did he do?

23   A   He consented to an interview.  He outlaid -- he outlined

24   his role in kind of this fraud, and then we asked him if he

25   would be willing to make some consensual monitored phone calls

SPECIAL AGENT LISA PALMER - Direct

1   with Mr. Tew.

2   Q    What did he decide to do?

3   A    He agreed to make those phone calls.

4   Q    Did you give him any instructions, before he made that

5   call?

6   A    We did.

7   Q    What did you instruct him to do?

8   A    We instructed him to elicit information from Mr. Tew about

9   the scheme as a whole and to not alert Mr. Tew that we were

10  present and aware of the recording.  The FBI agent and myself

11  we were actually sitting next to Mr. Yioulos while he made the

12  calls.

13  Q    Is that recording that has been marked as Government's

14  Exhibit 974?

15  A    Yes.

16  Q    Is there a transcript of Government's Exhibit 987?

17  A    Yes.  Or I should say, I believe so.  The 900 binder is not

18  in front of me, um...

19  Q    Let's pull them up.  Let's look at Government's Exhibit

20  987.

21  Q    All right.  All right.  So just to orient us, did you hear

22  two voices?

23  A    Yes.

24  Q    What two voices did you hear?

25  A    Mr. Yioulos' voice and Mr. Tew's voice.

SPECIAL AGENT LISA PALMER - Direct

1   Q   Let's fast forward a bit to one minute and twenty three.

2           MR. FIELDS:  Your Honor, I'm going to try a different

3   format to see if I can get the quality to be a little better.

4           THE COURT:  Okay.  Yeah, I don't know if there's

5   something that we can do, but ...

6           MR. FIELDS:  My guess is that it's government's

7   software.All right.

8       Q    (By Mr. Fields) The voices on that phone call, that's

9   Michael Tew and Jonathan Yioulos?

10  A   Correct.

11  Q   Did Michael Tew agree to make another call, the next day,

12  on July 8th -- sorry, did Jonathan Yioulos agree to make

13  another call, the next day, on July 8th?

14  A   He did.

15  Q   Was that call also consensually recorded?

16  A   It was.

17  Q   Is that marked as Government's Exhibit 975?

18  A   Yes.

19  Q   There's a transcript of it that's Government's Exhibit 988?

20  A   Yes.

21  Q   After that call between Jonathan Yioulos and Michael Tew,

22  did Jonathan Yioulos receive text messages?

23  A   He did.

24  Q   Let's look at Government's Exhibit 976.  Are these

25  photographs or email photographs of the text messages that

SPECIAL AGENT LISA PALMER – Direct

1   Michael Tew received?

2   A    They are text messages of the conversation between

3   Mr. Tew's phone number and Mr. Yioulos' phone, on his phone

4   though.  I don't ...

5   Q    How did you get them?

6   A    Yeah, sorry.  I took the photos of the text messages, as

7   they were coming in to Mr. Yioulos' phone, in real time for the

8   most part.  A couple were taken once I arrived and met

9   Mr. Yioulos in person that afternoon.

10  Q    This is on page four.  So, orient us a bit.  Who is in blue

11  and who is in, sort of, the dark gray?

12  A    The blue are Mr. Yioulos' messages, and the dark gray is

13  Mr. Tew, and I would like make one correction to this.  The

14  screen shots, I believe, were emailed to me, by Mr. Yioulos;

15  whereas, I took the photos in this exhibit.

16  Q    Gotcha.  So this is a photograph that you took?

17  A    Yes.

18  Q    So, is this on July 8th, 2020?

19  A    Yes.

20  Q    So blue, sorry again, who was that?

21  A    Mr. Yioulos.

22  Q    And then who is in dark gray?

23  A    Mr. Tew.

24  Q    And what is Mr. Tew asked there?

25  A    *How much can you get out.  Okay?  Thank you.  Understood.*

SPECIAL AGENT LISA PALMER – Direct

1   *Q*   And then, what follows.

2   *A*   *Global Fuel Logistics Inc., Navy Federal Credit Union*, and

    then the account and routing numbers for that account.

4   *Q*   This is page two.  Is this another part of their exchange

5   that same day?

6   *A*   Yes.

7   *Q*   Is this from Michael Tew?

8   *A*   Yes.

9   *Q*   What does he say here?

10  *A*   *I know with all going on it's weird.  Can you send one more*

11  *today and tomorrow for Friday?  Chris will be back in Boca.  I*

12  *have to get you your BTC.  After our conversation today I*

13  *realize how much of your hard work and help did go to waste*

14  *back then, and you really need to hedge your bets also.  We're*

15  *afraid shit is going to blow up, the FBI is going to come here*

16  *and kick on our door soon.  She's afraid you are working with*

17  *the FBI.  Now is the time to get us out of here.  Don't go dark*

18  *please.  Don't be angry.  She thinks we should all turn*

19  *ourselves in and end it.  Kimberly said she is turning herself*

20  *in today.  She says we are ganging up on her.  I'm going to*

21  *jail.*

22  *Q*   Did Jonathan send another payment that day?

23  *A*   He did not.

24  *Q*   Why not?

25  *A*   He had been fired and no longer had access to National Air

SPECIAL AGENT LISA PALMER - Cross

1    Cargo Systems or its finances.

2            *MR. FIELDS:*  Your Honor, I have no other questions.

3            *THE COURT:*  All right.  Thank you.  So, defense, I

4    don't know if you have got a plan for doing some Cross.  One at

5    a time.  I will make the plan.  One of you go ahead.

6            *MR. SCHALL:*  May I, Your Honor?

7            *THE COURT:*  Go ahead.

8                          **CROSS-EXAMINATION**

9    *BY MR. SCHALL:*

10   *Q*   I want to take us back to the early days of the alleged

11   conspiracy.  Is it your testimony that the discussions about

12   the American Express bill, whatever you call it, was the

13   initiation of the conspiracy between Michael Tew and Jonathan

14   Yioulos?

15   *A*   I don't believe so, sir.

16   *Q*   When did that conspiracy begin?

17   *A*   When Mr. Yioulos agreed -- or when Mr. Yioulos and Mr. Tew

18   spoke about receiving additional funds for a fraudulent vendor.

19   *Q*   Can you put a date or a time on that?

20   *A*   On or around August 7th 2018, the date I would like to tie

21   it to, is on or near the receipt and payment of the first

22   Hannah Scaife invoice.

23   *Q*   So that's the first, in my words, not yours, alleged overt

24   act?

25   *A*   Yes.

SPECIAL AGENT LISA PALMER - Cross

1  Q    What evidence do you have that the conspiracy predated

2  that, thus that was an overt act?

3  A    Mr. Yioulos talked to us about speaking about these

4  invoices with Mr. Tew.

5  Q    And that was in July of 2020?

6  A    I don't know the exact date of those conversations.

7  Q    When did you first speak to Mr. Yioulos?

8  A    We first approached Mr. Yioulos on July 7th, 2020.

9  Q    Okay.  So, didn't talk to him before?  He had never been

10 approached by law enforcement?

11 A    As far as I know, no.

12 Q    Okay.  And at that point, July 2020, is when you go back to

13 look for the start of the conspiracy?

14 A    Correct.

15 Q    And it's your testimony that it began on August, I think

16 you said, 7th, 2018?

17 A    Approximately then, yes.

18 Q    Okay.  And who was involved, at that time?

19 A    Mr. Yioulos had direct conversations with Mr. Tew, and had

20 communicated with Kimberly during that period, as well.

21 Q    And you know this because of Mr. Yioulos' statements?

22 A    As well as communications.  For example, not part of the

23 conspiracy, but Kimberly did work for National Air Cargo, so

24 she had contact with Mr. Yioulos predating the conspiracy and

25 the fraud.

SPECIAL AGENT LISA PALMER - Cross

1   Q   Were there others involved in these same communications

2   related to the Amex?

3   A   When you say communications related to the Amex, can you be

4   more specific?

5   Q   Sure.  Were there other people discussing the Amex issue,

6   for lack of a better word, other than Mr. Tew, Mr. Yioulos and

7   Mrs. Tew?

8   A   Aside from the three of them?  I know that executives and

9   higher ups at National Air Cargo were aware of it.  They were

10  talking with Amex.  They were working, for example, I believe,

11  with King Soopers, to obtain video evidence related to how the

12  card was being used, that's related to the investigation of the

13  fraud.  I'm not quite sure if that answers your question.

14  Q   Did the -- we're getting there.  Is the card that was used

15  the Amex card, was a corporate account?

16  A   Correct.

17  Q   Did it have an individual's name on it?

18  A   Based on my training and experience, the corporate card

19  would have an individual's name on it, but I never saw that

20  card, so I cannot speak as to whether or not a name was on that

21  card, specifically.

22  Q   Do you know who had access to that account, to use that

23  account?

24  A   I believe -- well, Michael had access to the card, and I

25  believe Kimberly also had access to the cards.

SPECIAL AGENT LISA PALMER - Cross

1    Q    Any other?

2    A    Not that I am aware of.

3    Q    So, it was -- it was -- to your knowledge, was it a card

4    issued by the company?

5    A    Yes.

6    Q    For use by employees?

7    A    For use by the employee it was assigned to.

8    Q    And you believe that to be Michael Tew?

9    A    Correct.

10   Q    But you don't know?

11   A    I have never seen the card.  I believe we have records for

12   the card, but I did not review that as part of the -- my

13   preparation today.  If I could look at the statements I could

14   probably tell you the name that's actually, specifically, on

15   the card.

16   Q    At this part, August 7th, 2018, the conspiracy, you are

17   identifying, is a conspiracy to commit wire fractured?

18   A    Correct.

19   Q    At this time, there's no conspiracy to commit money

20   laundering, that you are aware of?

21   A    Not that could be charged.

22   Q    Tell me what you are aware of?

23   A    At that point, there's a conspiracy to commit wire fraud

24   and to hide the proceeds, who they were going to.  The

25   conspiracy to commit money laundering wouldn't have started

SPECIAL AGENT LISA PALMER – Cross

1  until after, but I'm unsure of the exact date that conspiracy

2  would have started.

3  Q   And how did that conspiracy start, to your knowledge?

4  A   Would largely be on how the funds were spent.

5  Q   So is spending funds, money laundering?

6  A   It can be.

7  Q   Tell me what you know, your basis of knowledge for when the

8  money laundering conspiracy started?

9  A   There's many different kinds of money laundering, there's

10  concealment money laundering, there's spending money

11  laundering, there's promotional money laundering.  In this

12  case, once the Tews received the funds, discussions were

13  started on how the funds were spent.  Some of those discussions

14  elevate to the level of a money laundering conspiracy, once we

15  start talking about proceeds that exceed $10,000.

16  Q   Tell me how?

17  A   Mr. And Mrs. Tew maintained a close eye on the family

18  finances, and discussion of how to spend the fraud proceeds,

19  start to be discussions that approach that $10,000 limit per

20  transaction.

21  Q   So that would be a, if you are familiar, a 1957 violation?

22  A   Correct.

23  Q   I want to know about the 1956(h) violation, the conspiracy

24  to launder monetary assets, basically?

