IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 20-cr-305-DDD

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

1. MICHAEL AARON TEW
2. KIMBERLY ANN TEW,


    Defendants.

_____

**REPORTER'S TRANSCRIPT**
Final Pretrial Conference

_____

      Proceedings before the HONORABLE DANIEL D. DOMENICO,

Judge, United States District Court for the District of

Colorado, occurring at 1:30 p.m., on the 30th day of January,

2024, in Courtroom A1002, United States Courthouse, Denver,

Colorado.

**APPEARANCES**

      Bryan Fields and Sarah Weiss, Assistant U.S.

Attorneys, 1225 17th Street, Suite 700, Denver, Colorado,

80202, appearing for the Government.

      Jason Dale Schall, Bowlin & Schall Law LLC, 7350 East

Progress Place, Suite 100, Greenwood Village, CO 80111, and

Kristen M. Frost, Ridley McGreevy & Winocur PC, 303 16th

Street, Suite 200, appearing for the Defendant,

1    Michael Aaron Tew.

2            David Scott Kaplan, Stimson LaBranche Hubbard, LLC,

3    1652 North Downing Street, Denver, CO 80203, and Jamie Hughes

4    Hubbard, Stimson LaBranche Hubbard, LLC, 1652 North Downing

5    Street, Denver, CO 80218, appearing for the Defendant,

6    Kimberely Ann Tew.

7     Proceeding Recorded by Mechanical Stenography, Transcription
      Produced via Computer by Tammy Hoffschildt, 901 19th Street,
8         Room A251, Denver, Colorado, 80294, (303) 947-1905

9                              **PROCEEDINGS**

10       (In open court at 1:37 p.m.)

11          *THE COURT:*  Good afternoon.  Please take your seats.

12    We're here for a trial preparation conference in case number

13    20-cr-305, United States versus Michael Tew and Kimberly Tew.

14          Counsel, why don't you go ahead and enter your

15    appearances.

16          *MR. FIELDS:*  Good afternoon, Your Honor.  Bryan Fields

17    for the United States, joined by my co-counsel Sarah Weiss, and

18    our case agent, Special Agent Lisa Palmer with the IRS.

19          *THE COURT:*  Welcome.  Thank you all for being here.

20          *MR. SCHALL:*  Good afternoon, Your Honor.  Jason Schall

21    and Kristen Frost, with Mr. Tew, present at counsel table.

22          *MR. KAPLAN:*  Good afternoon, Your Honor.  David Kaplan

23    and Jamie Hubbard with Kimberly Tew.

24          *THE COURT:*  Thank you all for being here.  So this

25    afternoon what I think I want to do is try to first lay out

1   just some of the logistics for trial, then discuss some of the

2   motions and other issues that have come up, to the extent that

3   we can deal with some of the things that have come up in the

4   various -- in the various briefs and other documents that have

5   been filed.

6        Perhaps, though, we should start with the motion that

7   Ms. Tew filed to continue the trial.  This is **Document 374** on

8   our docket.  I will just say my inclination is to agree with

9   the government that this motion, given the history of this

10  case, the facts that are discussed in that motion, are mostly

11  things that could have been dealt with previously, and there

12  would be quite a bit of prejudice to the Court and the

13  witnesses by continuing the trial, at this point, but I do want

14  to give Ms. Tew's counsel a chance to explain that motion a bit

15  more, and then, of course, the government to respond, before we

16  make a decision.  So, Mr. Kaplan.

17       *MR. KAPLAN:*  Thank you, Your Honor.  First, I

18  understand the Court's inclination, as it relates to this.  It

19  wasn't any great satisfaction me coming to the decision to file

20  it as close to trial as I did.  I also would indicate, to the

21  Court, that one of the reasons that it was closer to trial, I

22  think, is because I was trying to hold onto the trial date it

23  was not something that I was anxious to vacate, for all of the

24  reasons that the Court referred to.

25       But I will say that I ended up at a place where I

1    thought, in order to do justice to my client and given the

2    circumstances that I thought needed, not a great additional

3    amount of time, that's why the request was merely for 120 days,

4    that it was incumbent on me, as a representative of hers, to

5    ask the Court for that short continuance.

6         I know that the Court has commented that case has been

7    around a long time.  My involvement in it, while not just very

8    short time ago, was not certainly as long as the case has been

9    pending, and I think that I have to confess that when I came

10   into the case, realizing it was large documents and large

11   number of documents, that I was prepared to do that, but even I

12   was a little bit stymed by the volume of it, and as we prepared

13   for it, I realized that in order to start to get prepared I

14   needed to look at all of the bank documents and try to put this

15   together, and I will indicate to the Court, and as counsel

16   knows, this was before there was a great indication of how the

17   government was going to prosecute the case.

18        Clearly, I have the Indictment, I have the grand jury

19   transcript, I have some motions hearings that I looked over,

20   but as I was just trying to get my hands around the volume of

21   information, I was putting things together, and it was not

22   until there was more indication for the -- by the government,

23   how it's going to present its case, and quite specifically a

24   very extensive *James* log that keyed in on what the government

25   was using to create, especially the case against Ms. Tew, that

1    I realized that there were parts of the discovery that I needed

2    to revisit, that I needed to take a look at, and, you know,

3    with all deference to the government and what they said in

4    their -- in their filing, in terms of how a case like this is

5    prepared, Mr. Fields I don't think has ever occupied the seat

6    that I occupy, and it's not as easy to look up and say to your

7    client, *Tell me what's important.  Tell me what you have.  Why*

8    *don't you help me in the specifics in a case this large,*

9    *identify what's important.*  Instead, when I realize that the

10   case was being prosecuted by so many of those conversations,

11   the attribution of those conversations, the complexity of the

12   attribution of those conversations, and the fact that I came to

13   realize that while the government may have picked and chosen,

14   as appropriate to their prosecution, those items important to

15   them to establish their case in front of the jury, that's

16   rightfully so, cherry picking the documents that were most

17   important to them in establishing their theory of the case.

18   And once I was clued in on that theory, and I went to look back

19   at some of the iCloud documents that were available for me to

20   take a look at those very same questions, to look for those

21   very same time periods, to look over those very same

22   conversations with those people, I came to realize, again, that

23   just looking at... that iCloud dump ended up being ... I think

24   I wrote some of this down.  Let me take a quick look.  Um ...

25   thousands of emails, thousands of pictures, and what is a

1    terabyte of information.

2            I don't suggest to the Court that there's a terabyte

3    of information to the Court that's going to be important, but

4    what I did realize is that I needed more time, and perhaps the

5    help of an expert, to focus more on the very things that the

6    government has focused on to make their case.

7            I confess to it being a limitation on my part, and I

8    confess to the fact that, I guess, you could look up and say

9    there were other opportunities, during the course of my

10   representation to do that, and I suggest I did beat myself up a

11   bit about it, but I also took a look and realized that the way

12   the government keys in on those things is to have agents and

13   experts go through this information themselves in -- and

14   provide reports to them, that the reports, themselves, are

15   hundreds of pages long, and so the support they get to key in

16   on the documents that end up in this *James* log, with all of the

17   contextual citations to it is something that's done by a

18   phalanx of support, and that's something that we don't have,

19   and that's something that I didn't anticipate when I took a

20   closer look at the case.

21           So, you know, I could not come in here and tell the

22   Court the difficulties that presented itself, and why they

23   became apparent to me at the time that they did, but I don't

24   think that's, as my obligation to my client, is an appropriate

25   way to present.  And so, I'm not saying that the Court's

1    observation and some of what the government says isn't

2    accurate, but this is not the kind of case that I wasn't

3    diligent on or that I should just be able to work some longer

4    hours and provide the information -- or avail myself of the

5    information that I need to confront with, now, I know, as of

6    December, and primarily the *James* log, may be out there that I

7    haven't reviewed.

8         THE COURT: So I guess I will say at the outside -- at

9    the outset, I don't question your diligence or think that it's

10    a question of necessarily working a few more hours here and

11    there, but I do -- you know, this case has been around since

12    2020. I know Ms. Tew wasn't indicted originally, but the case

13    has been around for a long time. There have been multiple

14    continuances, and, you know, I do get a bit of a sense that

15    there might be something to the government's assertion that

16    part of all of this is to just drag things out and avoid going

17    to trial.

18         How can you reassure me that that's not the case? And

19    what would be different if I give you three more months? Why

20    will we -- what are you going to do in three months that's

21    going to make any difference?

22         MR. KAPLAN: Okay. Those are, obviously, good

23    questions. Your Honor, one of the things is, you know, in my

24    practice, it does -- I have not been an attorney that feels

25    there's a benefit to continuing a case when it doesn't look

1  like the case is going to resolve.  In my private practice, it

2  costs more money, with not much added benefit, that's also

3  consideration as appointed counsel, it's also a consideration

4  in how my practice survives in that regard.  So, in terms of

5  the delay tactic and feeling that there's some sense of that, I

6  would just ask the Court to look at it in terms of my

7  involvement in the case.  All right.  And while sometimes you

8  look up and say, a year seems to be plenty, I think the Court

9  knows that cases like this, with lawyers who are on it and

10  don't change, often go longer than a year.

11         So, that's my experience in the case.  And so I

12  understand that there's also a concern for a case that has been

13  around a long time, but I would suggest that it's more

14  compelling when it's -- in terms of what I'm saying.  I mean,

15  you can presume some other things about what goes on behind the

16  scenes, but as far as what I'm telling you, it's not like I

17  have come up and repeatedly made a case of this complexity go

18  significantly longer than it should, even though there's

19  interest in getting something done when the Indictment has been

20  this old.

21         The reason why it would make a difference, and the

22  reason why I only ask for 120 days, and why it wouldn't result

23  in another delay after that, is I have now identified, and in

24  some sense with the benefit of the prosecution, focusing on

25  what their case is more about, and what if there is -- if there

1    are documents or computer expertise that would help me in the

2    defense, it is now a much more narrow, pointed place, as to

3    what I need to do.

4            It's not coming in here and saying I'm just flummoxed

5    about just the sheer volume and I don't know what to do with it

6    and I need time to organize it.  That was true at the

7    beginning.  But what I have realized now, is that in terms of

8    how this case is going to be tried, there's a focus now, and

9    what I'm coming here and telling the Court is, I have

10   identified, through, you know, particularly an iCloud dump and

11   the government's case and the focus on it, what I -- where I

12   need the help, and we've contacted individuals that are

13   available to do that, and as I said, that's why I didn't come

14   in here and say I need six months to do it.  I know what I'm

15   looking for.  I know whether -- if I'm going to find it, it's

16   going to help with the defense.  If I'm not going to find it,

17   I'm going to have the confidence to know that I have looked at

18   everything on behalf of my client.

19           And so, I ask the Court to look at the request,

20   really, in light of, I will say, my participation here, and

21   what I'm representing to the Court and how much time I need to

22   address what -- when I spoke with really my co-counsel, who

23   jumped on this case with me, and said, I think, despite the

24   discomfort of it, like I said when I started out, I'm not

25   thrilled going into a federal district court and asking for

 1   another 90 days, that's not my style, but if it is up against

 2   what I think is the best way to represent my client, I think 90

 3   days is not too much to ask.

 4        THE COURT:  All right.  Thank you, Mr. Kaplan.  I

 5   guess I should ask Mr. Tew's counsel if they have a position on

 6   this or want to weigh in one way or the other.  Mr. Schall?

 7        MR. SCHALL:  Can I speak here or do you want me up

 8   there?

 9        THE COURT:  If it's going to be short, you can stay

10   there.  If it's going to be a few paragraphs, come on up.

11        MR. SCHALL:  I can't tell you how long it's going to

12   be, Your Honor.

13        THE COURT:  All right.

14        MR. SCHALL:  Essentially, Your Honor, Mr. Tew's

15   position is a difficult one, because of the nature of his

16   relationship with the codefendant, and he is not in a

17   real-world position to oppose a continuance in this matter

18   because of that.

19        The government, rightfully, likes to remind the Court

20   that I have said that I don't think this is a particularly

21   complicated case, and that may be true as to my client, but

22   what I will say is, and in a way that I don't think the

23   government can be aware of, is that this is an incredibly

24   difficult case, and because the government's evidence might not

25   be complicated, because the money trail might not have that

1    many off-ramps, might not have that many transactions, the

2    nature of the spousal relationship, the nature of codefendants,

3    all mixed together with the back history, and even the

4    co-representation that was involved with a lot of this case, it

5    makes things very difficult on counsel; meaning, Mr. Kaplan,

6    myself and now Ms. Hubbard and Mr. Fields, and when Mr. Kaplan

7    says he needs more time, I get that, based on things that

8    aren't really privy to discuss before the Court.

9            And so, while Mr. Tew has not joined in that motion,

10   and will be ready to go to trial, if it starts on Monday, we

11   can't really oppose that motion either.

12           *THE COURT:*  Okay.  Thank you.  All right.  Mr. Fields.

13           *MR. FIELDS:*  Thank you, Your Honor.  Very briefly.  I

14   will just say if the government has spent the past

15   three-and-a-half years looking for cherries and picking them,

16   defense has been in the same orchard for the last year, and

17   while it might seem like Special Agent Palmer is an entire

18   phalanx, she is one agent who is able to go through and look

19   through these communications, not having lived through them.

20           The defendants are in a separate category, because

21   they lived through these events, have distinct personal

22   knowledge of them, and when we're dealing with electronic data

23   it's not as though it's all jumbled together in some sort of

24   weird digital format.  Cellebrite Readers are generally

25   commercially available.  They are used by defense counsel all

1    the time, and one thing that's nice about them, they are

2    extremely user friendly.  You can sort by, sort of, different

3    phone numbers, which are easily identifiable not only in the

4    discovery, generally, but in all of the search warrants, which

5    lay out a roadmap of the government's case, all of the

6    evidence, all of that stuff could have been used to prepare for

7    trial, even in the last 388 days.

8            And then I would say in response to the, sort of,

9    position that, you know, you look at just defense counsel has

10   only on it for a case, some cases take a year or more.  That's

11   true, but we are not starting from square one here, because

12   when these counsel entered the case, motions to suppress had

13   already been filed, they had been vigorously litigated.  A lot

14   of stuff had actually been done in the case, which saves some

15   of the time.  And I think, looking through those motions,

16   looking through the hearing, it was very clear what the

17   government intended to offer into evidence.  We vigorously

18   opposed the motion to suppress the digital evidence.  We talked

19   about that ad nauseam, at that hearing, and so there's no real

20   mysteries here, and nothing that couldn't have been done

21   earlier.

22           I don't doubt the diligence of counsel, and I said

23   that in the motion and we stand by it.  I think a lot of this

24   does have to deal with client disengagement from what's here

25   and just not wanting to confront it.

1          THE COURT:  Let me ask you, I guess this is, sort of,

2     related to your last point.  So, I don't think I disagree with,

3     sort of, your characterization of the history of the case and

4     the fact that a lot of what was in the *James* log, the

5     specifics, obviously, maybe, weren't explained quite as

6     in-depth, but the basic approach that the government was going

7     to take, and where that they were getting a lot of their

8     evidence is not new.

9          On the other hand, I have an obligation, and you do

10    too, to ensure that the defendants receive fair trials, right?

11    And we both seem to agree that counsel has been diligent, and

12    that he has now stood up and in writing and here in court and

13    said he doesn't think he can effectively do his job without

14    another 90 days.  So how do I -- what do I make of that?