25  A   Okay.

SPECIAL AGENT LISA PALMER - Cross

1    Q   When did that start?

2    A   I would argue that talking about how to spend these

3    proceeds and what to do with them started pretty much

4    immediately after they began to receive the funds.

5    Q   Okay.  I don't want you to argue.

6    A   Okay.

7    Q   I want you to tell me the facts that underlie your basis

8    for knowing when the money laundering conspiracy started?

9    A   Immediately after these payments to Hannah Scaife, CPA, we

10   begin seeing payments to Meyers Consulting Group and 5530

11   Jessamine Development Group -- or Jessamine Development, LLC.

12   Both of those companies are used by contacts of Mrs. Tew's.  To

13   the best of our knowledge, the information; such as, bank

14   account and routing numbers, would have come from those

15   contacts of Mrs. Tew with Mrs. Tew's participation in those

16   conversations, not just -- not just from Mr. Tew or Mr. Yioulos

17   obtaining that information on their own.

18           When we start to talk about money laundering, we are

19   talking about concealment of proceeds, and Mrs. Tew was part of

20   the discussion of *What are we going to do with these proceeds?*

21   *What portion is going to be sent to the people who are helping*

22   *us,* in this case, Meyers Consulting Group and 5530 Jessamine

23   Development.  Those conversations could not have happened

24   without her help.  That's part of the wire fraud conspiracy,

25   and many of those transactions were over $10,000, and what to

SPECIAL AGENT LISA PALMER – Cross

1   do with those proceeds goes to the heart of the money

2   laundering conspiracy as well.

3   Q    So the payment to Meyers Consulting of specified –– fruits

4   of specified unlawful activity, in excess of $10,000, is an

5   overt act in furtherance of the money laundering conspiracy?

6   Even if it was a debt owed to Michael Meyers?

7   A    Yes.

8   Q    Aside from NAC?

9   A    Yes.

10  Q    And so it's your position that the –– both conspiracies,

11  basically, started contemporaneously?

12  A    Yes.

13  Q    After money left National Air Cargo?

14  A    About that time, yes.

15  Q    Was Mr. Yioulos –– did he have clean hands before this?

16  A    No.

17  Q    Was he kind of a veteran at this?

18  A    I'm not sure I would use those words, but he had engaged in

19  other fraudulent activities at National Air Cargo.

20  Q    Tell me about those?

21  A    After we interviewed Mr. Yioulos, we took a look at his

22  financial records, we found deposits from National Air Cargo

23  that we could not explain.  When we approached him, he admitted

24  that those were payments that he had split with another

25  employee at National Air Cargo.  Those payments were fraudulent

SPECIAL AGENT LISA PALMER - Cross

1   in nature, and he had used his position as -- by the end he was

2   the controller, I believe prior to that it was a lesser title.

3   His position in the accounting department at National Air Cargo

4   to hide those payments and to make them look legitimate.

5   Q   Who was that other employee?

6   A   I don't recall his exact name but I believe it was Thomas

7   Seefert.

8   Q   Can you -- you don't have to be precise, there's a lot

9   here.  Can you estimate how much money was involved in those

10  transactions?

11  A   Again, this is an estimate.  If you wanted an exact number

12  I would need to check my records.  I believe it was

13  approximately a hundred thousand dollars.

14  Q   And that money went -- was split between Seefer and

15  Yioulos, generally speaking?

16  A   Very general.  I'm hesitant to pin down an exact number,

17  but, generally, I believe that's correct.

18  Q   They each got something?

19  A   Correct.

20  Q   Okay.  I want to take you to the -- what we all here are

21  calling the one-sided conversations, identified in the

22  government's exhibits.  Do you know what I'm talking about when

23  I say that?

24  A   Yes.  The gray messages from Mr. Yioulos' phone, where

25  there's no response.

SPECIAL AGENT LISA PALMER - Cross

1    Q    Where it looks like he is being ghosted?

2    A    Correct.

3    Q    Okay.  In your training and experience, what do you

4    believe, and I am asking you to speculate, or tell me what you

5    think, why there's no other side of that conversation?

6    A    I believe the messages were likely deleted off of the

7    phone.

8    Q    Are you -- does Cellebrite have the ability to recover

9    deleted messages?

10   A    I'm not aware enough of Cellebrite's capabilities to

11   speculate on that, but I can say that there's a field that we

12   can look at where it says, *deleted, yes or no*, within the

13   reader.  I don't know what populates that field or where that

14   data comes from.

15   Q    Do you have any knowledge or understanding of why or only

16   half of a conversation would be deleted?

17   A    I don't know enough about the Cellebrite Reader or how

18   Apple produces its reports in order to speculate on that.

19   Q    Can you say for certain that there was a conversation

20   ongoing, half of which we no longer have record of?

21   A    What I can say, for certain, is that Mr. Yioulos' messages

22   do appear within the iCloud account.  I can say that we have

23   testimony from Mr. Yioulos that he did communicate with

24   Kimberly, but I do not know, for certain, that Kimberly sent

25   messages, and I do know that the content of those messages, if

SPECIAL AGENT LISA PALMER - Cross

1    she sent them.

2          All I can say is, based on Mr. Yioulos's testimony,

3    what's in the phone and from my training and experience, what I

4    would expect to see as a one-sided conversation.

5    Q   But you don't -- you can't state definitively that the

6    device that Mr. Yioulos was sending it to, opened, read or a

7    user saw those messages?

8    A   Based on what I know today and the work I have done so far,

9    no, I cannot say that.

10   Q   Did you -- and you have met with Mr. Yioulos, spoken with

11   him a handful of times?

12   A   Correct.

13   Q   Did you ask him about these one-sided conversations?

14   A   I do not recall.  I would have to refresh my memory with my

15   memos of interviews with Mr. Yioulos.

16   Q   Do you have those available to you?

17   A   Um ... I'm not sure that we do.  I do know we have spoken

18   to him about conversations with Kimberly.  I just do not recall

19   if we spoke to him about specific messages from her phone.

20   Q   Do you -- would you recall asking him, specifically, to

21   fill in the cracks on the one-sided conversation?

22   A   If there were ones that particular spoke -- stuck out in

23   his mind, we would, but we would not ask him to speculate or to

24   try to get to an answer that he didn't remember.

25   Q   So, with regards to the one-sided conversations, you didn't

SPECIAL AGENT LISA PALMER - Cross

1  direct his attention to those, to say, is this a

2  conversation -- is this half a conversation you had?

3  A    I do not recall.

4  Q    You don't recall if you asked him that?

5  A    I don't recall if I asked him that specific question.

6  Q    Would that be something to do?

7  A    It would be.

8  Q    Is gambling illegal?

9  A    No.

10 Q    Is exchanging funds from specified unlawful activity into

11 gambling chips or debits or accounts at a casino a form of

12 money laundering?

13 A    It can be.

14 Q    Tell me how?

15 A    So, for example, under the 1957 statute, if you were to

16 exchange more than $10,000 of specified unlawful proceeds for

17 chips, that could be a 1957 charge.  It could also, depending

18 on the circumstances, be a 1956 concealment charge, if you were

19 trying to conceal the origin of the proceeds or control of the

20 proceeds.  Those are the two examples that come to mind, off

21 the top of my head.

22 Q    A couple times now, you testified about different forms of

23 money laundering.  Is that something you received extensive

24 training on at the academy?

25 A    Yes.

SPECIAL AGENT LISA PALMER - Cross

1    *Q*   And is that a FLETC or does the IRS have a different

2    academy?

3    *A*   Our academy is located at FLETC.  We go through three

4    months of training with FLETC proper, through the CITP program.

5    We go through three months of training still at FLETC, but

6    under INCIDA, which is our own training staff and training

7    curriculum.

8    *Q*   And not putting you on the hot seat, anymore than you are,

9    how many forms of money laundering can contribute to a money

10   laundering conspiracy?

11   *A*   Pretty much all of the forms of money laundering could be

12   part of a conspiracy.  The -- while this is not an exhaustive

13   list, the ones that come to mind, off the top of my head, are

14   money laundering, where you take the proceeds from a specified

15   unlawful activity and push it back into the specified unlawful

16   activity; so, promotional money laundering, there's concealment

17   money laundering, which we have already discussed, there are

18   sting-provision money laundering; maybe the proceeds are not

19   from a real SUA, but they are reported to be by an under

20   representative of the government.  We have money laundering

21   conspiracy to evade reporting requirements; such as, taxes or

22   BSA documents, and then there's also the money laundering

23   spending statute.

24          There are many other forms of money laundering.  Again

25   this is not an exhaustive list, but any of those kinds of money

SPECIAL AGENT LISA PALMER – Cross

1   laundering could be basis for a 1956(h) conspiracy charge.

2   *Q*   And in your training and experience, is money laundering as

3   simple or oftentimes as simple as the changing of the form of a

4   currency from one to another?

5   *A*   It can be.

6   *Q*   Would that be concealment?

7   *A*   It depends on the specifics of the scenario.

8   *Q*   What depends?

9   *A*   One of the challenging parts of money laundering is we do

10  have to approve intent, and some of that can be from contextual

11  clues.  So, if you are converting, say, your currency from

12  cryptocurrency to cash, in an attempt to conceal where it is

13  going, that might be a money laundering charge.  If you are

14  trying to conceal where the proceeds came from by say putting a

15  down payment on a house, to disguise -- the house is in

16  somebody else's name; that might be concealment.

17         When I say context matters, the specifics of the

18  transaction are integral to figuring out if you have money

19  laundering and what sort of money laundering it is.

20  *Q*   I want to focus you in on the context in this case?

21  *A*   Sure.

22  *Q*   The allegations here.  The wire fraud conspiracy is

23  essentially that fraudulent invoices were submitted and paid?

24  *A*   Yes.

25  *Q*   What's the money laundering conspiracy?

SPECIAL AGENT LISA PALMER - Cross

1    *A*   The money laundering conspiracy largely relates to 1957

2    spending charges on how the money was spent.

3    *Q*   Not trying to -- is there evidence that money was

4    squirreled away or hidden or anything of that nature?

5    *A*   There's no -- I was not able to uncover evidence that the

6    money was necessarily squirreled away or hidden.

7    *Q*   In large part, in your investigation, what did you

8    determine happened to the money?

9    *A*   In large part, the money was spent, often, on gambling.

10   *Q*   Was that by who?

11   *A*   Largely by Kimberly Tew.

12   *Q*   When Michael and Kimberly Tew discuss gambling, is it

13   inherently part of that conspiracy?

14   *A*   Yes.  Because they are discussing how to spend the proceeds

15   of the fraud.

16   *Q*   But can you say for certain that -- well, let me back up.

17   At this time or up into this time, had Kim or Michael Tew had

18   legitimate income?

19   *A*   Yes.

20   *Q*   And was it all mixed up together, do you know?

21   *A*   I'm not sure I understand the question.

22   *Q*   Okay.  So, if -- in a government exhibit, the Tews discuss

23   gambling, cards, whatever, buying Lotto tickets, how do you

24   know that they are discussing spending fruits of specified

25   unlawful activity versus Michael's job?