15         MR. FIELDS:  I think you look at that *West* factor,

16    Your Honor, and it goes back to your question of, like, *What*

17    *would happen in the next 90 days*?  There I think the government

18    put in its motion, as a matter of law, Your Honor, the Court

19    has ruled, right?  When it comes to a lot of the stuff an

20    attribution, attribution is not going to make a legal

21    difference to whether or not these communications come in.

22         THE COURT:  Well, it's not going to make a difference

23    as to whether they are admissible.  Couldn't it make a

24    difference as to whether the defendants are convicted if the

25    jury doesn't believe your story of who is talking to whom?

1          MR. FIELDS:  Your Honor, I would say in a vacuum, yes,

2     but if you look at that *James* log and you see all of the

3     different ways in which attribution is made, and you refer to

4     the testimony at the *James* hearing, which the defendants had

5     the opportunity to Cross-examine the agents vigorously on those

6     attribution decisions and column-by-column of that *James* log

7     and, sort of, sentence-by-sentence by Special Agent Lisa

8     Palmer, here are all of the different ways that you know those

9     communications from the Tews, right?  They are referencing

10    their own internal passwords.  They are referencing

11    transactions that are contemporaneously noted in bank records.

12    On some occasions they are talking about different bank

13    transactions.  You look at the ATM photographs and there are

14    Michael and Kimberly Tew making, like you can see it almost in

15    real time.

16          So, the evidence of, sort of, attribution and who is

17    talking to whom, is absolutely overwhelming, and while I think

18    it could make a difference in a different case, it wouldn't

19    make a difference here.  As the Court will remember from the

20    government's motion in limine, authenticity is a super low bar,

21    right?  And they can poke some holes maybe here and there.

22    They can say, *Jury, maybe you should question some of this*

23    *authenticity*, but as a whole the question of the second -- I

24    can't remember if it's the second or third West factor, you

25    know, is there going to be prejudice caused by not granting the

1   continuance so that they can, in the government's view, sort

2   of, second guess or, sort of, attack what the Court has already

3   said about the use of Rule 901 in the attribution, that's not

4   going to be time well spent and it's not really going to

5   advance the ball.

6       THE COURT:  Okay.  Thank you.  Thank you, Mr. Fields.

7   Mr. Kaplan, you want to quick --

8       MR. KAPLAN:  Very briefly.  Your Honor, it's what I

9   commented on when I first stood up.  I think Mr. Fields is just

10  promoting the strength of his case and the conclusions that he

11  has reached.  I mean, if he believes that his case is strong,

12  because of what their agent did with the *James* log, quite

13  frankly, I'm sitting here thinking that that gives more reason

14  for me to look at what I suggested I needed to look at in what

15  is a, you know, a narrow timeframe, not less.  I mean, he just

16  gave a closing argument as to why his case is very strong, but

17  I don't have to sit there and listen to those conclusions about

18  how their case is overwhelming, and therefore, additional work

19  on my part will be futile.  It's quite the opposite.  You know,

20  that what I looked at when I saw those and decided what else I

21  needed to do to compromise that case, is why I'm asking for

22  more time.

23      THE COURT:  So let me -- I mean -- let me just, I

24  guess, get you to explain a little bit more about what you

25  think.  What -- A, what was a surprise or new in the *James* log,

1    which was filed in December?  And, you know, a month before --

2    at least a month before this motion, and then what would it be

3    that you would be, you might be able to attack?  You think you

4    could really change that argument?

5         *MR. KAPLAN:*  I think it comes down to at least two

6    things, and one is that there is, what we mention, that there

7    are the use of certain text messaging, the source of who was

8    saying what to whom, all right, is important, and it's

9    something that I understand there are some of those things that

10   context may give rise to a conclusion, but many, many of them

11   don't, and that they are the use of emails that were the --

12   well, emails and text messages that have to do with what the

13   government perceives as sham corporations and communications

14   between the participants that I would like to take a look at,

15   closer, to see whether that, indeed, they can prove and

16   establish that the communications came from and went to the

17   people that they say are, you know, either in the log or --

18   well, in the log; whether it's communications between the

19   co-conspirators, directly, or where certain invoices were

20   mailed from and who mailed them.  So that's what I want to take

21   a closer look at.

22        The other thing that I want to look at is that there

23   is a period of time that now has been identified, certain days

24   that have been identified, where the communications are limited

25   to the ones that the government picked, and one of the things

1    that I realized I needed to do, and didn't, was to see, during

2    the time period of, specifically, the communications that they

3    have in the log, were there communications that in context that

4    would better explain what those communications that they picked

5    out meant.  Because there's a lot of things that Ms. Tew -- is

6    attributed to Ms. Tew that you need context to know whether

7    it's truly something that has her engaging in criminal conduct

8    or not, and that's what I want to look at, closer than I have.

9         THE COURT:  All right.  Thank you, Mr. Kaplan.  I'm

10   going to think about this for the rest of the day, but my

11   expectation is I'm going to deny this motion, but I do want to

12   give it a little bit more thought, but let's proceed with the

13   expectation that we will be going to trial on Monday, because I

14   think that's most likely what I'm going to do.

15        I do appreciate the arguments and don't discount them,

16   but given the passage of time, including from when the *James*

17   log was filed, it seems that, while I understand those things,

18   they are things that probably could still be done or could have

19   been done in the time this trial has been -- this case has been

20   pending, including since the *James* log.

21        So, my expectation is I will deny that, but I am going

22   to give it a bit more thought, today.

23        So then let's turn, I guess, back to some of the, sort

24   of, logistical aspects of the trial.  Looking at the time

25   estimates, seems that, I think, we estimated eight days for

1    this trial.  It seems that we should be able to do that trial

2    in that time, unless something very unexpected happens.  So, I

3    appreciate that.  Given that, the normal trial day, I will ask

4    the jury to be here from 9 to 5, every day, with the plan to

5    take an hour break for lunch, and then a couple of short breaks

6    in the morning and afternoon.  Counsel should be here, at least

7    on Monday, at 8:30, and then we can discuss whether to be here

8    early going forward, but I will expect to start with the jury

9    if we can, at all possible, at 9 each day and have them here

10   until 5.

11          For jury selection, we will have 12 jurors and one

12   alternate.  I will look at the proposed voir dire and ask the

13   questions that I -- that I think are necessary to get us down

14   to 31 people who I think are qualified and don't need to be

15   dismissed for cause.

16          I will then give each side 15 minutes.  Defense let me

17   give you each ten minutes or so, or you can work out how to

18   split any time, but I will give the government 15 minutes and

19   maybe ten minutes each for the defendants to ask their own

20   questions of the panel.

21          So the way we will do it, so we have the courtroom set

22   up the way it's going to look, and the jurors will be numbered.

23   Mr. Keech, do I have it right that we start with juror number

24   one in the top right?

25          *THE COURTROOM DEPUTY:*  Yes, Your Honor, closest to the

bench, in the top row.

THE COURT: In the back, but on my end, yes.  The

right, as we're facing it, and then, do you -- we snake it back

and so forth, so...

THE COURTROOM DEPUTY:  One through eight, nine through

16.  I don't have the --

THE COURT:  Here, I actually have --

THE COURTROOM DEPUTY:  -- seventeen --

THE COURT:  The first row of folding chairs is 17

through 24 and then 25 here.  The last three seats, so closest

to counsel's table there, will be the three potential

alternates in the front row here.  And so what I will do is we

will just randomly seat people, based on the list we get in

those seats.  The rest of the venire will be seated in the

gallery.

I will, as I explain to the potential jurors, I will

mainly direct my questions at the folks seated over here,

asking questions to try to see if there are any -- anybody who

needs to be dismissed for cause.

I won't be asking anybody in the -- so they will raise

their hand if they have some issue they need to discuss.  The

folks in the back, the extras, will not be asked to raise their

hands at that time, but if someone is excused, Mr. Keech will

just call someone up, the next person on the list, to have them

take that seat, and I will just instruct everyone in the panel

1    to keep notes, if any questions came up that they needed to

2    discuss.  So if Mr. Keech calls up the next juror, when they

3    come up, I will ask, *Have any of my questions triggered*

4    *anything that you need to discuss, or any issues that you think*

5    *might cause you to not, to be -- not to be able to serve on*

6    *this jury*?  If they say yes, we'll, discuss it.  If they say

7    no, we will just proceed until I get to everybody on the floor

8    here being, in my view, qualified.

9            I will then let you come up, explain a few -- if you

10   have any challenges for cause from that group.  We will discuss

11   that, but then we will just get down, and then we will have you

12   do your questions, and then once we get to the 31 folks, over

13   here, we will do peremptory strikes, which is the government,

14   then two defense.  So the defense are going to have to agree on

15   them.  You are going -- I'm not giving you separate ones each.

16   So the defense will have to discuss.  Mr. Keech will have a

17   piece of paper to hand back and forth; so, government, two

18   defense, government, two defense, till we get to the ten and

19   six, I think, of the main jurors, and then you will each have

20   one peremptory for a potential alternate.  So then we will get

21   down to our 12 plus one that way.  Does that process make sense

22   to everybody?  Any questions?

23           *MR. FIELDS:*  No questions from the government,

24   Your Honor.

25           *MS. FROST:*  Your Honor, I have a quick question.

1    Since we have to confer, will you give us time to speak with

2    counsel about when we're doing our strikes?

3         *THE COURT:*  Sure.  And so this will be -- that raises

4    one question I have, but, yes, so, it's done on paper.  You

5    will have a chance, the government will check or write the

6    number down of their first one, hand it to you, then you

7    discuss who you think the next two should be, hand it back, and

8    it will be -- you don't have to do it in front of, you know --

9    don't have to do it out loud, in front of the jury or anything

10   like that.

11        And I know that takes some time, so one question I

12   have, I have always done it where we just do it with everybody

13   here, but we could -- we could take a recess, let the jury,

14   everybody leave, so that you can, sort of, do it a little more

15   openly, potentially.  I don't know that -- I have never done it

16   that way.  I don't want to encourage you to take an hour to do

17   it, but it may -- I know the whispering and stuff gets very

18   awkward as we sit there while you are talking about that.

19   Ms. Hubbard?

20        *MS. HUBBARD:*  Yes.  Good afternoon, Your Honor.  What

21   I might suggest -- I'm picking the jury.  I need to be able to

22   look at their faces when we are, kind of, going through it,

23   because I'm not great with names.

24        *THE COURT:*  Yeah.

25        *MS. HUBBARD:*  But what might work, for purposes of us

1    being able to confer is, can we do all of the voir dire, take a

2    little bit of a recess, and the defense can try to get, kind of

3    generally, on the same page about where we think people are,

4    and then bring everybody back and do the strike process?

5            THE COURT:  Yeah.  That might make sense, and it may

6    be, sort of, timing-wise appropriate, anyway.

7            Mr. Fields, do you have -- does the government have

8    any thoughts on that?

9            MR. FIELDS:  No.  I think it's a good proposal,

10   Your Honor.

11           THE COURT:  All right.  We will try to do that.  Feel

12   free to remind me, if I forget.

13           MS. HUBBARD:  If I could come up here and make sure I

14   understand.  I think I'm just confused about the alternate

15   situation.  So they will be these three presumptively?

16           THE COURT:  That's right.  Those three will be -- the

17   alternate will be one of those three.  You know, obviously, if

18   one of them gets excused, it will be someone else, but when I

19   get to my 31, it will be one of those.  So your first -- your

20   first ten, right, peremptories, should not include anyone in

21   29, 30 or 31.

22           MS. HUBBARD:  Okay.

23           THE COURT:  And then when we do get to that, you each

24   just excuse one.  Now, if somebody -- if somebody doesn't use

25   all of them, we just go by the, sort of, random next person on

1   the list, but I have never had anybody not use them.

2        MS. HUBBARD:  Okay.  I think that explains what I was

3   wondering about.

4        THE COURT:  Okay.  Very good.  Anything else about,

5   sort of, the mechanics of the jury selection?  Yeah.

6        MR. FIELDS:  Your Honor, when it comes to voir dire,

7   the government would ask for equal time with the defendants.

8   We have the burden.  If there's only one defendant, I presume

9   we get equal time.  The defendants are going to get 20 minutes.

10  We would also ask for 20 minutes.

11       THE COURT:  Okay.  That's fine.  I mean, we're talking

12  about five minutes, that's fine.

13       Speaking of time, for opening statements then, my

14  inclination is give you each 90 minutes per side for both

15  openings and closings, to use however you want, but I'm open to

16  discussion of whether that's insufficient or inappropriate.  I

17  don't know if anybody has a position.  Mr. Fields?

18       MR. FIELDS:  Your Honor, so if -- just want to make

19  sure.  So we would have 90 minutes, and each defendant would

20  get 45?

21       THE COURT:  They would get -- they will get 90 minutes

22  to divide up how they want.

23       MR. FIELDS:  Okay.  Yeah.

24       THE COURT:  Between themselves.

25       MR. FIELDS:  Assuming that the time is equal on each

1    side, Your Honor, 90 minutes is more than enough time for the

2    government to present.

3            THE COURT:  Okay.  The defense have a position?

4            MR. SCHALL:  Your Honor, that seems like sufficient

5    time for Mr. Tew.

6            THE COURT:  Mr. Kaplan or Ms. Hubbard?

7            MR. KAPLAN:  It's more time than I think is needed.

8            THE COURT:  You don't have to use it, but that's for

9    opening and closing.

10            MR. SCHALL:  Combined?

11            THE COURT:  So if you --

12            MR. KAPLAN:  I misinterpreted.

13            THE COURT:  See, it's perfect.  Not too much.

14    Obviously, if we get close to closings and it's obvious, or

15    somebody can make a motion for extra time, but that's my

16    proposal, is if you want to use a lot of time for openings, you

17    have less for closings and vice versa.

18            Okay.  We will do that, obviously, with the potential

19    for adjusting it, if necessary.

20            So back to -- I skipped a couple of my points on the

21    jury.  Number one, I plan to ask our jury people to bring us 45

22    potential jurors.  I think that's a couple more than I usually

23    have in a criminal case, but since this is going to go into a

24    second week, it seems like there may be a few more that gives

25    us 14, 14 for cause people, that seems sufficient in this case.

1    Does anybody think that's insufficient?  Mr. Fields?

2           *MR. FIELDS:*  No, that seems about right, Your Honor.

3    I only paused, you know, it's cold and flu season, so that can

4    kind of upset things, but I think that goes more to the number

5    of alternates than the number of venire people you are bringing

6    in, and I think one alternate is fine, and 45 fine.

7           *THE COURT:*  Is that okay for the defense?

8           *MR. SCHALL:*  Your Honor, I tend to be risk adverse on

9    these things, call more people than otherwise, add a few on the

10   end just to be sure.  So I would say 50, but that's my risk

11   aversion there.

12          *THE COURT:*  Mr. Kaplan?

13          *MR. KAPLAN:*  I think that number is fine.

14          *THE COURT:*  So here is what I will do, Mr. Schall, I

15   will talk with our jury people and see if they have been having

16   a lot of trouble getting enough people.  I also will see if

17   there are other juries being seated on Monday.  I don't -- I

18   haven't looked.  And if there are, sometimes they can shift

19   people between the groups and we can get a couple more, if we

20   start getting desperate, but for now I think 45 should be

21   enough.

22          I'm not ... I have never come very close to running

23   out of people.  Just doesn't seem like a case where there's

24   going to be a lot of conflicts or, you know, people who know

25   each other or not super controversial issues, so I think we

1    should be okay.  Thank you for that, though.