SPECIAL AGENT LISA PALMER - Cross

1   *A*   The amount of money received by the Tews, as part of the

2   this fraud, dwarfs any legitimate income, and many times,

3   within these transactions we can look at the date of the test

4   message and go to the bank accounts to see what was going on in

5   the bank accounts at the time.  Often, but not always, the

6   money in the accounts has to be fraud proceeds, because there's

7   no money leftover in the account from legitimate sources.

8   *Q*   In your interviews, how many people at NAC would you say

9   you interviewed?

10  *A*   One moment, I'm thinking.  Somewhere between five and ten.

11  *Q*   And what -- did they -- did any of them insinuate or say

12  overtly to you that NAC did wrong to Michael Tew or that NAC

13  owed him money?

14  *A*   No.  They said that once Michael had been terminated, they

15  had no business dealings with the Tews, as far as they were

16  aware, that was their initial statement, until they uncovered

17  the fraud.

18  *Q*   Did anyone discuss whether or not, at the time, or just

19  before he was terminated, that Michael Tew was owed

20  compensation of some sort?  Whether legally or not?

21  *A*   I don't recall.

22  *Q*   Okay.  Can you -- I saw you thinking about how many people

23  you interviewed at NAC.  Can you name them for us?

24  *A*   Yes.  With kind of asterisks of I may miss something.

25  *Q*   Sure.

SPECIAL AGENT LISA PALMER - Cross

 1  *A*   Just memory, we spoke with Chris Alf, Lori Alf,

 2  Ron Brodfuehrer, he was the head of IT, spoke with Abby

 3  Schwartz, spoke with Brian Boyd, who is the head of security,

 4  and we may have spoken with one or two others, but those are

 5  the ones I remember off the top of my head.

 6  *Q*   Did you speak with the employee that Jonathan Yioulos

 7  committed a different kind of fraud with?

 8  *A*   I never spoke to him.

 9  *Q*   Do you know if any of the investigative team did?

10  *A*   I do not believe so.

11  *Q*   Lastly, I think, I want to talk about the reported calls,

12  the consensual recordings that were made July 2020.

13  *A*   (Nodding head.)

14  *Q*   The gig was up for Mr. Yioulos, at that point?

15  *A*   Yes.

16  *Q*   And who was with you there in Buffalo?

17  *A*   Special Agent -- FBI Special Agent Luke Humphrey.

18  *Q*   You-alls recording with Mr. Yioulos, is just that, it's

19  recorded?

20  *A*   Correct.

21  *Q*   And you are talking about everything from sports to you are

22  just killing time until the recorded call, basically?

23  *A*   Correct.

24  *Q*   None of that discussion is in furtherance of the

25  conspiracy?

SPECIAL AGENT LISA PALMER - Cross

1    A    Correct.

2    Q    When Jon gets on the phone with Michael, what makes it back

3    into the world of conspiracy, such that it can be Jon's

4    statements can be used against Michael?

5    A    Two things come to mind; one is, Ms. Tew was still in the

6    conspiracy with Mr. Tew, and, from their point of view,

7    Mr. Yioulos was still part of the conspiracy.  Based on my

8    preparation, I believe, one of the reasons we can include a

9    statement in a *James* log, is if the co-conspirators are trying

10    to soothe each others fears or concerns about the conspiracy as

11    a whole.  So, Mr. Tew speaking to Mr. Yioulos, walking him

12    through what's been done, how they have covered their tracks,

13    that could fall under such exception.

14    Q    You said there was a second?

15    A    The second was updating on the kind of overall status of a

16    conspiracy, and from Mr. Tew's eyes he was updating

17    Mr. Yioulos on what was going on; and then the other thought

18    would be if it was an undercover, how would that change things,

19    and I am not an attorney, but it seems to me that if an

20    undercover had made a similar call, it would be admissible, and

21    I am speculating, so I'm going to stop now.

22    Q    Set Michael Tew's statements aside.

23    A    Sure.

24    Q    I want to know about Jonathan Tew's (sic) statements that

25    he made in that call?

SPECIAL AGENT LISA PALMER - Cross

1   *A*   Jonathan Tew?

2   *Q*   Jonathan Yioulos'?

3   *A*   Thank you.

4   *Q*   He is on the other end of that call.  My apologies.  His

5   statements are not in furtherance of the conspiracy, because he

6   is no longer in the conspiracy?

7   *A*   Correct.

8   *Q*   He is, in fact, taking direction from you and your FBI

9   colleague?

10  *A*   Correct.

11  *Q*   And if I recall the conversation, there's some

12  watercooler-type talk about how to approach what to do; is this

13  a good time; those kinds of things?

14  *A*   Yes.

15  *Q*   So, is it fair to say that you are orchestrating what he is

16  doing, with his consent, of course?

17  *A*   We talked to him about what would be the best way to

18  approach, about what topics to potentially include, but we did

19  not give him a script.  We did not say, *You have to say A, B*

20  *and C*.  We trusted Mr. Yioulos to act normal and that he knew

21  the best way to elicit information from Mr. Tew.

22  *Q*   And at this point, you are happy that Mr. Yioulos is

23  convicting himself, as well, essentially, right?

24  *A*   Correct.

25         *MR. SCHALL:*  May I have just a minute, Your Honor?

SPECIAL AGENT LISA PALMER - Cross

1        *THE COURT:*  Sure.

2        Q    (By Mr. Schall) Going back to the Cellebrite

3   extraction.  Was this a clean process?

4   *A*    No.

5   *Q*   In your words, tell me why it was not?

6   *A*   I initially obtained a copy of the search warrant returns

7   in a Cellebrite Reader, and I began reviewing the information.

8   I initially focused on conversations between Mr. And Mrs. Tew

9   and expanded outwards to look at statements of other

10  co-conspirators and statements of other family members.  At

11  that point I realized one of the family members was an

12  attorney, and informed the prosecution team, and basically

13  stepped away while we considered if the phone and the contents

14  I had been looking at contained privileged information, in form

15  of attorney/client communications.

16  *Q*   And you -- what did you do next?

17  *A*    I waited.  I was temporarily paused, for lack of a better

18  word, from working on this case, while it was sorted out if I

19  had been tainted; tainted, meaning I had read attorney/client

20  communications that might be inappropriate for me to have read,

21  might alter my steps on this case.  Eventually, once a *taint*

22  *team* had been in place; a *taint team*, meaning a team of agents

23  or attorneys who did not perform the investigation who reviewed

24  all communications, including those that might be privileged.

25  They basically separated out the information into privileged

SPECIAL AGENT LISA PALMER - Cross

1    and the prosecution team could not look at the tainted

2    materials and non-tainted materials, was then a hearing and

3    later I was allowed back on the team when it was determined

4    that the information I read was not so privileged that I could

5    no longer help on the investigation.

6    Q    Setting aside the taint team and all of that, was there

7    issues with the forensic examination of Mr. Yioulos' phone?

8    A    I'm unclear exactly what your question means.  Could you

9    rephrase?

10            MR. SCHALL:  Your Honor, may I approach with a report?

11            THE COURT:  You can give it to Mr. Keech.

12            MR. SCHALL:  Okay.  I will share it with the

13    government.

14            THE COURT:  Sure.

15            THE WITNESS:  Thank you.

16        Q    (By Mr. Schall) You were just handed, I believe, an

17    FBI 302, which you would have not authored; is that correct?

18    A    Correct.

19    Q    Not your agency?

20    A    Correct.

21    Q    Are you familiar with the author of that report?

22    A    Yes.

23    Q    Okay.  Do the contents of that report ring a bell about

24    what happened with regards to the extractions of Mr. Yioulos'

25    phone?

SPECIAL AGENT LISA PALMER – Cross

1    *A*    One moment while I finish reviewing the memo.

2    *Q*    Of course.

3    *A*    I vaguely recall this.

4    *Q*    Something was lost?

5    *A*    Yes.

6    *Q*    What was that?

7    *A*    It looks like some of the content of Mr. Yioulos' phone was

8    lost or improperly processed.

9    *Q*    And the -- we -- you, as the case agent, do you have a base

10    of knowledge of understanding what was lost?

11    *A*    As it stands today, I do not recall this incident.  I am

12    sure that I was informed of it, at the time.

13    *Q*    So you don't know what happened?

14    *A*    I don't know what happened there.

15    *Q*    Okay.  You can't say whether or not what happened with the

16    extraction of Mr. Yioulos' phone, contributed to the one-sided

17    messages?

18    *A*    I cannot.

19    *Q*    Okay.  Did Mr. Yioulos tell you he deleted his messages?

20    *A*    He did.

21    *Q*    Were they recovered?

22    *A*    They were not.

23    *Q*    Did you ask him about the details of those messages?

24    *A*    We did.

25    *Q*    What did he say?

SPECIAL AGENT LISA PALMER - Cross

1   *A*   He said he communicated with Mr. And Mrs. Tew up until a

2   regular basis.  He said he hid his contact with Mr. Tew by

3   using the name, I believe, it was Jon Bear, in his phone,

4   instead of Michael Tew.  So if somebody called, they would not

5   get suspicious.  *They* being the employees at the National Air

6   Cargo.  He said he routinely deleted messages as part of... he

7   just regularly deleted messages.

8   *Q*   Did he use any apps that are for communication that

9   self-delete?

10  *A*   I cannot recall him using any.  I do -- yeah, I cannot

11  recall him using any.

12  *Q*   Are all of the messages -- all is a strong word.  Are the

13  messages in this *James* log, that come from text, either SMS or

14  iMessage texts?

15  *A*   The vast majority, but I would be uncomfortable saying all.

16  *Q*   Nothing like the Signal app or WhatsApp, that would be

17  different?

18  *A*   I'm uncomfortable saying all.  There's a chance that there

19  are messages from Signal or WhatsApp.

20  *Q*   Not a significant amount?

21  *A*   As far as I'm aware, not a significant amount.

22        *MR. SCHALL:*  May I have just a moment, Your Honor?

23        *THE COURT:*  Okay.

24        *MR. SCHALL:*  Pass the witness, Your Honor.

25        *THE COURT:*  Mr. Kaplan, do you have some questions?

SPECIAL AGENT LISA PALMER - Cross

1          *MR. KAPLAN:*  A few.

2          *THE COURT:*  Okay.  Go ahead.

3          *THE COURT:*  Go ahead.

4                              **CROSS-EXAMINATION**

5    *BY MR. KAPLAN:*

6    Q    Good afternoon.

7    A    Good afternoon.

8    Q    I just have a few questions.  The messages that were in the

9    *James* log, that you went over, the first ... 22 of them,

10   involve conversations between Michael Tew and Mr. Yioulos; is

11   that a fair statement?

12   A    I'm going to doublecheck.

13   Q    Sure.

14   A    Yes.

15   Q    And those do not involve conversations that Ms. Tew is

16   identified as a participant in?

17   A    So, if we look at message -- or entry in the *James* log 19.

18   Q    Yes.

19   A    Those messages are from Mr. Yioulos' phone number, ending

20   in 1709, and they are part of the messages we discussed where

21   they are the one-sided conversation.

22   Q    That's right.  But in terms of whose identified in these

23   first 22, as a participant in the conversation, Mrs. Tew is not

24   one of them?