2         So we will give the jurors a notebook, which will

3    include the preliminary instructions, which I think we should

4    have shared our draft of those with you.  The -- any

5    stipulations of fact that the parties are able to include.  I

6    let the jurors take notes, but not ask questions, during the

7    proceedings.  And then it will include the Indictment.  I

8    think, Mr. Schall, you may have objected to including the

9    entire Indictment.  I don't think that redaction is necessary,

10   but if you want to make a quick argument on it, you can.

11        *MR. SCHALL:*  Your Honor, really nothing more than I

12   put in writing.  But the -- we're here to determine whether or

13   not fraud happened, and the use of the adjective, fraudulent,

14   kind of begs the conclusion in a way that is almost by

15   definition surplusage, and I mean it's unnecessary, and I know

16   it could be awkward or weird to have redactions in an

17   Indictment, especially one going back to the jury, but I think

18   that could be worked around, but it is, from the beginning,

19   using the very word we're here to determine, to beat the jurors

20   over the head with, and I apologize for not raising this issue

21   earlier, and a trial brief is not ideal for that, but you know

22   if this were a civil case, you wouldn't put fraudulent invoices

23   in the claim.  You would say, very specifically, that they

24   involve materially false statements or something of that nature

25   and what's wrong with them, and that's what you have to prove,

 1   and obviously what's in the Indictment, the government has to

 2   prove, but it just starts a creep, Your Honor, of, you know,

 3   the skunk in the jury box, if you will.

 4        THE COURT:  Well, I guess I will let Mr. Fields or the

 5   government respond.  Ms. Hubbard did you want to say something

 6   first?

 7        MS. HUBBARD:  Yeah, Your Honor.  I was going to join

 8   the motion or -- it wasn't really a motion, I guess, but the

 9   issue from Kimberly Tew's perspective.  I think there's a

10   difference between sending an Indictment back with the jury

11   that lists the charges and the elements and a difference

12   between sending what I would call a speaking Indictment, back

13   to the jury before they've heard any evidence, before they've

14   heard any testimony.

15        I think the parties can agree.  I do think it would be

16   helpful for the jury to have something like the chart that

17   appears in the Indictment, in their materials, so that they can

18   track, given the number of counts in the case, but I think we

19   can do that without the government's overlay as to their theory

20   of the case that, as Mr. Schall points out, talks about

21   fraudulent payments and when a bank holding an accounts

22   received fraudulent payments closed, then it attributes certain

23   actions to my client, and we would object to the jury having

24   that material provided to them by the Court.  I think that

25   gives some sort of imprimatur to it, an importance it, that is

1   different than them hearing testimony about that sort of thing.

2          THE COURT:  All right.  Thank you.  Mr. Fields, would

3   you like to respond?

4          MR. FIELDS:  I would say there's no imprimatur,

5   because the Court is going to give an instruction that tells

6   the jury the Indictment is merely an accusation, it's not

7   actual evidence.

8          We're here in this case because a grand jury actually

9   found that there was probable cause to believe that those

10  invoices were fraudulent.  Now the question is, will the petit

11  jury agree with them, and find, beyond a reasonable doubt

12  that's the case.  The language of the Indictment actually

13  tracks the statute.  The statute uses false or fraudulent.

14  There's nothing sort of improper or weird about, sort of,

15  repeating what the statute requires the government to prove and

16  for the jury to find, and that's why the government would

17  object to removing that language.

18         THE COURT:  So, I think I agree with you.  The one

19  thing that gives me some pause is, as I said, I don't think

20  giving them an Indictment necessarily gives them imprimatur,

21  and the instruction is important on that point, and to some

22  extent including more qualifiers like fraudulent, if anything,

23  you now have to prove that, which you did anyway, but I mean it

24  just makes it clear, that that's something that has to be

25  proved to find them guilty.

1          But do you think there's any concern with the, as you

2    just said, that a grand jury already voted on this?  Is there

3    any reason to be concerned about that aspect of it?  Raising

4    any concern with the -- this jury?

5          *MR. FIELDS:*  I don't think so, Your Honor.  I brought

6    that up merely to, sort of, say, you know, for purposes of here

7    and, sort of, considering; like, why do we have this

8    Indictment?  It's not, sort of, just, you know, out of the

9    ether of the government's theory.  The grand jury actually came

10   to those conclusions.  So, I mention that here in court, but

11   the petit jury doesn't need to hear anything about the grand

12   jury finding probable cause.  Certainly wouldn't ask for that.

13   All I would say is, you know, what I have said earlier.

14         *THE COURT:*  Okay.  Thank you.  So, I agree with the

15   government.  The fact that the Indictment says what it does is

16   part of the case.  The jury will be instructed that it's just

17   the government's allegations, that the government has to prove,

18   that it's -- and I think that would be made abundantly clear,

19   and to the extent there are additional details in there, I

20   don't think that's any reason to exclude it or additional

21   adjectives like fraudulent.  It is something that the

22   government has to prove in order to convict these jurors.

23         So, I will include the Indictment, as it was handed

24   down and the preliminary instructions in the books.

25         *MS. HUBBARD:*  For purposes of the record, may we file

1    what we propose go back to the jury, as I suggested?

2                THE COURT:  Sure.

3                MR. SCHALL:  Your Honor, am I understanding correctly,

4    that the Court intends to put the Indictment in the packet that

5    the jurors will have with their notebook?

6                THE COURT:  Yes.

7                MR. SCHALL:  Just for purposes of the record, Mr. Tew

8    would object to that.

9                THE COURT:  Okay.  Thank you.  As to witnesses, do the

10   parties request sequestration under Rule 615?

11               MR. KAPLAN:  Yes, Your Honor.

12               THE COURT:  Okay.  So we will enter that order, and

13   each party, I will depend on you to make sure your witnesses

14   understand what that means.  Okay.

15               MR. FIELDS:  Your Honor, may I be heard very briefly

16   on that?

17               THE COURT:  Yeah.

18               MR. FIELDS:  Special Agent Palmer is one of our

19   witnesses.  We would like her to be our advisory witness at

20   table.  So, I would ask that the sequestration order exclude

21   her.  And also, Special Agent Anderson is the co-case agent

22   with the FBI.  We expect that she is going to help us with

23   logistics, in terms of making sure witnesses know when to come

24   in.  In that respect, it's useful to have her in the courtroom,

25   sort of, able to do that.  I don't expect that, you know, the

1    case agents, in particular, will hear anything from the

2    witnesses that they haven't already heard before.  So the

3    purpose of the sequestration aren't quite here, the same,

4    regarding the case agents.

5              THE COURT:  Any response to those two potential

6    exceptions?

7              MR. KAPLAN:  I would just say they should have one

8    advisory witness and pick one.

9              MR. SCHALL:  I would agree, Your Honor.

10             THE COURT:  All right.  I do too.  So you can have one

11   advisory witness, and I assume it will be Ms. Palmer.  You can

12   have someone else help with your witnesses.

13             I don't think any witnesses are in custody in this

14   case; is that right?  Okay.  Good.

15             We've discussed, I think, about the exhibits, and the

16   electronic -- provide electronic exhibits, which, I think,

17   already granted.  Are there any questions about how to deal

18   with the exhibits.  If there are, they are probably best

19   directed to Mr. Keech, but if there's anything you wanted to

20   discuss about that, let me know.

21             MS. FROST:  Can I ask one question on behalf of

22   Mr. Tew?  And I think I know the answer, so I apologize,

23   because I'm familiar with how the Court conducts a trial.  If

24   we have to refresh recollection, for instance, with a

25   particular witness, you are okay if we use a piece of paper

1    instead of using the electronic version of the exhibit, right?

2         THE COURT:  Oh, you mean -- yes.  If you have it,

3    obviously.

4         MS. FROST:  Prefer to be old school and still use

5    paper.

6         THE COURT:  Sure.  You don't have to -- the purpose of

7    the electronic -- allowing the use of the electronic exhibits

8    was just to avoid having to have too many of them.  But if you

9    do have a paper exhibit, as long as you share it and everybody

10   knows what's what, that's fine.

11        MS. FROST:  Thank you.

12        THE COURT:  Sure.  Are there any big exhibits or

13   objections to big exhibits -- big objections to exhibits that

14   we can, sort of, address now or you can give me heads up to

15   now, that I can start thinking about, or is that sort of stuff

16   we need to deal with?

17        MS. HUBBARD:  Your Honor, kind of category of exhibits

18   that I expect is going to be a contested issue throughout the

19   trial, is I'm going to use the word summary exhibits,

20   understanding that that might encompass a couple of different

21   evidentiary rules that things could be offered under.  We have

22   been talking with the government, trying to get an

23   understanding of what they are intending to proffer under Rule

24   1006 versus Rule 611 versus a demonstrative.

25             I tried to highlight some of those issues in our trial

1    brief, so that they would, at least, be flagged for everyone,

2    but I do anticipate those being a continuing issue throughout

3    the trial.

4        THE COURT:  I appreciate that, and I did see that in

5    the brief.  My feeling is I probably don't know enough, right

6    now, to give a lot of useful guidance on that.  I don't know if

7    the government has a response or anything they want to add on

8    it, right now?  You can.

9        MR. FIELDS:  Your Honor, yeah.  May I take the podium?

10       THE COURT:  Sure.

11       MR. FIELDS:  So I guess, in terms of the exhibits and

12   big objections, I think there are two.  This actually goes to,

13   kind of, the length of the trial.  So, first our motion in

14   limine, regarding the business records and authenticity.  We

15   filed all of our declarations and there were no objections.

16   So, the government would respectfully ask for a ruling from the

17   Court that those declarations actually meet the business

18   records exception.  The defendants would still be able to raise

19   other objections under 401 or 403, but that will definitely

20   help us, in terms of, you know, making sure we don't have to

21   subpoena all of these custodians.  And so we would ask for

22   that, because I think that will help streamline, at least, part

23   of the trial.

24       And then when it comes to summary exhibits, I think we

25   can work with defense counsel on, you know, what's a 1006

 1    versus a 611, but there's also this idea that, you know, an

 2    agent, potentially, talking about an exhibit is somehow summary

 3    testimony, and in that regard, if the defendants' position is

 4    correct, and only a witness with percipient knowledge can

 5    actually read something into the record, we see a bunch of

 6    problems with that, because the Court will know, in our exhibit

 7    list, the majority of those records are bank records, right?

 8    So if we have to call the custodian before the custodian can

 9    actually read what's on the bank record or say this transaction

10    happened on March 19th, that's going to take a lot of time.

11         In the alternative, if no one is actually allowed to

12    read anything in the record, we just have to stand here and

13    show the jury, flipping through, page-by-page, that is going to

14    take an enormous amount of time; more than the eight days.  So,

15    we would ask for some clarification on the defendants'

16    position.  Especially when it comes to the bank records,

17    because if we need to call the custodians, who have personal

18    knowledge of the recordkeeping, we would ask leave to file a

19    bunch of additional exhibits -- or a bunch of additional

20    witnesses.

21         And then also, there are no stipulations in this case,

22    but one of the things that the government has been working on

23    is interstate commerce.  Flagstar Bank, which took over

24    Signature Bank's responsibilities, has told the government that

25    they can provide us with a business record that is going to

1    show, sort of, where their servers are and all of those

2    contractual relationships.  The government -- that was not on

3    our exhibit list.  It's not part of the declarations, but the

4    government would respectfully respect leave, if and when we

5    receive that, to file that with the Court, and to also get a

6    similar ruling, which would mean, you know, one fewer witness,

7    in this case, which we think would also streamline things.

8         THE COURT:  Okay.  Let me leave this, sort of,

9    business records for a little bit later, and ask the defense to

10   respond on this last point, if you would, and then we will turn

11   back to the business records, but sort of the stipulation

12   issue.

13        MR. KAPLAN:  Your Honor, as I understand it, they have

14   not yet provided the document that they are seeking to use to

15   establish interstate commerce.  I certainly would like to

16   review it.  It's a fairly significant issue, in terms of what

17   they have to establish, and if it's one witness, doesn't seem

18   as compelling, but rather than give a position, I would like to

19   see the document and what it says.

20        THE COURT:  Okay.  So we will wait till it's provided.

21   Mr. Fields.

22        MR. FIELDS:  Your Honor, I wasn't asking for a

23   decision on whether it's a business record.  I want leave to

24   actually still add it to our exhibit list and file those with

25   the Court, even though it's after the exhibit list deadline.

1            THE COURT:  Sure.  Sure.  Of course.  And then, of

2     course, share it with defense counsel, and they will have an

3     opportunity to respond to that.

4            Let me just talk, sort of, before we get into too much

5     of the substance about a couple of, sort of, other logical

6     things.  So, speaking of exhibits, I'm going to order the

7     parties to pick a time, the day before -- the night before each

8     trial, 7 p.m., seems reasonable to me, but you figure it out,

9     and at that time, the party presenting evidence the next day

10    needs to explain which exhibits are going to be used, including

11    demonstratives, and then we can, if we need to, discuss any

12    objections to those the next morning.  So if you would do that;

13    7 p.m. is just a suggested time, but the requirement to do that

14    is an order.

15           Speaking of objections, I don't have a blanket rule

16    one way or the other about doing everything at the bench or

17    not.  I, sort of, rely on counsel to use their judgment about

18    not having long discussions that may go into things that would

19    be problematic for the jury to hear.  So if you think you need

20    to, in an objection or a response to an objection, to have a

21    bench conference, just let me know.  But if it's something,

22    sort of, short and relatively straightforward, I think we can

23    do that from the tables.  Obviously, the jury will be

24    instructed, multiple times, throughout the course of the case,

25    that objections and attorney argument and my rulings on

37

1    objections are not evidence, and so I think that obviates the

2    need to necessarily come up every time, but I do think it's

3    best if we -- you know, if we're going to get into some

4    in-depth things, to not do it in the jury's hearing.  So I will

5    ask you to use your judgment on those types of things.

6         So on my list of, sort of, more substantive things, I

7    think, to me, besides the timing of the trial, are the motions

8    regarding the proffer statements, and so why don't we go ahead

9    and discuss those now.

10        *MS. HUBBARD:*  Your Honor, can I ask one quick followup

11   question?

12        *THE COURT:*  Sure.

13        *MS. HUBBARD:*  After we exchange the information for

14   the next day, if we have identified something that we believe

15   will take, you know, 15 to 20 minutes to address, outside the

16   presence of the jury, what's the best way to let you know that

17   insufficient time.

18        *THE COURT:*  It's probably best to email.  I mean, I

19   will be here by 8:30, every day, and so, you know, just let us

20   know if there's something we need to discuss, probably by

21   email, and then I will be prepared to come out, and we can try

22   to discuss it, immediately, before.  You know, sometimes it may

23   be something that's not going to come up until after lunch, and

24   we can do it over lunch or something like that.  Just -- it

25   doesn't have to be on the docket or anything.

1           So, as to the proffer statements, as I sort of read

2     the written submissions on those, my general position is to

3     agree with the government, that these are sort of, in general,

4     constitutional and, in general, people can waive their rights.

5     I mean, people waive their rights in a very blanket way

6     sometimes, in admitting to certain facts, in the process of

7     discussing plea agreements, and that doesn't strike me as

8     necessarily unconstitutional.