25   A    Mrs. Tew is not identify as sending the messages, but, for

SPECIAL AGENT LISA PALMER - Cross

1   example, in conversation 19, I would argue she is a

2   participant.  She is the receiver of those messages.

3   Q   And you have testified as to your confirmation of whether

4   she actually received them, and that you don't have that

5   confirmation?

6   A   Correct.

7   Q   When it comes to these first messages, there are

8   discussions of various bank accounts; is that correct?

9   A   Yes.

10  Q   The bank accounts that you have researched, you have -- I

11  mean that are involved in this case, you have identified who

12  the signatories are on those?

13  A   Correct.

14  Q   And to make it easier than looking at who are the

15  signatories, let me ask who is not.  Ms. Tew is not a signatory

16  in any of those bank accounts, except for the Navy Federal

17  Credit Union account, involving 8486?

18  A   Correct.

19  Q   And so when you look through the first batches, and I am

20  now talking about 1 to 22, we're talking about those

21  conversations.  Those conversations involved Guarantee Bank?

22  A   Yes.

23  Q   And Ms. Tew is not a signatory on that?

24  A   Correct.

25  Q   It talks about ... let me just look real quick.  Matter of

SPECIAL AGENT LISA PALMER - Cross

1    fact -- let me ask another question.  Matter of fact that in

2    those communicaions, that we're looking at now, none of them

3    involve the Navy Federal Credit Union, account 8446?

4    A    Correct.

5    Q    When it comes to the invoices that you have spoken of,

6    those invoices were primarily delivered by Michael Tew?

7    A    Primarily.

8    Q    And that is between him and Mr. Yioulos?

9    A    Correct.

10   Q    In the first communications that are in the *James* log,

11   Mr. Yioulos talks about Bitcoin; isn't that correct?

12   A    Correct.

13   Q    And you testified that he dealt with cryptocurrency?

14   A    Yes.

15   Q    And he dealt with cryptocurrency prior to these

16   conversations?

17   A    Yes.

18   Q    And he was somebody who invested in them?

19   A    Yes.

20   Q    Somebody who traded in them?

21   A    I am not familiar with the full extent of his

22   cryptocurrency dealings, but he held several different

23   cryptocurrencies.

24   Q    There's nothing illegal about being involved in

25   cryptocurrency?

SPECIAL AGENT LISA PALMER – Cross

 1   A    No.

 2   Q    It is a, now, a method of exchanging money and investing in

     the hope of increasing your investment?

 4   A    Yes.

 5   Q    And so if there are conversations about cryptocurrency,

 6   there's nothing that is illegal about those conversations?

 7   A    Context is important.  We can use legal things for illegal

 8   means.  I hesitate to say generally.  It would rely on the

 9   specific conversation.

10   Q    But generally speaking, just because you are talking about

11   cryptocurrency, doesn't mean that you are engaged in illegal

12   activity?

13   A    Correct.

14   Q    And you covered some of this ground; that is true when you

15   are talking about gambling; there's nothing illegal about

16   gambling.

17   A    Correct.

18   Q    Legal gambling?

19   A    Yes.

20   Q    Okay.  Casino gambling, the like?

21   A    Exactly.

22   Q    Now, probably more forms of gambling.  And so there can be

23   conversations about being at a casino and hitting a jackpot,

24   there's nothing illegal about that?

25   A    Correct.

SPECIAL AGENT LISA PALMER - Cross

1   *Q*   Throughout this *James* log there are conversations that

2   Kimberly Tew is having with her husband, Michael Tew, that

3   deals with -- with how they're doing at casinos; is that right?

4   *A*   Yes.

5   *Q*   And the transfer of Bitcoin?

6   *A*   Yes.

7   *Q*   And where they were traveling, perhaps, on a vacation to

8   Vegas; there's some communication involving that?

9   *A*   Yes.

10  *Q*   There are communications in this *James* log that are

11  describing conversations that are simply between Kimberly Tew

12  and Michael Tew?

13  *A*   Yes.

14  *Q*   With nobody else participating on that conversation?

15  *A*   Yes.

16  *Q*   You talked a little bit about legitimate income, and you

17  testified that there was legitimate income that was in the

18  accounts that were controlled by Michael Tew?

19  *A*   Yes.

20  *Q*   And to your knowledge, there were legitimate income, in the

21  account at Navy Credit -- Navy Federal Credit Union, that was a

22  joint account with Ms. Tew?

23  *A*   Yes.

24  *Q*   And as you testified, that those accounts had both, in your

25  estimation, legitimate and non-legitimate funds?

SPECIAL AGENT LISA PALMER - Redirect

1    A    Correct.

2    Q    And you cannot determine if some of those funds were used

     for different purchases, whether the funds came from illegal or

4    legal activity?

5    A    It depends on the transaction and the balances in the

6    account at the time of the transaction.

7    Q    So, some of them, you believe, you could establish, through

8    the documents, came from, say, the NAC payments and some not?

9    A    Yes.

10         MR. KAPLAN:  If I may just have a moment?  Nothing

11   further.

12         THE COURT:  All right.  Thank you, Mr. Kaplan.

13   Mr. Fields, do you have some Redirect?

14         MR. FIELDS:  Very briefly, Your Honor.

15         THE COURT:  Okay.  Let's go ahead.

16                    **REDIRECT EXAMINATION**

17   BY MR. FIELDS:

18   Q    All right.  Agent Palmer, do you remember being asked

19   questions about when the conspiracy to commit money laundering

20   began?

21   A    Yes.

22   Q    Do you recall -- let's -- first all, let's look at

23   Government's Exhibit 613.  Is this an exchange between Jonathan

24   Yioulos and Michael Tew?

25   A    Yes.

SPECIAL AGENT LISA PALMER - Redirect

1    Q    And what time?

2    A    August 22d, 2018.

3    Q    All right.  And do you see the message, *What is your BTC*

4    *address*?

5    A    Yes.

6    Q    What is BTC?

7    A    Bitcoin.

8    Q    And then you see the alphanumeric, and then you see

9    *blockchain*.  What is the *blockchain*?

10   A    Blockchain.com is one of many websites you can go to, to

11   look for transactions on the *blockchain*.  You can also look at

12   Active Wallet -- not wallet -- address balances.  So I would

13   have to look at this particular link, but it could either be a

14   confirmation of a transaction on the blockchain or a

15   confirmation of a balance in a Wallet as of the date it was

16   sent.

17   Q    And around this time, this is August 2018, had false

18   invoices for Hannah Scaife already been submitted?

19   A    Yes.

20   Q    Was Jonathan Yioulos hoping to get his Bitcoin?

21   A    Yes.

22   Q    According to him, who was going to be helping him engage in

23   these Bitcoin transactions?

24   A    Kimberly Tew.

25   Q    Talk about a Bitcoin, a coin.  Can it fluctuate in value?

SPECIAL AGENT LISA PALMER - Redirect

1    *A*    It can.

2    *Q*    Did you know, approximately, how much it was worth around

3    this time period?

4    *A*    I believe in 2017 Bitcoin was on its way up towards $10,000

5    a coin, and I think in the 2018 it hit $20,000 a coin.

6    *Q*    So, it was already more than 10,000, approximately, around

7    that time period?

8    *A*    Yes.

9    *Q*    In fact, actually, if you look, this is a little bit later,

10    but let's look at Government's Exhibit 809.  Go to page five.

11    Well, first of all, let's orient ourselves.  On page four here,

12    are there screen shots from Michael Tew, to Kimberly Tew?

13    *A*    Yes.

14    *Q*    The screen shots on the next page.  Is this a screen shot

15    of the Bitcoin ATM?

16    *A*    Yes, it is.

17    *Q*    Then you see at the top there, *We sell Bitcoin at*, it's

18    kind of a Bitcoin sign and then one Bitcoin equals how much

19    money?

20    *A*    Thirteen thousand... sorry, $13,009.02.

21    *Q*    And this was in what time period?

22    *A*    July 2019.

23    *Q*    So it's after August 2018.  But it does show that Bitcoin,

24    at times was over $10,000?

25    *A*    Yes.

SPECIAL AGENT LISA PALMER – Redirect

1   Q   And what was one of the things that the Tews were going to

2   spend their fraud proceeds on?

3   A   They were going to buy Bitcoin for Mr. Yioulos, as

4   previously discussed in messages.

5   Q   All right.  Then you remember being asked about Cellebrite?

6   A   Yes.

7   Q   And in particular, about the forensic extraction of

8   Mr. Yioulos' phone?

9   A   Yes.

10  Q   The text messages, you know, like we just looked at and you

11  looked at throughout your presentation, from what source were

12  they derived?

13  A   They were derived, ultimately, from the search warrant

14  returns for the kley@me.com account.

15  Q   Did you rely on any of that extraction from Jonathan

16  Yioulos' phone?

17  A   No.

18  Q   Did Apple provide a certificate of authenticity when it

19  provided the Apple returns?

20  A   It did.

21  Q   Has that been marked as Government's Exhibit ... 1015?

22  A   I do not have 1015 in front of me.  If you wouldn't mind

23  bringing it up?  Yes.  Or it's 1115.

24  Q   Thank you, 1115.  Do you have any reason to think that

25  Apple did not give you everything that was in their possession

SPECIAL AGENT LISA PALMER - Redirect

1   in response to the warrant?

2   *A*   I do not.

3          *MR. FIELDS:*  Your Honor, I have no further questions.

4          *THE COURT:*  All right.  Thank you.  And thank you.

5   You may step down.

6          *THE WITNESS:*  Thank you.

7          *THE COURT:*  So we've gone on quite a while and still

8   have, sort of, our discussion time, but I think we need at

9   least a half hour.  So why don't we take a half-hour break and

10  get something to eat and come back and discuss where things

11  stand.  So we'll be back at say five after.  All right.  Thank

12  you.

13         *THE COURTROOM DEPUTY:*  All rise.  Court is in recess.

14     (Recess at 12:35 p.m.)

15     (In open court at 1:12 p.m.)

16         *THE COURT:*  Please take your seats.  So my

17  understanding is we're done with the witness portion of the

18  hearing, and can get into, sort of, discussion, and so I will

19  begin with the government, and why don't you address, sort of,

20  everything that's, kind of, on the table, and I will ask any

21  questions, and then we will have the defense -- give the

22  defense an opportunity.