9           On the other hand, I agree with the defendants that

10    there are constitutional implications to doing so, and that it

11    would be -- that I need to be careful to not read them as

12    having waived more of their rights to present a defense than

13    they actually did.

14          So, my read of things here is that the easy case for

15    admitting probably almost everything that was said in these, is

16    if the defendants testify, and testify as to facts or anything

17    that really contradicts what they said in the proffer; that

18    probably allows most, if not all, of what they said in the

19    proffers to come in.

20          The opposite extreme, I guess, where very little would

21    come in, is if the defense, sort of, just bases its theory

22    completely on the idea that the government's evidence is

23    insufficient, and doesn't really present, sort of, alternative

24    theories or any of their own evidence.  In that case I'm not

25    sure any of the proffer evidence would come in appropriately.

1          A case that we found, is a second Circuit case, that I

2     think, sort of, makes that point, which is *US vs. Oluwanisola*,

3     605 F.3d, 124, if you want to look at it.  So, in this case,

4     the way I read the language is probably closer to how the

5     defendants read it than to how the government reads it.  I see

6     some of the broad language in there about contradicting their

7     other evidence or presenting a position, even in an argument,

8     that could be read as saying even if your attorney suggests

9     that you didn't do something, I read very broadly, I think that

10    is a plausible reading of it.

11         On the other hand, reading it that way essentially

12    makes it basically the -- what the defendants said in the

13    proffer was, essentially, that they did all of these things,

14    and so if the theory of the case, which is seems to be, their

15    only defense is that they didn't do it or that they didn't do

16    it intentionally, that is basically, they can't present any

17    defense, because any defense is contrary to the certain things

18    they said in the proffers, and I just can't read these proffer

19    agreements that broadly, and so, as I read it, I don't think an

20    attorney saying really much of anything, is likely to allow

21    these proffers in.  Attorney -- as I just said, attorneys are

22    not attorney arguments, attorney questions are not evidence and

23    I think that the defendants here did waive their right to come

24    in and present evidence saying they didn't do things, that they

25    admitted to doing in the proffer statements.  It doesn't allow

 1    them to come in -- well, they can do that, but then the

 2    proffers would come in, and likewise, if they were to testify

 3    in a way that said they behaved or thought or acted differently

 4    than they said in the proffer sessions, then the proffer would

 5    come in.  But simply attorney questioning, attorneys saying

 6    that the government's evidence doesn't show that they did this

 7    or that they didn't do it willfully or that they didn't do it

 8    with the right mens rea, to me, an attorney taking a position

 9    like that is not contrary to the language they agreed to and

10    therefore it doesn't permit, under those agreements, the

11    government to use the proffer language.

12            So that's where I am now.  I do, I guess, want to

13    allow everybody to explain their positions.  These are defense

14    motions, so if you would like to explain what you think.

15            MS. HUBBARD:  Just a moment, Your Honor.

16            MS. FROST:  I'm sorry, may we have a moment,

17    Your Honor?

18            THE COURT:  Sure.

19            MS. HUBBARD:  Your Honor, given the Court's

20    observations about your view on what does and doesn't

21    constitute a breach of the proffer agreement, at this point, we

22    all think we have enough guidance to at least make opening

23    statements and start the trial, and as -- until a specific

24    issue comes up.

25            THE COURT:  Okay.  Thank you.  For the government,

1    Ms. Weiss?

2         *MS. WEISS:*  Your Honor, I believe that, for purposes

3    of today and getting through everything that we need to get

4    through for today's hearing, the most important thing is that

5    we have a chance to look at that case from the Second Circuit,

6    absorb it, and if we deem appropriate, respond to that case,

7    since it does seem to be convincing to the Court.

8         We stand by the position of our briefing, which is the

9    words of Judge Easterbrook, which is, *Evidence is evidence,*

10   *whether it comes out on direct or Cross-examination.  One can*

11   *otherwise present a position, through the argument of counsel*

12   *alone, so it is easy to see how a position can be presented by*

13   *evidence developed on Cross-examination and elaborated by*

14   *counsel.*

15        Anytime a defendant presents a defense, there's lots

16   of different ways to do it and one of those ways is through

17   cross-examination or by defense arguments.  Those are some of

18   the strongest tools in their entire toolbox and they are used

19   effectively everyday to do exactly what Your Honor is

20   suggesting, which is, poke holes in the government's case here

21   or there.  That is one of the most common types of defenses

22   that there is.

23        Now, if you eliminate from the *Mezzanato* waiver any

24   sort of defendants like that, you are effectively, upending the

25   expectation of the parties in every single proffer agreement in

1    every single case in this district.  This is the language that

2    is used across every case.

3           THE COURT:  Well, the Tenth Circuit cases you

4    pointed -- I mean, in proffer agreements that may be true, but

5    in the cases you pointed me to, from the Tenth Circuit, which

6    were, I think, both plea agreement cases, *Jim* and *Mitchell*, I

7    think, those have just broad, very simple language that says,

8    *Anything you say in here can be used against you*.  Doesn't have

9    qualifiers, doesn't have, *If you do this, if you do that*.  So,

10   this is clearly meant to be not that broad, right?  You could

11   have written it that way, but you didn't.  So, what is the

12   point of -- what kind of a defense could someone make, if you

13   are right, that Cross-examination or asking questions or making

14   an argument that says the government hasn't shown that they did

15   this knowingly, what's left?

16          MS. WEISS:  I can conceive of a lot of different

17   defenses, Your Honor, for instance, and we've heard some of

18   them alluded to here today.  *I didn't have full knowledge of*

19   *everything that my spouse was doing*.

20          THE COURT:  Isn't that contrary to some of the

21   language in the proffers?

22          MS. WEISS:  To some of that language, and sure, in

23   that case, you would be opening yourself to impeachment, and

24   that's essentially, the choice, right, Your Honor, is, do you

25   want to try and provide the jury with an explanation that is

1   different at trial, than the one that you gave to the

2   government?

3         THE COURT:  Well, I agree with that.  I agree with

4   that.  If they get up here and testify, I think, as I said,

5   that's coming in, and the language about impeachment makes

6   perfect sense.  But if they ask, I don't know, if they ask a

7   case agent, *Well, you don't know what was in her head at that

8   time, do you*?  Or, *That doesn't tell you that she was doing

9   this voluntarily*.  That's Cross-examination.  This would not be

10  used to impeach anybody.  Nobody has testified to the contrary,

11  but as I read your argument, you are saying that would be

12  contrary, and I think it would be contrary to some of the

13  statements that were made.

14        So under your theory, that would also mean somehow

15  then, I don't know how we would admit the proffer statements,

16  in that circumstance, but I'm just talking about purely on

17  Cross-examination, poking holes, as you said, and then, you say

18  well that's -- that hole was filled by their own statement in

19  this proffer session, that seems different to me.

20        MS. WEISS:  Sure.  And I think, Your Honor, that we

21  could even take a more concrete example that might be even

22  better than talking about the defendants' intent, and the

23  extent of their knowledge, and something to me which is a

24  little bit more squishy.  Let's talk about something more

25  specific like who created the email address.  So all of these

1    invoices were submitted through email addresses that were

2    created, the government has independent attribution evidence to

3    present on each one of those email addresses.  Now, is there

4    ever going to be a circumstance where we know exactly who is

5    behind the keyboard in that moment?  No.  We don't live at

6    their house, right?  And so the best we can do is look to the

7    circumstantial evidence of things like Google subscriber

8    records, and how those email addresses were used, et cetera, et

9    cetera.

10           Now, let's say, and we have evidence like that, in

11    these particular proffers, where we have Michael Tew or

12    Kimberly Tew admitting, *I created that email address*, or, *I*

13    *used that email address*, or, *I sent that invoice*, or *I created*

14    *that invoice*.  Now imagine a scenario where we have Agent

15    Palmer up on the stand and we have one of the defense counsel

16    get up and say, *You can't prove who created that email address,*

17    *can you?*  And that's just simply not true.  There is evidence

18    out there, mainly the defendant's own confessions, and that's

19    what these are, confessions, that the jury would never hear,

20    and that's what the problem is, is that what you end up doing

21    is dissipating the integrity of the entire judicial process by

22    hiding the balls of -- pardon me -- hiding the balls on

23    information that the jury would otherwise have, and what we're

24    saying is the jury needs to hear that information, and if

25    there's some explanation and some story and some defense that

1   they want to provide, whether that be out of their own mouths,

2   out of the mouths of others, witnesses, their counsel, other

3   agents, they are free to do that, that's the defense they are

4   choosing and that's the point of these waivers.

5         *THE COURT:*  But there's lots of rules that inhibit the

6   pure truth-seeking function of a trial, because there are other

7   values too, right?  That we value, that are important to us,

8   and one is to not be compelled to testify or give evidence

9   against yourself, and that comes up in lots of ways, and we

10  throw out -- we, meaning judges -- throw out cases all the

11  time, because even though it's very obvious the defendant was

12  guilty, because of these other values.  And so, yeah, I agree

13  with you, this would be a much easier case if we just put the

14  proffers in there, and there's no reason to doubt that what the

15  proffer said is true, but our system requires the government to

16  prove their case, and it generally doesn't allow using the

17  defendants' own words to do that.  Now, they can waive that, as

18  you said.  So to me, that's really the question.

19        *MS. WEISS:*  Well, and, Your Honor, if I may, I think

20  that is the question, right?  Is that we have knowing and

21  voluntary statements and confessions to law enforcement, all

22  day, every day, right?  In a variety of different context.  And

23  there's a constellation of cases that everybody knows, that

24  pertain to how those types of statements are made, and in what

25  context and so the two most important guide rails to those

1  statements and whether or not they come in a trial, and that's

2  the question we're asking here; is not, are these defendants

3  guilty or taking away their right to a jury trial?  It's, does

4  this evidence come in?  Was it custodial?  That increases the

5  ability that it would be coercive in some way or fashion, and

6  were they represented by counsel or advised of that right?

7         So we're talking about a situation in which defendants

8  gave these statements under a noncustodial setting, in the full

9  presence and advice of counsel.  So, when we talk about knowing

10  and voluntary waivers, this is, kind of, the best record you

11  are going to get of that, right?  Is a situation, in a

12  noncustodial setting, represented by counsel, advised in

13  writing, and advised by counsel, orally, and signed by both,

14  right?  The record is there.

15         Now, when we talk about getting the proffer statements

16  in a trial, that's not the government's decision, and that's

17  the defendant's decision, and that's how these waivers work, is

18  that power, that ball, is in their court.  The government never

19  gets it, and the government would never use these proffer

20  statements in this case or seek to use them, unless they are

21  contradicted.  The government only gets that ball if it's

22  passed to them.

23         THE COURT:  Yeah.  But how can they do anything

24  without triggering this, in your interpretation?  If they say,

25  the government can't prove that you created this email, which

1    is your example?

2        *MS. WEISS:* Hm-hm.

3        *THE COURT:* I mean, they have to -- government has to

4    prove that they created the email, right, or that's part of it.

5    As you said, there's lots of ways to prove that.

6        *MS. WEISS:* Hm-hm.

7        *THE COURT:* If that's their argument, if they say

8    that, would that trigger this?

9        *MS. WEISS:* If they said the government can't prove

10   that you created that email?

11       *THE COURT:* Hm-hm.

12       *MS. WEISS:* I believe so. I think that there's a

13   distinction between saying the government has provided to you

14   attribution evidence, this, that and the other, but they can't

15   prove it to you, there's nothing else on earth that could prove

16   that to you, that's not accurate.

17       *THE COURT:* What if they just get up and say the

18   government can't prove that my client is guilty?

19       *MS. WEISS:* That would not trigger it, and the

20   government is not seeking to eliminate their ability to say the

21   government has not met their burden.

22       *THE COURT:* Why not? This says -- I mean, the

23   language you are relying on says that this is triggered if they

24   present a position, including in an argument, that can

25   contradict statements made by your client. You don't think

1   statements made in those proffers show they are guilty?

2        MS. WEISS:  I think if the argument is the government

3   has not met its burden, then no, that does not contradict these

4   proffers.

5        THE COURT:  So they could say the government hasn't

6   met its burden, but they can't say my client is not guilty.

7        MS. WEISS:  I think they could say that, as well.

8        THE COURT:  Why?

9        MS. WEISS:  I think that they can argue that they are

10  not guilty, because the government hasn't proved its burden,

11  right.  There isn't any -- that is what triggers the not guilty

12  verdict.

13       THE COURT:  Okay.  Fair enough.  All right.  Could

14  they say the government's evidence is insufficient to show my

15  client is guilty?

16       MS. WEISS:  Yes, they could.

17       THE COURT:  Why?

18       MS. WEISS:  Because they have not said that there's no

19  evidence, other than what the government has that would prove

20  their client guilty.  They are just saying the evidence that

21  the government has presented, in its case in chief, within the

22  four corners of this courtroom, is not sufficient.

23       THE COURT:  So, I have to try to police this line

24  through this trial between them saying the government's

25  evidence is -- doesn't show this, and that's okay, but not that

1    the evidence -- there's no evidence -- there isn't evidence to

2    support this?

3            *MS. WEISS:*  Yes, yes, Your Honor.  Unfortunately so,

4    and that is why we included, you know, procedural suggestions

5    for how to deal with this at trial.  We understand that this is

6    something that could be hotly contested; that it's something

7    that's going to have to be argued outside the presence of the

8    jury; but it's also something that if it is triggered once,

9    it's triggered, so --

10           *THE COURT:*  And you think that line, that we have been

11   trying to draw here, is something that, as you said, every

12   defendant who signs one of these, understands that that's the

13   line they are walking when they sign it?

14           *MS. WEISS:*  Yes, I do, Your Honor.

15           *THE COURT:*  Because I don't really understand it,

16   right now.

17           *MS. WEISS:*  So I would point, actually, to, the facts

18   of this case, and let's take it by analogy, again, to knowing

19   and voluntary statements to law enforcement, which are made all

20   the time.

21           So, if we were standing up here on a motion to

22   suppress, where a defendant had -- was not within the presence

23   of counsel, was in a custodial setting, and nevertheless had

24   waived their *Miranda* rights, and then later on, got the benefit

25   of counsel, said, for whatever reason, *That waiver is not*

1    *knowing and voluntary.  We should have a hearing on that.*  That

2    would be the motion to suppress.  And the burden of proof that

3    the government would be facing is simply just proving that

4    there's a preponderance of the evidence that the waiver was

5    knowing and voluntary.

6            Again, that's the standard in a far more coercive

7    setting than the one we have here, right?  And a waiver, that

8    has been signed, even outside of the presence of the counsel,

9    while not totally dispositive of that question, is a very

10   powerful piece of evidence for that question, under the case

11   law.

12           THE COURT:  Yeah, I agree with you.  I agree with you

13   on all of that.  But the waivers that you typically see in

14   those circumstances are pretty blanket waivers, that if you

15   sign this, we can use this against you in a court of law,

16   however we want.  This has a bunch of ifs and qualifications.

17   You are not going to be able to use it in every circumstance,

18   right?  I mean, that's the hard part for me.

19           MS. WEISS:  Right.  And I understand, it's, you know,

20   it's a long sentence; it's a whole paragraph; it's multiple

21   sentences in one paragraph.  There's also a reference to this

22   in the final sentence of paragraph one, where both attorney and

23   client recognize that this evidence could be used in their --

24   in their trial, if they contradict it.