23         *MR. FIELDS:*  Thank you, Your Honor.  So briefly, I'm

24  going to start with two legal points.  The first in the

25  submission by Michael Tew there's, at least, a suggestion at

107

1    the very beginning, that the admission of co-conspirator

2    statements might violate the confrontation clause.  The law on

3    that is completely to the contrary.  Tenth Circuit has

4    explicitly ruled that co-conspirator statements are not

5    testimonial, that's in *United States vs. Patterson*, 713, F3d

6    1237, 1247, Tenth Circuit 2013, and *Crawford*, itself,

7    explicitly mentions co-conspirator statement as, sort of, a

8    paradigmatic example of the kinds of statements that would not

9    be testimonial, for that same reason, there's no burden issue,

10   that's *United States vs. Smalls*, 605, F.3d, 765, 768, in

11   footnote two, and I would note that it's footnoted, but it's

12   one of those kind of more substantive footnotes, explicitly

13   referencing *Crawford*, and the pincite for the *Crawford* is 541

14   US 36, 56. So, no issues regarding the confrontation clause.

15       The other legal point I would like to address is

16   raised by Kimberly Tew, and that has to do with when she joined

17   the conspiracy, and whether or not she is responsible for the

18   statements in entries 1 through 22.  So, two points on that,

19   one factual, one legal.  I will start with the legal point.  It

20   has been blackletter law for over 30 years that previous

21   statements made by co-conspirators are admissible against the

22   defendant who subsequently joins the conspiracy; that's *United*

23   *States vs. Brown*, 943, F.2d, 1246, 1255, that's the Tenth

24   Circuit, in 1991, and the Tenth Circuit there was noting that

25   that was the prevailing view among the Circuits, and that has

numerous citations to Circuit Courts around the country.  So as

a legal matter, even if the Court concludes that factually she

was not part of the conspiracy, at that time, once you join a

conspiracy, you know, in for a penny, in for a pound.  You

bring along all of your co-conspirators' baggage, including the

statements they made.  Under principles of agency, right, you

have decided to join the conspiracy, these are going to be

partners in crime, and you have, sort of, agreed to join them

in their criminal endeavor, you actually get the benefit of

being in the conspiracy, as well as what they have done in the

past for you, on your behalf, to advance the conspiracy.  As a

factual matter though, she had joined the conspiracy, and

there's references to that very early in the *James* log that we

saw during the testimony.

        If you look at *James* log entries 9, 14 and 17, you can

see the references to Kimberly helping get Jonathan Yioulos'

Bitcoin.  This is right around the time that Mr. Yioulos is

sending money, based on these fraudulent invoices to Hannah

Scaife and 5530 Jessamine Development.  So those statements are

in furtherance of conspiracy for the reasons set forth in the

log and should be admitted.

        Another, sort of, overall point raised by both of the

defendants is the notion that, you know, there's no

interdependence, right?  So maybe there's a conspiracy, sort

of, in other Circuits, but no interdependence.  I would point

1    the Court to Government's Exhibit 917, which is entry 317 in

2    the *James* log, when the Court looks at that what they will see

3    are examples of Michael Tew sending to Kimberly Tew screen

4    shots of his messages with Jonathan Yioulos.  He is keeping

5    Kimberly up to date on the progress of the scheme.  *When is*

6    *money coming*, she asked.  His response is *Here, look this is*

7    *what I have texted Jonathan*, *here is what he is telling me*.

8    That's a paradigmatic example of a conspiracy.  You have all

9    three of these conspirators, sort of, working together, asking

10   about, sort of, the status of payments, when they are going to

11   come, and Jonathan Yioulos sending payments shortly thereafter.

12   So, there's clearly interdependence.  That exhibit alone shows

13   it, but if you didn't have that, you have the testimony from

14   Special Agent Palmer today, about each of the defendants'

15   various roles in the conspiracy.

16          Next I will address the credit card charges.  So

17   there's -- objections have been raised, particularly to entry

18   six on the *James* log.  So that references, you know, *Abby's*

19   *looking at the Amex*.  Your Honor, the Amex charges and the

20   Craig Feigin and, sort of, the reasons behind Michael Tew's

21   firing are pretty integral to understanding the conspiracy;

22   that's item number E, under the *James* proffer, that's -- the

23   case that is cited; there is background material necessary to

24   understand the conspiracy.

25          On top of that, Jonathan Yioulos is keeping Michael

110

 1    Tew updated on efforts by National Air Cargo, to investigate

 2    the Amex charges, and, sort of, to investigate the finances

 3    overall.  This is one conspirator helping another conspirator

 4    understand what others might be doing that might uncover the

 5    fraud.  Those are also examples --

 6            THE COURT:  So let me ask you, sort of, how broad this

 7    kind of explaining the conspiracy or the reason for it, how

 8    broad is that exception or I don't know if you would call it an

 9    exception?

10            MR. FIELDS:  Hm-hm.

11            THE COURT:  That aspect of this rule.  Because it

12    seems like it could, sort of, be such a large -- you could --

13    anything you want to get in, presumably, unless it would be

14    totally irrelevant, would help explain the context of all of

15    this, but that makes me nervous.  So why is that not too broad

16    of an explanation.

17            MR. FIELDS:  So I think the Tenth Circuit has stated

18    it that broadly, Your Honor.  So I agree, like, in principle,

19    you can see that's, sort of, swallowing the rule and anything

20    can come in.  So my response to that would be to tailor it to

21    the facts here, right.  And in the facts here, what we saw,

22    through the testimony of Special Agent Palmer, is not only were

23    they, sort of, investigating the Amex charges, but later on in

24    the conspiracy, the Tews are using proceeds that they are

25    getting from Jonathan Yioulos to pay back that $45,000 on the

1    Amex charge.  We saw that explicitly communicated in the text

2    messages, and so I think just, sort of, squarely looking at

3    this, you have got a situation where these Amex charges are,

4    sort of, a motivating factor behind the conspiracy.  They help

5    to understand who might uncover the conspiracy, and they are

6    clearly in furtherance, because explaining, sort of, what

7    happened with the Amex charges is one of the reasons that the

8    Tews are asking Yioulos for more money.  *Send this our way, so*

9    *we can pay those Amex charges*.

10            So I think important events in the conspiracy could be

11    really broad.  Here, this event, sort of, animates several

12    steps that are clearly in furtherance of the conspiracy.  We're

13    talking about very clear instructions to send money for this

14    reason, based on false invoices.  So I would tailor it to the

15    facts here, and for those reasons I would say it comes in.  If

16    not, sort of, under the E, A is also really broad.  Tenth

17    Circuit has said, statements that in anyway promote the

18    objectives of the conspiracy.  And I think one reason that the

19    Tenth Circuit, sort of, phrases things so broadly, in terms of,

20    you know, these are more standards and not rules, is because

21    conspiracies can take a lot of different forms, and the Tenth

22    Circuit understands that.  It's always going to be part of your

23    discretion to decide whether or not -- and this is another key

24    point here.  We're not talking about -- for purposes of the

25    *James* hearing, the question is, *Is there enough evidence for*

1  *the jury to consider these evidence might be in furtherance of*

2  *the conspiracy*?  So your findings here, which is reviewed for

3  an abuse of discretion is, is there enough, have we established

4  under 104(a), you know, a certain quantum of evidence,

5  scintilla, is what the Tenth Circuit has said, to show that

6  these might be co-conspirator statements.  It's ultimately a

7  jury question to decide whether or not there was a conspiracy.

8  Were these in furtherance of it?  How should they consider it?

9  You have a gatekeeping function here, Your Honor, but it's

10 somewhat limited in that regard.

11       *THE COURT:*  And I think you would agree with me that

12 if at trial or whenever it appeared that you are relying on a

13 lot of this, sort of, maybe stuff further to the fringes,

14 rather, and didn't have a lot at the core, there might be a

15 403, misleading, confusing, but if you are relying too much on

16 that sort of thing, rather than the core kind of evidence, that

17 I still could -- this isn't necessarily a definitive ruling.

18 This is all coming in no matter what, right?  I still have that

19 role to play.

20       *MR. FIELDS:*  That's right, Your Honor, 403 would still

21 be there.  Also, I mean, the *James* log is extensive,

22 Your Honor, and I can proffer to the Court that we certainly

23 don't plan on showing the jury, you know, 375 exhibits, sort

24 of, line-by-line, right?

25            So, some of this is, sort of, figuring out, now, as an

1    evidentiary threshold what might be covered by the exceptions

2    and then the government can select those exhibits, but

3    certainly 403 cumulative, right, other things like that, that

4    would certainly come into play.

5           THE COURT:  Okay.  Thank you.

6           MR. FIELDS:  The next category are these messages from

7    Jonathan Yioulos to Kimberly Tew that received no response.

8    So, the question is, are those in furtherance of the

9    conspiracy?  Certainly Jonathan Yioulos' messages to Kimberly

10    Tew, Jonathan Yioulos is a conspirator.  I don't know if that's

11    particularly disputed, but if it was, there's overwhelming

12    evidence to that.  There's the testimony Lisa Palmer gave here

13    today, there's his plea to the conspiracy, and there's the text

14    message describing it extensively.  So, his messages to

15    Kimberly Tew, asking her about certain invoices, updating her

16    on the status of payments, sort of, pushing back a little bit,

17    *Do you really need this money*, that sort of thing, those are

18    all statements in furtherance of the conspiracy.

19           Now, there's no response, and so the question arises,

20    *Did she actually get them?  Did she receive them*?  I think

21    circumstantial evidence would show that she did receive them.

22    Would be -- if you look throughout the *James* log, you will see

23    numerous conversations where she is using the 2046 number, and

24    she's responding to Michael Tew.  She is, you know, questions

25    back and forth.  It would be anomalous if these were the only

1     text messages that she didn't receive or elicit.

2            Also, we only have one side of the conversation, but

3     if you look at just that one side, you can see they are clearly

4     in response to certain queries, questions, other things being

5     posed.

6            So, circumstantially, I think that shows there was a

7     counter party to the conversation.  I don't think there's any

8     evidence that Jonathan Yioulos was hallucinating or anything

9     like that.  Nothing like that.  Also, we looked at that

10    particular example involving, we have the whole thing, it's

11    between Michael Tew and Jonathan Yioulos.  *Your wife is sending*

12    *me rat emojis now.  I'm done with her*.  At the same time, you

13    can see on the one-sided conversation, through Jonathan

14    Yioulos, sort of, a discussion where it appears as though

15    Kimberly Tew is, sort of, taken aback by being potentially

16    called a criminal or, sort of, you know, these aspersions are

17    being thrown that they are engaged in a crime.  Also, *You are*

18    *extremely rude and confrontational*.  You can see, in parallel,

19    the evidence that, sort of, corroborates the idea that she is

20    receiving these text messages.  So, for all of those reasons,

21    the government would say that they are in furtherance.

22           If they -- so even if they were not, they would be

23    still admissible for their effect on the listener.  So the

24    question would be, were they actually listened to?  And again,

25    the same, sort of, body of evidence would bear on that

115

1    question, and there's certainly circumstantial evidence that

2    she did hear those messages.

3         There's also reference to these -- I ended up not

4    playing the recordings, because despite testing it yesterday

5    and having it work fine, it was weird today, but we have the

6    transcripts, and if you look through those transcripts, you

7    will see, very specific discussions between Michael Tew and

8    Jonathan Yioulos, where they are, sort of, talk about some of

9    these conversations that Kimberly Tew had with Jonathan, and

10   Michael Tew, sort of, admits, *Yeah, yeah, that happened, that*

11   *happened*.  So, there's certainly enough evidence to show that

12   Kimberly Tew received those messages.

13        The next category, I would say, is these objections

14   to, you know, discussions of bank transactions, by themselves,

15   are not in furtherance of the conspiracy, and the response

16   there, as the agent testified, is that, very frequently, these

17   conversations would take place right around the time the Tews

18   were receiving proceeds from the fraud.  So, if you look

19   through the *James* log and the additional context column, you

20   will see all of those instances where there's a discussion

21   about bank transactions, and around the same time Jonathan

22   Yioulos is sending money to one of the Tew's various bank

23   accounts, and they are actively discussing what to do with

24   those proceeds.  Those are also in furtherance.