25           Now, that's why we have defense counsel, to parse

1    through this language with their clients; that's why we have a

2    body of case law, which, as Your Honor notes, overwhelmingly

3    supports these types of waivers and overwhelmingly has

4    supported them in cases, in exactly the way that the government

5    is suggesting.

6           So, to say that the four esteemed, highly experienced

7    defense counsel that are representing the Tews here today, did

8    not understand the implications of this waiver, could have

9    brought it up earlier, is strange.  The idea that the original

10   attorney, who sat there next to Michael Tew on the day of his

11   waiver, also would have had to have a misunderstanding, as

12   would have been the two defense attorneys from New York City,

13   that represented him at the second proffer statement --

14          *THE COURT:*  I think everybody understands -- as I

15   said, I agree with your -- the blanket argument that I think is

16   an implication, in some of the defendants' motions that these

17   are, sort of, inherently unconstitutional or problematic.  I

18   agree with you, or that you can't possibly have voluntarily

19   waived any of these rights.  I agree with you, that's not -- I

20   don't find that persuasive, but as we've been -- and I think

21   there are some easy cases.  If they testify, as I said, and

22   they say something contrary to what's in these, that, to me, is

23   an easy case that you can use it.

24          *MS. WEISS:*  Agreed.

25          *THE COURT:*  And I think it's also an easy case that if

1    the defense, on the opposite extreme, if the defense is very

2    limited and extremely careful about how they characterize

3    things, and say only things like the government -- the evidence

4    the government has presented doesn't support X, Y or Z, then

5    it's an easy case, that none of it gets in.  But to me, it's a

6    little bit more of a gray area between those two.  If they

7    don't testify, and if counsel simply is saying things like, to

8    an agent, *You don't have -- this exhibit doesn't say who*

9    *created the email account, does it*?

10        *MS. WEISS:*  Hm-hm.

11        *THE COURT:*  And things like that, trying to draw this

12   line, that you are suggesting I try to draw, seems very

13   difficult and not obvious, to me, that even someone with

14   experienced counsel would understand that they are walking that

15   line, when they agree to this, because it's just hard for me to

16   figure out a really principled distinction between some of the

17   things that you are asking me to distinguish.

18        *MS. WEISS:*  Well, the principle distinction that I

19   would argue here, Your Honor, is a defendant can't send out a

20   surrogate or an agent to go do something that the defendant

21   himself or herself could not do, right?  Without triggering

22   this waiver.

23        *THE COURT:*  Sure they can.  Defendants all the time

24   can send up a lawyer to say I'm innocent of a crime that they

25   know they are guilty of.

1        *MS. WEISS:*  But what they can't do is say that in the

2   face of a contract that they signed with the government where

3   they said, *I will not do that.  I'm going to tell you the truth*

4   *here today at this proffer session and I am going to be bound*

5   *by that truth*; that's the deal, that's the bargain that was

6   struck that day.

7        *THE COURT:*  All right.  Let me let your colleagues on

8   the other side respond.

9        *MS. WEISS:*  Absolutely.

10       *THE COURT:*  Thank you, though.

11       *MR. SCHALL:*  Your Honor, may I make a selfish request?

12  Pretty sure my daughter walked home from the bus stop at 3

13  o'clock, but I would really like a break to call her and find

14  out.

15       *THE COURT:*  Oh well, of course, yes.  I mean, if you

16  need to do more than make a phone call.

17       *MR. SCHALL:*  It would be five minutes, Your Honor.

18       *THE COURT:*  All right.  Okay.  Let's take a ten-minute

19  recess.

20       *THE COURTROOM DEPUTY:*  All rise.  Court is in recess.

21     (Recess at 3:05 p.m.)

22     (In open court at 3:18 p.m.)

23       *THE COURT:*  Please take your seats.  Ms. Hubbard,

24  looks like you are ready to go.

25       *MS. HUBBARD:*  I am, Your Honor.  On behalf of Ms. Tew,

1   I would like to point out and reiterate some of the points that

2   the Court started with, which is that, you know, we agree that

3   this document is a contract, and we think the parties should be

4   bound by its language, and we think the language here is

5   nowhere near as broad as the government would ask it to be

6   interpreted as.

7           As I put in the reply brief, the letter very clearly

8   makes a distinction between actions of you, which is me, in

9   this circumstance, being the person who represented Ms. Tew at

10  the time, versus actions of your client and Ms. Tew.  And the

11  sentence that I think is where everyone is focused here, talks

12  about what Ms. Tew does or doesn't do.  And, Your Honor, if the

13  government made the argument that if you don't interpret this

14  proffer letter the way they advocate, then you are effectively

15  upending the expectation of the parties, and I vehemently

16  disagree.

17          It's tricky for me to say too much more, given my

18  involvement, but I can tell you that the interpretation

19  advocated by the government does not comport with how I would

20  read this agreement, and over the last couple of weeks, in

21  beating myself up, maybe, for being -- anyway, I have conferred

22  with many others in the defense community, and I can tell you

23  that the feedback I received is that I haven't talked to a

24  single defense lawyer who reads the proffer letter the way the

25  government advocates.

1          And so, if the Court is inclined to go with the

2     government's interpretation, and find that the actions of

3     counsel through argument or Cross-examination can trigger the

4     waiver provision, then I would reiterate our request for a

5     hearing about the knowing nature of any waiver, and I don't

6     want to go too much farther into that, outside of a hearing.

7          THE COURT:  Okay.  Let me ask you, I mean, I don't

8     think I'm prepared to go quite as far as you think, and say

9     that nothing counsel does could trigger the waiver, but as, I

10    think, have been fairly clear, I do agree, it's problematic to

11    read the language as broadly as the government suggests, to me,

12    because arguing a position that you are not guilty when your

13    client has said, I think, actually used the word guilty.  In

14    the proffer, would, I think, under the government's reading,

15    trigger that.  I'm not willing to read it as saying you can't

16    argue that your client isn't guilty.  I certainly don't think

17    you can read it as saying that you can't argue that the

18    government hasn't presented it.

19         But let me just ask you, kind of, a question about the

20    hypothetical we get into a little bit with Ms. Weiss.  So, say

21    you asked an agent, *You don't know who created this email*

22    *account,* something like that, right?  I think that was the

23    hypothetical.  What if they do know who created it, because

24    they read the proffer?  They can't be expected to lie and say

25    *No, I didn't know about that*, right?  What do we do with that?

1          MS. HUBBARD:  Well, I think that would be a poorly

2    worded question.  I would anticipate the question being more

3    along the lines of, *This document, doesn't show you who created*

4    *the email address*, which I think an agent could truthfully

5    testify, *No, it doesn't*, right?  And that there's other

6    evidence showing, you know, subscriber information and backup

7    email accounts, and other circumstantial pieces that we might

8    point to, to suggest the evidence is not coming from our client

9    versus someone else.

10         THE COURT:  All right.  So say that's what happens,

11   you asked the better question, they then, on Redirect asked,

12   *How do you know this was created by Ms. Tew*?  Then what should

13   the agent say?  And wouldn't that be a fair question to ask?

14   Ask --

15         MS. HUBBARD:  I apologize.  I don't think it would be

16   a fair question, Your Honor, because it gets to the point that

17   you referenced earlier that there are -- this happens all the

18   time in cases where an agent, particularly a case agent, who

19   may have investigated the entire case and interviewed all kinds

20   of witnesses who aren't testifying, for various reasons, may

21   have knowledge about a fact that they are told by the Court or

22   told by counsel or whoever, that they cannot testify to, and

23   our clients signed proffer agreements, that are contracts with

24   the government, and those contracts say that unless they put on

25   evidence, make statements, that needs to be impeached by

1  something in the proffer agreement, that's the only thing that

2  constitutes a waiver.

3       So I think me asking a question, or certainly the

4  government asking a question on rebuttal, would not trigger the

5  waiver that would authorize -- the waiver that would authorize

6  them to use the proffer statements.

7       THE COURT:  Okay.  I think I interrupted you.  Did you

8  have anything else?

9       MS. HUBBARD:  Let me check my notes.

10       THE COURT:  All right.

11       MS. HUBBARD:  Your Honor, for purposes of allowing us

12  to adequately prepare for trial and avoid the need for, you

13  know, mid-trial substantive hearings, that would interrupt the

14  jury, our understanding is as I outlined in the reply brief,

15  that counsels' actions, through Cross-examination, opening

16  statements, closing statements, cannot trigger the waiver

17  provision in the proffer agreement, and if the Court is going

18  to deviate from that, we would renew our request, and ask for a

19  hearing on the knowing and voluntary nature of the waiver,

20  because I think there's a very real issue that goes to that.

21       THE COURT:  But that -- the -- that's based on your

22  contention that your client didn't know that this language

23  would be interpreted that way, not any kind of other, sort of,

24  coercion-type argument?

25       MS. HUBBARD:  It's really not a voluntariness issue.

1   It's really the knowing issue.  I think, under the cases that I

2   was reading, you know, the defendant has to understand the

3   rights they are giving up.

4         THE COURT:  Right.

5         MS. HUBBARD:  And I think if you are going to limit

6   how counsel can represent her, including through argument or

7   Cross-examination, then we need a hearing on whether or not she

8   knowingly waived these rights.

9         THE COURT:  Okay.  Thank you.  Did -- Mr. Schall, did

10  you have anything to add?

11        MR. SCHALL:  I don't know how much it adds,

12  Your Honor, but if I may.  I feel that it's relevant to point

13  out that where we sit right now is a -- perhaps, a novel issue,

14  because of the circumstances that precipitated it, and the vast

15  majority of cases where there's a proffering defendant, I mean,

16  we're talking upper 90s here, that case is going to resolve and

17  enter a plea agreement and this -- this language is never

18  aired.  It's never contested.  It's never litigated.  Well,

19  that's not the case here.  And it's even more of a morass,

20  because of the changing of attorneys, for Mr. Tew, for the

21  multiple nature of the proffers, for the spousal thing, it's

22  just messy, and because the defense -- our position is that it

23  constrains, obviously, to some extent, what can be done at

24  trial.

25        I think it would be appropriate to ask the Court, if

1    it is willing, given the nature of the novel issue, to provide

2    written guidance, an order, regarding the proffers, so that we

3    know what to do, and that it was clear that the guardrails, if

4    you will, are out there, and not to create more work for the

5    Court over the next six days that would -- it seems clear from

6    your ruling, Your Honor, that introducing contrary evidence,

7    testifying, easy, yes, but there's this -- there's this slice

8    that is iffy, that it would be nice to have something.

9         THE COURT:  Okay.  I understand the request.  It's not

10   unreasonable.

11        Why don't I let the government respond, briefly.

12        MS. WEISS:  Just very briefly, Your Honor.  What I

13   want to do is walk through three different examples of this

14   language by comparison.  The first example I'm going to take,

15   is actually from this Court's own order, on October 27th, 2022,

16   in relation to the order denying the motion for severance, and

17   on page six of that, there was a discussion about the proffer

18   agreements, which Ms. Tew brought up as a basis for severance

19   back in October of 2022.  And the Court issued a ruling on

20   that, and said, completely consistently with us, the government

21   is arguing here today, *The proffers are testimonial, given in a*

22   *formal capacity to law enforcement, and thus would be subject*

23   *to Bruton*; that was the context in which this issue was raised.

24   *However, the defendants have complete control over whether*

25   *their proffers can come in they can choose whether to present a*

1    *defense inconsistent with the proffers, and they can keep their*

2    *proffers out of the trial entirely.*

3        That's the government's own language, present -- I'm

4    sorry, the Court's own language.  Present a defense.

5        Now, let's turn to *Krilick*, which did, helpfully, have

6    the proper language at issue in that case cited in full, that's

7    159 F.3d 1028, 1998 Seven Circuit, that said, should the

8    defendant*, Krilich*, subsequently testify contrary to the

9    substance of the proffer, part one, should the defendant

10   testify or otherwise present a position inconsistent with the

11   proffer.  So, easy case, that we have been talking about, more

12   complicated cases that we have been talking about.

13       Now, let's turn to the language here.  In paragraph

14   one, *You and your client understand that false statements*

15   *willfully made during this proffer will negate the government's*

16   *agreement not to use this proffered information against your*

17   *client*.  No caveats there.

18       Now let's look at paragraph four, *The government may*

19   *use any statements made by your client during the proffer*

20   *either as evidence or for Cross-examination*.  So, either as

21   evidence or Cross-examination, *and at any other stage of the*

22   *criminal prosecution, if your client later testifies*, one, easy

23   case, offers other evidence, okay, puts new evidence up, in the

24   form of other witnesses, other documents or testimony in their

25   defense case or presents a position, including through

1    affidavit or in argument.  That's that third part here,

2    presents the position that is entirely consistent with

3    Your Honor's wording, in the order on the motion to sever,

4    presents a defense, entirely consistent with Krilich, presents

5    a position.  That's the only way a defendant, who is not pro

6    se, can present a position.  It's either testifying themselves

7    or making an argument through counsel.

8         THE COURT:  Right.  Exactly.  And so if they're going

9    to present a defense saying *I'm not guilty*, isn't that contrary

10   to what they admitted to in the proffers, and therefore they

11   can't present any defense.  Would be a much simpler way to

12   write a proffer agreement, if they're just not allowed to

13   defend themselves.

14        MS. WEISS:  Well, and that is part of the point,

15   right?  Is to box them into the statements they've said in the

16   past, and if they go against those statements, they have a

17   choice to make; that is the point of the agreement; that is the

18   leverage that the government brings to the table versus

19   refusing to have these meetings at all.

20        THE COURT:  Do you have any cases -- any cases you can

21   point to, to help me out?  Mr. Schall suggested this is -- I

22   mean, it's clearly unusual to get to this stage, with this

23   language, but you said this language is used in every proffer

24   session in this district.  Do you have some cases where you

25   have gone to trial, and the judges have just -- have ruled the

1   way you are suggesting?

2        *MS. WEISS:*  Yes.  Krilich is exactly one of those

3   cases, exactly one of those cases and so is *Barrow*, which is

4   quoted in our brief.  I apologize, I left my big binder back at

5   home, back there.

6        *THE COURT:*  So that's the Second Circuit case, right?

7   And that's the one that -- the one I cited to you with the

8   difficult name, distinguishes --

9        *MS. WEISS:*  Correct.  Okay.

10       *THE COURT:*  Okay.  Do you have anything else?  I

11  interrupted you again.

12       *MS. WEISS:*  My only point that I would make is that

13  these defendants are represented by very smart counsel, and you

14  saw Ms. Hubbard walk this line and understand where this fence

15  post is, perfectly.  Perfectly, up here.  And we contend that

16  they will be able to walk that line at trial.  If we think they

17  are getting close to it, we will call a sidebar, we will

18  address it in the moment, we will make an opportunity to have a

19  record on this so that the defendants can preserve this issue

20  down the line if they want to, but this is the deal that they

21  struck and they should be held to it.

22       *THE COURT:*  Okay.  Thank you.  All right.  So, I'm

23  going to -- I probably will try to give you a little bit of

24  written guidance, but just so you are aware, I think I have,

25  sort of, made my position fairly clear that the government is

1    right, that, in general, these are enforceable.  I don't think

2    we need an evidentiary hearing, because what we're talking

3    about is how to interpret this, what we have all agreed is

4    contractual language, and that's generally a legal question,

5    and I think my reading of that contractual language is not

6    quite as broad as the government wants it to be, but maybe not

7    as narrow as the position offered by the defense, that nothing

8    counsel can do could ever trigger this.  I do think the

9    language clearly says that, at least sometimes, argument being

10   presented on behalf of a defendant can trigger this.  On the

11   other hand, I think that's ambiguous enough, and the rights at

12   stake are important enough, that I'm going to read that

13   narrowly, and so, you know, if counsel says, instead of saying

14   *The government's evidence won't show this*, they say, *There's no*

15   *evidence*, I'm not going to read that as sort of opening the

16   floodgates to let everything that was said in the proffer in.