25        They are in furtherance of the money laundering

1   conspiracy, but they are also in furtherance of the fraud.  So

2   that's rationale end, in the government's *James* proffer, and

3   here I would also add another source, I'm going to quote here

4   *It is well settled that the distribution of the proceeds of a*

5   *conspiracy is an act occurring during the pendency of the*

6   *conspiracy*, and that's *United States vs. Morgan*, 748 F.3d,

7   1024, at 1036 to '37.  It's from the Tenth Circuit in 2014,

8   talking about how you are going to, sort of, divide up the

9   proceeds and what you are going do with them.  This was, at

10  root, is a fraud scheme.  They are trying to get money, and

11  they are figuring out what to do with it; how to hide it; how

12  to transfer it; how to spend it as quickly as possible.  All of

13  that is in furtherance of the conspiracy.  So you see that in

14  the additional context column and you also see that in the

15  Tenth Circuit's pronouncements on that.

16       The next category that I would talk about is, sort of,

17  the gambling.  I think it fits into a similar bucket.

18  Your Honor will recall the testimony of Special Agent Palmer

19  regarding that specific example, where they are asking, *Where*

20  *is Navy Federal Credit Union?  How quickly can we get there?*

21  *Bring that $26,000 back*.  If you look into the bank records,

22  sure enough you will see that National Air Cargo, through

23  Jonathan Yioulos, sends a payment, premised on a false invoice,

24  right into the Navy Federal Credit Union account.  There are

25  clear indications they are using the proceeds, they are using

1    Jonathan Yioulos to stick their gambling.  You will see that in

2    the messages themselves, where Kimberly is asking, *How much is*

3    *Jon sending?  When are we going to get more?  I need more.*

4         So, even within the messages themselves, while

5    Kimberly is talking about her jackpots or how much she has

6    lost, there's these followup concerns about Jon.

7         *THE COURT:*  So let me -- that's probably the biggest

8    question, I guess, I have for you is, I accept that

9    characterization of it, I think, at least for purposes of this,

10   but the conspiracy is not to gamble.  So how they spent the

11   money on an Audi® and gambling and Bitcoin, is not, itself,

12   furthering the conspiracy, is it?

13        *MR. FIELDS:*  I would say that keeping track of your

14   fraud proceeds and where they are going, how much more you are

15   going to need is in furtherance of the conspiracy.  It's, you

16   know, akin to, sort of, keeping a ledger of your account,

17   understanding how much fraud money you have, how much money is

18   going out, how much more you are going to need to request from

19   Jon.  Every request from Jon requires a new invoice, with

20   additional risk.  Every single one of those invoices is an

21   additional, sort of, criminal act.  So I think all of that goes

22   to showing that those discussions are in furtherance of the

23   ongoing fraud.

24        *THE COURT:*  Well, so, I agree with, you know, keeping

25   track of the amounts and anytime they request money from

1    Yioulos or discuss how much an invoice has to be, I'm talking

2    about, sort of, on the back end; like, talking about what

3    they're going to spend the money on or what they have spent it

4    on, I think it's my understanding of the testimony, which makes

5    sense to me, is that sometimes that could be if you are buying

6    Bitcoin or something, so you can send it back or so you can

7    hide the source of it, would be one thing, but just spending it

8    on blackjack or lottery tickets or a car, I'm not sure how that

9    furthers the conspiracy.

10        *MR. FIELDS:*  Let me see if I can illustrate this with

11   an example, Your Honor.  Would you give me just a moment to

12   look through my outline, and see if I can find this?

13        *THE COURT:*  Sure.

14        *MR. FIELDS:*  All right.  So yeah, let's look at -- may

15   I grab my laptop, Your Honor?

16        *THE COURT:*  Of course, yeah.

17        *MR. FIELDS:*  Okay.  Let's look at -- this is entry

18   number 279.  We saw it during the testimony, and it's Exhibit

19   879.  So this is a specific example of what I was talking

20   about, right?  This is, *Jon has to send something on Monday*.

21   So they're relying on, sort of, the fraud proceeds, and they

22   are already thinking about how they are going to spend them,

23   that goes into, sort of, they are planning for how to execute

24   the fraud.  They need to know when they are going to submit

25   these invoices, when they are going to be available to make

1      those bank transfers, and the fraud proceeds are, sort of,

2      integral to their planning about how they're going to do them.

3              You see another example of this on Government's

4      Exhibit ... this is entry 283, and it's Government's Exhibit

5      883.  Go down here to page ... so this is October 2019.  They

6      are still at the casino.  And they are already, sort of,

7      thinking about how they're going to -- how they are going to

8      get home, how they are going to have enough money, *It's good*

9      *luck even if Jon sends 25K*.  The fraud planning here, what they

10     are going to do with the money, why they need the money, all of

11     that is in furtherance of the conspiracy.  It's the Tews

12     talking together about, *Hey, we need more money.  How are we*

13     *going to get it?  We're going to execute the fraud*.  It's in

14     furtherance.  They're planning it in real time as they sat

15     there today, because the conspiracy obviously spans a lot of

16     years, but each individual act in furtherance of the fraud, is

17     also, itself, it's own crime, Your Honor.

18              So all of these messages, while they are at the

19     casino, on the gaming floor, thinking about how much they've

20     got, are in furtherance of the conspiracy, for the reasons that

21     the government has articulated.

22              I will say that, sort of, you know, are there

23     limitations to discussions about, sort of, the fraud or, sort

24     of, proceeds and what's going to happen?  And I don't think the

25     Tenth Circuit has answered that question.  A lot of the

1   examples come from -- so the specific example, the *Morgan* case,

2   that is a kidnapping case, right, so they get the proceeds of

3   the kidnapping and then afterwards everyone is sitting around,

4   they are like, *Well, how much do you get?  How much do you get.*

5   Those discussions are in furtherance of it, and what I would

6   say here is this case, while not like *Morgan*, because it's not

7   a kidnapping, basically instead of one kidnapping event, you

8   have multiple serial events over time, where each time they get

9   the money, they are thinking about how to distribute those

10  proceeds, and it's an iterative process, right?  So it's, *How*

11  *are we going to spend the proceeds*, looking in the past, and

12  also, *How are we planning going forward*, sort of relying on the

13  fact that their friend Jon is always going to be there, and

14  they can always just write one more invoice.  All of that, sort

15  of, furthers and perpetuates the fraud throughout, and for

16  those reasons it would be in furtherance.

17          THE COURT:  Okay.  All right.  Thank you.

18          MR. FIELDS:  The other example that I would -- that's

19  been cited are these messages with Michael Meyers.  So Michael

20  Meyers is not a member of the conspiracy, but Michael Tew is,

21  and as the Court heard during the the testimony, Jonathan

22  Yioulos would direct money to accounts controlled by Michael

23  Meyers, at Michael Tew's direction.  Then you have followup

24  discussions where Michael Tew is, sort of, talking to Mike

25  Meyers about the implications of that.  How to handle it.

1    Whether there's going to need to be more money sent.  All of

2    those further the conspiracy, because they are also about the

3    distribution of proceeds.

4        Now, Meyers doesn't know, as far as we can tell, these

5    are actually the proceeds of the fraud, but Michael Tew

6    certainly does, and trying to keep a third party, sort of,

7    quiet and happy, so they're not rocking the boat, so they don't

8    have another situation like this Craig Feigin guy calling one

9    of Michael Tew's employers or the police or something like

10   that.  All of that is also in furtherance of the conspiracy.

11   It's to, sort of, assuage third parties, keep the conspiracy

12   concealed and ongoing.

13       So, for those reasons, the government would contend

14   that Michael Tew's messages to Meyers, Meyers' statements, he

15   is not a conspirator, but the cases cited in the *James* log, the

16   Tenth Circuit has concluded that those, sort of, contextual

17   statements are non-hearsay.  You have to know what the other

18   party is saying, in order to understand what Michael Tew is

19   saying.  So, it goes to, sort of, effect on the listener.  It's

20   not for the truth of the matter asserted.  It's for, *What did*

21   *Michael Tew mean when he said those things*.

22       THE COURT:  And I take is that's, essentially, the

23   same explanation for why Yioulos' statements, after he began

24   cooperating, are admissible?

25       MR. FIELDS:  Exactly, Your Honor, and those cases are

1    cited on page ... three of the government's *James* log, it's

2    United States vs. *Cesareo-Ayala*, that's a Tenth Circuit case,

3    but the Circuits are in union there.  They are numerous Second

4    Circuit cases also concluding the same thing.  It would be

5    anomalous, right.  You couldn't expect the jury to hear one

6    side of the conversation and just be, sort of, left guessing.

7    Sometimes circumstantial evidence can help, as we've already,

8    sort of, illustrated with the Kimberly Tew, Jonathan Yioulos,

9    where there's only one side.  Certainly, if you have both

10   sides, you know, we're not looking at, sort of, the truth of

11   what Jonathan Yioulos is saying, focuses on what did Michael

12   Tew say --

13          All right.  So now let's get to those telephone calls.

14   So the government would concede, Your Honor, that at that

15   point, in the conspiracy, Jonathan Yioulos has withdrawn from

16   the conspiracy.  He is not a conspirator.  He is working with

17   the government.  But that still leaves two additional

18   conspirators, Kimberly and Michael.

19          So, a couple of points there.  First, these

20   conversations, one on July 7th, one on July 8th, are bookended

21   by requests for money.  So there were requests for money, just

22   a week prior, on July 2nd.  We saw that email.  And then just

23   shortly after the July 8th call, Michael Tew, and you saw this

24   in the text messages that are photographed, Government's

25   Exhibit 976, Michael Tew is asking, *Can you send more today*?

1    And he asking, you know, where the owners of National Airlines

2    are; *National Air Cargo are in Boca, right*?  *You can send*

3    *another payment*.  Michael Tew might suspect that Jonathan

4    Yioulos has, sort of, turned, but he still thinks he might be

5    part of the conspiracy, and he is acting in furtherance of it.

6    He is asking for another payment.  And he, specifically, is

7    referencing Kimberly in this conversation, right?  *Kimberly is*

8    *concerned.  Kimberly says she is going to go in*.  Michael Tew

9    is going to help her out.  He is going to help out a

10   co-conspirator.  Those bookend the conversations.  I think they

11   show that the conversation, in the middle, the Tews, are still

12   part of the conspiracy.

13          The phonecalls, themselves, also show that these are

14   in furtherance.  So, during the testimony we saw, sort of, the

15   lead up to those calls.  National Air Cargo was doing audits.