17   I'm going to err, to the extent I'm erring, on the side of not

18   allowing the proffers in, unless there's been a pretty clear

19   contradiction of factual statements, not just, sort of, general

20   statements, and so, to that extent, I will be denying these

21   motions, in general, but I will be policing this pretty

22   carefully, so that we're not going to be just any time the

23   government says or the defense counsel asks about a particular

24   type of evidence, that someone may have -- may have talked

25   about, that's not going to be enough to trigger it.  It's going

 1    to have to be a fairly clear contradiction of a factual

 2    statement, and not just a suggestion that there's not evidence

 3    or that sort of thing.

 4          So, that's where I'm going on that.  The proffers

 5    won't be let in as a blanket matter, and they won't be excluded

 6    as a blanket matter.  Obviously, if the defendants testify or

 7    they do offer up clear evidence that -- or offer up evidence

 8    that clearly contradicts -- is clearly contradicted by

 9    something in the proffers, those are easy cases.  If they are

10    simply making arguments in openings that the government can't

11    prove something or won't be able to prove something or their

12    evidence won't show, that's not going to be enough to trigger

13    these.

14          MS. HUBBARD:  Your Honor, before we move on from that,

15    may I ask one other question?  It is our view that a large

16    percentage of the proffers that could be offered against

17    Mr. Tew raise *Bruton* issues.  You know, this is not a case

18    where there's two friends who rob a bank together and you can

19    inculpate yourself without really touching on the other person.

20    This is a married couple, with joint bank accounts and shared

21    electronic devices that end up enmeshed with each other on

22    different cloud-based storage accounts.  It's just a lot

23    messier from a *Bruton* perspective than, I think, a lot of other

24    cases.  So one thing that I was thinking might be helpful to

25    avoid or to minimize the amount of distraction at trial, would

1    be for the government to identify what portion of the proffers

2    that they believe they maybe could elicit without running afoul

3    of *Bruton*, because I am not sure we're going to view the issues

4    the same as them, as far as what implicates *Bruton*, and if we

5    can have, maybe, some conferral prior to trial starting about

6    whether there are some things that wouldn't trigger *Bruton*

7    versus would, I think that could, potentially, be helpful.

8          THE COURT:  Okay.  I will let the government respond.

9    This did come up, to some extent before, but I admit I don't

10   remember exactly how we dealt with it.

11         MR. FIELDS:  Thank you, Your Honor.  It did come up

12   during the motion to sever.  I think we can work with defense

13   counsel, in the same way that they want us to identify

14   statements that we don't think are *Bruton*, it would be helpful

15   if they identify statements they feel are clearly *Bruton*.  The

16   Supreme Courts decision last term in *Samia*, I think, actually

17   provides good guidance on this.  I don't think *Bruton* is quite

18   as, sort of, rigid as they may have implied there, and so I

19   think that there are definitely ways in which we can admit

20   these statements that are going to satisfy *Bruton*.

21         THE COURT:  Okay.  That sounds like a good plan to me.

22   If you will confer between now and then, and we will find time,

23   if necessary, to discuss the places where you don't agree.  So,

24   thank you for bringing that up.

25         Mr. Tew also filed a motion in limine regarding the

 1   reasons for his firing.  Would you like to discuss that

 2   briefly, Mr. Schall?

 3        MR. SCHALL:  Your Honor, I believe it was actually

 4   Ms. Tew that filed it.

 5        THE COURT:  Yeah, you, you are right, Ms. Tew, but

 6   it's about Mr. Tew's employment.  I'm sorry.  Mr. Kaplan?

 7        MR. KAPLAN:  That was in response to the government's

 8   trial brief.  I don't know if you want to go through those

 9   issues, if there's any, and then -- or do you want to go right

10   to that one?  However the Court wants to do it.

11        THE COURT:  Ms. Weiss?

12        MS. WEISS:  I would suggest that we do this motion in

13   limine, since Your Honor has drawn a clear distinction between

14   a motion in limine, which is to exclude or include evidence

15   entirely, versus trial briefs, which are more to notify the

16   Court, and don't ask for a ruling.  I think the way this has

17   been teed up it needs to be handled separately.

18        THE COURT:  Well, I have got it next to my list, so

19   let's go ahead.  Mr. Kaplan.

20        MR. KAPLAN:  The only -- in the trial brief it says

21   that they wanted to introduce evidence of why Mr. Tew was

22   terminated, and then the question is raised whether it's

23   extrinsic or intrinsic in the evaluations of the 404(b) versus

24   the res gestae, the new language really leading towards

25   intrinsic and extrinsic, which I recognize, and our position,

1    listening to the government respond, is that his termination is

2    extrinsic to the case, and there was a mention, in this

3    paragraph, which is paragraph four, that they were talking

4    about some -- also some extracurricular activities and hobbies,

5    I think, is what were mentioned of Ms. Tew.

6        So, if what they're referring to is gambling and

7    cryptocurrency, I guess we need to know that, but as it relates

8    specifically to the termination, they didn't put in the

9    paragraph what evidence of the termination they want to

10   introduce, so that probably needs a little bit to be expanded

11   upon, and then depending on what that is, and I have a sense of

12   what it might be, I don't believe it's intrinsic to the case

13   and shouldn't come in, that's our position.

14       THE COURT:  All right.  Thank you.  Ms. Weiss.

15       MS. WEISS:  Very briefly, Your Honor.  This is

16   evidence that is intrinsic to the case, as Your Honor already

17   ruled, after the James hearing.  You know, it's very easy to

18   forget that we are living in the world of these facts and not

19   all of them are in front of Your Honor yet, but the termination

20   of Michael Tew was due to two separate events, both occurring

21   in early September 2018, kind of all around the same time

22   period.

23       So, first of all, he was stealing from National Air

24   Cargo, by using the corporate credit card between him and his

25   wife, both buying gift cards at five, six, seven-hundred

1   dollars a pop, over a six-week period of approximately July 18,

2   2018 to September 2018.

3          So, that was for the tune of about $45,000 in a

4   six-week period.  That credit card activity was discovered when

5   Amex contacted National Air Cargo to report suspicious

6   activity, and asked whether the card had been stolen, and

7   Michael Tew was confronted about that credit card activity at

8   the time.  He denied, candidly, that the card had been stolen.

9   He said that his wife had taken it, and that she had taken it

10  to buy these gift cards to pay off people that she owed money

11  to through speculative cryptocurrency investments.

12         Kimberly Tew was heard in the background of that call

13  and also got on that call, similarly admitted that she was

14  responsible for some of this, and admitted to using the poor

15  judgment, is way it was put.

16         Now, the evidence at trial will include employees at

17  National Air Cargo contacted some of the retailers and were

18  able to look at some of the surveillance footage and see that

19  yes, indeed, it was Michael Tew and Kimberly Tew using these

20  credit cards to buy all of these gift cards.  All right.  That

21  was point one.

22         Point two, relatedly, is the calls from an individual

23  who I'm going to use the name Craig Feigin, that's how this

24  person was identifying themselves, at the time.  So a person by

25  the name of Craig Feigin was contacting National Air Cargo's

1    headquarters and asking to speak to HR, management, et cetera,

2    et cetera, saying that Michael Tew and his wife Kimberly Tew

3    owed him money through cryptocurrency investments and that if

4    National did not pay that money, he was going to do stuff to

5    National.

6          This same individual contacted the owners of National,

7    Christopher and Lori Alf and their daughter and said they

8    would -- this person would put up naked photos of their teenage

9    daughter on the Internet if National did not pay off Michael

10   Tew and Kimberly Tew's debts related to this cryptocurrency

11   algorithm scam thing that Kimberly was running.  So that is why

12   Michael Tew was fired.

13         Now, when we look back at the *James* log, we see that

14   these events, that led up to Michael's termination were also

15   the same events that precipitated this fraud starting, and this

16   scheme to defraud that's described in the Indictment.  So, for

17   instance, we have *James* log entry, I guess it must have been 37

18   in the log, it's now 637 in the government's evidence, a

19   conversation between Jonathan Yioulos and Kimberly Tew, in

20   which Jonathan describes, *You guys are getting fucked by this*

21   *scumbag Craig Feigin?  You guys are being blackmailed, and you*

22   *would do anything to keep yourselves safe*.  So you will hear

23   Jonathan Yioulos testify at this trial that part of the reason

24   why he got into this, in the first place, is he believed that

25   the Tews were being blackmailed, and that he could help them,

1    sort of, on the back and on the sly, pay off this $45,000

2    credit card debt they incurred that he believed it incurred

3    because they were being blackmailed.

4         You will also hear, and it shows as you go through the

5    *James* lodge that Jonathan Yioulos will say that as time went

6    on, the Tews then started tell him that these same individuals

7    knew about his involvement, and would also be blackmailing

8    Jonathan Yioulos if he didn't keep sending these payments.  So,

9    this is a story that's sort of evolved over time, it's res

10   gestae to the entire fraud.  Over and over and over again in

11   the *James* log you see these issues of the Amex card and these

12   Craig Feigin calls come up or be referenced, and all of those

13   *James* log entries have already been deemed in furtherance of

14   the conspiracy.

15        So, this issue is settled, it is res gestae, did not

16   need to be 404(b) noticed, and it is timely.

17        Now, on the other end of the spectrum, this motion in

18   limine is not timely, and this is not a new issue, and once

19   again not something that hasn't been, sort of, briefed and

20   discussed and part of the background of this case as early as

21   those proffer statements, in which all of these events were

22   also discussed.

23        *THE COURT:*  So, your position is, these particular

24   facts provided the motivation, part of the motive, at least,

25   for starting this fraud that you have alleged, right, and that

1    makes them res gestae?

2         *MS. WEISS:*  It's all tied up.  Right.  The debt

3    started to be incurred before Michael Tew was fired, so they

4    first tried to cover up the debt to use the corporate credit

5    cards, then the calls started coming, he gets fired, now all of

6    a sudden he is no longer in debt, in trouble, doesn't have

7    access to that corporate credit card, he has lost his

8    legitimate source of income, which was like $500,000 a year.

9    So he is in a worse position than before, he is angry at this

10   company, it's all tied up together.

11        *THE COURT:*  The -- say it was -- well, but he hasn't

12   been -- the charges, themselves, don't relate to the credit

13   card; is that right?

14        *MS. WEISS:*  They do, and our intention is to use that

15   in a very minimal way.  We have noticed the credit card

16   statements that apply that show there's not really a better

17   document to show that it's five/six-hundred dollars at a time,

18   you know, every target in the entire Denver metro area, and

19   then very, very limited targeted testimony from relevant

20   witnesses about there was allegations that he stole from the

21   company through the credit card and allegations about these

22   calls coming in.

23        It is not our intention nor do we desire to make this

24   into a mini trial on other things.  We're just going to have to

25   provide the basic essentials of what you need to know, which

72

1    is, he got fired, he was stealing, it did have to do with this

2    cryptocurrency stuff, which again comes back around, when we

3    look at some of the other individuals, like a notice witness

4    who is the name behind one of these companies, that was

5    submitting false invoices, this person too was someone who

6    Kimberly Tew owed money through -- owed money to through this

7    cryptocurrency scam.

8         THE COURT:  I think my last question on this, say that

9    instead of misuse of a credit card or getting involved with

10   cryptocurrency people, who end up threatening your employer, it

11   was something really, you know really bad, that a defendant was

12   being blackmailed over, I don't know, sex abuse or something

13   really awful, would the analysis be any different for that or

14   is that a different rule?

15        MS. WEISS:  I think it certainly would be.  In that

16   instance we would be looking at a different 403 balancing test.

17   If we were talking about some allegation that was completely

18   separate and apart from what was discovered later on, two years

19   down the road.

20        THE COURT:  But it wouldn't be a 404 issue, it would

21   just be a 403, excluded under 403?

22        MS. WEISS:  That's correct.  At least in the example

23   that Your Honor just posed, absolutely.

24        THE COURT:  Okay.  Thank you.

25        MS. WEISS:  Yes.

1          THE COURT:  Mr. Kaplan, do you want respond?

2          MR. KAPLAN:  Just briefly, Your Honor.  This area of

3    in limine or not in limine, I think it's real cloudy now

4    because the government gets to determine in the first instance

5    whether it's just a res gestae, and raises it in something, and

6    now is suggesting that we don't have an opportunity to object

7    to it.  I think that the description that was just provided the

8    Court is clearly other act, bad-act evidence.  They can say

9    that he was fired, and therefore lacked, perhaps, a salary or

10   employment, but to go into something that's not part of the

11   scheme, was not charged, this is an invoice scheme, that

12   they're alleging, with parties outside of the company, started

13   inside the company then outside of the company, resulting in

14   fraudulent invoices that are paid by Mr. Yioulos.  And the fact

15   that they have -- now I think they are seeking to reconsider

16   that, I think it's that -- that *James* log entry, that there's

17   some conversation of the payment of a credit card, is clearly

18   more directed towards a bad act, that's not intrinsic to the

19   scheme and the prosecution in this case.

20          None of what they suggested, even the fact that this

21   Chris -- how do you pronounce his name?  Caused problems with

22   the company, by contacting them, because he thought he was owed

23   money by one or both of the Tews, is not part of the scheme

24   that they are prosecuting the defendants on, and what it ends

25   up being is more of a bad act coming in, demonstrating bad

1  character, suggesting to the jury that that's why they should

2  be convicted.

3      THE COURT:  All right.  Thank you.  So, I agree with

4  the government on this and will deny this motion.  The motive

5  for the crime, to me, is intrinsic to the crime itself.  The

6  reasons the defendants needed -- may have needed money are

7  directly connected and provide, at the very least, context for

8  the government's argument that they would do something

9  desperate to get money.  So, I don't think there's a 404(b)

10  problem here, and agree with the government on that.  So, I

11  will deny that motion, and then we can then turn to the rest of

12  the trial brief issue.

13      I have talked already about the Indictment, and we

14  briefly discussed the, sort of, questions about summary

15  testimony, and 1006.  I don't know, without knowing better what

16  everything is, if I can give any guidance, other than that I

17  think witnesses can, sort of, talk about their understanding of

18  the case, but there, obviously, is a line that the government

19  can't go over, that we may have to just police, but if there's

20  anything in particular you want to bring to my attention on

21  those sorts of things I'm happy to try.

22      Mr. Fields, do you have anything?

23      MR. FIELDS:  Thank you, Your Honor.  I mentioned this

24  briefly, but it really does come down to, sort of, trial

25  logistics.  There's a lot of bank records.  We have got

1    declarations.  I'm hoping for a ruling from the Court that they

2    are business records.  At that point, what we would propose to

3    do is have an agent who is going to say, *Here's the*

4    *corresponding bank statement.*  If the defense is right, that

5    the agent who doesn't have personal knowledge of the bank

6    statements would admit that, can't then, sort of, read or, sort

7    of, tell the jury which transaction is, sort of, at issue, this

8    trial is going to be really, really tedious.  I mean, we will

9    need some giant monitors up there for the jury to go through,

10   have to sort of poll them as to when they are done reading.