16   So there was already some concerns about, you know, *What are*

17   *Chris and Lori doing?  Why is Abby snooping around in all of*

18   *this stuff?  What are these meetings with the FBI?*  These

19   conversations, I think, can be understood, in the context of,

20   over the past two years, the Tews have continuously had to try

21   to reassure Yioulos, to keep him involved.  They have used

22   various means to do that.  They've tried offering him Bitcoin,

23   sometimes they have threatened him, sometimes they just, sort

24   of, assure him, *Don't worry, we're not going to get caught*, and

25   these conversations, when you go through them, you can see

124

 1   Michael Tew, sort of, clearly, asking Yioulos, *What's going on?*

 2   *What are they looking at*?  And remember, Michael Tew was, sort

 3   of, this acting CFO.  He had a pretty high-level position.  So,

 4   Yioulos it, sort of, looking to Tew for guidance.  *How do I get*

 5   *through these audits?  How do I pass them*?  And Michael Tew was

 6   happy to provide.

 7         So, on Government's Exhibit 987 is the transcript, and

 8   I am going to be using the transcript here, although the audio

 9   is the real evidence, and the transcript is pretty preliminary,

10   but it is -- gives a rough sense.  On page 133, Michael Tew

11   says, *I wanted to see if you heard anything*?  He is asking

12   about what is going on.  And then Yioulos, sort of, talks about

13   how he is nervous; he is panicking; that's on page 135.  He is

14   nervous, on page 186.  On page 139 he says he is not sure

15   exactly what he is going to tell Abby or Chris, if they have

16   question about these invoices.  And then Michael tries to

17   reassure him that what he has done might not pass law

18   enforcement scrutiny, he is pretty clear about that.  He is

19   like, *It will pass an audit*.  On its, sort of, face, this is

20   what they're going to do.  They are going to look and see, on

21   the face of Global Fuel, looks like a legitimate company, here

22   are these invoices.  They go through the banking that's

23   involved, and Michael Tew says, *Yeah, it's got its own bank*

24   *account*.  You know, *I have set up this corporation*.  And

25   there's more of that, on the next day on July 8th.  Yioulos

1    starts off, he says he has got a weird vibe about what's going,

2    in terms of these audits, these meetings, that's on page two.

3    Michael Tew probes him for more information, that is on page

4    four again on page ten.  Michael Tew specifically asks, *What is*

5    *Abby doing today*?  Right?  And then on page 13 he says, *Well,*

6    *they are doing this audit.  How high on the vendor list are*

7    *they?  Like what companies are they looking at.*  And they, sort

8    of, talk about political media and everything that's happening

9    there.

10            And then, this is on July 8th, this also goes to the

11   fact that the conspiracy is still ongoing, when you get to page

12   17 of that transcript, you will see there's notation that

13   there's a long pause in the middle of the conversation, this is

14   while Michael Tew is, sort of, asking questions of Yioulos

15   about what's going, Michael is trying to, sort of, provide

16   information, long pause, and he comes back, and Michael says,

17   *Oh, Kimberly has some questions*.  The implication being that he

18   has consulted with his co-conspirator, Kimberly, and she has

19   some questions about what's going on, and so Michael is going

20   to gather more information that way.  These are two

21   conspirators trying to find out more information about what

22   might reveal or uncover the conspiracy, and to help a

23   co-conspirator continue to falsify the books at National

24   Airlines, which is -- this is key.  It's a fraud case.  Like,

25   all of these invoices, that is the fraudulent pretense.  This

1    is, sort of, core to the fraud.  How are we going to make sure

2    that these pass scrutiny and allow us to continue getting

3    money?

4         And then you get more advice about how to pass an

5    audit on pages 21 and pages 22.  All in the contents of

6    discussing all of these companies, Hannah Scaife, Jessamine

7    Development, Michael Meyers, Larry Ward.  Michael Tew, sort of,

8    assures Mr. Yioulos that Political Media, whose proprietor is

9    Larry Ward, is, sort of, a close, personal friend, so you don't

10   have to worry about him; got that covered.

11        Hannah Scaife, used to be Kimberly's friend, that's

12   referenced in the phonecalls as well.  Michael Tew, sort of,

13   scoffs at her, he like, *Well she is* -- I think he calls her a

14   lunatic and just like -- or she is in rehab, basically.  *You*

15   *don't need to worry about her, either*.  She is not going to

16   rock the boat.

17        When it comes say Jessamine and Meyers, Tew is

18   reassuring Mr. Yioulos, he doesn't need to worry about them

19   because he and Kimberly have, sort of, taken care of them.

20        Then that leaves Global Fuel, which Michael Tew,

21   himself, set up, and he, sort of, goes through in pretty

22   exacting detail, how is he set up the company, how he set it up

23   in Michigan, because that's where National Airlines was first

24   based, he uses his in-laws' address, he discusses all of that.

25   He discusses how he set up its own bank account.  He discusses

1       how banks use, sort of, internal controls.  Specifically, talks

2       about, you know, one reason they are using Navy Federal Credit

3       Union, is that Michael Tew thought it was a, quote, shitty

4       bank.  They didn't have very many internal controls.  He talks

5       about how the bank is usually set up for veterans, and how it

6       is designed to, sort of, with a service theme to sort of help

7       those folks.  So they don't care what happens with the money.

8       And Michael Tew is very excited about that.  He is trying to

9       reassure Mr. Yioulos, We *have the perfect bank, too.  Don't*

10      *worry, they are not going to report things.  You don't have to*

11      *worry about them getting shut down.  I have set this all up, so*

12      *you, Jonathan, can be assured that everything is going to be*

13      *okay*.

14          So you have got this assurance, and then, you know,

15      Michael Tew is hoping that it worked.  The next day he asked

16      for more money.

17          So for all of though reasons, the government's

18      position is that the recorded calls are still in furtherance of

19      the conspiracy and should be admitted, and I think I have

20      answered all of the objections raised by the defendants,

21      Your Honor, so I would sit down.

22          *THE COURT:*  Yeah.  I just got one question for you,

23      which is, I think my understanding of the government's position

24      about the marital privileges, if I agree with you, or to the

25      extent that I agree with you about statements being made in

1    furtherance of the conspiracy, the marital privilege doesn't

2    apply to those statements?  On the other hand, if I do find any

3    of these statements between Mr. and Mrs. Tew to be not in

4    furtherance of any conspiracy, then they are covered by the

5    privilege; is that right?

6            *MR. FIELDS:*  Yes, Your Honor.

7            *THE COURT:*  All right.

8            *MR. FIELDS:*  That's our position.

9            *THE COURT:*  All right.  Thank you.

10           *MR. FIELDS:*  That leaves the motion in limine.

11   Your Honor, I'm happy to, sort of, address it now or we can

12   come up and follow that up afterwards.

13           *THE COURT:*  Let's just -- let's just address it later.

14   I think we will give them a chance to respond on this.  Thank

15   you.  Mr. Schall, I take it.

16           *MR. SCHALL:*  Your Honor, trying to think about this,

17   I'm struck by the some of the exhibits that the Court has seen,

18   there's numerous but, and the communications, there are large

19   redacted sections, blacked out, and we don't know -- from the

20   discovery, I can find out what's in there.  It's not redacted

21   in discovery.  I'm not saying it is.  But the government has

22   made the unilateral decision that some evidence is not in

23   furtherance of the conspiracy or is not relevant or is personal

24   or spousal or is something that is not what they intend to

25   elicit as evidence, and the gist of Michael Tew's argument is

1    that in some cases those black boxes aren't wide enough; that

2    there are some communications that aren't, by a preponderance

3    of the evidence, in furtherance of either conspiracy, whether

4    it's wire fraud, money laundering.  I will be the first to

5    admit that the conspiracy statutes are very wide nets that can

6    capture just about everything, but our objections are based on

7    the fact that it shouldn't be the government's decision to put

8    the -- where the ends of that net are, and if it is, then it

9    has to be supported, and when it comes to discussions about

10   gambling, I mean, the government can make arguments that Navy

11   Federal Credit Union, they have an LA branch, all of those

12   things.  Well, that's a lot different than, *Hey, I'm buying in*

13   *some lotto tickets*, or something that is of such a spousal

14   nature that it's really hard to imagine that that was in

15   furtherance of a conspiracy.  Because if every dollar they

16   spend and they discuss, as partners in life and as parents, if

17   every dollar they spend is evidence of a conspiracy, then

18   there's no limit.  I mean, there can't be.  But there -- the

19   Court should and needs to find what that limit is.  And could

20   some evidence, by a preponderance of the evidence, support the

21   gambling was a way to spend the proceeds of unlawful activity?

22   Sure.  That 1957 statute says if you spend over $10,000 on

23   something that's, per se, money laundering.  If you know that

24   the money was fruits of specified unlawful activity.

25        But 1956(h) is... it's different.  It's not about

130

1    spending money.  It's about changing money.  Hiding money.

2    It's about manipulating currency in a way to distance it from

3    the underlying offense, and that's what money laundering is,

4    right?  And that's why the 1956 crime has a 20-year max, and I

5    believe, I could be wrong, 1957 has a ten-year max.  They are

6    different penalties.  They are different worlds.  And here,

7    they don't overlap, they don't unite as clearly as they're --

8         THE COURT:  Let me ask you a question, because I agree

9    with you, and I think I understand what you are saying, and I

10   agree with your basic proposition that some of the more

11   tangential discussions about, *Hey, we won some moneys or let's*

12   *buy some lottery tickets*, or something like that, it's not as

13   clear to me that those are in furtherance -- that those are

14   part of money laundering, I guess.  But I heard Mr. Fields

15   make, sort of, a different or additional argument for some of

16   those statements, which those help to explain motivation for

17   not just the money laundering, but maybe more directly the

18   motivation for the underlying alleged fraud, and that they are

19   admissible to explain why the defendants were doing this; is

20   that -- do you agree with that?

21        MR. SCHALL:  I don't want to agree with that,

22   Your Honor.  The fraud is not complicated.  Fake invoices sent

23   to a company, company pays, that that's pretty compact.  If

24   talking about money and getting money is related to that, and

25   it's clear, by a preponderance of the evidence, that, *Hey, we*

1   *need to send another invoice, for Hannah Scaife to get another*

2   *$25,000*, well then, that's -- that passes the threshold that

3   you need to decide, I believe.  But if it's not clear, if it's

4   just talking about gambling, and it's, you know, let's mix the

5   analogy, if it's intermingled with the general husband/wife

6   discussions, it's not so clear that it's in furtherance of the

7   wire fraud conspiracy.

8          The bulk of the evidence, if I may be so blunt, is

9   that the wire fraud conspiracy involved Michael Tew and

10  Jonathan Yioulos, and the bulk of the money laundering

11  conspiracy involved Kimberly Tew and Michael Tew, and if this

12  is a Venn diagram, certainly there's some overlap there.  I

13  don't know the extent of that, and I don't know how much can be

14  put into Mr. Fields' statement that any efforts to talk about

15  getting money, were in furtherance of additional wire fraud.

16         *THE COURT:*  Okay.  All right.  Thank you.

17         *MR. SCHALL:*  Good enough point to end there,

18  Your Honor.

19         *THE COURT:*  Okay.  Thank you.

20         *THE COURT:*  Mr. Kaplan?

21         *MR. KAPLAN:*  Your Honor, may I just have one moment?

22         *THE COURT:*  Sure.

23         (Discussion off the record between counsel and his

24  client.)