11        What we would propose and what I have done in every

12   other trial is instead, *Agent, here's the bank statement what*

13   *do you see on page three?*  They are able to read it.  Which is

14   good, not only for the jurors, but also for the appellate

15   record, because otherwise the transcript is a mess.  You just

16   end up with these giant blank spaces.

17        So if -- you know, we would seek some guidance from

18   the Court.  If the Court is inclined only to allow witnesses

19   with personal knowledge to talk about those things, then we

20   would need to call in those bank custodians.

21        The same is true with regard to the text messages that

22   we plan to admit.  If this theory is right, and there's no

23   cited rule of evidence, but I think the Court would have

24   discretion under 611 to do whatever it would like, it has vast

25   discretion over, sort of, the mode and presentation of

1     evidence, if the case agent can't read messages that are

2     admitted, let's assume they are, then the government again

3     would propose even bigger monitors, and it will take more time.

4     So we would file a revised witness list with a longer estimate.

5          THE COURT:  So taking that one first.  My

6     understanding is that what you are proposing on that is fine

7     and appropriate, and they can read the relevant portions or you

8     can ask them about particular portions of text messages that

9     are up there.  What I don't want, and what I don't hear you

10    saying is that you, sort of, put on a dramatic interpretation

11    of them, where some agent is saying, *Kimberly said this*, or

12    that's sort of thing, am I understanding you correctly, what

13    you are proposing?

14         MR. FIELDS:  Correct, Your Honor.  There's going to be

15    no opinion about it.  There might be testimony about

16    attribution and why, you know, there are certain things like

17    that, but certainly no lay opinions about what does this mean

18    or what does this say or anything like that.

19         THE COURT:  Okay.  So I'm inclined to allow, kind of,

20    that, and if it starts to turn into something else, I will

21    certainly entertain an objection or try to cut you off.

22         I also think that, as you pointed out, there wasn't

23    any specific objection, now that you have filed more

24    declarations, and so I think all of the things you have talked

25    about, in general, are -- I'm inclined to admit, with the sort

1    of caveats about Cross-examination or that we've talked about,

2    but I will let the defense respond.

3            MS. FROST:  May I approach, Your Honor?

4            THE COURT:  Yes.

5            MS. FROST:  Thank you.  I just want to make sure that

6    the record is very clear.  We conferred with the government a

7    little before the hearing today, but what we're objecting to

8    is, obviously, what the Court is addressing, interpretations of

9    texts, an agent providing their meaning their significance.  We

10   actually don't even think the agent should be to -- if the

11   government were to move such documents in through an agent, for

12   example, if they are in evidence, but that by blowing up

13   certain transactions on bank records or highlighting certain

14   language on text messages, that could be tantamount to

15   emphasizing certain pieces of evidence that the agent doesn't

16   have personal knowledge of, and testifying, more or less, and

17   so that's, kind of, our first objection.

18           I understand the Court just said that the government

19   is not allowed to have an agent providing meaning or context to

20   the communications that have been admitted into evidence.  I

21   wanted to address highlighting, and, kind of, let's say, bank

22   records for instance are in evidence, and they have come in

23   through a custodian, then the government brings them back up

24   through an agent, on the stand, and the agent -- they are

25   blowing up certain transactions, that, from our perspective, if

1    I could also speak with counsel -- speak for counsel, Ms. Tew,

2    in our -- from our perception that is improper, and that type

3    of emphasis and testimony shouldn't be allowed.

4         THE COURT:  Okay.  So, I mean, in general, I think I

5    disagree about that type of evidence that you trial lawyers

6    love to highlight things and have people underlining things,

7    and have your technicians do all of this great stuff.  It's

8    really impressive.  That happens all the time.  Now -- so that

9    I'm not inclined to say is not allowed.  It's a different

10   question whether then the highlighted documents become exhibits

11   that go back, that I'm more inclined to agree with.  Is that

12   what we're talking about?  Not become the evidence themselves?

13        MS. FROST:  I will break it down.  I apologize if I'm

14   not being specific enough.  Yes, agreed, that is one thing I'm

15   talking about, is highlighted bank records, texts going back to

16   the jury.  But I'm going back to even -- and I understand what

17   you are saying, of course, trial lawyers love their toys, if

18   you will, but when -- it's different in a criminal case when a

19   law enforcement agent is emphasizing certain words via

20   highlighting versus a civil case, that's about a breach of

21   contract, and the impact it can have on the jury just by

22   highlighting that alone if it's a law enforcement agent from

23   the FBI, for instance, the jury is going to have the

24   impression, because of who the witness is, and because it's a

25   criminal case, that if that word is getting highlighted on a

1    text, by a federal agent, that word is not only just important,

2    but probably means that these people are guilty, and so that's

3    the second category of highlighting I'm talking about in the

4    context of this trial.

5              THE COURT:  Okay.  Let me let the government respond.

6              MS. HUBBARD:  Briefly, Your Honor?

7              MS. FROST:  I apologize, I thought I was speaking to

8    Ms. Hubbard.

9              MS. HUBBARD:  She was, for the most part.  I would add

10   to what Ms. Frost has said, is where a witness who is on the

11   stand has personal knowledge of something related to that

12   document.  So again, if we go to the civil context, we're

13   talking about a breach of contract, you have one of the two

14   signing parties or someone involved with execution of the

15   document and you blow up provision number two, and you want the

16   jury to see it very carefully, because this witness is going to

17   tell you what provision number two means to them, and that's

18   exactly why, in this context, where it's the government agent

19   who will have sat here through the entire trial, and advise the

20   prosecutors, and who will testify that they are the lead agent

21   on the case, why it's so damaging to have the government blow

22   up a piece of a bank record and highlight that to the jury,

23   and, Your Honor, I don't know if you have a copy of the

24   government exhibits, but I can give you this one, it's 10-19

25   but there's a series of them, where the government has bold and

1    highlighted and copy and pasted things from documents in a

2    way -- with the Department of Justice seal on it, that they are

3    intending to walk through with Agent Palmer at the close of

4    their case, and I think -- you know, I don't believe they are

5    intending to introduce this, and for it to go back to the jury,

6    but they are intending to spend six hours, I think is the

7    estimate, five hours, not including Cross-examination, with

8    Agent Palmer, walking through department of justice documents

9    that are just clipping things, and I think that's where our

10   objection lies, is the documents say what the documents say.

11   Will it make for a boring trial?  Yep, it's a white collar,

12   criminal case in federal court.  It will be a boring trial.

13        I had the unfortunate benefit of sitting through three

14   chicken trials, that were exceedingly boring, where the

15   government had to just put a communication up, and the jury

16   read it, and then in closing statements, the government argued

17   how the jury should interpret those things, and in closing

18   statements defense counsel argued how the jury should interpret

19   those things, that's perfectly appropriate for argument by

20   counsel, it is not appropriate for testimony from a government

21   agent.

22        THE COURT:  Okay.  Let me get the government's

23   response.

24        MR. FIELDS:  Your Honor, I agree with Ms. Hubbard, it

25   would be inappropriate for an agent to get up there and talk

1    about the meaning of, sort of, a bank transaction.  So I think

2    actually maybe there's a little confusion about exactly what's

3    going to happen.  As I would propose, the agent is going to

4    say, *Let's turn to Government's Exhibit 247, it's a bank*

5    *record.  What do you see there on March 19th*?  And then you can

6    zoom in and you can see the transaction, and the agent can

7    read, *$45,000, NACH*, *comes from National Air Cargo*, but she

8    doesn't even need to say that, it can be *NACH*.  What do you see

9    happens afterwards?  *Transfers to Kimberly Tew*, which are

10   clearly listed in the bank record.  She doesn't need to say

11   about the meaning; doesn't need to talk about the banks; she is

12   just, actually, sort of, an avatar for the jury to sort of see

13   the document in a way that is easy.

14        The slides that Ms. Hubbard was just showing, in

15   advance, to help streamline the trial, instead of having to

16   pull up every exhibit, piece-by-piece, we have done that in

17   advance, right, with the highlighting.  That's a 611 Exhibit,

18   it doesn't go back to the jury.  The underlying bank record is

19   the evidence.  Same with, you know, the text messages, if they

20   are offered, right?  The underlying text message goes in, the

21   agent can read the exhibit, if it's admitted, because it is in

22   evidence, but doesn't need to talk about its meaning.  So if

23   there's, sort of, a weird phrase that's used or some sort of

24   slang, the agent, who doesn't have personal knowledge, isn't

25   going to say, *Well, I think this means X*.  The document speaks

1    for itself, but you need someone to actually read the document

2    to the jury.  So I think as this argument has, sort of, been

3    distilled, there's a little bit of agreement.  If there's

4    potential disagreement, it would be with this really broad

5    principle that any time there's a federal agent up there,

6    there's some sort of imprimatur to the agent.  Taken at its

7    broader, that would mean no government agent could testify,

8    which is just not the law, and you would fully expect, if they

9    want to offer a jury instruction, the law enforcement witnesses

10   are no different than any witness, we wouldn't object, that's a

11   standard Tenth Circuit instruction and the government wouldn't

12   suggest otherwise.

13            THE COURT:  All right.  Thank you.  So, given the

14   government's representation that seems consistent with the

15   rules and appropriate.  Obviously, there may be lines that we

16   have to keep an eye on, but in general, highlighting and

17   summarizing things in different exhibits, especially if they

18   are not going to go back to the jury, is fair and appropriate

19   to do, whether the witness is a law enforcement official.  I

20   think we probably will include that sort of instruction, and

21   so, obviously, if there's specific instances where cross that

22   line, we can deal with that, but in general, I will agree with

23   that.

24            I would like to discuss a little bit the -- the issue

25   of possible use of suppression hearing testimony.  Just -- I'm

1    not totally sure what we're talking about there, if you would.

2         MS. WEISS:  Thank you, Your Honor.  This is something

3    that was brought up in our trial brief, and frankly is similar

4    to and in this case an outgrowth of the proffer issue and

5    therefore here I am back again.

6         So, as to the specific evidence that we're talking

7    about here, prior to the motions to suppress on three of the

8    email accounts, the defense needed to make a representation in

9    order to obtain standing for that issue, and so they did not

10    submit a sworn affidavit, at that time, and again we're talking

11    about prior counsel, and again, while Michael Tew and Kimberly

12    Tew were represented by the same counsel, in that case I

13    believe it was Peter Bornstein, and if we look at the filings

14    on that, Mr. Bornstein, in his reply, in response to the

15    government's argument that there need to be sworn testimony

16    about standing, in order to open this up, Mr. Bornstein,

17    instead, submitted a reply brief where he said that Kimberly

18    Tew used and created the CR email address and MCG email

19    address, those were two of the companies that submitted false

20    invoices, and Michael Tew did the same, with regard to one

21    other email address, and they had to make those admissions in

22    order to bring the motion to suppress, because otherwise they

23    wouldn't have had standing.

24         Now, the Court credited that, at its word, and did not

25    reach standing issue, at the time, and instead, addressed the

1   motion to suppress on the merits, which is fine, but it also

2   now leads us back to another place where, turning back to the

3   proffer language, we have statements that were directly

4   contradictory to things that were said in the proffers, and so

5   it would be our position that, once again, the fairest thing

6   here, in the best light, is sanitation of the facts, which is

7   bring everything in, I think we can do that in a very limited

8   fashion, that just says on X date, Kimberly Tew admitted to the

9   use or creation of this email and we can cite directly to, you

10  know, the language in that filing.  I think we can make it

11  very, very brief, and again just for impeachment purpose and in

12  a very limited fashion.

13          THE COURT:  So just for impeachment purposes?

14          MS. WEISS:  Correct, yes.

15          THE COURT:  So, this would only come up if the

16  defendants, themselves, testify; is that right?

17          MS. WEISS:  I believe it would come up if there was

18  any sort of argument, Cross-examination, presentation that --

19          THE COURT:  Who are you going to impeach about an

20  argument?

21          MS. WEISS:  I believe on rebuttal we could ask -- I

22  believe the Court would probably be the right person to ask for

23  that reading from, but if on a Cross-examination question or

24  argument in closing arguments for instance, someone says

25  something like Michael Tew and Kimberly Tew did not create or

1    use these email addresses, then the Court could instead read a

2    short statement that says, *This is a fact of the case*, *on this*

3    *date, Kimberly Tew admitted to the Court that she used that*

4    *email address*.

5        THE COURT:  All right.  I don't think I'm going to do

6    that, but I may let you use it for impeachment, actual

7    impeachment of a witness who says something contrary, but I'm

8    not inclined to do that.  I don't like the idea, and I don't

9    know that we have any Tenth Circuit authority that statements

10   made in briefs on suppression are admissible automatically.

11       MS. WEISS:  And admittedly, this isn't perfect, the

12   cases that we cited were witnesses that testified in both

13   proceedings, this is why the sworn affidavits are important,

14   because then we have a document that we could impeach with, but

15   here we are, so, thank you.

16       THE COURT:  All right.  Thank you.  Defense want to

17   respond on that?

18       MS. HUBBARD:  Your Honor, I think there's a wild

19   difference between a statement made by my client personally, in

20   a proffer session, where she understands that it's being

21   recorded and whatnot, and a statement made by her lawyer, in a

22   brief, while she is represented at the same time as her

23   husband.  I think there's just -- or by the same lawyer as her

24   husband.  I think there are a lot of complicating factors in

25   that situation that take this even farther afield than we were

1    on the actual proffer statements issue.

2          So, Your Honor, I would just ask the Court to rule

3    that statements made by counsel, that counsel attributes to my

4    client, are not admissible.  And to another point, it feels, to

5    me, like kind of maybe underneath this is like an estoppel

6    argument, right?  If you make a representation at some point in

7    the case, you can't change it later, and my not recent

8    understanding of that case law is that estoppel argument

9    applies when you win an issue.  So if my client had said, *I'm*

10   *responsible for these two email accounts*, and the Court had

11   ruled, based on the representation, I'm not going to allow

12   evidence from these two email accounts, she could not then turn

13   around and change things, her position to her advantage.  But

14   my understanding is that the Court did not rule in favor of the

15   defendants.  I was not on the case at the time, but that

16   evidence from these email accounts will be presented, and so I

17   don't think from an estoppel perspective, there's a fairness

18   issue there.

19         THE COURT:  All right.  Thank you.

20         MS. FROST:  Just real quick, Your Honor.  This

21   argument relates to Ms. Tew, not really Mr. Tew, but certainly

22   to the extent that there's a joint trial here, involving two

23   defendants who are a married couple, there is that natural kind

24   of prejudice and concern about guilt by association, and so I'm

25   just making the record that certainly that nothing that

87

1   Ms. Tew's counsel said in a pleading, in order to preserve a

2   suppression issue for Ms. Tew, should prejudice Mr. Tew, if

3   that makes any sense?

4        THE COURT:  Okay.  It does.  Thank you.

5        MS. FROST:  Thank you.

6        THE COURT:  So my feeling on this is that I'm not

7   going to allow the government to just introduce this, sort of,

8   in their case in chief or even go so far as Ms. Weiss

9   suggested, that if anybody says something contrary to that

10  position, will go back to this filing.  I'm not willing to do

11  that.  I do think it could be used, potentially, as

12  impeachment, since it's a filing that was made in this court,

13  in an effort to have this court rule in a particular way.  I

14  think it's not unfair or inappropriate to rely on that as the

15  equivalent as a sworn statement.  I'm not going to allow it in

16  just, sort of, a more general matter.  It would have to, I

17  think, probably be only if Mrs. Tew were to take the stand and

18  said something to the contrary, then it could potentially be

19  used for impeachment, and if that occurs then we can discuss

20  it, at that point, but I'm not going to let it in otherwise, I

21  don't think.