25         *MR. KAPLAN:*  Thank you, Your Honor.  I think most of

1    the ground has been covered, so I don't think I need to repeat

2    anything.  I guess if I were to emphasize anything in support

3    of what really Mr. Schall said is as a result of these

4    arguments, I haven't -- Mr. Schall can speak for himself --

5    asked that all of these statements shouldn't be allowed in

6    under a co-conspirator theory.  We picked those items that the

7    government is trying to bootstrap into being part of the

8    conspiracy and part of the wire fraud, when it has to refer to

9    other things for context.  When the statements, as the Court

10    can see from our paper, talk about what the bottom line is, is

11    the invoices and getting money from Mr. Yioulos as a result of

12    invoices that NAC could pay through the actions of these

13    parties, it's not what I'm here arguing.  It doesn't come in.

14         So, to reemphasize the points that have been made,

15    when it comes to the other things that the Court has mentioned,

16    gambling, the Bitcoin, the other communications that Michael

17    and Kimberly had about things that did not implicate the

18    essence of the fraud that the government is seeking to prove,

19    that's where the limitation is, and as its been discussed and

20    Mr. Fields even recognized, if you don't find those limitations

21    somewhere, then it becomes a situation where there's no

22    limitations.

23         THE COURT:  Okay.  I appreciate that and I don't -- I

24    think you are right, that it's been covered pretty well.

25         Why don't we discuss the motion in limine, to the

1    extent that we can.  I have read the motion, so it may make

2    sense to ask the defendants to explain their position on what

3    all we need to do, that hasn't already been done.

4         MR. SCHALL:  Your Honor, on behalf of Mr. Tew, this

5    point in time, our position is just that custodian witnesses

6    are necessary for introduction of a vast amount of the

7    government's exhibits.  Maybe the vast majority.  And that,

8    stipulating to their authenticity, at this point, is -- it

9    defeats a fair amount of trial strategy, to put it candidly.

10        THE COURT:  Okay.

11        MR. SCHALL:  Whether it's beyond dispute that it would

12   be more efficient to do so, but at this point we're not in a

13   position to agree.

14        THE COURT:  Okay.  Okay.  Mr. Kaplan, do you have

15   anything to add?

16        MR. KAPLAN:  No, Your Honor.  On behalf of Kimberly

17   Tew, the same.  Only thing I would add, that I haven't been

18   able to do, before this hearing, I think the government was

19   going to submit additional documents having to do with

20   certifications.  So I think, quite frankly, this rests a lot on

21   the ability to do a self-authenticating introduction of these

22   documents.  Although the government talked about other ways to

23   do that.  I understand that.  But I am curious to make sure

24   that we get all of the submissions that the government is going

25   to rely on, to try to present, without foundation witnesses.

1          THE COURT:  Okay.  Mr. Fields, where does that leave

2     us, in your view?

3          MR. FIELDS:  Your Honor, when it comes to those

4     certifications, we have attached a lot of them.  They are the

5     1100 series of exhibits for this hearing.  The exhibit list

6     itself, sort of, references -- sorry, it was an attachment to

7     the motion in limine, the exhibits and then the corresponding

8     certification that goes with it.  So, for all -- I won't rehash

9     what's in the motion, but the rules of evidence are designed to

10     prevent a situation where the jury has to sit there and listen

11     to 19 custodians of records talk about how they are kept in the

12     regular course of their regularly conducted activities.

13          When it comes to trial strategy, nothing here, sort

14     of, impacts defense strategy.  The question for the Court is,

15     is there enough evidence for the jury to decide they are what

16     the government is saying they purport to be, right?  These are

17     text messages between Yioulos and Michael Tew.  Yioulos is

18     going to be here.  They can Cross-examine him if they have any

19     questions about the text exchanges.

20          The text exchanges between the Tews, context, sort of,

21     shows all of that.  That's enough to get over the

22     authentication threshold, and if the defendants, just like if

23     this was a physical exhibit case, like if there was a gun in

24     police custody there were questions about, *Did the gun get*

25     *tampered with, did some policeman do something with the serial*

1    *number*.  Usually that goes to the weight, not the

2    admissibility, and the defendants would admit their own, sort

3    of, evidence about the tampering.  There's nothing stopping the

4    defendants from using their subpoena power to call all 19 of

5    those witnesses, if they want, and conduct examinations that

6    they think reflect on the, sort of, lack of authenticity of

7    these records.  But they have not made an argument that any of

8    these records are inauthentic.  For the most part, like the

9    bank records, I mean they're -- first of all, there's all of

10   the regulations that go through it, and so the Tenth Circuit

11   cases talk about how bank records are, keep on using this word

12   paradigmatic, but they are a paradigmatic example of why we

13   have 902(11) and 803(6) certifications.

14        So, all of that is going to be needless and

15   cumulative, and what the government would ask for is a ruling

16   from the Court, as soon as possible, so that we can avoid

17   burdening 19 witnesses -- 19 companies, we're going to send

18   witnesses out of state, to talk about records that, you know,

19   as far as the government can tell, there's no real good-faith

20   dispute over whether or not they are authentic.

21        *THE COURT:*  All right.  Here is what I think I would

22   like to do.  I still want to give the defense a chance to

23   respond to your motion, in writing, to work through any of

24   these things.  I don't know what the normal deadline for that

25   response would be.  Do you want me to set a deadline now for a

1    written response, and then I can decide what to do?

2            MR. KAPLAN:  Yeah.  I think that makes sense.

3            THE COURT:  All right.

4            MR. SCHALL:  No objection.

5            THE COURT:  I know Christmas is on Monday, I am not

6    trying to be a jerk to everybody, but we're getting up against

7    it here.  So what do you think?

8            MR. SCHALL:  Your Honor, I happen to agree with

9    Mr. Fields that determination on this sooner rather than later

10   would be beneficial.  I don't know that I have all of that much

11   to put in writing, but Friday?

12           THE COURT:  Mr. Kaplan?  I mean I will note that you

13   have had it for a week now.

14           MR. KAPLAN:  Yes, I understand.  I have gone over it.

15   It's not as if it has been ignored, so I can take that day.

16           THE COURT:  All right.  I will ask for written

17   responses then by Friday, and I will do my best to get out an

18   order, because I agree with everybody.

19           Is there any -- well, Mr. Schall, you had another

20   motion pending.  Do you want to talk about that, at all?

21           MR. SCHALL:  I can, Your Honor.  That motion has to do

22   with the the nuts and bolts of our case here, and that if it

23   proceeds to trial, and if two defendants, who are spouses and

24   co-parents of two infant -- not infant, but minor children are

25   convicted, if the Court, I understand, from Mr. Fields, that

1    the government would be inclined to ask for the defendant, at

2    least Mr. Tew, to be remanded into the custody of the U.S.

3    Marshals following a conviction, and if the Court were inclined

4    to go there, then I, frankly, I would like my client to know

5    that.

6         THE COURT:  Yeah.  I think that's fair, and as long as

7    you understand, I guess my position is I can only tell you,

8    based on what I know now, by the time we get there, I will have

9    different information, so that may change my thinking, but I

10   can tell you that based on what I know now, and we've gone up

11   through quite a bit in this case by now, that I would be

12   non-inclined to require the defendant to either -- either

13   defendant to be remanded immediately on a conviction or a plea,

14   if it came to that.

15        They've had opportunities, as has been discussed at

16   various times, I think we have let them travel, maybe even out

17   of the country, I can't remember.  We've had their location

18   monitoring removed, and they've shown up and haven't shown any

19   inclination to flee.  These are pretty serious charges, I get

20   that the presumptions change if there's a conviction or a plea,

21   but in -- from -- based on what I know now, I would expect to

22   not immediately remand the defendant.  So that's probably the

23   best I can do at this time.

24        MR. SCHALL:  Thank you, Your Honor.  This is probably

25   a very inopportune moment to inform the Court that the defense

138

1   will probably be asking the Court's permission, later today or

2   tomorrow, to travel over the holidays, but not -- to

3   California.

4           THE COURT:  Okay.  That's fine.  I will take a look at

5   it.  I guess this is a chance for me to just say, given what I

6   just said that, at some point, and I would never tell a

7   defendant what to do or to plead or not plead, but I do

8   encourage everybody involved in this case to take a step back,

9   in the next few weeks, while we have a little bit of time, and

10  look at the risks of this case and the possibilities in this

11  case, and make sure that they are doing what is in their own

12  best interests and really take as objective a look as possible

13  at what's going on in this case.  And from the government's

14  perspective, I would ask that any plea negotiations or offers

15  that you engage in, that you are not insisting on anything that

16  is not necessary in the interests of justice, and that you are

17  only asking for things that really are necessary, and that the

18  defendants make sure that the risks of going to trial on a

19  60-count Indictment, where -- and I will just say I think there

20  are probably a few of these -- for example, there are a few of

21  these exhibits that I may not allow in, but most of this

22  evidence is going to get in, and there's a lot of evidence in

23  this case, and so there's a real risk to everybody.

24          Trials are unpredictable and juries unpredictable, so,

25  just make sure you are taking that into account over the next

 1    few weeks, and make sure you are doing what is in your own --

 2    what is in your best interests and that you think through the

 3    possibilities, and that, you know, the parties, at some point,

 4    just go back to one another and make sure that going forward is

 5    really what they want and need to do.

 6          You don't have to report on anything or tell me

 7    anything.  I will just assume that if we show up for whatever

 8    is next on the calendar, that everybody has had those

 9    conversations with each other and with your clients and with

10    the other side.

11          So, I will just encourage you to do that, and of

12    course, I think these are hard decisions and wouldn't -- don't

13    hold it against anybody either way.  I would just suggest,

14    based on what Mr. Schall was saying about the family situation,

15    that, you know, one thing I have seen the government do in

16    another similar case, with parents who both ended up pleading,

17    is we staggered sentences in a way so that there was no time

18    where both parents were incarcerated at the same time.  That's

19    something that certainly could be considered, and so, there are

20    options out there that if everybody -- that I think my

21    experience is, we can work in good faith.

22          So, I just want to encourage everybody to take that

23    step back and think about what's necessary in this case and

24    what is in your best interests.

25          Is there anything else we need to deal with today?

140

1           MR. FIELDS:  Not from the government, Your Honor.

2    Thank you.

3           MR. KAPLAN:  Not on behalf of Mrs. Tew.

4           MR. SCHALL:  Nor on behalf of Mr. Tew.  Thank you.

5           THE COURT:  Thank you all.  The Court will be in

6    recess.

7           THE COURTROOM DEPUTY:  All rise.  Court is now in

8    recess.

9        (Recess at 2:09 p.m.)

10                              **INDEX**

11   **Item**                                                 **Page**

12   ITEM                                                      PAGE

13           WITNESSES

14      SPECIAL AGENT LISA PALMER

15           Direct Examination By Mr. Fields              8

16           Cross-examination By Mr. Schall              75

17           Cross-examination By Mr. Kaplan              97

18           Redirect Examination By Mr. Fields          102

19                     REPORTERS' CERTIFICATE

20        I certify that the foregoing is a correct transcript

21   from the record of proceedings in the above-entitled matter.

22        Dated at Denver, Colorado, this 2nd day of February,

23   2024.

24                         s/Tammy Hoffschildt, FCRR, CRR, RMR

25