22        I guess -- so, we've talked about the issues

23  surrounding 404, with the potential reasons Mr. Tew may have

24  been in need of money.  There's also the issue of how much the

25  parties will be allowed to get into Mrs. Tew's potential

1     gambling, and to me that's related to this issue of a duress

2     defense, and so I would, kind of, like the parties to discuss

3     how those things intertwine.  My general feeling is probably

4     that it all -- it all likely comes in the -- not all

5     necessarily, but the basic discussion of gambling debts and

6     other potential debts, as I said, seems relevant to the motive

7     for the crime and is likely admissible for that, among other

8     reasons.

9          On the flip side, if the defendants are able to

10    present evidence of duress, I don't see why that would be

11    excludible.  So that's, kind of, my thinking on both of those.

12    Maybe I will ask the government to kind of present their

13    position, first.

14         *MR. FIELDS:*  Thank you, Your Honor.  When it comes to

15    duress, the issue would really come down to, have they

16    presented enough evidence in the record to get the jury

17    instruction?  And one of the elements of duress would be that

18    there was a lack of a reasonable lawful alternative, and I

19    think it would be very difficult to show that you needed to

20    commit fraud for two-and-a-half years and steal $5 million?

21    You had no other alternatives?

22         So, I think as a matter of law, duress defense would

23    be difficult, but we can see how the evidence comes in, and it

24    would just be a matter of, have they met those elements, or at

25    least established enough to establish that affirmative defense.

1          THE COURT:  Okay.  That makes sense to me.  All right.

2     For the defendants?

3          MR. KAPLAN:  I think the only thing that I will raise

4     right now, I understood the Court's ruling, when it comes to

5     the cryptocurrency evidence, that the government may or may not

6     introduce, there was a reference, I believe, in the log --

7     excuse me -- in the trial pleading, talking about unwitting

8     investors.

9          THE COURT:  That stood out to me as, potentially,

10    problematic.

11         MR. KAPLAN:  I'm raising, you know, at least some

12    caution, because then we're back into a question of whether

13    that is probably 404(b) issues or 403 issues.

14         THE COURT:  Yeah.  That's a good question that I had

15    too, about what -- characterizing people as investors makes me

16    sort of -- I hadn't thought about it that way, at least,

17    before.  Go ahead, Mr. Fields.

18         MR. FIELDS:  Your Honor, I think what you will see in

19    the way the evidence will come in, is the Tews certainly owed

20    debts to other people, and one of the things that they did to

21    pay those debts was steal money from National Air Cargo.

22    There's plenty of references to that.  I don't think we have to

23    characterize the investments.  We certainly wouldn't do that.

24    It's not characterized in the text messages themselves, right?

25    So, coming back to this issue is the agent going to, sort of,

1   ascribe meaning when Kimberly Tew says, I owe, say, one of the

2   individuals mentioned in the text messages is Craig Warner, and

3   you can see in the bank statements, sure enough, she pays the

4   person right after getting money from National Air Cargo.  We

5   don't need to characterize, like, was that a legitimate

6   investment?  How is it going?  All it comes down to is that is

7   the flow of money, which is certainly relevant how they are

8   spending the proceeds.  What they are doing with it.  We don't

9   need to get into was it lawful or anything like that.  So, I

10  think there's a way to accurately portray all of that in court,

11  without implicating 404(b) or 403.

12          THE COURT:  Okay.  Thank you.  Anything else on these,

13  from either defendant?

14          MR. SCHALL:  No, Your Honor.  I don't believe we have

15  presented a duress instruction as part of the initial packet.

16  If that changes, we just ask the ability to offer it at the

17  time, where there might be a case for it?

18          THE COURT:  Yeah, of course, that's fair.  Okay.

19  Given those representations, I will hold the government to,

20  sort of, not turning this into some, sort of, you know,

21  securities-fraud-type case.  I don't think we need to do that.

22  But the basic points, I think, we've ruled on, are generally

23  going to be admissible about the motivation and the potential

24  debts.

25          The government also asked for reconsideration of log

1    entry 37.  I think they are right that that was just included

2    incorrectly, but -- excluded incorrectly, but if anyone has a

3    specific response on that, and then I may as well have the

4    government discuss the other two statements, and why you think

5    it's appropriate to include those, even though they were not on

6    the original log?

7              MR. KAPLAN:  Did you provide those statements to us?

8              MR. FIELDS:  They are on our exhibit list.

9              MR. KAPLAN:  With the exhibits.

10             MR. FIELDS:  You have all of the exhibits.

11             MR. KAPLAN:  I haven't looked at it, Your Honor.

12             THE COURT:  Okay.  Well, why don't you just explain

13   what we're talking about, Mr. Fields, then we can see if we --

14   what we need to do about it.

15             MR. FIELDS:  Thank you, Your Honor.  So, with respect

16   to Government's Exhibit 637, yes, the government would like to

17   admit that one.  We don't believe it's barred by marital

18   privilege.  These other two are identified in the government's

19   *James* log, sorry not *James* log, exhibit list, which tracks the

20   *James* log pretty extensively, towards the end.  They are

21   Government's Exhibits 989 and 990.  So, we are talking about

22   two additional text message exchanges that were identified by

23   the government that relate specifically to counts of the

24   Indictment.  They were inadvertently not included in the *James*

25   log.  The government would ask for leave to still include them,

1    and from finding of the Court that they are in furtherance.

2         Here's what I will say about that, in terms of *James*,

3    *James* is not an exclusionary process, right?  The purpose of a

4    *James* hearing is for the Court, under Rule 104, to make those

5    preliminary findings as to whether or not there was, indeed, a

6    conspiracy, and were these statements in furtherance?  The

7    Court has already concluded, by at least a preponderance of

8    evidence, that there is sufficient evidence to show that there

9    was a conspiracy.  So then it comes down to those two

10   individuals statements, were they in furtherance?

11        The way I would propose doing this, is that the

12   government can offer those exhibits, the defendants, if they

13   think they are not in furtherance, they can object, at that

14   time, and I am willing to bet by the time we get to that stage

15   of the trial, the Court will be more than well informed as to,

16   sort of, the nature of the conspiracy, can make a decision then

17   as to whether or not it was in furtherance, which is kind of

18   the way it's done in almost every other Circuit.  When I was in

19   Brooklyn and/or Miami, that's, sort of, how it was done.  You

20   wouldn't have the *James* hearings in advance, you would just

21   hear the evidence and the Court would know, *Okay, yeah, I think*

22   *it's in furtherance*.  So, that's the procedure that we propose

23   here, and those are those two exhibits.

24             *THE COURT:*  Okay.  All right.  Thank you.

25             *MR. SCHALL:*  Your Honor, would it be too much to ask

1    for a notice, a flashing light, that this is the *James*, the not

2    priorly admitted statement before you do it in court?  I mean,

3    even if Mr. Fields just comes over and tells us, *Hey, this is*

4    *this*, would that be too much to ask?

5          *THE COURT:*  Yeah.  I mean, I think that would be

6    appropriate that -- I mean they are on the list, but have they

7    seen the actual exchanges?  These are text or email exchanges;

8    is that right?

9          *MR. FIELDS:*  They are text exchanges.  All of these

10    exhibits have been provided to defense counsel.  They were

11    provided last Friday if not before then.

12          *THE COURT:*  Okay.  So you have them.  I think you said

13    they are 989 and 990, if I wrote that down correctly?

14          *MR. FIELDS:*  That's right.

15          *THE COURT:*  All right.  So, I'm not going to rule on

16    that, for now.  I will let you look at it, and we can discuss

17    it, either Monday or whenever the appropriate time comes up.

18          So, a lot of the other things in the trial briefs had

19    to do with not harassing witnesses and things like that,

20    obviously, other than saying don't harass witnesses, I can't

21    give a lot of specific rulings on that, but, you know, I

22    think -- I think counsel is -- understands their obligations

23    here.  So I doubt I will need to do that.  There are going to

24    be things that I'm sure will make some people uncomfortable,

25    and that they don't want to testify about, and obviously, if it

1   gets too far into that, and away from actual material relevant

2   information, I will stop it, but, in general, a part of the

3   deal is people have to answer uncomfortable questions,

4   sometimes, when they are a witness in a trial.  So I can't make

5   a sort of firm ruling, one way or the other on that, other than

6   I expect counsel to act professionally and I'm sure they will.

7           It then, sort of related to that, is everybody else's

8   conduct, including witnesses and the parties.  I think there

9   was a discussion before about maybe -- or there was a previous

10  hearing, that jury being able to see one of the defendants

11  screens, I think, you know, you probably don't want that

12  anyway, so be careful.  If we have to rearrange.  And then,

13  just everyone has to, sort of, allow the evidence to speak for

14  itself.  You can't be trying to undermine witnesses by our

15  behavior in the courtroom, and I know this is going to be a

16  stressful, difficult process for everyone, but, you know, if

17  people appear to be trying to send messages to the jury or to a

18  witness or anyone else, in an inappropriate way, we will have

19  to put an end to it, and that's not a pleasant process.  So I

20  hope everyone will take that to heart, that includes, sort of,

21  nonverbal communication or outbursts or anything like that as

22  is inappropriate, and I really hope everyone will avoid that.

23          I think I mentioned my plan is to try to get you our

24  draft of the final jury instructions.  Obviously, you can't

25  make all of the final decisions about them until sometime

1   during the trial, but I'm going to try to get those to you,

2   tomorrow, just so you can see them, and then we can at least

3   have an idea of whether there are major issues we still have to

4   hash out or not.  I'm going to try, on most of the things that

5   we discussed today, that I can get you any written guidance, to

6   try to do that, may not be tomorrow, but Thursday or something,

7   just brief explanation of my orders on all of these things.  I

8   mentioned I'm going to keep thinking about the continuance, but

9   I would not -- don't count on it, prepare -- plan to prepare

10  for trial on Monday.

11          Speaking of highlighting and all of the other

12  technology, make sure you prepared and discussed any of the

13  technology with Mr. Keech, before we start.  I think for voir

14  dire, I may either move the table or at least kind of put the

15  screen away, and turn the podium so you are facing the jurors,

16  but otherwise, we will keep it like this.

17          Don't walk around, partly that's, you know for me,

18  we're not -- it's not a T.V. show, but more it's for the court

19  reporter, who relies on the microphones to hear everything, and

20  so try to stay at the podium, if you would.

21          Are there any other issues the parties wanted to

22  discuss?  Mr. Fields, anything?

23          *MR. FIELDS:*  No, not from the government, Your Honor.

24  Thank you.

25          *THE COURT:*  For the defendants?

1          MS. FROST:  Two quick things, Your Honor.  The first,

2     although I'm very new to this case, I'm familiar that the

3     policy during trials in this courtroom is generally no coffee,

4     and I want to see if that's changed at all or if it remains the

5     same?

6          THE COURT:  That is the policy, even I don't bring

7     coffee up here in the courtroom, and my other warning, nobody

8     here seems to have -- you may have told everybody, Ms. Frost

9     about this, the other thing I don't like are the metal -- oh

10    yeah, see ... you are new too.  Those are actually -- they just

11    are loud when you set them down, and so if you can bring a

12    plastic one or I should probably get something better than my

13    paper cups, but, you know, it's not a rule.  Try not to bring

14    coffee, partly because, just if you spill it will turn into a

15    big fiasco, and I don't want to deal with that.

16          So, drink your coffee before and during the breaks,

17    and don't bring it in here.  I took down the signs about not

18    putting your briefcases on the tables, but, you know, you do

19    need to be careful.  Sometimes, if you have a phone or a

20    computer too close to the microphones, it can start playing

21    some weird feedback on the speakers.  So try to keep your

22    electrical equipment away from the microphones, which are

23    basically live all the time, so be careful.

24          Any -- I think was -- that was your first.

25          MS. FROST:  That was the most important question,

97

1    again.  I just wanted to make sure that the rules hadn't

2    changed, and I set up Ms. Hubbard with that metal bottle.

3            *THE COURT:*  You have been quiet with it, it's okay.

4            *MS. FROST:*  The second issue is a quick scheduling

5    thing about my schedule.  Can I confer with the government

6    really quick before I -- because I don't know that I want to

7    talk about it on the record.

8            (Discussion off the record between counsel.)

9            *MS. FROST:*  Your Honor, can I go off the record and

10   just talk about a scheduling thing?  It relates to another

11   case.

12           *THE COURT:*  Okay.

13           *MS. FROST:*  And the fact that I'm doing it is work

14   product, technically.

15           (Discussion off the record.)

16           *MR. SCHALL:*  Anticipating that openings happen on

17   Tuesday, that's my assignment, and the first witness or two are

18   also my assignment, with respect to Ms. Frost, and her

19   extraordinary abilities, we will miss her, but not entirely

20   necessary.

21           *THE COURT:*  It's okay, it's fine with me, I

22   understand.

23           *MS. FROST:*  I appreciate.

24           *THE COURT:*  You are welcome.  All right.  That's all I

25   have.  I will, I guess, just one more time, urge the parties to

1    make sure this is what they want to do.  I know the defendants

2    both made proffers.  I know the government, at one time at

3    least, had an offer on the table about a reasonable -- what

4    they thought at the time was a reasonable resolution of the

5    case.  I don't put pressure on anyone one way or the other, I

6    try to uphold everyone's rights to a fair trial, as best I can,

7    but trials are unpredictable and difficult, and I have told

8    this story before, at some point, lawyers, in particular, I

9    think, but parties too, can sometimes get a little too

10   convinced with how great our arguments and our positions are.

11   And it's very easy to start believing nobody could disagree

12   with your position.  Story I have told, this was in the context

13   of a civil case, where we were going to have a jury of nine

14   people, and so the parallel was better, but I argued a couple

15   of cases in the US Supreme Court and I remember after spending

16   months on these cases, walked out, and the whole team from this

17   was at the Attorney General's Office, the whole team is just,

18   *This is so great.  We're going to win this case.  You did such*

19   *a great job.  This is just -- we're going to win*, and then a

20   couple months later I lost nine nothing, and the nine justices

21   of the Supreme Court are a lot more predictable in how they're

22   going to rule than jurors, than 12 members of this jury in this

23   case, and it's just unpredictable, and so, I just urge you,

24   again, to think back -- to go back and take as objective a look

25   as you can at your own position and whether that's really

1    what's necessary for your client, for yourself, and I won't be

2    offended if we have put in all of this work and you decide to

3    go back to resolving it some other way.  I do think there's a

4    risk for everybody in a trial, and I hope everyone thinks that

5    through, and takes positions that are truly in their best

6    interests, but assuming that we do go forward, I will see

7    everyone at 8:30.

8            You can expect some written orders from me over the

9    next couple days, along with the proposed jury instructions,

10   and otherwise, I will see you on Monday morning.  The Court

11   will be in recess.

12           THE COURTROOM DEPUTY:  All rise.  Court is in recess.

13       (Recess at 4:38 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

**REPORTERS' CERTIFICATE**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Dated at Denver, Colorado, this 2nd day of February, 2024.

_____
Tammy Hoffschildt, FCRR,CRR,RMR